-Fee Paid
- B/O

FILED

CLERK, U.S. DISTRICT COURT

06/30/2026

CENTRAL DISTRICT OF CALIFORNIA

BY_____bom_____DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM


Barinder Singh Bal
4460 W. Shaw Ave. #426
Fresno, CA 93722
Telephone: (559) 962-4828
Plaintiff in Pro Per

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

**BARINDER SINGH "NABE" BAL,**
                  Plaintiff,
     v.

**TAN TRAN, an individual; VEMANTI GROUP, INC.,**
**a Nevada corporation; and DOES 1 through 10,**
**inclusive,**
               Defendants.

Case No. ___2:26-CV-07187-CV-KES___

# COMPLAINT FOR VIOLATIONS OF FEDERAL

# SECURITIES LAWS, CALIFORNIA SECURITIES

# LAWS, AND COMMON LAW

# DEMAND FOR JURY TRIAL

Plaintiff Barinder Singh "Nabe" Bal, appearing pro se, alleges as follows:

## I.  NATURE OF THE ACTION

1.     This is a federal securities fraud action brought by Plaintiff **Barinder Singh "Nabe" Bal**

("Plaintiff" or "Bal") against Defendants **Tan Tran** ("Tan") — the founder, Chairman of

the Board, President, and (at all times relevant to this Complaint) Chief Executive Officer,

and through September 7, 2021 also Chief Financial Officer, of Vemanti Group, Inc. — and **Vemanti Group, Inc.** ("Vemanti" or the "Company") (collectively, "Defendants"). Vemanti is a Nevada corporation whose common stock has at all relevant times been publicly quoted on the OTC Markets under the ticker symbol "VMNT." Vemanti's principal executive offices are located at 7545 Irvine Center Drive, Suite 200, Irvine, California 92618, within Orange County and within the Southern Division of this District.

2. This action arises from a documented and continuous scheme of market manipulation, securities fraud, material-fact misrepresentation, undisclosed insider selling, and concealment, conducted by Tan personally and on behalf of Vemanti from approximately the third quarter of 2020 through March 24, 2022 (the "**in-scope period**"). The scheme included two discrete and parallel insider-selling cycles — the first during the third quarter of 2020 (the "**Cycle 1**" or the "**Q3 2020 Cycle**") and the second during the first quarter of 2021 (the "**Cycle 2**" or the "**Q1 2021 Cycle**") — together with continuing periods of concealment, oral denials of selling, and induced reliance that bridged and followed those discrete selling cycles, including throughout the second quarter of 2021 ("**Q2 2021**"), during which Plaintiff continued to purchase Vemanti common stock in justifiable reliance on Tan's ongoing oral denials and concealment. The scheme was perpetuated and ultimately memorialized through Vemanti's Annual Report on Form 10-K filed with the U.S. Securities and Exchange Commission ("SEC") on March 24, 2022 (the "**Cycle 3**" or the "**FY2021 10-K**").

3. In each of Cycle 1 and Cycle 2, Tan secretly sold exactly 650,000 shares of his Vemanti common stock from his personal beneficial holdings (a total of 1,300,000 shares across the two cycles), while simultaneously transmitting to Plaintiff — a Vemanti shareholder (both

before and during the relevant period) and the contracted social-media advocate of the Company under a written Consulting Agreement — a coordinated and recurring series of (a) specific factual misrepresentations regarding the status of pending corporate transactions, (b) specific numerical price-band directives instructing Plaintiff to support Vemanti's stock price within stated ranges, (c) explicit articulations of manipulative purpose tied to influencing third-party transaction counterparties, and (d) affirmative oral denials of selling activity that were materially false against Vemanti's contemporaneous quarterly disclosure record. The 650,000-share sale volume is identical across both cycles, to the share.

4.     On **September 22, 2020 at 7:45 p.m. Pacific Time**, during the Q3 2020 secret-selling window, Tan transmitted to Plaintiff via WhatsApp a written instruction stating: "*I'm in the middle of closing the gold deal and they're watching our stock. We need to keep it between 0.35-0.40 so we can keep them excited.*" (Exhibit I.) That single message contains, in writing, every element of a Section 9(a)(2) and Rule 10b-5 manipulation case: (i) a present-tense factual representation about deal status (later proven false — no "gold deal closing" ever materialized publicly); (ii) a specific numerical price-range directive ($0.35–$0.40); and (iii) an explicit articulation of manipulative purpose stated in writing ("keep them excited").

5.     On **February 12, 2021 at 9:11 a.m. Pacific Time**, during the Q1 2021 secret-selling window, Tan transmitted to Plaintiff via WhatsApp a materially identical written instruction stating: "*We need to keep her stable at $1.50 if possible....impacting deals we're working on.*" Approximately three days earlier, on **February 9, 2021 at 11:46 p.m. Pacific Time**, Tan had transmitted a related instruction stating: "*We just need to hold her steady for*

*the next 2-4 weeks*." (Exhibit I.) Each Cycle 2 directive paired a specific numerical price target with explicit articulation of manipulative purpose tied to deal-counterparty influence — the same playbook deployed in Cycle 1, six months later, with the same volume of concealed insider selling.

6. Plaintiff justifiably relied upon, was deceived by, and suffered substantial economic damage as a direct and proximate result of, Defendants' conduct. In aggregate during the in-scope period, Plaintiff (a) deployed over **$500,000** of his personal capital to purchase Vemanti common stock, (b) sold only a small fraction of, and retained the bulk of, his then-existing Vemanti positions, declining to liquidate into then-prevailing prices that were artificially supported by Tan's manipulation directives and Plaintiff's own induced bid-side trading, (c) forewent substantial trading profits otherwise available to him on contemporaneously-traded positions in other securities, in an amount to be determined through discovery and expert analysis, and (d) provided to Vemanti, without compensation, more than eighteen (18) months of substantial promotional and consulting services that helped drive Vemanti's stock price from approximately $0.02 per share at the inception of Plaintiff's services to a peak of approximately $2.74 per share.

7. Plaintiff brings this action only for in-scope conduct — namely, conduct on or before March 24, 2022 (the date Vemanti filed the FY2021 10-K). Plaintiff expressly reserves all rights to pursue separate claims arising from later conduct of Defendants and others, including without limitation the April 1, 2024 Share Exchange Agreement with VinHMS Pte. Ltd. and related dilutive transactions, which conduct will be the subject of a separate civil action.

## II.  JURISDICTION AND VENUE

8.  This Court has subject-matter jurisdiction over Plaintiff's federal securities claims pursuant to **28 U.S.C. § 1331** (federal question) and **Section 27 of the Exchange Act, 15 U.S.C. § 78aa** (exclusive jurisdiction over actions arising under the Securities Exchange Act of 1934).

9.  This Court has supplemental jurisdiction over Plaintiff's California state law claims pursuant to **28 U.S.C. § 1367(a)**. Plaintiff's state law claims arise from the same nucleus of operative facts as the federal claims and form part of the same case or controversy under Article III of the United States Constitution.

10. Venue is proper in the United States District Court for the Central District of California, Southern Division (Santa Ana), pursuant to **Section 27 of the Exchange Act, 15 U.S.C. § 78aa**, and **28 U.S.C. § 1391(b)(1) and (b)(2)**:

11. (a) Defendants are "found" and "inhabit" this District. Defendant Vemanti maintains its principal executive offices at 7545 Irvine Center Drive, Suite 200, Irvine, California 92618 — within Orange County and within the Southern Division of this District. Defendant Tan Tran, individually, resides in or about Irvine, California — within Orange County and within the Southern Division of this District. Defendants' telephone number of record (949-559-7200) and other contact details published in their corporate disclosures are based in the 949 area code, an Orange County area code.

12. (b) Substantial parts of the events and omissions giving rise to Plaintiff's claims occurred in this District. Among other things: (i) Tan transmitted his manipulation directives, MNPI

tippings, false representations, and concealment communications from California; (ii) Vemanti's public filings and press releases were prepared and disseminated from Vemanti's Irvine offices; (iii) Plaintiff and Tan met in person on October 10, 2020 at the Bluefin restaurant on Pacific Coast Highway in Newport Beach, California (Orange County), and Plaintiff stayed overnight in Costa Mesa, California (Orange County) for a follow-up meeting on October 11, 2020; and (iv) substantial portions of Plaintiff's purchases of Vemanti common stock during the in-scope period were placed and executed while Plaintiff was physically present in California.

13.    (c) ***Forum-Selection Clause Compliance.*** The Consulting Agreement between Plaintiff and Vemanti, made as of June 26, 2020 and executed June 29, 2020, contains a forum-selection clause providing that disputes "shall be subject to" the courts of "Orange County, California." The Santa Ana federal courthouse of the Southern Division of the Central District of California is located within Orange County, California, and accordingly satisfies the contractual forum-selection requirement under *Atlantic Marine Construction Co. v. United States District Court for the Western District of Texas, 571 U.S. 49 (2013)*.

14.    (d) ***Plaintiff's residency.*** During the relevant period, Plaintiff resided in California (during 2020, including throughout the Cycle 1 conduct alleged herein), Arkansas (from approximately late 2020 through at least 2022, including during the Cycle 2 February 2021 conduct and the March 24, 2022 FY2021 10-K filing), and California (currently). At the time of the original execution of the Consulting Agreement on June 29, 2020, Plaintiff's legal address of record was in Nevada, reflecting Plaintiff's prior period of residence with a cousin in that state; however, Plaintiff's physical residence and the location at which

Plaintiff received the substantial majority of communications underlying the Cycle 1 allegations was California.

15. In the conduct alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, the United States mails, the facilities of national securities markets and quotation systems, and electronic communications systems including the SEC's EDGAR filing system, the OTC Markets disclosure portal, and the WhatsApp messaging platform.

16. This Court is the proper division within the Central District of California pursuant to General Order 19-03 (assignment of cases by county to the Western, Eastern, and Southern Divisions), as Orange County (where Defendants reside and where substantial events occurred) is assigned to the Southern Division (Santa Ana).

### III.  PARTIES

17. Plaintiff **Barinder Singh "Nabe" Bal** is a natural person currently residing in Fresno, California. During the in-scope period, Plaintiff's physical residence was: California (during 2020, including the Cycle 1 conduct period); Arkansas (from approximately late 2020 through at least 2022, including during the Cycle 2 conduct period and the FY2021 10-K filing date). Plaintiff was a Vemanti shareholder both prior to and throughout the relevant period of this Complaint. Plaintiff first acquired Vemanti common stock through ordinary open-market purchases in or about 2017–2019 and held that position until selling due to the security's persistent illiquidity. Plaintiff re-acquired a Vemanti common-stock position in or about Q3 2020 through additional open-market purchases as further described in Section IV.A below, and continues to hold Vemanti common stock as of the

filing of this Complaint. From in or about Q3 2020 through and beyond the close of the in-scope period, Plaintiff served as Vemanti's primary unpaid social-media promoter and brand ambassador. Plaintiff is a party to a written Consulting Agreement with Vemanti, made as of June 26, 2020 and executed June 29, 2020 (the "Consulting Agreement," attached hereto as Exhibit A), under which Plaintiff agreed to provide promotional and shareholder-engagement consulting services to Vemanti.

18.    Defendant **Tan Tran** is a natural person residing in or about Irvine, California (Orange County, within the Southern Division of this District). At all relevant times during the in-scope period (Q3 2020 through March 24, 2022), Tan served as the founder, Chairman of the Board, President, and Chief Executive Officer of Vemanti, and (through September 7, 2021) also served as the sole Chief Financial Officer of Vemanti. Tan is the beneficial owner of all 40,000,000 issued and outstanding shares of Vemanti's Series A Preferred Stock, each share of which carries ten (10) votes per share, voting together with common stock. As of the close of the in-scope period (March 24, 2022), Tan's combined beneficial common-stock and Series A Preferred holdings provided him with approximately ninety and six-tenths percent (90.6%) of the combined voting power of all classes of Vemanti capital stock. Tan is a "control person" of Vemanti within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and California Corporations Code § 25504. Beneficial ownership references herein, where applicable, include shares directly owned by Tan and shares directly owned by members of Tan's immediate household (specifically, his wife Phoebe Tran and his son Jacob Tran), all of which are subject to Tan's beneficial ownership under SEC Rule 13d-3.

19.    Defendant **Vemanti Group, Inc.** is a Nevada corporation with its principal executive offices at 7545 Irvine Center Drive, Suite 200, Irvine, California 92618 (Orange County, within the Southern Division of this District). Vemanti's common stock has at all relevant times been publicly quoted on the OTC Markets under the ticker symbol "VMNT." Vemanti registered its common stock under Section 12(g) of the Exchange Act effective June 9, 2021, via the effectiveness of its Form 10/A Registration Statement (Amendment No. 6, filed August 23, 2021; underlying Form 10-12G originally filed June 7, 2021). From and after June 9, 2021, Vemanti has been subject to the reporting and disclosure obligations of Sections 13(a) and 15(d) of the Exchange Act, and Tan, as a Section 16 officer, director, and ten-percent (10%) beneficial owner, has been subject to Sections 13(d) and 16(a) of the Exchange Act.

20.    Defendants **Does 1 through 10** are persons or entities, presently unknown to Plaintiff, who participated in, aided and abetted, conspired with respect to, or are otherwise responsible for the wrongful conduct alleged herein. Plaintiff will seek leave to amend this Complaint to allege the true names and capacities of such Doe defendants once their identities and roles become known. Plaintiff specifically anticipates that discovery may identify other officers, directors, employees, agents, brokers, or counsel of Vemanti whose conduct contributed to the violations alleged.

21.    At all relevant times during the in-scope period, Tan was advised in connection with Vemanti's SEC and OTC Markets disclosure activities by *The Crone Law Group, P.C.*, a securities specialty law firm, including Mark Crone, Esq. The Crone Law Group, P.C. prepared and filed Tan's original Schedule 13D and is referenced herein as Tan's counsel of record solely for the purpose of negating any inference that Tan was unaware of the federal

securities-disclosure obligations described in this Complaint. The Crone Law Group, P.C. is not named as a defendant in this Complaint.

## IV.  FACTUAL ALLEGATIONS

### A.  Origin of the Relationship and the Consulting Agreement (June 2020)

22.     Prior to the events giving rise to this action, Plaintiff had previously been a shareholder of Vemanti Group, Inc. ("Vemanti"). Between approximately 2017 and 2019, Plaintiff independently identified Vemanti while researching publicly traded companies listed on the OTC Markets. At that time, Vemanti's public-facing materials — including its corporate website — represented the company as being engaged in the artificial intelligence ("AI") sector, an industry Plaintiff believed held substantial long-term growth potential. Based on that investment thesis, Plaintiff acquired an initial position in Vemanti common stock through ordinary open-market purchases. Plaintiff subsequently sold that position, however, due to the persistent and severe lack of trading liquidity in VMNT shares — the same chronic liquidity deficiency that would later become central to the parties' relationship and to the allegations set forth herein.

23.     In or about the spring of 2020, Plaintiff was discussing securities markets with his trader associate and friend, "Rich" (full name to be provided in discovery or supplemental pleading), in the course of which Plaintiff mentioned his prior interest in Vemanti. Rich informed Plaintiff that he was personally acquainted with an early investor in Vemanti. Plaintiff requested that Rich facilitate an introduction to Vemanti's Chief Executive Officer, Defendant Tan Tran ("Tan"). Through this chain of contacts, Tan was advised in advance that Plaintiff — a prospective investor in Vemanti — would be reaching out to

him. Tan thereafter caused his personal cellular telephone number to be conveyed to Plaintiff for the express purpose of direct contact. Tan's personal cellular telephone number was not, and is not, listed in Vemanti's public filings with the Securities and Exchange Commission ("SEC"), in Vemanti's publicly available investor relations materials, or in any other publicly accessible Vemanti source; Tan provided it specifically and privately so that Plaintiff could initiate communication with him outside of Vemanti's formal investor relations channels.

24.     On or about **June 4, 2020**, at approximately 4:28 p.m., Plaintiff initiated contact with Tan by sending a direct SMS text message to the personal cellular telephone number Tan had caused to be conveyed. In that initial message, Plaintiff identified himself as "Rich's friend Nabe" and stated that he had been informed Tan was seeking assistance to increase trading liquidity in Vemanti's publicly traded common stock (OTC: VMNT). Tan responded the same day, and the parties commenced direct communications regarding Vemanti, its stock, and Plaintiff's potential role in promoting the company. At Tan's request, the parties shortly thereafter migrated their primary communications to the WhatsApp messaging platform. The resulting WhatsApp message record — a true and correct compilation of which, together with related VMNT investor-group messages and authenticating materials, is attached hereto as Exhibit I — forms a significant portion of the documentary evidence supporting this Complaint and is referenced throughout the paragraphs that follow.

25.     At the time of these initial communications, the public market for Vemanti's common stock suffered from extremely limited trading liquidity, with thin daily volume and a narrow accessible public float. Plaintiff expressed interest in re-acquiring a position in Vemanti shares but was unable to accumulate any meaningful quantity through ordinary open-

market activity due to the lack of available supply. To address this, Tan personally introduced Plaintiff to an existing Vemanti shareholder (the "Introduced Shareholder") who held approximately five million (5,000,000) shares of VMNT common stock. Following Tan's introduction, the Introduced Shareholder placed sell orders into the public market and Plaintiff placed corresponding buy orders, such that Plaintiff acquired his initial Vemanti position through open-market transactions. The Introduced Shareholder is not a party to this action and is identified herein solely to establish that, from the very outset of the parties' relationship, Tan — in his capacity as Chief Executive Officer of Vemanti — served as the conduit between Plaintiff and a source of available Vemanti stock and was personally aware of the identities, holdings, and trading dispositions of significant Vemanti shareholders.

26.     Beginning shortly after the parties' June 2020 migration to WhatsApp, Tan transmitted to Plaintiff via WhatsApp a series of substantive corporate materials and communications concerning Vemanti and its operations. Among the materials Tan personally sent to Plaintiff was a corporate presentation deck for FVNDIT, Inc. ("Fvndit"), a Vemanti portfolio company in which Vemanti held a twenty percent (20%) equity interest. Tan also sent Plaintiff additional written communications, financial information, business updates, partnership representations, and strategic disclosures concerning Vemanti throughout the parties' relationship, the substance of which is detailed in the paragraphs that follow and is supported by the documentary evidence cited herein and appended hereto.

27.     Plaintiff's relationship with Vemanti during the period relevant to this Complaint was characterized by a dual capacity. First, and at all times relevant hereto, Plaintiff was a Vemanti shareholder. Plaintiff had been a Vemanti shareholder before the parties' June

2020 contact, became a Vemanti shareholder again through the open-market acquisitions described above in or about Q3 2020, materially increased his Vemanti position through additional open-market purchases during Q1 2021 (as detailed below), and continues to hold Vemanti common stock as of the filing of this Complaint. Plaintiff's economic interests were at all times aligned with, and not adverse to, the interests of Vemanti's broader shareholder base. Second, beginning in or about Q3 2020, Plaintiff entered into a written consulting arrangement with Vemanti pursuant to which Plaintiff undertook promotional and communications activities concerning the company (the "Consulting Agreement"), the terms and circumstances of which are described in greater detail below. In connection with that arrangement, Plaintiff expressly declined any compensation in the form of Vemanti common stock or equity, despite such compensation being customary in similar engagements, specifically because Plaintiff did not wish to contribute to dilution of existing Vemanti shareholders. Throughout the relevant period, Plaintiff conducted all promotional activity in good faith and in reliance on Tan's representations that Vemanti was a legitimate operating business with genuine commercial prospects — representations that, as alleged herein, were materially false.

28.    During the period from approximately June 4 through June 29, 2020, Tan engaged Plaintiff in a series of WhatsApp communications cultivating a relationship of trust. Among other things, Tan presented himself as a "type 3 real entrepreneur" — most notably in a multi-part WhatsApp transmission on June 23, 2020 in which Tan articulated a three-tier framework distinguishing "fake," "pitching," and "real" entrepreneurs, concluding with the prompt "You decide which one we are…" followed by a smug winking-face emoji — positioned Plaintiff as a sophisticated participant in Vemanti's emerging shareholder community, and

developed an informal "DD friend" relationship in which Tan represented to Plaintiff that he would serve as a trusted source of factual information about Vemanti's corporate activities. The trust framework Tan established during this pre-contract period was a deliberate prerequisite to the cultivation pattern alleged below.

29.    On **June 29, 2020**, Plaintiff and Vemanti executed the Consulting Agreement, which is made as of June 26, 2020, a true and correct copy of which is attached hereto as **Exhibit A** and incorporated by reference. Under the Consulting Agreement: (a) Plaintiff agreed to provide social-media marketing campaign management, online advocacy, community and influencer outreach, and shareholder-engagement consulting services for Vemanti; (b) Plaintiff was, by contractual design, walled off from securities-advisory work, including investment-negotiation, due-diligence on prospective investments, valuation services, or any handling of investor funds; (c) Vemanti expressly represented that any information disseminated to or through Plaintiff in furtherance of the Consulting Agreement would not contain any untrue statement of material fact or omit any material fact necessary to make statements made not misleading; (d) Vemanti undertook an affirmative duty to advise Plaintiff of facts known to Vemanti that affected the accuracy of any prior data Vemanti had provided; and (e) the Consulting Agreement contains a forum-selection clause designating Orange County, California as the exclusive forum for disputes.

30.    At the inception of Plaintiff's involvement under the Consulting Agreement, Vemanti's common stock was trading at approximately $0.02 per share. Within approximately nine (9) months — by the peak of Cycle 2 in early Q1 2021 — Vemanti's common stock had risen to a high of approximately $2.74 per share, an approximately 137-fold increase.

Plaintiff's sustained promotional efforts during that period, conducted under the Consulting Agreement, were a substantial cause of that price appreciation.

31. During the early months of the relationship, Tan offered Plaintiff Vemanti common shares as compensation for Plaintiff's promotional services. Plaintiff declined share compensation, expressly to avoid diluting other Vemanti shareholders — and in particular the retail investors whom Plaintiff was actively encouraging to invest in Vemanti. Plaintiff communicated this reason to Tan directly, explaining that the single most important thing the Company could do was earn and keep the trust of its shareholders by refusing to dilute them, and that this principle was Plaintiff's reason for declining the shares. Plaintiff further made clear to Tan that his objective was to bring retail investors a legitimate operating company — one whose management was building a real business — rather than the kind of dilutive, share-selling promotion Plaintiff understood to be common among OTC-quoted issuers. Plaintiff did so in reliance on Tan's representations that the relationship would continue on terms of mutual good faith, that Tan would "take care of" Plaintiff through alternative compensation mechanisms (including, in Tan's repeated oral framing, post-Nasdaq-uplist arrangements), and that Tan would not act in a manner adverse to Plaintiff's interests. Tan reinforced these assurances orally, both by telephone and in person, telling Plaintiff that he would take care of him and that he "did not forget about people."

32. Tan and Plaintiff communicated regularly via WhatsApp throughout the in-scope period and additionally communicated at various times via telephone calls, an in-person meeting on October 10, 2020 at the Bluefin restaurant in Newport Beach, California, and a follow-up in-person coffee meeting on October 11, 2020 in Costa Mesa, California. Tan repeatedly represented to Plaintiff, both expressly and through course of conduct, that Tan would deal

openly and honestly with Plaintiff, would inform Plaintiff of material developments at Vemanti, would not make representations he had no reasonable basis to believe true, and would not act in a manner adverse to Plaintiff's interests. Plaintiff justifiably relied on these representations.

### *Defendant Tan Tran's Founding Ownership and Pre-In-Scope Share Trajectory*

33.     On **April 3, 2014**, the date of Vemanti Group, Inc.'s incorporation under the laws of the state of Nevada, Vemanti issued **40,000,000 shares** of its common stock and **40,000,000 shares** of its preferred stock to the sole member of VoiceStep Telecom, LLC ("VoiceStep"), a California limited liability company that had been originally founded in 2002 and formally organized under California law on January 27, 2005. The 40,000,000-common and 40,000,000-preferred share issuance was made in exchange for one hundred percent (100%) of the membership interest in VoiceStep, with VoiceStep thereafter becoming Vemanti's wholly-owned subsidiary. This founding-issuance transaction was publicly disclosed in Note 1 (Organization and Basis of Presentation) to the Consolidated Financial Statements contained in Vemanti's Annual Report filed on or about February 11, 2016 with the OTC Markets disclosure system for the fiscal year ending December 31, 2015 (a true and correct copy of which, or relevant excerpts, is attached hereto as **Exhibit O**).

34.     On information and belief, the sole member of VoiceStep who received the founding 40,000,000-common and 40,000,000-preferred share issuance on April 3, 2014 was Defendant **Tan Tran**. This inference is supported by the following documentary chain: (a) VoiceStep Telecom, LLC's California Limited Liability Company Articles of

Organization, filed January 27, 2005 with the California Secretary of State (File No. 200503110236), identify **Tan Tran** as VoiceStep's Initial Agent for Service of Process, with an address of 21 Arizona, Irvine, California 92606 (a true and correct copy of which is attached hereto as **Exhibit P**); (b) Vemanti's OTC Annual Report filed on or about February 11, 2016 for the fiscal year ending December 31, 2015 identifies **Tan Tran** as Vemanti's Chairman of the Board and Chief Executive Officer, lists his residence address as 51 Acorn Glen, Irvine, California 92620, and discloses his beneficial ownership of Vemanti at **ninety-five and three-tenths percent (95.3%)** of Vemanti's common stock (a true and correct copy of which, or relevant excerpts, is attached hereto as **Exhibit Q**); (c) as of February 5, 2016 (the as-of date referenced in the same Annual Report's Security Information section), Vemanti reported total common shares outstanding of 41,970,000 — of which 95.3% equals approximately 39,997,410 shares, reconciling within approximately 0.01% to the founding 40,000,000-share issuance to VoiceStep's sole member; and (d) Tan continues to beneficially own all 40,000,000 issued and outstanding shares of Vemanti's Series A Preferred Stock to this day, as currently disclosed in Vemanti's public filings and as alleged in paragraph 18 above.

35. Plaintiff is informed and believes, and on that basis alleges, that Defendant Tan Tran's beneficial ownership of Vemanti common stock decreased materially and progressively between his approximately **40,000,000-share founding position** on April 3, 2014 and the start of the in-scope period on or about June 30, 2020, by which date Tan held approximately **28,650,000** common shares. This represents a pre-in-scope reduction of approximately **11,350,000 common shares** — over twenty-eight percent (28%) of Tan's founding common-stock position — across approximately six years preceding the in-scope

conduct alleged herein. The transaction-level history of Tan's pre-in-scope share movements (including the identification of buyers, dates, prices, and methods of transfer) is within Tan's exclusive possession and control, is contained in records held by Vemanti's transfer agent (Globex Stock Transfer, Inc. of Deltona, Florida, identified as Vemanti's registered transfer agent in the February 11, 2016 OTC Annual Report), and is not contained in any single contemporaneous public disclosure. The sustained pattern of Tan's pre-in-scope liquidation, when combined with the additional reductions of approximately 1,345,000 common shares during calendar year 2021 (alleged below), aggregates to a pre-March-24-2022 reduction of approximately 13,345,000 common shares, or approximately one-third of Tan's founding common-stock position. This sustained multi-year liquidation pattern is materially inconsistent with, and directly contradicts, Tan's contemporaneous oral and written representations to Plaintiff during the in-scope period that Tan was "in this for the long haul," "building a unicorn," holding for "his legacy," and "playing the long game." Plaintiff requests, and the Court is respectfully prayed to order, full discovery of the transaction-level history of Tan's Vemanti share movements from April 3, 2014 through the close of the in-scope period.

### *The 2016–2017 Round-Trip Share Movement Pattern and the Disclosure-Opacity Foundation for the In-Scope Period*

36.    During the period from approximately Q3 2016 through Q2 2017, Defendant Tan Tran's beneficial ownership of Vemanti common stock, as reported in Vemanti's contemporaneous OTC Markets quarterly and annual disclosures (each personally certified by Tan), followed a documented pattern of dramatic intra-period movement that materially refines, and substantially expands the scope of, the pre-in-scope share-trajectory

allegations set forth in paragraph 35 above. The documented quarter-by-quarter sequence, drawn directly from Vemanti's contemporaneous OTC Markets disclosures, is as follows: (a) **September 30, 2016** (Q3 2016 OTC Markets quarterly disclosure, filed October 31, 2016): total common shares outstanding 45,020,000; Tan Tran beneficial common ownership **31,000,000 shares (68.93%)**; Non-Restricted public float 4,710,000; Shareholders of Record 49; (b) **December 31, 2016** (2016 Annual Report): total common shares outstanding 45,270,000; Tan Tran beneficial common ownership **27,600,000 shares (60.96%)**; Non-Restricted public float 5,030,000; Shareholders of Record 53; (c) **March 31, 2017** (Q1 2017 OTC Markets quarterly disclosure, filed June 1, 2017): total common shares outstanding 45,370,000; Tan Tran beneficial common ownership **25,100,000 shares (55.32%)**; Non-Restricted public float 5,030,000; Shareholders of Record 348; (d) **June 30, 2017** (Q2 2017 OTC Markets quarterly disclosure, filed August 1, 2017): total common shares outstanding 45,370,000; Tan Tran beneficial common ownership **28,650,000 shares (63.15%)**; Non-Restricted public float 5,480,000; Shareholders of Record 348; and (e) **June 30, 2020** (Q2 2020 OTC Markets quarterly disclosure, filed August 6, 2020): total common shares outstanding 65,784,086; Tan Tran beneficial common ownership **28,650,000 shares (which Vemanti reported as 45.81%, although 28,650,000 shares represented only 43.55% of the 65,784,086 common shares Vemanti simultaneously reported as outstanding)**; Public Float 8,420,000; Shareholders of Record 88. True and correct copies of the relevant excerpts of the OTC Markets quarterly and annual disclosures cited in subparagraphs (a) through (d) are collectively attached hereto as **Exhibit R**. The Q2 2020 OTC Markets quarterly disclosure cited in subparagraph (e) is attached hereto as **Exhibit S**. A summary, prepared pursuant to Federal Rule of Evidence 1006, of the

reported beneficial-ownership and share-structure figures contained in the 2016–2017 OTC Markets filings reproduced at Exhibit R is attached hereto as **Exhibit T**.

37. ***The Q4 2016 quarter (the cleanest example of the public-float arithmetic).*** During the quarter ending December 31, 2016, Tan's beneficial ownership of Vemanti common stock decreased by **three million four hundred thousand (3,400,000) shares** (from 31,000,000 at September 30, 2016 to 27,600,000 at December 31, 2016). During the same Q4 2016 quarter, Vemanti's reported Non-Restricted public float increased by only **three hundred twenty thousand (320,000) shares** (from 4,710,000 to 5,030,000), and Vemanti's reported Shareholders of Record increased by only **four (4)** (from 49 to 53). The arithmetic forecloses any innocent explanation that the 3,400,000-share Q4 2016 movement represented a broad-based distribution of Vemanti common stock to the public retail market: of the 3,400,000 shares that departed Tan's beneficial ownership in Q4 2016, **a maximum of approximately 320,000 shares (approximately 9.4%) could have become publicly tradable**, and the remaining approximately **three million eighty thousand (3,080,000) shares (approximately 90.6%) necessarily moved to other restricted holders** — meaning insiders, affiliates, consultants, nominees, related parties, or persons acting in concert with Tan. The transferees of those approximately 3,080,000 shares are not identified in the 2016 Annual Report or in any other contemporaneous Vemanti public disclosure.

38. ***The Q1 2017 quarter (an even tighter arithmetic example).*** During the quarter ending March 31, 2017, Tan's beneficial ownership of Vemanti common stock decreased by an additional **two million five hundred thousand (2,500,000) shares** (from 27,600,000 at December 31, 2016 to 25,100,000 at March 31, 2017). During the same Q1 2017 quarter,

Vemanti's reported Non-Restricted public float did not change at all (remained at 5,030,000). The arithmetic forecloses any innocent explanation that the 2,500,000-share Q1 2017 movement represented a distribution to the public retail market: **the entire 2,500,000-share Q1 2017 reduction in Tan's beneficial ownership necessarily moved to other restricted holders**. The transferees of those 2,500,000 shares are not identified in the Q1 2017 OTC Markets quarterly disclosure or in any other contemporaneous Vemanti public disclosure.

39.     ***The Q2 2017 round-trip transaction.*** During the quarter ending June 30, 2017, Tan's beneficial ownership of Vemanti common stock **increased** by **three million five hundred fifty thousand (3,550,000) shares** (from 25,100,000 at March 31, 2017 to 28,650,000 at June 30, 2017). During the same Q2 2017 quarter, Vemanti issued no new common shares — total common shares outstanding remained constant at 45,370,000. The arithmetic establishes that the 3,550,000-share increase in Tan's beneficial ownership during Q2 2017 was not attributable to any new issuance by Vemanti and was therefore mathematically attributable to **inbound transfers from existing restricted-share holders to Tan**. During the same Q2 2017 quarter, Vemanti's reported Non-Restricted public float increased by only 450,000 shares (from 5,030,000 to 5,480,000), and Vemanti's reported Shareholders of Record did not change at all (remained at 348). The contemporaneous and offsetting character of (i) Tan's net outbound transfers of approximately 5,900,000 common shares to other restricted holders during the immediately preceding Q4 2016 and Q1 2017 quarters and (ii) the net inbound transfer of 3,550,000 common shares from other restricted holders to Tan during Q2 2017 (a return rate of approximately sixty percent (60%) within approximately nine (9) months) constitutes a documented round-trip share movement

pattern within a small closed group of restricted beneficial holders. Such a round-trip pattern is mathematically and operationally incompatible with the innocent explanation that the Q4 2016 and Q1 2017 outbound transfers represented arm's-length sales of Vemanti common stock to a broadly distributed retail market. The pattern is consistent only with affiliated, nominee, custody, or related-party share arrangements among a small closed group of restricted beneficial holders including or controlled by Tan.

40. ***Stabilization at exactly 28,650,000 carrying into the in-scope period.*** Following the Q2 2017 round-trip transaction, Tan's reported beneficial ownership of Vemanti common stock stabilized at exactly **28,650,000 shares** and, as documented in Vemanti's Q2 2020 OTC Markets quarterly disclosure (Exhibit S), remained at exactly **28,650,000 shares** through and including the date of June 30, 2020 — the start of the in-scope period as alleged in paragraph 35 above. The three-year period of reported zero net movement (Q2 2017 through Q2 2020), immediately following the documented prior three-year period (April 2014 through Q2 2017) of dramatic net movement and round-trip transactional activity, is itself probative of the disclosure-design pattern alleged herein. Either (a) Tan's actual transactional activity in Vemanti common stock genuinely ceased for three full years following the Q2 2017 round-trip — after the wild and pattern-establishing 2014–2017 movement record — or (b) intra-period transactional activity existed during the 2017–2020 window that was obscured by snap-back transactions calibrated to maintain a public-facing 28,650,000 endpoint figure on each subsequent OTC Markets quarterly disclosure. The documented 2016–2017 pattern affirmatively establishes Tan's operational capacity and demonstrated willingness to execute the latter without contemporaneous public disclosure.

41.   ***The June 30, 2020 cumulative-versus-public-float arithmetic.*** As documented in Vemanti's Q2 2020 OTC Markets quarterly disclosure (Exhibit S), as of June 30, 2020 — the start of the in-scope period — Vemanti reported (a) Tan Tran's beneficial ownership of common stock as 28,650,000 shares; (b) Vemanti's Public Float as 8,420,000 shares; and (c) total common shares outstanding as 65,784,086. The cumulative number of common shares that had departed Tan's beneficial ownership between the April 3, 2014 founding and the June 30, 2020 in-scope start (eleven million three hundred fifty thousand (11,350,000) shares, calculated as 40,000,000 minus 28,650,000) **exceeds Vemanti's entire reported Public Float as of June 30, 2020 (8,420,000 shares) by approximately two million nine hundred thirty thousand (2,930,000) shares — meaning the number of common shares that departed Tan's beneficial ownership during the pre-in-scope period exceeds the entire freely-tradable float of the company at the in-scope start date by approximately thirty-five percent (35%)**. Further, Vemanti's Public Float of 8,420,000 as of June 30, 2020 is not composed solely of shares originating with Tan. The Issuance History contained at pages 3–4 of Exhibit S documents over twenty-four million (24,000,000) additional common shares newly issued by Vemanti to non-Tan recipients (including cash purchasers, equity-exchange recipients, and consultants) between January 23, 2018 and April 1, 2019, some portion of which subsequently became unrestricted and joined the Public Float during 2019 and 2020. The portion of the 8,420,000 Public Float that could conceivably trace back to Tan's 11,350,000 shares-out is therefore materially smaller than 8,420,000, and the unaccounted-for portion of Tan's shares-out is correspondingly larger. The arithmetic accordingly forecloses, as a matter of mathematical necessity, the innocent explanation that Tan's 11,350,000-share net pre-in-scope departure

was distributed to a broadly held retail-market population. A material majority of Tan's pre-in-scope shares-out cannot be located in the Public Float as of the in-scope start date and must reside in restricted holders whose identities are not disclosed in any contemporaneous Vemanti public filing.

42. ***Documented suspicious issuance patterns reinforcing the discovery basis.*** Vemanti's Issuance History during the pre-in-scope period, as documented in the contemporaneous OTC Markets disclosures cited above and at pages 3–4 of Exhibit S, contains multiple discrete documented issuances that, while not pleaded as standalone causes of action herein, are factually alleged as part of the disclosure-opacity pattern supporting Plaintiff's request for transferee-level discovery: (a) **June 24, 2016 — 2,000,000 common shares issued for "debt conversion valued at $2,000"** — a per-share consideration of approximately one-tenth of one cent ($0.001), approximately one hundred (100) times below the ten cents ($0.10) per-share consideration Vemanti used for other contemporaneous issuances, with no underlying debt instrument disclosed and no recipient identified; (b) **October 29, 2018 — 626,043 common shares issued to "Thomas Duc Tran" for "Equity Exchange"** at approximately $0.1198 per share — the recipient bearing the same surname as Defendant Tan Tran, with the underlying acquisition transaction not specifically disclosed in the filing; (c) **October 29, 2018 — 626,043 common shares issued to "Trung Viet Vo" for "Equity Exchange"** at approximately $0.1198 per share — same-day, identical-share-quantity, identical-non-cash-rationale as the Thomas Duc Tran issuance, suggesting both share blocks were issued in connection with the same underlying acquisition transaction; and (d) **April 1, 2019 — 3,250,000 common shares issued to "Chenyuan Anthony Chen" for "Consultant"** at

approximately $0.035 per share — the largest single below-market services-rendered issuance documented in the pre-in-scope period, with no specific consulting-services description disclosed. Plaintiff factually alleges each of these issuances without any present theory of liability against any named recipient, and expressly reserves all transferee-specific theories (related-party, nominee, group-acting-in-concert, undisclosed-affiliate, and Section 13(d) "group" analysis where applicable) for amendment after discovery.

43.    *Transfer agent transition during the pre-in-scope period.* During the pre-in-scope period, Vemanti transitioned its transfer agent from **Globex Stock Transfer, LLC** (with offices at 780 Deltona Boulevard, Suite 202, Deltona, Florida 32725) — as identified in Vemanti's OTC Markets quarterly disclosures through and including the 2017 reporting periods — to **V Stock Transfer, LLC** (with offices in New York, New York) — as identified in the Q2 2020 OTC Markets quarterly disclosure (Exhibit S). The precise transition date is not disclosed in any contemporaneous Vemanti public filing. Both transfer agents necessarily possess transaction-level records of the share movements alleged in paragraphs 36 through 42 above, including the identities of all transferees, transfer dates, transfer prices, and transfer methods. Plaintiff requests, and the Court is respectfully prayed to order, full discovery from both Globex Stock Transfer, LLC and V Stock Transfer, LLC, as further set forth in the Prayer for Relief below.

44.    *Implications for the in-scope reported transactional figures.* The documented 2016–2017 round-trip share movement pattern alleged in paragraphs 36 through 42 above, taken in combination with the subsequent three-year endpoint-stabilization at exactly 28,650,000 (paragraph 40) and the June 30, 2020 cumulative-versus-Public-Float arithmetic (paragraph 41), establishes that Tan possessed, during the in-scope period: (a) the

operational capacity to move large quantities of Vemanti common stock to and from his beneficial ownership without contemporaneous public-record transparency; (b) a documented prior practice of round-trip transactions within a small closed group of restricted beneficial holders; and (c) a disclosure-design pattern (percentage-only reporting, endpoint-only reporting, no transferee identification) structurally calibrated to mask transactional detail behind quarterly endpoint figures. Accordingly, **the in-scope reported reductions of 650,000 common shares during Q3 2020 (alleged in Section IV.B below) and of 650,000 common shares during Q1 2021 (alleged in Section IV.C below) are pleaded by Plaintiff as net endpoint visibility figures, not as ceilings on Tan's actual gross transactional activity in Vemanti common stock during those quarters**. Tan's actual gross transactional activity in Vemanti common stock during Cycle 1, Cycle 2, the bridging Q4 2020 and Q2 2021 periods, and the post-Section-12-registration portion of the in-scope period may, on information and belief, materially exceed the publicly visible net endpoint reductions documented in Vemanti's contemporaneous OTC Markets quarterly disclosures and in Tan's Original Schedule 13D. Plaintiff expressly reserves the right to amend or supplement this Complaint to plead additional unreported sales or transfers, and additional damages associated therewith, upon their discovery through Court-ordered discovery proceedings.

### B.  Cycle 1: The Q3 2020 "Mali Gold / LBMA Cycle"

45.    During the third quarter of 2020 (July 1, 2020 through September 30, 2020), Tan engaged in a coordinated and continuous course of conduct directed at Plaintiff that included: (a) repeated transmission of material non-public information regarding pending Vemanti corporate transactions, accompanied by explicit confidentiality framing; (b) specific

factual misrepresentations about the status of those transactions; (c) at least one specific written manipulation directive containing a numerical price-band instruction and explicit articulation of manipulative purpose; (d) verbal price-supporting directives delivered by WhatsApp; and (e) affirmative oral denials of insider selling. Throughout this same Q3 2020 window, Tan secretly sold **650,000 shares** of his personal Vemanti common stock holdings, reducing his beneficial common-stock ownership from **28,650,000 shares as of June 30, 2020** to **28,000,000 shares as of September 30, 2020**, as documented in Vemanti's Q2 2020 OTC Markets quarterly disclosure (filed August 6, 2020) and Q3 2020 OTC Markets quarterly disclosure (filed February 25, 2021), respectively (true and correct copies of which, or relevant excerpts, are attached hereto as **Exhibits S and B**). The 650,000-share Q3 2020 reduction in Tan's beneficial common-stock ownership alleged in this paragraph reflects a publicly visible net endpoint reduction, not a ceiling on Tan's actual gross transactional activity in Vemanti common stock during Q3 2020; consistent with paragraphs 36 through 44 above, Plaintiff alleges on information and belief that Tan's actual gross transactional activity in Vemanti common stock during Q3 2020 may materially exceed the 650,000-share net endpoint reduction reflected herein, and expressly reserves the right to plead additional and previously undisclosed transactional activity upon its discovery through Court-ordered discovery proceedings.

46. Tan's Q3 2020 secret selling was effectively concealed from public investors during the relevant period in three principal respects: (i) Section 16(a) of the Exchange Act had not yet attached to Tan because Vemanti was not yet a Section 12 registered company, and Tan was therefore under no Form 4 reporting obligation during Q3 2020; (ii) although Vemanti's Q2 2020 OTC Markets quarterly disclosure had publicly established the 28,650,000-share pre-

cycle baseline on August 6, 2020 (Exhibit S), Vemanti did not file its Q3 2020 OTC Markets quarterly disclosure (which would have shown the reduced 28,000,000 figure necessary to identify the 650,000-share Q3 2020 reduction by comparison) until February 25, 2021 — five months after the close of Q3 2020 and after the Q1 2021 Cycle 2 selling had already begun; and (iii) Tan further concealed his Q3 2020 selling activity through contemporaneous affirmative oral denials made to Plaintiff during late September 2020 and early October 2020, as alleged in paragraphs 54 through 61 below.

47.    On or about **August 4, 2020** via WhatsApp, Tan transmitted to Plaintiff a series of representations including, in substance: "*Confidential. A big company just gave me a Letter of Intent. They want to buy eLoan!*" Tan also for the first time referenced an "African gold friend" deal call — the earliest preview of the Marena Gold transaction Vemanti would not publicly announce until December 1, 2020 (approximately four months later). The eLoan acquisition referenced in the August 4 message never materialized into any publicly disclosed transaction; on information and belief, no such Letter of Intent existed at the time of Tan's representation.

48.    On or about **August 5, 2020**, in justifiable reliance on Tan's August 4 representations, Plaintiff documentary purchased **50,000 shares** of Vemanti common stock at approximately **$0.23 per share**, deploying approximately $11,500 of personal capital. This is the first of multiple documented Cycle 1 purchases by Plaintiff during the Q3 2020 secret-selling window.

49.    On or about **August 6, 2020** via WhatsApp, Tan forwarded to Plaintiff several photographs labeled "MALI" depicting raw gold bars, with accompanying message "*From my friend in

*Mali.*" Tan also sent a contemporaneous audio recording, which Tan thereafter caused to be deleted on his side of the WhatsApp exchange. The August 6 transmissions were the first concrete indication to Plaintiff that the "African gold friend" deal Tan had referenced two days earlier involved a Mali gold operation.

50.    On or about **August 13, 2020** via WhatsApp, Tan transmitted to Plaintiff specific factual misrepresentations regarding the eLoan transaction status, including in substance: "*main docs all have been signed... government registration delayed by COVID... I can show you the docs*" and "*Hang in there...we've got good stuff coming.*" On information and belief, no such signed transaction documents existed; the eLoan acquisition never closed in any form; and no government-registration impediment existed because no transaction had been documented to require registration. The August 13 representations were therefore materially false at the time made. The accompanying "Hang in there" directive was the first of multiple Cycle 1 verbal price-supporting directives transmitted by Tan to Plaintiff.

51.    On or about **August 15, 2020** via WhatsApp, Tan transmitted to Plaintiff a substantive cluster of MNPI tipping and manipulation-related representations, including in substance: "*Recording from my meeting...with the gold partner*"; "*Being certified for LBMA is huge. That means our 20% will be worth hundreds of millions*"; "*for your eyes only....do not share with anyone*"; "*Listen to it and delete it*" (followed by a smiling emoji); "*This is a real deal*"; "*But when it's done...we'll be north of $1*"; "*Yes, he's legit. I've asked around*"; "*Don't panic...it's coming. People will be sorry they got out too early.*"

52.    The August 15, 2020 representations contained multiple discrete factual misrepresentations and manipulation-related elements: (a) the LBMA-certification representation ("Being

certified for LBMA is huge. That means our 20% will be worth hundreds of millions") was misleading at the time made because the Mali gold operation Tan was referencing (Marena Gold Refinery) was not LBMA-certified as of August 15, 2020, and was not LBMA-certified as of December 1, 2020 (when Vemanti publicly announced the Marena Gold Letter of Intent), and per the express terms of that LOI announcement, LBMA certification was a *post-closing aspirational goal* that would require additional working capital not yet secured; (b) the "north of $1" price prediction was tied to a premise (LBMA certification of an operation owned by Vemanti) that had no factual basis; (c) the "listen to it and delete it" directive paired with the smiling emoji was a written instruction directing Plaintiff to destroy evidence of an MNPI transmission, and reflects consciousness on Tan's part that the transmitted content was non-public, sensitive, and not properly disclosable to Plaintiff in his shareholder capacity; (d) the "I've asked around" representation conveyed to Plaintiff that Tan had performed due diligence on the gold partner, which on information and belief was false; (e) the "people will be sorry they got out too early" framing was a price-supporting verbal directive.

53.     On or about **August 20, 2020** via WhatsApp, Tan transmitted to Plaintiff a contemporaneous written admission of price-impact awareness, in substance: "*People are telling me...it seems like every time I talk, the stock reacts... so I need to make sure what I say is true.....*" followed by a smug winking-face emoji. Tan also transmitted to Plaintiff a directive regarding the timing of social-media disclosures, in substance: "*Don't share it before 8am... share it after 8am only*." The August 20 message is direct documentary evidence of Tan's contemporaneous and self-aware understanding that his statements as Vemanti's CEO had a measurable price impact on Vemanti common stock; the implicit

acknowledgment that prior statements may not have uniformly satisfied a truthfulness standard; and the deliberate use of timing to manage the impact of his statements on stock price.

54.    On or about **September 10, 2020** via WhatsApp, Tan transmitted to Plaintiff a series of representations including: "*I'm playing the long game. Stay with me!*"; "*I'll keep engaging with shareholders but not too overly*"; "*I know how it works now...*"; "*Anticipation is better than the real news*"; "*The days leading up to that big game, new movie release, new phone, etc, are always better than the day after everything has happened*"; "*We have the biggest news on OTC and I was dumbfounded....now I know*"; "*That's why in my tweet today I just said next week and not specific date....*" followed by a smug winking-face emoji.

55.    The September 10, 2020 cluster constituted (a) further verbal price-supporting directives to Plaintiff ("Stay with me", "playing the long game"); (b) Tan's contemporaneous articulation of a sophisticated theory of pre-announcement market dynamics ("Anticipation is better than the real news"), which Tan paired with a documented operational application of that theory to Vemanti's corporate Twitter strategy ("that's why in my tweet today I just said next week and not specific date"); (c) further evidence of Tan's self-aware understanding of his ability to influence stock-price dynamics through strategic information management; and (d) MNPI tipping regarding pending government meetings with Mali's Ismael Siby ("Siby"), the principal of Marena Gold Refinery.

56.    On or about **September 21, 2020 at approximately 9:39 p.m. Pacific Time**, via WhatsApp, Tan transmitted to Plaintiff the following written representation: "*Working on closing the gold deal and busy with the deployment of the $30M of course.*" That single

sentence contained two specific factual misrepresentations: (a) the representation that Tan was "closing" the gold deal as of September 21, 2020, when in fact Vemanti's Letter of Intent with Marena Gold was not signed until December 1, 2020 (seventy days later) and no "closing" ever materialized publicly; and (b) the representation that Vemanti was "busy with the deployment of the $30M of course," referring to a specific dollar amount of capital deployment that, on information and belief and per Plaintiff's contemporaneous knowledge, was a fabricated number with no underlying corporate basis.

57.     On or about **September 22, 2020 at 7:45 p.m. Pacific Time**, via WhatsApp, Tan transmitted to Plaintiff the following written instruction (the "September 22 Manipulation Directive"): *"I'm in the middle of closing the gold deal and they're watching our stock. We need to keep it between 0.35-0.40 so we can keep them excited."*

58.     The September 22 Manipulation Directive contains, in writing, three independently actionable components: (a) a present-tense factual representation that Tan was "in the middle of closing the gold deal," which was materially false at the time made (no Letter of Intent had been signed; no definitive share-exchange agreement existed; the gold deal's LOI — when ultimately announced on December 1, 2020 — was expressly subject to multiple unsatisfied conditions including completion of mutually satisfactory due diligence, regulatory approvals, third-party approvals, stockholder approval, and other regulatory requirements; and the gold deal never "closed" in any binding sense); (b) a specific numerical price-range directive ($0.35–$0.40) addressed to a known retail shareholder Tan understood was actively engaged in promotional and trading activity supportive of Vemanti common stock; and (c) an explicit, in-writing articulation of manipulative purpose — keeping the price within the specified range "so we can keep them

excited" — referring to influencing a third-party transaction counterparty's continued participation in a represented corporate transaction.

59.    Plaintiff, in justifiable reliance on the September 22 Manipulation Directive (and on Tan's representation that the gold deal was "closing"), responded approximately twenty (20) minutes later: *"Okay you got it... I'll Bid support... tweet about Gold Becoming the new world currency and tag @peterschiff in your tweet"* and *"I'll get to work."* Plaintiff's response reflected his sincere belief, induced by Tan's representation, that there was an active, imminent corporate transaction whose closing depended on price stability. Plaintiff's continued accumulation at the bid (which has the natural effect of supporting price) was an investment decision based on what Plaintiff understood to be true CEO-supplied information about an imminent corporate transaction.

60.    During the period from late September 2020 through early October 2020, in one or more telephone conversations between Plaintiff and Tan, Plaintiff observed unusual dilutive trading patterns on Vemanti's Level 2 order book and directly inquired of Tan whether Tan was selling Vemanti common stock. Tan responded by making two related but distinct oral misrepresentations: (a) Tan affirmatively denied any then-current selling, stating in substance: *"No, I'm in this for the long haul"*; and (b) Tan orally characterized the totality of his prior selling as comprising *"sold like 400K shares when VMNT was in the Teens,"* and represented that he had *"sold all the shares he wanted to sell for under .20 cents."* By these two related representations, Tan conveyed to Plaintiff that (i) Tan was not presently selling, and (ii) the totality of Tan's prior selling activity had been limited to approximately 400,000 shares sold at prices in the teens (i.e., below $0.20 per share).

61.     Tan's late-September-to-early-October 2020 oral representations were materially false at the time made in at least the following independently quantifiable respects: (i) Tan's denial of then-current selling was false because Tan had already secretly sold **650,000 shares** of his Vemanti common stock during the just-completed Q3 2020 reporting period (between June 30, 2020 and September 30, 2020), reducing his beneficial common-stock holdings from 28,650,000 to 28,000,000, as documented in Vemanti's Q2 2020 OTC Markets quarterly disclosure (filed August 6, 2020, Exhibit S) and Q3 2020 OTC Markets quarterly disclosure (filed February 25, 2021, Exhibit B); and (ii) Tan's historical-quantity representation that he had "sold like 400K shares" was false because Tan had actually sold **650,000 shares** during Q3 2020 — a difference of approximately **250,000 shares** (an understatement of approximately sixty-two and one-half percent (62.5%) over Tan's stated 400,000-share figure), as documented in the contemporaneous OTC Markets quarterly disclosures. The specific execution prices of Tan's Q3 2020 sales are within Tan's exclusive possession and control and are not contained in any publicly available disclosure; whether any portion of those sales was executed at prices outside the "teens" range Tan orally represented is preserved for proof through discovery. Tan's oral representations were made with knowledge of their falsity and with the purpose and effect of inducing Plaintiff to continue to hold his Vemanti common-stock position, to refrain from selling at then-prevailing prices, to continue purchasing additional Vemanti common stock, and to continue providing promotional services to Vemanti.

62.     On or about **October 2, 2020** via WhatsApp, Tan transmitted to Plaintiff additional MNPI tipping regarding the Mali gold transaction. Specifically, Tan forwarded to Plaintiff screenshots of his iMessage conversation with a third party identified as "Ivan Hoo",

including discussions of: "*It goes alright. He said he is in but need to make sure everyone there is handled especially the government side. Until now couple of his board members still outside Mali*"; "*ECOWAS sanctions really killing the business activity*"; "*The video is about French TV canal + made a mini doc on Marena Gold.*" Tan also transmitted to Plaintiff: "*FYI. Siby is in which is key*"; a YouTube link to a French-language television documentary entitled "Sur la piste de l'or malien avec Ismael Siby"; "*There's our guy with buyers from Korea*"; and "*For your eyes only!*"

63. The October 2, 2020 transmissions are independently significant because they contemporaneously document Tan's knowledge of specific risks affecting the Mali gold transaction — including ECOWAS sanctions, government-side handling difficulties, and Marena Gold board members' difficulties operating within Mali. Those are the same political and governmental complications that, as Plaintiff is informed and believes, ultimately caused the Marena Gold transaction to be abandoned without any public closing announcement. Tan's contemporaneous knowledge of those risks, established by the October 2 transmissions, is materially inconsistent with Tan's September 22 representation that he was "in the middle of closing the gold deal" and renders that earlier representation false (or at minimum materially misleading by omission of known counterparty risk) at the time made.

64. On or about **October 6, 2020** at approximately 11:37 a.m. Pacific Time, via WhatsApp, Tan informed Plaintiff: "*I just got off the phone with FINRA. Let's chat tonight.*" Tan further stated: "*They were asking about all the press releases and podcasts*" and "*We just need to be careful about what we put out.*" In response to Plaintiff's acknowledgment that "Everything you said is true…," Tan replied: "*Yeah....and it needs to stay that way....*"

followed by a smug winking-face emoji. When Plaintiff inquired further, Tan downplayed the FINRA contact as: "*I know....they're doing routing checks.... routine.... Just to keep us honest.....*"

65.    The October 6, 2020 FINRA inquiry is significant in two independent respects: (a) Tan's downplaying of the FINRA contact as a "routine routing check" was materially misleading; on information and belief, FINRA's actual inquiry concerned specific Vemanti press releases and Tan's podcast appearances during the Q3 2020 cycle, which is targeted regulatory scrutiny, not routine; (b) more critically, Tan's receipt of regulatory notice on October 6, 2020 should, in the exercise of reasonable corporate compliance, have caused Tan to immediately cease the manipulation-related conduct alleged herein. Instead, Tan continued the same conduct, escalating within forty-eight (48) hours by transmitting additional confidential corporate documents to Plaintiff with explicit instructions not to share (alleged in the next paragraph). The continuation of the same conduct after direct regulatory notice is direct evidence supporting the requisite strong inference of scienter under *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)*.

66.    On or about **October 8, 2020** at approximately 1:26 p.m. Pacific Time, via WhatsApp, Tan transmitted to Plaintiff a three-page PDF entitled "*EQUITY PURCHASE AGREEMENT (EPA) CONFIDENTIAL TERM SHEET*" between Vemanti Group, Inc. (as issuer) and Livingston Asset Management LLC (as purchaser, signed by Stephen Hicks, Manager) on Southridge letterhead. The term sheet provided for a $10,000,000 equity-line financing facility under which Vemanti would issue common stock to Livingston at a 10% discount to the lowest closing bid price during a 10-day Valuation Period, with up to 9.99% of outstanding common per drawdown, registered on Form S-1, with a $75,000 commitment-

fee promissory note, governed by New York law (the "EPA Term Sheet"). Tan accompanied the transmission with the following written instruction: "*For your eyes only. Extremely confidential. Please don't share.*"

67.     The October 8, 2020 EPA Term Sheet transmission was an MNPI tipping that occurred two (2) days after Tan's receipt of FINRA's October 6, 2020 inquiry concerning Vemanti's press releases and podcasts. The EPA Term Sheet by its nature contemplates a dilutive equity-line financing structure under which Vemanti would issue new common shares to a counterparty (Livingston Asset Management LLC) at a discount, with the counterparty thereafter selling those shares into the market — a controlled-supply mechanism that would create downward price pressure on Vemanti common stock and that was fundamentally inconsistent with the price-supporting narrative Tan was concurrently transmitting to Plaintiff. The October 8, 2020 transmission, with explicit "For your eyes only… Please don't share" framing, is the third in a documented Cycle 1 series of confidentiality-marked MNPI transmissions to Plaintiff (the first being the August 15 "Listen to it and delete it" directive, the second being the October 2 "For your eyes only!" transmission).

68.     Throughout the Cycle 1 period, Tan engaged in a sustained pattern of relationship cultivation directed at Plaintiff designed to deepen the trust framework that made the misrepresentations and concealment alleged herein effective. The cultivation pattern included: (a) periodic unsolicited "check-in" WhatsApp messages from Tan to Plaintiff during quiet periods (e.g., September 21, 2020 at 9:16 p.m.: "How's it going, Nabe? Just checking in..."); (b) personal meet-up scheduling and a culminating in-person meeting at the Bluefin restaurant in Newport Beach, California on October 10, 2020, with a follow-up coffee meeting on October 11, 2020 in Costa Mesa, California; (c) reciprocity-building

gestures including Plaintiff's gift of a slow-juicer product to Tan during the October 11 meeting; (d) recurring informal language such as "we", "our stock," "my guys," and "our chart" establishing a sense of shared enterprise; and (e) Tan's repeated framing of his role as "just a guy who's trying to be useful to my shareholders" — a humility framing that was inconsistent with the contemporaneous and concurrent secret-selling and manipulation conduct alleged herein.

69. In aggregate during Cycle 1 (Q3 2020 plus the early-October 2020 continuation period), Plaintiff: (a) made multiple documented purchases of Vemanti common stock, including the documented August 5, 2020 purchase of 50,000 shares at $0.23 per share and a documented October 9, 2020 purchase of approximately 15,000 shares; (b) sold only a small fraction of his existing Vemanti common-stock position and retained the bulk; (c) actively engaged in promotional advocacy for Vemanti including social-media posts, shareholder outreach, and editorial input on Vemanti corporate press releases; (d) continued to provide consulting services under the Consulting Agreement without compensation; and (e) deferred or foreclosed alternative investment opportunities. Each of these actions was undertaken in justifiable reliance on the misrepresentations and concealment alleged herein.

### C.  Cycle 2: The Q1 2021 "Hold Her Steady Cycle"

70. During the first quarter of 2021 (January 1, 2021 through March 31, 2021), Vemanti's common-stock price rose sharply, approaching and crossing the $1.50 threshold by early February 2021 and reaching a high of approximately $2.74 per share by the close of Q1

2021 — an approximately 137-fold increase from the $0.02 price at the inception of Plaintiff's consulting services in mid-2020.

71.     Throughout Q1 2021, Tan engaged in the same coordinated and continuous course of conduct directed at Plaintiff that he had previously deployed during Cycle 1: (a) specific written manipulation directives containing numerical price-band instructions; (b) explicit articulations of manipulative purpose tied to influencing third-party transaction counterparties (specifically, "deals" Tan represented Vemanti was "working on"); (c) verbal price-supporting directives transmitted by WhatsApp; and (d) recurring oral denials of insider selling. Throughout this same Q1 2021 window, Tan secretly sold an additional **650,000 shares** of his personal Vemanti common stock holdings, reducing his beneficial common-stock ownership from **28,000,000 shares as of December 31, 2020** to **27,350,000 shares as of March 31, 2021**, as documented in Vemanti's 2020 Annual Report (Page 15) and Vemanti's Q1 2021 OTC Markets quarterly disclosure (Page 16), respectively (true and correct copies of the relevant excerpts of which are attached hereto as **Exhibits C and D**). The 650,000-share Q1 2021 reduction in Tan's beneficial common-stock ownership alleged in this paragraph reflects a publicly visible net endpoint reduction, not a ceiling on Tan's actual gross transactional activity in Vemanti common stock during Q1 2021; consistent with paragraphs 36 through 44 above, Plaintiff alleges on information and belief that Tan's actual gross transactional activity in Vemanti common stock during Q1 2021 may materially exceed the 650,000-share net endpoint reduction reflected herein, and expressly reserves the right to plead additional and previously undisclosed transactional activity upon its discovery through Court-ordered discovery proceedings.

72. On or about **February 9, 2021 at 11:46 p.m. Pacific Time**, via WhatsApp, Tan transmitted to Plaintiff the following written directive: "*We just need to hold her steady for the next 2-4 weeks,*" referring to the price of Vemanti common stock (the "February 9 Directive").

73. On or about **February 12, 2021 at 9:11 a.m. Pacific Time**, via WhatsApp, Tan transmitted to Plaintiff the following written directive: "*We need to keep her stable at $1.50 if possible....impacting deals we're working on*" (the "February 12 Directive"). Approximately one minute later, Tan added: "*Every deal we're working on is looking at our stock....*" followed by a smiling-face emoji.

74. The February 12 Directive is materially identical in form and purpose to the September 22 Manipulation Directive alleged in Cycle 1. Each pairs (a) a specific numerical price target ($1.50 in Cycle 2, $0.35–$0.40 in Cycle 1) with (b) an explicit, in-writing articulation of manipulative purpose tied to deal-counterparty influence ("impacting deals we're working on" in Cycle 2, "so we can keep them excited" in Cycle 1). Each was issued during a quarter in which Tan was concurrently and secretly selling exactly 650,000 shares of his personal Vemanti common stock holdings. The Cycle 2 Directives demonstrate that the September 22 Manipulation Directive was not an isolated incident but the first deployment of a recurring playbook.

75. Plaintiff, in justifiable reliance on the February 9 Directive and the February 12 Directive, responded affirmatively each time. On February 10, 2021 at 6:30 a.m., Plaintiff stated: "*I'll buy support....*" On February 12, 2021 at 9:12 a.m. (one minute after Tan's February 12 Directive), Plaintiff stated: "*I'll put my bids in.*" Plaintiff's responses reflected his sincere,

induced belief, based on Tan's representations, that there were active corporate transactions whose successful completion depended on price stability.

76. During the Cycle 2 window, in addition to the written directives identified above, Tan made multiple oral representations to Plaintiff regarding (a) Tan's purported absence of selling activity; (b) Tan's long-term commitment to Vemanti; and (c) future compensation arrangements for Plaintiff. Specifically, on multiple occasions during Cycle 2 (and previously during the Cycle 1 continuation period and at intervals during the period between Cycles 1 and 2), Plaintiff observed unusual dilutive trading patterns on Vemanti's Level 2 order book and directly inquired of Tan whether Tan was selling Vemanti common stock. On each such occasion, Tan affirmatively denied selling, stating in substance that he was not selling, that he was "*in this for the long haul*," that he was "*building a unicorn*," and that he was holding for "*his legacy*."

77. Tan's recurring oral denials of selling were materially false at each instance. Tan secretly sold 650,000 shares of his Vemanti common stock during Q3 2020 and an additional 650,000 shares during Q1 2021, each as documented in Vemanti's contemporaneous OTC Markets quarterly disclosures.

78. During the Cycle 2 window, Tan also made oral representations to Plaintiff regarding future compensation arrangements, stating in substance that he "*valued [Plaintiff] as a friend*" and that he "*would take care of [Plaintiff] after he takes the company to Nasdaq.*" On information and belief, the post-Nasdaq-uplist compensation promise was made without intent to perform, was conditional on a corporate milestone (Nasdaq listing) Vemanti never achieved during the in-scope period (Vemanti applied to OTCQB, one tier

below Nasdaq, on January 26, 2021, and never reached Nasdaq during the in-scope period or thereafter).

79.    In aggregate during Cycle 2, Plaintiff: (a) deployed over **$500,000** of his personal capital to purchase additional Vemanti common stock following Tan's February 12 Directive to keep the price stable at $1.50, executed through approximately 225 separate purchase transactions against only approximately 4 sale transactions (a buy-to-sell ratio exceeding fifty-to-one) during the period from February 12, 2021 through July 29, 2021, and including a same-day purchase of approximately 4,500 shares on February 12, 2021 at prices between approximately $1.49 and $1.51 per share, within hours of Tan's February 12 Directive; (b) sold only a small fraction of, and retained the bulk of, his then-existing Vemanti position, which totaled approximately 1,190,000 shares as of the date of the February 12 Directive; (c) executed bid-side trading in Vemanti common stock in direct response to Tan's February 9 and February 12 Directives; (d) continued to provide consulting and promotional services without compensation; (e) forewent substantial trading profits otherwise available to him on contemporaneously-traded positions in other securities, in an amount to be determined through discovery and expert analysis. Each of these actions was undertaken in justifiable reliance on the misrepresentations, concealment, and manipulation directives alleged herein.

80.    During the Cycle 2 window, Tan's representations to Plaintiff regarding "deals" included references to: (i) the Letter of Intent with Marena Gold Refinery, publicly announced on or about December 1, 2020 (which had not closed and which was, on information and belief, suffering known governmental and political complications in Mali including ECOWAS sanctions, as Tan documented in his October 2, 2020 third-party iMessage transmissions);

(ii) an Equity Purchase Agreement with LiveTrade Capital LLC publicly announced on or about December 14, 2020; (iii) anticipated stablecoin and digital-asset projects ultimately reflected in the launch of Vemanti Digital Limited and the USDV stablecoin in mid-2021 (a project Vemanti subsequently announced terminated as of February 22, 2022, with all USDV tokens "burned"); and (iv) generalized "fintech partnerships" referenced in Vemanti's public communications during the Cycle 2 window. Each of those "deals" was variously a non-binding letter of intent, a pre-authorized dilution channel operating against shareholder interests, or a project that ultimately produced no commercial revenue. Tan's representations that maintaining the price was necessary so as not to "impact deals" he was "working on" were therefore materially misleading to the extent the "deals" referenced were not, in fact, in advanced execution stages or in any meaningful sense capable of being "impacted" by Plaintiff's individual trading activity.

### *Continuing Reliance and Purchases Throughout Q2 2021*

81.    During the period from approximately **April 1, 2021 through and including June 9, 2021** — a period of approximately seventy (70) days corresponding to Q2 2021 prior to the effective date of Vemanti's Section 12(g) registration — Tan held his Vemanti common-stock position constant at 27,350,000 shares per his Original Schedule 13D filed July 7, 2021. The Q2 2021 pause in reported selling is independently addressed in Section IV.D below as scienter evidence; for Cycle 2 purposes, the pause constituted a *continuation of, not a departure from*, the manipulation scheme. During this Q2 2021 window: (a) Tan continued to conceal from Plaintiff and from the market the fact of his Q1 2021 secret selling of 650,000 shares; (b) in one or more telephone conversations during Q2 2021, Plaintiff observed continued unusual dilutive trading patterns on Vemanti's Level 2 order

book and directly inquired of Tan, by telephone, whether Tan was selling Vemanti common stock, and Tan affirmatively denied selling and reiterated representations that he remained committed to Vemanti for the long term; (c) Tan continued to represent to Plaintiff that Vemanti's pending corporate transactions remained in active and good-faith pursuit; (d) Tan continued to omit any disclosure of his prior Q3 2020 and Q1 2021 selling activity, the October 2020 FINRA inquiry, the abandonment of the Marena Gold transaction, or the October 8, 2020 EPA Term Sheet contemplating dilutive equity-line financing; and (e) Plaintiff continued, in ongoing justifiable reliance on Tan's Q1 2021 manipulation directives and on Tan's continuing oral denials and concealment, to purchase additional Vemanti common stock and to refrain from selling his existing Vemanti positions. Plaintiff's documented Q1 2021 and Q2 2021 purchases — to be supported by the brokerage statements attached as Exhibit J — are alleged as part of the damages claimed herein.

82.    Consistent with paragraphs 36 through 44 above and the documented 2016–2017 round-trip share movement pattern alleged therein, on information and belief, certain of Tan's actual sales and transfers of Vemanti common stock during the in-scope period — including but not limited to potential additional sales or transfers during Q3 2020, Q4 2020, Q1 2021, and Q2 2021 not reflected in Vemanti's contemporaneous OTC Markets quarterly disclosures or in Tan's Original Schedule 13D as of its June 9, 2021 effective date — may not be fully or accurately reflected in Tan's contemporaneous public filings, OTC Markets quarterly disclosures, or representations to Plaintiff. The collective pattern of Tan's documented selling and disclosure activity — including without limitation the 650,000-share Q3 2020 secret-selling cycle, the 650,000-share Q1 2021 secret-selling cycle, the multiple late and

non-compliant Form 4 filings, the approximately 7,850 shares of Section 16(a)-noncompliant selling between June 9 and July 6, 2021, the approximately 497,835 shares of Section 16(a)-noncompliant selling between July 30, 2021 and March 24, 2022 (the reference date of the FY2021 10-K Item 12 beneficial-ownership table), and the failure to file any Schedule 13D amendment during the in-scope period despite material changes in beneficial ownership — establishes that the publicly available record cannot be presumed complete or accurate. Plaintiff expressly reserves the right to amend or supplement this Complaint to plead additional unreported sales upon their discovery through formal discovery proceedings, including without limitation broker subpoenas, third-party records requests, and document discovery against Defendants.

83.    In addition to the explicit oral denials of selling described above, Tan made multiple written WhatsApp representations during the in-scope period that, while not constituting explicit denials of selling, conveyed to Plaintiff the strong implicit representation that Tan was not engaged in selling activity — including without limitation: (a) the September 10, 2020 representation "*I'm playing the long game. Stay with me!*"; (b) the August 13, 2020 representation "*Hang in there*"; (c) the August 15, 2020 representation "*People will be sorry they got out too early*"; and (d) repeated "we," "our stock," "our chart," and similar framings throughout the in-scope period suggesting a shared long-term enterprise. Each such written representation reinforced, and was reinforced by, Tan's contemporaneous and recurring oral denials of selling, such that the combined effect of Tan's written commitment-to-hold representations and Tan's oral denials of selling established to Plaintiff a firm and justifiably held belief that Tan was not selling Vemanti common stock during the periods relevant to this Complaint. (Plaintiff's reliance on that belief is

documented in Exhibit I; see, e.g., his June 16, 2021 messages confirming that he continued to hold and had purchased additional Vemanti common stock in the belief that Tan was not selling.) The combined effect of those representations was materially false at the time made, and was understood by Tan to be so, in light of Tan's contemporaneous Q3 2020 and Q1 2021 secret-selling activity.

### D. Vemanti's Section 12 Registration and Tan's Federal Reporting Failures (June 2021 – March 2022)

84. On or about April 9, 2021, Vemanti initially filed a Form 10 Registration Statement with the SEC. Vemanti subsequently filed multiple Form 10/A amendments responding to SEC Staff comments. Vemanti's Form 10 / Form 10/A became effective on June 9, 2021, registering Vemanti's common stock under Section 12(g) of the Exchange Act.

85. From and after June 9, 2021, Tan was subject to the federal beneficial-ownership reporting obligations of Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and Rule 13d-2(a) thereunder, 17 C.F.R. § 240.13d-2(a). As a beneficial owner of more than five percent (5%) of Vemanti's common stock, Tan was required to file an initial Schedule 13D within ten (10) days of the registration date and to amend the Schedule 13D promptly upon any material change in the facts disclosed therein.

86. From and after June 9, 2021, Tan was likewise subject to the federal insider-reporting obligations of Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-3 thereunder, 17 C.F.R. § 240.16a-3. As an officer, director, and beneficial owner of more than ten percent (10%) of Vemanti's common stock, Tan was required to file a Form 4 within two (2) business days of any non-exempt transaction in Vemanti securities.

87. From and after April 9, 2021 (the date Vemanti initially filed its Form 10), Vemanti was subject to the periodic-reporting obligations of Sections 13(a) and 15(d) of the Exchange Act and the rules thereunder.

88. Between March 31, 2021 (the close of the Q1 2021 secret-selling cycle) and June 9, 2021 (the Section 12 registration effective date) — a period of approximately seventy (70) days — Tan held his common-stock position constant at 27,350,000 shares. Tan made no purchases and no sales of Vemanti common stock during this 70-day window, as confirmed by the original Schedule 13D Tan filed on July 7, 2021. The 70-day quiet period is itself probative of Tan's scienter: it demonstrates that Tan and his counsel were actively timing Tan's selling around the Section 12 registration date, pausing pre-registration sales so as not to require disclosure on the soon-to-be-filed Schedule 13D, and resuming sales only after the original Schedule 13D had been filed.

89. On July 7, 2021, Tan filed his original Schedule 13D with the SEC under Accession Number 0001477932-21-004431 (the "Original 13D"). The Original 13D was prepared and filed by Mark Crone, Esq. of The Crone Law Group, P.C. The Original 13D disclosed Tan's beneficial ownership as of June 9, 2021 of 27,350,000 common shares (approximately 39.3% of common) and 40,000,000 Series A Preferred shares (100% of preferred). A true and correct copy of the Original 13D is attached hereto as **Exhibit E**.

90. Beginning on or about July 6, 2021 — within twenty-seven (27) days of his Section 12 registration becoming effective and within days of the "as-of" date for the Original 13D — Tan resumed selling Vemanti common stock. Tan filed five (5) Form 4 reports during July 2021 (collectively, the "July 2021 Form 4s") disclosing aggregate sales of **189,315**

**common shares** between July 6 and July 29, 2021, with the following specific transactions: (a) Form 4 dated July 12, 2021 (transactions July 6–9, 2021) — 43,100 shares sold at a weighted average of approximately $1.153 per share; (b) Form 4 dated July 20, 2021 (transaction July 15, 2021) — 1,315 shares sold at $0.94 per share; (c) Form 4 dated July 22, 2021 (transactions July 20, 2021) — 3,809 shares sold at a weighted average of approximately $0.807 per share; (d) Form 4 dated July 23, 2021 (transactions July 21–23, 2021) — 58,194 shares sold at a weighted average of approximately $0.751 per share; (e) Form 4 dated July 29, 2021 (transactions July 26–29, 2021) — 82,897 shares sold at a weighted average of approximately $0.758 per share. True and correct copies of the July 2021 Form 4s are collectively attached hereto as **Exhibit F**.

91. The first of the July 2021 Form 4s — the Form 4 dated July 12, 2021 — was filed four (4) business days after the earliest reported transaction (July 6, 2021), in violation of Section 16(a)'s two-business-day filing requirement. The Form 4 dated July 20, 2021 was filed three (3) business days after the reported transaction (July 15, 2021), again in violation of the two-business-day rule.

92. Upon becoming aware of the Form 4 filings described above, on or about mid-July 2021, Plaintiff placed a telephone call to Defendant Tan Tran to inquire directly whether Tan was selling Vemanti common stock. During that call, Tan stated to Plaintiff, in words and substance: **"Nabe, I am not selling."** Tan thereafter reiterated the denial by attributing any contemporaneous transactions to a broker rather than to Tan himself — conveying to Plaintiff, in substance, that because a broker (and not Tan personally) was executing transactions, Tan was not "selling." Tan's denial was materially false and misleading when made. Tan was the reporting person of record on the very Form 4 filings then on file under

his own name; Tan was the beneficial owner of the Vemanti common stock disclosed on those filings; and Tan was the legal seller of those shares for purposes of Section 16(a), Section 10(b), and Rule 10b-5. A broker executing a sale possesses no independent authority to dispose of an insider's beneficially-owned shares; such sales occur only by the insider's authorization or direction and are reported as the insider's own transactions. Tan's attribution of his sales to a broker was a deliberate semantic equivocation calculated to deceive Plaintiff into believing Tan was not disposing of his Vemanti holdings. Tan's statement was, at minimum, an actionable half-truth: it stated the truth only so far as it went while omitting the critical qualifying fact — that Tan was the reporting person and legal seller of the shares being sold — necessary to render the statement "not misleading" within the meaning of Rule 10b-5(b). Tan made the statement with scienter, in that Tan personally authorized, controlled, and benefited from the sales disclosed on the Form 4 filings under his own name. In justifiable reliance on Tan's denial — informed by more than fourteen (14) months of relationship history, by Tan's use of Plaintiff's personal nickname during the call, and by Plaintiff's contemporaneous good-faith investment in Vemanti's purported success — Plaintiff continued to purchase Vemanti common stock in the days following the call and continued to refrain from liquidating his existing Vemanti position, to his further detriment, until the scale of Tan's subsequent bulk selling (commencing on or about July 30, 2021, as alleged above) became impossible to reconcile with Tan's denial. Moreover, even as Tan privately denied selling and continued to sell, Tan was soliciting fresh capital from the same shareholder community he was exiting: on or about July 26, 2021 — during the very July 26–29, 2021 period in which Tan sold 82,897 shares as disclosed on his Form 4 dated July 29, 2021 — Tan sent a private text message to a retail Vemanti shareholder,

Javier, stating: "Hi Javier. I'm looking for $1M. However, the $ from my shares should give us a bit of time to raise it with the banker. You think the group can gather $1M?" (Exhibit I at 68 (Item B-61).) Javier subsequently shared Tan's message in the "VMNT Investor Room" — the Vemanti shareholder group chat that Plaintiff had created and administered on Twitter (now X) — where it became visible to the broader shareholder community. That Tan solicited $1,000,000 from individual retail shareholders, privately and one-to-one, while personally and contemporaneously liquidating his own Vemanti position, evidences both Tan's consciousness that his selling was material and his bad faith toward the very shareholders he was soliciting.

93.   After July 29, 2021, Tan ceased filing Form 4s for the remainder of the in-scope period. As of March 24, 2022, Tan additionally held 40,000,000 shares of Vemanti Series A Preferred Stock (constituting 100% of the preferred class), each share of which carries ten (10) votes per share of common stock, and which together with Tan's 26,655,000-share common-stock holding (representing 37.3% of the 71,519,830 shares of common stock issued and outstanding) represented approximately ninety and six-tenths percent (90.6%) of the total combined voting power of Vemanti Group, Inc. as of March 24, 2022. The FY2021 10-K reports at Page 48 (Item 12) that, as of March 24, 2022, Tan beneficially owned 26,655,000 shares of Vemanti common stock — a reduction of **497,835 shares** from his post-Form 4 #5 position of 27,152,835 shares as of July 29, 2021. The 497,835 shares Tan sold between July 30, 2021 and March 24, 2022 were never the subject of any Form 4 filing during the in-scope period.

94.   In total, during the calendar year 2021, Tan reduced his common-stock holdings from 28,000,000 shares (at year-end 2020) to 26,655,000 shares (at year-end 2021), a net

reduction of 1,345,000 shares. Of those 1,345,000 shares, only 189,315 (approximately 14.07%) were reported on Form 4 filings. The remaining 1,155,685 shares (approximately 85.93%) were sold without contemporaneous Form 4 disclosure during the relevant periods. Of those unreported shares, 650,000 were sold during Q1 2021 — before Vemanti was a Section 12 registered company and accordingly without any then-applicable Form 4 obligation — and the remainder, 505,685 shares, were sold while Section 16(a) was in force.

95.   Of the 505,685 shares sold while Section 16(a) was in force without corresponding Form 4 filings, the breakdown is as follows: 7,850 shares sold between June 9, 2021 (the Section 12 registration effective date) and July 6, 2021 (the date of the earliest transaction reported on Form 4 #1); and 497,835 shares sold between July 30, 2021 and March 24, 2022. Each such unreported transaction was a separate violation of Section 16(a) and Rule 16a-3.

96.   In addition to his Section 16(a) failures, Tan failed to file any amendment to his Schedule 13D during the in-scope period, despite the cumulative sale of approximately 695,000 common shares between June 9, 2021 and March 24, 2022 (consisting of the 189,315 shares reported across the five July 2021 Form 4 filings, plus the approximately 505,685 shares sold without any corresponding Form 4 filing during the same window). By March 24, 2022, Tan's cumulative reduction in beneficial ownership from his Original Schedule 13D filing position approached the SEC's one-percent (1%) materiality guideline as a percentage of class outstanding. The reported and unreported components of this 695,000-share reduction, and the status of each corresponding Section 13(d) and Section 16(a) filing, are summarized in tabular form at Exhibit U.

97.    Tan did not file any amendment to his Schedule 13D until October 24, 2023 — twenty-seven (27) months after the Original 13D filing and more than eighteen (18) months after the close of the in-scope period. When Tan finally filed that amendment, it was occasioned by, and disclosed, intra-family transfers of his common stock — reporting his common position as held 20,155,000 shares by Tan, 3,250,000 shares by his wife, Phoebe Tran, and 3,250,000 shares by his son, Jacob Tran (Exhibit N) — yet it still did not separately disclose or itemize the 505,685 shares Tan had sold during the in-scope period without any Form 4, the cumulative reduction remaining discernible only by comparing share balances across separate filings (Exhibit U). The October 24, 2023 Schedule 13D/A is referenced herein solely as evidence corroborating the existence and materiality of the disclosures Tan failed to make during the in-scope period; no claim is asserted in this Complaint based on conduct after March 24, 2022.

98.    Plaintiff is informed and believes, and on that basis alleges, that Tan's ongoing relationship with The Crone Law Group, P.C. — counsel that prepared and filed the Original 13D — forecloses any inference that Tan was unaware of his Section 13(d) and Section 16(a) reporting obligations. The Crone Law Group, P.C. is a securities specialty law firm experienced in such filings. Tan's failure to file the required amendments and Form 4s was therefore knowing or, at minimum, reckless.

### E.  Cycle 3: The FY2021 10-K (Filed March 24, 2022)

99.    On March 24, 2022, Vemanti filed the FY2021 10-K with the SEC. A true and correct copy of the FY2021 10-K (or relevant portions) is attached hereto as **Exhibit G** and incorporated by reference. The FY2021 10-K was signed by Tan as Chief Executive Officer of Vemanti

and was personally certified by Tan under Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 (Exhibits 31.1 and 32.1 to the FY2021 10-K).

100.  The FY2021 10-K contains, and Tan personally certified the truth of, the following materially false or misleading statements and material omissions:

101.  (a) *Item 12 (Page 48):* The FY2021 10-K reports Tan's beneficial ownership of common stock as 26,655,000 shares as of March 24, 2022, and his ownership of Series A Preferred Stock as 40,000,000 shares (100%), giving him 90.6% combined voting power. The disclosure fails to identify, contextualize, or otherwise alert the reader to the fact that approximately 1,345,000 of Tan's shares had been sold during the fiscal year, that Tan had sold approximately 505,685 shares after Vemanti became subject to Securities Exchange Act reporting requirements without filing the required Form 4 reports, and that the cumulative selling materially changed the facts disclosed on the Original 13D without contemporaneous amendment.

102.  (b) *Item 405 of Regulation S-K (17 C.F.R. § 229.405):* Item 405 requires Vemanti to disclose any known late or missing Section 16(a) filings during the most recent fiscal year. The FY2021 10-K included a "Delinquent Section 16(a) Reports" disclosure (Item 10, Page 46) acknowledging in general terms that certain of the Company's officers, directors, and ten-percent holders had failed to file timely Section 16(a) reports, and specifically identifying only Stephen R. Jones, the Company's Chief Financial Officer, as having filed a late Form 3 and a late Form 4 (for 25,000 shares issued to him in October 2021). That disclosure was materially false and misleading because it omitted Tan's own far more significant Section 16(a) delinquencies — his untimely July 2021 Form 4 filings and his

failure to file any Form 4 for the approximately 505,685 shares he sold during the fiscal year (as summarized at Exhibit U) — of which Vemanti, acting through Tan, was aware. By disclosing the Chief Financial Officer's comparatively minor delinquencies while concealing Tan's, the disclosure conveyed the materially misleading impression that the Company had identified and reported its Section 16(a) compliance failures.

103.    (c) *Item 9A (Controls and Procedures):* Tan certified at Item 9A that Vemanti's disclosure controls and procedures were "not effective at a reasonable assurance level" due to material weaknesses in internal control over financial reporting. The Item 9A disclosure fails to identify the specific instances of disclosure failure constituted by the missing Form 4s, the unamended Schedule 13D, the materially false and incomplete Item 405 "Delinquent Section 16(a) Reports" disclosure described above, and the omitted disclosure of insider price-pegging instructions during Q3 2020 and Q1 2021.

104.    (d) *Item 13 (Certain Relationships and Related Transactions):* The FY2021 10-K's Item 13 disclosures, while purporting to describe management dealings, omit any reference to Tan's Q3 2020 or Q1 2021 WhatsApp communications with Plaintiff or to Plaintiff's status as Vemanti's unpaid promotional consultant under the Consulting Agreement. The Item 13 disclosures were rendered materially misleading by these omissions.

105.    (e) *USDV Stablecoin Disclosures (Page 4):* The FY2021 10-K describes the development of the USDV stablecoin as a major business activity for which Vemanti incurred general-and-administrative expenses of approximately $1,531,193 during fiscal year 2021. The FY2021 10-K reports at Page 4 that, as of February 22, 2022, Vemanti "terminated its agreements with Stably and FDT, and all USDV tokens have been burned." The FY2021

10-K fails to disclose that the USDV project was the same project Tan had used during Cycle 2 (Q1 2021) as a forward-looking justification for instructing Plaintiff to maintain the price of Vemanti stock — and that the project ultimately produced no commercial revenue.

106.    (f) *Risk Factors (Page 16):* The FY2021 10-K's Risk Factor disclosure regarding management ownership concentration acknowledges that "management beneficially owns 37.3% of our outstanding shares" and that "their interests may differ from the interests of our other shareholders." The disclosure is materially misleading because, by the date of the FY2021 10-K filing, management (and specifically Tan) had already acted in a manner adverse to the interests of other shareholders during the period being reported, and the Risk Factor failed to disclose the historical misalignment.

107.    (g) *Item 1 (Business) — Status of Marena Gold Transaction:* The FY2021 10-K's Item 1 disclosures concerning Vemanti's pending or potential transactions, in combination with the Item 12 ownership disclosures, do not adequately disclose the actual operational status of the Marena Gold transaction (announced as an LOI on December 1, 2020 with a stated expected closing by end of January 2021). The transaction had failed to close and had been effectively abandoned due to political and governmental complications in Mali (including ECOWAS sanctions and difficulties affecting Marena Gold's principals' ability to operate within Mali) of which Tan was aware no later than October 2, 2020 (as documented in his contemporaneous third-party iMessage communications). To the extent the FY2021 10-K addressed the Marena Gold transaction at all, it did so in a manner that, in light of the totality of circumstances and Plaintiff's contemporaneous understanding induced by Tan's representations, was materially misleading by omission.

**108.** Each of the misstatements and omissions identified in the preceding paragraph was material under the standard articulated in *Basic Inc. v. Levinson, 485 U.S. 224 (1988),* and *Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27 (2011)*. There is a substantial likelihood that a reasonable investor would have considered the omitted facts important in deciding whether to purchase, hold, or sell Vemanti securities, and there is a substantial likelihood that disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the total mix of information available.

**109.** Each of the misstatements and omissions identified above was made with scienter. Tan personally signed the FY2021 10-K and personally certified its accuracy under Sections 302 and 906 of the Sarbanes-Oxley Act. Tan possessed personal, direct, and contemporaneous knowledge of (i) his own selling activity during the in-scope period, (ii) the WhatsApp directives and oral representations he had given Plaintiff during Cycle 1 and Cycle 2, (iii) the late and missing Form 4 filings, (iv) the unamended Schedule 13D, (v) the actual operational status of the USDV project and the absence of binding "deals," and (vi) the abandonment of the Marena Gold transaction. Tan certified the FY2021 10-K with that knowledge.

### F. *Pattern Evidence of Scienter Across the In-Scope Period*

**110.** In addition to the specific scienter elements identified within each Cycle above, the strong inference of scienter required under *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007),* and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2), is established by the following pattern evidence:

111.    (a) *Twin-cycle 650,000-share volume symmetry.* Tan secretly sold exactly 650,000 shares in Q3 2020 and exactly 650,000 shares in Q1 2021 — the same volume to the share, executed against the same victim with the same playbook, six months apart, in two consecutive in-scope cycles. The 650,000/650,000 symmetry is not credibly explained by coincidence and demonstrates a deliberate and recurring scheme.

112.    (b) *Repeated written manipulation directives with explicit articulation of manipulative purpose.* Tan transmitted to Plaintiff at least two written manipulation directives — the September 22 Manipulation Directive ("keep it between 0.35-0.40 so we can keep them excited") and the February 12 Directive ("keep her stable at $1.50 if possible....impacting deals we're working on") — each pairing a specific numerical price target with explicit articulation of manipulative purpose tied to deal-counterparty influence. Direct documentary evidence of manipulative intent is the rarest exhibit in private securities litigation; Plaintiff has it twice, six months apart.

113.    (c) *Pattern of self-aware admissions paired with smug-emoji visual annotations.* During the seven-week window from August 15, 2020 to October 6, 2020, Tan transmitted to Plaintiff at least five WhatsApp messages each pairing language reflecting Tan's self-aware understanding of price-impact dynamics, market psychology, and post-FINRA-notice cautionary positioning, with a visually annotated emoji (a smug winking face or comparable expression) reflecting Tan's contemporaneous awareness of the cynical or self-aware nature of the message: (i) August 15 — "people will be sorry they got out too early"; (ii) August 20 — "every time I talk, the stock reacts...so I need to make sure what I say is true"; (iii) September 10 — "anticipation is better than the real news" paired with "that's why in my tweet today I just said next week and not specific date"; (iv) October 6 (post-

FINRA contact) — "and it needs to stay that way"; and (v) October 8 (EPA tipping context) — "still negotiating….always...."

114.    (d) ***Continuation of conduct after direct regulatory notice from FINRA.*** On October 6, 2020, FINRA contacted Tan with a substantive inquiry about Vemanti's press releases and podcasts. Within forty-eight (48) hours, Tan transmitted to Plaintiff a confidential corporate financing term sheet (the EPA Term Sheet) with explicit "For your eyes only. Extremely confidential. Please don't share" framing. The continuation of MNPI tipping conduct within forty-eight hours of regulatory notice, the second secret-selling cycle four months later, and the failure to file required Section 13(d) and 16(a) disclosures during the in-scope period collectively demonstrate that Tan was warned by a regulator and continued the same conduct, escalating rather than ceasing.

115.    (e) ***Position and access.*** Tan was, at all relevant times, Vemanti's sole CEO during the in-scope period and Vemanti's sole CFO through September 7, 2021. As such, Tan had unilateral control over Vemanti's public disclosures, internal records, and corporate communications. Tan signed and personally certified the FY2021 10-K under Sarbanes-Oxley §§ 302 and 906.

116.    (f) ***Counsel of record.*** Tan was advised at all relevant times by The Crone Law Group, P.C., a securities specialty firm. Inference that Tan was unaware of his disclosure obligations under Section 13(d), Section 16(a), and the periodic-reporting provisions of the Exchange Act is therefore foreclosed.

117.    (g) ***Sustained multi-year pre-in-scope liquidation directly contradicting Tan's "long haul / unicorn / legacy" representations.*** As alleged in the "Founding Ownership and Pre-

In-Scope Share Trajectory" sub-section above, Tan held approximately 40,000,000 common shares of Vemanti at founding (April 3, 2014) and approximately 28,650,000 common shares at the start of the in-scope period (June 30, 2020) — a pre-in-scope reduction of approximately 11,350,000 common shares over approximately six years. By the close of the in-scope period (March 24, 2022), Tan's common holdings had further decreased to 26,655,000, for a cumulative reduction from founding of approximately 13,345,000 common shares (approximately one-third of Tan's founding common-stock position). This sustained multi-year liquidation pattern, predating the in-scope period and continuing through it, is materially inconsistent with Tan's contemporaneous oral and written representations to Plaintiff that Tan was "in this for the long haul," "building a unicorn," holding for "his legacy," and "playing the long game." The pattern is further corroborated by Tan's sustained pattern of inadequate, obscured, and inconsistent OTC and SEC disclosure regarding his beneficial ownership and Vemanti's share structure, including without limitation: (i) reporting Tan's beneficial ownership in percentage form ("95.3%" in the February 11, 2016 filing) without specifying the contemporaneous share count; (ii) inconsistent disclosure of additional classes of securities (the February 11, 2016 filing's Security Information section stated "Additional class of securities: Not Applicable," notwithstanding the contemporaneous existence of 40,000,000 issued and outstanding shares of Vemanti preferred stock as disclosed in the same filing's Note 1 to the Consolidated Financial Statements); (iii) the late OTC quarterly disclosures alleged above; (iv) the late, missing, and noncompliant Form 4 filings alleged in Section IV.D above; and (v) the failure to file any required Schedule 13D amendment during the in-scope period despite material changes in beneficial ownership; (vi) the documented Q4 2016 outbound

net transfer of approximately 3,400,000 common shares from Tan's beneficial ownership against a contemporaneous Non-Restricted public-float increase of only approximately 320,000 shares and a Shareholders-of-Record increase of only four (4), and the documented Q1 2017 outbound net transfer of approximately 2,500,000 common shares from Tan's beneficial ownership against a contemporaneous Non-Restricted public-float change of zero, as alleged in paragraphs 37 and 38 above; (vii) the documented Q2 2017 inbound net transfer of approximately 3,550,000 common shares to Tan's beneficial ownership in a quarter during which Vemanti issued no new common shares, constituting a round-trip share movement pattern within a small closed group of restricted beneficial holders mathematically incompatible with arm's-length retail distribution, as alleged in paragraph 39 above; (viii) the documented June 30, 2020 cumulative-versus-Public-Float arithmetic in which the eleven million three hundred fifty thousand (11,350,000) common shares net departed from Tan's beneficial ownership during the pre-in-scope period exceeded Vemanti's entire reported Public Float as of June 30, 2020 of 8,420,000 shares by approximately 2,930,000 shares, as alleged in paragraph 41 above; and (ix) the absence of transferee identification in any contemporaneous Vemanti OTC Markets quarterly or annual disclosure for any of the share movements alleged in paragraphs 36 through 44 above.

118.    (h) **Engagement of other paid promoters as part of the manipulative scheme.** Plaintiff is informed and believes, and on that basis alleges, that during the in-scope period Tan retained, compensated, or directed one or more additional third-party promoters, investor-relations agents, newsletter publishers, or social-media promoters to publish or disseminate favorable communications concerning Vemanti common stock, in order to stimulate retail

buying interest and trading volume contemporaneously with Tan's own undisclosed selling. The identities of such promoters, the form and amount of their compensation, and the content and timing of their communications are presently within the exclusive knowledge and control of Tan and Vemanti and are not disclosed in any contemporaneous public filing. This allegation is pleaded as predicate conduct supporting Plaintiff's scheme-liability theory under Rule 10b-5(a) and (c) (see Count One below) and as a basis for the discovery requested in the Prayer for Relief; it is not pleaded as a standalone private cause of action under Section 17(b) of the Securities Act, under which no private right of action lies. Plaintiff's own role is materially and categorically distinct from that of any such paid promoter: Plaintiff's consulting relationship with Vemanti was disclosed and memorialized in the written Consulting Agreement (Exhibit A); Plaintiff expressly declined share or equity compensation specifically to avoid diluting other Vemanti shareholders; and Plaintiff conducted his promotional activity in good-faith reliance on Tan's representations that Vemanti was a legitimate operating business, rather than as a knowing participant in any scheme to defraud. Plaintiff expressly reserves the right to amend or supplement this Complaint to name additional participants, and to plead additional facts and theories, upon their identification through Court-ordered discovery.

### G. Discovery of the Fraud

119. Plaintiff did not become aware, and could not in the exercise of reasonable diligence have become aware, of the full scope of Tan's twin-cycle manipulation, the related Section 16(a) and Section 13(d) failures, the misrepresentations regarding Tan's past selling history, and the material misstatements and omissions in the FY2021 10-K, until on or about January 2025. In or about January 2025, while conducting independent research into Vemanti's

OTC Markets disclosures, Plaintiff first discovered that Tan had reduced his Vemanti common-stock holdings — that is, had been selling — during the first quarter of 2021, the very period during which Tan was directing Plaintiff by WhatsApp to keep the stock price stable at $1.50 (the February 12, 2021 directive). Upon further research into Vemanti's and Tan's securities filings, Plaintiff discovered that Tan had been selling Vemanti common stock throughout 2021 while failing to file all of the Form 4 reports required to disclose those sales. The fraud was not capable of discovery earlier because:

120.    (a) During Cycle 1 (Q3 2020), Vemanti was not yet a Section 12 registered company. Vemanti did not register under Section 12(g) of the Exchange Act until June 9, 2021. Accordingly, no Form 4, Schedule 13D, or other federal insider-reporting filings disclosing Tan's Q3 2020 sales existed during Q3 2020 or for many months thereafter.

121.    (b) Tan's manipulation directives and MNPI tippings were communicated to Plaintiff via private WhatsApp messages, and Tan's affirmative denials of selling were communicated via private telephone calls — none via any public disclosure. Plaintiff had no reason to suspect, and could not have suspected based on public information, that Tan was instructing him to support a price floor while Tan was personally selling.

122.    (c) Although Vemanti's Q2 2020 OTC Markets quarterly disclosure (filed August 6, 2020, Exhibit S) had publicly established the 28,650,000-share pre-cycle baseline for Tan's beneficial common-stock ownership, Vemanti did not file the Q3 2020 OTC Markets quarterly disclosure (Exhibit B) that would have revealed the reduced 28,000,000-share post-cycle figure until February 25, 2021 — five months after the close of Q3 2020 and after the Q1 2021 Cycle 2 selling had already begun. During the intervening period Tan

made affirmative oral denials of selling activity to Plaintiff (as alleged in paragraphs 54 through 61 above), transmitted manipulation directives and material misrepresentations regarding pending corporate transactions (as alleged in paragraphs 47 through 53 and 63 through 80), and was under no Section 16(a) Form 4 reporting obligation because Vemanti was not yet a Section 12 registered company. Plaintiff could not reasonably have been expected to identify Tan's Cycle 1 secret selling during the period prior to February 25, 2021; and Plaintiff's discovery thereafter was further impeded by Tan's continuing affirmative concealment, including the mid-July 2021 phone-based denial alleged at paragraph 92 above.

123.    (d) Vemanti's Q1 2021 OTC Markets quarterly disclosure was not publicly filed until later in 2021. The contemporaneous Q1 2021 OTC filing, when ultimately filed, reflected an end-of-period beneficial ownership figure for Tan but did not disaggregate Tan's individual sale transactions by date or volume in a manner that would have alerted Plaintiff to the contemporaneous nature of Tan's selling vis-à-vis Tan's February 9 and February 12, 2021 WhatsApp directives.

124.    (e) Tan and his counsel concealed the cumulative effect of his post-Section 12-registration selling by failing to file required Section 13(d) amendments. Had Tan amended his Schedule 13D as required, the public record would have disclosed his declining beneficial ownership; the absence of any such amendment until October 24, 2023 effectively suppressed the public information from which Plaintiff could have learned of the cumulative selling pattern.

125.   (f) Tan continued to represent to Plaintiff during the years following Cycle 2 that the corporate strategy was unfolding favorably, that pending deals were materializing, and that Plaintiff's continued holding of Vemanti stock was prudent — representations that obscured rather than disclosed the Cycle 1 and Cycle 2 fraud.

126.   The applicable statutes of limitation are tolled by the doctrines of fraudulent concealment, equitable tolling, and the discovery rule. Each of Plaintiff's claims is timely brought within the maximum statutes of repose and within the applicable discovery periods. Specifically:

127.   (a) Plaintiff's claim under Section 10(b) of the Exchange Act is timely brought within five (5) years of the violation under 28 U.S.C. § 1658(b)(2) (the latest in-scope event being the FY2021 10-K filing on March 24, 2022), within two (2) years of Plaintiff's discovery of the violation under 28 U.S.C. § 1658(b)(1), and as further tolled by the doctrines of fraudulent concealment, equitable tolling, and the discovery rule alleged above.

128.   (b) Plaintiff's California fraud claims are timely brought within three (3) years of Plaintiff's discovery under California Code of Civil Procedure § 338(d), and as further tolled by the doctrines of fraudulent concealment, equitable tolling, and the discovery rule alleged above.

129.   (c) Plaintiff's breach-of-written-contract claim is timely brought under California Code of Civil Procedure § 337, the four-year limitations period of which is measured from the date of Plaintiff's discovery of the breach pursuant to the delayed discovery rule and the doctrines of fraudulent concealment, equitable tolling, and the discovery rule alleged above.

130.    (d) Plaintiff's claim under California Business and Professions Code § 17200 is timely brought under the four-year limitations period of § 17208, measured from the date of Plaintiff's discovery of the underlying wrongful conduct pursuant to the delayed discovery rule, equitable tolling, and the doctrine of fraudulent concealment alleged above.

131.    (e) Plaintiff's Section 13(d) and Section 16(a) related claims are timely brought (i) as continuing violations and as fresh violations occasioned by each separate failure-to-file event during the in-scope period; and (ii) in the alternative, as tolled by the doctrines of fraudulent concealment, equitable tolling, and the discovery rule alleged above.

### *H.  Damages*

132.    As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiff has suffered substantial damages. Plaintiff organizes his compensatory injury below into three principal categories — foregone-sale damages, post-directive purchase damages, and cross-instrument trading and loss-of-livelihood damages — together with continuing-hold, quasi-contract, statutory, and punitive components. The dollar amounts stated below are approximate, are derived from Plaintiff's brokerage records and federal income-tax filings, and are pleaded as reasonable estimates subject to precise computation through discovery and expert analysis at trial. Each category of damages was directly and proximately caused by Defendants' manipulation directives, secret selling, oral and written misrepresentations, half-truths, and concealment, as alleged herein:

133.    (a) **First Damages Category — Foregone-Sale Damages on the Position Held in Reliance on Tan's Long-Term-Hold, Nasdaq-Listing, and Stabilization Representations.** As of February 12, 2021, Plaintiff held approximately 1,190,000 shares

of Vemanti common stock. In numerous telephone conversations throughout the in-scope period — both preceding and surrounding his written directives — Tan repeatedly represented to Plaintiff, in words and substance, that he was committed to Vemanti for the long term, that Plaintiff should hold his shares for the long term alongside Tan, and that Tan intended to take Vemanti public on the Nasdaq Stock Market. Tan reinforced those oral representations in writing through his February 9 and February 12, 2021 directives to "hold her steady" and to "keep her stable at $1.50," and through his written statement that Vemanti's share price needed to remain stable for a period of approximately two to four weeks on account of pending corporate transactions. In direct and justifiable reliance on those representations — and because Plaintiff had recommended Vemanti to other investors on the strength of Tan's same long-term and Nasdaq representations and did not wish to liquidate a large position into the very shareholders he had encouraged to invest — Plaintiff sold only a small fraction of his shares into the Cycle 2 price appreciation and retained the bulk of his approximately 1,190,000-share position, even as Vemanti common stock traded at intraday prices of approximately $2.00, then above $2.50, and as high as approximately $2.74 per share. Consistent with Tan's stabilization directives, the limited sales Plaintiff made as the price rose were more than offset by his contemporaneous purchases on price pullbacks — the directive-conforming, bid-supporting trading further described in Paragraph 134 — through which Plaintiff helped keep Vemanti's price stable rather than liquidating into strength. Had Plaintiff instead sold his approximately 1,190,000-share position during the Cycle 2 window at an average price of approximately $1.70 per share — well below the approximately $2.74 intraday high the stock reached — he would have realized approximately $2,000,000. Because Plaintiff held the bulk of that

position in reliance on Tan's representations while Tan was simultaneously and secretly selling 650,000 shares of his own Vemanti common stock during that same window — and because Vemanti's share price thereafter collapsed, leaving Plaintiff to realize only a fraction of that value upon eventual liquidation — Plaintiff's foregone-sale damages, measured by the difference between the value available during the Cycle 2 window and the substantially lesser value he ultimately realized, are estimated at not less than approximately $2,000,000, subject to precise computation through discovery.

134.    (b) **Second Damages Category — Post-Directive Purchase Damages.** In direct reliance on the February 12 Directive — Tan's instruction to keep Vemanti's share price stable at $1.50 — Plaintiff purchased over $500,000 of additional Vemanti common stock over the following months, from February 12, 2021 through July 29, 2021. During that same period, Plaintiff executed approximately 225 separate purchase transactions against only approximately 4 sale transactions — a buy-to-sell ratio exceeding fifty-to-one — reflecting the directive-conforming, bid-supporting accumulation pattern that Tan's February 12 Directive was designed to induce. On February 12, 2021 itself, within hours of receiving the February 12 Directive, Plaintiff purchased approximately 4,500 shares at prices between approximately $1.49 and $1.51 per share — contemporaneous, same-day documentary evidence of Plaintiff's immediate reliance. The shares Plaintiff purchased during this post-directive window were acquired at prices artificially supported by Tan's manipulation and by Plaintiff's own induced bid-side trading, and exceeded the value those shares would have commanded had Tan's contemporaneous secret selling and the related material facts been truthfully disclosed. Plaintiff's out-of-pocket losses within this category — the realized losses Plaintiff sustained on the portion of this post-directive tranche he was

ultimately compelled to liquidate below his cost — are to be determined through discovery and expert analysis. The opportunity cost of the personal capital Plaintiff diverted into this tranche — capital that, but for Defendants' inducement, Plaintiff would have continued to deploy in his otherwise consistently profitable trading in other securities — is accounted for within the cross-instrument trading and loss-of-livelihood damages described in the Third Damages Category below, and is not separately claimed in this category in order to avoid duplication.

135.    (c) **Third Damages Category — Cross-Instrument Trading Damages and Loss of Trading Livelihood.** During the in-scope period, Plaintiff was a full-time, independent securities trader whose livelihood depended on disciplined, diversified trading across numerous securities. The time, attention, capital, and psychological focus that Tan's manipulation scheme diverted into Vemanti common stock, and the disruption to Plaintiff's trading discipline caused by Tan's directives, concealment, oral denials, and the eventual discovery of Tan's fraud, caused a sustained and measurable deterioration in Plaintiff's trading performance across all other (non-Vemanti) securities. Plaintiff's net realized trading gains and losses on securities other than Vemanti, as reflected in Plaintiff's brokerage records and federal income-tax filings — Plaintiff's IRS-filed Form 1040 and Schedule D records for tax years 2017 through 2024 being attached hereto as **Exhibit K** — reflect three distinct phases. In the pre-Vemanti baseline period (tax years 2017–2019), Plaintiff's non-Vemanti realized trading results averaged a gain of approximately $76,450 per year (approximately $49,422 in 2017, $105,934 in 2018, and $73,993 in 2019). In the Vemanti-era peak (tax years 2020–2021), those results averaged a gain of approximately $262,455 per year (approximately $208,936 in 2020 and $315,973 in 2021). Following the

in-scope period and the crystallization of Tan's fraud, Plaintiff's non-Vemanti trading performance reversed: in the post-fraud collapse period (tax years 2022–2024), Plaintiff's results averaged a loss of approximately $85,931 per year (losses of approximately $8,719 in 2022, $50,965 in 2023, and $198,109 in 2024). The resulting swing — approximately $348,386 per year measured from the Vemanti-era peak, and approximately $162,381 per year measured from Plaintiff's pre-Vemanti baseline — coincides precisely with the in-scope conduct and its aftermath and reflects the cross-instrument damage proximately caused by Defendants' conduct. Plaintiff's complete brokerage trading records and IRS-filed income-tax returns underlie the figures set forth above; the portions reproduced in Exhibits J and K, together with the VMNT-disposition reconciliation for tax year 2023 set forth in Exhibit J — Supplement A, have been redacted only as required by Federal Rule of Civil Procedure 5.2(a), and Plaintiff stands ready and willing to produce the complete, unredacted records — including every individual trade and the full IRS-filed returns for each tax year — to the Court and to opposing counsel for verification. After approximately eight (8) years as a full-time independent securities trader — documented across tax years 2017–2024 in Exhibit K — Plaintiff's once-consistently-profitable trading deteriorated, in the period following Defendants' Q1 2021 conduct, to the point that it no longer provided a viable livelihood. Although Plaintiff continued to trade, his performance fell off materially, and he was ultimately compelled to return to conventional salaried employment. Plaintiff's cross-instrument trading and loss-of-livelihood damages within this category are to be determined through discovery and expert analysis.

136.    (d) **Continuing-Hold Damages.** As of March 24, 2022 — the close of the in-scope period — Plaintiff continued to hold approximately 866,700 shares of Vemanti common stock.

Plaintiff continues to hold approximately 175,000 of those shares, all acquired during Cycle 1 (Q3 2020), as of the filing of this Complaint. Plaintiff held, and was induced to continue holding, that position in reliance on Tan's repeated representations that Tan was "in this for the long haul," "building a unicorn," and "playing the long game." But for Plaintiff's financial circumstances, which compelled the involuntary liquidation of a substantial portion of Plaintiff's long-term Vemanti holdings during 2025, Plaintiff would have continued to hold approximately 600,000 shares acquired in Q3 2020. The diminution in value of Plaintiff's continuing and involuntarily-liquidated holdings, measured against the value those holdings would have retained absent Defendants' manipulation and concealment, constitutes additional continuing-hold damages, in an amount to be determined through discovery and expert analysis.

137.    (e) **Quasi-Contract and Quantum Meruit Damages** for unpaid promotional and consulting services rendered to Vemanti during the in-scope period (Q3 2020 through March 24, 2022), valued at reasonable market rates for the social-media advocacy, shareholder-engagement, and corporate-communications-input services rendered. The substantial appreciation in Vemanti's stock price (from approximately $0.02 per share at the inception of Plaintiff's services to a peak of approximately $2.74 per share) during Plaintiff's service period reflects the value Plaintiff conferred upon Vemanti.

138.    (f) **Reliance Damages** arising from Plaintiff's declining of share compensation, in order to avoid dilution of other Vemanti shareholders, in reliance on Tan's representations regarding alternative compensation arrangements that were never honored.

139.    (g) **Pre-judgment and post-judgment interest** on all sums awarded, at the maximum lawful rate.

140.    (h) **Punitive and exemplary damages** under California Civil Code § 3294, on the grounds of malice, oppression, and fraud, Defendants' conduct having been intentional, despicable, and undertaken in conscious disregard of Plaintiff's rights.

141.    (i) **Emotional distress damages.** Under California common law, a plaintiff who establishes intentional fraud may recover damages for emotional distress proximately caused by the fraud. Plaintiff suffered substantial emotional distress as a direct and proximate result of Defendants' sustained deception, including the financial hardship and the loss of trading livelihood described above.

142.    (j) **Attorneys' fees and costs** to the extent recoverable, including under the Consulting Agreement and California Civil Code § 1717, together with the costs of suit incurred herein.

143.    (k) **Disgorgement** of the proceeds of Tan's in-scope sales of Vemanti common stock and of any other unjust enrichment obtained through the conduct alleged herein.

144.    (l) **Rescission,** in the alternative, of the relevant in-scope transactions, together with restitution of the consideration Plaintiff paid.

145.    **Aggregate compensatory damages.** Plaintiff's compensatory damages, exclusive of punitive damages and prejudgment interest, are estimated in the aggregate at not less than approximately $2,000,000 and as much as approximately $5,000,000, subject to precise computation through discovery and expert analysis at trial.

146. Plaintiff's damages are causally connected to Defendants' conduct under the standard articulated in *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005)*. The relevant truth — including Tan's contemporaneous Q3 2020 and Q1 2021 selling, the falsity of Tan's denials of selling, the missing Form 4s, the unamended Schedule 13D, the material misstatements and omissions in the FY2021 10-K, and the Marena Gold transaction's actual operational status — was concealed during the period of Plaintiff's purchases and during the period when Plaintiff would otherwise have profitably exited or reallocated capital. The eventual disclosure or discovery of these facts coincided with Plaintiff's recognition of his losses.

## V.  CAUSES OF ACTION

### COUNT ONE — Violation of Section 10(b) of the Exchange Act and Rule 10b-5

*(Against Tan and Vemanti)*

147. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

148. Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, prohibit, in connection with the purchase or sale of any security: (a) employing any device, scheme, or artifice to defraud; (b) making any untrue statement of a material fact, or omitting to state a material fact necessary in order to make the statements made not misleading; or (c) engaging in any act, practice, or course of business that operates as a fraud or deceit upon any person.

149.	Defendants made each of the following materially false or misleading statements with scienter, in connection with the purchase or sale of Vemanti securities, including without limitation:

150.	(a) *Cycle 1 misrepresentations and manipulation directive (Q3 2020):* (i) the August 4, 2020 representation that a "big company" had given Vemanti a Letter of Intent to acquire eLoan; (ii) the August 13, 2020 representation that "main docs all have been signed" in respect of the eLoan transaction; (iii) the August 15, 2020 LBMA-certification representations and the "north of $1" price prediction; (iv) the September 21, 2020 representation that Tan was "busy with the deployment of the $30M of course"; (v) the September 22 Manipulation Directive ("keep it between 0.35-0.40 so we can keep them excited", paired with the representation that Tan was "in the middle of closing the gold deal"); (vi) the late-September-to-early-October 2020 oral telephone misrepresentations comprising (a) the denial that Tan was then selling shares ("No, I'm in this for the long haul") and (b) the false historical-quantity representation that Tan had "sold like 400K shares" when the actual Q3 2020 selling was 650,000 shares; (vii) the October 6, 2020 downplaying of the FINRA inquiry as a "routine routing check"; and (viii) the multiple Cycle 1 verbal price-supporting directives transmitted by WhatsApp.

151.	(b) *Cycle 2 misrepresentations and manipulation directives (Q1 2021):* (i) the February 9, 2021 directive ("hold her steady"); (ii) the February 12, 2021 directive ("keep her stable at $1.50 if possible....impacting deals we're working on"); (iii) the recurring Q1 2021 oral denials of selling ("I'm not selling, I'm in this for the long haul, building a unicorn, for my legacy"); and (iv) the conditional post-Nasdaq-uplist compensation promise made without intent to perform.

152.    (c) *Cycle 3 misstatements and omissions in the FY2021 10-K:* each statement and omission specifically identified in the Cycle 3 paragraphs above, including without limitation: (i) Item 12 disclosure failures (Page 48); (ii) Item 405 missing-disclosure failure; (iii) Item 9A controls-and-procedures failure; (iv) Item 13 related-transactions omission; (v) USDV stablecoin contextual omissions (Page 4); (vi) Risk Factors disclosure failures (Page 16); and (vii) Item 1 (Business) disclosure inadequacies regarding the Marena Gold transaction.

153.    Each of the foregoing statements was false or misleading at the time made: Tan was contemporaneously selling Vemanti common stock during Cycle 1 and Cycle 2; Tan had no reasonable basis for the "deals" representations he made to Plaintiff; the FY2021 10-K omitted material facts (Cycle 1 and Cycle 2 manipulation, missing Form 4s, unamended 13D, Marena Gold abandonment, true status of USDV, and required Item 405 disclosure) without which the disclosures made were misleading; and Tan's denials of selling were materially false against the contemporaneous OTC Markets quarterly disclosure record.

154.    The statements and denials alleged above are actionable under Rule 10b-5(b) as affirmative misrepresentations and as misleading half-truths. Each was a statement actually made by Tan — including the September 22, 2020 and February 9 and 12, 2021 manipulation directives, Tan's repeated oral denials of selling (including Tan's mid-July 2021 statement "Nabe, I am not selling"), and the affirmative representations contained in the FY2021 10-K — rendered materially misleading by Tan's omission of his contemporaneous secret selling and the related material facts necessary to make those statements not misleading. Plaintiff's claim does not rest on any "pure omission" divorced from an affirmative statement; rather, each omission alleged is tied to, and rendered actionable by, an

affirmative statement Tan in fact made, consistent with *Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257 (2024)*, which holds that Rule 10b-5(b) reaches misleading half-truths — statements that are true only so far as they go while omitting critical qualifying information necessary to render them not misleading.

155. Independently, Defendants are liable under the scheme-liability provisions of Rule 10b-5(a) and (c), 17 C.F.R. § 240.10b-5(a), (c), and under Section 10(b). Tan employed a device, scheme, and artifice to defraud, and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiff and the market, including by: issuing price-support manipulation directives to Plaintiff while secretly selling his own shares; concealing his selling through false denials and through the failure to file required Form 4 and Schedule 13D disclosures; and, on information and belief, retaining or directing other paid promoters to disseminate favorable communications concerning Vemanti common stock contemporaneously with Tan's undisclosed selling, as alleged in Section IV.F above. Under *Lorenzo v. Securities and Exchange Commission, 587 U.S. 71 (2019)*, a person who, with intent to defraud, knowingly disseminates false or misleading statements, or who engages in conduct that operates as a fraud, is primarily liable under Rule 10b-5(a) and (c) even if that person did not "make" the statement within the meaning of Rule 10b-5(b). Tan's scheme-liability conduct provides an independent basis for liability under Count One regardless of the maker analysis applicable to any particular statement.

156. Defendants acted with scienter as established by the pattern evidence summarized in Section IV.F above and as further established by: (a) twin-cycle 650,000-share volume symmetry; (b) two written manipulation directives with explicit articulation of manipulative purpose; (c) the five-instance smug-emoji scienter pattern documented within

a seven-week window; (d) Tan's continuation of the manipulation conduct after direct regulatory notice from FINRA on October 6, 2020; (e) Tan's position as Vemanti's sole CEO and (until September 7, 2021) sole CFO with unilateral disclosure-control authority; (f) Tan's personal certification of the FY2021 10-K under Sarbanes-Oxley §§ 302 and 906; and (g) Tan's representation by securities specialty counsel (The Crone Law Group, P.C.) at all relevant times.

157.  Plaintiff justifiably relied on Tan's manipulation directives, MNPI tippings, oral denials of selling, factual representations regarding pending corporate transactions, and on the disclosures (and omissions) in the FY2021 10-K. Reliance is also presumed under the fraud-on-the-market doctrine of *Basic Inc. v. Levinson, 485 U.S. 224 (1988)*, as reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258 (2014)*, with respect to the FY2021 10-K disclosures.

158.  Plaintiff suffered economic loss as a direct and proximate result of Defendants' conduct, and loss causation is established. Loss causation under Section 10(b) requires a causal connection between Defendants' deceptive conduct and Plaintiff's economic loss (*Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005)*); in this Circuit it is governed by a general proximate-cause standard and does not require that Defendants' fraud have been affirmatively revealed to the market as fraud (*Mineworkers' Pension Scheme v. First Solar, Inc., 881 F.3d 750 (9th Cir. 2018)*). Loss causation is satisfied where, as here, the risks that Defendants' misrepresentations and omissions concealed from Plaintiff later materialized and proximately caused the decline in the value of the security. The facts Defendants concealed were the very facts whose materialization produced Plaintiff's loss. Throughout the in-scope period Tan directed Plaintiff (and the broader VMNT shareholder community)

to acquire, hold, and price-support Vemanti common stock at specified levels — including the $0.35–$0.40 directive of September 22, 2020 and the "keep her stable at $1.50" directive of February 12, 2021 — while concealing that (i) Tan was himself contemporaneously and secretly selling Vemanti common stock during those same windows; (ii) the corporate catalysts Tan represented as imminent or in progress — including the August 2020 eLoan acquisition, the "closing" gold deal, and the "$30M deployment" — did not exist or never materialized into any publicly consummated transaction; and (iii) Tan was enlarging Vemanti's outstanding float. Those concealed conditions did not remain inert: Tan's undisclosed selling injected persistent sell-side supply that the artificial price support Tan had engineered — through his own conduct and through Plaintiff's induced bid-side buying — could not sustain; the catalysts Tan had represented generated no offsetting positive corporate development because they did not exist; and Tan's continued and escalating selling — including the sales disclosed on the July 2021 Form 4s, the further bulk selling commencing on or about July 30, 2021, and the related enlargement of the float — accelerated the decline. As those concealed facts materialized, Vemanti's common stock collapsed from its Cycle 2 peak of approximately $2.74 per share, leaving Plaintiff able to realize only a fraction of the value that had been available during the Cycle 2 window. That materialization proximately caused both (a) the loss in value of the Vemanti common stock Plaintiff purchased at the artificially supported prices Defendants' directives and concealment had induced, and (b) the loss of the substantial value Plaintiff would have realized had Defendants not fraudulently induced him to hold, rather than sell into, the supported prices then prevailing. Plaintiff's loss was proximately caused by the materialization of the very risks Defendants concealed, and not

by any intervening or generalized market movement unrelated to Defendants' conduct. The specific directives, sales, dates, volumes, and price levels underlying these allegations are set forth in the paragraphs incorporated above, satisfying the particularity required of every element of a Section 10(b) claim in this Circuit (*Oregon Public Employees Retirement Fund v. Apollo Group, Inc., 774 F.3d 598 (9th Cir. 2014)*).

## COUNT TWO — Violation of Section 9(a) of the Exchange Act

*(Against Tan)*

159.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

160.    Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2), prohibits any person, directly or indirectly, from effecting, alone or with others, a series of transactions in any security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

161.    Tan's September 22 Manipulation Directive ("keep it between 0.35-0.40 so we can keep them excited"), February 9 Directive ("hold her steady"), and February 12 Directive ("keep her stable at $1.50 if possible....impacting deals we're working on") — paired with Tan's contemporaneous secret selling of 650,000 common shares in Q3 2020 and an additional 650,000 common shares in Q1 2021 — were intended to peg, fix, or stabilize the price of Vemanti common stock for the purpose of inducing Plaintiff to refrain from selling and to continue purchasing Vemanti stock. The directives were, in effect and in expressly stated purpose, an attempt to enlist Plaintiff as an unwitting price-supporter while Tan exited his concentrated position. Such conduct is the textbook target of Section 9(a)(2).

162.    Tan's expressly stated manipulative purposes — "so we can keep them excited" (Cycle 1) and "impacting deals we're working on" (Cycle 2) — reach the "others" required by Section 9(a)(2) by reference both to (a) third-party transaction counterparties whose investment or transactional decisions were intended to be influenced by the artificially supported stock price, and (b) Plaintiff and similarly situated retail shareholders whose hold/buy decisions were intended to be (and were) induced by the same artificially supported stock price.

163.    Plaintiff has standing to seek damages under Section 9(f) of the Exchange Act, 15 U.S.C. § 78i(f), as a person who purchased and sold Vemanti common stock at prices affected by Tan's manipulative conduct.

## COUNT THREE — Violation of Section 13(d) of the Exchange Act and Rule 13d-2(a)

### *(Against Tan)*

164.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

165.    Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and Rule 13d-2(a), 17 C.F.R. § 240.13d-2(a), require any person who beneficially owns more than five percent (5%) of a class of registered equity securities to file a Schedule 13D within ten (10) days of crossing the threshold and to amend the Schedule 13D promptly upon any material change in the facts disclosed.

166.    Tan filed his Original 13D on July 7, 2021, disclosing 27,350,000 common shares as of June 9, 2021. Tan thereafter sold approximately 695,000 common shares between June 9,

2021 and March 24, 2022 — a material change in the facts disclosed in the Original 13D — but did not file a Schedule 13D amendment during the in-scope period. The reported and unreported share movements constituting that material change are summarized at Exhibit U.

167. Tan's failure to file the required amendment was knowing or, at minimum, reckless. Tan was advised at all relevant times by The Crone Law Group, P.C., counsel that filed the Original 13D and is presumed to have understood the amendment obligation under Rule 13d-2(a).

## COUNT FOUR — Violation of Section 16(a) of the Exchange Act and Rule 16a-3

*(Against Tan)*

168. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

169. Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-3 thereunder, 17 C.F.R. § 240.16a-3, require officers, directors, and beneficial owners of more than ten percent (10%) of a class of registered equity securities to file a Form 4 within two (2) business days of any non-exempt transaction in such securities.

170. Tan failed to file Form 4 reports for approximately 505,685 common shares sold during the in-scope period after Vemanti became a Section 12 registered company on June 9, 2021, including approximately 7,850 shares sold between June 9 and July 6, 2021, and approximately 497,835 shares sold between July 30, 2021 and March 24, 2022.

171.    Tan was additionally late in filing his Form 4 dated July 12, 2021 (filed four (4) business days after the earliest reported transaction) and his Form 4 dated July 20, 2021 (filed three (3) business days after the reported transaction).

172.    Each separate failure to file, and each separate late filing, is a separate violation of Section 16(a). Tan is liable for damages caused by such violations to the extent permitted by law. The reported Form 4 transactions and the unreported dispositions giving rise to these violations are summarized at Exhibit U.

## COUNT FIVE — Violation of Section 18 of the Exchange Act

*(Against Tan and Vemanti)*

173.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

174.    Section 18 of the Exchange Act, 15 U.S.C. § 78r, imposes liability on any person who makes or causes to be made any statement in any application, report, or document filed pursuant to the Exchange Act that, at the time and in the light of the circumstances under which it was made, was false or misleading with respect to any material fact.

175.    The FY2021 10-K filed March 24, 2022 contains the materially false or misleading statements and omissions specifically identified in Section IV.E above. Tan caused those statements to be made and personally certified the truth of the FY2021 10-K. Vemanti is the issuer that filed the FY2021 10-K.

176.    Plaintiff purchased and continued to hold Vemanti securities in actual reliance on the contents of the FY2021 10-K. Plaintiff suffered damages as a direct and proximate result.

**COUNT SIX — Violation of Section 20(a) of the Exchange Act (Control Person Liability)**

*(Against Tan)*

177. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

178. Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), imposes joint and several liability on every person who, directly or indirectly, controls another person primarily liable under the Exchange Act.

179. At all relevant times, Tan was a "controlling person" of Vemanti within the meaning of Section 20(a) by virtue of (i) his roles as founder, Chairman, President, CEO, and (through September 7, 2021) CFO; (ii) his ownership of 100% of the Series A Preferred Stock with 10:1 voting rights; and (iii) his beneficial ownership of more than 37% of common shares — collectively giving him approximately ninety and six-tenths percent (90.6%) of combined voting power.

180. Tan is jointly and severally liable for all primary violations of the Exchange Act committed by Vemanti, including the materially false or misleading statements in the FY2021 10-K.

**COUNT SEVEN — Violation of California Corporations Code § 25400 (Market Manipulation)**

*(Against Tan)*

181. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

182.    California Corporations Code § 25400 prohibits market manipulation in securities sold or offered for sale in California, and § 25500 provides a private right of action for damages.

183.    Tan's September 22, 2020 Manipulation Directive, February 9, 2021 Directive, and February 12, 2021 Directive — paired with his contemporaneous secret selling — constitute market manipulation within the meaning of § 25400. Plaintiff is a person who purchased and held Vemanti stock at prices affected by Tan's manipulation, while physically present in California during the Cycle 1 period and in Arkansas during the Cycle 2 period, with Tan's communications originating from California in both cycles.

**COUNT EIGHT — Violation of California Corporations Code § 25401 (Untrue Statements in Connection with Securities)**

*(Against Tan and Vemanti)*

184.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

185.    California Corporations Code § 25401 prohibits the offer or sale of securities, and the purchase of securities, by means of any communication that includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Section 25501 provides a private right of action.

186.    Tan's WhatsApp directives, MNPI tippings, oral denials of selling, and the FY2021 10-K (signed and certified by Tan) each constitute communications within the meaning of §

25401. Each contained material misstatements or omissions that induced Plaintiff to purchase Vemanti securities and to refrain from selling.

### COUNT NINE — Violation of California Corporations Code § 25402 (Insider Trading)

*(Against Tan)*

187. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

188. California Corporations Code § 25402 prohibits insider trading by officers, directors, and controlling persons of an issuer. Section 25502.5 provides a private right of action.

189. Tan, as Vemanti's officer, director, and controlling shareholder, sold Vemanti stock during the Cycle 1 (Q3 2020) and Cycle 2 (Q1 2021) fraud windows while in possession of material non-public information regarding (i) the manipulation directives he had given Plaintiff and other shareholders; (ii) the actual operational status of Vemanti's purported "deals" (including but not limited to the eLoan acquisition, the Marena Gold transaction, and the USDV stablecoin project); and (iii) his own undisclosed selling pattern.

### COUNT TEN — Joint and Several Liability under California Corporations Code § 25504

*(Against Tan)*

190. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

191. California Corporations Code § 25504 imposes joint and several liability on every person who directly or indirectly controls a person liable under §§ 25401 or 25501, and on every

aider, abettor, or co-conspirator. Tan is the controlling officer and shareholder of Vemanti and is jointly and severally liable for any primary violation by Vemanti.

**COUNT ELEVEN — Fraud / Intentional Misrepresentation (Common Law)**

*(Against Tan)*

192. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

193. Tan, with knowledge of the falsity and with intent to induce Plaintiff's reliance, made the materially false statements specifically identified in this Complaint, including without limitation: (a) the August 4 and 13, 2020 eLoan-deal representations; (b) the August 15, 2020 LBMA / "north of $1" representations; (c) the September 21, 2020 "$30M deployment" fabrication; (d) the September 22 Manipulation Directive's embedded "closing the gold deal" representation; (e) the late-September-to-early-October 2020 oral telephone misrepresentations, comprising (i) the denial that Tan was then selling shares ("No, I'm in this for the long haul") and (ii) the false historical-quantity representation regarding "400K shares" sold "in the teens" / "under .20 cents"; (f) the October 6, 2020 downplaying of the FINRA inquiry; (g) the February 9 and February 12, 2021 Directives' embedded representations regarding "deals we're working on"; (h) the recurring oral denials of selling during Cycle 2; and (i) the conditional post-Nasdaq-uplist compensation promise made without intent to perform.

194. Plaintiff justifiably relied on those statements to his detriment. Tan acted with malice, oppression, and fraud within the meaning of California Civil Code § 3294, entitling Plaintiff to punitive and exemplary damages.

## COUNT TWELVE — Fraudulent Concealment

*(Against Tan and Vemanti)*

195. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

196. Tan, as Plaintiff's confidant, business counterparty under the Consulting Agreement, and as the controlling officer and majority voting shareholder of Vemanti, owed Plaintiff a duty to disclose material facts within Tan's exclusive knowledge — including (i) Tan's contemporaneous Cycle 1 and Cycle 2 secret sales; (ii) the absence of binding "deals" supporting his price-related representations; (iii) the political and governmental complications affecting the Marena Gold transaction known to Tan no later than October 2, 2020; (iv) the EPA dilution structure being negotiated with Livingston Asset Management LLC contemplated by the October 8, 2020 confidential term sheet; and (v) the material change in beneficial ownership requiring amendment of the Schedule 13D. Tan deliberately concealed those facts from Plaintiff. Plaintiff justifiably relied on Tan's silence and on the impression created by Tan's affirmative representations, and was damaged thereby.

197. Vemanti, as Tan's employer and the issuer of the relevant securities, ratified and adopted Tan's concealment by failing to disclose the same matters in its OTC Markets quarterly disclosures during the relevant period and in the FY2021 10-K.

## COUNT THIRTEEN — Negligent Misrepresentation (Pleaded in the Alternative)

*(Against Tan)*

198.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

199.    In the alternative, even if Tan's statements were not knowingly false at the time made, Tan had no reasonable grounds to believe them true. Plaintiff justifiably relied on Tan's representations and was damaged thereby.

## COUNT FOURTEEN — Breach of Written Contract

### *(Against Vemanti)*

200.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

201.    Plaintiff and Vemanti entered into the Consulting Agreement on June 29, 2020. Plaintiff fully performed his obligations under the Consulting Agreement during the contract period (June 29, 2020 through June 29, 2021). Vemanti breached the Consulting Agreement by, among other things: (a) failing to compensate Plaintiff for promotional and consulting services rendered; (b) breaching Vemanti's express representations and warranties regarding the truthfulness of information disseminated to or through Plaintiff in connection with the Consulting Agreement's purposes; and (c) breaching Vemanti's contractual duty (Page 3 of the Consulting Agreement) to advise Plaintiff of facts known to Vemanti that affected the accuracy of any prior data Vemanti had provided.

202.    Plaintiff is entitled to recover damages, attorneys' fees, and costs under the Consulting Agreement, including under the indemnification provision (Page 4) and California Civil Code § 1717.

## COUNT FIFTEEN — Breach of the Implied Covenant of Good Faith and Fair Dealing

*(Against Vemanti)*

203. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

204. Every contract under California law contains an implied covenant of good faith and fair dealing. Vemanti, acting through Tan as its CEO, breached that covenant by, among other things, (a) instructing Plaintiff to maintain the price of Vemanti stock during Q3 2020 and Q1 2021 while Tan was secretly selling — conduct that frustrated Plaintiff's reasonable expectations under the Consulting Agreement and deprived Plaintiff of the benefits of the bargain; (b) directing Plaintiff to disseminate corporate communications and engage in shareholder advocacy based on factual representations Tan knew or had reason to know were false; and (c) failing to advise Plaintiff of material adverse facts known to Vemanti and Tan affecting Vemanti's corporate state.

## COUNT SIXTEEN — Breach of Fiduciary Duty

*(Against Tan)*

205. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

206. Tan, as the controlling officer, founder, Chairman, CEO, (until September 7, 2021) CFO, and majority voting shareholder of Vemanti, and as Plaintiff's confidant and primary contractual counterparty under the Consulting Agreement, occupied a position of trust and confidence vis-à-vis Plaintiff. Under California law, controlling shareholders owe

fiduciary duties to minority shareholders, including duties of disclosure, candor, and loyalty. Tan further owed Plaintiff fiduciary or quasi-fiduciary duties arising from the relationship of trust deliberately cultivated through repeated MNPI tippings, the in-person October 10–11, 2020 meeting, the recurring "we" / "our stock" / "our chart" framing, and the explicit "for your eyes only" confidentiality framings.

207.    Tan breached those duties by (a) concealing his Cycle 1 and Cycle 2 sales; (b) instructing Plaintiff to act in a manner that benefited Tan at Plaintiff's expense; (c) failing to disclose the late and missing Form 4s and the unamended Schedule 13D; (d) using confidential corporate information to induce Plaintiff's purchases and refraining-from-sales while Tan executed his own contrary trades; and (e) failing to disclose the political and governmental complications affecting the Marena Gold transaction.

### COUNT SEVENTEEN — Promissory Estoppel (Pleaded in the Alternative)

*(Against Vemanti and Tan)*

208.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

209.    In the alternative, Tan and Vemanti made promises (express and implied) to compensate Plaintiff for his promotional services, including (a) Tan's recurring oral promises to "take care of" Plaintiff, (b) Tan's specific promise that he would "take care of" Plaintiff after Vemanti uplisted to Nasdaq, and (c) Vemanti's implied promises arising from the Consulting Agreement and from the parties' course of conduct. Plaintiff reasonably and detrimentally relied on those promises by rendering services without immediate compensation, by declining offered share compensation in order to avoid diluting other

shareholders, and by deferring or foreclosing alternative employment and investment opportunities. Tan and Vemanti should be estopped from denying their promises.

### COUNT EIGHTEEN — Unjust Enrichment

*(Against Vemanti)*

210. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

211. Vemanti has been unjustly enriched at Plaintiff's expense by virtue of the substantial promotional, social-media-marketing, shareholder-engagement, and consulting services Plaintiff rendered to Vemanti without compensation during the in-scope period. Plaintiff's services contributed substantially to the rise in Vemanti's stock from approximately $0.02 per share at the inception of Plaintiff's services to a peak of approximately $2.74 per share. It would be inequitable for Vemanti to retain the benefit of those services without compensating Plaintiff.

### COUNT NINETEEN — Quantum Meruit

*(Against Vemanti)*

212. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

213. Plaintiff rendered valuable promotional, social-media-marketing, shareholder-engagement, and consulting services to Vemanti during the in-scope period (Q3 2020 through March 24, 2022) at the request of Vemanti and (after the formal Consulting Agreement term expired

on June 29, 2021) under continuing implied request through course of conduct. Plaintiff is entitled to be paid the reasonable value of those services.

## COUNT TWENTY — Violation of California Business and Professions Code § 17200 (Unfair Competition Law)

*(Against Tan and Vemanti)*

214. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

215. California Business and Professions Code § 17200 et seq. prohibits unlawful, unfair, or fraudulent business acts or practices. Defendants' conduct as alleged herein constitutes unlawful business practices (predicated on the federal and state securities-law violations alleged), unfair business practices (by reason of conduct that offends public policy and is otherwise unfair), and fraudulent business practices (by reason of statements likely to deceive a reasonable consumer).

216. Plaintiff seeks restitution and injunctive relief under § 17203, in addition to such other relief as the Court deems appropriate.

## COUNT TWENTY-ONE — Deceit (California Civil Code §§ 1709-1710)

*(Against Tan)*

217. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

218. California Civil Code §§ 1709 and 1710 impose liability on one who willfully deceives another with intent to induce reliance. Tan's conduct constitutes deceit within the meaning of §§ 1709-1710, including all four statutory categories: (i) suggestion of fact not true (e.g., the August 13, 2020 "main docs all have been signed" representation about eLoan; the September 22, 2020 "closing the gold deal" representation; the recurring oral denials of selling); (ii) assertion of fact not warranted by information of the maker (e.g., the August 15, 2020 LBMA / "north of $1" representations; the September 21, 2020 "$30M deployment" representation; the late-September-to-early-October 2020 historical-quantity representation that Tan had sold approximately 400,000 shares when his actual Q3 2020 selling was 650,000 shares); (iii) suppression of fact by one bound to disclose (the recurring concealment of Tan's contemporaneous Cycle 1 and Cycle 2 selling activity, the abandonment of the Marena Gold transaction, and the EPA dilution structure); and (iv) promise without intent to perform (the post-Nasdaq-uplist compensation promise).

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally where applicable, as follows:

A. For compensatory damages in an amount to be proven at trial through discovery and expert analysis, of not less than approximately Two Million Dollars ($2,000,000) and as much as approximately Five Million Dollars ($5,000,000). The not-less-than-$2,000,000 floor reflects the value Plaintiff forewent on the approximately 1,190,000 shares of Vemanti common stock he held and declined to sell into the Cycle 2 price appreciation — when Vemanti common stock traded as high as approximately $2.74 per share and Plaintiff could have sold at an average of approximately $1.70 per share

— in reliance on Tan's oral long-term-hold and Nasdaq-listing representations and his written stabilization directives. The remainder of Plaintiff's compensatory damages, up to approximately $5,000,000, comprises Plaintiff's post-directive purchase losses, the profits Plaintiff would have earned trading other securities but for the capital and trading focus Tan's scheme diverted into Vemanti, the diminution in value of Plaintiff's continuing and involuntarily-liquidated Vemanti holdings, quasi-contract and quantum-meruit recovery for Plaintiff's unpaid promotional and consulting services, and emotional-distress damages — all as alleged herein and to be determined through discovery and expert analysis;

**B.** For punitive and exemplary damages under California Civil Code § 3294, in an amount sufficient to punish Defendants and to deter similar conduct, in an amount to be determined at trial;

**C.** For statutory and treble damages where authorized by law;

**D.** For disgorgement of Tan's profits from the concealed Cycle 1 and Cycle 2 sales and any other ill-gotten gains;

**E.** For rescission, in the alternative, of relevant in-scope transactions;

**F.** For pre-judgment and post-judgment interest at the maximum rates permitted by law;

**G.** For injunctive relief enjoining Defendants from further violations of the federal and state securities laws and any other unfair business practices;

**H.** For restitution under California Business and Professions Code § 17203;

**I.** For Plaintiff's costs of suit and attorneys' fees and litigation expenses to the extent recoverable, including under the Consulting Agreement and California Civil Code § 1717;

**J.** For an order directing Defendant Tan Tran to identify, by name and current mailing address, every recipient and every transferor of every share of Vemanti common stock that entered or departed his beneficial ownership during the period from April 3, 2014 through and including March 24, 2022, together with the date, share quantity, consideration paid or received, method of transfer, restrictive-legend status, and registration exemption (if any) for each such share movement; and for an order directing the production of (i) the complete shareholder register and transaction history of Globex Stock Transfer, LLC of Deltona, Florida pertaining to Vemanti Group, Inc. for the period from April 3, 2014 through and including the date of transition to V Stock Transfer, LLC; (ii) the complete shareholder register and transaction history of V Stock Transfer, LLC of New York, New York pertaining to Vemanti Group, Inc. for the period from the date of transition through and including March 24, 2022; (iii) Defendant Tan Tran's brokerage account statements for all accounts at any broker, custodian, or financial institution at which Vemanti common stock was held in his beneficial ownership during the foregoing period; and (iv) the books and records of any limited liability company, trust, family-member account, or other entity in which Defendant Tan Tran has held any direct or indirect beneficial interest in Vemanti securities during the foregoing period; and (v) all agreements, communications, invoices, and records of cash or share-based consideration paid or promised to any third-party stock promoter, investor-relations firm, newsletter publisher, social-media promoter, or stock-promotion service engaged or compensated by Defendant Tan Tran or Vemanti, directly or indirectly, in connection with the promotion of Vemanti common stock during the period from January 1, 2018 through and including March 24, 2022;

**K.** For such other and further relief as the Court may deem just and proper.

## VII.  DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: ___06 - 29 -___, 2026

Respectfully submitted,

By: _____

**BARINDER SINGH "NABE" BAL**

*Plaintiff, Pro Se*

4460 W. Shaw Ave. #426

Fresno, CA 93722

(559) 962-4828

# EXHIBIT LIST

**Exhibit A —** Consulting Agreement between Plaintiff and Vemanti Group, Inc., made as of June 26, 2020 and executed June 29, 2020 (7 pages).

**Exhibit B —** Excerpt from Vemanti Group, Inc.'s Q3 2020 OTC Markets quarterly disclosure (Quarterly Report for the Period Ending September 30, 2020, filed February 25, 2021), reflecting Tan Tran's beneficial ownership of 28,000,000 common shares as of September 30, 2020.

**Exhibit C —** Excerpt from Vemanti Group, Inc.'s 2020 Annual Report (for fiscal year ended December 31, 2020), reflecting Tan Tran's beneficial ownership of 28,000,000 common shares and 40,000,000 Series A Preferred shares as of year-end 2020.

**Exhibit D —** Excerpt from Vemanti Group, Inc.'s Q1 2021 OTC Markets quarterly disclosure, reflecting Tan Tran's beneficial ownership of 27,350,000 common shares as of March 31, 2021.

**Exhibit E —** Schedule 13D filed by Tan Tran on July 7, 2021 (SEC Accession Number 0001477932-21-004431).

**Exhibit F —** Tan Tran's five Form 4 filings during July 2021: (1) Form 4 dated July 12, 2021; (2) Form 4 dated July 20, 2021; (3) Form 4 dated July 22, 2021; (4) Form 4 dated July 23, 2021; (5) Form 4 dated July 29, 2021.

**Exhibit G —** Vemanti Group, Inc.'s Annual Report on Form 10-K for the fiscal year ended December 31, 2021, filed with the SEC on March 24, 2022.

**Exhibit H —** Vemanti Group, Inc.'s Form 10/A Registration Statement, effective June 9, 2021.

**Exhibit I —** WhatsApp message communications between Plaintiff and Defendant Tan Tran (together with related VMNT investor-group messages), spanning June 7, 2020 through

July 30, 2021, comprising sixty-five (65) screenshots presented in two sections — an authentication section and a chronological section — and including without limitation: (a) authentication materials, comprising the WhatsApp Contact Information screen for Tan Tran (direct mobile number +1 (949) 378-4140) and the parties' first WhatsApp message dated June 7, 2020; (b) the August 4, 2020 eLoan-deal MNPI; (c) the August 13, 2020 "main docs all have been signed" representation; (d) the August 15, 2020 LBMA / "north of $1" / "listen and delete" cluster; (e) the August 20, 2020 "every time I talk" admission; (f) the September 10, 2020 "anticipation is better than the real news" / tweet-timing cluster; (g) the September 21, 2020 "$30M deployment" representation; (h) the September 22, 2020 7:45 p.m. Pacific Time Manipulation Directive ("keep it between 0.35-0.40 so we can keep them excited"); (i) the October 2, 2020 forwarded Mali / Siby third-party iMessage screenshots; (j) the October 6, 2020 FINRA-inquiry exchange and "it needs to stay that way" scienter admission; (k) the October 8, 2020 EPA Term Sheet transmission with "For your eyes only. Extremely confidential. Please don't share" framing; (l) the November 20, 2020 price projection ("OTCQB+Gold+Crypto+Defi+Fintech = $10 or more"); (m) the February 9, 2021 11:46 p.m. Pacific Time "hold her steady" Directive; (n) the February 12, 2021 9:11 a.m. Pacific Time "keep her stable at $1.50…impacting deals we're working on" Directive; (o) Tan's continued no-dilution representations during February through June 2021, including his statement that his conduct was "all in the best interests of the company and the shareholders"; (p) the June 16, 2021 messages reflecting Plaintiff's reliance, in which Plaintiff confirmed that he had continued to hold and had purchased additional Vemanti common stock in the belief that Tan had not been selling; (q) the July 12, 2021 Fintel insider-transaction alert ("Insider Tan Tran reports selling 43,100 shares of $VMNT for a total cost of $49,710.00"), together with Plaintiff's contemporaneous message questioning the reported selling; (r) the July 22, 2021 Insider Forms and SEC Form 4 records documenting Tan's sale of 3,809 shares of Vemanti common stock on July 20, 2021 (1,309 shares at $0.84 and 2,500 shares at $0.79, for $3,074.56); (s) Tan's July 26,

2021 solicitation of $1,000,000 from the VMNT investor group ("I'm looking for $1M… the $ from my shares should give us a bit of time to raise it with the banker. You think the group can gather $1M?") while his Vemanti shares were being sold; and (t) Plaintiff's contemporaneous brokerage records corroborating his deployment of over $500,000 into Vemanti common stock (a June 10, 2021 position reflecting a $514,427.66 cost basis) and his active trading livelihood; in each case with associated date and time stamps.

**Exhibit J —** Plaintiff's E*TRADE brokerage records documenting Plaintiff's purchases and sales of Vemanti Group, Inc. common stock (CUSIP 92259A102) during the in-scope period: (Section A) Plaintiff's Form 1099-B as filed with the Internal Revenue Service, reporting Plaintiff's sales with FIFO-matched cost basis and realized gain or loss per lot; and (Section B) Plaintiff's E*TRADE Investment Activity Report documenting Plaintiff's purchases.

**Exhibit K —** Plaintiff's IRS-filed federal income-tax records for tax years 2017 through 2024 — Form 1040 together with the accompanying Schedule D, Form 8949, Schedule 1, and Form 6781 — establishing, from Plaintiff's returns as filed with the Internal Revenue Service, Plaintiff's IRS-reported total realized capital gain or loss for each year. Section A reproduces the IRS-filed source pages; Section B reconciles those totals to (i) Plaintiff's VMNT-specific realized gain documented in Exhibit J and (ii) Plaintiff's non-VMNT (alternative-position) realized profit and loss, which is the foundation for Plaintiff's opportunity-cost and cross-instrument trading damages. Because the complete transaction-level brokerage statements for those alternative positions span many hundreds of pages, Plaintiff submits these IRS-filed annual totals as the authoritative summary of his realized trading results, with the underlying brokerage records available for production as needed.

**Exhibit L —** Vemanti Group, Inc.'s GlobeNewswire press releases during the in-scope period (Q3 2020 through March 24, 2022), including the December 1, 2020 Marena Gold LOI announcement, December 14, 2020 LiveTrade Equity Purchase Agreement announcement, and July 7, 2021 USDV Pilot Launch announcement.

**Exhibit M —** EQUITY PURCHASE AGREEMENT (EPA) CONFIDENTIAL TERM SHEET between Vemanti Group, Inc. and Livingston Asset Management LLC (Southridge letterhead), transmitted by Tan to Plaintiff via WhatsApp on October 8, 2020 with "For your eyes only. Extremely confidential. Please don't share" framing.

**Exhibit N —** Schedule 13D/A filed October 24, 2023 (referenced solely as evidentiary corroboration of facts that should have been disclosed during the in-scope period).

**Exhibit O —** Excerpt from Vemanti Group, Inc.'s Annual Report for fiscal year ending December 31, 2015 (filed on or about February 11, 2016 with the OTC Markets disclosure system), Note 1 to the Consolidated Financial Statements (Organization and Basis of Presentation), documenting Vemanti's incorporation on April 3, 2014 and the founding-issuance transaction in which the sole member of VoiceStep Telecom, LLC exchanged 100% of his membership interest for 40,000,000 shares of Vemanti common stock and 40,000,000 shares of Vemanti preferred stock.

**Exhibit P —** California Limited Liability Company Articles of Organization for VoiceStep Telecom, LLC (File No. 200503110236), filed with the California Secretary of State on January 27, 2005, identifying Tan Tran as the Initial Agent for Service of Process at 21 Arizona, Irvine, California 92606.

**Exhibit Q —** Excerpts from Vemanti Group, Inc.'s OTC Markets Annual Report filed on or about February 11, 2016 for the fiscal year ending December 31, 2015, including: (i) Section 3 (Security Information) disclosing total shares outstanding of 41,970,000 as of February 5, 2016; (ii) Section 4 (Issuance History) itemizing the 40,000,000-share founding exchange for the VoiceStep membership interest; and (iii) Section 8C (Beneficial Shareholders) disclosing Tan Tran (residing at 51 Acorn Glen, Irvine, California 92620) as the holder of 95.3% beneficial ownership of Vemanti common stock.

**Exhibit R —** Consolidated excerpts from Vemanti Group, Inc.'s OTC Markets quarterly disclosures and annual report for the 2016–2017 pre-in-scope period, including: (i) Q1 2016 OTC Markets quarterly disclosure (period ending March 31, 2016, filed June 1, 2016); (ii) Q2 2016 OTC Markets quarterly disclosure (period ending June 30, 2016, filed August 17, 2016); (iii) Q3 2016 OTC Markets quarterly disclosure (period ending September 30, 2016, filed October 31, 2016); (iv) 2016 Annual Report (for fiscal year ending December 31, 2016); (v) Q1 2017 OTC Markets quarterly disclosure (period ending March 31, 2017, filed June 1, 2017); and (vi) Q2 2017 OTC Markets quarterly disclosure (period ending June 30, 2017, filed August 1, 2017). Relevant excerpts include the Securities Information (Section 3), Issuance History (Section 4), and Beneficial Shareholders (Section 8C) pages of each filing.

**Exhibit S —** Vemanti Group, Inc.'s Q2 2020 OTC Markets quarterly disclosure (period ending June 30, 2020, filed August 6, 2020), including the Securities Information section (page 2) disclosing total common shares outstanding of 65,784,086, Public Float of 8,420,000, and Shareholders of Record of 88 as of June 30, 2020; the Issuance History section (pages 3–4) itemizing all changes to outstanding shares from the December 31, 2017 Opening Balance through the June 30, 2020 Ending Balance, including the October 29, 2018 Equity Exchange issuances of 626,043 common shares to Thomas Duc Tran and 626,043 common shares to Trung Viet Vo, and the April 1, 2019 Consultant issuance of 3,250,000 common shares to Chenyuan Anthony Chen; and the Officers, Directors, and Control Persons section (page 16) disclosing Tan Tran's beneficial ownership of 28,650,000 common shares (45.81%) as of June 30, 2020.

**Exhibit T —** Summary, prepared pursuant to Federal Rule of Evidence 1006, of the reported beneficial-ownership and share-structure figures contained in the OTC Markets quarterly disclosures and annual report reproduced at Exhibit R for the 2016–2017 pre-in-scope period, organizing by filing the reported total common shares outstanding, non-restricted

(free-trading) shares, Tan Tran's reported common and preferred beneficial ownership, and shareholders of record, with pin-cites to the corresponding pages of Exhibit R. Offered as a summary under Federal Rule of Evidence 1006; the underlying filings reproduced at Exhibit R remain available for examination.

**Exhibit U —** Summary, prepared pursuant to Federal Rule of Evidence 1006, of the reported and unreported changes in Tan Tran's beneficial ownership of Vemanti common stock and the status of his Section 13(d) and Section 16(a) reporting between June 9, 2021 and October 24, 2023, organizing by filing the reported common-share balances, the 189,315 shares reported across the five July 2021 Form 4 filings, the approximately 505,685 shares disposed of without any Form 4 in two windows (7,850 shares between June 9 and July 5, 2021, and 497,835 shares between July 30, 2021 and March 24, 2022), the cessation of Form 4 filing after July 29, 2021, and the absence of any Schedule 13D amendment until October 24, 2023, with pin-cites to the underlying filings reproduced at Exhibits E, F, G, and N. Offered as a summary under Federal Rule of Evidence 1006; the underlying filings reproduced at Exhibits E, F, G, and N remain available for examination.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

BARINDER SINGH "NABE" BAL,
*Plaintiff,*
v.
TAN TRAN, an individual; and VEMANTI GROUP, INC.,
a Nevada corporation,
*Defendants.*

Case No. _____

# EXHIBIT A

Consulting Agreement between Plaintiff Barinder Singh Bal and Vemanti Group, Inc., made and entered into as of June 26, 2020, and fully executed by both parties.

*(6 pages of agreement text; final page reflects the fully-executed signature page with the signatures of both Tan Tran, Chairman & CEO of Vemanti Group, Inc., and Barinder Singh Bal, Consultant.)*

# CONSULTING AGREEMENT

THIS AGREEMENT (the "Agreement"), is made and entered into as of this **26ᵗʰ** day of **June, 2020**, by and between **Barinder Singh Bal**, with address at ███████████████████ ████ (the "Consultant"), and **Vemanti Group, Inc.**, a Nevada corporation, with office at 5000 Birch Street, West Tower, Third Floor, Newport Beach, CA 92660 (the "Company") (together the "Parties").

**WHEREAS**, Consultant is in the business of providing advisory services for social media-based public relations;

**WHEREAS**, the Company deems it to be in its best interest to retain Consultant to render to the Company such services as may be needed; and

**WHEREAS,** the Parties desire to set forth the terms and conditions under which Consultant shall provide services to the Company.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants herein contained, and other valid consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

**Term of Agreement**

The Agreement shall remain in effect from the date hereof through the expiration of a period of twelve (12) months from the date hereof (the "Term"), and thereafter may be renewed upon the mutual written consent of the Parties.

**Nature of Services to be rendered.**

During the Term and any renewal thereof, Consultant shall use its experience and knowledge and connections to these services (the "Services"):

(a) Manage social media marketing campaigns and day-to-day activities including:
   - Develop relevant content topics to reach the company's target constituencies including, but not limited to, investors and the media.
   - Create, curate, and manage all published content (images, messages, videos, and audio/podcast).
   - Monitor, listen and respond to users in a "Social" way while cultivating a positive image for the Company.
   - Conduct online advocacy and open a stream for reciprocal communications with the Company's current and prospective shareholders.
(b) Develop and expand community and/or influencer outreach efforts.
(c) Support design (i.e. social media graphics for Facebook cover, profile pic, thumbnails, ads, landing pages, Twitter profile, Blog, etc.).
(d) Design, create and manage social campaigns to integrate with the Company's vision.
(e) Create and manage an online feedback platform for the invesment community regarding the Company.

1

(f)  Become an advocate for the company in social media spaces, engaging in dialogues and answering questions related to the Company's vision and mission where appropriate.

(g)  Monitor trends in social media tools, applications, channels, design and strategy.

(h)  Identify threats and opportunities in user-generated content surrounding the Company. Report notable threats to appropriate management.

(i)  Analyze campaigns and translate anecdotal or qualitative data into recommendations and plans for revising social media campaigns.

(j)  Monitor effective benchmarks for measuring the impact of social media campaigns. Analyze, review, and report on effectiveness of campaigns in an effort to maximize results.

It is acknowledged and agreed by the Company that Consultant carries no professional licenses, and is not rendering legal advice or performing accounting services, nor acting as an investment advisor or broker/dealer within the meaning of the applicable state and federal securities laws.  The Services of Consultant shall not be exclusive nor shall Consultant be required to render any specific number of hours or assign specific personnel to the Company or its projects, however it is anticipated and agreed upon by both parties that considerable time and resources will be required to fulfill the obligations to the Company under this agreement. The Consultant shall specifically not provide any of the following services to the Company: (i) negotiation for the sale of any the Company's securities; (ii) discuss details of the nature of the securities sold or whether recommendations were made concerning the sale of the securities; (iii) engage in due diligence activities; (iv) provide advice relating to the valuation of or the financial advisability of any investments in the Company; or (v) handle any funds or securities on behalf of the Company.

**Disclosure of Information**

The Consultant shall NOT disclose to any third party any material non-public information or data received from the Company without the prior written consent and approval of the Company other than: (i) to its agents or representatives that have a need to know in connection with the Services hereunder; provided such agents and representatives have a similar obligation to maintain the confidentiality of such information; (ii) as may be required by applicable law; provided, Consultant shall provide prompt prior written notice thereof to the Company to enable the Company to seek a protective order or otherwise prevent such disclosure; and (iii) such information as becomes publicly known through no action of the Consultant, or its agents or representatives.

**Compensation.**

Upon execution of the Agreement, the Company will issue 100,000 shares of the Company's restricted common stock (symbol: VNMT) (the "Restricted Shares"). The Parties acknowledge and agree that the Restricted Shares shall be fully earned from the signing of this Agreement and that the date of acquisition of the Restricted Shares is the effective date of this Agreement (the "Vesting Date"). A certificate for the Restricted Shares will not be issued to Consultant and Consultant may not vote (including, without limitation, the right to inspect or receive the Company's balance sheets or financial statements or any rights to receive dividends or non-cash distributions with respect to such securities), pledge, sell or otherwise transfer or dispose of the Restricted Shares until after a 12-month period has elapsed from the signing of this Agreement and the Vesting Date (the "Restriction Period"). This Agreement is annulled and voided and no Restricted Shares shall be issued under this if the Consultant's relationship with the Company is terminated for any reason as determined by the Company or if the Consultant terminates the Services or other relationship with

2

the Company for any reason during the Restriction Period as set forth above for shares under this Agreement.

**Working Title.**

Consultant will join the Company as "Social Media Advisor" to render the Services. This position will not be considered as an officer or director position within the Company for purposes of filings and disclosure.

**Representations and Warranties of the Consultant.**

In order to induce the Company to enter into this Agreement, the Consultant hereby makes the following unconditional representations and warranties:

In connection with its execution of and performance under this Agreement, the Consultant has not taken and will not take any action that will cause it to become required to make any filings with or to register in any capacity with the Securities and Exchange Commission (the "SEC"), the FINRA, the securities commissioner or department of any state, or any other regulatory or governmental body or agency. Neither the Consultant nor any of its principals is subject to any sanction or restriction imposed by the SEC, the FINRA, any state securities commission or department, or any other regulatory or governmental body or agency, which would prohibit, limit or curtail the Consultant's execution of this Agreement or the performance of its obligation hereunder. The Consultant's purchase of shares pursuant to this Agreement is an investment made for its own account. The Consultant is permitted to provide consulting services to any corporation or entity engaged in a business identical or similar to the Company's.

**Duties of the Company.**

The Company will supply Consultant, on a regular basis and timely basis, with all approved data and information about the Company, its management, its products, and its operations as reasonably requested by Consultant and which the Company can obtain with reasonable effort; and Company shall be responsible for advising Consultant of any facts which would affect the accuracy of any prior data and information previously supplied to Consultant so that the Consultant may take corrective action.

**Representations and Warranties of the Company.**

In order to induce the Consultant to enter into this Agreement, the Company hereby makes the following unconditional representations and warranties: The Company is not subject to any restriction imposed by the SEC or by operation of the 1933 Act, the Exchange Act of 1934, as amended (the "1934 Act") or any of the rules and regulations promulgated under the 1933 Act or the 1934 Act which prohibit its execution of this Agreement or the performance of its obligations to the Consultant set forth herein.  The Company has not been sanctioned by the SEC, FINRA or any state securities commissioner or department in connection with any issuance of its securities. All payments required to be made on time and in accordance with the payment terms and conditions set forth herein.

**Compliance with Securities Laws**

3

The Parties acknowledge and agree that the Company is subject to the requirements of the 1934 Act, and that the 1933 Act, the 1934 Act, the rules and regulations promulgated thereunder and the various state securities laws (collectively, "Securities Laws") impose significant burdens and limitations on the dissemination of certain information about the Company by the Company and by persons acting for or on behalf of the Company.  Each of the Parties agrees to comply with all applicable Securities Laws in carrying out its obligations under the Agreement; and without limiting the generality of the foregoing, the Company hereby agrees (i) all information about the Company provided to the Consultant by the Company, which the Company expressly agrees may be disseminated to the public by the Consultant in providing any public relations or other services pursuant to the Agreement, shall not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements made, in light of the circumstances in which they were made, not misleading, (ii) the Company shall promptly notify the Consultant if it becomes aware that it has publicly made any untrue statement of a material fact regarding the Company or has omitted to state any material fact necessary to make the public statements made by the Company, in light of the circumstances in which they were made, not misleading, and (iii) the Company shall promptly notify the Consultant of any "quiet period" or "blackout period" or other similar period during which public statements by or on behalf of the Company are restricted by any Securities Law.  Each Party (an "indemnifying party") hereby agrees, to the full extent permitted by applicable law, to indemnify and hold harmless the other Party (the "indemnified party") for any damages caused to the indemnified party by the indemnifying party's breach or violation of any Securities Law, except to the extent that the indemnifying party's breach or violation of a Securities Law is caused by the indemnified party's breach or violation of the Agreement, or any Securities Law.

**Issuance of Stock Certificate to Consultant**

A stock certificate of the earned Restricted Shares shall be issued to Consultant after the Restriction Period has passed. The Company shall take all corporate action necessary for the issuance of the Restricted Stock, to be legally valid and irrevocable, including obtaining the prior approval of its Board of Directors.

**Indemnification of Consultant by the Company.**

The Company acknowledges that the Consultant relies on information provided by the Company in connection with the provisions of Services hereunder and represents that said information does not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements made, in light of the circumstances in which they were made, not misleading, and agrees to hold harmless and indemnify the Consultant for claims against the Consultant as a result of any breach of such representation and for any claims relating to the purchase and/or sale of the Company's securities occurring out of or in connection with the Consultant's relationship with the Company including, without limitation, reasonable attorney's fees and other costs arising out of any such claims; provided, however, that the Company will not be liable in any such case for losses, claims, damages, liabilities or expenses that arise from the gross negligence or willful misconduct of the Consultant.

**Indemnification of the Company by the Consultant.**

The Consultant shall identify and hold harmless the Company and its principals from and against any and all liabilities and damages arising out of any the Consultant's gross negligence or intentional breach of its representations, warranties or agreements made hereunder.

4

**Applicable Law.**

It is the intention of the parties hereto that this Agreement and the performance hereunder and all suits and special proceedings hereunder be construed in accordance with and under and pursuant to the laws of the State of California and that in any action, special proceeding or other proceedings that may be brought arising out of, in connection with or by reason of this Agreement, the law of the State of California shall be applicable and shall govern to the exclusion of the law of any other forum, without regard to the jurisdiction on which any action or special proceeding may be instituted.

**Disputes**.

Any conflicts, disputes and disagreements arising out of or in connection with the Agreement, shall be subject to a court in Orange County, California.  However, if Consultant needs to enforce any registration rights or shareholder rights, Consultant reserves the right to file an injunctive action in a court in Orange County, California. In signing this Agreement, the Company waives their right to challenge jurisdiction on this issue.

**Entire Understanding/Incorporation of other Documents.**

The Agreement contains the entire understanding of the Parties with regard to the subject matter hereof, superseding any and all prior agreements or understandings whether oral or written, and no further or additional agreements, promises, representations or covenants may be inferred or construed to exist between the Parties.

**No Assignment or Delegation Without Prior Approval.**

No portion of the Agreement or any of its provisions may be assigned, nor obligations delegated, to any other person or party without the prior written consent of the Parties except by operation of law or as otherwise set forth herein.

**Survival of Agreement.**

The Agreement and all of its terms shall inure to the benefit of any permitted assignees of or lawful successors to either Party.

**Independent Contractor.**

Consultant agrees to perform its consulting duties hereto as an independent contractor.  Nothing contained herein shall be considered to as creating an employer-employee relationship between the parties to this Agreement.

**No Amendment Except in Writing.**

Neither the Agreement nor any of its provisions may be altered or amended except in a dated writing signed by the Parties.

**Waiver of Breach.**

No waiver of any breach of any provision hereof shall be deemed to constitute a continuing waiver or a waiver of any other portion of the Agreement.

5

**Severability of the Agreement.**

Except as otherwise provided herein, if any provision hereof is deemed by arbitration or a court of competent jurisdiction to be legally unenforceable or void, such provision shall be stricken from the Agreement and the remainder hereof shall remain in full force and effect.

**Non-Circumvention.** The parties agree that non-public information shared by the Company ('Confidential Information") shall not be used for the enrichment, directly or indirectly, of the Consultant or its affiliates, without the express written consent of the Company. The parties further agree that following receipt of Confidential Information from the Company including, but not limited, to relationships and business contacts, Consultant shall not contract or attempt to sell to, transact with or purchase from the Company-provided sources without the written permission from the Company unless (i) a business relationship between Consultant and Company-provided source predated this Agreement, and (ii) Consultant can substantiate exchanges specific to the Company-disclosed information between Consultant and the Company-provided source prior to the date of the signing of this Agreement.

**Termination of the Agreement.**

The Company may terminate the Agreement, with or without cause, by providing written notification to the Consultant. The Agreement will terminate ten days following the date of receipt of the written notification by the Consultant ("Date of Termination"). In the event of termination of the Agreement by the Company, the Consultant shall be entitled to keep any fees or other compensation it received from the Company under the Agreement prior to the Date of Termination.

**Counterparts and Facsimile Signature.**

This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Execution and delivery of this Agreement by exchange of electronic copies bearing the signature of a party hereto shall constitute a valid and binding execution and delivery of this Agreement by such party. Such electronic copies shall constitute enforceable original documents.

**No Construction Against Drafter.**

The Agreement shall be construed without regard to any presumption or other requiring construction against the Party causing the drafting hereof.

      **IN WITNESS WHEREOF**, the parties hereto have duly executed and delivered this Agreement, effective as of the date set forth above.

**Vemanti Group, Inc.**           **Barinder Singh Bal**

By:_____      By:_____

Tan Tran, Chairman & CEO      Barinder Singh Bal, Consultant

6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION


BARINDER SINGH "NABE" BAL,
*Plaintiff,*
v.
TAN TRAN, an individual; and VEMANTI GROUP, INC.,
a Nevada corporation,
*Defendants.*


Case No. _____


# EXHIBIT B


Excerpt from Vemanti Group, Inc.'s Q3 2020 OTC Markets quarterly disclosure
(Quarterly Report for the Period Ending September 30, 2020, filed February 25, 2021),
reflecting Tan Tran's beneficial ownership of 28,000,000 common shares as of
September 30, 2020.


*(Source: OTC Markets disclosure system, www.otcmarkets.com. The excerpted page is Part D, Item 11
(Management Structure and Financial Information) of the disclosure, identifying Tan Tran as Chief Executive
Officer and Chief Financial Officer of Vemanti Group, Inc. and disclosing his beneficial ownership of 28,000,000
common shares (42.56% of class outstanding) and 40,000,000 Series A Preferred shares (80.00% of class
outstanding) as of September 30, 2020.)*



## PART D - MANAGEMENT STRUCTURE AND FINANCIAL INFORMATION

**Item 11.   The Name of the Chief Executive Officer, Members of the Board of Directors, as well as Control Persons**

*Chief Executive Officer, Members of the Board of Directors & Control Persons*

| Name | Age | Position |
|---|---|---|
| Tan Tran | 56 | Chief Executive Officer and Chief Financial Officer |
| Richard Oravec | 50 | Director |
| Rachel Boulds | 50 | Director |

The following table set forth certain information as of September 30, 2020, with respect to the beneficial ownership of our common stock by: (1) each person or entity known by the Company to beneficially own 5% or more of the Company's common stock; (2) each of the Company's directors; and (3) each of the Company's executive officers. For the purposes of computing a person's beneficial ownership, shares of common stock issuable upon the exercise of securities exercisable or convertible into common stock on September 30, 2020, are deemed outstanding for the purposes of computing the share ownership and percentage ownership of the person holding such securities.

Unless otherwise indicated, the principal address of each of the directors below is: c/o Vemanti Group, Inc., 7545 Irvine Center Dr., Suite 200, Irvine CA, 92618.

Page 16 of 40

| Name of Officer/Director and Control Person | Affiliation with Company (e.g. Officer/Director/Owner of more than 5%) | Number of shares owned | Share type/class | Ownership Percentage of Class Outstanding |
|---|---|---|---|---|
| Tan Tran | CEO/CFO | 28,000,000 | Common | 42.56% |
| Tan Tran | CEO/CFO | 40,000,000 | Preferred | 80.00% |
| Richard Oravec | Director | None | None | None |
| Rachel Boulds | Director | None | None | None |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION


BARINDER SINGH "NABE" BAL,
*Plaintiff,*
v.
TAN TRAN, an individual; and VEMANTI GROUP, INC.,
a Nevada corporation,
*Defendants.*


Case No. _____


# EXHIBIT C


Excerpt from Vemanti Group, Inc.'s 2020 Annual Report (for the fiscal year ended December 31, 2020, filed March 31, 2021), reflecting Tan Tran's beneficial ownership of 28,000,000 common shares and 40,000,000 Series A Preferred shares as of year-end 2020.


*(Source: OTC Markets disclosure system, www.otcmarkets.com. The excerpted page is Part D, Item 11 (Management Structure and Financial Information) of the 2020 Annual Report, identifying Tan Tran as Chief Executive Officer and Chief Financial Officer of Vemanti Group, Inc. and disclosing his beneficial ownership of 28,000,000 common shares (40.59% of class outstanding) and 40,000,000 Series A Preferred shares (80.00% of class outstanding) as of December 31, 2020. The page also discloses Director Richard Oravec's beneficial ownership of 600,000 common shares (0.87% of class).)*

www.otcmarkets.com/file/company/financial-report/27630

15  of 42     —  +  Automatic Zoom     VPN

the Sarbanes-Oxley Act of 2002.

**Item 10.  The Nature and Extent of the Issuer's Facilities**

Since 2014, the Company has operated under a shared-workspace environment with Regus in Irvine, CA and Newport Beach, CA. Its official mailing address is 7545 Irvine Center Dr., Ste. 200, Irvine, CA 92660, CA 92660, USA. The Company does not own or have any mortgages on this or any other facilities. All employees, including the officers and directors, are working remotely in a distributed workforce setup via the use of virtual office technologies.

### PART D - MANAGEMENT STRUCTURE AND FINANCIAL INFORMATION

**Item 11.  The Name of the Chief Executive Officer, Members of the Board of Directors, as well as Control Persons**

*Chief Executive Officer, Members of the Board of Directors & Control Persons*

| Name | Age | Position |
|------|-----|----------|
| Tan Tran | 56 | Chief Executive Officer and Chief Financial Officer |
| Richard Oravec | 50 | Director |
| Rachel Boulds | 50 | Director |

The following table set forth certain information as of December 31, 2020, with respect to the beneficial ownership of our common stock by: (1) each person or entity known by the Company to beneficially own 5% or more of the Company's common stock; (2) each of the Company's directors; and (3) each of the Company's executive officers. For the purposes of computing a person's beneficial ownership, shares of common stock issuable upon the exercise of securities exercisable or convertible into common stock on December 31, 2020, are deemed outstanding for the purposes of computing the share ownership and percentage ownership of the person holding such securities.

Unless otherwise indicated, the principal address of each of the directors below is: c/o Vemanti Group, Inc., 7545 Irvine Center Dr., Suite 200, Irvine CA, 93618.

| Name of Officer/Director and Control Person | Affiliation with Company (e.g. Officer/Director/Owner of more than 5%) | Number of shares owned | Share type/class | Ownership Percentage of Class Outstanding |
|---|---|---|---|---|
| Tan Tran | CEO/CFO | 28,000,000 | Common | 40.59% |
| Tan Tran | CEO/CFO | 40,000,000 | Preferred | 80.00% |
| Richard Oravec | Director | 600,000 | Common | 0.87% |
| Rachel Boulds | Director | None | None | None |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION


BARINDER SINGH "NABE" BAL,
*Plaintiff,*
v.
TAN TRAN, an individual; and VEMANTI GROUP, INC.,
a Nevada corporation,
*Defendants.*


Case No. _____


# EXHIBIT D


Excerpt from Vemanti Group, Inc.'s Q1 2021 OTC Markets quarterly disclosure (Quarterly Report for the Period Ending March 31, 2021, filed June 3, 2021), reflecting Tan Tran's beneficial ownership of 27,350,000 common shares as of March 31, 2021.


*(Source: OTC Markets disclosure system, www.otcmarkets.com. The excerpted page shows the Officers, Directors and Control Persons section identifying Tan Tran as Chief Executive Officer and Chief Financial Officer of Vemanti Group, Inc. and disclosing his beneficial ownership of 27,350,000 common shares (39.43% of class outstanding) and 40,000,000 Series A Preferred shares (80.00% of class outstanding) as of March 31, 2021. This 27,350,000 figure reflects a 650,000-share reduction from Tan's 28,000,000-share position disclosed in the Q3 2020 and 2020 Annual Report filings (Exhibits B and C), documenting the publicly visible Cycle 2 net endpoint reduction.)*

→  C        ⊘ www.otcmarkets.com/file/company/financial-report/28692  ⊡ ☆        ↓  ⊗ VPN  ☺  ↥

∧  ∨      16   of 20        —  +  Automatic Zoom  ∨        ⊞  ⊳ ✐ T ⌀ ⊡  🖶

## NOTE 9 – Subsequent Events

The Company has evaluated subsequent events through May 7, 2021, the date on which the accompanying consolidated financial statements were available to be issued, and concluded that, no material subsequent events have occurred since March 31, 2021 that require recognition or disclosure in the consolidated financial statements except as follows:

On April 1, 2021, the Company issued 50,000 shares of common stock at $1.00 per share for the total value of $50,000 in cash.

On April 28, 2021 the Company issued 150,000 shares of common stock to two consultants in exchange for professional services perform during the first quarter of 2021. The stock price closed at $1.01 per share on that date. The total value of the issuance is $151,500.

Issuers Facilities

The Company operates under a shared-workspace environment with Regus in Irvine, CA and Newport Beach, CA. Its official mailing address is 7545 Irvine Center Dr., Ste. 200, Irvine, CA 92660, CA 92660, USA. The Company does not own or have any mortgages on this or any other facilities. All employees, including the officers and directors, are working remotely in a distributed workforce setup via the use of virtual office technologies.

Officers, Directors and Control Persons

The following table set forth certain information as of March 31, 2021, with respect to the beneficial ownership of our common stock by: (1) each person or entity known by the Company to beneficially own 5% or more of the Company's

common stock; (2) each of the Company's directors; and (3) each of the Company's executive officers. For the purposes of computing a person's beneficial ownership, shares of common stock issuable upon the exercise of securities exercisable or convertible into common stock on March 31, 2021, are deemed outstanding for the purposes of computing the share ownership and percentage ownership of the person holding such securities.

Unless otherwise indicated, the principal address of each of the directors below is: c/o Vemanti Group, Inc., 7545 Irvine Center Dr., Suite 200, Irvine CA, 92618.

| Name of Officer/Director and Control Person | Affiliation with Company (e.g. Officer/Director/Owner of more than 5%) | Number of shares owned | Share type/class | Ownership Percentage of Class Outstanding |
|---|---|---|---|---|
| Tan Tran | CEO/CFO | 27,350,000 | Common | 39.43 % |
| Tan Tran | CEO/CFO | 40,000,000 | Preferred | 80.00% |
| Richard Oravec | Director | 600,000 | Common | 0.86% |
| Rachel Boulds | Director | None | None | None |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

BARINDER SINGH "NABE" BAL,
*Plaintiff,*
v.
TAN TRAN, an individual; and VEMANTI GROUP, INC.,
a Nevada corporation,
*Defendants.*

Case No. _____

# EXHIBIT E

Schedule 13D filed by Tan Tran on July 7, 2021 (SEC Accession Number 0001477932-21-004431).

*(Source: U.S. Securities and Exchange Commission EDGAR database, www.sec.gov. Date of Event triggering the filing: June 9, 2021 (Vemanti's Section 12(g) registration effective date). The Reporting Person, Tan Tran, reports beneficial ownership of 27,350,000 shares of Vemanti common stock (39.3% of common stock outstanding as of June 9, 2021) and 40,000,000 shares of Series A Preferred Stock (100% of preferred class), with each share of Series A Preferred Stock entitled to ten (10) votes — for aggregate sole voting power of 427,350,000 votes. The filing identifies Mark Crone, Esq., The Crone Law Group, P.C. as the person authorized to receive notices and communications. Tan Tran's signature is dated July 2, 2021; the filing date of record with the SEC is July 7, 2021.)*



SC 13D 1 vemanti_sc13d.htm SC 13D

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 13D

**Under the Securities Exchange Act of 1934**

# VEMANTI GROUP, INC.

(Name of Issuer)

**Common Stock, $0.0001 par value per share**
(Title of Class of Securities)

**92259A102**
(CUSIP Number)

Mark Crone, Esq.
The Crone Law Group, P.C.
500 Fifth Avenue, Suite 938
New York, New York 10110
Telephone: (646) 861-7891

(Name, Address and Telephone Number of Person
Authorized to Receive Notices and Communications)

**June 9, 2021**
(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box. ☐

Note: Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See §240.13d-7 for other parties to whom copies are to be sent.

\* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

**Persons who respond to the collection of information contained in this form are not required to**
**respond unless the form displays a currently valid OMB control number.**

| 1. | NAMES OF REPORTING PERSONS I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS (ENTITIES ONLY) Tan Tran |
|---|---|
| 2. | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP *N/A (see instructions) (a) ☐ (b) ☐ |
| 3. | SEC USE ONLY |
| 4. | SOURCE OF FUNDS (see instructions) OO |
| 5. | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) or 2(e) ☐ |
| 6. | CITIZENSHIP OR PLACE OF ORGANIZATION United States |

| | | | |
|---|---|---|---|
| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7. | SOLE VOTING POWER | 427,350,000[1] |
| | 8. | SHARED VOTING POWER | |
| | 9. | SOLE DISPOSITIVE POWER | 67,350,000[1] |
| | 10. | SHARED DISPOSITIVE POWER | |

| 11. | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON 67,350,000[1] |
|---|---|
| 12. | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (see instructions) ☐ |
| 13. | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11) 61.47% [2] |
| | TYPE OF REPORTING PERSON (see instructions) IN |

[1] Includes 27,350,000 shares of the Issuer's common stock, par value $0.0001 per share, and 40,000,000 shares of the Issuer's Series A preferred stock, par value $0.0001 per share. The Series A preferred stock are convertible into shares of common stock and vote with the common stock on the basis of each share of common stock being entitled to one vote and each share of Series A preferred stock being entitled to 10 votes.

[2] Percentage calculated based on 69,564,086 shares of common stock, par value $0.0001 per share, outstanding as of June 9, 2021, plus 40,000,000 shares of common stock underlying the Series A preferred stock on an as-converted basis held by the Reporting Person.

**Item 1. Security and Issuer.**

This statement on Schedule 13D (this "Statement") relates to the shares of common stock, par value $0.0001 per share, of Vemanti Group, Inc., a Nevada corporation with principal executive offices located at 7545 Irvine Center Dr., Suite 200, Irvine, CA 92618 (the "Issuer"). As of the date of this filing, the Issuer has 69,564,086 shares of common stock issued and outstanding.

**Item 2. Identity and Background.**

    (a)    The name of the person filing this Statement is Mr. Tan Tran.

           Mr. Tran owns 27,350,000 shares of the common stock of the Issuer.

           Mr. Tran owns 40,000,000 shares of the Series A Preferred Stock of the Issuer.

    (b)    Mr. Tran's business address is c/o Vemanti Group, Inc., 7545 Irvine Center Dr., Suite 200, Irvine, CA 92618.

    (c)    Mr. Tran's principal occupation is serving as the Chairman, Director, President, Chief Executive Officer, and Chief Financial Officer of the Issuer.

    (d)    During the past five years, Mr. Tran, to his knowledge, has never been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors).

    (e)    During the past five years, Mr. Tran, to his knowledge, has never been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction and as a result of such proceeding was the subject of a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal and state securities laws of findings of any violation with respect to such law.

    (f)    Citizenship of Mr. Tan Tran: United States

**Item 3. Source or Amount of Funds or Other Consideration.**

The shares beneficially owned by Mr. Tran were acquired on April 3, 2014 in exchange for 100% of his membership interest in VoiceStep Telcom LLC ("VoiceStep").

**Item 4. Purpose of Transaction.**

On April 3, 2014, Mr. Tran entered into a Contribution Agreement with Vemanti whereby he exchanged 100% of his interest in VoiceStep for 40,000,000 shares of Vemanti's common stock and 40,000,000 shares of Vemanti's Series A preferred stock. As of June 9, 2021, the company became subject to the reporting requirements of the Securities Exchange Act of 1934, as amended.

Except as set forth in this Schedule 13D, Mr. Tan Tran has not formulated any plans or proposals which relate to or would result in: (a) the acquisition by any person of additional securities of the Issuer or the disposition of securities of the Issuer, (b) an extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the Issuer or any of its subsidiaries, (c) a sale or transfer of a material amount of the assets of the Issuer or any of its subsidiaries, (d) any change in the present Board of Directors or management of the Issuer, including any plans or proposals to change the number or term of directors or to fill any existing vacancies on the board, (e) any material change in the Issuer's capitalization or dividend policy of the Issuer, (f) any other material change in the Issuer's business or corporate structure, (g) any change in the Issuer's charter or bylaws or other instrument corresponding thereto or other action which may impede the acquisition of control of the Issuer by any person, (h) causing a class of the Issuer's securities to be deregistered or delisted from a national securities exchange or to cease to be authorized to be quoted in an inter-dealer quotation system of a registered national securities association, (i) a class of equity securities of the Issuer becoming eligible for termination of registration pursuant to Section 12(g)(4) of the Act or (j) any action similar to any of those enumerated above.

**Item 5. Interest in Securities of the Issuer.**

(a)   As of the date of this Schedule 13D, Mr. Tran beneficially owns an aggregate of 27,350,000 shares of the common stock and 40,000,000 shares of Series A preferred stock of the Issuer. The 27,350,000 shares of common stock constitute approximately 39.3% of the Issuer's common stock issued and outstanding as of June 9, 2021, as reported in the Issuer's Form 10/A filed with the Securities and Exchange Commission on June 7, 2021. The 40,000,000 shares of Series A preferred stock constitute 100% of the Issuer's preferred stock issued and outstanding as of June 9, 2021, as reported in the Issuer's Form 10/A filed with the Securities and Exchange Commission on June 7, 2021.

(b)   The beneficial ownership of Mr. Tran is:

    i.    27,350,000 shares of common stock of the Company (39.3%).

    ii.    40,000,000 of preferred stock of the Company (100%)

(c)   Mr. Tran holds 27,350,000 votes reported herein, and is deemed to control and/or have shared disposition rights and voting rights over such votes.

(d)   Mr. Tan Tran holds 40,000,000 votes reported herein, and is deemed to control and/or have shared disposition rights and voting rights over such votes. Series A preferred stock is convertible into shares of common stock and each share of Series A preferred stock is entitled to 10 votes.

(e)   There have been no other transactions in the shares of common stock of the Issuer effected by Mr. Tran during the past 60 days.

(f)   Not applicable.

**Item 6. Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer.**

See Item 4 of this Schedule 13D for a description of the Contribution Agreement.

**Item 7. Material to Be Filed as Exhibits.**

| Exhibit | Description of Exhibit |
| --- | --- |
| 1 | Contribution Agreement by and between Vemanti Group, Inc. and Tan Tran, dated April 3, 2014. |

4

**SIGNATURE**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: July 2, 2021

                                 /s/ Tan Tran
                                 Tan Tran

5

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION


BARINDER SINGH "NABE" BAL,
*Plaintiff,*
v.
TAN TRAN, an individual; and VEMANTI GROUP, INC.,
a Nevada corporation,
*Defendants.*


Case No. _____


# EXHIBIT F


Tan Tran's five Form 4 filings during July 2021:
(1) Form 4 dated July 12, 2021;
(2) Form 4 dated July 20, 2021;
(3) Form 4 dated July 22, 2021;
(4) Form 4 dated July 23, 2021;
(5) Form 4 dated July 29, 2021.


*(Source: U.S. Securities and Exchange Commission EDGAR database, www.sec.gov. Each Form 4 is a Statement of Changes in Beneficial Ownership filed pursuant to Section 16(a) of the Securities Exchange Act of 1934. The five filings collectively report 74 separate sale transactions by Tan Tran during July 6 through July 29, 2021, totaling 189,315 shares sold, reducing Tan's reported beneficial common-stock holdings from 27,342,150 shares (immediately prior to the first reported transaction on July 6, 2021) to 27,152,835 shares (immediately following the final reported transaction on July 29, 2021). These were the only Form 4 filings made by Tan Tran during the in-scope period; no further Form 4 filings were made after July 29, 2021.)*

SEC Form 4

**FORM 4**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden hours per response: | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

**1. Name and Address of Reporting Person***

Tran Tan

| (Last) | (First) | (Middle) |
|---|---|---|

7545 IRVINE CENTER DR.
STE. 200

| (Street) |
|---|

| IRVINE | CA | 92618 |
|---|---|---|
| (City) | (State) | (Zip) |

**2. Issuer Name and Ticker or Trading Symbol**

Vemanti Group, Inc. [ VMNT ]

**3. Date of Earliest Transaction (Month/Day/Year)**
07/06/2021

**4. If Amendment, Date of Original Filed (Month/Day/Year)**

**5. Relationship of Reporting Person(s) to Issuer** (Check all applicable)

X Director    X 10% Owner
X Officer (give title below)    Other (specify below)

President, CEO, CFO

**6. Individual or Joint/Group Filing (Check Applicable Line)**

X Form filed by One Reporting Person
Form filed by More than One Reporting Person

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 07/06/2021 | | S | | 2,500 | D | $1.17 | 27,339,650 | D | |
| Common Stock | 07/06/2021 | | S | | 2,500 | D | $1.09 | 27,337,150 | D | |
| Common Stock | 07/07/2021 | | S | | 2,500 | D | $1.11 | 27,334,650 | D | |
| Common Stock | 07/07/2021 | | S | | 2,500 | D | $1.14 | 27,332,150 | D | |
| Common Stock | 07/07/2021 | | S | | 3,500 | D | $1.18 | 27,328,650 | D | |
| Common Stock | 07/07/2021 | | S | | 2,500 | D | $1.2 | 27,326,150 | D | |
| Common Stock | 07/07/2021 | | S | | 2,500 | D | $1.22 | 27,323,650 | D | |
| Common Stock | 07/07/2021 | | S | | 3,500 | D | $1.23 | 27,320,150 | D | |
| Common Stock | 07/07/2021 | | S | | 3,500 | D | $1.24 | 27,316,650 | D | |
| Common Stock | 07/07/2021 | | S | | 2,500 | D | $1.25 | 27,314,150 | D | |
| Common Stock | 07/08/2021 | | S | | 2,500 | D | $1.05 | 27,311,650 | D | |
| Common Stock | 07/08/2021 | | S | | 2,500 | D | $1.09 | 27,309,150 | D | |
| Common Stock | 07/08/2021 | | S | | 2,500 | D | $1.12 | 27,306,650 | D | |
| Common Stock | 07/08/2021 | | S | | 2,500 | D | $1.15 | 27,304,150 | D | |
| Common Stock | 07/09/2021 | | S | | 2,500 | D | $1.08 | 27,301,650 | D | |
| Common Stock | 07/09/2021 | | S | | 2,500 | D | $1.06 | 27,299,150 | D | |
| Common Stock | 07/09/2021 | | S | | 100 | D | $1.1 | 27,299,050 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**

/s/ Tan Tran    07/12/2021

** Signature of Reporting Person    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.

SEC Form 4



**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden hours per response: | 0.5 |

| 1. Name and Address of Reporting Person* <br> **Tran Tan** | 2. Issuer Name and Ticker or Trading Symbol <br> **Vemanti Group, Inc.** [ VMNT ] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|

1. Name and Address of Reporting Person*

**Tran Tan**

| (Last) | (First) | (Middle) |
|---|---|---|

7545 IRVINE CENTER DR.
STE. 200

(Street)

| IRVINE | CA | 92618 |
|---|---|---|
| (City) | (State) | (Zip) |

2. Issuer Name and Ticker or Trading Symbol

**Vemanti Group, Inc.** [ VMNT ]

3. Date of Earliest Transaction (Month/Day/Year)
07/15/2021

4. If Amendment, Date of Original Filed (Month/Day/Year)

5. Relationship of Reporting Person(s) to Issuer (Check all applicable)

| X | Director | X | 10% Owner |
|---|---|---|---|
| X | Officer (give title below) | | Other (specify below) |

President, CEO, CFO

6. Individual or Joint/Group Filing (Check Applicable Line)

X   Form filed by One Reporting Person

Form filed by More than One Reporting Person

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 07/15/2021 | | S | | 1,315 | D | $0.94 | 27,297,735 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

Explanation of Responses:

Remarks:

/s/ Tan Tran

** Signature of Reporting Person

07/20/2021

Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.



SEC Form 4

**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden hours per response: | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) | |
|---|---|---|---|
| **Tran Tan** | **Vemanti Group, Inc.** [ VMNT ] | X Director | X 10% Owner |
| (Last)        (First)        (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | X Officer (give title below) | Other (specify below) |
| 7545 IRVINE CENTER DR. STE. 200 | 07/20/2021 | President, CEO, CFO | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) | |
| IRVINE      CA      92618 | | X Form filed by One Reporting Person | |
| (City)      (State)      (Zip) | | Form filed by More than One Reporting Person | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 07/20/2021 | | S | | 2,500 | D | $0.79 | 27,295,235 | D | |
| Common Stock | 07/20/2021 | | S | | 1,309 | D | $0.84 | 27,293,926 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**

/s/ Tan Tran                                                          07/22/2021

** Signature of Reporting Person                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.

SEC Form 4

**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden hours per response: | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See Instruction 1(b).*

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **Tran Tan** | **Vemanti Group, Inc.** [ VMNT ] | X Director   X 10% Owner |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | X Officer (give title below)   Other (specify below) |
| 7545 IRVINE CENTER DR. STE. 200 | 07/21/2021 | **President, CEO, CFO** |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| IRVINE  CA  92618 | | X Form filed by One Reporting Person |
| (City) (State) (Zip) | | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 07/21/2021 | | S | | 500 | D | $0.759 | 27,293,426 | D | |
| Common Stock | 07/21/2021 | | S | | 1,000 | D | $0.761 | 27,292,426 | D | |
| Common Stock | 07/21/2021 | | S | | 694 | D | $0.8 | 27,291,732 | D | |
| Common Stock | 07/21/2021 | | S | | 4,000 | D | $0.74 | 27,287,732 | D | |
| Common Stock | 07/21/2021 | | S | | 4,000 | D | $0.72 | 27,283,732 | D | |
| Common Stock | 07/21/2021 | | S | | 2,500 | D | $0.74 | 27,281,232 | D | |
| Common Stock | 07/21/2021 | | S | | 2,000 | D | $0.765 | 27,279,232 | D | |
| Common Stock | 07/21/2021 | | S | | 2,500 | D | $0.8 | 27,276,732 | D | |
| Common Stock | 07/21/2021 | | S | | 2,500 | D | $0.79 | 27,274,232 | D | |
| Common Stock | 07/21/2021 | | S | | 2,500 | D | $0.782 | 27,271,732 | D | |
| Common Stock | 07/21/2021 | | S | | 2,500 | D | $0.775 | 27,269,232 | D | |
| Common Stock | 07/21/2021 | | S | | 2,500 | D | $0.77 | 27,266,732 | D | |
| Common Stock | 07/22/2021 | | S | | 2,500 | D | $0.77 | 27,264,232 | D | |
| Common Stock | 07/22/2021 | | S | | 2,500 | D | $0.779 | 27,261,732 | D | |
| Common Stock | 07/22/2021 | | S | | 2,500 | D | $0.769 | 27,259,232 | D | |
| Common Stock | 07/22/2021 | | S | | 2,500 | D | $0.739 | 27,256,732 | D | |
| Common Stock | 07/22/2021 | | S | | 2,000 | D | $0.759 | 27,254,732 | D | |
| Common Stock | 07/22/2021 | | S | | 2,500 | D | $0.755 | 27,252,232 | D | |
| Common Stock | 07/23/2021 | | S | | 2,500 | D | $0.759 | 27,249,732 | D | |
| Common Stock | 07/23/2021 | | S | | 2,500 | D | $0.749 | 27,247,232 | D | |
| Common Stock | 07/23/2021 | | S | | 2,500 | D | $0.729 | 27,244,732 | D | |
| Common Stock | 07/23/2021 | | S | | 6,500 | D | $0.703 | 27,238,232 | D | |
| Common Stock | 07/23/2021 | | S | | 2,500 | D | $0.719 | 27,235,732 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**

/s/ Tan Tran
** Signature of Reporting Person

07/23/2021
Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

SEC Form 4

**FORM 4**

www.sec.gov/Archives/edgar/data/1869377/0001477932210

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden hours per response: | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

| 1. Name and Address of Reporting Person* **Tran Tan** | 2. Issuer Name **and** Ticker or Trading Symbol **Vemanti Group, Inc.** [ VMNT ] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|

(Last)   (First)   (Middle)
7545 IRVINE CENTER DR.
STE. 200

3. Date of Earliest Transaction (Month/Day/Year)
07/26/2021

| X | Director | X | 10% Owner |
|---|---|---|---|
| X | Officer (give title below) | | Other (specify below) |

President, CEO, CFO

(Street)
IRVINE    CA    92618

4. If Amendment, Date of Original Filed (Month/Day/Year)

6. Individual or Joint/Group Filing (Check Applicable Line)

X  Form filed by One Reporting Person
   Form filed by More than One Reporting Person

(City)   (State)   (Zip)

## Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 07/26/2021 | | S | | 2,500 | D | $0.739 | 27,233,232 | D | |
| Common Stock | 07/26/2021 | | S | | 2,500 | D | $0.729 | 27,230,732 | D | |
| Common Stock | 07/26/2021 | | S | | 2,500 | D | $0.765 | 27,228,232 | D | |
| Common Stock | 07/26/2021 | | S | | 2,500 | D | $0.755 | 27,225,732 | D | |
| Common Stock | 07/26/2021 | | S | | 7,500 | D | $0.72 | 27,218,232 | D | |
| Common Stock | 07/26/2021 | | S | | 2,500 | D | $0.759 | 27,215,732 | D | |
| Common Stock | 07/26/2021 | | S | | 2,500 | D | $0.749 | 27,213,232 | D | |
| Common Stock | 07/27/2021 | | S | | 2,500 | D | $0.8 | 27,210,732 | D | |
| Common Stock | 07/27/2021 | | S | | 2,500 | D | $0.789 | 27,208,232 | D | |
| Common Stock | 07/27/2021 | | S | | 2,500 | D | $0.775 | 27,205,732 | D | |
| Common Stock | 07/27/2021 | | S | | 2,500 | D | $0.769 | 27,203,232 | D | |
| Common Stock | 07/27/2021 | | S | | 2,500 | D | $0.785 | 27,200,732 | D | |
| Common Stock | 07/28/2021 | | S | | 2,400 | D | $0.829 | 27,198,332 | D | |
| Common Stock | 07/28/2021 | | S | | 5,000 | D | $0.74 | 27,193,332 | D | |
| Common Stock | 07/28/2021 | | S | | 2,500 | D | $0.759 | 27,190,832 | D | |
| Common Stock | 07/28/2021 | | S | | 2,500 | D | $0.749 | 27,188,332 | D | |
| Common Stock | 07/28/2021 | | S | | 5,000 | D | $0.78 | 27,183,332 | D | |
| Common Stock | 07/28/2021 | | S | | 2,500 | D | $0.8 | 27,180,832 | D | |
| Common Stock | 07/28/2021 | | S | | 2,500 | D | $0.804 | 27,178,332 | D | |
| Common Stock | 07/28/2021 | | S | | 2,500 | D | $0.82 | 27,175,832 | D | |
| Common Stock | 07/29/2021 | | S | | 100 | D | $0.749 | 27,175,732 | D | |
| Common Stock | 07/29/2021 | | S | | 5,204 | D | $0.74 | 27,170,528 | D | |
| Common Stock | 07/29/2021 | | S | | 193 | D | $0.779 | 27,170,335 | D | |
| Common Stock | 07/29/2021 | | S | | 2,500 | D | $0.74 | 27,167,835 | D | |
| Common Stock | 07/29/2021 | | S | | 2,500 | D | $0.74 | 27,165,335 | D | |
| Common Stock | 07/29/2021 | | S | | 2,500 | D | $0.74 | 27,162,835 | D | |
| Common Stock | 07/29/2021 | | S | | 2,500 | D | $0.735 | 27,160,335 | D | |
| Common Stock | 07/29/2021 | | S | | 2,500 | D | $0.735 | 27,157,835 | D | |
| Common Stock | 07/29/2021 | | S | | 2,500 | D | $0.739 | 27,155,335 | D | |
| Common Stock | 07/29/2021 | | S | | 2,500 | D | $0.739 | 27,152,835 | D | |

## Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**

/s/ Tan Tran
** Signature of Reporting Person

07/29/2021
Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).
** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).
Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

BARINDER SINGH "NABE" BAL,
*Plaintiff,*
v.
TAN TRAN, an individual; and VEMANTI GROUP, INC.,
a Nevada corporation,
*Defendants.*

Case No. _____

# EXHIBIT G

Vemanti Group, Inc.'s Annual Report on Form 10-K for the fiscal year ended December 31, 2021, filed with the U.S. Securities and Exchange Commission on March 24, 2022.

*(Source: U.S. Securities and Exchange Commission EDGAR database, www.sec.gov. Commission File No. 000-56266; CIK 0001605057; trading symbol VMNT. Signed by Tan Tran as Principal Executive Officer and by Stephen R. Jones as Principal Financial Officer, including Sarbanes-Oxley Section 302 certifications at Exhibits 31.1 and 31.2 and Sarbanes-Oxley Section 906 certifications at Exhibits 32.1 and 32.2, each dated March 24, 2022.)*

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2021**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**COMMISSION FILE NO. 000-56266**

# VEMANTI GROUP, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Nevada** | **6199** |
| (State or other jurisdiction of incorporation) | (Primary Standard Industrial Classification Code Number) |
| **46-5317552** | **7545 Irvine Center Dr., Ste 200, Irvine, CA 92618** |
| (IRS Employer Identification No.) | (Address and telephone number of registrant's executive office) |

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| None | N/A | N/A |

Securities registered pursuant to Section 12(g) of the Act: Common Stock

Indicate by check mark whether the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐     No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for shorter period that the registrant as required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated Filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by checkmark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant, as of June 30, 2021, the last business day of the registrant's most recently completed fiscal year, was approximately $51,653,685 based on a closing price of $1.22 as of such date. Solely for purposes of

this disclosure, shares of common stock held by executive officers, directors, and beneficial holders of 10% or more of the outstanding common stock of the registrant as of such date have been excluded because such persons may be deemed to be affiliates.

As of March 24, 2022, the Registrant had 71,519,830 shares of common stock and 40,000,000 shares of Series A Preferred Stock issued and outstanding.

**VEMANTI GROUP, INC.**
**FORM 10-K**
**ANNUAL REPORT**
**For the Fiscal Year Ended December 31, 2021**

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|

**PART I**

| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 9 |
| Item 1B. | Unresolved Staff Comments | 20 |
| Item 2. | Properties | 20 |
| Item 3. | Legal Proceedings | 20 |
| Item 4. | Mine Safety Disclosures | 20 |

**PART II**

| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 21 |
| Item 6. | [Reserved] | 22 |
| Item 7. | Management's Discussion and Analysis of Financial Conditions and Results of Operations | 22 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 26 |
| Item 8. | Financial Statements and Supplementary Data | 28 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 39 |
| Item 9A. | Controls and Procedures | 39 |
| Item 9B. | Other Information | 43 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 43 |

**PART III**

| Item 10. | Directors, Executive Officers, and Corporate Governance | 44 |
| Item 11. | Executive Compensation | 47 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 48 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 49 |
| Item 14. | Principal Accounting Fees and Services | 50 |

**PART IV**

| Item 15. | Exhibits and Financial Statement Schedules | 51 |
| Item 16. | Form 10-K Summary | 51 |

PART I

**ITEM 1. BUSINESS**

As used in this annual report, the terms "we", "us", "our", "the Company", and "Vemanti" mean Vemanti Group, Inc. unless otherwise indicated.

**Cautionary Note Regarding Forward-Looking Statements**

This annual report contains forward-looking statements. These statements relate to future events or our future financial performance. These statements often can be identified by the use of terms such as "may," "will," "expect," "believe," "anticipate," "estimate," "approximate" or "continue," or the negative thereof. We intend that such forward-looking statements be subject to the safe harbors for such statements. We wish to caution readers not to place undue reliance on any such forward-looking statements, which speak only as of the date made. Any forward-looking statements represent management's best judgment as to what may occur in the future. However, forward-looking statements are subject to risks, uncertainties, and important factors beyond our control that could cause actual results and events to differ materially from historical results of operations and events and those presently anticipated or projected. We disclaim any obligation subsequently to revise any forward-looking statements to reflect events or circumstances after the date of such statement or to reflect the occurrence of anticipated or unanticipated events.

The results anticipated by any or all of these forward-looking statements might not occur. Important factors, uncertainties, and risks that may cause actual results to differ materially from these forward-looking statements include those described in Item 1A. – Risk Factors. We undertake no obligation to publicly update or revise any forward-looking statements, whether as the result of new information, future events, or otherwise.

## OUR BUSINESS

**Corporate History and Structure**

The Chief Executive Officer ("CEO") of Vemanti Group, Inc. ("Vemanti"), Mr. Tan Tran, together with Mark Wehberg, incorporated VoiceStep Telecom, LLC, a California limited liability company, on January 27, 2005 ("VoiceStep"). The purpose was to offer digital voice telecommunications services based on Voice over Internet Protocol ("VoIP"), which were provisioned via the internet instead of over traditional fixed lines. The majority of VoiceStep's business was entirely dedicated to serving smaller and prepaid long-distance ("LD") carriers (e.g., International calling card providers) with competitive inbound and outbound services compared to similar products from the incumbent and bigger carriers. VoiceStep built up its customer base through direct marketing and sales as well as re-sellers. On January 22, 2014, Mr. Tran purchased the membership interest in VoiceStep owned by Mr. Wehberg.

Vemanti Group, Inc. was incorporated by Mr. Tan Tran on April 3, 2014 under the laws of the state of Nevada. The Company was created to be a holding company for VoiceStep and other future acquisitions. Simultaneous with the incorporation of the Company, Mr. Tan, the sole member of VoiceStep, exchanged one hundred percent (100%) of his membership interests in VoiceStep for shares of Vemanti's capital stock, effecting a change of control and making VoiceStep a wholly owned subsidiary of the Company.

On July 10, 2018, the Company made an investment in Fvndit, Inc. ("Fvndit"), f/k/a Directus Holdings, Inc., a Nevada corporation, for 20% equity in Fvndit. This was done in an effort to broaden our future service offerings and engage further with the financial technology industry.

Fvndit is a Nevada-based fintech company, the parent company to eLoan JSC ("ELoan"), and focuses on solving the working capital problem for small and medium-sized enterprises ("SMEs").

On June 9, 2021, our wholly owned subsidiary, Vemanti Digital, Ltd. ("Vemanti Digital"), was incorporated in the British Virgin Islands.

**Business Overview**

Vemanti, incorporated on April 3, 2014 under the laws of the State of Nevada, is a technology-driven company that seeks to generate revenues in high-growth emerging markets. We believe that our core strengths are in newer technology development and that we drive growth through disruptive and foundational technologies by teaming up with early-stage impact-driven companies or projects that have market viable products.

On June 26, 2021, through our wholly owned subsidiary incorporated under the laws of the British Virgin Islands, Vemanti Digital Ltd. ("Vemanti Digital"), we deployed an Ethereum smart contract for a US Dollar-backed, fully reserved, stablecoin named Vemanti USD ("USDV"). Stably Corporation ("Stably"), a blockchain and financial technology company, provided the technology infrastructure for asset tokenization for USDV, and First Digital Trust Ltd. ("FDT") acted as the escrow agent and custodian/trustee for the USD reserve funds of USDV. No USDV tokens were released to any party outside of the Company. Due to the current lack of a clear legal framework specific to stablecoins, the Company currently does not foresee an unhindered path for USDV to become commercially available and widely adopted in any jurisdiction without regulatory and compliance risks and thus has decided to end the USDV project. As of February 22, 2022, the Company has terminated its agreements with Stably and FDT, and all USDV tokens have been burned.

Through our wholly owned subsidiary VoiceStep, we continue to provide a one-stop solution with regard to business-class VoIP services to our small to medium-sized business customers in the United States. VoiceStep provides a cloud-based multi-location, multi-user, enterprise-grade communications solution that enables employees to communicate through voice, text, web conferencing, and fax on devices, including smartphones, tablets, PCs, and desk phones. It offers PBX features such as multiple extensions, call control, Outlook integration, SM, telephony conferencing; fax, auto-receptionist, call logs and rule-based call routing and answering. The Company also has the ability to deliver customized voice applications to meet a customer's business requirements. The entire switching infrastructure of VoiceStep is based on next-generation softswitch architecture and was engineered in-house from the ground up. This eliminates certain dependency on third-party vendors and, at the same time, allows the company greater technical flexibility and economic scalability. We offer business-class VoIP products such as cloud phone systems (aka hosted PBX) and domestic/International origination and termination as a cost-saving and profit-increasing solution to multi-location enterprise customers. We are capable of delivering business-class VoIP solutions in all 50 States as well as in Canada and other countries where VoIP applications are allowed. VoiceStep's network enables the following technology solutions: unified communications, data center services, content delivery, VoIP and cloud computing.

We also have an 18.6% interest in Fvndit, f/k/a Directus Holdings, Inc., which owns eLoan, JSC ("eLoan"). Fvndit, through its subsidiaries, operates an online short-term P2P financing platform for SMEs in Vietnam. Fvndit's mission is to make borrowing through credit a simpler process for entrepreneurs, thus making investing more rewarding for investors. Its wholly owned subsidiary eLoan, which was launched in 2017, operates an online P2P funding platform that matches investors with entrepreneurs, allowing anyone on the platform to fund short-term working capital directly to SMEs in Vietnam. The Company purchased a 20% interest in Fvndit on November 13, 2018 for a total purchase price of $300,000. Subsequently, our interest in Fvndit became 18.6% due to Fvndit's new stock issuances. The Company paid $150,000 of the purchase price in a cash payment together with 1,252,086 shares of newly issued common stock of Vemanti (worth $150,0000). Immediately upon the closing of the transaction, Vemanti was entitled to the following rights in Fvndit (i) at least one (1) seat on each of the board of directors of Fvndit and/or eLoan and eLoan Holdings, (ii) veto rights regarding all matters relating to corporate governance and operations of Fvndit and eLoan, (iii) right of first refusal regarding an investment or acquisition of any kind, (iv) most favored nation protection and treatment above all other shareholders of Fvndit and eLoan, (v) at least a 25% discount preference on each and all future rounds of fundraising, and (vi) should eLoan engage in a down round of financing, Vemanti's holdings shall be maintained at the rate and value before any such down round financing at no cost to Vemanti.

*Our Growth Strategies*

We plan to seek out high-growth opportunities in financial technology (fintech) development and in emerging markets like Southeast Asia and Vietnam where adoption of fintech solutions are often accelerated due to lack of existing supportive banking infrastructure. We intend to drive revenue growth and business development through partnership and collaboration with companies in the fintech sector that have market viable products. Strategically, we're focused on providing inclusive financial services for the underserved consumers and businesses using technologies, including neobank (aka digital bank) platforms, API, cloud computing, machine learning, and artificial intelligence.

Due to lack of capital, our Fixed-Mobile Convergence ("FMC") technology was not fully developed and has only been deployable in a controlled test environment. Its consumption of valuable engineering resources caused the Company to fall behind in the host-PBX market. Due to the global and distributed nature of the workforce, businesses today demand service providers to offer not only simple voice and data services, but also fully integrated productivity and coloration tools such as Customer Relationship Management ("CRM"), call center, team and video messaging, and videotelephony conferencing to bring their teams and customers together on one single business communications platform. In order to match those demands, the Company would need to revamp and re-engineer its current platform as well as add a large team of product and business developers which would require a sizable upfront investment. Currently, the Company does not have sufficient capital, so there are no plans to further grow VoiceStep's core business. Furthermore, the market is already saturated with much more established players. Going forward, the Company will focus its business development activities in the fintech sector.

For the next 12 months, we plan to implement two strategies to sustain the operations of VoiceStep: cost reduction and revenue growth. We have started cost-reduction measures for our ongoing operating expenses by renegotiating prices and/or cancelling redundant products with existing vendors and service providers. As for revenue growth, we plan to seek out and partner with local IT services companies who are seeking a white-label business-class VoIP solution for their existing customers who either have not yet made the switch to VoIP or are looking for a voice solution that allows employees to work remotely using a virtual phone system due to COVID-19. Additionally, we have reserved a portion of our cash on hand to ensure the operational continuity of VoiceStep for at least the next 12 months. Therefore, we don't foresee any negative impact on our ongoing VoiceStep operations or future fintech business strategies.

Given telecommunications technologies (i.e., voice and data networks) are the basic foundation for all Internet-based products and services, we believe that moving our focus to fintech is a natural evolution for telecom service providers like ourselves. We believe that the telecommunications industry has changed dramatically and it is merging and/or intersecting with other industries, such as social media and financial services. For example, an end-user communications device such as a mobile phone can now be utilized as a vehicle for bill payments, investments, and e-commerce services. Telecom standards continue to improve in terms of speed and capacity to allow service providers to launch additional value-added services. Many of the major carriers in the US have been considering how they can roll out embedded banking services using 5G. Outside of the US, many telecom service providers, including carriers in Southeast Asia and Vietnam, started making e-wallet services available over 10 years ago to their end-users. This allows them to pay for online purchases (like Paypal), perform person-person funds transfer (similar to Venmo), and pay monthly utility bills. Our CEO, Tan Tran, had acted as an advisor to some of these service providers in their implementation strategies, so we believe that fintech is something in which the Company is well versed.

Over 70% of businesses and consumers in Southeast Asia ("SEA") are underbanked. With all the countries in the region that expect to have 5%+ GDP growth in the coming years, despite COVID-19, we feel SEA is a region where fintech innovation will thrive. Fintech products and services in SEA can be broken down into 4 major sectors: digital lending, electronic payments, online investment, and B2B back-office solutions. We plan to be active in digital lending and electronic payments. Outside of payments, the regulatory environment in Vietnam and other Southeast Asian countries for fintech is still not yet clearly defined. Strong demand by both businesses and consumers have prompted many startups to launch innovative products and services, but without the supportive regulations needed in place. In Vietnam, where our portfolio company Fvndit is based, the government is trying to put a regulatory framework in place for fintech companies without hampering impact-driven innovations. We believe their goal is to keep out bad actors. We further believe that Peer-to-Peer ("P2P") lending is one of the sectors on which the Vietnamese government is focused. This framework in Vietnam is only about four (4) years old. As such, the regulations on P2P lending are still relatively underdeveloped. Both the sheer volume and popularity of these platforms have driven the State Bank of Vietnam ("SBV"), the financial services authority of Vietnam, to begin establishing a regulatory framework specifically for online lending services. In December 2018, Fvndit submitted a proposal to the SBV requesting that it be approved as a licensed Peer-to-Peer lending/crowdfunding platform. The proposal was accepted and is currently under review. Due to COVID-19, the SBV has pushed back the release of their fintech guidelines until end of 2021 or early 2022. Fvndit is actively conducting a dialogue-based approach and information exchange with the SBV. For the time being, Fvndit is conducting all its transactions with full KYC/AML checks and proper tax withholdings and with quarterly reports submitted to the SBV to give them full insight into its operations. We expect to see the same approach from the SBV when it comes to a legal framework for using cryptocurrencies and other digital monetary mediums in payments, lending, and investment applications. Through Fvndit, we will continue to monitor guidelines issued by the SBV in Vietnam and plan our fintech strategies accordingly.

On August 11, 2021, we signed a Fintech and Banking-as-a-Service ("BaaS") business cooperation Memorandum of Understanding ("MOU") with Vietnam Public Joint Stock Commercial Bank ("PVcomBank") to jointly develop financial products and banking solutions for the underserved consumers and small businesses in Vietnam. PVcomBank is a fully licensed and regulated bank in Vietnam with core banking products and services. It has a network of 109 transaction offices in major provinces and cities in Vietnam that provide a range of products and services for its individual and corporate clients. According to the signed MOU outlining the partnership, Vemanti will gain access to the technical know-hows and banking expertise of PVcomBank via the latter's bank license, core banking services, and an existing technology platform purpose-built for API-based integration. Currently, no definitive agreement exists between us and PVcomBank, and we are not responsible for any actions pursuant to the current MOU. The partnership's mission is to develop, demonstrate, and provide innovative, tech-driven, embedded financial and banking services to customers without requiring them to go into a physical branch to become registered bank customers. A market study to assess the business opportunity and commercial feasibility of the planned services will be jointly carried out by both parties. Once launched, the on-demand commercially-ready banking services from PVcomBank will be accessible via Application Programming Interfaces ("APIs") and offered as Vemanti-branded products in its ecosystem. It is aimed to be a cost-effective and efficient approach to bring banking services to the underserved consumers and small businesses compared to traditional banking products that are either under-penetrated or under-marketed.

At the end of March 2021, we made a Bitcoin purchase through Gemini Trust Company, LLC ("Gemini") (https://gemini.com) a digital currency exchange and custodian that allows customers to buy, sell, and store digital assets. Gemini is a New York-based trust company regulated by the New York State Department of Financial Services (NYDFS). We currently own 0.20488159 Bitcoin, which are being stored in custody with Gemini. The Bitcoin was purchased as an investment. Currently, we do not hold, or intend to acquire or hold, digital assets other than Bitcoin.

Another strategy our Company employs is to acquire companies and/or form joint ventures. We focus on helping smaller companies accelerate their growth, execute their business plans and then scale up from there. We have a team assembled for the express purpose of sourcing attractive investment and M&A opportunities, developing and scaling them, and then building valuation for Vemanti shareholders. We believe that we are well versed in the high-tech industry and have significant experience in international deals. We understand cross-border transactions, what drives deal flow, and how to successfully integrate and accelerate the growth of portfolio companies. We are currently not in any discussions with any parties regarding acquisitions or joint ventures.

*Competitive Strengths*

We believe our following competitive strengths differentiate us from our competitors:

- access to many partner companies in the fintech sector that already have market viable products;
- ground-level knowledge and experience working in Vietnam and SE Asia; and
- our ability to tie leading-edge technologies to real-world solutions.

*Products*

VoiceStep's current core products are:

- Business-class VOIP cloud phone system (a/k/a "Hosted PBX");
- Carrier-class domestic/international origination and termination; and
- Essential business communications tools and applications such as fax, SMS (texting), call conferencing, and call center.

VoiceStep operates in a variety of small to medium business industries. All of our customers are on a monthly recurring service plan. As our customers do not require capital investment or maintenance contracts, it lowers our cost of ownership and allows the customers to easily migrate away from costly traditional on-premise PBX providers.

*Our Suppliers*

We currently depend on four (4) suppliers to deliver the VoIP solutions to us that we then re-sell to small and medium business customers:

1. Cyxtera Technologies, a data center and colocation vendor from whom we rent rack space, power, and internet connectivity on a contractual basis to host our servers and networking equipment;

2. Voyant Communications, f/k/a Vitelity, a wholesale VoIP communications service provider, who, from their end, terminates the telephone calls for our customers, which then allows them to receive incoming calls to telephone numbers in the US and Canada;

3. ScarletHawk Solutions, D.B.A Voxlinx, a wholesale VoIP communications service provider, who, from their end, terminates telephone calls for our customers, which then allows them to receive incoming calls to telephone numbers located in more than 60 countries outside the US and Canada; and

4. THINQ is a wholesale VoIP communication service provider, who interconnects with multiple carriers across the globe to allow our customer to make outgoing calls to any numbers in the US and to other countries.

*Marketing and Sales*

We currently market our products through third-party sales and marketing services providers. We changed our business model 8 years ago when Skype, WhatsApp and other similar platforms started to come into the marketplace. Whereas we originally sold calling card minutes to individuals, we then adjusted and focused more on business customers. We focused on businesses that already had an internet subscription or connection and could purchase phone lines from our Company at discounted rates, rather than other mainstream companies such as AT&T and Verizon which offered more costly calling card packages. Our Company offers alternative services that allow businesses to be able to communicate with the outside world as well as their consumer base, but at a lower cost.

Revenue that has been generated in the last 2 years is based on the same customers the Company has had since 2015.

### *Customers*

We define a "customer" as a party that purchases or subscribes to our products and services directly or indirectly through our channel partners. For VoiceStep, our Company currently has a customer base which mostly comprises SMEs, such as dentist offices, beauty salons, real estate companies etc., in the United States. We strive to establish and maintain long-term relationships with our customers and we currently do not have a significant customer concentration in any particular business sector. None of our customers account for more than 10% of our total revenue for the years ended December 31, 2021 and 2020. Our service is subscription based. Customers initially sign up for services via our VoiceStep Business Communications Service Agreement. Customers designate how many users our services are needed for, Voice & FAX plan type, and whether they choose to be billed annually or monthly.

Customer accounts automatically renew each month or year, depending on their payment choice, until such time that a customer chooses to cancel their service.

We generate revenues primarily from the sale of our monthly and yearly subscription plans for our cloud-based VoIP services. As our customers' needs change, they often add users to existing services or upgrade to better plans, which provide them with additional features and functionality.

In late 2014, the Company started working on Fixed Mobile Convergence ("FMC") technology. This end-to-end mobility solution will help ensure that employees, partners, customers, processes and assets of a company are securely connected and can be optimized in the workplace. When employees leave the office, they're leaving opportunities behind if they're missing critical calls and voice messages on their desk phone, playing phone tag with important customers or sacrificing certain ideal features of their fixed, desk-based phones. The Company's solutions for FMC make PBX features that are enjoyed in the office available and accessible through a smart phone – helping employees be more responsive and productive from virtually anywhere. In addition, the FMC solutions bring a set of unique features that enhance integration between wireline and wireless networks.

When a user is on Wi-Fi, all of their calls are delivered to the cloud phone system over the Internet at no charge. If their Wi-Fi signal degrades or, if they move away from a wireless router, their mobile phone will simply connect to the different cellular networks without disconnecting calls. Whether they're on Wi-Fi or not, their calls are always connected to the Company's cloud phone system without the use of an app or mobile data connection. This provides a streamlined switch between Wi-Fi and cellular, optimizing access and reducing cost. FMC was projected to create a substantial and new stream of revenue for the Company. However, this goal was not realized.

### *Seasonality of Business*

There is no significant seasonality in our business.

### *Research and Development*

We do not have any dedicated in-house research and development.

### *Intellectual Property*

All the source coding we utilize is open-source code, so there is never a need to copyright code as we do not own the coding.

### *Environmental Issues*

Our business currently does not implicate any environmental regulation.

### *Competition*

Any entity offering Internet-based communication services such as VoIP or Fax-over-IP ("FoIP") continue to be considered a direct competitor of us, regardless of whether the end-user is required to pay for those services or not. This also includes applications that allow users to send text messages and voice messages, make voice and video calls, and share images, documents, user locations, and other content such as WhatsApp, Facebook Messenger, Skype, WeChat, Viber, etc.

### Employees

Currently, the Company has two employees, our President and Chief Executive Officer, Tan Tran, and our Chief Financial Officer, Stephen R. Jones.

### ITEM 1A. RISK FACTORS

### Risks Related to Our Business and Industry

### *The current COVID-19 pandemic, as well as other epidemics, natural disasters, terrorist activities, political unrest, and other outbreaks could disrupt our delivery and operations, which could materially and adversely affect our business, financial condition, and results of operations.*

The current COVID-19 pandemic adversely affected many aspects of our business, including sales, operational efficiency, technical support and our customer's ability to pay our fees. Global pandemics, or fear of spread of contagious diseases, such as Ebola virus disease ("EVD"), coronavirus disease 2019 ("COVID-19"), Middle East respiratory syndrome ("MERS"), severe acute respiratory syndrome ("SARS"), H1N1 flu, H7N9 flu, and avian flu, as well as hurricanes, earthquakes, tsunamis, or other natural disasters could disrupt our business operations, reduce or restrict our supply of products, incur significant costs to protect our employees and facilities, or result in regional or global economic distress, which may materially and adversely affect our business, financial condition, and results of operations. Actual or threatened war, terrorist activities, political unrest, civil strife, and other geopolitical uncertainty could have a similar adverse effect on our business, financial condition, and results of operations. Any one or more of these events may impede our product offering efforts and adversely affect our sales results, or even for a prolonged period of time, which could materially and adversely affect our business, financial condition, and results of operations.

COVID-19 has had a global economic impact on the financial markets. The global spread of COVID-19 pandemic may result in global economic distress, and the extent to which it may affect our results of operations will depend on future developments, which are highly uncertain and cannot be predicted. Relaxation of restrictions on economic and social activities may also lead to new cases which may lead to re-imposed restrictions. We cannot assure you that the COVID-19 pandemic can be eliminated or contained in the near future, or at all, or a similar outbreak will not occur again. A third wave of COVID-19 or a similar pandemic could materially and adversely affect our business, financial condition, and results of operations.

We are also vulnerable to natural disasters and other calamities. We cannot assure you that we are adequately protected from the effects of fire, floods, typhoons, earthquakes, power loss, telecommunications failures, break-ins, war, riots, terrorist attacks, or similar events. Any of the foregoing events may give rise to interruptions, damage to our property, delays in production, breakdowns, system failures, technology platform failures, or internet failures, which could cause the loss or corruption of data or malfunctions of our manufacturing facility as well as adversely affect our business, financial condition, and results of operations.

O*ur financial situation creates doubt whether we will continue as a going concern.*

There can be no assurances that we will ever be able to achieve a level of revenues adequate to generate sufficient cash flow from operations or obtain additional financing through private placements, public offerings and/or bank financing necessary to support our working capital requirements. To the extent that funds generated from any private placements, public offerings and/or bank financing are insufficient, we will have to raise additional working capital and no assurance can be given that additional financing will be available, or if available, will be on acceptable terms. These conditions potentially raise substantial doubt about our ability to continue as a going concern. If adequate working capital is not available, we may be forced to discontinue operations, which would cause investors to lose their entire investment.

*Maintenance of our Investment Company Act exemption imposes limits on our operations, which may adversely affect our results of operations.*

Section 3(a)(1)(A) of the Investment Company Act defines an investment company as any issuer that is, holds itself out as being, or proposes to be, primarily engaged in the business of investing, reinvesting or trading in securities and Section 3(a)(1)(C) of the Investment Company Act defines an investment company as any issuer that is engaged or proposes to engage in the business of investing, reinvesting, owning, holding or trading in securities and owns or proposes to acquire "investment securities" (within the meaning of the Investment Company Act) having a value exceeding 40% of the value of the issuer's total assets (exclusive of United States government securities and cash items) on an unconsolidated basis (the "40% test"). Excluded from the term "investment securities" are, among others, securities issued by majority-owned subsidiaries unless the subsidiary is an investment company or relies on the exceptions from the definition of an investment company provided by Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act (a "fund"). The Investment Company Act defines a "majority-owned subsidiary" of a person as any company 50% or more of the outstanding voting securities (i.e., those securities presently entitling the holder thereof to vote for the election of directors of the company) of which are owned by that person, or by another company that is, itself, a majority owned subsidiary of that person.

We conduct our operations primarily through our wholly owned subsidiaries. We believe our wholly owned subsidiaries VoiceStep Telecom, LLC and Vemanti Digital, Ltd. are outside of the definition of an investment company pursuant to Section 3(a)(1)(A) of the Investment Company Act, as neither VoiceStep Telecom, LLC or Vemanti Digital, Ltd. is, holds itself out as being, or proposes to be, primarily engaged in the business of investing, reinvesting or trading in securities. In addition, the Company believes VoiceStep Telecom, LLC and Vemanti Digital, Ltd. are outside of the definition of an investment company pursuant to Section 3(a)(1)(C) of the Investment Company Act, as neither subsidiary is engaged or proposes to engage in the business of investing, reinvesting, owning, holding or trading in securities and owns or proposes to acquire "investment securities" (within the meaning of the Investment Company Act) having a value exceeding 40% of the value of its total assets (exclusive of United States government securities and cash items) on an unconsolidated basis. If it is determined that the investments of either VoiceStep Telecom, LLC or Vemanti Digital, Ltd. have a value that exceeds 40% of the value of its total assets (exclusive of United States government securities and cash items) on an unconsolidated basis, we believe that both subsidiaries are exempt from the definition of investment company pursuant to Section 3(b)(1) of the Investment Company Act, as both Vemanti Digital, Ltd. and VoiceStep Telecom, LLC are primarily engaged, directly or through a wholly owned subsidiary or subsidiaries, in a business or businesses other than that of investing, reinvesting, owning, holding, or trading in securities.

The composition of "Other Assets" shown on the Company's consolidated balance sheet comprises our investment in Fvndit, Inc. ("Fvndit"). On November 13, 2018, we purchased a 20% investment in Directus Holdings, Inc., which owns eLoan, JSC ("eLoan"), a fintech company based in Vietnam, for $300,000. Half of the investment was made through a cash payment of $150,000, and the remaining half of the investment was made through the issuance of 1,252,086 shares of Vemanti Group's common stock to the Founders of eLoan. On December 19, 2018, Directus Holdings, Inc. filed a Certificate of Amendment to Articles of Incorporation to the State of Nevada for its corporation name to be changed to Fvndit, Inc.

On October 5, 2020, Fvndit issued 500,000 shares of common stock to Tan Tran, CEO and majority shareholder of Vemanti. The issuance raised the total number of Fvndit outstanding shares to 40,500,000. Mr. Tran and Vemanti together owned 8,500,000 shares or 20.99% of total Fvndit outstanding shares at that time.

On March 16, 2021, Tan Tran resigned as an Officer and Director of Fvndit. On that same date, Fvndit issued 2,500,000 shares of common stock to Thomas Duc Tran (unaffiliated with Tan Tran), and appointed him as the Chairman, CEO, President, Secretary, and Treasurer of Fvndit. The issuance raised the total number of Fvndit outstanding shares to 43,000,000. As a result, Mr. Tran and Vemanti together own 19.77% of total Fvndit outstanding shares.

This investment is accounted for under the cost method of accounting since March 16, 2021. As of December 31, 2021, this investment had a balance of $296,405 and is reflected in "Other Assets" on the Company's consolidated balance sheets. If it is determined that the investment in Fvndit has a value that exceeds 40% of the value of our total assets (exclusive of United States government securities and cash items) on an unconsolidated basis, we believe that we are exempt from the definition of investment company pursuant to Section 3(b)(1) of the Investment Company Act, as the Company is primarily engaged, directly or through a wholly owned subsidiary or subsidiaries, in a business or businesses other than that of investing, reinvesting, owning, holding, or trading in securities. We intend to continue to conduct our operations so that we are not required to register as an investment company under the Investment Company Act.

As noted above, if the combined values of the investment securities issued by our Company, and our subsidiary, that must rely on Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act, together with any other investment securities we may own, exceeds 40% of the value of our total assets on an unconsolidated basis, we may be deemed to be an investment company. If we fail to maintain an exception, exemption or other exclusion from the Investment Company Act, we could, among other things, be required either (i) to change substantially the manner in which we conduct our operations to avoid being subject to the Investment Company Act or (ii) to register as an investment company. Either of these would likely have a material adverse effect on us, our ability to service our indebtedness and on the market price of our shares and any other securities we may issue. If we were required to register as an investment company under the Investment Company Act, we would become subject to substantial regulation with respect to our capital structure (including our ability to use leverage), management, operations, transactions with certain affiliated persons (within the meaning of the Investment Company Act), portfolio composition (including restrictions with respect to diversification and industry concentration) and other matters.

If the SEC or a court of competent jurisdiction were to find that we were required, but failed, to register as an investment company in violation of the Investment Company Act, we would have to cease business activities, we would breach representations and warranties and/or be in default as to certain of our contracts and obligations, civil or criminal actions could be brought against us, our contracts would be unenforceable unless a court were to require enforcement and a court could appoint a receiver to take control of us and liquidate our business, any or all of which would have a material adverse effect on our business.

***The successful operation of our business depends upon the performance and reliability of the Internet infrastructure in the United States.***

Our business depends on the performance and reliability of the Internet infrastructure in in the United States. The use of our VoiceStep products requires access to the internet. The failure of connection to the internet could adversely interfere with the use of our products. We have no control over the internet services provided by the internet service providers. In addition, if Internet access fees or other charges to Internet users increase, our users may abandon our products or look for alternative services, which in turn may adversely affect our business, financial condition and results of operations.

***Certain of our software are licensed from third parties.***

We license software for certain components of our products from third parties we do not control, such as Cyxtera Technologies, Voyant Communications (f/k/a Vitelity), ScarletHawk Solutions (D.B.A. Voxlinx) and THINQ. Although we have contracts in place with our third-party software providers, there can be no assurance that the software we license will continue to be available on commercially reasonable terms, or at all, in the future. The lack of renewal, or termination, of one or more of our license agreements, or the renewal of license agreements on less favorable terms, could have a material adverse effect on our business, financial condition and results of operations.

While proprietary or open source alternatives may be available in some cases, transitioning to such alternatives may take time and be costly. The loss of existing licenses or the unavailability of such alternative software could result in a decrease in the quality of our products or loss of the ability to provide our products until equivalent software or suitable alternatives can be developed, identified, licensed and integrated.

Our products and services rely on certain technical standards, among other things, for interoperability of communication of voice and video, including standards relating to audio and video compression standards. These standards may be covered by patent rights held by third parties. The combined costs of identifying and obtaining licenses from all holders of patent rights essential to such standards could be high and could reduce our profitability or increase our losses. The cost of not obtaining such licenses could also be high if a holder of such patent rights brings a claim for patent infringement. While some such patent holders, based on their involvement with the standard setting organizations, may license relevant technology to us under reasonable and non-discriminatory terms, there can be no assurance that all necessary patent rights can be secured under such terms, and we may have to pay substantial royalties to secure such patent rights.

***If we fail to keep up with industry trends or technological developments, our business, results of operations and financial condition may be materially and adversely affected.***

The IP-based business communication industry is rapidly evolving and subject to continuous technological changes. Our success will depend on our ability to keep up with the changes in technology and user behavior resulting from new developments and innovations. For example, as we provide our product and service offerings across a variety of mobile systems and devices, we are dependent on the interoperability of our services with popular mobile devices and mobile operating systems that we do not control, such as Android and iOS. If any changes in such mobile operating systems or devices degrade the functionality of our services or give preferential treatment to competitive services, the usage of our services could be adversely affected.

Technological innovations may also require substantial capital expenditures in product development as well as in modification of products, services or infrastructure. We cannot assure you that we can obtain financing to cover such expenditure. If we fail to adapt our products and services to such changes in an effective and timely manner, we may suffer from decreased user base, which, in turn, could materially and adversely affect our business, financial condition and results of operations

***Rapidly evolving technologies could cause demand for our products to decline or could cause our products to become obsolete.***

Current or future competitors may develop technological or product innovations that address Internet communications in a manner that is, or is perceived to be, equivalent or superior to our products. In the technology market in particular, innovative products have been introduced which have the effect of revolutionizing a product category and rendering many existing products obsolete. If competitors introduce new products or services that compete with or surpass the quality or the price/performance of our products, we may be unable to attract and retain users or to maintain or increase revenues from our users. We may not anticipate such developments and may be unable to adequately compete with these potential solutions. As a result of these or similar potential developments, in the future it is possible that competitive dynamics in our market may require us to reduce prices for our paid for products, which could harm our net revenues, gross margin and operating results or cause us to incur losses.

***If our business were deemed to be a regulated telecommunications business in one or more jurisdictions, it would significantly increase our expenses and may require us to change our products and other aspects of our business in potentially detrimental ways.***

VoiceStep operates as a software company and not as a regulated telecommunications company. We are subject to the risk that, due to changes in communications and other similar laws and regulations or in the application, interpretation or enforcement of both existing and future communications and other similar laws and regulations, we may be required to comply with communications and other similar laws and regulations in one or more jurisdictions. In addition, we are continually seeking ways to improve our products and offer them across multiple communication platforms, which may involve from time to time upgrades or changes in the technological infrastructure on which our products are based and which could result in subjecting our activities to greater regulation in multiple jurisdictions. For example, the rolling out of our IP-based business communication in the United States may subject us to a greater risk of regulatory oversight in this country. If we are required to comply with communications and other similar laws and regulations, we would need to meet a number of obligations, which could vary from jurisdiction to jurisdiction, including new or enhanced compliance in the following areas:

- licensing and notification requirements;

- emergency calling requirements, including enhanced emergency calling through multi-line telephone systems;

- lawful interception or wiretapping requirements;

- privacy and data retention and disclosure requirements;

- limitations on our ability to use encryption technology;

- disability access requirements;

- consumer protection requirements and local dispute resolution requirements;

- requirements related to customer support;

- quality of service requirements;

- provision of numbering directories;

- numbering rules, including portability requirements;

- directory and operator services; and

- access and interconnection obligations.

If we fail to comply with communications, e-commerce and other similar laws and regulations in one or more jurisdictions, our business, results of operations and financial condition may be materially and adversely affected.

***Third parties have raised, and may raise in the future, concerns about the application of regulations to our business.***

Some third parties, including our competitors, have raised, and may raise in the future, concerns with policymakers and regulators in various parts of the world about the application of local laws and regulations to our business. We believe that some of these established businesses (which may include incumbent telecommunications companies) and their trade association groups employ significant resources in their efforts to shape legal and regulatory regimes and may employ these resources to change legal and regulatory regimes in ways intended to reduce the effectiveness of our business. Most incumbent telecommunications companies, landline and wireless, have substantial budgets devoted to lobbying and governmental relations and long-standing relationships with regulators and legislators that we, as a newer entrant in the Internet communications market, do not have. Some of these incumbent businesses have raised concerns relating to allowing consumers open access to the Internet, the lack of regulatory controls and obligations placed on Internet communications products, and the cost advantage this brings to providers of such products. Continuing actions by these competitors or trade groups may result in additional jurisdictions requiring us to comply with the local telecommunications and other laws and regulations.

*Table of Contents*

***Our business depends on our users having continued and unimpeded access to the Internet. Companies providing access to the Internet may be able to block or degrade our calls, or block access to our website or charge us or our users additional fees for our products.***

All of our users rely on open, unrestricted access to the Internet to use our products. If they have limited, restricted or no access at all to the Internet, or their connection to the Internet is interrupted or disturbed, they may be less likely to use our products as a result.

In many cases, that access is provided by companies that compete with at least some of our products, including incumbent landline telephone companies, cable television system operators, mobile wireless communications companies, and large Internet service providers. Some of these providers have stated that they may take measures that could block, degrade or otherwise disrupt our calls, or increase the cost of customers' use of our products by restricting or prohibiting the use of their lines or access points to the Internet for our products, by filtering, blocking, delaying, or degrading the packets of data used to transmit our communications, and by charging increased fees to our users for access to our products.

Some Internet access providers have additionally, or alternatively, contractually restricted their customers' access to Internet communications products (which may include our VoIP products) through their terms of service. For example, SFR in France and Vodafone in Germany contractually prohibit their customers from using voice over the Internet protocol services on the Apple iPad 3G. T-Mobile in Germany and Vodafone in France and the United Kingdom have established special additional tariffs for voice over the Internet protocol. Customers of these and other Internet access providers may not be aware that technical disruptions or additional tariffs are the act of other parties, which could harm our brand. Even if customers understand that we are not the source of such disruptions, they may be less likely to use our products as a result.

In the United States, the European Union and other jurisdictions, regulatory authorities are in the process of examining the adoption of "network neutrality" policies, which aim to treat all Internet traffic equally, and developing or considering laws and regulations to codify acceptable behaviors on the part of network operators and access providers when providing consumers and businesses with access to the Internet. Different regulatory authorities have different approaches to this policy area both from a substantive and procedural perspective. Any failure on the part of regulatory authorities to protect the accessibility of the Internet to all, or any particular category of, Internet subscribers, or their failure to protect the delivery on a non-discriminatory basis of user communications over the Internet, regardless of type or service, could harm our results of operations and prospects.

***Our business depends on the continued reliability of the Internet infrastructure.***

Unlike traditional communications products, our users rely on the Internet to access our products. Increasing numbers of users and increasing bandwidth requirements may harm the performance of the Internet. In addition, if Internet service providers and other third parties providing Internet services have outages or deteriorations in their quality of service, our customers will not have access to our products or may experience a decrease in the quality of our products.

Furthermore, as the rate of adoption of new technology increases, the networks on which our products rely in certain countries may not be able to sufficiently adapt to the increased demand for their products and services. Frequent or persistent interruptions could cause current or potential users to believe that our systems are unreliable, leading them to switch to our competitors or to avoid our products, and could permanently harm our reputation and brands.

***Problems with or price increases by third parties who provide services to us or to our users could harm our business.***

We rely on telecommunications providers to provide certain of our products, such as Voyant Communications, a wholesale VoIP communications service provider, who, from their end, terminates the telephone calls for our customers which then allow them to receive incoming calls to telephone numbers in the US and Canada. We have agreements with a number of telecommunication providers in order for us to provide many of our paid products. The quality of calls made by our users to and received by our users from landline and mobile phones depends in large part of the call quality of the relevant landline or mobile network. As a result, if these third parties do not provide sufficiently high quality services, our call quality may be negatively affected which may in turn adversely impact our brand, reputation and consumer acceptance of our products. In addition, price increases by companies that provide services to us or our users could harm our results of operations.

***We are dependent upon our only key executive who is not bound by any employment agreement nor does the Company maintain director and officers ("D&O") liability insurance for him.***

Our success depends, in part, upon the continued services of the key member of our management. Our executive's knowledge of the market, our business and our Company represents a key strength of our business, which cannot be easily replicated. The success of our business strategy and our future growth also depend on our ability to attract, train, retain and motivate skilled managerial, sales, administration, development and operating personnel.

There can be no assurance that our existing personnel will be adequate or qualified to carry out our strategy, or that we will be able to hire or retain experienced, qualified employees to carry out our strategy. The loss of our key executive, or the failure to attract and retain additional key personnel, could have a material adverse effect on our business, financial condition and results of operations.

***We may be subject to intellectual property infringement claims, which may be expensive to defend and may disrupt our business and operations.***

We cannot be certain that our operations or any aspects of our business do not or will not infringe upon or otherwise violate intellectual property rights held by third parties. We have not but in the future may be, subject to legal proceedings and claims relating to the intellectual property rights of others. There could also be existing intellectual property of which we are not aware that our products may inadvertently infringe. We cannot assure you that holders of intellectual property purportedly relating to some aspect of our technology or business, if any such holders exist, would not seek to enforce such intellectual property against us in the United States, or any other jurisdictions. If we are found to have violated the intellectual property rights of others, we may be subject to liability for our infringement activities or may be prohibited from using such intellectual property, and we may incur licensing fees or be forced to develop alternatives of our own. In addition, we may incur significant expenses, and may be forced to divert management's time and other resources from our business and operations to defend against these infringement claims, regardless of their merits. Successful infringement or licensing claims made against us may result in significant monetary liabilities and may materially disrupt our business and operations by restricting or prohibiting our use of the intellectual property in question, and our business, financial position and results of operations could be materially and adversely affected.

***We cannot control Internet based delays and interruptions, which may negatively affect our customers and thus our revenues.***

Any delay or interruption in the services by these third parties service providers could result in delayed or interrupted service to our customers and could harm our business. Accordingly, we could be adversely affected if such third party service providers fail to maintain consistent and reliable services, or fail to continue to make these services available to us on economically acceptable terms, or at all. These suppliers could also be adversely impacted by the COVID-19 pandemic, which could affect their ability to deliver their services to our Company in a satisfactory manner, or at all.

***If our business plans are not successful, we may not be able to continue operations as a going concern and our shareholders may lose their entire investment in us.***

We may not have sufficient working capital to fund the expansion of our operations and to provide working capital necessary for our ongoing operations and obligations. We may need to raise significant additional capital to fund our operating expenses, pay our obligations, and grow our company. Therefore, our future operations may be dependent on our ability to secure additional financing. The COVID-19 pandemic may have an adverse impact on the Company's ability to raise capital or to continue as a going concern.

***Our failure to adopt certain corporate governance procedures may prevent us from obtaining a listing on a national securities exchange.***

We do not have an audit, compensation, or nominating and corporate governance committee. The functions such committees would perform are performed by the board as a whole. Consequently, there is a potential conflict of interest in board decisions that may adversely affect our ability to become a listed security on a national securities exchange and as a result adversely affect the liquidity of our common stock.

***Since our management beneficially owns 37.3% of our outstanding shares, their interests may differ from the interests of our other shareholders, which could cause a material decline in the value of our shares.***

Our officers and directors indirectly own 26,755,000 common shares. In addition, Mr. Tran, our Chairman and principal executive officer, owns 40,000,000 shares of Series A Preferred Stock, which are convertible into shares of common stock and vote with the common stock on the basis of each share of Series A Preferred Stock having the right to 10 votes. Accordingly, management beneficially owns and controls all of the voting stock of the Company. Therefore, management has significant influence on determining the outcome of any matters submitted to the shareholders for approval, including mergers, consolidations, the election of directors and other significant corporate actions. This ownership and control may also have the effect of delaying or preventing a future change in control, impeding a merger, consolidation, takeover or other business combination that may be in the best interest of the Company. Without the consent of management, we may be prevented from entering into transactions that could be beneficial to us or our minority shareholders. The interest of management may differ from the interests of our other shareholders. The concentration in the ownership of our shares may cause a material decline in the value of our shares. We cannot assure you that management will act in our best interests given management's ability to control a significant majority of our voting shares.

**Risks Related to Our Common Stock**

***The extent and duration of Russia's military action in Ukraine or future escalation of such hostilities, the extent and impact of existing and future sanctions, market disruptions and volatility, and the result of any diplomatic negotiations cannot be predicted. Any of these factors may result in large and sudden changes in the volume and price at which our common stock will trade.***

In late February 2022, Russia launched a large-scale military attack on Ukraine. The invasion significantly amplified already existing geopolitical tensions among Russia, Ukraine, Europe, NATO and the West, including the U.S. In response to the military action by Russia, various countries, including the U.S., the United Kingdom, and European Union issued broad-ranging economic sanctions against Russia. Such sanctions included, among other things, a prohibition on doing business with certain Russian companies, large financial institutions, officials and oligarchs; a commitment by certain countries and the European Union to remove selected Russian banks from the Society for Worldwide Interbank Financial Telecommunications ("SWIFT"), the electronic banking network that connects banks globally; and restrictive measures to prevent the Russian Central Bank from undermining the impact of the sanctions. Additional sanctions may be imposed in the future. Such sanctions (and any future sanctions) and other actions against Russia may adversely impact, among other things, the Russian economy and various sectors of the economy, including but not limited to, financials, energy, metals and mining, engineering and defense and defense-related materials sectors; result in a decline in the value and liquidity of Russian securities; result in boycotts, tariffs, and purchasing and financing restrictions on Russia's government, companies and certain individuals; weaken the value of the ruble; downgrade the country's credit rating; freeze Russian securities and/or funds invested in prohibited assets and impair the ability to trade in Russian securities and/or other assets; and have other adverse consequences on the Russian government, economy, companies and region. Further, several large corporations and U.S. states have announced plans to divest interests or otherwise curtail business dealings with certain Russian businesses.

Table of Contents

The ramifications of the hostilities and sanctions, however, may not be limited to Russia, Ukraine, and Russian and Ukrainian companies but may spill over to and negatively impact other regional and global economic markets (including Europe and the United States), companies in other countries (particularly those that have done business with Russia and Ukraine) and on various sectors, industries and markets for securities and commodities globally, such as oil and natural gas. Accordingly, the actions discussed above and the potential for a wider conflict could increase financial market volatility, cause severe negative effects on regional and global economic markets, industries, and companies and have a negative effect on investments and performance beyond any direct exposure to Russian and Ukrainian issuers or those of adjoining geographic regions. In addition, Russia may take retaliatory actions and other countermeasures, including cyberattacks and espionage against other countries and companies around the world, which may negatively impact such countries and the companies.

The extent and duration of the military action or future escalation of such hostilities, the extent and impact of existing and future sanctions, market disruptions and volatility, and the result of any diplomatic negotiations cannot be predicted. Any of these factors may result in large and sudden changes in the volume and price at which our common stock will trade.

***Since we are traded on the OTCQB, an active, liquid trading market for our common stock may not develop or be sustained. If and when an active market develops, the price of our common stock may be volatile.***

Presently, our common stock is traded on the OTCQB. There is limited trading in our stock and, in the absence of an active trading market, investors may have difficulty buying and selling or obtaining market quotations, market visibility for shares of our common stock may be limited, and a lack of visibility for shares of our common stock may have a depressive effect on the market price for shares of our common stock.

The lack of an active market impairs your ability to sell your shares at the time you wish to sell them or at a price that you consider reasonable. The lack of an active market may also reduce the fair market value of your shares. An inactive market may also impair our ability to raise capital to continue to fund operations by selling shares. Holders of our common stock may, therefore, have difficulty selling their common stock, should they decide to do so. In addition, there can be no assurances that such markets will continue or that any shares of common stock will be able to be sold without incurring a loss. Any such market price of the common stock may not necessarily bear any relationship to our book value, assets, past operating results, financial condition or any other established criteria of value, and may not be indicative of the market price for the common stock in the future. Further, the market price for the common stock may be volatile depending on a number of factors, including business performance, industry dynamics, news announcements or changes in general.

*Table of Contents*

Trading in stocks quoted on the OTCQB is often thin and characterized by wide fluctuations in trading prices, due to many factors that may have little to do with our operations or business prospects. The securities market has from time to time experienced significant price and volume fluctuations that are not related to the operating performance of particular companies. These market fluctuations may also materially and adversely affect the market price of shares of our common stock. Moreover, the OTCQB is not a stock exchange, and trading of securities is often more sporadic than the trading of securities listed on a quotation system like Nasdaq or a national stock exchange like the NYSE. Accordingly, stockholders may have difficulty reselling any shares of common stock.

### *There is no assurance that we will be able to pay dividends to our shareholders, which means that you could receive little or no return on your investment*

Payment of dividends from our earnings and profits may be made at the sole discretion of our Board of Directors. There is no assurance that we will generate any distributable cash from operations. Our Board may elect to retain cash for operating purposes, debt retirement, or some other purpose. Consequently, you may receive little or no return on your investment.

### *Our shares will be subordinate to all of our debts and liabilities, which increases the risk that you could lose your entire investment.*

Our shares are equity interests that will be subordinate to all of our current and future indebtedness with respect to claims on our assets. In any liquidation, all of our debts and liabilities must be paid before any payment is made to our shareholders. The amount of any debt financing we incur creates a substantial risk that in the event of our bankruptcy, liquidation or reorganization, we may have no assets remaining for distribution to our shareholders after payment of our debts.

### *Our Board of Directors may authorize and issue shares of new classes of stock that could be superior to or adversely affect you as a holder of our common stock*

Our Board of Directors has the power to authorize and issue shares of classes of stock, including preferred stock that have voting powers, designations, preferences, limitations and special rights, including preferred distribution rights, conversion rights, redemption rights and liquidation rights without further shareholder approval which could adversely affect the rights of the holders of our common stock. In addition, our Board could authorize the issuance of a series of preferred stock that has greater voting power than our common stock or that is convertible into our common stock, which could decrease the relative voting power of our common stock or result in dilution to our existing common stockholders.

Any of these actions could significantly adversely affect the investment made by holders of our common stock. Holders of common stock could potentially not receive dividends that they might otherwise have received. In addition, holders of our common stock could receive less proceeds in connection with any future sale of the Company, whether in liquidation or on any other basis.

### *We may, in the future, issue additional common shares, which would reduce investors' percent of ownership and may dilute our share value.*

Our Articles of Incorporation authorizes the issuance of 500,000,000 shares of common stock. We currently have 71,519,830 shares of common stock issued and outstanding. The future issuance of common stock will result in substantial dilution in the percentage of our common stock held by our then existing shareholders. We may value any common stock issued in the future on an arbitrary basis. The issuance of common stock for future services or acquisitions or other corporate actions may have the effect of diluting the value of the shares held by our investors and might have an adverse effect on any trading market for our common stock.

*Table of Contents*

***The trading price of our common stock is likely to be volatile, which could result in substantial losses to investors.***

The trading price of our common stock is likely to be volatile and could fluctuate widely due to factors beyond our control. This may happen because of broad market and industry factors, including the performance and fluctuation of the market prices of other companies with business operations located outside of the United States. In addition to market and industry factors, the price and trading volume for our common stock may be highly volatile for factors specific to our own operations, including the following:

- variations in our revenues, earnings and cash flow;

- announcements of new investments, acquisitions, strategic partnerships or joint ventures by us or our competitors;

- announcements of new offerings, solutions and expansions by us or our competitors;

- changes in financial estimates by securities analysts;

- detrimental adverse publicity about us, our brand, our services or our industry;

- additions or departures of key personnel;

- sales of additional equity securities; and

- potential litigation or regulatory investigations.

Any of these factors may result in large and sudden changes in the volume and price at which our common stock will trade.

In the past, shareholders of public companies have often brought securities class action suits against those companies following periods of instability in the market price of their securities. If we were involved in a class action suit, it could divert a significant amount of our management's attention and other resources from our business and operations and require us to incur significant expenses to defend the suit, which could harm our results of operations. Any such class action suit, whether or not successful, could harm our reputation and restrict our ability to raise capital in the future. In addition, if a claim is successfully made against us, we may be required to pay significant damages, which could have a material adverse effect on our financial condition and results of operations.

***We are subject to the penny stock rules, which will make shares of our common stock more difficult to sell.***

We are subject now and, in the future, may continue to be subject, to the SEC's "penny stock" rules if our shares of common stock sell below $5.00 per share. Penny stocks generally are equity securities with a price of less than $5.00. The penny stock rules require broker-dealers to deliver a standardized risk disclosure document prepared by the SEC which provides information about penny stocks and the nature and level of risks in the penny stock market. The broker-dealer must also provide the customer with current bid and offer quotations for the penny stock, the compensation of the broker-dealer and its salesperson, and monthly account statements showing the market value of each penny stock held in the customer's account. The bid and offer quotations, and the broker-dealer and salesperson compensation information must be given to the customer orally or in writing prior to completing the transaction and must be given to the customer in writing before or with the customer's confirmation.

In addition, the penny stock rules require that prior to a transaction, the broker dealer must make a special written determination that the penny stock is a suitable investment for the purchaser and receive the purchaser's written agreement to the transaction. The penny stock rules are burdensome and may reduce purchases of any offerings and reduce the trading activity for shares of our common stock. As long as our shares of common stock are subject to the penny stock rules, the holders of such shares of common stock may find it more difficult to sell their securities.

***The sale or availability for sale of substantial amounts of our common stock could adversely affect their market price.***

Sales of substantial amounts of our common stock in the public market, or the perception that these sales could occur, could adversely affect the market price of our common stock and could materially impair our ability to raise capital through equity offerings in the future. Shares held by our existing shareholders may be sold in the public market in the future subject to the restrictions in Rule 144 and Rule 701 under the Securities. We currently have 71,519,830 shares of common stock outstanding, with approximately 37% of the shares being held by affiliates. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of our common stock.

***We are an emerging growth company within the meaning of the Securities Act and therefore may take advantage of certain reduced reporting requirements.***

Since we are an "emerging growth company," as defined in the JOBS Act, we will take advantage of certain exemptions from requirements applicable to other public companies which are eligible to be considered emerging growth companies. Most significantly, we need not comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002.

**ITEM 1B. UNRESOLVED STAFF COMMENTS**

Not applicable.

**ITEM 2. PROPERTIES**

Our headquarter and principal executive office are located at 7545 Irvine Center Dr., Ste 200, Irvine, California under an online virtual office agreement ("Lease") with Regus Management Group, LLC ("Regus") for a period of 12 months and auto-renewed thereafter for another 12 months with a current monthly rent of $99.00. Under this lease, we share virtual office space in Irvine, CA and Newport Beach, CA, respectively.

We neither own any real property, nor own or have any mortgages on this or any other facilities. All employees, including the officers and directors, are working remotely in a distributed workforce setup via the use of virtual office technologies. Pursuant to the terms of the Lease, we are entitled to receive mailbox and telephone answering services, two (2) days of private office usage per month in the U.S. and five (5) days of private office usage per month globally at the spaces designated by Regus.

We believe that this property is sufficient for our current and proposed business.

**ITEM 3. LEGAL PROCEEDINGS**

On June 29, 2021, the Company filed a complaint against Messrs. Chenyuan Anthony Chen and Ang Hu (the "Defendants") in the Superior Court of the State of California, County of Orange (the "Complaint"). Pursuant to a Consulting Agreement dated April 1, 2019 by and among the Company and the Defendants (the "Consulting Agreement"), the Company issued to the Defendants 3,250,000 shares of the Company's common stock (the "Consulting Shares") as compensation for certain consulting services to be performed by the Defendants. Pursuant to the Complaint, the Company alleges that the Defendants breached the Consulting Agreement by failing to perform such consulting services and thereby seeks injunctive relief to restrain Defendants from sales of the Consulting Shares, the cancellation of the Consulting Shares, and compensatory damages and legal fees. As of the date of this annual report, the Complaint is pending.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**PART II**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

Our common stock is currently quoted on the OTCQB under the trading symbol "VMNT". Any over-the-counter market quotations reflect inter-dealer prices, without retail mark-up, mark-down or commission and may not necessarily represent actual transactions. Trading in stocks quoted on the OTC Markets is often thin and is characterized by wide fluctuations in trading prices due to many factors that may have little to do with a company's operations or business prospects. There is no active trading market for our common stock. We cannot assure you that there will be a market for our common stock in the future.

As of March 24, 2022, we had 71,519,830 shares of our common stock, par value $0.0001, issued and outstanding. There were 64 beneficial owners of our common stock.

**Penny Stock Regulations**

The Securities and Exchange Commission has adopted regulations which generally define "penny stock" to be an equity security that has a market price of less than $5.00 per share. Our Common Stock is currently within the definition of a penny stock and will be subject to rules that impose additional sales practice requirements on broker-dealers who sell such securities to persons other than established customers and accredited investors (generally those with assets in excess of $1,000,000, or annual incomes exceeding $200,000 individually, or $300,000, together with their spouse).

For transactions covered by these rules, the broker-dealer must make a special suitability determination for the purchase of such securities and have received the purchaser's prior written consent to the transaction. Additionally, for any transaction, other than exempt transactions, involving a penny stock, the rules require the delivery, prior to the transaction, of a risk disclosure document mandated by the SEC relating to the penny stock market. The broker-dealer also must disclose the commissions payable to both the broker-dealer and the registered representative, current quotations for the securities and, if the broker-dealer is the sole market-maker, the broker-dealer must disclose this fact and the broker-dealer's presumed control over the market. Finally, monthly statements must be sent disclosing recent price information for the penny stock held in the account and information on the limited market in penny stocks. Consequently, the "penny stock" rules may restrict the ability of broker-dealers to sell our Common Stock and may affect the ability of investors to sell their Common Stock in the secondary market.

In addition to the "penny stock" rules promulgated by the Securities and Exchange Commission, the Financial Industry Regulatory Authority ("FINRA") has adopted rules that require that in recommending an investment to a customer, a broker-dealer must have reasonable grounds for believing that the investment is suitable for that customer. Prior to recommending speculative low priced securities to their non-institutional customers, broker-dealers must make reasonable efforts to obtain information about the customer's financial status, tax status, investment objectives and other information. Under interpretations of these rules, FINRA believes that there is a high probability that speculative low-priced securities will not be suitable for at least some customers. The FINRA requirements make it more difficult for broker-dealers to recommend that their customers buy our Common Stock, which may limit the investors' ability to buy and sell our stock.

**Dividend Policy**

We have not paid any cash dividends since our inception. Any future determination as to the declaration and payment of dividends on shares of our common stock will be made at the discretion of our Board of Directors out of funds legally available for such purpose. We are under no contractual obligations or restrictions to declare or pay dividends on our shares of common stock. In addition, we currently have no plans to pay such dividends. Our Board of Directors currently intends to retain all earnings for use in the business for the foreseeable future.

**Equity Compensation Plan Information**

The Company has a formal Stock Incentive Plan (the "Plan"), adopted in March 25, 2015, which is filed as an exhibit and incorporated herein by reference. 5,000,000 shares of the Company's common stock was reserved for awards in the Plan.

**Purchases of Equity Securities by the Registrant and Affiliated Purchaser**

We have not repurchased any shares of our common stock during the fiscal years ended December 31, 2021 and 2020.

**Recent Sales of Unregistered Securities and Use of Proceeds**

Between January 29, 2021 and June 11, 2021, the Company issued 555,000 shares of common stock in consideration of $415,000. Each purchaser of the Company's securities is an accredited investor as defined under Rule 501 of Regulation D of the Act.

From January 1, 2021 to December 31, 2021, the Company issued 865,000 shares of common stock to several consultants as payment for consulting services to the Company.

The issuances of the shares described above were exempt from registration under Section 4(a)(2) and/or Rule 506(b) of Regulation D as promulgated by the Securities and Exchange Commission under the Securities Act, as transactions by an issuer not involving any public offering. The foregoing issuances did not involve any underwriters, underwriting discounts or commissions, or any public offering and we believe are exempt from the registration requirements of the Securities Act of 1933 by virtue of Section 4(2) thereof.

**ITEM 6. [Reserved]**

Not Applicable.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULT OF OPERATIONS**

You should read the following discussion together with our consolidated financial statements and the related notes included elsewhere in this annual report. This discussion contains forward-looking statements that are based on our current expectations, estimates and projections about our business and operations. Our actual results may differ materially from those currently anticipated and expressed in such forward-looking statements.

**Overview**

Vemanti, incorporated on April 3, 2014 under the laws of the State of Nevada, is a technology-driven and fintech-focused company that seeks to be active in the high-growth emerging markets. Through our wholly owned subsidiary, VoiceStep, we provide a one-stop solution with regard to business-class VoIP services to our SME customers in the United States. We also have an 18.6% ownership interest in Fvndit, which, through its subsidiaries, operates an online short-term P2P financing platform for SMEs in Vietnam. We currently do not generate any revenues through our wholly owned subsidiary Vemanti Digital.

We began generating revenue from the sales of our VoiceStep products since its inception in 2014, but have incurred significant net losses since 2015. While we believe in the viability of our strategy to generate sufficient revenues and in our ability to raise additional funds, there can be no assurances that we will be successful or that our cash position will be sufficient to support our daily operations. Our continued existence is dependent upon our ability to continue to execute our operating plan and to obtain additional debt or equity financing. There can be no assurance the necessary debt or equity financing will be available or will be available on terms acceptable to our Company. Accordingly, we may decide to exit our existing business and explore potential strategic alternatives, including establishing a new business, or target an existing business for acquisition, without restriction to any specific business, industry or geographical location.

**Critical Accounting Policies and Estimates**

*Use of Estimates*

The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates made by management include, among others, revenue recognition, recoverability of accounts receivable, and investments. Actual results could differ from those estimates. It is possible that accounting estimates and assumptions may be material to the Company due to the levels of subjectivity and judgment involved.

*Revenue Recognition*

The Company recognizes revenue in accordance with Accounting Standards Codification ("ASC") 606, the core principle of which is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to receive in exchange for those goods or services. To achieve this core principle, five basic criteria must be met before revenue can be recognized: (1) identify the contract with a customer; (2) identify the performance obligation(s) in the contract; (3) determine the transaction price; (4) allocate the transaction price to performance obligation(s) in the contract; and (5) recognize revenue when or as the Company satisfies a performance obligation.

The Company recognizes revenues derived from sub-leasing telecommunications infrastructure and the provision of telecommunications and colocation services. These revenues are accounted for as a single performance obligation satisfied over time because the customer simultaneously receives and consumes the benefits of the Company's performance on a monthly basis. These arrangements stipulate monthly billing and the Company has elected the "as invoiced" practical expedient to recognize revenue as the services are consumed as the Company has the right to payment in an amount that corresponds directly with the value of performance completed to date.

Taxes collected from customers and remitted to a governmental authority are reported on a net basis and are excluded from revenue. Most revenue is billed in advance on a fixed-rate basis. The remainder of revenue is billed in arrears on a transactional basis determined by customer usage.

The Company often bills customers for upfront charges. These charges relate to down payments or prepayments for future services or equipment and are influenced by various business factors including how the Company and customer agree to structure the payment terms. These payments are recognized as deferred revenue until the service is provided or equipment is delivered and installed. All ongoing fees are billed and recognized as revenue on a monthly basis as service is provided.

*Recent Authoritative Guidance*

In December 2019, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) No. 2019-12 Income Taxes (Topic 740)—Simplifying the Accounting for Income Taxes, to remove certain exceptions and improve consistency of application including, among other things, requiring that an entity reflect the effect of an enacted change in tax laws or rates in the annual effective tax rate computation in the interim period that includes the enactment date. The amendments in this update are effective for fiscal years beginning after December 15, 2020. Most amendments within the standard are required to be applied on a prospective basis, while certain amendments must be applied on a retrospective or modified retrospective basis. The Company adopted the amendments in this update during the current year. The Company believes the adoption did not have a material impact on its consolidated financial position and results of operations.

In October 2020, the FASB issued ASU No. 2020-10 Codification Improvements, to make incremental improvements to generally accepted accounting principles (GAAP) and address stakeholder suggestions, including, among other things, clarifying that the requirement to provide comparative information in the financial statements extends to the corresponding disclosures section. The amendments in this update are effective for fiscal years beginning after December 15, 2020. The amendments in this update should be applied retrospectively and at the beginning of the period that includes the adoption date. The Company adopted the amendments in this update during the current year. The Company believes the adoption of the amendments in this update did not have a material impact on its consolidated financial position and results of operations.

Management does not believe any other recently issued but not yet effective accounting pronouncement, if adopted, would have a material impact effect on the Company's present or future financial statements.

**RESULTS OF OPERATIONS**

*The fiscal year ended December 31, 2021, compared to the fiscal year ended December 31, 2020*

|  | 2021 Amount | | 2020 Amount | |
|---|---|---|---|---|
| Sales | $ | 147,950 | $ | 162,292 |
| Cost of sales | $ | 22,241 | $ | 36,016 |
| Gross margin | $ | 125,709 | $ | 126,276 |
| Total other income (expense) net | $ | (7,298) | $ | 9,187 |
| Total operating expenses | $ | 1,741,885 | $ | 210,692 |
| Income taxes | $ | (1,650) | $ | 1,648 |
| Net loss | $ | 1,625,124 | $ | 76,876 |

*Revenues*

Revenues were $147,950 for the fiscal year ended December 31, 2021, a decrease of $14,342 or 8.8%, compared to $162,292 for the fiscal year ended December 31, 2020. The decrease was mainly due to the abundant supply of telecommunications applications that provide free-of-charge video chats and voice calls between computers, tablets, and mobile devices over the internet which led to a drop in demand for VoiceStep payment-based voice services.

*Gross Profit and Gross Profit Margin*

Gross profit was $125,709 for the fiscal year ended December 31, 2021, compared to $126,276 for the same period of 2020. Our gross profit margin increased from 78% to 85% for the fiscal year ended December 31, 2021. The increase was mainly due to the loss of several higher cost, lower margin customers during the year.

*General and Administrative (G&A) Expenses*

G&A expenses were $1,741,885 for the fiscal year ended December 31, 2021 compared to $210,692 for the same period in 2020, representing an increase of $1,531,193. The increase was mainly due to expenses and compensation paid to outside consultants and contractors related to the Company's development and investment in its Vemanti Dollar ("USDV"), an ERC-20 1:1 USD-pegged stablecoin.

*Operating Loss*

Total operating loss was $1,616,176 for the fiscal year ended December 31, 2021, compared to $84,415 for the same period of 2020, representing an increase of $1,531,761 or 1,815%. The increase was mainly due to increased expenses and compensation paid to outside consultants and contractors related to the development and investment in the USDV stablecoin.

As of December 31, 2021, and 2020, there were no significant deferred tax assets, except for a net operating loss carryforward for which a 100% valuation allowance has been provided.

The Company annually conducts an analysis of its tax positions and has concluded that it has no uncertain tax positions as of December 31, 2021, and December 31, 2020. The 2018 to 2021 tax years are still subject to federal audit. The 2017 to 2021 tax years are still subject to state audit.

The Company had $2,679,077 and $1,132,304 of net operating loss carryforwards available as of December 31, 2021, and 2020, respectively, for Federal and state tax purposes. The federal net operating loss carryforward does not expire while the state net operating losses expire in various years through 2041.

*Net Loss*

As a result of the above factors, we had a net loss of $1,625,124 for the fiscal year ended December 31, 2021compared to a net loss of $76,876 for the fiscal year ended December 31, 2020.

**LIQUIDITY AND CAPITAL RESOURCES**

Historically, our primary uses of cash have been to finance working capital needs. We expect that we will be able to meet our needs to fund operations, capital expenditures and other commitments in the next 12 months primarily with our cash balance and operating cash flows.

We may need to raise additional capital to fund our operating expenses, pay our obligations, and grow our company in the future. Our current resources may be insufficient to satisfy all of our cash requirements and we may seek to sell additional equity or debt securities or obtain a credit facility. Our future operations may be dependent on our ability to secure additional financing. Even if we are able to raise the funds required, it is possible that we could incur unexpected costs and expenses, fail to collect amounts owed to us, or experience unexpected cash requirements that would force us to seek alternative financing. Furthermore, if we issue additional equity or debt securities, stockholders may experience additional dilution or the new equity securities may have rights, preferences or privileges senior to those of existing holders of our common stock.

Currently, the Company has sufficient cash to remain in business for the next 12 months.

*The following table sets forth a summary of our cash flows for the periods indicated.*

| Item | For the Fiscal Year Ended December 31, | | | |
|---|---|---|---|---|
| | | **2021** | | **2020** |
| Net cash used in operating activities | $ | 477,557 | $ | 75,312 |
| Net cash provided by (used in) investing activities | $ | (10,000) | $ | 200,000 |
| Net cash provided by financing activities | $ | 540,000 | $ | - |
| Net increase in cash | $ | 52,443 | $ | 124,688 |
| Cash at the beginning of period | $ | 243,494 | $ | 118,806 |
| Cash at the end of period | $ | 295,937 | $ | 243,494 |

*Operating Activities*

Net cash used in operating activities was $477,557 for the fiscal year ended December 31, 2021, as compared to $75,312 used in operating activities for the fiscal year ended December 31, 2020, primarily due to the net losses incurred from the development of the USDV.

*Investing Activities*

Net cash used in investing activities was $10,000 for the fiscal year ended December 31, 2021, compared to net cash provided by investing activities of $200,000 for the fiscal year ended December 31, 2020. The change was primarily due to investing in a cryptocurrency in 2021, while the loan to Fvndit was paid back in 2020.

*Financing Activities*

Net cash provided by financing activities was $540,000 for the fiscal year ended December 31, 2021, compared to $0 for the fiscal year ended December 31, 2020.  The change was primarily due to issuances of common stock for cash and receipt of a shareholder loan in the amount of $125,000.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Not applicable.



18012 Sky Park Circle, Suite 200
Irvine, California  92614
tel 949-852-1600
fax 949-852-1606
www.rjicpas.com

Report of Independent Registered Public Accounting Firm

To the Stockholders and Board of Directors
Vemanti Group, Inc.

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Vemanti Group, Inc. and Subsidiary (the "Company"), as of December 31, 2021 and 2020, and the related consolidated statements of operations, stockholders' equity and cash flows for the years then ended, and the related notes to the consolidated financial statements.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2021 and 2020, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Security and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.  The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error fraud and performing procedures that respond to those risks.  Such procedures include examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements.  Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.  We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

Critical audit matters are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee that (1) relate to accounts or disclosures that are material to the consolidated financial statements and (2) involved challenging, subjective, or complex judgements. We determined that there are no critical audit matters.

/s/ Ramirez Jimenez International CPAs

We have served as the Company's auditor since 2017
Irvine, California
March 24, 2022

PCAOB ID #820

ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

**Vemanti Group, Inc. and Subsidiary**
**Consolidated Balance Sheets**

|  | December 31, 2021 | December 31, 2020 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash | $ 295,937 | $ 243,494 |
| Accounts receivable | 4,415 | 1,224 |
| Digital Asset | 6,107 | - |
| Due from Fvndit, Inc | 25,142 | 24,498 |
| Total Current Assets | 331,601 | 269,216 |
| | | |
| Equipment, net | 632 | 1,373 |
| Other assets | 296,405 | 298,056 |
| TOTAL ASSETS | $ 628,638 | $ 568,645 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| | | |
| Current Liabilities: | | |
| Accounts payable | $ 4,502 | $ 1,077 |
| Accrued expenses | 427,293 | - |
| Deferred revenues | - | 613 |
| Loan from shareholder | 125,000 | - |
| Total Current Liabilities | 556,795 | 1,690 |
| TOTAL LIABILITIES | 556,795 | 1,690 |
| | | |
| STOCKHOLDERS' EQUITY: | | |
| Preferred stock, $0.0001 par value, 50,000,000 shares authorized; 40,000,000 shares issued and outstanding | 4,000 | 4,000 |
| Common stock, $0.0001 par value, 500,000,000 shares authorized; 70,404,086 and 68,984,086 shares issued and outstanding as of December 31, 2021 and 2020, respectively | 7,040 | 6,898 |
| Additional paid-in capital | 3,344,890 | 2,215,020 |
| Accumulated deficit | (3,284,087) | (1,658,963) |
| Total stockholders' equity | 71,843 | 566,955 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 628,638 | $ 568,645 |

*The accompanying notes are an integral part of these consolidated financial statements.*

**Vemanti Group, Inc. and Subsidiary**
**Consolidated Statements of Operations**

| | For the Years Ended December 31, | |
| --- | --- | --- |
| | **2021** | **2020** |
| Sales | $ 147,950 | $ 162,292 |
| Cost of sales | 22,241 | 36,016 |
| Gross margin | 125,709 | 126,276 |
| | | |
| Operating expenses: | | |
| General and administrative expenses | 1,741,885 | 210,691 |
| Total operating expenses | 1,741,885 | 210,691 |
| Loss from operations | (1,616,176) | (84,415) |
| | | |
| Other income (expense): | | |
| Other income / (expense) | (1,754) | 17,690 |
| Unrealized gain/(loss) | (5,544) | (8,503) |
| Total other income (expense) | (7,298) | 9,187 |
| | | |
| Loss before provision for income taxes | (1,623,474) | (75,228) |
| | | |
| Provision for income taxes | (1,650) | 1,648 |
| | | |
| Net loss | $ (1,625,124) | $ (76,876) |
| | | |
| Loss per share: | | |
| Basic | $ (0.00) | $ (0.00) |
| Diluted | $ (0.00) | $ (0.00) |
| | | |
| Weighted average shares outstanding: | | |
| Basic | 69,697,059 | 68,984,086 |
| Diluted | 69,697,059 | 68,984,086 |

*The accompanying notes are an integral part of these consolidated financial statements.*

Page 29 of 52

**Vemanti Group, Inc. and Subsidiary**
**Consolidated Statements of Stockholders' Equity**

| | Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | |
| Balance, December 31, 2019 | 40,000,000 | $ 4,000 | 68,984,086 | $ 6,898 | $ 2,215,020 | $ (1,582,087) | $ 643,831 |
| Net loss | - | - | - | - | - | (76,876) | (76,876) |
| Balance, December 31, 2020 | 40,000,000 | $ 4,000 | 68,984,086 | $ 6,898 | $ 2,215,020 | $ (1,658,963) | $ 566,955 |
| Stock issued for professional services | - | - | 865,000 | 87 | 714,925 | - | 715,012 |
| Stock issued for cash | - | - | 555,000 | 55 | 414,945 | - | 415,000 |
| Net loss | - | - | - | - | - | (1,625,124) | (1,625,124) |
| Balance, December 31, 2021 | 40,000,000 | $ 4,000 | 70,404,086 | $ 7,040 | $ 3,344,890 | $ (3,284,087) | $ 71,843 |

*The accompanying notes are an integral part of these consolidated financial statements.*

Page 30 of 52

**Vemanti Group, Inc. and Subsidiary**
**Consolidated Statements of Cash Flows**

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2021 | | 2020 | |
| Cash flows from operating activities: | | | | |
| Net loss | $ | (1,625,124) | $ | (76,876) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Depreciation and amortization | | 741 | | 741 |
| Unrealized (gain)/loss from investment in Fvndit | | 1,651 | | 8,503 |
| Impairment of digital assets | | 3,893 | | - |
| Stock-based compensation | | 1,142,305 | | - |
| Changes in assets and liabilities: | | | | |
| Accounts receivable | | (3,191) | | 1,011 |
| Due from Fvndit | | (644) | | (7,389) |
| Accounts payable | | 3,425 | | 163 |
| Accrued expenses | | - | | (2,078) |
| Deferred revenues | | (613) | | 613 |
| Net cash used in operating activities | | (477,557) | | (75,312) |
| | | | | |
| Cash flows from investing activities: | | | | |
| Purchase of digital assets | | (10,000) | | - |
| Proceeds from loan repayment by Fvndit | | - | | 200,000 |
| Net cash provided by (used in) investing activities | | (10,000) | | 200,000 |
| | | | | |
| Cash flows from financing activities: | | | | |
| Loan from shareholder | | 125,000 | | - |
| Issuance of common stock for cash | | 415,000 | | - |
| Net cash provided by financing activities | | 540,000 | | - |
| | | | | |
| Net increase in cash | | 52,443 | | 124,688 |
| | | | | |
| Cash, beginning of the year | | 243,494 | | 118,806 |
| | | | | |
| Cash, end of the year | $ | 295,937 | $ | 243,494 |
| | | | | |
| Supplemental disclosure of cash flow information: | | | | |
| Cash paid for interest | $ | - | $ | 25 |
| Income taxes | $ | 1,650 | $ | 1,665 |
| Supplemental disclosure of non-cash flow investing and financing activities: | | - | | - |
| Accrued stock-based compensation | $ | 427,293 | $ | - |

*The accompanying notes are an integral part of these consolidated financial statements.*

**NOTE 1 - Organization and Basis of Presentation**

Organization and Line of Business

Vemanti Group, Inc., ("Vemanti") was incorporated on April 3, 2014, under the laws of the state of Nevada. VoiceStep Telecom, LLC, a California limited liability company, was formed on January 27, 2005, and originally founded in 2002 ("VoiceStep"). On January 22, 2014, the sole member of VoiceStep exchanged 100% of his membership interest in VoiceStep for 40,000,000 shares of Vemanti's common stock and 40,000,000 shares of Vemanti's preferred stock. Vemanti and its wholly owned subsidiary, VoiceStep is hereafter referred to as the "Company."

The Company is a technology-driven holding company that seeks to be active in high-growth and emerging markets. Its core strengths are in technology development and investment. It drives growth through acquisition and investment in disruptive and foundational technologies by targeting early-stage companies that have market viable products or by starting a new subsidiary of its own. Strategically, it focuses mainly on blockchain projects and applications combined with other emerging technologies, including machine learning/AI, security and internet of things (IoT).

Currently, through VoiceStep, the Company provides a one-stop resource for IP (Internet Protocol) communication needs. VoiceStep's network offers availability, coverage and flexibility, and enables the following technology solutions: unified communications, data center services, content delivery, voice over IP (VoIP) and cloud computing. VoiceStep's core customer base is largely made up of wholesale International prepaid calling operators. That aspect of its business has eroded drastically due to wide consumer adoption of free messaging apps such as Viber, WhatsApp, Facebook, Facetime, WeChat, etc. Its declined year over year revenues are a result of those wholesale customers slowly exiting the market. It is now focusing mostly on small business customers with better retention.

Management's Plans

The Company reported net losses in the amount of $1,625,124 and $76,876, in 2021 and 2020, respectively, and used cash in operating activities in the amount of $477,557 and $75,312 in 2021 and 2020, respectively.    As of December 31, 2021, the Company had negative working capital in the amount of approximately $225,194 and total stockholders' equity of approximately $71,843.  After December 31, 2021, the Company issued 250,000 of common shares at $0.55 per share for $137,500 in cash proceeds.

Due to the global and distributed nature of the workforce, businesses today demands service providers to offer not only simple voice and data services, but also fully integrated productivity and coloration tools such as Customer Relationship Management (CRM), call center, team and video messaging, and e conferencing to bring their teams and customers together on one single business communications platform. In order to match those demands, the Company would need to revamp and re-engineer its current platform as well as adding a large team of product and business developers which would require a sizable upfront investment. Currently, the Company simply does not have the capital committed for such development, so there are no plans to further grow VoiceStep's core business. Furthermore, the market is already saturated with much more established players. Going forward, the Company will focus its business development activities in the fintech sector to achieve future revenues and profits, specifically delivering lending and payment services to small and medium enterprises ("SMEs") in Southeast Asia through partnerships with banks and payment service providers in the region. Management believes it will be able to generate sufficient cash from operating activities to fully operate the Company during 2022 and beyond.

Risk and Uncertainties

The Company's operations may be affected by the ongoing outbreak of the coronavirus disease 2019 (Covid-19) which has been declared a pandemic by the World Health Organization in early 2020 and continued throughout 2021 and into 2022. The ultimate disruption which may be caused by the outbreak is uncertain; however, it may result in a material adverse impact on the Company's consolidated financial position, operations and cash flows. Possible areas that may be affected include, but are not limited to, disruption to the Company's labor workforce, unavailability of products and supplies used in operations, and the decline in value of assets held by the Company, including property and equipment. Currently, the Company is unable to determine the impact that Covid-19 may have.

**NOTE 2 – Summary of Significant Accounting Policies**

Basis of Presentation

The consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Company and its wholly owned subsidiary, VoiceStep. All significant intercompany transactions and balances have been eliminated.

Use of Estimates

The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates made by management include, among others, revenue recognition, recoverability of accounts receivable, and investments. Actual results could differ from those estimates. It is possible that accounting estimates and assumptions may be material to the Company due to the levels of subjectivity and judgment involved.

Cash and Cash Equivalents

Cash and cash equivalents include cash on hand and cash in time deposits, certificates of deposit, and all highly liquid debt instruments with original maturities of three months or less. As of December 31, 2021, and December 31, 2020, the Company had no cash equivalents.

Accounts Receivable

The Company regularly reviews its accounts receivable for collectability and establishes an allowance for doubtful accounts as necessary using the allowance method. The receivables are not collateralized.

The Company estimates the ability to collect receivables by performing ongoing credit evaluations of its customers' financial condition. Estimates are based on assumptions and other considerations, including payment history, credit ratings, customer financial performance, industry financial performance and aging analysis. The Company reviews its accounts receivable by aging category and to identify customers with known disputes or collection issues. In determining the allowance, the Company makes judgments about the creditworthiness of a majority of its customers based on ongoing credit evaluations. The Company also considers its historical level of credit losses and current economic trends that might impact the level of future credit losses. Accounts receivables are written-off when they are deemed uncollectible.

Equipment

Equipment is stated at cost. Expenditures for maintenance and repairs are charged to earnings as incurred; additions, renewals and betterments are capitalized. When equipment is retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts, and any gain or loss is included in operations. Depreciation of equipment is provided using the straight-line method for substantially all assets with estimated lives as follows:

| | |
|---|---|
| Software licenses | 5 years |
| Computer equipment | 5 years |

Long-Lived Assets

The Company applies the provisions of Accounting Standards Codification ("ASC") Topic 360, *Property, Plant, and Equipment*, which addresses financial accounting and reporting for the impairment or disposal of long-lived assets. ASC 360 requires impairment losses to be recorded on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. In that event, a loss is recognized based on the amount by which the carrying amount exceeds the fair value of the long-lived assets. Loss on long-lived assets to be disposed of is determined in a similar manner, except that fair values are reduced for the cost of disposal. Based on its review at December 31, 2021, and December 31, 2020, the Company believes there was no impairment of its long-lived assets.

Revenue Recognition

On January 1, 2019, the Company adopted the accounting standard ASC 606, *Revenue from Contracts with Customers*, for all open contracts and related amendments as of December 31, 2019, using the modified retrospective method. The adoption had no impact to the reported results.

The Company recognizes revenue in accordance with ASC 606, the core principle of which is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to receive in exchange for those goods or services. To achieve this core principle, five basic criteria must be met before revenue can be recognized: (1) identify the contract with a customer; (2) identify the performance obligation(s) in the contract; (3) determine the transaction price; (4) allocate the transaction price to performance obligation(s) in the contract; and (5) recognize revenue when or as the Company satisfies a performance obligation.

The Company recognizes revenues derived from sub-leasing telecommunications infrastructure and the provision of telecommunications and colocation services. These revenues are accounted for as a single performance obligation satisfied over time because the customer simultaneously receives and consumes the benefits of the Company's performance on a monthly basis. These arrangements stipulate monthly billing, and the Company has elected the "as invoiced" practical expedient to recognize revenue as the services are consumed as the Company has the right to payment in an amount that corresponds directly with the value of performance completed to date.

Taxes collected from customers and remitted to a governmental authority are reported on a net basis and are excluded from revenue. Most revenue is billed in advance on a fixed-rate basis. The remainder of revenue is billed in arrears on a transactional basis determined by customer usage.

The Company often bills customers for upfront charges. These charges relate to down payments or prepayments for future services or equipment and are influenced by various business factors including how the Company and customer agree to structure the payment terms. These payments are recognized as deferred revenue until the service is provided or equipment is delivered and installed. All ongoing fees are billed and recognized as revenue on a monthly basis as service is provided.

Stock-Based Compensation

The Company records stock-based compensation in accordance with Financial Accounting Standards Board ("FASB") ASC Topic 718, *Compensation – Stock Compensation*. FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees. Nonemployee share-based payment equity awards are measured at the grant-date fair value of the equity instruments and recognized as an expense over the requisite service period.

Income Taxes

The Company accounts for income taxes in accordance with FASB ASC Topic 740, *Income Taxes*. ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded.

Basic and Diluted Earnings (Loss) Per Share

Earnings (loss) per share is calculated in accordance with ASC Topic 260, *Earnings Per Share*. Basic earnings per share ("EPS") is based on the weighted average number of common shares outstanding. Diluted EPS is based on the assumption that all dilutive convertible shares and stock warrants were converted or exercised. Dilution is computed by applying the treasury stock method. Under this method, options and warrants are assumed to be exercised at the beginning of the period (or at the time of issuance, if later), and as if funds obtained thereby were used to purchase common stock at the average market price during the period. There are no potentially dilutive securities outstanding during any periods presented.

Fair Value Measurements

The Company applies the provisions of ASC 820-10, *"Fair Value Measurements and Disclosures."* ASC 820-10 defines fair value and establishes a three-level valuation hierarchy for disclosures of fair value measurement that enhances disclosure requirements for fair value measures. The three levels of valuation hierarchy are defined as follows:

- Level 1 inputs to the valuation methodology are quoted prices for identical assets or liabilities in active markets.
- Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.
- Level 3 inputs to the valuation methodology are unobservable and significant to the fair value measurement.

For certain financial instruments, the carrying amounts reported in the consolidated balance sheets for cash and current liabilities, each qualify as financial instruments and are a reasonable estimate of their fair values because of the short period of time between the origination of such instruments and their expected realization and their current market rate of interest.

The Company used Level 1 inputs for its valuation methodology for digital assets by using Coinbase (coinbase.com, in United States Dollars). The digital assets were adjusted to the fair value at each period end, with any decreases in the fair value being recorded as a loss on the consolidated statement of operations.

Recent Authoritative Guidance

In December 2019, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) No. 2019-12 *Income Taxes (Topic 740)—*Simplifying the Accounting for Income Taxes, to remove certain exceptions and improve consistency of application including, among other things, requiring that an entity reflect the effect of an enacted change in tax laws or rates in the annual effective tax rate computation in the interim period that includes the enactment date. The amendments in this update are effective for fiscal years beginning after December 15, 2020. Most amendments within the standard are required to be applied on a prospective basis, while certain amendments must be applied on a retrospective or modified retrospective basis. The Company adopted the amendments in this update during the current year. The adoption did not have a material impact on its consolidated financial position and results of operations.

In October 2020, the FASB issued ASU No. 2020-10 *Codification Improvements*, to make incremental improvements to generally accepted accounting principles (GAAP) and address stakeholder suggestions, including, among other things, clarifying that the requirement to provide comparative information in the financial statements extends to the corresponding disclosures section. The amendments in this update are effective for fiscal years beginning after December 15, 2020. The amendments in this update should be applied retrospectively and at the beginning of the period that includes the adoption date. The Company adopted the amendments in this update during the current year. The adoption of the amendments in this update did not have a material impact on its consolidated financial position and results of operations.

In December 2019, the FASB issued ASU No. 2019-12 *Income Taxes* (Topic 740)—*Simplifying the Accounting for Income Taxes*. The guidance removes certain exceptions to the general income tax accounting principles and clarifies and amends existing guidance to facilitate consistent application of the accounting principles. The new guidance is effective for the Company as of January 1, 2021. The adoption of the amendments in this update did not have a material impact on the Company consolidated financial position and results of operations.

Management does not believe any other recently issued but not yet effective accounting pronouncement, if adopted, would have a material impact effect on the Company's present or future financial statements.

**NOTE 3 – Digital Assets**

The following represents the change in digital assets:

| | December 31, 2021 | | December 31, 2020 | |
|---|---|---|---|---|
| | **Cryptocurrencies** | | | |
| Beginning balance | $ | - | $ | - |
| Purchase | | 10,000 | | - |
| Realized gain / (loss) | | - | | - |
| Impairment | | (3,893) | | - |
| Ending balance | $ | 6,107 | $ | - |

The Company does not record fair value gains (losses) associated with its digital assets. Cryptocurrencies are classified as intangible assets, and the Company tests these assets for impairment on an annual basis.

**NOTE 4 – Equipment**

Equipment at December 31, 2021 and December 31, 2020 consisted of the following:

| | December 31, 2021 | | December 31, 2020 | |
|---|---|---|---|---|
| Software licenses | $ | 32,188 | $ | 32,188 |
| Computer equipment | | 17,080 | | 17,080 |
| | | 49,268 | | 49,268 |
| Less accumulated depreciation | | (48,636) | | (47,895) |
| Equipment, net | $ | 632 | $ | 1,373 |

Depreciation expense was $741 for the years ended December 31, 2021, and 2020.

**NOTE 5 – Stockholders' Equity**

Members' Interest

VoiceStep is governed by the terms and conditions of the Limited Liability Company Agreement (the Agreement) dated May 3, 2005, as amended on January 27, 2014. VoiceStep shall continue until terminated in accordance with the terms of the Agreement or as provided by law, including events of dissolution. VoiceStep shall be dissolved only upon any of the following events: (i) the vote of Member(s) holding a majority to the dissolution and winding up of VoiceStep, (ii) the entry of a decree of judicial dissolution of VoiceStep and (iii) at any time there are no Member(s), subject to remedy within 90 days of occurrence of termination event by the last remaining Member in writing.

VoiceStep originally consisted of two Members each owning 50% of VoiceStep. On January 27, 2014, one of the members was bought out with the remaining member owning 100% of the membership interest in VoiceStep. On April 3, 2014, the remaining member exchanged his 100% interest in VoiceStep for 40,000,000 shares of Vemanti common stock.

Preferred stock

The Company has authorized the issuance of 50,000,000 shares of preferred stock, $0.0001 par value. At both December 31, 2021, and December 31, 2020, the Company had 40,000,000 shares of preferred stock issued and outstanding. (See Note 1)

The Articles of Incorporation were amended on May 1, 2014, designating 40,000,000 shares of authorized and issued preferred stock of the Company as "Series A Preferred Stock" with voting rights, preferences and powers such that each share of Series A Preferred Stock shall vote as a class on all issues to which shareholders of common stock have a right to vote but shall have ten (10) votes per share of Series A Preferred stock while the shares of Common Stock shall have one vote per share. There are 40,000,000 of Series A Preferred Stock outstanding.

Common stock

The Company has authorized the issuance of 500,000,000 shares of common stock, $0.0001 par value. At December 31, 2021, and December 31, 2020, the Company had 70,404,086 and 68,984,086 shares of common stock issued and outstanding, respectively.

During the twelve months ended December 31, 2021, the Company issued 865,000 shares of its common stock with a fair value of $715,012 to consultants for services rendered. The Company also accrued $427,293, in stock-based compensation in 2021 and such amount is included as accrued expenses on the accompanying 2021 consolidated balance sheet.

During the twelve months ended December 31, 2021, the Company issued 555,000 shares of its common stock for cash proceeds of $415,000.

During the twelve months ended December 31, 2020, the Company did not issue any shares of its common stock.

Stock Incentive Plan

On March 25, 2015, the Company adopted a stock incentive plan. This plan allows the Board of Directors to issue up to 5,000,000 shares of common stock to employees, directors, or consultants of the Company or its affiliates under terms determined by the Board of Directors. This plan automatically terminates ten years from its date of adoption.

Time-Based Restricted Stock

Time-based restricted stock units ("RSU") and restricted stock awards ("RSA") granted to employees under the 2015 Plan typically vest over 3 to 4 years and are subject to forfeiture if employment terminates prior to the vesting or lapse of the restrictions, as applicable. RSUs are not considered issued or outstanding common stock until they vest. RSAs are considered issued and outstanding on the grant date and are subject to forfeiture if specified vesting conditions are not satisfied.

The following table summarizes the activity related to RSUs and RSAs subject to time-based vesting requirements for the fiscal year ended December 31, 2021:

| | RSUs | | RSAs | |
| --- | --- | --- | --- | --- |
| | Number of Shares | Weighted Average Grant Date Fair Value | Number of Shares | Weighted Average Grant Date Fair Value |
| Non-vested as of December 31, 2020 | 600,000 | $ 0.40 | - | $ - |
| Granted | 4,260,000 | $ 0.57 | - | $ - |
| Vested | (1,647,000) | $ 0.69 | - | $ - |
| Forfeited | (120,000) | $ 0.63 | - | $ - |
| Non-vested as of December 31, 2021 | 3,093,000 | $ 0.47 | - | $ - |

As of December 31, 2021, there was $ $1,429,455 of remaining unamortized stock-based compensation expense associated with RSUs, which will be expensed over a weighted average remaining service period of approximately 3.2 years. The 3,093,000 outstanding non-vested and expected to vest RSUs have an aggregate intrinsic value of $2,517,702 and a weighted average remaining contractual term of 3 years.

**NOTE 6 – Investment in Fvndit, Inc. (formerly Directus Holdings, Inc.)**

On July 10, 2018, the Company purchased a 20% investment in Directus Holdings, Inc., which owns eLoan, JSC ("eLoan"), a fintech company based in Vietnam, for $300,000. Half of the investment was made through a cash payment of $150,000, and the remaining half of the investment was made through the issuance of 1,252,086 shares of Vemanti Group's common stock to the Founders of eLoan. On December 19, 2018, Directus Holdings, Inc. filed a Certificate of Amendment to Articles of Incorporation to the State of Nevada for its corporation name to be changed to Fvndit, Inc.

On October 5, 2020, Fvndit issued 500,000 shares of common stock to Tan Tran, CEO and majority shareholder of Vemanti. The issuance raised the total number of Fvndit outstanding shares to 40,500,000. Mr. Tran and Vemanti together own 8,500,000 shares or 20.99% of total Fvndit outstanding shares.

On March 16, 2021, Tan Tran resigned as an Officer and Director of Fvndit. On that same date, Fvndit issued 2,500,000 shares of common stock to Thomas Duc Tran (unaffiliated with Tan Tran), and appointed him as the Chairman, CEO, President, Secretary, and Treasurer of Fvndit. The issuance raised the total number of Fvndit outstanding shares to 43,000,000. As a result, Mr. Tran and Vemanti together own 19.77% of total Fvndit outstanding shares.

Case 2:26-cv-07187-CV-KES    Document 1    Filed 06/30/26    Page 166 of 500   Page ID
#:166

Page 38 of 52

This investment is accounted for under the cost method of accounting since March 16, 2021. As of December 31, 2021, this investment had a balance of $296,405 and is reflected in other assets on the accompanying consolidated balance sheets.

**NOTE 7 – Loan to Fvndit, Inc. (formerly Directus Holdings, Inc.)**

Vemanti entered into an agreement to lend $200,000 to Fvndit for the purpose of developing a peer-to-peer business lending platform operating in Vietnam. The annual interest rate on the loan is 10.5% payable monthly to Vemanti. On August 12, 2019, Fvndit drew down the full $200,000. The entire loan was subsequently repaid in full in 2020.

**NOTE 8 – Income Taxes**

A reconciliation of the differences between the effective and statutory income tax rates for years ended December 31, 2021, and 2020 is as follows:

| | 2021 | | 2020 | |
| --- | --- | --- | --- | --- |
| | Amount | Percent | Amount | Percent |
| Federal statutory rates | $ (340,930) | 21.0% | $ (15,798) | 21.0% |
| State income taxes | 1,650 | 8.8% | (6,620) | 8.8% |
| Permanent differences | 1,256 | 21.00% | 946 | 21.00% |
| Valuation allowance | 339,674 | -29.72% | 21,472 | -28.54% |
| Effective rate | $ 1,650 | 0.0% | $ - | 0.0% |

As of December 31, 2021, and 2020, there were no significant deferred tax assets, except for a net operating loss carryforward for which a 100% valuation allowance has been provided.

The Company annually conducts an analysis of its tax positions and has concluded that it has no uncertain tax positions as of December 31, 2021, and 2020. The 2018 to 2021 tax years are still subject to federal audit. The 2017 to 2021 tax years are still subject to state audit.

The Company had $2,679,077 and $1,132,304 of net operating loss carryforwards available as of December 31, 2021, and 2020, respectively, for Federal and state tax purposes. The federal net operating loss carryforward does not expire while the state net operating losses expire in various years through 2041.

**NOTE 9 – Related Party Transactions**

Since 2019, The Company has paid for some administrative expenses on behalf of Fvndit. The balance of those payments was $25,142 for the year ended December 31, 2021, and $24,498 for the year ended December 31, 2020, and are recorded as Due from Fvndit, Inc. on the accompanying consolidated balance sheets. From October 2018 through March 2021, Tan Tran served as an Officer and Director of Fvndit.

VoiceStep pays a member of the CEO's family for technical services. The total of those payments was $53,500 in 2021, and $40,000 in 2020.

The Company pays the CEO for professional services and health insurance premiums for his family. The total of those professional payments were $0 in 2021, and $40,000 in 2020. The total of health insurance premium payments were $15,364 in 2021 and $17,344 for 2020. Such costs are reflected as a component of general and administrative expenses on the accompanying condensed consolidated statements of operations.

On August 6, 2021, the Company borrowed $125,000 from the CEO. The loan will mature and become payable 12 months from the date of signing. Interest at the rate of 1% will be accrued on the outstanding balance.

**NOTE 10 – Subsequent Events**

The Company has evaluated subsequent events through March 24, 2022, the date on which the accompanying consolidated financial statements were available to be issued, and concluded that, no material subsequent events have occurred since December 31, 2021, that require recognition or disclosure in the consolidated financial statements except as follows:

From January 1, 2022, to March 2, 2022, the Board authorized the issuance of 484,214 common shares in exchange for consulting services rendered to the Company.

On February 1, 2022, the Company issued 250,000 shares of common stock at $0.55 per share for $137,500 cash proceeds.

On March 1, 2022, a resolution was approved by the Board of Directors to dissolve Vemanti Digital Ltd., a company incorporated on June 9, 2021, by Vemanti Group, Inc.

On March 15, 2022, the Company entered into an Equity Commitment Agreement ("the Agreement") for $200,000 whereby it will issue 381,530 shares of common stock and a warrant allowing the investor to purchase up to $2,000,000 in common stock under the terms described in the Agreement up until its expiration on April 15, 2024.

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

Not applicable.

**ITEM 9A. CONTROLS AND PROCEDURES**

**Disclosure Controls and Procedures**

Our disclosure controls and procedures are designed to ensure that the information we are required to disclose in reports that we file or submit under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management to allow timely decisions regarding required disclosure.

Our management, with the participation and supervision of our Chief Executive Officer and our Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this annual report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that as of such date, our disclosure controls and procedures were not, in design and operation, effective at a reasonable assurance level due to the material weaknesses in internal control over financial reporting described below. Because of our limited operations, we have a limited number of employees, which prohibits a segregation of duties. In addition, we lack an audit committee and a financial expert as a member of our audit committee. As we grow and expand our operations, we will engage additional employees and experts as needed. However, there can be no assurance that our operations will expand.

*Table of Contents*

**Management's Report on Internal Control over Financial Reporting**.

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Our internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with policies or procedures may deteriorate.

Our management assessed the effectiveness of our internal control over financial reporting based on the parameters set forth above and has concluded that as of December 31, 2021, our internal control over financial reporting was not effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles as a result of the following material weaknesses:

- The Company does not have sufficient segregation of duties within accounting functions due to only having two officers and limited resources.

- The Company does not have an independent Board of Directors, an Audit Committee, or a financial expert as a member of the Audit Committee.

- The Company does not have written documentation of our internal control policies and procedures.

We plan to rectify these weaknesses by implementing an independent Board of Directors, appointing a financial expert as a member of the Audit Committee, establishing written policies and procedures for our internal control of financial reporting, and hiring additional accounting personnel as we grow and expand our operations.

**Changes in Internal Controls Over Financial Reporting**

Effective as of September 7, 2021, the Company's Board of Directors approved the appointment of Stephen R. Jones as the Company's Chief Financial Officer, replacing Tan Tran. Mr. Tran resigned as the Chief Financial Officer effective as of September 7, 2021 and will remain as the President, Chief Executive Officer, and director of the Company. The hiring of Mr. Jones allowed us to segregate duties of the Chief Financial Officer from the Chief Executive Officer.

There were no other changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the period covered by this annual report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Inherent Limitations on the Effectiveness of Controls**

The effectiveness of any system of internal control over financial reporting, including ours, is subject to inherent limitations, including the exercise of judgment in designing, implementing, operating, and evaluating the controls and procedures, and the inability to eliminate misconduct completely. Accordingly, in designing and evaluating the disclosure controls and procedures, management recognizes that any system of internal control over financial reporting, including ours, no matter how well designed and operated, can only provide reasonable, not absolute assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs. Moreover, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. We intend to continue to monitor and upgrade our internal controls as necessary or appropriate for our business but cannot assure you that such improvements will be sufficient to provide us with effective internal control over financial reporting.

**ITEM 9B. OTHER INFORMATION**

None.

**ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS**

Not applicable.

PART III

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

**Directors and Executive Officers**

The following table sets forth information regarding our current directors and executive officers:

| Name | Age | Position |
|------|-----|----------|
| Tan Tran | 57 | Chief Executive Officer, Director |
| Stephen R. Jones | 55 | Chief Financial Officer |

**Tan Tran:** Mr. Tran has been our Company's Chairman and Director since the Company's inception in April 2014. Mr. Tran has also served, full time, as the Company's President and Chief Executive Officer since April 2014. He co-founded VoiceStep in 2004. From October 2018 to March 2021, Mr. Tran served as an Officer and Director for Fvndit. Since founding Vemanti Group, Tan has worked to share Vemanti's strategy and vision with customers, partners, shareholders, and investors. His mission is to turn Vemanti into an investment and incubation platform for emerging companies with great growth potential, especially in Vietnam, which continues to be an economic force on both a regional and global scale. He holds a B.S.E.E. from California State University, Fullerton. Mr. Tran's management and extensive experience and his role as founder of VoiceStep led to the conclusion that he should serve as a director of Vemanti.

**Stephen R. Jones:** Mr. Jones has been our Company's Chief Financial Officer since September 2021. From 2019 to 2021, Mr. Jones served as the Chief Financial Officer of DreamPlex, a company incorporated under the laws of Vietnam, directing the day-to-day financial operations and strategic planning and overseeing accounting, treasury, tax, risk management, procurement, and IT operations. From 2017 to 2019, Mr. Jones served as the Chief Operating Officer of HMB, Inc. From 2013 to 2016, Mr. Jones served as the Chief Financial Officer of VietnamWorks. Mr. Jones holds a BA from Vanderbilt University and an MBA from the University of Cincinnati.

**Family Relationships**

There are no family relationships between our director or executive officers.

**Involvement in Certain Legal Proceedings**

During the past ten years no current director, executive officer, promoter or control person of the Company has been involved in the following:

(1) A petition under the Federal bankruptcy laws or any state insolvency law which was filed by or against, or a receiver, fiscal agent or similar officer was appointed by a court for the business or property of such person, or any partnership in which he was a general partner at or within two years before the time of such filing, or any corporation or business association of which he was an executive officer at or within two years before the time of such filing;

(2) Such person was convicted in a criminal proceeding or is a named subject of a pending criminal proceeding (excluding traffic violations and other minor offenses);

(3) Such person was the subject of any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining him from, or otherwise limiting, the following activities:

i. Acting as a futures commission merchant, introducing broker, commodity trading advisor, commodity pool operator, floor broker, leverage transaction merchant, any other person regulated by the Commodity Futures Trading Commission, or an associated person of any of the foregoing, or as an investment adviser, underwriter, broker or dealer in securities, or as an affiliated person, director or employee of any investment company, bank, savings and loan association or insurance company, or engaging in or continuing any conduct or practice in connection with such activity;

ii. Engaging in any type of business practice; or

iii. Engaging in any activity in connection with the purchase or sale of any security or commodity or in connection with any violation of Federal or State securities laws or Federal commodities laws;

(4) Such person was the subject of any order, judgment or decree, not subsequently reversed, suspended or vacated, of any Federal or State authority barring, suspending or otherwise limiting for more than 60 days the right of such person to engage in any activity described in paragraph (f)(3)(i) of this section, or to be associated with persons engaged in any such activity;

(5) Such person was found by a court of competent jurisdiction in a civil action or by the Commission to have violated any Federal or State securities law, and the judgment in such civil action or finding by the Commission has not been subsequently reversed, suspended, or vacated;

(6) Such person was found by a court of competent jurisdiction in a civil action or by the Commodity Futures Trading Commission to have violated any Federal commodities law, and the judgment in such civil action or finding by the Commodity Futures Trading Commission has not been subsequently reversed, suspended or vacated;

(7) Such person was the subject of, or a party to, any Federal or State judicial or administrative order, judgment, decree, or finding, not subsequently reversed, suspended or vacated, relating to an alleged violation of:

> i. Any Federal or State securities or commodities law or regulation; or

> ii. Any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent injunction, order of disgorgement or restitution, civil money penalty or temporary or permanent cease-and-desist order, or removal or prohibition order; or

> iii. Any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or

(8) Such person was the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any self-regulatory organization (as defined in Section 3(a)(26) of the Exchange Act (15 U.S.C. 78c(a)(26)), any registered entity (as defined in Section 1(a)(29) of the Commodity Exchange Act (7 U.S.C. 1(a)(29)), or any equivalent exchange, association, entity or organization that has disciplinary authority over its members or persons associated with a member.

**Election of Directors and Officers**

Directors are elected to serve until the next annual meeting of stockholders and until their successors have been elected and qualified. Officers are appointed to serve until the meeting of the Board following the next annual meeting of stockholders and until their successors have been elected and qualified.

**Audit Committee**

We do not currently have any committees of the Board, as we only have one director. We do not have an audit committee financial expert.

**Director Independence**

We do not currently have any independent directors. We evaluate independence by the standards for director independence established by Marketplace Rule 5605(a)(2) of the Nasdaq Stock Market, Inc.

**Code of Ethics**

The Company adopted a code of ethics policy to apply to its principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions on February 23, 2016.

**Delinquent Section 16(a) Reports**

Section 16(a) of the Exchange Act requires the Company's directors, executive officers, and persons who own more than 10% of the Company's Common Stock to file initial reports of ownership and changes in ownership of the Company's Common Stock with the SEC. These individuals are required by the regulations of the SEC to furnish us with copies of all Section 16(a) forms they file. Based solely upon a review of the copies of the forms furnished to the Company and information involving securities transactions of which the Company is aware, certain of the Company's officers, directors and holders of more than 10% of the outstanding common stock of the Company failed to timely file reports required by Section 16(a) of the Exchange Act. To the Company's knowledge, Mr. Stephen R. Jones failed to file a Form 3 within the required time frame following his appointment as Chief Financial Officer and a Form 4 within the required time frame following issuance to him of 25,000 shares of Company's common stock in October 2021.

**ITEM 11. EXECUTIVE COMPENSATION**

The following table sets forth information concerning all cash and non-cash compensation awarded to, earned by or paid to our named executive officers with compensation exceeding $100,000 during 2021 and 2020.

**SUMMARY COMPENSATION TABLE**

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Option Awards ($)(2) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Tan Tran | 2021 | $ - | - | - | - | $ - |
| | 2020 | $ 40,000 | - | - | - | $ 40,000 |

**Employment Agreements with Key Executives**

Pursuant to a Consultant Agreement dated September 7, 2021, the Company's Board of Directors appointed Stephen R. Jones as the Company's Chief Financial Officer, replacing Tan Tran. Mr. Jones will receive compensation for his services in connection with this appointment as outlined below:

- Month 1: $2,500
- Month 2: $3,000
- Month 3: $3,500
- Month 4: $4,000
- Month 5: $4,500
- Month 6 and beyond: $5,000

In addition to the above, the Company will issue one million two hundred thousand (1,200,000) shares of the Company's restricted common stock to Mr. Jones, to be earned and issued over forty-eight (48) months at the rate of twenty-five thousand (25,000) shares per month from September 7, 2021.

**Director Compensation**

There is currently no agreement or arrangement to pay any of our Directors for their services as directors. For the years ended December 31, 2021 and 2020, no members of our Board of Directors received compensation in their capacity as Directors.

**Outstanding Equity Awards at Fiscal Year-End**

There are no current outstanding equity awards as of December 31, 2021.

**Long-Term Incentive Plans**

There are no arrangements or plans in which we provide pension, retirement or similar benefits.

**Compensation Committee**

We currently do not have a compensation committee of the Board of Directors. The Board of Directors as a whole determines executive compensation.

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The following table lists, as of March 24, 2022, the number of shares of common stock beneficially owned by (i) each person, entity or group (as that term is used in Section 13(d)(3) of the Securities Exchange Act of 1934) known to the Company to be the beneficial owner of more than 5% of the outstanding common stock; (ii) each of our directors (iii) each of our Named Executive Officers and (iv) all executive officers and directors as a group. Information relating to beneficial ownership of common stock by our principal stockholders and management is based upon information furnished by each person using "beneficial ownership" concepts under the rules of the SEC. Under these rules, a person is deemed to be a beneficial owner of a security if that person directly or indirectly has or shares voting power, which includes the power to vote or direct the voting of the security, or investment power, which includes the power to dispose or direct the disposition of the security. The person is also deemed to be a beneficial owner of any security of which that person has a right to acquire beneficial ownership within 60 days. Under the SEC rules, more than one person may be deemed to be a beneficial owner of the same securities, and a person may be deemed to be a beneficial owner of securities as to which he or she may not have any pecuniary interest. Except as noted below, each person has sole voting and investment power with respect to the shares beneficially owned and each stockholder's address is c/o Vemanti Group, Inc., 7545 Irvine Center Dr., Suite 200, Irvine CA, 93618.

The percentages below are calculated based on 71,519,830 shares of common stock issued and outstanding as of March 24, 2022.

| Name of Beneficial Owner | Shares | Percentage | Voting Power % | Total Combined Voting Power% |
|---|---|---|---|---|
| **Executive Officers and Directors:** | | | | |
| Rachel Boulds (2) | Common: 0 | 0% | 0% | 0% |
| | Preferred: 0 | 0% | 0% | |
| | | | | |
| Tan Tran (1) | Common: 26,655,000 | 37.3% | 37.3% | |
| | Preferred: 40,000,000 | 100% | 100% | **90.6%** |
| | | | | |
| Stephen R. Jones (3) | Common: 100,000 | 0% | 0% | 0% |
| | Preferred: 0 | | | |
| All officers and directors as a group of (2 persons) | | | | |
| | | | | |
| **5% or Greater Holders:** | | | | |
| | | | | |
| Tan Tran (1) | Common: 26,655,000 | 37.3% | 37.3% | |
| | Preferred: 40,000,000 | 100% | 100% | **90.6%** |

_____

(1)    Each share of Series A Preferred Stock has the right to 10 votes per each share of common stock.

(2)    Ms. Boulds resigned as the Company's Director as of September 3, 2021.

(3)    Mr. Jones was appointed as the Company's Chief Financial Officer as of September 7, 2021. As of March 24, 2022, he holds 100,000 shares of the Company's common stock through Edgar Holdings Group Limited.

*Table of Contents*

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

**Certain Relationships and Related Transactions**

On November 13, 2018, the Company purchased a 20% interest in Fvndit, Inc.. f/k/a Directus Holdings, Inc., which owns eLoan, JSC ("eLoan"), a fintech company based in Vietnam, for $300,000. Half of the purchase price was made through a cash payment of $150,000, and the remaining half of the purchase price was made through the issuance of 1,252,086 shares of Vemanti Group's common stock to the founders of eLoan.

On October 5, 2020, Fvndit issued 500,000 shares of common stock to Tan Tran, CEO and majority shareholder of Vemanti. Mr. Tran and Vemanti together owned 8,500,000 shares or 20.99% of Fvndit's total outstanding shares.

On August 9, 2019 Vemanti entered into an agreement to lend $200,000 to Fvndit for the purpose of developing a peer-to-peer business lending platform operating in Vietnam. The annual interest rate on the loan is 10.5% payable monthly to Vemanti. On August 12, 2019, Fvndit drew down the full $200,000. The entire loan was subsequently repaid in full by August 12, 2020.

Tan Tran served as an Officer and Director for Fvndit from October 2018 until March 2021, when he resigned. Tan Tran is not affiliated with Thomas Duc Tran, who was appointed Chairman, CEO, President, Secretary, and Treasurer of Fvndit on March 16, 2021.

**Material Transactions with Related Parties**

The Company pays the Chief Executive Officer for professional services. The total of those payments was $0 in 2021 and $40,000 in 2020.

VoiceStep pays a member of the Chief Executive Officer's family for technical services. The total of those payments was $53,500 in 2021 and $40,000 in 2020.

On August 6, 2021 (the "Effective Date"), the Company entered into a Loan Agreement (the "Loan Agreement") with Mr. Tan Tran (the "Lender"), our Chief Executive Officer, Chief Financial Officer, President, and Chairman, pursuant to which the Lender agreed to provide a loan in the principal amount of up to $125,000 (the "Loan"). Subject to the terms of the Loan Agreement, the Company may draw down an amount of the principal amount of the Loan on one or more occasions during a period between the Effective Date and 12 months from the Effective Date by giving written notification to the Lender. The purpose of the funds is to augment working capital for the Company's wholly owned subsidiary, Vemanti Digital, Ltd. The Loan matures on the date that is 12 months following the Effective Date and bears interest at a rate of one percent (1%) per annum. The Loan Agreement contains certain events of default. In the event of a default, at its option, the Lender may consider the Loan immediately due and payable.

**Review, Approval and Ratification of Related Party Transactions**

Given our small size and limited financial resources, we have not adopted formal policies and procedures for the review, approval or ratification of transactions, such as those described above, with our executive officer(s), director(s) and significant stockholders. We intend to establish formal policies and procedures in the future, once we have sufficient resources and have appointed additional directors, so that such transactions will be subject to the review, approval or ratification of our Board of Directors, or an appropriate committee thereof. On a moving forward basis, our directors will continue to approve any related party transaction.

**Director Independence**

Our Board of Directors is currently composed of one member, Mr. Tan Tran, who does not qualify as an independent director in accordance with the published listing requirements of NASDAQ.

**ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES**

Aggregate fees for professional services rendered to us by our independent registered public accounting firm, Ramirez Jimenez International CPAs, for the years ended December 31, 2021 and 2020 were:

|  | 2021 | | 2020 | |
|---|---|---|---|---|
| Audit Fees | $ | 53,186 | $ | 22,000 |
| Audit-Related Fees | | - | | - |
| Tax Fees | | - | | - |
| All Other Fees | | - | | - |
| Total | $ | 53,186 | $ | 22,000 |

The Audit Fees for the years ended December 31, 2021, and 2020 were for services rendered for audits and quarterly reviews of our consolidated financial statements, consents and assistance with review of documents filed with the SEC.

The Audit-Related Fees for the years ended December 31, 2021 and 2020 were for services rendered for due diligence related to acquisitions and dispositions and employee benefit plan audits and compilations.

The Tax Fees for the years ended December 31, 2021 and 2020 were for professional services related to tax return preparation and review, tax audit assistance, tax planning and tax advice.

All Other Fees for services rendered the years ended December 31, 2021 and 2020 were for miscellaneous services rendered.

We do not currently have any committees of the Board, as we only have one director.

**PART IV**

## ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a) (1) Financial Statements. The financial statements filed as part of this report are listed in the index to financial statements at the beginning of this document.

(a) (2) Financial Statement Schedules. Financial statement schedules are omitted because of the absence of the conditions under which they are required or because the required information is included in the Financial Statements or the notes thereto.

(a) (3) Exhibits. The exhibits are either filed with this report or incorporated by reference into this report. See (b) Exhibits, which follows.

(b) Exhibits.

| Exhibit Number | Description of Document |
| --- | --- |
| 3.1* | Articles of Incorporation of VoiceStep Telecom, LLC dated January 27, 2005. |
| 3.2* | Articles of Incorporation of the Company dated April 3, 2014. |
| 3.4* | Certificate of Amendment to the Articles of Incorporation of the Company dated May 1, 2014. |
| 3.5* | Bylaws of the Company. |
| 10.1* | Membership Interest Purchase Agreement between Mark Wehberg and Tan Tran dated January 22, 2014. |
| 10.2* | Contribution Agreement between the Company and Tan Tran dated April 3, 2014. |
| 10.3* | Note Agreement between the Company and Chopp, Inc. dated July 17, 2018. |
| 10.4* | Note Cancellation Agreement between the Company and Chopp. Inc. dated June 27, 2019. |
| 10.5* | Definitive Agreement between the Company, eLoan Joint Stock Company, eLoan Qualified Shareholders, eLoan Holdings Vietnam Joint Stock Company and Directus Holdings, Inc. dated July 10, 2018. |
| 10.6* | Investment Agreement (short form) between the Company, eLoan Joint Stock Company and the eLoan Qualified Shareholders dated January 26, 2018. |
| 10.7* | Loan Agreement between the Company and Fvndit, Inc. dated August 9, 2019. |
| 10.8* | Form of VoiceStep Business Communications Service Agreement. |
| 10.9** | Loan Agreement between the Company and Mr. Tan Tran dated August 6, 2021. |
| 21.1 | List of subsidiaries of the Company |
| 31.1 | Certification of Principal Executive Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Principal Financial Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification of Principal Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | Certification of Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS | Inline XBRL Instance Document (the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document). |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document. |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document. |

| 101.LAB | Inline XBRL Taxonomy Extension Labels Linkbase Document. |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document. |
| 104 | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibit 101). |

\* Incorporated by reference to an exhibit to our Form 10 filed with the SEC on April 9, 2021.
\*\* Incorporated by reference to an exhibit to our Form 8-K filed with the SEC on August 12, 2021.

**ITEM 16. FORM 10-K SUMMARY**

None.

*Table of Contents*

**SIGNATURES**

In accordance with the requirements of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

<div align="center"><strong>VEMANTI GROUP, INC.</strong></div>

Dated: March 24, 2022                              By: */s/ Tan Tran*

<div align="right" style="margin-right:20%">Tan Tran<br>Chief Executive Officer<br>(Principal Executive Officer)</div>

Pursuant to the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

By:  */s/ Tan Tran*
Title: Director
Date: March 24, 2022

<div align="center">Page 52 of 52</div>

EXHIBIT 21.1

**Significant Subsidiaries of**
**Vemanti Group, Inc.**

Name of Subsidiary, Ownership %
VoiceStep Telecom, LLC (100%)
Fvndit, Inc. (18.6%)
Vemanti Digital, Ltd. (100%)

**EXHIBIT 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**OF REGISTRANT PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**
**(RULE 13a-14(a) or 15d-14(a) OF THE EXCHANGE ACT)**

I, Tan Tran, certify that:

1.    I have reviewed this annual report on Form 10-K of Vemanti Group, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly for the period in which this report is being prepared;

b)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.    I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a)    all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: March 24, 2022

By:    */s/ Tan Tran*
Name: Tan Tran
Title:  Chief Executive Officer
         (Principal Executive Officer)

**EXHIBIT 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER
OF REGISTRANT PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002
(RULE 13a-14(a) or 15d-14(a) OF THE EXCHANGE ACT)**

I, Stephen R. Jones, certify that:

1.   I have reviewed this annual report on Form 10-K of Vemanti Group Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly for the period in which this report is being prepared;

   b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

   d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.   I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

   a)   all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

   b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: March 24, 2022

By:   */s/ Stephen R. Jones*
Name: Stephen R. Jones
Title:  Chief Financial Officer
           (Principal Financial and Accounting Officer)

EXHIBIT 32.1

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO SECTION 906 OF**
**THE SARBANES-OXLEY ACT OF 2002**

In connection with this annual report on Form 10-K of Vemanti Group, Inc. (the "Company") for the preiord ended December 31, 2021, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, in the capacity and on the date indicated below, hereby certifies pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to his knowledge:

1.    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operation of the Company.

Date: March 24, 2022

By:    */s/ Tan Tran*
Name: Tan Tran
Title:  Chief Executive Officer
        (Principal Executive Officer)

EXHIBIT 32.2

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO SECTION 906 OF**
**THE SARBANES-OXLEY ACT OF 2002**

In connection with this annual report on Form 10-K of Vemanti Group, Inc. (the "Company") for the period ended December 31, 2021, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, in the capacity and on the date indicated below, hereby certifies pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to his knowledge:

1.    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operation of the Company.

Date: March 24, 2022

By:    */s/ Stephen R. Jones*
Name: Stephen R. Jones
Title:  Chief Financial Officer
          (Principal Financial Officer)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

**BARINDER SINGH "NABE" BAL,**

Plaintiff,

v.

**TAN TRAN, an individual; and VEMANTI GROUP, INC.,**
**a Nevada corporation,**

Defendants.

Case No. _____

# EXHIBIT H

Vemanti Group, Inc. Form 10/A Registration Statement (Form 10-12G/A),
Effective June 9, 2021

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| BARINDER SINGH BAL, | Case No.: _____ |
| Plaintiff, | **EXHIBIT H** TO COMPLAINT |
| v. | |
| TAN TRAN, an individual; and VEMANTI GROUP, INC., a Nevada corporation, | |
| Defendants. | |

# EXHIBIT H

## Vemanti Group, Inc.'s Form 10/A Registration Statement

Form 10-12G/A — Amended General Form for Registration
of Securities Pursuant to Section 12(g) of the Securities
Exchange Act of 1934

| | |
|---|---|
| **Registrant:** | Vemanti Group, Inc. (Nevada) |
| **SEC CIK:** | 0001605057 |
| **Trading Symbol:** | VMNT (OTCQB) |
| **Principal Office:** | 7545 Irvine Center Dr., Ste. 200, Irvine, CA 92618 |
| **Underlying Form 10 Effective:** | June 9, 2021 (automatic effectiveness under §12(g)(1)) |
| **Form 10-12G/A Filed:** | July 2, 2021 |
| **Signed by:** | Tan Tran, President, CEO, and CFO |
| **Registrant's Counsel:** | Mark Crone, Esq., The Crone Law Group, P.C. |
| **Length:** | 71 pages (full document as filed) |

### Description

This Exhibit H reproduces the complete Form 10-12G/A registration statement filed by Vemanti Group, Inc. with the U.S. Securities and Exchange Commission on July 2, 2021. The underlying Form 10 registration statement became automatically effective on June 9, 2021, 60 days after initial filing, pursuant to Section 12(g)(1) of the Securities Exchange Act of 1934. This post-effective amendment is the operative version of the registrant's Section 12(g) registration as of mid-2021 and is the document

that, upon effectiveness, subjected Vemanti Group, Inc. to the periodic reporting requirements of Section 13(a) of the Exchange Act (Forms 10-K, 10-Q, and 8-K).

**Substantive Facts Surfaced by This Document**

• **Tan Tran's 427,350,000 votes of voting control, certified to the SEC.** Item 4 (page 28 of the SEC document) discloses Tan Tran's beneficial ownership of 27,350,000 common shares (39.2% of common) and 40,000,000 shares of Series A Preferred Stock (100% of preferred), with each preferred share carrying 10 votes. Combined voting power: $27,350,000 + (40,000,000 \times 10) = $ **427,350,000 votes**. The same Item states that "management beneficially owns and controls all of the voting stock of the Company."

• **Tan Tran is Vemanti's sole employee.** Item 1A (page 6 of the SEC document) states: "Currently, the Company has one employee, our President, Chief Executive Officer and Chief Financial Officer Tan Tran." There is no organizational layer separating Tan Tran from Vemanti's conduct, statements, or filings during the in-scope period.

• **The Crone Law Group, P.C. is identified as the registrant's SEC counsel.** Page 2 of the SEC document lists, under "Copies to:": "Mark Crone, Esq., The Crone Law Group, P.C., 500 Fifth Avenue, Suite 938, New York, NY 10110, Telephone: 646-861-7891." This corroborates Mark Crone's representation of Tan Tran on the Schedule 13D filed five days later (Exhibit E).

• **Section 13 reporting obligations triggered.** The Explanatory Note (page 3 of the SEC document) states: "Once this Registration Statement is deemed effective, we will be subject to the requirements of Regulation 13A under the Exchange Act, which will require us to file annual reports on Form 10-K; quarterly reports on Form 10-Q; and current reports on Form 8-K." Effectiveness on June 9, 2021 is the trigger event for the SEC reporting record relied upon in Cycle 3 of the Complaint, including the FY2021 Form 10-K filed March 24, 2022 (Exhibit G).

• **Q1 2021 capital-raising disclosure.** Item 10 (Recent Sales of Unregistered Securities) and Note 5 to the unaudited financial statements disclose that Vemanti issued 380,000 common shares for cash of $265,000 during the three months ended March 31, 2021 — the same quarter in which Tan Tran secretly sold 650,000 shares of his personal holdings.

• **Related-party compensation flowing to Tan Tran.** Item 7 / Note 10 disclose payments to Tan Tran for "professional services" of $40,000 in 2020 and $134,000 in 2019, plus additional payments of $40,000 (2020) and $48,000 (2019) by VoiceStep to a member of Tan Tran's family for "technical services."

• **Certification under penalty of federal law.** The signature block (page 39 of the SEC document) states the registration statement was "duly caused…to be signed on its behalf by the undersigned thereunto duly authorized," signed by "/s/ Tan Tran" on July 2, 2021 in his capacity as Principal Executive Officer and Principal Financial and Accounting Officer of the registrant.

*The full 71-page Form 10-12G/A as filed with the Securities and Exchange Commission follows.*

# VEMANTI GROUP, INC.

## FORM 10-12G/A
(Amended Securities Registration (section 12(g)))

## Filed 07/02/21

| | |
|---|---|
| Address | 7545 IRVINE CENTER DR. |
| | STE. 200 |
| | IRVINE, CA, 92618 |
| Telephone | 949-559-7200 |
| CIK | 0001605057 |
| Symbol | VMNT |
| SIC Code | 4899 - Communications Services, Not Elsewhere Classified |
| Fiscal Year | 12/31 |

Powered By **EDGAR** Online
https://www.edgar-online.com

© Copyright 2026, EDGAR Online LLC, a subsidiary of OTC Markets Group. All Rights Reserved.

Distribution and use of this document restricted under EDGAR Online LLC, a subsidiary of OTC Markets Group, Terms of Use.

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10/A

**GENERAL FORM FOR REGISTRATION OF SECURITIES**
**Pursuant to Section 12(b) or (g) of The Securities Exchange Act of 1934**

## VEMANTI GROUP, INC.

(Exact name of registrant as specified in its charter)

| **Nevada** | **46-5317552** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| **7545 Irvine Center Dr., Ste 200, Irvine, CA** | **92618** |
|---|---|
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code: **(949) 559-7200**

Copies to:
**Mark Crone, Esq.**
**The Crone Law Group, P.C.**
**500 Fifth Avenue**
**Suite 938**
**New York, NY 10110**
**Telephone: 646-861-7891**

Securities to be registered pursuant to Section 12(b) of the Act:

| **Title of each class to be so registered** | **Name of each exchange on which each class is to be registered** |
|---|---|
| None | None |

Securities to be registered pursuant to Section 12(g) of the Act: Common Stock, Par Value

**$0.0001**
(Title of class)

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large Accelerated Filer | ☐ | Accelerated Filer | ☐ |
| Non-Accelerated Filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**EXPLANATORY NOTE**

We are filing this General Form for Registration of Securities on Form 10 to register our common stock, par value $0.0001 per share (the "Common Stock"), pursuant to Section 12(g) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Once this Registration Statement is deemed effective, we will be subject to the requirements of Regulation 13A under the Exchange Act, which will require us to file annual reports on Form 10-K; quarterly reports on Form 10-Q; and current reports on Form 8-K. We will be required to comply with all other obligations of the Exchange Act applicable to issuers filing registration statements pursuant to Section 12(g) of the Exchange Act. Unless otherwise noted, references in this Registration Statement to the "Registrant", the "Company", "we", "our", or "us" means "Vemanti Group, Inc."

**FORWARD LOOKING STATEMENTS**

There are statements in this Registration Statement that are not historical facts or that are based on good faith estimates of management. These "forward-looking statements" can be identified by use of terminology such as "believe," "hope," "may," "anticipate," "should," "intend," "plan," "will," "expect," "estimate," "project," "positioned," "strategy" and similar expressions. You should be aware that these forward-looking statements are subject to risks and uncertainties that are beyond our control. For a discussion of these risks, you should read this entire Registration Statement carefully, especially the risks discussed under the section entitled "Risk Factors." Although management believes that the assumptions underlying the forward- looking statements included in this Registration Statement are reasonable, they do not guarantee our future performance, and actual results could differ from those contemplated by these forward-looking statements. The assumptions used for purposes of the forward-looking statements specified in the following information represent estimates of future events and are subject to uncertainty as to possible changes in economic, legislative, industry, and other circumstances. As a result, the identification and interpretation of data and other information and their use in developing and selecting assumptions from and among reasonable alternatives require the exercise of judgment. To the extent that the assumed events do not occur, the outcome may vary substantially from anticipated or projected results, and, accordingly, no opinion is expressed on the achievability of those forward-looking statements. In light of these risks and uncertainties, there can be no assurance that the results and events contemplated by the forward-looking statements contained in this Registration Statement will in fact transpire. You are cautioned to not place undue reliance on these forward-looking statements, which speak only as of their dates. We do not undertake any obligation to update or revise any forward-looking statements.

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 7 |
| Item 2. | Financial Information | 18 |
| Item 3. | Properties | 28 |
| Item 4. | Security Ownership of Certain Beneficial Owners and Management | 28 |
| Item 5. | Directors and Executive Officers | 29 |
| Item 6. | Executive Compensation | 32 |
| Item 7. | Certain Relationships and Related Transactions, and Director Independence | 32 |
| Item 8. | Legal Proceedings | 33 |
| Item 9. | Market Price of and Dividends on the Registrant's Common Equity and Related Stockholder Matter | 33 |
| Item 10. | Recent Sales of Unregistered Securities | 35 |
| Item 11. | Description of Registrant's Securities to be Registered | 35 |
| Item 12. | Indemnification of Directors and Officers | 36 |
| Item 13. | Financial Statements and Supplementary Data | 37 |
| Item 14. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 38 |
| Item 15. | Financial Statements and Exhibits | 39 |

*Table of Contents*

**COMMONLY USED DEFINED TERMS**

Unless otherwise indicated or the context requires otherwise, references in this disclosure to:

Unless the context provides otherwise, "we," "us," "our company," "our," "the Company" and "Vemanti" is to Vemanti Group Inc., a Nevada company and its wholly-owned subsidiary VoiceStep Telecom, LLC.

All references to "U.S. dollars," "dollars," "USD" or "$" are to the legal currency of the United States

"FMC" means the ability of telecommunications companies to provide their subscribers with services that interact with and use both the fixed networks incumbent wire line and/or cable operators and the mobile/cellular networks of mobile operators

IoT" means Internet of Things, the network of physical objects—"things" or objects—that are embedded with sensors, software, and other technologies for the purpose of connecting and exchanging data with other devices and systems over the internet

"IP" means Internet Protocol, the set of rules governing the format of data sent via the internet or local network.

"P2P" means Peer to Peer computing or networking that is a distributed application architecture that partitions tasks or workloads between peers.

"PBX" means Private Branch Exchange, a very old fashioned term for a system that has evolved significantly over the past century

 "PC" means personal computer

"SM" means shared memory

"SMS" means short message service

"VoIP" means Voice over Internet Protocol, a technology that allows you to make voice calls using a broadband Internet connection instead of a regular (or analog) phone line.

"Websites" are to our websites at www.vemanti.com, and www.voicestep.com.

2

## ITEM 1. BUSINESS

**Corporate History and Structure**

The CEO of Vemanti, Mr. Tan Tran, together with Mark Wehberg, incorporated VoiceStep Telecom, LLC, a California limited liability company, on January 27, 2005 ("VoiceStep"). The purpose was to offer digital voice telecommunications services based on Voice over Internet Protocol (VoIP) which were provisioned via the internet instead of over traditional fixed lines. The majority of VoiceStep's busines was entirely dedicated to serving smaller and prepaid long-distance (LD) carriers (e.g., International calling card providers) with competitive inbound and outbound services compared to similar products from the incumbent and bigger carriers. VoiceStep built up its customer base through direct marketing and sales as well as re-sellers.

Vemanti Group, Inc. was incorporated by Mr. Tan Tran on April 3, 2014 under the laws of the state of Nevada. The Company was created to be a holding company for VoiceStep and any other future acquisitions. Simultaneous with the incorporation of the Company, the two members of VoiceStep exchanged one hundred percent (100%) of their membership interests in VoiceStep for shares of Vemanti's capital stock, effecting a change of control and making VoiceStep a wholly-owned subsidiary of the Company.

On July 10, 2018, the Company made an investment in Fvndit, Inc. ("Fvndit"), f/k/a Directus Holdings, Inc., a Nevada corporation, for 20% equity in Fvndit. This was done in an effort to broaden our future service offerings and engage further with the financial technology industry.

Fvndit is a Nevada-based fintech company, the parent company to eLoan JSC ("ELoan"), and focuses on solving the working capital problem for small and medium-sized enterprises ("SMEs").

**Business Overview**

Vemanti, incorporated on April 3, 2014 under the laws of the State of Nevada, and is a technology-driven company that seeks to be active in the high-growth emerging markets. Through our wholly-owned subsidiary, VoiceStep, we provide a one-stop solution with regard to business-class VoIP services to our small to medium-sized business customers in the United States.

Vemanti is a technology-driven company that seeks to generate revenues in the high-growth emerging markets. Through our wholly-owned subsidiary, VoiceStep, we provide a one-stop solution with business-class VoIP services to our SME customers in the United States. We believe that our core strengths are in technology development. Vemanti drives growth through investment in disruptive and foundational technologies by targeting early-stage companies that have market viable products. Strategically, we focus mainly on blockchain projects and applications combined with other emerging technologies, including machine learning/AI, security and IoT.

VoiceStep provides a cloud-based multi-location, multi-user, enterprise-grade communications solution that enables employees to communicate through voice, text, web conferencing, and fax on devices, including smartphones, tablets, PCs, and desk phones. It offers PBX features such as multiple extensions, call control, Outlook integration, SM, web conferencing; fax, auto-receptionist, call logs and rule-based call routing and answering. The Company also has the ability to deliver customized voice applications to meet a customer's business requirements. The entire switching infrastructure of VoiceStep is based on next-generation softswitch architecture and was engineered in-house from the ground up. This eliminates certain dependency on third-party vendors and, at the same time, allows the company greater technical flexibility and economic scalability. We offer business-class VoIP products such as cloud phone systems (aka hosted PBX) and domestic/International origination and termination as a cost-saving and profit increasing solution to multi-location enterprise customers. We are capable of delivering business-class VoIP solutions in all 50 States as well as in Canada, Mexico and other countries in Central and South America, Europe, and Asia.

Through VoiceStep, we provide a convenient and low-cost resource for IP communication needs. VoiceStep's network offers availability, coverage and flexibility, and enables the following technology solutions: unified communications, data center services, content delivery, VoIP and cloud computing.

We also have a 20% interest in Fvndit, f/k/a Directus Holdings, Inc., which owns eLoan, JSC ("eLoan"). Fvndit, through its subsidiaries, operates an online short-term P2P financing platform for SMEs in Vietnam. Fvndit's mission is to make borrowing through credit a simpler process for entrepreneurs, thus making investing more rewarding for investors. Its wholly-owned subsidiary eLoan, which was launched in 2017, operates an online P2P funding platform that matches investors with entrepreneurs, allowing anyone on the platform to fund short-term working capital directly to SMEs in Vietnam. The Company purchased its 20% interest in Fvndit on November 13, 2018 for a total purchase price of $300,000. The Company paid $150,000 of the purchase price in a cash payment together with 1,252,086 shares of newly issued common stock of Vemanti (worth $150,0000). Immediately upon the closing of the transaction, Vemanti was entitled to the following rights in Fvndit (i) at least one (1) seat on each of the board of directors of Fvndit and/or eLoan and eLoan Holdings, (ii) veto rights regarding all matters relating to corporate governance and operations of Fvndit and eLoan, (iii) right of first refusal regarding an investment or acquisition of any kind, (iv) most favored nation protection and treatment above all other shareholders of Fvndit and eLoan, (v) at least a 25% discount preference on each and all future rounds of fundraising, and (vi) should eLoan engage in a down round of financing, Vemanti's holdings shall be maintained at the rate and value before any such down round financing at no cost to Vemanti.

3

*Table of Contents*

***Products***

VoiceStep's current core products are:

- Business-class VOIP cloud phone system (a/k/a "Hosted PBX") and
- Carrier-class domestic/international origination and termination.
- Essential business communications tools and applications such as fax, SMS (texting), call conferencing, and call center.

VoiceStep operates in a variety of small to medium business industries. All of our customers are on a monthly recurring service plan. As our customers do not require capital investment or maintenance contracts, it lowers our cost of ownership and allows the customers to easily migrate away from costly traditional on-premise PBX providers.

***Our Suppliers***

We currently depend on four (4) suppliers to deliver the VoIP solutions to us that we then re-sell to small and medium business customers:

1. Cyxtera Technologies, a data center and colocation vendor from whom we rent rack space, power, and internet connectivity on a contractual basis to host our servers and networking equipment;

2. Voyant Communications, f/k/a Vitelity, a wholesale VoIP communications service provider, who, from their end, terminates the telephone calls for our customers, which then allows them to receive incoming calls to telephone numbers in the US and Canada;

3. ScarletHawk Solutions, D.B.A Voxlinx, a wholesale VoIP communications service provider, who, from their end, terminates telephone calls for our customers, which then allows them to receive incoming calls to telephone numbers located in more than 60 countries outside the US and Canada; and

4. THINQ is a wholesale VoIP communication service provider, who interconnects with multiple carriers across the globe to allow our customer to make outgoing calls to any numbers in the US and to other countries.

*Table of Contents*

### *Marketing and Sales*

We do not currently have a dedicated sales or marketing team. We changed our business model 8 years ago when Skype, WhatsApp and other similar platforms started to come into the marketplace. Whereas we originally sold calling card minutes to individuals, we then adjusted and focused more on business customers. We focused on businesses that already had an internet subscription or connection and could purchase phone lines from our Company at discounted rates, rather than other mainstream companies such as AT&T and Verizon which offered more costly calling card packages. Our Company offers alternative services that allow businesses to be able to communicate with the outside world as well as their consumer base, but at a lower cost.

Revenue that has been generated in the last 2 years is based on the same customers the Company has had since 2015.

We currently do not have adequate resources to market our services.

### *Customers*

We define a "customer" as a party that purchases or subscribes to our products and services directly or indirectly through our channel partners. Currently, our Company has a customer base which is mostly comprised of SMEs, such as dentist offices, hair salons, landscaping companies etc., in the United States. We strive to establish and maintain long-term relationships with our customers and we currently do not have a significant customer concentration in any particular business sector. None of our customers account for more than 10% of our total revenue for the years ended December 31, 2020 and 2019. Our service is subscription based. Customers initially sign up for services via our VoiceStep Business Communications Service Agreement. Customers designate how many users our services are needed for, plan type, and whether they choose to be billed annually or monthly.

We offer four (4) different plan options:

1. VFAX – Unlimited;
2. VFAX – Premium;
3. VFAX – Basic; and
4. VFAX – Device.

Customer accounts automatically renew each month or year, depending on their payment choice, until such time that a customer chooses to cancel their service.

We generate revenues primarily from the sale of our monthly and yearly subscription plans for our cloud-based VoIP services. As our customer's needs change, they often add users to existing services or upgrade to better plans, which provide them with additional features and functionality.

In late 2014 the Company started working on fixed mobile convergence ("FMC") technology. This end-to-end mobility solution will help ensure that employees, partners, customers, processes and assets of a company are securely connected and can be optimized in the workplace. When employees leave the office, they're leaving opportunities behind if they're missing critical calls and voice messages on their desk phone, playing phone tag with important customers or sacrificing certain ideal features of their fixed, desk-based phones. The Company's solutions for FMC make PBX features that are enjoyed in the office available and accessible through a smart phone – helping employees be more responsive and productive from virtually anywhere. In addition, the FMC solutions bring a set of unique features that enhance integration between wireline and wireless networks.

When a user is on Wi-Fi, all of their calls are delivered to the cloud phone system over the Internet at no charge. If their Wi-Fi signal degrades or, if they move away from a wireless router, their mobile phone will simply connect to the different cellular networks without disconnecting calls. Whether they're on Wi-Fi or not, their calls are always connected to the Company's cloud phone system without the use of an app or mobile data connection. This provides a streamlined switch between Wi-Fi and cellular, optimizing access and reducing cost. FMC was projected to create a substantial and new stream of revenue for the Company, however this goal was not realized.

5

### Seasonality of Business

There is no significant seasonality in our business.

### Research and Development

We do not have any research and development.

### Intellectual Property

All the source coding we utilize is open source code, so there is never a need to trademark anything as we do not own the coding.

### Environmental Issues

Our business currently does not implicate any environmental regulation.

### Our Growth Strategies

Our objective as a company is to shift our focus to financial technology where consumer-to-consumer, business-to-consumer, and business-to-business transactions can be conducted via cryptocurrency and other decentralized monetary mediums. As a technology-driven company, we will seek out high-growth and emerging markets. Our core strengths are in technology development and investment. We intend to drive growth through investment in early-stage companies, specifically in the fintech sector, that have market viable products and are post-revenue. Strategically, we're focused on solving long-term problems using blockchain combined with other technologies, including machine learning and artificial intelligence. As we will mainly target fintech and e-commerce firms, we will also engage our Company's management team to help create and manage these firm's businesses as they grow.

Due to lack of capital our FMC technology did not get fully developed and has only been deployable in a controlled test environment. Its consumption of valuable engineering resources caused the Company to fall behind in the host-PBX market. Due to the global and distributed nature of the workforce, businesses today demand service providers to offer not only simple voice and data services, but also fully integrated productivity and coloration tools such as customer relationship management ("CRM"), call center, team and video messaging, and videotelephony conferencing to bring their teams and customers together on one single business communications platform. In order to match those demands, the Company would need to revamp and re-engineer its current platform as well as add a large team of product and business developers which would require a sizable upfront investment. Currently, the Company does not have sufficient capital, so there are no plans to further grow VoiceStep's core business. Furthermore, the market is already saturated with much more established players. Going forward, the Company will focus its business development activities in the fintech sector.

For the next 12 months, our main focus will be on sustaining the operations of VoiceStep. There are 2 strategies we plan to implement for VoiceStep: cost reduction and revenue growth. We have started cost-reduction measures for our ongoing operating expenses by renegotiating prices and/or cancelling redundant products with existing vendors and service providers. We hope to see positive results by end of Q2 2021. As for revenue growth, we plan to seek out and partner up with local IT services companies who are looking for a white-label business-class VoIP solution for their existing customers who either have not yet made the switch to VoIP or are looking for a voice solution that allows employees to work remotely using a virtual phone system due to COVID-19. Additionally, we have reserved a portion of our cash on hand to ensure the operational continuity of VoiceStep for at least the next 12 months. Therefore, we don't foresee any negative impact on our ongoing VoiceStep operations or future fintech business strategies.

Given telecommunications technologies (i.e., voice and data networks) are the basic foundation for all Internet-based products and services, moving our focus to fintech is a natural evolution for telecom service providers like ourselves. The telecommunications industry has changed dramatically and it is merging and/or intersecting with other industries, such as social media and financial services. For example, an end-user communications device such as a mobile phone can now be utilized as a vehicle for bill payments, investments, and e-commerce services. Telecom standards continue to improve in terms of speed and capacity to allow service providers to launch additional value-added services. Many of the major carriers in the US have been considering how they can roll out embedded banking services using 5G. Outside the US, many telecom service providers, including carriers in Southeast Asia and Vietnam, started making e-wallet services available over 10 years ago to their end-users. This allows them to pay for online purchases (like PayPal), perform person-person funds transfer (similar to Venmo), and pay monthly utility bills. Our CEO, Tan Tran, had acted as an advisor to some of these service providers in their implementation strategies, so fintech is something the Company is well versed in.

Over 70% of businesses and consumers in Southeast Asia (SEA) are underbanked. With all the countries in the region that expect to have 5%+ GDP growth in the coming years, despite COVID-19 , we feel SEA is a region where fintech innovation will thrive. Fintech products and services in SEA can be broken down in 4 major sectors: digital lending, electronic payments, online investment, and B2B back-office solutions. We plan to be active in the digital lending space. Outside of payments, the regulatory environment in Vietnam and other Southeast Asian countries for fintech is still not yet clearly defined. Strong demand by both businesses and consumers have prompted many startups to launch innovative products and services, but without the supportive regulations needed being in place. In Vietnam, where our portfolio company Fvndit is based, the government is trying to put a regulatory framework in place for fintech companies without hampering impact-driven innovations. Their goal is to keep out bad actors. Peer-to-Peer (P2P) lending is one of sectors the government is really looking at. This framework in Vietnam is only about three (3) years old. As such, the regulations on P2P lending are still relatively lax. Both the sheer volume and popularity of these platforms have driven the State Bank of Vietnam (SBV), the financial services authority of Vietnam, to begin establishing a regulatory sandbox specifically for online lending services.  In December 2018, Fvndit submitted a proposal to the SBV requesting that it be approved as a licensed Peer-to-Peer lending/crowdfunding platform. The proposal was accepted and is currently under review. Due to COVID-19, the SBV has pushed back the release of their fintech guidelines until end of 2021 or early in 2022. Fvndit is actively conducting a dialogue-based approach and information exchange with the SBV. For the time being, Fvndit is conducting all its transactions with full KYC/AML checks and proper tax withholdings and with quarterly reports submitted to the SBV to give them full insight into its operations. We expect to see the same approach from the SBV when it comes to a legal framework for using cryptocurrencies and other decentralized monetary mediums in payments, lending, and investment applications. Through Fvndit, we will continue to monitor guidelines issued by the SBV in Vietnam and plan our fintech strategies accordingly.

As for the timeline and expenditures of our new investment strategy, it will also depend on the capital we have available. We will design a business plan in the next 3-6 months with details on capital requirements. We expect it will then take an additional 6 months or so to raise the capital we will need to move forward. Add to that, we are still waiting on the new regulatory guidelines from the SBV. Therefore, we don't expect any major changes for next 9-12 months.

Our intention is to look towards building a financial technology ecosystem based on blockchain and other complimentary emerging technologies such as Machine Learning/Artificial Intelligence to provide tools for businesses and consumers to transact more efficiently [directly between themselves and with each other] as well as to create more accessible and efficient user interfaces built on blockchain and other emerging technologies.  Initially, we intend to utilize popular existing public blockchains, such as Ethereum, to test out their viability and usability. Cost-per-transaction is a big determining factor that ties directly to user growth, so we will look for more efficient and cost-effective blockchains before we expand. We will look into building a platform and assess, at that time, if that is a logical step for the Company.

It is well recognized in the blockchain community that digital currencies, including USD-backed and other stablecoins, have the potential to enhance efficiency, increase competition, lower costs, and foster broader financial inclusion. We intend to work on a USD-backed stablecoin. The minting and redemption of this stablecoin, as well as holding and managing the reserve, will be conducted by 3rd-party regulated trust and custodian entities who, to the best of our knowledge, after reasonable investigation, are licensed to conduct such activity.  We also plan to pursue integration of this stablecoin into a range of third-party platforms to support the adoption of our stablecoin as a digital currency. We currently do not have any agreements in connection with stablecoin.

At the end  of March 2021, we made a Bitcoin purchase through Gemini Trust Company, LLC (https://gemini.com aka Gemini) a digital currency exchange and custodian that allows customers to buy, sell, and store digital assets. It is a New York trust company that is regulated by the New York State Department of Financial Services (NYDFS). The same amount of Bitcoin purchased is still being held with Gemini.  We may also hold and trade our own stable coin.  If we do so, it will be purchased through, and minted by, the third-party trust custodian, on the same terms as any other purchaser.

Another strategy our Company employs is to acquire companies and/or form joint ventures. We focus on helping smaller companies accelerate their growth, execute their business plans and then scale up from there. We have a team assembled for the express purpose of sourcing attractive investment and M&A opportunities, developing and scaling them, and then building valuation for Vemanti shareholders. We are well versed in the high-tech industry and have significant experience in International deals. We understand cross-border transactions, what drives deal flow, and how to successfully integrate and accelerate the growth of portfolio companies. We are currently not in any discussions with any parties regarding acquisitions or joint ventures.

We fundamentally understand that people are seeking easy access, convenience, efficiency, and speed. People want to conduct transactions via mobile technology platforms and applications, and such activities include managing their financial lives, whether that is tracking their overall spending, applying for a loan, or optimizing their investment strategies. Many people prefer to use online applications or sites for finances. Our Company will create and optimize the platforms needed to achieve these goals for consumers.

### Competition

Any entity offering Internet-based communication services such as VoIP or Fax-over-IP (FoIP) is considered a direct competitor of our Company, regardless of whether the end-user is required to pay for those services or not. This also includes applications that allow users to send text messages and voice messages, make voice and video calls, and share images, documents, user locations, and other content such as WhatsApp, Facebook Messenger, Skype, WeChat, Viber, etc.

### Employees

Currently, the Company has one employee, our President, Chief Executive Officer and Chief Financial Officer Tan Tran.

### ITEM 1A.RISK FACTORS

*Investing in our common stock involves a high degree of risk. You should carefully consider the following risks, together with all of the other information contained in this Form 10 Registration Statement, including our consolidated financial statements and related notes, before making a decision to invest in our common stock. Any of the following risks could have an adverse effect on our business, operating results, financial condition and prospects, and could cause*

*the trading price of our common stock to decline, which would cause you to lose all or part of your investment. Our business, operating results, financial condition and prospects could also be harmed by risks and uncertainties not currently known to us or that we currently do not believe are material.*

*We consider the following to be the material risks for an investor regarding our common stock. Our Company should be viewed as a high-risk investment and speculative in nature. An investment in our common stock may result in a complete loss of the invested amount. An investment in our common stock is highly speculative, and should only be made by persons who can afford to lose their entire investment in us. You should carefully consider the following risk factors and other information in this Registration Statement before deciding to become a holder of our common stock. If any of the following risks actually occur, our business and financial results could be negatively affected to a significant extent.*

7

**Risks Related to Our Business and Industry**

***The current COVID-19 pandemic, as well as other epidemics, natural disasters, terrorist activities, political unrest, and other outbreaks could disrupt our delivery and operations, which could materially and adversely affect our business, financial condition, and results of operations.***

As of December 31, 2020, our revenues were $162,292, a decrease of 50.3% from $326,840 in the December of 2019. The current COVID-19 pandemic adversely affected many aspects of our business, including sales, operational efficiency, technical support and our customer's ability to pay our fees. Global pandemics, or fear of spread of contagious diseases, such as Ebola virus disease (EVD), coronavirus disease 2019 (COVID-19), Middle East respiratory syndrome (MERS), severe acute respiratory syndrome (SARS), H1N1 flu, H7N9 flu, and avian flu, as well as hurricanes, earthquakes, tsunamis, or other natural disasters could disrupt our business operations, reduce or restrict our supply of products, incur significant costs to protect our employees and facilities, or result in regional or global economic distress, which may materially and adversely affect our business, financial condition, and results of operations. Actual or threatened war, terrorist activities, political unrest, civil strife, and other geopolitical uncertainty could have a similar adverse effect on our business, financial condition, and results of operations. Any one or more of these events may impede our product offering efforts and adversely affect our sales results, or even for a prolonged period of time, which could materially and adversely affect our business, financial condition, and results of operations.

COVID-19 has had a global economic impact on the financial markets. The global spread of COVID-19 pandemic may result in global economic distress, and the extent to which it may affect our results of operations will depend on future developments, which are highly uncertain and cannot be predicted. Relaxation of restrictions on economic and social activities may also lead to new cases which may lead to re-imposed restrictions. We cannot assure you that the COVID-19 pandemic can be eliminated or contained in the near future, or at all, or a similar outbreak will not occur again. A third wave of COVID-19 or a similar pandemic could materially and adversely affect our business, financial condition, and results of operations.

We are also vulnerable to natural disasters and other calamities. We cannot assure you that we are adequately protected from the effects of fire, floods, typhoons, earthquakes, power loss, telecommunications failures, break-ins, war, riots, terrorist attacks, or similar events. Any of the foregoing events may give rise to interruptions, damage to our property, delays in production, breakdowns, system failures, technology platform failures, or internet failures, which could cause the loss or corruption of data or malfunctions of our manufacturing facility as well as adversely affect our business, financial condition, and results of operations.

***O****ur financial situation creates doubt whether we will continue as a going concern.*

There can be no assurances that we will ever be able to achieve a level of revenues adequate to generate sufficient cash flow from operations or obtain additional financing through private placements, public offerings and/or bank financing necessary to support our working capital requirements. To the extent that funds generated from any private placements, public offerings and/or bank financing are insufficient, we will have to raise additional working capital and no assurance can be given that additional financing will be available, or if available, will be on acceptable terms. These conditions potentially raise substantial doubt about our ability to continue as a going concern. If adequate working capital is not available, we may be forced to discontinue operations, which would cause investors to lose their entire investment.

***Maintenance of our Investment Company Act exemption imposes limits on our operations, which may adversely affect our results of operations.***

Section 3(a)(1)(A) of the Investment Company Act defines an investment company as any issuer that is, holds itself out as being, or proposes to be, primarily engaged in the business of investing, reinvesting or trading in securities and Section 3(a)(1)(C) of the Investment Company Act defines an investment company as any issuer that is engaged or proposes to engage in the business of investing, reinvesting, owning, holding or trading in securities and owns or proposes to acquire "investment securities" (within the meaning of the Investment Company Act) having a value exceeding 40% of the value of the issuer's total assets (exclusive of United States government securities and cash items) on an unconsolidated basis (the "40% test"). Excluded from the term "investment securities" are, among others, securities issued by majority-owned subsidiaries unless the subsidiary is an investment company or relies on the exceptions from the definition of an investment company provided by Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act (a "fund"). The Investment Company Act defines a "majority-owned subsidiary" of a person as any company 50% or more of the outstanding voting securities (i.e., those securities presently entitling the holder thereof to vote for the election of directors of the company) of which are owned by that person, or by another company that is, itself, a majority owned subsidiary of that person.

We conduct our operations primarily through our wholly-owned subsidiary. Our subsidiary is either outside of the definition of an investment company in Sections 3(a)(1)(A) and 3(a)(1)(C), described above, or excepted from the definition of an investment company under the Investment Company Act. We believe that we are not, and that we do not propose to be, primarily engaged in the business of investing, reinvesting or trading in securities and we do not believe that we have held ourselves out as such. We intend to continue to conduct our operations so that we are not required to register as an investment company under the Investment Company Act.

As noted above, if the combined values of the investment securities issued by our Company, and our subsidiary, that must rely on Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act, together with any other investment securities we may own, exceeds 40% of the value of our total assets on an unconsolidated basis, we may be deemed to be an investment company. If we fail to maintain an exception, exemption or other exclusion from the Investment Company Act, we could, among other things, be required either (i) to change substantially the manner in which we conduct our operations to avoid being subject to the Investment Company Act or (ii) to register as an investment company. Either of these would likely have a material adverse effect on us, our ability to service our indebtedness and on the market price of our shares and any other securities we may issue. If we were required to register as an investment company under the Investment Company Act, we would become subject to substantial regulation with respect to our capital structure (including our ability to use leverage), management, operations, transactions with certain affiliated persons (within the meaning of the Investment Company Act), portfolio composition (including restrictions with respect to diversification and industry concentration) and other matters.

If the SEC or a court of competent jurisdiction were to find that we were required, but failed, to register as an investment company in violation of the Investment Company Act, we would have to cease business activities, we would breach representations and warranties and/or be in default as to certain of our contracts and obligations, civil or criminal actions could be brought against us, our contracts would be unenforceable unless a court were to require enforcement and a court could appoint a receiver to take control of us and liquidate our business, any or all of which would have a material adverse effect on our business.

***Certain of our software is licensed from third parties.***

We license software for certain components of our products from third parties we do not control, such as Cyxtera Technologies, Voyant Communications (f/k/a Vitelity), ScarletHawk Solutions (D.B.A. Voxlinx) and THINQ. For the year ended December 31, 2019 and 2020, we incurred software license fees of $32,188 and $32,188, respectively. Although we have contracts in place with our third party software providers, there can be no assurance that the software we license will continue to be available on commercially reasonable terms, or at all, in the future. The lack of renewal, or termination, of one or more of our license agreements, or the renewal of license agreements on less favorable terms, could have a material adverse effect on our business, financial condition and results of operations.

While proprietary or open source alternatives may be available in some cases, transitioning to such alternatives may take time and be costly. The loss of existing licenses or the unavailability of such alternative software could result in a decrease in the quality of our products or loss of the ability to provide our products until equivalent software or suitable alternatives can be developed, identified, licensed and integrated.

Our products and services rely on certain technical standards, among other things, for interoperability of communication of voice and video, including standards relating to audio and video compression standards. These standards may be covered by patent rights held by third parties. The combined costs of identifying and obtaining licenses from all holders of patent rights essential to such standards could be high and could reduce our profitability or increase our losses. The cost of not obtaining such licenses could also be high if a holder of such patent rights brings a claim for patent infringement. While some such patent holders, based on their involvement with the standard setting organizations, may license relevant technology to us under reasonable and non-discriminatory terms, there can be no assurance that all necessary patent rights can be secured under such terms, and we may have to pay substantial royalties to secure such patent rights.

***If we fail to keep up with industry trends or technological developments, our business, results of operations and financial condition may be materially and adversely affected.***

The IP-based business communication industry is rapidly evolving and subject to continuous technological changes. Our success will depend on our ability to keep up with the changes in technology and user behavior resulting from new developments and innovations. For example, as we provide our product and service offerings across a variety of mobile systems and devices, we are dependent on the interoperability of our services with popular mobile devices and mobile operating systems that we do not control, such as Android and iOS. If any changes in such mobile operating systems or devices degrade the functionality of our services or give preferential treatment to competitive services, the usage of our services could be adversely affected.

Technological innovations may also require substantial capital expenditures in product development as well as in modification of products, services or infrastructure. We cannot assure you that we can obtain financing to cover such expenditure. If we fail to adapt our products and services to such changes in an

effective and timely manner, we may suffer from decreased user base, which, in turn, could materially and adversely affect our business, financial condition and results of operations

9

***Rapidly evolving technologies could cause demand for our products to decline or could cause our products to become obsolete.***

Current or future competitors may develop technological or product innovations that address Internet communications in a manner that is, or is perceived to be, equivalent or superior to our products. In the technology market in particular, innovative products have been introduced which have the effect of revolutionizing a product category and rendering many existing products obsolete. If competitors introduce new products or services that compete with or surpass the quality or the price/performance of our products, we may be unable to attract and retain users or to maintain or increase revenues from our users. We may not anticipate such developments and may be unable to adequately compete with these potential solutions. As a result of these or similar potential developments, in the future it is possible that competitive dynamics in our market may require us to reduce prices for our paid for products, which could harm our net revenues, gross margin and operating results or cause us to incur losses.

***If our business were deemed to be a regulated telecommunications business in one or more jurisdictions, it would significantly increase our expenses and may require us to change our products and other aspects of our business in potentially detrimental ways.***

We operate as a software company and not as a regulated telecommunications company. We are subject to the risk that, due to changes in communications and other similar laws and regulations or in the application, interpretation or enforcement of both existing and future communications and other similar laws and regulations, we may be required to comply with communications and other similar laws and regulations in one or more jurisdictions. In addition, we are continually seeking ways to improve our products and offer them across multiple communication platforms, which may involve from time to time upgrades or changes in the technological infrastructure on which our products are based and which could result in subjecting our activities to greater regulation in multiple jurisdictions. For example, the rolling out of our IP-based business communication in the United States may subject us to a greater risk of regulatory oversight in this country. If we are required to comply with communications and other similar laws and regulations, we would need to meet a number of obligations, which could vary from jurisdiction to jurisdiction, including new or enhanced compliance in the following areas:

- licensing and notification requirements;

- emergency calling requirements, including enhanced emergency calling through multi-line telephone systems;

- lawful interception or wiretapping requirements;

- privacy and data retention and disclosure requirements;

- limitations on our ability to use encryption technology;

- disability access requirements;

- consumer protection requirements and local dispute resolution requirements;

- requirements related to customer support;

- quality of service requirements;

- provision of numbering directories;

- numbering rules, including portability requirements;

- directory and operator services; and

- access and interconnection obligations.

If we fail to comply with communications, e-commerce and other similar laws and regulations in one or more jurisdictions, our business, results of operations and financial condition may be materially and adversely affected.

10

***Third parties have raised, and may raise in the future, concerns about the application of regulations to our business.***

Some third parties, including our competitors, have raised, and may raise in the future, concerns with policymakers and regulators in various parts of the world about the application of local laws and regulations to our business. We believe that some of these established businesses (which may include incumbent telecommunications companies) and their trade association groups employ significant resources in their efforts to shape legal and regulatory regimes and may employ these resources to change legal and regulatory regimes in ways intended to reduce the effectiveness of our business. Most incumbent telecommunications companies, landline and wireless, have substantial budgets devoted to lobbying and governmental relations and long-standing relationships with regulators and legislators that we, as a newer entrant in the Internet communications market, do not have. Some of these incumbent businesses have raised concerns relating to allowing consumers open access to the Internet, the lack of regulatory controls and obligations placed on Internet communications products, and the cost advantage this brings to providers of such products. Continuing actions by these competitors or trade groups may result in additional jurisdictions requiring us to comply with the local telecommunications and other laws and regulations.

***Our business depends on our users having continued and unimpeded access to the Internet. Companies providing access to the Internet may be able to block or degrade our calls, or block access to our website or charge us or our users additional fees for our products.***

All of our users rely on open, unrestricted access to the Internet to use our products. If they have limited, restricted or no access at all to the Internet, or their connection to the Internet is interrupted or disturbed, they may be less likely to use our products as a result.

In many cases that access is provided by companies that compete with at least some of our products, including incumbent landline telephone companies, cable television system operators, mobile wireless communications companies, and large Internet service providers. Some of these providers have stated that they may take measures that could block, degrade or otherwise disrupt our calls, or increase the cost of customers' use of our products by restricting or prohibiting the use of their lines or access points to the Internet for our products, by filtering, blocking, delaying, or degrading the packets of data used to transmit our communications, and by charging increased fees to our users for access to our products.

Some Internet access providers have additionally, or alternatively, contractually restricted their customers' access to Internet communications products (which may include our VoIP products) through their terms of service. For example, SFR in France and Vodafone in Germany contractually prohibit their customers from using voice over the Internet protocol services on the Apple iPad 3G. T-Mobile in Germany and Vodafone in France and the United Kingdom have established special additional tariffs for voice over the Internet protocol. Customers of these and other Internet access providers may not be aware that technical disruptions or additional tariffs are the act of other parties, which could harm our brand. Even if customers understand that we are not the source of such disruptions, they may be less likely to use our products as a result.

---

11

*Table of Contents*

In the United States, the European Union and other jurisdictions, regulatory authorities are in the process of examining the adoption of "network neutrality" policies, which aim to treat all Internet traffic equally, and developing or considering laws and regulations to codify acceptable behaviors on the part of network operators and access providers when providing consumers and businesses with access to the Internet. Different regulatory authorities have different approaches to this policy area both from a substantive and procedural perspective. Any failure on the part of regulatory authorities to protect the accessibility of the Internet to all, or any particular category of, Internet subscribers, or their failure to protect the delivery on a non-discriminatory basis of user communications over the Internet, regardless of type or service, could harm our results of operations and prospects.

***Our business depends on the continued reliability of the Internet infrastructure.***

Unlike traditional communications products, our users rely on the Internet to access our products. Increasing numbers of users and increasing bandwidth requirements may harm the performance of the Internet. In addition, if Internet service providers and other third parties providing Internet services have outages or deteriorations in their quality of service, our customers will not have access to our products or may experience a decrease in the quality of our products.

Furthermore, as the rate of adoption of new technology increases, the networks on which our products rely in certain countries may not be able to sufficiently adapt to the increased demand for their products and services. Frequent or persistent interruptions could cause current or potential users to believe that our systems are unreliable, leading them to switch to our competitors or to avoid our products, and could permanently harm our reputation and brands.

***Problems with or price increases by third parties who provide services to us or to our users could harm our business.***

We rely on telecommunications providers to provide certain of our products, such as Voyant Communications, a wholesale VoIP communications service provider, who, from their end, terminates the telephone calls for our customers which then allow them to receive incoming calls to telephone numbers in the US and Canada. We have agreements with a number of telecommunication providers in order for us to provide many of our paid products. The quality of calls made by our users to and received by our users from landline and mobile phones depends in large part of the call quality of the relevant landline or mobile network. As a result, if these third parties do not provide sufficiently high quality services, our call quality may be negatively affected which may in turn adversely impact our brand, reputation and consumer acceptance of our products. In addition, price increases by companies that provide services to us or our users could harm our results of operations.

12

*Table of Contents*

***We are dependent upon our only key executive who is not bound by any employment agreement nor does the Company maintain director and officers ("D&O") liability insurance for him.***

Our success depends, in part, upon the continued services of the key member of our management. Our executive's knowledge of the market, our business and our Company represents a key strength of our business, which cannot be easily replicated. The success of our business strategy and our future growth also depend on our ability to attract, train, retain and motivate skilled managerial, sales, administration, development and operating personnel.

There can be no assurance that our existing personnel will be adequate or qualified to carry out our strategy, or that we will be able to hire or retain experienced, qualified employees to carry out our strategy. The loss of our key executive, or the failure to attract and retain additional key personnel, could have a material adverse effect on our business, financial condition and results of operations.

***We may be subject to intellectual property infringement claims, which may be expensive to defend and may disrupt our business and operations.***

We cannot be certain that our operations or any aspects of our business do not or will not infringe upon or otherwise violate intellectual property rights held by third parties. We have not but in the future may be, subject to legal proceedings and claims relating to the intellectual property rights of others. There could also be existing intellectual property of which we are not aware that our products may inadvertently infringe. We cannot assure you that holders of intellectual property purportedly relating to some aspect of our technology or business, if any such holders exist, would not seek to enforce such intellectual property against us in the United States, or any other jurisdictions. If we are found to have violated the intellectual property rights of others, we may be subject to liability for our infringement activities or may be prohibited from using such intellectual property, and we may incur licensing fees or be forced to develop alternatives of our own. In addition, we may incur significant expenses, and may be forced to divert management's time and other resources from our business and operations to defend against these infringement claims, regardless of their merits. Successful infringement or licensing claims made against us may result in significant monetary liabilities and may materially disrupt our business and operations by restricting or prohibiting our use of the intellectual property in question, and our business, financial position and results of operations could be materially and adversely affected.

Our consolidated financial statements for the year ended December 31, 2020, were prepared assuming that we would continue as a going concern, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. The accompanying financial statements do not include any adjustments relating to the recovery of the recorded assets or the classification of the liabilities that might be necessary should the Company be unable to continue as a going concern.

***We cannot control internet based delays and interruptions, which may negatively affect our customers and thus our revenues.***

Any delay or interruption in the services by these third parties service providers could result in delayed or interrupted service to our customers and could harm our business. Accordingly, we could be adversely affected if such third party service providers fail to maintain consistent and reliable services, or fail to continue to make these services available to us on economically acceptable terms, or at all. These suppliers could also be adversely impacted by the COVID-19 pandemic, which could affect their ability to deliver their services to our Company in a satisfactory manner, or at all.

13

***If our business plans are not successful, we may not be able to continue operations as a going concern and our shareholders may lose their entire investment in us.***

We do not have sufficient working capital to fund the expansion of our operations and to provide working capital necessary for our ongoing operations and obligations. We need to raise significant additional capital to fund our operating expenses, pay our obligations, and grow our company. Therefore, our future operations may be dependent on our ability to secure additional financing. The COVID-19 pandemic may have an adverse impact on the Company's ability to raise capital or to continue as a going concern. As a result of the above, there is substantial doubt about the ability of the Company to continue as a going concern and the accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. The accompanying consolidated financial statements do not include any adjustments that may result from the outcome of this uncertainty.

***Our failure to adopt certain corporate governance procedures may prevent us from obtaining a listing on a national securities exchange.***

We do not have a compensation or nominating and corporate governance committee. The functions such committees would perform are performed by the board as a whole. Consequently, there is a potential conflict of interest in board decisions that may adversely affect our ability to become a listed security on a national securities exchange and as a result adversely affect the liquidity of our Common Stock.

***Since our management beneficially owns 39% of our outstanding shares, their interests may differ from the interests of our other shareholders, which could cause a material decline in the value of our shares.***

Our three officers and directors indirectly own 27,950,000 common shares. In addition, Mr. Tran, our Chairman and principal executive officer, owns 40,000,000 shares of Series A Preferred Stock which are convertible into shares of common stock and vote with the common stock on the basis of each share of Series A Preferred Stock having the right to 10 votes. Accordingly, management beneficially owns and controls all of the voting stock of the Company. Therefore, management has significant influence on determining the outcome of any matters submitted to the shareholders for approval, including mergers, consolidations, the election of directors and other significant corporate actions. This ownership and control may also have the effect of delaying or preventing a future change in control, impeding a merger, consolidation, takeover or other business combination that may be in the best interest of the Company. Without the consent of management, we may be prevented from entering into transactions that could be beneficial to us or our minority shareholders. The interest of management may differ from the interests of our other shareholders. The concentration in the ownership of our shares may cause a material decline in the value of our shares. We cannot assure you that management will act in our best interests given management's ability to control a significant majority of our voting shares.

14

**Risks Related to Our Common Stock**

***Since we are traded on the OTCQB, an active, liquid trading market for our common stock may not develop or be sustained. If and when an active market develops the price of our common stock may be volatile.***

Presently, our common stock is traded on the OTCQB. Presently there is limited trading in our stock and in the absence of an active trading market investors may have difficulty buying and selling or obtaining market quotations, market visibility for shares of our common stock may be limited, and a lack of visibility for shares of our common stock may have a depressive effect on the market price for shares of our common stock.

The lack of an active market impairs your ability to sell your shares at the time you wish to sell them or at a price that you consider reasonable. The lack of an active market may also reduce the fair market value of your shares. An inactive market may also impair our ability to raise capital to continue to fund operations by selling shares.

Trading in stocks quoted on the OTCQB is often thin and characterized by wide fluctuations in trading prices, due to many factors that may have little to do with our operations or business prospects. The securities market has from time to time experienced significant price and volume fluctuations that are not related to the operating performance of particular companies. These market fluctuations may also materially and adversely affect the market price of shares of our common stock. Moreover, the OTCQB is not a stock exchange, and trading of securities is often more sporadic than the trading of securities listed on a quotation system like Nasdaq or a national stock exchange like the NYSE. Accordingly, stockholders may have difficulty reselling any shares of common stock.

***There is no assurance that we will be able to pay dividends to our shareholders, which means that you could receive little or no return on your investment***

Payment of dividends from our earnings and profits may be made at the sole discretion of our board of directors. There is no assurance that we will generate any distributable cash from operations. Our board may elect to retain cash for operating purposes, debt retirement, or some other purpose. Consequently, you may receive little or no return on your investment.

***Our shares will be subordinate to all of our debts and liabilities, which increases the risk that you could lose your entire investment.***

Our shares are equity interests that will be subordinate to all of our current and future indebtedness with respect to claims on our assets. In any liquidation, all of our debts and liabilities must be paid before any payment is made to our shareholders. The amount of any debt financing we incur creates a substantial risk that in the event of our bankruptcy, liquidation or reorganization, we may have no assets remaining for distribution to our shareholders after payment of our debts.

***Our Board of Directors may authorize and issue shares of new classes of stock that could be superior to or adversely affect you as a holder of our common stock***

Our board of directors has the power to authorize and issue shares of classes of stock, including preferred stock that have voting powers, designations, preferences, limitations and special rights, including preferred distribution rights, conversion rights, redemption rights and liquidation rights without further shareholder approval which could adversely affect the rights of the holders of our common stock. In addition, our board could authorize the issuance of a series of preferred stock that has greater voting power than our common stock or that is convertible into our common stock, which could decrease the relative voting power of our common stock or result in dilution to our existing common stockholders.

15

Any of these actions could significantly adversely affect the investment made by holders of our common stock. Holders of common stock could potentially not receive dividends that they might otherwise have received. In addition, holders of our common stock could receive less proceeds in connection with any future sale of the Company, whether in liquidation or on any other basis.

***There is a limited public market for our Common Stock***

There is currently a limited public market for the common stock. Holders of our common stock may, therefore, have difficulty selling their common stock, should they decide to do so. In addition, there can be no assurances that such markets will continue or that any shares of common stock will be able to be sold without incurring a loss. Any such market price of the common stock may not necessarily bear any relationship to our book value, assets, past operating results, financial condition or any other established criteria of value, and may not be indicative of the market price for the common stock in the future. Further, the market price for the common stock may be volatile depending on a number of factors, including business performance, industry dynamics, news announcements or changes in general.

***We may, in the future, issue additional common shares, which would reduce investors' percent of ownership and may dilute our share value.***

Our Articles of Incorporation authorizes the issuance of 500,000,000 shares of common stock. We currently have 69,689,086 shares of common stock issued and outstanding. The future issuance of common stock will result in substantial dilution in the percentage of our common stock held by our then existing shareholders. We may value any common stock issued in the future on an arbitrary basis. The issuance of common stock for future services or acquisitions or other corporate actions may have the effect of diluting the value of the shares held by our investors and might have an adverse effect on any trading market for our common stock.

***There is a limited market for our common stock, which may make it difficult for holders of our common stock to sell their stock.***

Our common stock currently trades on the OTCQB under the symbol "VMNT" and currently there is minimal trading in our common stock. There can be no assurance as to the liquidity of any markets that may develop for our common stock, the ability of holders of our common stock to sell our common stock, or the prices at which holders may be able to sell our common stock. Further, many brokerage firms will not process transactions involving low price stocks, especially those that come within the definition of a "penny stock." If we cease to be quoted, holders of our common stock may find it more difficult to dispose of, or to obtain accurate quotations as to the market value of our common stock, and the market value of our common stock would likely decline.

16

*Table of Contents*

***The trading price of our Common Stock is likely to be volatile, which could result in substantial losses to investors.***

The trading price of our common stock is likely to be volatile and could fluctuate widely due to factors beyond our control. This may happen because of broad market and industry factors, including the performance and fluctuation of the market prices of other companies with business operations located outside of the United States. In addition to market and industry factors, the price and trading volume for our common stock may be highly volatile for factors specific to our own operations, including the following:

- variations in our revenues, earnings and cash flow;
- announcements of new investments, acquisitions, strategic partnerships or joint ventures by us or our competitors;
- announcements of new offerings, solutions and expansions by us or our competitors;
- changes in financial estimates by securities analysts;
- detrimental adverse publicity about us, our brand, our services or our industry;
- additions or departures of key personnel;
- sales of additional equity securities; and
- potential litigation or regulatory investigations.

Any of these factors may result in large and sudden changes in the volume and price at which our common stock will trade.

In the past, shareholders of public companies have often brought securities class action suits against those companies following periods of instability in the market price of their securities. If we were involved in a class action suit, it could divert a significant amount of our management's attention and other resources from our business and operations and require us to incur significant expenses to defend the suit, which could harm our results of operations. Any such class action suit, whether or not successful, could harm our reputation and restrict our ability to raise capital in the future. In addition, if a claim is successfully made against us, we may be required to pay significant damages, which could have a material adverse effect on our financial condition and results of operations.

***We are subject to be the penny stock rules which will make shares of our common stock more difficult to sell.***

We are subject now and, in the future, may continue to be subject, to the SEC's "penny stock" rules if our shares of common stock sell below $5.00 per share. Penny stocks generally are equity securities with a price of less than $5.00. The penny stock rules require broker-dealers to deliver a standardized risk disclosure document prepared by the SEC which provides information about penny stocks and the nature and level of risks in the penny stock market. The broker-dealer must also provide the customer with current bid and offer quotations for the penny stock, the compensation of the broker-dealer and its salesperson, and monthly account statements showing the market value of each penny stock held in the customer's account. The bid and offer quotations, and the broker-dealer and salesperson compensation information must be given to the customer orally or in writing prior to completing the transaction and must be given to the customer in writing before or with the customer's confirmation.

In addition, the penny stock rules require that prior to a transaction, the broker dealer must make a special written determination that the penny stock is a suitable investment for the purchaser and receive the purchaser's written agreement to the transaction. The penny stock rules are burdensome and may reduce purchases of any offerings and reduce the trading activity for shares of our common stock. As long as our shares of common stock are subject to the penny stock rules, the holders of such shares of common stock may find it more difficult to sell their securities.

17

*Table of Contents*

***The sale or availability for sale of substantial amounts of our common stock could adversely affect their market price.***

Sales of substantial amounts of our common stock in the public market, or the perception that these sales could occur, could adversely affect the market price of our common stock and could materially impair our ability to raise capital through equity offerings in the future. Shares held by our existing shareholders may be sold in the public market in the future subject to the restrictions in Rule 144 and Rule 701 under the Securities. We currently have 69,689,086 shares of common stock outstanding, with approximately 39% of the shares being held by affiliates. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of our common stock.

***We are an emerging growth company within the meaning of the Securities Act and therefore may take advantage of certain reduced reporting requirements.***

Since we are an "emerging growth company," as defined in the JOBS Act, we will take advantage of certain exemptions from requirements applicable to other public companies which are eligible to be considered emerging growth companies. Most significantly, we need not comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002.

## ITEM 2. FINANCIAL INFORMATION

### Management's Discussion and Analysis of Financial Condition and Results of Operations

*We make forward-looking statements in this report, in other materials we file with the Securities and Exchange Commission (the "SEC") or otherwise release to the public, and on our website. In addition, our senior management might make forward-looking statements orally to analysts, investors, the media and others. Statements concerning our future operations, prospects, strategies, financial condition, future economic performance (including growth and earnings) and demand for our products and services, and other statements of our plans, beliefs, or expectations, including the statements contained in this Item 2 "Management's Discussion and Analysis of Financial Condition and Results of Operation," regarding our future plans, strategies and expectations are forward-looking statements. In some cases, these statements are identifiable through the use of words such as "anticipate," "believe," "estimate," "expect," "intend," "plan," "project," "target," "can," "could," "may," "should," "will," "would" and similar expressions. You are cautioned not to place undue reliance on these forward-looking statements because these forward-looking statements we make are not guarantees of future performance and are subject to various assumptions, risks, and other factors that could cause actual results to differ materially from those suggested by these forward-looking statements. Thus, our ability to predict results or the actual effect of future plans or strategies is inherently uncertain. Factors which could have a material adverse effect on our operations and future prospects include, but are not limited to, changes in: economic conditions generally and the automotive modified plastics market specifically, legislative or regulatory changes that affect our business, including changes in regulation, the availability of working capital, the introduction of competing products, and other risk factors described herein. These risks and uncertainties, together with the other risks described from time-to-time in reports and documents that we filed with the SEC should be considered in evaluating forward-looking statements and undue reliance should not be placed on such statements. Indeed, it is likely that some of our assumptions will prove to be incorrect. Our actual results and financial position will vary from those projected or implied in the forward-looking statements and the variances may be material. We expressly disclaim any obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.*

18

*The forward-looking statements are not historical facts, but rather are based on current expectations, estimates, assumptions and projections about our industry, business and future financial results. The forward-looking statements speak only as of the date on which they are made, and, except to the extent required by federal securities laws, we undertake no obligation to update any forward-looking statements to reflect events or circumstances after the date on which the statements are made or to reflect the occurrence of unanticipated events. Our actual results could differ materially from the results contemplated by these forward-looking statements due to a number of factors, including those discussed under "Item 1A. Risk Factors" and other sections in this Form 10.*

**Overview**

Vemanti, incorporated on April 3, 2014 under the laws of the State of Nevada, is a technology-driven and fintech-focused company that seeks to be active in the high-growth emerging markets. Through our wholly-owned subsidiary, VoiceStep, we provide a one-stop solution with regard to business-class VoIP services to our SME customers in the United States. We also have 20% ownership interest in Fvndit which, through its subsidiaries, operates an online short-term P2P financing platform for SMEs in Vietnam.

On July 17, 2018, the Company made a $25,000 Keep It Simple Security ("KISS") investment in a first round offering of Chopp, Inc. ("Chopp"), a Delaware-registered online logistics company that currently operates as a same-day e-grocery delivery service. Vemanti believed Chopp had similar synergies to eLoan and as such, would be a good investment for our Company. Chopp's valuation exceeded our Company's expectations and they continued to take on more investors. Unfortunately, our initial investment was diluted to the extent that it did not make sense to keep our investment in Chopp. Given Chopp's higher than expected valuation, it also did not make sense financially for the Company to come in on a second round offering as we did not have the capital needed. In June 2019, the Company cancelled its investment in Chopp, Inc. and received repayment of its initial $25,000 investment.

We began generating revenue from the sales of our VoiceStep products since its inception in 2014, but have incurred significant net losses since 2015. For the fiscal year ended December 31, 2020 and 2019, we recognized approximately $162,292, and $326,840, respectively, in sales, and $17,690 and $10,751, respectively from other income. For the fiscal year ended December 31, 2020 and 2019, we also recorded $8,503 unrealized loss and an unrealized gain of $6,559, respectively, on our investment in Fvndit. For the fiscal year ended December 31, 2019, the earnings from Fvndit was insignificant. We incurred a net loss of $76,876 and $225,861, respectively, for the fiscal year ended December 31, 2020 and 2019.

For the three months ended March 31, 2021 and 2020, we recognized approximately $36,243, and $48,767, respectively, in sales, and $0 and $5,251, respectively from interest income. For the three months ended March 31, 2021 and 2020, we also recorded $1,651 unrealized loss and an unrealized gain of $0, respectively, on our investment in Fvndit. We incurred a net loss of $69,967 and $34,071, respectively, for the three months ended March 31, 2021 and 2020.

As reflected in the consolidated financial statements, we used cash in operations of $75,312 and had a net loss from operations of $76,876 and an accumulated deficit of $1,658,963 for the fiscal year ended December 31, 2020. As reflected in the unaudited interim financial statements, we used cash in operations of $62,873 and had a net loss from operations of $69,967 and an accumulated deficit of $1,728,930 for the three months ended March 31, 2021. While we believe in the viability of our strategy to generate sufficient revenues and in our ability to raise additional funds, there can be no assurances that we will be successful or that our cash position will be sufficient to support our daily operations. Our continued existence is dependent upon our ability to continue to execute our operating plan and to obtain additional debt or equity financing. There can be no assurance the necessary debt or equity financing will be available or will be available on terms acceptable to our Company. Accordingly, we may decide to exit our existing business and explore potential strategic alternatives, including establishing a new business, or target an existing business for acquisition, without restriction to any specific business, industry or geographical location.

19

*Table of Contents*

**Results of Operations**

*Fiscal year ended December 31, 2020 compared to fiscal year ended December 31, 2019*

|  | 2020 Amount | | 2019 Amount | |
|---|---|---|---|---|
| Sales | $ | 162,292 | $ | 326,840 |
| Cost of sales | $ | 36,016 | $ | 64,008 |
| Gross margin | $ | 126,276 | $ | 262,832 |
| Total other income (expense) net | $ | 9,187 | $ | 17,310 |
| Total operating expenses | $ | 210,691 | $ | 506,003 |
| Net loss | $ | (76,876) | $ | (225,861) |

*Revenues*

Revenues were $162,292 in the fiscal year ended December 31, 2020, a decrease of $164,548 or 50.3%, compared to $326,840 in the same period of last year. The decrease was mainly due to the abundant supply of telecommunications applications that provide free-of-charge video chats and voice calls between computers, tablets, and mobile devices over the internet which led to a drop in demand for VoiceStep's payment-based voice services.

*Gross Profit and Gross Profit Margin*

Gross profit was $126,276 in the fiscal year ended December, 2020, compared to $262,832 in the same period of 2019. Our gross profit margin decreased 51.9% for the fiscal year ended December 31, 2020. The decrease was mainly due to the abundant supply of telecommunications applications that provide free-of-charge video chats and voice calls between computers, tablets, and mobile devices over the internet which led to a drop in demand for VoiceStep's payment-based voice services

*Equipment*

Equipment at December 31, 2020 and December 31, 2019 consisted of the following:

|  | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| Software licenses | $ | 32,188 | $ | 32,188 |
| Computer equipment | | 17,080 | | 17,080 |
|  | | 49,268 | | 49,268 |
| Less accumulated depreciation | | (47,895) | | (47,154) |
| Equipment, net | $ | 1,373 | $ | 2,114 |

Depreciation expense was $741 for the years ended December 31, 2020 and 2019.

20

*Digital Assets*

The following represents the change in digital assets:

| | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| | **Cryptocurrencies** | | | |
| Beginning balance | $ | - | $ | 3,921 |
| Realized gain | | - | | 4,322 |
| Impairment Loss | | - | | - |
| Transfer of cryptocurrencies | | - | | (8,243) |
| Ending balance | $ | - | $ | - |

The Company does not record fair value gains (losses) associated with its digital assets. Cryptocurrencies are classified as intangible assets, and the Company tests these assets for impairment on an annual basis. In May 2019, the Company's entire digital assets balance was used to pay the CEO for services rendered (see Material Transactions with Related Parties).

*General and Administrative Expenses*

General and administrative (G&A) expenses were $210,691 for the fiscal year ended December 31, 2020 compared to $506,003 in the same period in 2019, representing a decrease of 58.3%, or $295,312. The decrease was mainly due to reduced expenses and compensations paid to outside consultants and contractors.

*Operating Loss*

Total operating income loss was $84,415 in the fiscal year ended December 31, 2020 compared to $243,171 in the same period of 2019, representing a decrease $158,756 or 65.3%. This decrease is primarily due to reduced operating expenses.

*Income Taxes*

| | 2020 | | 2019 | |
|---|---|---|---|---|
| | **Amount** | **Percent** | **Amount** | **Percent** |
| Federal statutory rates | $ (15,798) | 21.0% | $ (47,431) | 21.0% |
| State income taxes | (6,620) | 8.8% | (19,876) | 8.8% |
| Permanent differences | 946 | 21.00% | (915) | -0.4% |
| Valuation allowance | 21,472 | -28.54% | 66,392 | -29.8% |
| Effective rate | $ - | 0.0% | $ - | 0.0% |

As of December 31, 2020 and 2019, there were no significant deferred tax assets, except for a net operating loss carryforwards for which a 100% valuation allowance has been provided.

The Company annually conducts an analysis of its tax positions and has concluded that it has no uncertain tax positions as of December 31, 2020 and 2019. The 2017 to 2019 tax years are still subject to federal audit. The 2016 to 2019 tax years are still subject to state audit.

The Company had $1,132,304 and $1,061,581 of net operating loss carryforwards available as of December 31, 2020 and 2019, respectively, for Federal and state tax purposes. Net operating loss carryforwards start to expire in 2039 or 20 years for federal income and state tax purposes.

*Net Income*

As a result of the above factors, we had a net loss of $76,876 at the fiscal year end of December 31, 2020 compared to a net loss of $225,861 in 2019.

**Results of Operations**

*The three months ended March 31, 2021 compared to the three months ended March 31, 2020*

| | 2021 Amount | | 2020 Amount | |
|---|---|---|---|---|
| Sales | $ | 36,243 | $ | 48,767 |
| Cost of sales | $ | 5,403 | $ | 10,465 |
| Gross margin | $ | 30,840 | $ | 38,302 |
| Total other income (expense) net | $ | (1,651) | $ | 5,251 |
| Total operating expenses | $ | 99,156 | $ | 78,459 |
| Net loss | $ | (69,967) | $ | (34,071) |

*Revenues*

Revenues were $36,243 for the three months ended March 31, 2021, a decrease of $12,524 or 25%, compared to $48,767 in the same period of last year. The decrease was mainly due to the abundant supply of telecommunications applications that provide free-of-charge video chats and voice calls between computers, tablets, and mobile devices over the internet which led to a drop in demand for VoiceStep's payment-based voice services.

*Gross Profit and Gross Profit Margin*

Gross profit was $30,840 for the three months ended March 31, 2021, compared to $38,302 in the same period of 2020. Our gross profit margin decreased 19.4% for the three months ended March 31, 2021. The decrease was mainly due to the abundant supply of telecommunications applications that provide free-of-charge video chats and voice calls between computers, tablets, and mobile devices over the internet which led to a drop in demand for VoiceStep's payment-based voice services

*Equipment*

Equipment at March 31, 2021 and December 31, 2020 consisted of the following:

| | March 31, 2021 | | December 31, 2020 | |
|---|---|---|---|---|
| Software licenses | $ | 32,188 | $ | 32,188 |
| Computer equipment | | 17,080 | | 17,080 |
| | | 49,268 | | 49,268 |
| Less accumulated depreciation | | (48,080) | | (47,895) |
| Equipment, net | $ | 1,188 | $ | 1,373 |

Depreciation expense was $185 for both the three months ended March 31, 2021 and 2020.

22

*Table of Contents*

***Digital Assets***

The following represents the change in digital assets:

|  | March 31, 2021 | December 31, 2020 |
|---|---|---|
|  | **Cryptocurrencies** | |
| Beginning balance | $ - | $ - |
| Purchase of cryptocurrencies | 10,000 | - |
| Gain or (loss) | - | - |
|  | - | - |
| Ending balance | $ 10,000 | $ - |

The Company does not record fair value gains (losses) associated with its digital assets. Cryptocurrencies are classified as intangible assets, and the Company tests these assets for impairment on an annual basis. Cryptocurrencies are classified as intangible assets, and the Company tests these assets for impairment on an annual basis.

***General and Administrative Expenses***

General and administrative (G&A) expenses were $99,156 for the three months ended March 31, 2021 compared to $78,459 in the same period in 2020, representing an increase of 26.4%, or $20,697. The increase was mainly due to increased expenses and compensations paid to outside consultants and contractors.

***Operating Loss***

Total operating income loss was $68,316 for the three months ended March 31, 2021 compared to $40,157 in the same period of 2020, representing an increase of $28,159 or 70.1%. This increase is primarily due to increased operating expenses.

23

As of March 31, 2021 and 2020, there were no significant deferred tax assets, except for a net operating loss carryforwards for which a 100% valuation allowance has been provided.

The Company annually conducts an analysis of its tax positions and has concluded that it has no uncertain tax positions as of December 31, 2020 and 2019. The 2017 to 2019 tax years are still subject to federal audit. The 2016 to 2019 tax years are still subject to state audit.

The Company had $1,132,304 and $1,061,581 of net operating loss carryforwards available as of December 31, 2020 and 2019, respectively, for Federal and state tax purposes. Net operating loss carryforwards start to expire in 2039 or 20 years for federal income and state tax purposes.

### Net Income

As a result of the above factors, we had a net loss of $69,976 for the three months ended March 31, 2021 compared to a net loss of $34,071 in 2020.

### LIQUIDITY AND CAPITAL RESOURCES

Historically, our primary uses of cash have been to finance working capital needs. We expect that we will be able to meet our needs to fund operations, capital expenditures and other commitments in the next 12 months primarily with our cash and cash equivalents and operating cash flows.

We may need to raise additional capital to fund our operating expenses, pay our obligations, and grow our company in the future. Our current resources may be insufficient to satisfy all of our cash requirements and we may seek to sell additional equity or debt securities or obtain a credit facility. Our future operations may be dependent on our ability to secure additional financing. Even if we are able to raise the funds required, it is possible that we could incur unexpected costs and expenses, fail to collect amounts owed to us, or experience unexpected cash requirements that would force us to seek alternative financing. Furthermore, if we issue additional equity or debt securities, stockholders may experience additional dilution or the new equity securities may have rights, preferences or privileges senior to those of existing holders of our common stock.

Currently, the Company has sufficient cash to remain in business for the next 12 months.

### The following table sets forth a summary of our cash flows for the periods indicated.

| Item | | For the Year Ended December 31, | |
| --- | --- | --- | --- |
| | | 2020 | 2019 |
| Net cash used in operating activities | $ | (75,312) | (109,553) |
| Net cash used in investing activities | | 200,000 | (175,000) |
| Net cash provided by financing activities | | - | - |
| Net (decrease) increase in cash | | 124,688 | (284,553) |
| Cash at the beginning of period | | 118,806 | 403,359 |
| Cash at the end of period | $ | 243,494 | $ 118,806 |

### Operating Activities

Net cash used in operating activities was $75,312 for the fiscal year ended December 31, 2020, as compared to $109,553 used in operating activities for the fiscal year ended December 31, 2019, primarily due to the net losses incurred.

### Investing Activities

Net cash provided by investing activities was $200,000 for the fiscal year ended December 31, 2020, compared to net cash used in investing activities of $175,000 for the fiscal year ended December 31, 2019.

| Item | | For the Three Months Ended March 31, | |
| --- | --- | --- | --- |
| | | 2021 | 2020 |
| Net cash used in operating activities | $ | (62,873) | (37,759) |
| Net cash used in investing activities | | (10,000) | - |
| Net cash provided by financing activities | | 265,000 | - |
| Net (decrease) increase in cash | | 192,127 | (37,759) |
| Cash at the beginning of period | | 243,494 | 118,806 |
| Cash at the end of period | $ | 435,621 | $ 81,047 |

24

***Operating Activities***

Net cash used in operating activities was $62,873 for the three months ended March 31, 2021, as compared to $37,759 used in operating activities for the three months ended March 31, 2020, primarily due to the net losses incurred.

***Investing Activities***

Net cash used in investing activities was $10,000 for the three months ended March 31, 2021, compared to net cash used in investing activities of $0 for the three months ended March 31, 2020.

**COMMITMENTS AND CONTINGENCIES**

**Off-Balance Sheet Arrangements**

We have no off-balance sheet arrangements.

**Critical Accounting Policies**

These audited consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). These audited consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto. In preparing these audited consolidated financial statements, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities as of the date of the consolidated financial statements and the reported amount of revenues and expenses during the reporting periods. Actual results could differ from those estimates. The most significant estimates and assumptions included in the Company's consolidated financial statements relate to revenue recognition, allowances for doubtful accounts, valuations for deferred income taxes and recoverability of investments.

The accompanying audited consolidated financial statements include the accounts of the Company and its wholly-owned subsidiary, VoiceStep. All significant intercompany transactions and balances have been eliminated.

**Revenue recognition**

On January 1, 2019, the Company adopted the accounting standard ASC 606, *Revenue from Contracts with Customers*, for all open contracts and related amendments as of December 31, 2019 using the modified retrospective method. The adoption had no impact to the reported results.

The Company recognizes revenue in accordance with ASC 606, the core principle of which is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to receive in exchange for those goods or services. To achieve this core principle, five basic criteria must be met before revenue can be recognized: (1) identify the contract with a customer; (2) identify the performance obligation(s) in the contract; (3) determine the transaction price; (4) allocate the transaction price to performance obligation(s) in the contract; and (5) recognize revenue when or as the Company satisfies a performance obligation.

25

*Table of Contents*

The Company recognizes revenues derived from sub-leasing telecommunications infrastructure and the provision of telecommunications and colocation services. These revenues are accounted for as a single performance obligation satisfied over time because the customer simultaneously receives and consumes the benefits of the Company's
performance on a monthly basis. These arrangements stipulate monthly billing and the Company has elected the "as invoiced" practical expedient to recognize revenue as the services are consumed as the Company has the right to payment in an amount that corresponds directly with the value of performance completed to date.

Taxes collected from customers and remitted to a governmental authority are reported on a net basis and are excluded from revenue. Most revenue is billed in advance on a fixed-rate basis. The remainder of revenue is billed in arrears on a transactional basis determined by customer usage.
The Company often bills customers for upfront charges. These charges relate to down payments or prepayments for future services or equipment and are influenced by various business factors including how the Company and customer agree to structure the payment terms. These payments are recognized as deferred revenue until the service is provided or equipment is delivered and installed. All ongoing fees are billed and recognized as revenue on a monthly basis as service is provided.

**Use of estimates**

The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates made by management include, among others, revenue recognition, recoverability of accounts receivable, and investments. Actual results could differ from those estimates. It is possible that accounting estimates and assumptions may be material to the Company due to the levels of subjectivity and judgment involved.

**Income taxes**

The Company accounts for income taxes in accordance with FASB ASC Topic 740, *Income Taxes*. ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded.

**Property, Plant And Equipment, Net**

Equipment is stated at cost. Expenditures for maintenance and repairs are charged to earnings as incurred; additions, renewals and betterments are capitalized. When equipment is retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts, and any gain or loss is included in operations. Depreciation of equipment is provided using the straight-line method for substantially all assets with estimated lives as follows:

| | |
|---|---|
| Software licenses | 5 years |
| Computer equipment | 5 years |

**Long-Lived Assets**

The Company applies the provisions of Accounting Standards Codification ("ASC") Topic 360, *Property, Plant, and Equipment*, which addresses financial accounting and reporting for the impairment or disposal of long-lived assets. ASC 360 requires impairment losses to be recorded on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. In that event, a loss is recognized based on the amount by which the carrying amount exceeds the fair value of the long-lived assets. Loss on long-lived assets to be disposed of is determined in a similar manner, except that fair values are reduced for the cost of disposal. Based on its review at September 30, 2020 and December 31, 2019, the Company believes there was no impairment of its long-lived assets.

**Recently Issued Accounting Guidance**

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement* (Topic 820): *Disclosure Framework— Changes to the Disclosure Requirements for Fair Value Measurement*. The guidance is intended to improve the fair value measurement reporting of financial instruments including the effectiveness of the notes to financial statements by facilitating clearer communication, and it includes multiple new, eliminated and modified disclosure requirements. The guidance was effective for the Company as of January 1, 2020. The adoption of this guidance is not expected to have a material impact on the Company's consolidated financial statements.

In December 2019, the FASB issued ASU No. 2019-12 *Income Taxes* (Topic 740)—*Simplifying the Accounting for Income Taxes*. The guidance removes certain exceptions to the general income tax accounting principles and clarifies and amends existing guidance to facilitate consistent application of the accounting principles. The new guidance is effective for the Company as of January 1, 2021. The adoption of the amendments in this update is not expected to have a material impact on the Company consolidated financial position and results of operations.

Management does not believe any other recently issued but not yet effective accounting pronouncement, if adopted, would have a material impact effect on the Company's present or future financial statements.

**Quantitative and Qualitative Disclosures about Market Risks**

Not applicable.

27

**Legal Proceedings**

From time to time, the Company and its affiliates are parties to various legal actions arising in the ordinary course of business. There are no pending legal proceedings against the Company or its affiliates.

**ITEM 3. PROPERTIES.**

Since 2014, the Company has operated under a shared-workspace environment at Regus in Irvine, CA and Newport Beach, CA. Its official mailing address is 7545 Irvine Center Dr., Ste. 200, Irvine, CA 92660, CA 92660, USA. The Company does not own any real estate. The Company believes that its current space is sufficient for its business.

**ITEM 4. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT.**

The following table lists, as of June 30, 2021, the number of shares of common stock beneficially owned by (i) each person, entity or group (as that term is used in Section 13(d)(3) of the Securities Exchange Act of 1934) known to the Company to be the beneficial owner of more than 5% of the outstanding common stock; (ii) each of our directors (iii) each of our Named Executive Officers and (iv) all executive officers and directors as a group. Information relating to beneficial ownership of common stock by our principal stockholders and management is based upon information furnished by each person using "beneficial ownership" concepts under the rules of the SEC. Under these rules, a person is deemed to be a beneficial owner of a security if that person directly or indirectly has or shares voting power, which includes the power to vote or direct the voting of the security, or investment power, which includes the power to dispose or direct the disposition of the security. The person is also deemed to be a beneficial owner of any security of which that person has a right to acquire beneficial ownership within 60 days. Under the SEC rules, more than one person may be deemed to be a beneficial owner of the same securities, and a person may be deemed to be a beneficial owner of securities as to which he or she may not have any pecuniary interest. Except as noted below, each person has sole voting and investment power with respect to the shares beneficially owned and each stockholder's address is c/o Vemanti Group, Inc., 7545 Irvine Center Dr., Suite 200, Irvine CA, 93618.

The percentages below are calculated based on 69,689,086 shares of common stock issued and outstanding as of June 30, 2021.

| Name of Beneficial Owner | Shares | Percentage | Voting Power % | Total Combined Voting Power |
|---|---|---|---|---|
| **Executive Officers and Directors:** | | | | |
| Rachel Boulds | Common: 0 | 0% | 0% | 0 |
| | Preferred: 0 | 0% | 0% | |
| | | | | |
| Tan Tran (1) | Common: 27,350,000 | 39.2% | 39.2% | |
| | Preferred: 40,000,000 | 100% | 100% | **427,350,000** |
| All officers and directors as a group of (2 persons) | | | | |
| | | | | |
| **5% or Greater Holders:** | | | | |
| | | | | |
| Tan Tran (1) | Common: 27,350,000 | 39.2% | 39.2% | |
| | Preferred: 40,000,000 | 100% | 100% | **427,350,000** |

_____

(1)    Each share of Series A Preferred Stock has the right to 10 votes per each share of common stock.

**ITEM 5. DIRECTORS AND EXECUTIVE OFFICERS.**

The following table sets forth information regarding our current directors and executive officers:

| Name | Age | Position |
|------|-----|----------|
| Tan Tran | 56 | Chief Executive Officer and Chief Financial Officer |
| Rachel Boulds | 51 | Director |

**Tan Tran:** Mr. Tran, age 56, has been our Company's Chairman and Director since the Company's inception in April 2014. Mr. Tran has also served, full time, as the Company's President and Chief Executive Officer since April 2014. He co-founded VoiceStep in 2004. From October 2018 to March 2021, Mr. Tran served as an Officer and Director for Fvndit. Since founding Vemanti Group, Tan has worked to share Vemanti's strategy and vision with customers, partners, shareholders, and investors. His mission is to turn Vemanti into an investment and incubation platform for emerging companies with great growth potential, especially in Vietnam which continues to be an economic force on both a regional and global scale. He attended California State University, Fullerton with B.S.E.E. Mr. Tran's management and extensive experience and his role as founder of VoiceStep led to the conclusion that he should serve as a director of Vemanti.

**Rachel Boulds:** Ms. Boulds, age 51, has been our Company's Director since January 2021. Ms. Boulds was appointed as the Company's Chief Financial Officer and served in that capacity from May 2016 through October 2018, when she resigned. Ms. Boulds rejoined the Company as a Director earlier this year. Ms. Boulds specializes in preparation of full disclosure financial statements for public companies to comply with GAAP and SEC requirements. Prior to joining our Company, Ms. Boulds worked as a senior auditor for HJ & Associates, LLC, where she performed audits and reviews for public and private companies. Ms. Boulds holds a Bachelor's degree in Accounting from San Jose State University. Ms. Bould's leadership experience makes her well qualified to serve as a director on our board.

*Table of Contents*

**Family Relationships**

There are no family relationships among our directors.

**Involvement in Certain Legal Proceedings**

During the past ten years no current director, executive officer, promoter or control person of the Company has been involved in the following:

(1) A petition under the Federal bankruptcy laws or any state insolvency law which was filed by or against, or a receiver, fiscal agent or similar officer was appointed by a court for the business or property of such person, or any partnership in which he was a general partner at or within two years before the time of such filing, or any corporation or business association of which he was an executive officer at or within two years before the time of such filing;

(2) Such person was convicted in a criminal proceeding or is a named subject of a pending criminal proceeding (excluding traffic violations and other minor offenses);

(3) Such person was the subject of any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining him from, or otherwise limiting, the following activities:

i. Acting as a futures commission merchant, introducing broker, commodity trading advisor, commodity pool operator, floor broker, leverage transaction merchant, any other person regulated by the Commodity Futures Trading Commission, or an associated person of any of the foregoing, or as an investment adviser, underwriter, broker or dealer in securities, or as an affiliated person, director or employee of any investment company, bank, savings and loan association or insurance company, or engaging in or continuing any conduct or practice in connection with such activity;

ii. Engaging in any type of business practice; or

iii. Engaging in any activity in connection with the purchase or sale of any security or commodity or in connection with any violation of Federal or State securities laws or Federal commodities laws;

(4) Such person was the subject of any order, judgment or decree, not subsequently reversed, suspended or vacated, of any Federal or State authority barring, suspending or otherwise limiting for more than 60 days the right of such person to engage in any activity described in paragraph (f)(3)(i) of this section, or to be associated with persons engaged in any such activity;

(5) Such person was found by a court of competent jurisdiction in a civil action or by the Commission to have violated any Federal or State securities law, and the judgment in such civil action or finding by the Commission has not been subsequently reversed, suspended, or vacated;

(6) Such person was found by a court of competent jurisdiction in a civil action or by the Commodity Futures Trading Commission to have violated any Federal commodities law, and the judgment in such civil action or finding by the Commodity Futures Trading Commission has not been subsequently reversed, suspended or vacated;

30

(7) Such person was the subject of, or a party to, any Federal or State judicial or administrative order, judgment, decree, or finding, not subsequently reversed, suspended or vacated, relating to an alleged violation of:

      i. Any Federal or State securities or commodities law or regulation; or

      ii. Any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent injunction, order of disgorgement or restitution, civil money penalty or temporary or permanent cease-and-desist order, or removal or prohibition order; or

      iii. Any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or

(8) Such person was the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any self-regulatory organization (as defined in Section 3(a)(26) of the Exchange Act (15 U.S.C. 78c(a)(26))), any registered entity (as defined in Section 1(a)(29) of the Commodity Exchange Act (7 U.S.C. 1(a)(29))), or any equivalent exchange, association, entity or organization that has disciplinary authority over its members or persons associated with a member.

**Board Committees**

      The Company has a formal Audit Committee as of January 2021. Rachel Boulds is a member of the Audit Committee . The Company does not have a formal Nominating Committee or Compensation Committee. As the Company's business expands, the directors will evaluate the necessity of such committees.

**Code of Ethics**

      The Company adopted a code of ethics policy to apply to its principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions on February 23, 2016.

31

## ITEM 6. EXECUTIVE COMPENSATION.

The following table sets forth information concerning all cash and non-cash compensation awarded to, earned by or paid to our Chief Executive Officer with compensation exceeding $100,000 during 2020 ("Named Executive Officer").

### SUMMARY COMPENSATION TABLE

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Option Awards ($)(2) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Tan Tran | 2020 | $ 40,000 | 0 | 0 | $ 0 | $ 40,000 |
| | 2019 | $ 134,000 | 0 | 0 | $ 8,234 | $ 142,234 |

### Employment Agreements with Key Executives

None.

### Director Compensation

There is currently no agreement or arrangement to pay any of our directors for their services as directors.

### Outstanding Equity Awards at Fiscal Year-End

There are no current outstanding equity awards as of December 31, 2020.

### Long-Term Incentive Plans

There are no arrangements or plans in which we provide pension, retirement or similar benefits.

### Compensation Committee

We currently do not have a compensation committee of the Board of Directors. The Board of Directors as a whole determines executive compensation.

### Compensation of Directors

For the years ended December 31, 2020 and 2019, no members of our board of directors received compensation in their capacity as directors.

## ITEM 7. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.

### Certain Relationships and Related Transactions

On November 13, 2018, the Company purchased a 20% interest in Fvndit, Inc.. f/k/a Directus Holdings, Inc., which owns eLoan, JSC ("eLoan"), a fintech company based in Vietnam, for $300,000. Half of the purchase price was made through a cash payment of $150,000, and the remaining half of the purchase price was made through the issuance of 1,252,086 shares of Vemanti Group's common stock to the founders of eLoan.

On October 5, 2020, Fvndit issued 500,000 shares of common stock to Tan Tran, CEO and majority shareholder of Vemanti. Mr. Tran and Vemanti together own 8,500,000 shares or 20.99% of Fvndit's total outstanding shares.

On August 9, 2019 Vemanti entered into an agreement to lend $200,000 to Fvndit for the purpose of developing a peer-to-peer business lending platform operating in Vietnam. The annual interest rate on the loan is 10.5% payable monthly to Vemanti. On August 12, 2019 Fvndit drew down the full $200,000. The entire loan was subsequently repaid in full by August 12, 2020.

Tan Tran served as an Officer and Director for Fvndit from October 2018 until March 2021, when he resigned. Tan Tran is not affiliated with Thomas Duc Tran, who was appointed Chairman, CEO, President, Secretary, and Treasurer of Fvndit on March 16, 2021.

**Material Transactions with Related Parties**

On May 15, 2019, the Company transferred assets with a fair market value of $8,243 to Mr. Tran in exchange for services rendered.

Since 2019, The Company has paid for some administrative expenses on behalf of Fvndit. The balance of those payments were $24,498 for the year ended December 31, 2020 and $17,109 for the year ended December 31, 2019.

The Company pays the Chief Executive Officer for professional services. The total of those payments were $40,000 in 2020, and $134,000 in 2019.

VoiceStep pays a member of the Chief Executive Officer's family for technical services. The total of those payments were $40,000 in 2020, and $48,000 in 2019.

**Review, Approval and Ratification of Related Party Transactions**

Given our small size and limited financial resources, we have not adopted formal policies and procedures for the review, approval or ratification of transactions, such as those described above, with our executive officer(s), Director(s) and significant stockholders. We intend to establish formal policies and procedures in the future, once we have sufficient resources and have appointed additional Directors, so that such transactions will be subject to the review, approval or ratification of our Board of Directors, or an appropriate committee thereof. On a moving forward basis, our Directors will continue to approve any related party transaction.

**Director Independence**

Our board of directors is currently composed of three members, two of whom qualify as independent directors in accordance with the published listing requirements of the NASDAQ Global Market. The NASDAQ independence definition includes a series of objective tests, such as that the director is not, and has not been for at least three years, one of our employees and that neither the director, nor any of his family members has engaged in various types of business dealings with us.

**ITEM 8. LEGAL PROCEEDINGS.**

The Company is not a party to any legal proceedings nor is the Company aware of any pending or threatened litigation.

**ITEM 9. MARKET PRICE OF AND DIVIDENDS ON THE REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS.**

Our common stock is currently quoted on the OTCQB under the trading symbol "VMNT". Trading in stocks quoted on the OTC Markets is often thin and is characterized by wide fluctuations in trading prices due to many factors that may have little to do with a company's operations or business prospects. We cannot assure you that there will be a market for our common stock in the future.

There is no active trading market for our common stock.

As of June 30, 2021, we had 69,689,086 shares of our Common Stock, par value $0.0001, issued and outstanding. There were 76 beneficial owners of our Common Stock.

33

**Penny Stock Regulations**

The Securities and Exchange Commission has adopted regulations which generally define "penny stock" to be an equity security that has a market price of less than $5.00 per share. Our Common Stock is currently within the definition of a penny stock and will be subject to rules that impose additional sales practice requirements on broker-dealers who sell such securities to persons other than established customers and accredited investors (generally those with assets in excess of $1,000,000, or annual incomes exceeding $200,000 individually, or $300,000, together with their spouse).

For transactions covered by these rules, the broker-dealer must make a special suitability determination for the purchase of such securities and have received the purchaser's prior written consent to the transaction. Additionally, for any transaction, other than exempt transactions, involving a penny stock, the rules require the delivery, prior to the transaction, of a risk disclosure document mandated by the SEC relating to the penny stock market. The broker-dealer also must disclose the commissions payable to both the broker-dealer and the registered representative, current quotations for the securities and, if the broker-dealer is the sole market-maker, the broker-dealer must disclose this fact and the broker-dealer's presumed control over the market. Finally, monthly statements must be sent disclosing recent price information for the penny stock held in the account and information on the limited market in penny stocks. Consequently, the "penny stock" rules may restrict the ability of broker-dealers to sell our Common Stock and may affect the ability of investors to sell their Common Stock in the secondary market.

In addition to the "penny stock" rules promulgated by the Securities and Exchange Commission, the Financial Industry Regulatory Authority ("FINRA") has adopted rules that require that in recommending an investment to a customer, a broker-dealer must have reasonable grounds for believing that the investment is suitable for that customer. Prior to recommending speculative low priced securities to their non-institutional customers, broker-dealers must make reasonable efforts to obtain information about the customer's financial status, tax status, investment objectives and other information. Under interpretations of these rules, FINRA believes that there is a high probability that speculative low-priced securities will not be suitable for at least some customers. The FINRA requirements make it more difficult for broker-dealers to recommend that their customers buy our Common Stock, which may limit the investors' ability to buy and sell our stock.

**Dividend Policy**

We have not paid any cash dividends since our inception. Any future determination as to the declaration and payment of dividends on shares of our Common Stock will be made at the discretion of our board of directors out of funds legally available for such purpose. We are under no contractual obligations or restrictions to declare or pay dividends on our shares of Common Stock. In addition, we currently have no plans to pay such dividends. Our board of directors currently intends to retain all earnings for use in the business for the foreseeable future.

34

**Equity Compensation Plan Information**

The Company has a formal Stock Incentive Plan (the "Plan"), which was adopted in March 25, 2015, which is filed as an exhibit and incorporated herein by reference. 5,000,000 shares of the Company's common stock was reserved for awards in the Plan. No awards have been granted since the Plan's adoption in March 2015.

**Purchases of Equity Securities by the Registrant and Affiliated Purchaser**

We have not repurchased any shares of our common stock during the fiscal years ended December 31, 2020, or 2019, respectively.

**ITEM 10. RECENT SALES OF UNREGISTERED SECURITIES.**

The following information represents securities sold by the Company within the past three years which were not registered under the Securities Act. Included are sales of reacquired securities, as well as new issues, securities issued in exchange for property, services, or other securities, and new securities resulting from the modification of outstanding securities.

Between January 23, 2018 and June 11, 2021, the Company issued 4,881,086 shares of common stock in consideration of 1,138,100. Each purchaser of the Company's securities is an accredited investor as defined under Rule 501 of Regulation D of the Act.

On October 29, 2018, the Company issued 626,043 shares of common stock to Trung Viet Vo in consideration for the Company's 20% ownership interest in Fvndit f/k/a Directus Holdings, Inc.

On October 29, 2018, the Company issued 626,043 shares of common stock to Thomas Duc Tran in consideration for the Company's 20% ownership interest in Fvndit f/k/a Directus Holdings, Inc.

On March 29, 2019, the Company issued 300,000 shares of common stock to Dennis Gumm, an individual, as payment for his consulting services to the Company.

On April 1, 2019, the Company issued 3,250,000 shares of common stock to the Chenyuan Anthony Chen, an individual, as payment for his consulting services to the Company.

The issuances of the shares described above were exempt from registration under Section 4(a)(2) and/or Rule 506(b) of Regulation D as promulgated by the Securities and Exchange Commission under the Securities Act, as transactions by an issuer not involving any public offering. The foregoing issuances did not involve any underwriters, underwriting discounts or commissions, or any public offering and we believe are exempt from the registration requirements of the Securities Act of 1933 by virtue of Section 4(2) thereof.

**ITEM 11. DESCRIPTION OF REGISTRANT'S SECURITIES TO BE REGISTERED.**

**Common Stock**

The Company's outstanding shares of common stock have a par value of $0.0001 per share. The Company's Articles of Incorporation (the "Articles of Incorporation") authorizes 500,000,000 shares of common stock. There are 69,689,086 total shares outstanding of which 21,520,000 shares in the public float as of June 30, 2021. The holders of common stock are entitled to one vote per share on all matters submitted to a vote of the stockholders. Holders of common stock do not have cumulative voting rights.

35

Holders of Common Stock do not have any preference, preemptive rights or right of subscription to acquire shares of the Company's authorized, issued, or sold, or to be authorized, issued or sold, or any obligations, nor any right of subscription thereto, other than to the extent, if any, the Board of Directors, in its sole discretion, may determine from time to time.

**No Cumulative Voting**

Except as may be provided by the resolutions of the Board of Directors authorizing the issuance of common stock, cumulative voting by any shareholder is expressly denied.

**Rights upon Liquidation, Dissolution or Winding-Up of the Company**

Upon any liquidation, dissolution or winding-up of the corporation, whether voluntary or involuntary, the remaining net assets of the Company shall be distributed pro rata to the holders of the common stock.

**Preferred Stock**

The Articles of Incorporation also authorizes 50,000,000 shares of preferred stock, par value $0.0001 per share. The purpose of authorizing the Board of Directors to issue preferred stock and determine its rights and preferences is to eliminate delays associated with a shareholder vote on specific issuances. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions, future financings and other corporate purposes, could have the effect of making it more difficult for a third party to acquire, or could discourage a third party from seeking to acquire, a majority of the Company's outstanding voting stock. Additionally, the issuance of preferred stock may adversely affect the holders of the Company's common stock by restricting dividends on the Company's common stock, diluting the voting power of the Company's common stock or subordinating the liquidation rights of the Company's common stock. As a result of these or other factors, the issuance of preferred stock could have an adverse impact on the market price of the Company's common stock.

The Articles of Incorporation were amended on May 1, 2014 designating 40,000,000 shares of authorized and issued preferred stock of the Company as "Series A Preferred Stock" with voting rights, preferences and powers such that each share of Series A Preferred Stock shall vote as a class on all issues to which shareholders of common stock have a right to vote but shall have ten (10) votes per share of Series A Preferred stock while the shares of Common Stock shall have one vote per share. There are 40,000,000 of Series A Preferred Stock outstanding.

**ITEM 12. INDEMNIFICATION OF DIRECTORS AND OFFICERS.**

Under our Bylaws, every person who was or is a party to, or is threatened to be made a party to, or is involved in any action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of the fact that he, or a person of whom he is the legal representative, is or was a director or officer of the Company, or is or was serving at the request of the Company as a director or officer of another corporation, or as its representative in a partnership, joint venture, trust, or other enterprise, shall be indemnified and held harmless to the fullest extent legally permissible under the laws of the State of Nevada from time to time against all expenses, liability, and loss (including attorneys' fees judgments, fines, and amounts paid or to be paid in settlement) reasonably incurred or suffered by him in connection therewith. Such right of indemnification shall be a contract right, which may be enforced in any manner desired by such person. The expenses of officers and directors incurred in defending a civil or criminal action, suit, or proceeding must be paid by the Company as they are incurred and in advance of the final disposition of the action, suit, or proceeding, upon receipt of an undertaking by or on behalf of the director or officer to repay the amount if it is ultimately determined by a court of competent jurisdiction that he is not entitled to be indemnified by the company. Such right of indemnification shall not be exclusive of any other right which such directors, officers, or representatives may have or hereafter acquire, and, without limiting the generality of such statement, they shall be entitled to their respective rights of indemnification under any bylaw, agreement, vote of shareholders, provision of law, or otherwise.

Without limiting the application of the foregoing, the Board of Directors may adopt bylaws from time to time with respect to indemnification, to provide at all times the fullest indemnification permitted by the laws of the State of Nevada, and may cause the Company to purchase and maintain insurance on behalf of any person who is or was a director or officer of the Company, or is or was serving at the request of the Company as a director or officer of another corporation, or as its representative in a partnership, joint venture, trust, or other enterprise against any liability asserted against such person and incurred in any such capacity or arising out of such status, whether or not the Company would have the power to indemnify such person. The indemnification provided shall continue as to a person who has ceased to be a director, officer, employee, or agent, and shall inure to the benefit of the heirs, executors and administrators of such person.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling the Company pursuant to the foregoing provisions, the Company has been informed that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

We have not entered into any agreements with our directors and executive officers that require us to indemnify these persons against expenses, judgments, fines, settlements and other amounts actually and reasonably incurred (including expenses of a derivative action) in connection with any proceeding, whether actual or threatened, to which any such person may be made a party by reason of the fact that the person is or was a director or officer of our Company or any of our affiliated enterprises. We do not maintain any policy of directors' and officers' liability insurance that insures its directors and officers against the cost of defense, settlement or payment of a judgment under any circumstances.

**ITEM 13. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

<div align="center">

**CONSOLIDATED FINANCIAL STATEMENTS**

**DECEMBER 31, 2020 AND 2019 (AUDITED)**

**Vemanti Group, Inc.**

**CONSOLIDATED FINANCIAL STATEMENTS**

December 31, 2020 and 2019

With Report of Independent Registered Public Accounting Firm Thereon

37

</div>

**TABLE OF CONTENTS**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Financial Statements: | |
| Consolidated Balance Sheets | F-3 |
| Consolidated Statements of Operations | F-4 |
| Consolidated Statements of Stockholders' Equity | F-5 |
| Consolidated Statements of Cash Flows | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

F-1

18012 Sky Park Circle, Suite 200
Irvine, California 92614
tel 949-852-1600
fax 949-852-1606
www.rjicpas.com

Report of Independent Registered Public Accounting Firm

To the Stockholders and Board of Directors
Vemanti Group, Inc.

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Vemanti Group, Inc. and Subsidiary (the "Company"), as of December 31, 2020 and 2019, and the related consolidated statements of operations, stockholders' equity and cash flows for the years then ended, and the related notes to the consolidated financial statements.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of their operations and their cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Security and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error fraud and performing procedures that respond to those risks. Such procedures include examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

Critical audit matters are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee that (1) relate to accounts or disclosures that are material to the consolidated financial statements and (2) involved challenging, subjective, or complex judgements. We determined that there are no critical audit matters.

*/s/ Ramirez Jimenez International CPAs*

We have served as the Company's auditor since 2017
Irvine, California
March 24, 2021

F-2

**Vemanti Group, Inc. and Subsidiary**
**Consolidated Balance Sheets**

| | | December 31, 2020 | | December 31, 2019 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current Assets: | | | | |
| Cash | $ | 243,494 | $ | 118,806 |
| Accounts receivable | | 1,224 | | 2,235 |
| Loan to Fvndit, Inc | | - | | 200,000 |
| Due from Fvndit, Inc | | 24,498 | | 17,109 |
| Total Current Assets | | 269,216 | | 338,150 |
| | | | | |
| Equipment, net | | 1,373 | | 2,114 |
| Other assets | | 298,056 | | 306,559 |
| TOTAL ASSETS | $ | 568,645 | $ | 646,823 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| | | | | |
| Current Liabilities: | | | | |
| Accounts payable | $ | 1,077 | $ | 914 |
| Accrued expenses | | - | | 2,078 |
| Deferred revenues | | 613 | | - |
| Total Current Liabilities | | 1,690 | | 2,992 |
| TOTAL LIABILITIES | | 1,690 | | 2,992 |
| | | | | |
| STOCKHOLDERS' EQUITY: | | | | |
| Preferred stock, $0.0001 par value, 50,000,000 shares authorized; 40,000,000 shares issued and outstanding | | 4,000 | | 4,000 |
| Common stock, $0.0001 par value, 500,000,000 shares authorized; 68,984,086 shares issued and outstanding as of December 31, 2020 and 2019 | | 6,898 | | 6,898 |
| Additional paid-in capital | | 2,215,020 | | 2,215,020 |
| Accumulated deficit | | (1,658,963) | | (1,582,087) |
| Total stockholders' equity | | 566,955 | | 643,831 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ | 568,645 | $ | 646,823 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-3

**Vemanti Group, Inc. and Subsidiary**
**Consolidated Statements of Operations**

| | For the Years Ended December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Sales | $ 162,292 | $ 326,840 |
| Cost of sales | 36,016 | 64,008 |
| Gross margin | 126,276 | 262,832 |
| | | |
| Operating expenses: | | |
| General and administrative expenses | 210,691 | 506,003 |
| Total operating expenses | 210,691 | 506,003 |
| Loss from operations | (84,415) | (243,171) |
| | | |
| Other income (expense): | | |
| Other income | 17,690 | 10,751 |
| Unrealized gain/(loss) | (8,503) | 6,559 |
| Total other income (expense) | 9,187 | 17,310 |
| | | |
| Loss before provision for income taxes | (75,228) | (225,861) |
| | | |
| Provision for income taxes | 1,648 | - |
| | | |
| Net loss | $ (76,876) | $ (225,861) |
| | | |
| Loss per share: | | |
| Basic | $ (0.00) | $ (0.00) |
| Diluted | $ (0.00) | $ (0.00) |
| | | |
| Weighted average shares outstanding: | | |
| Basic | 68,984,086 | 68,101,483 |
| Diluted | 68,984,086 | 68,101,483 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-4

**Vemanti Group, Inc. and Subsidiary**
**Consolidated Statements of Stockholders' Equity**

| | Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | |
| Balance, December 31, 2018 | 40,000,000 | $ 4,000 | 65,434,086 | $ 6,543 | $ 2,041,792 | $ (1,356,226) | $ 696,109 |
| Stock issued for professional services | - | - | 3,550,000 | 355 | 173,228 | - | 173,583 |
| Net loss | - | - | - | - | - | (225,861) | (225,861) |
| Balance, December 31, 2019 | 40,000,000 | 4,000 | 68,984,086 | 6,898 | 2,215,020 | (1,582,087) | 643,831 |
| Net loss | - | - | - | - | - | (76,876) | (76,876) |
| Balance, December 31, 2020 | 40,000,000 | $ 4,000 | 68,984,086 | $ 6,898 | $ 2,215,020 | $ (1,658,963) | $ 566,955 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-5

**Vemanti Group, Inc. and Subsidiary**
**Consolidated Statements of Cash Flows**

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2020 | | 2019 | |
| Cash flows from operating activities: | | | | |
| Net loss | $ | (76,876) | $ | (225,861) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Depreciation and amortization | | 741 | | 741 |
| Unrealized (gain)/loss from investment in Fvndit | | 8,503 | | (6,559) |
| Disposal of digital assets | | - | | 3,921 |
| Stock-based compensation | | - | | 173,583 |
| Changes in assets and liabilities: | | | | |
| Accounts receivable | | 1,011 | | 4,260 |
| Other current assets | | (7,389) | | (17,109) |
| Accounts payable | | 163 | | (932) |
| Accrued expenses | | (2,078) | | (41,597) |
| Deferred revenues | | 613 | | - |
| Net cash used in operating activities | | (75,312) | | (109,553) |
| | | | | |
| Cash flows from investing activities: | | | | |
| Proceeds from cancellation of investment in Chopp, Inc. | | - | | 25,000 |
| Proceeds from loan repayment by Fvndit | | 200,000 | | - |
| Loan to Fvndit | | - | | (200,000) |
| Net cash provided by (used in) investing activities | | 200,000 | | (175,000) |
| | | | | |
| Net (decrease) increase in cash | | 124,688 | | (284,553) |
| | | | | |
| Cash, beginning of the year | | 118,806 | | 403,359 |
| | | | | |
| Cash, end of the year | $ | 243,494 | $ | 118,806 |
| | | | | |
| Supplemental disclosure of cash flow information: | | | | |
| Cash paid for interest | $ | 25 | $ | - |
| Income taxes | $ | 1,665 | $ | - |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-6

**Vemanti Group, Inc. and Subsidiary**
**Notes to Consolidated Financial Statements**
**December 31, 2020 and 2019**

**NOTE 1 - Organization and Basis of Presentation**

Organization and Line of Business

Vemanti Group, Inc., ("Vemanti") was incorporated on April 3, 2014 under the laws of the state of Nevada. VoiceStep Telecom, LLC, a California limited liability company, was formed on January 27, 2005 and originally founded in 2002 ("VoiceStep"). On April 3, 2014, the sole member of VoiceStep exchanged 100% of his membership interest in VoiceStep for 40,000,000 shares of Vemanti's common stock and 40,000,000 shares of Vemanti's preferred stock. Vemanti and its wholly-owned subsidiary, VoiceStep is hereafter referred to as the "Company."

The Company is a technology-driven holding company that seeks to be active in high-growth and emerging markets. Its core strengths are in technology development and investment. It drives growth through acquisition and investment in disruptive and foundational technologies by targeting early-stage companies that have market viable products or by starting a new subsidiary of its own. Strategically, it focuses mainly on blockchain projects and applications combined with other emerging technologies, including machine learning/AI, security and internet of things (IoT).

Currently, through VoiceStep, the Company provides a one-stop resource for IP (Internet Protocol) communication needs. VoiceStep's network offers availability, coverage and flexibility, and enables the following technology solutions: unified communications, data center services, content delivery, voice over IP (VoIP) and cloud computing. VoiceStep's core customer base is largely made up of wholesale International prepaid calling operators. That aspect of its business has eroded drastically due to wide consumer adoption of free messaging apps such as Viber, WhatsApp, Facebook, Facetime, WeChat, etc. Its declined year over year revenues are a result of those wholesale customers slowly exiting the market. It's now focusing mostly on small business customers with better retention.

Management's Plans

The Company reported net losses in the amount of approximately $76,876 and $225,861, in 2020 and 2019, respectively, and used cash in operating activities in the amount of approximately $75,312 and $109,553 in 2020 and 2019, respectively. As of December 31, 2020, the Company had positive working capital in the amount of approximately $267,526 and total stockholders' equity of approximately $566,000. Subsequent to December 31, 2020, the Company issued 250,000 common shares at $0.46 per share for $115,000, and 80,000 common shares at $1.25 per share for $100,000.

Due to the global and distributed nature of the workforce, businesses today demands service providers to offer not only simple voice and data services, but also fully integrated productivity and coloration tools such as Customer Relationship Management (CRM), call center, team and video messaging, and e-conferencing to bring their teams and customers together on one single business communications platform. In order to match those demands, the Company would need to revamp and re-engineer its current platform as well as adding a large team of product and business developers which would require a sizable upfront investment. Currently, the Company simply does not have the capital committed for such development, so there are no plans to further grow VoiceStep's core business. Furthermore, the market is already saturated with much more established players. Going forward, the Company will focus its business development activities in the fintech sector to achieve future revenues and profits. Management believes it will be able to generate sufficient cash from operating activities to fully operate the Company during 2021 and beyond.

Risk and Uncertainties

The Company's operations may be affected by the rent and ongoing outbreak of the coronavirus disease 2019 (Covid-19) which has been declared a pandemic by the World Health Organization in early 2020. The ultimate disruption which may be caused by the outbreak is uncertain; however, it may result in a material adverse impact on the Company's consolidated financial position, operations and cash flows. Possible areas that may be affected include, but are not limited to, disruption to the Company's labor workforce, unavailability of products and supplies used in operations, and the decline in value of assets held by the Company, including property and equipment. Currently, the Company is unable to determine the impact that Covid-19 may have.

*Table of Contents*

**Vemanti Group, Inc. and Subsidiary**
**Notes to Consolidated Financial Statements**
**December 31, 2020 and 2019**

**NOTE 2 – Summary of Significant Accounting Policies**

Basis of Presentation

The consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiary, VoiceStep. All significant intercompany transactions and balances have been eliminated.

Use of Estimates

The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates made by management include, among others, revenue recognition, recoverability of accounts receivable, and investments. Actual results could differ from those estimates. It is possible that accounting estimates and assumptions may be material to the Company due to the levels of subjectivity and judgment involved.

Cash and Cash Equivalents

Cash and cash equivalents include cash on hand and cash in time deposits, certificates of deposit, and all highly liquid debt instruments with original maturities of three months or less. As of December 31, 2020 and December 31, 2019, the Company had no cash equivalents.

Accounts Receivable

The Company regularly reviews its accounts receivable for collectability and establishes an allowance for doubtful accounts as necessary using the allowance method. The receivables are not collateralized.

The Company estimates the ability to collect receivables by performing ongoing credit evaluations of its customers' financial condition. Estimates are based on assumptions and other considerations, including payment history, credit ratings, customer financial performance, industry financial performance and aging analysis. The Company reviews its accounts receivable by aging category and to identify customers with known disputes or collection issues. In determining the allowance, the Company makes judgments about the creditworthiness of a majority of its customers based on ongoing credit evaluations. The Company also considers its historical level of credit losses and current economic trends that might impact the level of future credit losses. Accounts receivable are written-off when they are deemed uncollectible.

Equipment

Equipment is stated at cost. Expenditures for maintenance and repairs are charged to earnings as incurred; additions, renewals and betterments are capitalized. When equipment is retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts, and any gain or loss is included in operations. Depreciation of equipment is provided using the straight-line method for substantially all assets with estimated lives as follows:

| | |
|---|---|
| Software licenses | 5 years |
| Computer equipment | 5 years |

F-8

**Vemanti Group, Inc. and Subsidiary**
**Notes to Consolidated Financial Statements**
**December 31, 2020 and 2019**

Long-Lived Assets

The Company applies the provisions of Accounting Standards Codification ("ASC") Topic 360, *Property, Plant, and Equipment*, which addresses financial accounting and reporting for the impairment or disposal of long-lived assets. ASC 360 requires impairment losses to be recorded on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. In that event, a loss is recognized based on the amount by which the carrying amount exceeds the fair value of the long-lived assets. Loss on long-lived assets to be disposed of is determined in a similar manner, except that fair values are reduced for the cost of disposal. Based on its review at December 31, 2020 and December 31, 2019, the Company believes there was no impairment of its long-lived assets.

Revenue Recognition

On January 1, 2019, the Company adopted the accounting standard ASC 606, *Revenue from Contracts with Customers*, for all open contracts and related amendments as of December 31, 2019 using the modified retrospective method. The adoption had no impact to the reported results.

The Company recognizes revenue in accordance with ASC 606, the core principle of which is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to receive in exchange for those goods or services. To achieve this core principle, five basic criteria must be met before revenue can be recognized: (1) identify the contract with a customer; (2) identify the performance obligation(s) in the contract; (3) determine the transaction price; (4) allocate the transaction price to performance obligation(s) in the contract; and (5) recognize revenue when or as the Company satisfies a performance obligation.

The Company recognizes revenues derived from sub-leasing telecommunications infrastructure and the provision of telecommunications and colocation services. These revenues are accounted for as a single performance obligation satisfied over time because the customer simultaneously receives and consumes the benefits of the Company's performance on a monthly basis. These arrangements stipulate monthly billing and the Company has elected the "as invoiced" practical expedient to recognize revenue as the services are consumed as the Company has the right to payment in an amount that corresponds directly with the value of performance completed to date.

Taxes collected from customers and remitted to a governmental authority are reported on a net basis and are excluded from revenue. Most revenue is billed in advance on a fixed-rate basis. The remainder of revenue is billed in arrears on a transactional basis determined by customer usage.

The Company often bills customers for upfront charges. These charges relate to down payments or prepayments for future services or equipment and are influenced by various business factors including how the Company and customer agree to structure the payment terms. These payments are recognized as deferred revenue until the service is provided or equipment is delivered and installed. All ongoing fees are billed and recognized as revenue on a monthly basis as service is provided.

Stock-Based Compensation

The Company records stock-based compensation in accordance with Financial Accounting Standards Board ("FASB") ASC Topic 718, *Compensation – Stock Compensation*. FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees. Nonemployee share-based payment equity awards are measured at the grant-date fair value of the equity instruments and recognized as an expense over the requisite service period.

**Vemanti Group, Inc. and Subsidiary**
**Notes to Consolidated Financial Statements**
**December 31, 2020 and 2019**

Income Taxes

The Company accounts for income taxes in accordance with FASB ASC Topic 740, *Income Taxes*. ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded.

Basic and Diluted Earnings (Loss) Per Share

Earnings (loss) per share is calculated in accordance with ASC Topic 260, *Earnings Per Share*. Basic earnings per share ("EPS") is based on the weighted average number of common shares outstanding. Diluted EPS is based on the assumption that all dilutive convertible shares and stock warrants were converted or exercised. Dilution is computed by applying the treasury stock method. Under this method, options and warrants are assumed to be exercised at the beginning of the period (or at the time of issuance, if later), and as if funds obtained thereby were used to purchase common stock at the average market price during the period. There are no potentially dilutive securities outstanding during any periods presented.

Fair Value Measurements

The Company applies the provisions of ASC 820-10, *"Fair Value Measurements and Disclosures."* ASC 820-10 defines fair value, and establishes a three-level valuation hierarchy for disclosures of fair value measurement that enhances disclosure requirements for fair value measures. The three levels of valuation hierarchy are defined as follows:

- Level 1 inputs to the valuation methodology are quoted prices for identical assets or liabilities in active markets.

- Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- Level 3 inputs to the valuation methodology are unobservable and significant to the fair value measurement.

For certain financial instruments, the carrying amounts reported in the consolidated balance sheets for cash and current liabilities, each qualify as financial instruments and are a reasonable estimate of their fair values because of the short period of time between the origination of such instruments and their expected realization and their current market rate of interest.

The Company used Level 1 inputs for its valuation methodology for digital assets by using Coinbase (coinbase.com, in United States Dollars). The digital assets were adjusted to the fair value at each period end, with any decreases in the fair value being recorded as a loss on the consolidated statement of operations.

F-10

**Vemanti Group, Inc. and Subsidiary**
**Notes to Consolidated Financial Statements**
**December 31, 2020 and 2019**

Recent Authoritative Guidance

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement* (Topic 820): *Disclosure Framework— Changes to the Disclosure Requirements for Fair Value Measurement*. The guidance is intended to improve the fair value measurement reporting of financial instruments including the effectiveness of the notes to financial statements by facilitating clearer communication, and it includes multiple new, eliminated and modified disclosure requirements. The guidance was effective for the Company as of January 1, 2020. The adoption of this guidance is not expected to have a material impact on the Company's consolidated financial statements.

In December 2019, the FASB issued ASU No. 2019-12 *Income Taxes* (Topic 740)—*Simplifying the Accounting for Income Taxes*. The guidance removes certain exceptions to the general income tax accounting principles and clarifies and amends existing guidance to facilitate consistent application of the accounting principles. The new guidance is effective for the Company as of January 1, 2021. The adoption of the amendments in this update is not expected to have a material impact on the Company consolidated financial position and results of operations.

Management does not believe any other recently issued but not yet effective accounting pronouncement, if adopted, would have a material impact effect on the Company's present or future financial statements.

**NOTE 3 – Digital Assets**

The following represents the change in digital assets:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| | **Cryptocurrencies** | |
| Beginning balance | $ - | $ 3,921 |
| Realized gain | - | 4,322 |
| Impairment Loss | - | - |
| Transfer of cryptocurrencies | - | (8,243) |
| Ending balance | $ - | $ - |

The Company does not record fair value gains (losses) associated with its digital assets. Cryptocurrencies are classified as intangible assets, and the Company tests these assets for impairment on an annual basis. In May 2019, the Company's entire digital assets balance was used to pay the CEO for services rendered (see note 10).

**NOTE 4 – Equipment**

Equipment at December 31, 2020 and December 31, 2019 consisted of the following:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Software licenses | $ 32,188 | $ 32,188 |
| Computer equipment | 17,080 | 17,080 |
| | 49,268 | 49,268 |
| Less accumulated depreciation | (47,895) | (47,154) |
| Equipment, net | $ 1,373 | $ 2,114 |

Depreciation expense was $741 for the years ended December 31, 2020 and 2019.

F-11

**Vemanti Group, Inc. and Subsidiary**
**Notes to Consolidated Financial Statements**
**December 31, 2020 and 2019**

**NOTE 5 – Stockholders' Equity**

Members' Interest

VoiceStep is governed by the terms and conditions of the Limited Liability Company Agreement (the Agreement) dated May 3, 2005, as amended on January 27, 2014. VoiceStep shall continue until terminated in accordance with the terms of the Agreement or as provided by law, including events of dissolution. VoiceStep shall be dissolved only upon any of the following events: (i) the vote of Member(s) holding a majority to the dissolution and winding up of VoiceStep, (ii) the entry of a decree of judicial dissolution of VoiceStep and (iii) at any time there are no Member(s), subject to remedy within 90 days of occurrence of termination event by the last remaining Member in writing.

VoiceStep originally consisted of two Members each owning 50% of VoiceStep. On January 27, 2014, one of the members was bought out with the remaining member owning 100% of the membership interest in VoiceStep. On April 3, 2014, the remaining member exchanged his 100% interest in VoiceStep for 40,000,000 shares of Vemanti common stock.

Preferred stock

The Company has authorized the issuance of 50,000,000 shares of preferred stock, $0.0001 par value. At both December 31, 2020 and December 31, 2019, the Company had 40,000,000 shares of preferred stock issued and outstanding. (See Note 1)

Common stock

The Company has authorized the issuance of 500,000,000 shares of common stock, $0.0001 par value. At December 31, 2020 and December 31, 2019, the Company had 68,984,086 shares of common stock issued and outstanding, respectively.

During the twelve months ended December 31, 2019, the Company issued 3,550,000 shares of its common stock with a fair value of $173,583 to consultants for services rendered.

During the twelve months ended December 31, 2020, the Company did not issue any shares of its common stock.

**NOTE 6 – Investment in Chopp, Inc.**

On July 17, 2018, the Company made a $25,000 Keep It Simple Security ("KISS") investment in Chopp, Inc. ("Chopp"), a Delaware-registered online logistics company that currently operates as a same-day e-grocery delivery service. The Company has recorded the investment under the cost method of accounting.

In June 2019, the Company cancelled its investment in Chopp, Inc. and received repayment of its $25,000 investment.

**NOTE 7 – Investment in Fvndit, Inc. (formerly Directus Holdings, Inc.)**

On November 13, 2018, the Company purchased a 20% investment in Directus Holdings, Inc., which owns eLoan, JSC ("eLoan"), a fintech company based in Vietnam, for $300,000. Half of the investment was made through a cash payment of $150,000, and the remaining half of the investment was made through the issuance of 1,252,086 shares of Vemanti Group's common stock to the Founders of eLoan. On December 19, 2018, Directus Holdings, Inc. filed a Certificate of Amendment to Articles of Incorporation to the State of Nevada for its corporation name to be changed to Fvndit, Inc.

On October 5, 2020, Fvndit issued 500,000 shares of common stock to Tan Tran, CEO and majority shareholder of Vemanti. The issuance raised the total number of Fvndit outstanding shares to 40,500,000.Mr. Tran and Vemanti together own 8,500,000 shares or 20.99% of total Fvndit outstanding shares. From October 2018 through March 2021, Tan Tran served as an O fficer and D irec tor of Fvndit.

F-12

**Vemanti Group, Inc. and Subsidiary**
**Notes to Consolidated Financial Statements**
**December 31, 2020 and 2019**

This investment is accounted for under the equity method of accounting. The equity method is applicable when a company has ownership in another company between 20% and 50% of the stock of the investee or if a company has significant influence over the other company. Under this accounting method, the investing company records the earning or loss of the investee for its proportional share of net income or loss. For 2020, Vemanti recorded $8,503 of unrealized loss on its investment in Fvndit. For 2019, Vemanti recorded $6,559 of unrealized gain on its investment in Fvndit.

**NOTE 8 – Loan to Fvndit, Inc. (formerly Directus Holdings, Inc.)**

Vemanti entered into an agreement to lend $200,000 to Fvndit for the purpose of developing a peer-to-peer business lending platform operating in Vietnam. The annual interest rate on the loan is 10.5% payable monthly to Vemanti. On August 12, 2019 Fvndit drew down the full $200,000.The entire loan was subsequently repaid in full in 2020.

**NOTE 9 – Income Taxes**

A reconciliation of the differences between the effective and statutory income tax rates for years ended December 31, 2020 and 2019 is as follows:

|  | 2020 | | 2019 | |
| --- | --- | --- | --- | --- |
|  | **Amount** | **Percent** | **Amount** | **Percent** |
| Federal statutory rates | $ (15,798) | 21.0% | $ (47,431) | 21.0% |
| State income taxes | (6,620) | 8.8% | (19,876) | 8.8% |
| Permanent differences | 946 | 21.00% | (915) | -0.4% |
| Valuation allowance | 21,472 | -28.54% | 66,392 | -29.8% |
| Effective rate | $ - | 0.0% | $ - | 0.0% |

At December 31, 2020 and 2019, there were no significant deferred tax assets, except for a net operating loss carryforwards for which a 100% valuation allowance has been provided.

The Company annually conducts an analysis of its tax positions and has concluded that it has no uncertain tax positions as of December 31, 2020 and 2019. The 2017 to 2019 tax years are still subject to federal audit. The 2016 to 2019 tax years are still subject to state audit.

The Company had $1,132,304 and $1,061,581 of net operating loss carryforwards available as of December 31, 2020 and 2019, respectively, for Federal and state tax purposes. Net operating loss carryforwards start to expire in 2039 or 20 years for federal income and state tax purposes.

**NOTE 10 – Related Party Transactions**

On May 15, 2019, the Company transferred assets with a fair market value of $8,243 to the CEO in exchange for services rendered.

Since 2019, The Company has paid for some administrative expenses on behalf of Fvndit. The balance of those payments were $24,498 for the year ended December 31, 2020 and $17,109 for the year ended December 31, 2019. From October 2018 through March 2021, Tan Tran served as an Officer and Director of Fvndit.

The Company pays the CEO for professional services. The total of those payments were $40,000 in 2020, and $134,000 in 2019.

VoiceStep pays a member of the CEO's family for technical services. The total of those payments were $40,000 in 2020, and $48,000 in 2019.

F-13

**Vemanti Group, Inc. and Subsidiary**
**Notes to Consolidated Financial Statements**
**December 31, 2020 and 2019**

**NOTE 11 – Subsequent Events**

The Company has evaluated subsequent events through March 24, 2021, the date on which the accompanying consolidated financial statements were available to be issued, and concluded that, no material subsequent events have occurred since December 31, 2020 that require recognition or disclosure in the consolidated financial statements except as follows:

On February 1, 2021, the Company issued 250,000 shares of common stock at $0.46 per share for $115,000.

On March 19, 2021, the Company issued 80,000 shares of common stock at $1.25 per share for $100,000.

F-14

**ITEM 13. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

**MARCH 31, 2021 AND DECEMBER 31, 2020 (UNAUDITED)**



F-15

**TABLE OF CONTENTS**

Consolidated Financial Statements:

| | |
|---|---|
| Consolidated Balance Sheets | F-17 |
| Consolidated Statements of Operations | F-18 |
| Consolidated Statements of Stockholders' Equity | F-19 |
| Consolidated Statements of Cash Flows | F-20 |
| Notes to Consolidated Financial Statements | F-21 |

F-16

**Vemanti Group, Inc. and Subsidiary**
**Consolidated Balance Sheets**
**(Unaudited)**

| | March 31, 2021 | December 31, 2020 |
|---|---:|---:|
| **ASSETS** | | |
| Current Assets: | | |
| Cash | $ 435,621 | $ 243,494 |
| Accounts receivable | 1,398 | 1,224 |
| Due from Fvndit, Inc. | 25,142 | 24,498 |
| Digital assets | 10,000 | - |
| Total current assets | 472,161 | 269,216 |
| | | |
| Equipment, net | 1,188 | 1,373 |
| Other assets | 296,405 | 298,056 |
| TOTAL ASSETS | $ 769,754 | $ 568,645 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current Liabilities: | | |
| Accounts payable | $ 7,766 | $ 1,077 |
| Deferred revenues | - | 613 |
| Total current liabilities | 7,766 | 1,690 |
| TOTAL LIABILITIES | 7,766 | 1,690 |
| | | |
| STOCKHOLDERS' EQUITY: | | |
| Preferred stock, $0.0001 par value, 50,000,000 shares authorized; 40,000,000 shares issued and outstanding | 4,000 | 4,000 |
| | | |
| Common stock, $0.0001 par value, 500,000,000 shares authorized; 69,364,086 and 68,984,086 shares issued and outstanding as of March, 31,2021, and December 31, 2020, respectively | 6,936 | 6,898 |
| | | |
| Additional paid-in capital | 2,479,982 | 2,215,020 |
| Accumulated deficit | (1,728,930) | (1,658,963) |
| Total stockholders' equity | 761,988 | 566,955 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 769,754 | $ 568,645 |

*The accompanying notes are an integral part of these unaudited consolidated financial statements.*

F-17

**Vemanti Group, Inc. and Subsidiary**
**Consolidated Statements of Operations**
**(Unaudited)**

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | | 2021 | | 2020 |
| Sales | $ | 36,243 | $ | 48,767 |
| Cost of sales | | 5,403 | | 10,465 |
| Gross margin | | 30,840 | | 38,302 |
| | | | | |
| Operating expenses: | | | | |
| General and administrative expenses | | 99,156 | | 78,459 |
| Total operating expenses | | 99,156 | | 78,459 |
| Loss from operations | | (68,316) | | (40,157) |
| | | | | |
| Other income (expense): | | | | |
| Interest income | | - | | 5,251 |
| Unrealized gain (loss) | | (1,651) | | - |
| Total other income (expense) | | (1,651) | | 5,251 |
| | | | | |
| Loss before provision for income taxes | | (69,967) | | (34,906) |
| | | | | |
| Provision for income taxes | | - | | (835) |
| | | | | |
| Net loss | $ | (69,967) | $ | (34,071) |
| | | | | |
| Loss per share: | | | | |
| Basic | $ | (0.00) | $ | (0.00) |
| Diluted | $ | (0.00) | $ | (0.00) |
| | | | | |
| Weighted average shares outstanding: | | | | |
| Basic | | 69,154,308 | | 68,984,086 |
| Diluted | | 69,154,308 | | 68,984,086 |

*The accompanying notes are an integral part of these unaudited consolidated financial statements.*

F-18

*Table of Contents*

**Vemanti Group, Inc. and Subsidiary**
**Consolidated Statements of Stockholders' Equity**
**(unaudited)**

| | Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | |
| Balance, December 31, 2020 | 40,000,000 | 4,000 | 68,984,086 | 6,898 | 2,215,020 | (1,658,963) | 566,955 |
| Stock issued for cash | - | - | 380,000 | 38 | 264,962 | - | 265,000 |
| Net loss | - | - | - | - | - | (69,967) | (69,967) |
| Balance, March 31, 2021 | 40,000,000 | $ 4,000 | 69,364,086 | $ 6,936 | $ 2,479,982 | $ (1,728,930) | $ 761,988 |

| | Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | |
| Balance, December 31, 2019 | 40,000,000 | 4,000 | 68,984,086 | 6,898 | 2,215,020 | (1,582,087) | 643,831 |
| Net loss | - | - | - | - | - | (34,071) | (34,071) |
| Balance, March 31, 2020 | 40,000,000 | $ 4,000 | 68,984,086 | $ 6,898 | $ 2,215,020 | $ (1,616,158) | $ 609,760 |

*The accompanying notes are an integral part of these unaudited consolidated financial statements.*

F-19

**Vemanti Group, Inc. and Subsidiary**
**Consolidated Statements of Cash Flows**
**(Unaudited)**

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Cash flows from operating activities: | | |
| Net loss | $ (69,967) | $ (34,071) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 185 | 185 |
| Unrealized (gain)/loss from investment in Fvndit | 1,651 | - |
| Changes in assets and liabilities: | | |
| Accounts receivable | (174) | (4,010) |
| Other current assets | (644) | (120) |
| Accounts payable | 6,689 | 2,161 |
| Accrued expenses | - | (1,904) |
| Deferred revenues | (613) | - |
| Net cash used in operating activities | (62,873) | (37,759) |
| | | |
| Cash flows from investing activities: | | |
| Purchase of digital assets | (10,000) | - |
| Net cash used in investing activities | (10,000) | - |
| | | |
| Cash flows from financing activities: | | |
| Issuance of common stock | 265,000 | - |
| Net cash provided by financing activities | 265,000 | - |
| | | |
| Net increase (decrease) in cash | 192,127 | (37,759) |
| | | |
| Cash, beginning of the period | 243,494 | 118,806 |
| | | |
| Cash, end of the period | $ 435,621 | $ 81,047 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid for: | | |
| Interest: | $ - | $ - |
| Income tax | $ - | $ - |

*The accompanying notes are an integral part of these unaudited consolidated financial statements.*

F-20

**Vemanti Group, Inc. and Subsidiary**
**Notes to Unaudited Consolidated Financial Statements**
**March 31, 2021 and December 31, 2020**

**NOTE 1 - Organization and Basis of Presentation**

Organization and Line of Business

Vemanti Group, Inc., ("Vemanti") was incorporated on April 3, 2014 under the laws of the state of Nevada. VoiceStep Telecom, LLC, a California limited liability company, was formed on January 27, 2005 and originally founded in 2002 ("VoiceStep"). On April 3, 2014, the sole member of VoiceStep exchanged 100% of his membership interest in VoiceStep for 40,000,000 shares of Vemanti's common stock and 40,000,000 shares of Vemanti's preferred stock. Vemanti and its wholly-owned subsidiary, VoiceStep is hereafter referred to as the "Company."

The Company is a technology-driven holding company that seeks to be active in high-growth and emerging markets. Its core strengths are in technology development and investment. It drives growth through acquisition and investment in disruptive and foundational technologies by targeting early-stage companies that have market viable products or by starting a new subsidiary of its own. Strategically, it focuses mainly on blockchain projects and applications combined with other emerging technologies, including machine learning/AI, security and internet of things (IoT).

Currently, through VoiceStep, the Company provides a one-stop resource for IP (Internet Protocol) communication needs. VoiceStep's network offers availability, coverage and flexibility, and enables the following technology solutions: unified communications, data center services, content delivery, voice over IP (VoIP) and cloud computing. VoiceStep's core customer base is largely made up of wholesale International prepaid calling operators. That aspect of its business has eroded drastically due to wide consumer adoption of free messaging apps such as Viber, WhatsApp, Facebook, Facetime, WeChat, etc. Its declined year over year revenues are a result of those wholesale customers slowly exiting the market. It's now focusing mostly on small business customers with better retention.

Management's Plans

The Company reported net losses in the amount of approximately $69,967 and $34,071, in the first quarter of 2021 and 2020, respectively, and used cash in operating activities in the amount of approximately $62,873 and $37,546 in the first quarter of 2021 and 2020, respectively. As of March 31, 2021, the Company had positive working capital in the amount of approximately $464,395 and total stockholders' equity of approximately $761,988.

Due to the global and distributed nature of the workforce, businesses today demands service providers to offer not only simple voice and data services, but also fully integrated productivity and coloration tools such as Customer Relationship Management (CRM), call center, team and video messaging, and e conferencing to bring their teams and customers together on one single business communications platform. In order to match those demands, the Company would need to revamp and re-engineer its current platform as well as adding a large team of product and business developers which would require a sizable upfront investment. Currently, the Company simply does not have the capital committed for such development, so there are no plans to further grow VoiceStep's core business. Furthermore, the market is already saturated with much more established players. Going forward, the Company will focus its business development activities in the fintech sector to achieve future revenues and profits. Management believes it will be able to generate sufficient cash from operating activities to fully operate the Company during 2021 and beyond.

Risk and Uncertainties

The Company's operations may be affected by the recent and ongoing outbreak of the coronavirus disease 2019 (Covid-19) which has been declared a pandemic by the World Health Organization in early 2020. The ultimate disruption which may be caused by the outbreak is uncertain; however, it may result in a material adverse impact on the Company's consolidated financial position, operations and cash flows. Possible areas that may be affected include, but are not limited to, disruption to the Company's labor workforce, unavailability of products and supplies used in operations, and the decline in value of assets held by the Company, including property and equipment. Currently, the Company is unable to determine the impact that Covid-19 may have.

**Vemanti Group, Inc. and Subsidiary**
**Notes to Unaudited Consolidated Financial Statements**
**March 31, 2021 and December 31, 2020**

**NOTE 2 – Summary of Significant Accounting Policies**

Basis of Presentation

These unaudited consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") for interim financial information. Accordingly, they do not include all of the information and footnotes required by U.S. GAAP for complete financial statements. In the opinion of management, all adjustments of a normal recurring nature and considered necessary for a fair presentation of its financial condition and results of operations for the interim periods presented in this quarterly report. Operating results of the interim periods are not necessarily indicative of financial results for the full year. These unaudited consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto. In preparing these unaudited consolidated financial statements, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities as of the date of the consolidated financial statements and the reported amount of revenues and expenses during the reporting periods. Actual results could differ from those estimates. Significant estimates and assumptions included in the Company's consolidated financial statements relate revenue recognition, allowances for doubtful accounts, valuations for deferred income taxes and recoverability of investments.

Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiary, VoiceStep. All significant intercompany transactions and balances have been eliminated.

Use of Estimates

The preparation of the consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. It is possible that accounting estimates and assumptions may be material to the Company due to the levels of subjectivity and judgment involved.

Cash and Cash Equivalents

Cash and cash equivalents include cash on hand and cash in time deposits, certificates of deposit, and all highly liquid debt instruments with original maturities of three months or less. As of March 31, 2021 and December 31, 2020, the Company had no cash equivalents.

Accounts Receivable

The Company regularly reviews its accounts receivable for collectability and establishes an allowance for doubtful accounts as necessary using the allowance method. The receivables are not collateralized.

The Company estimates the ability to collect receivables by performing ongoing credit evaluations of its customers' financial condition. Estimates are based on assumptions and other considerations, including payment history, credit ratings, customer financial performance, industry financial performance and aging analysis. The Company reviews its accounts receivable by aging category and to identify customers with known disputes or collection issues. In determining the allowance, the Company makes judgments about the creditworthiness of a majority of its customers based on ongoing credit evaluations. The Company also considers its historical level of credit losses and current economic trends that might impact the level of future credit losses. Accounts receivable are written-off when they are deemed uncollectible.

Equipment

Equipment is stated at cost. Expenditures for maintenance and repairs are charged to operations as incurred; additions, renewals and betterments are capitalized. When equipment is retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts, and any gain or loss is included in operations. Depreciation of equipment is provided using the straight-line method for substantially all assets with estimated lives as follows:

| | |
|---|---|
| Software licenses | 5 years |
| Computer equipment | 5 years |

F-22

**Vemanti Group, Inc. and Subsidiary**
**Notes to Unaudited Consolidated Financial Statements**
**March 31, 2021 and December 31, 2020**

Long-Lived Assets

The Company applies the provisions of Accounting Standards Codification ("ASC") Topic 360, *Property, Plant, and Equipment*, which addresses financial accounting and reporting for the impairment or disposal of long-lived assets. ASC 360 requires impairment losses to be recorded on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. In that event, a loss is recognized based on the amount by which the carrying amount exceeds the fair value of the long-lived assets. Loss on long-lived assets to be disposed of is determined in a similar manner, except that fair values are reduced for the cost of disposal. Based on its review at March 31, 2021 and December 31, 2020, the Company believes there was no impairment of its long-lived assets.

Revenue Recognition

On January 1, 2019, the Company adopted ASC 606, *Revenue from Contracts with Customers*, for all open contracts and related amendments as of December 31, 2019 using the modified retrospective method. The adoption had no impact to the reported results.

The Company recognizes revenue in accordance with ASC 606, the core principle of which is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to receive in exchange for those goods or services. To achieve this core principle, five basic criteria must be met before revenue can be recognized: (1) identify the contract with a customer; (2) identify the performance obligation(s) in the contract; (3) determine the transaction price; (4) allocate the transaction price to performance obligation(s) in the contract; and (5) recognize revenue when or as the Company satisfies a performance obligation.

The Company recognizes revenues derived from sub-leasing telecommunications infrastructure and the provision of telecommunications and colocation services. These revenues are accounted for as a single performance obligation satisfied over time because the customer simultaneously receives and consumes the benefits of the Company's performance on a monthly basis. These arrangements stipulate monthly billing and the Company has elected the "as invoiced" practical expedient to recognize revenue as the services are consumed as the Company has the right to payment in an amount that corresponds directly with the value of performance completed to date.

Taxes collected from customers and remitted to a governmental authority are reported on a net basis and are excluded from revenue. Most revenue is billed in advance on a fixed-rate basis. The remainder of revenue is billed in arrears on a transactional basis determined by customer usage.

The Company often bills customers for upfront charges. These charges relate to down payments or prepayments for future services or equipment and are influenced by various business factors including how the Company and customer agree to structure the payment terms. These payments are recognized as deferred revenue until the service is provided or equipment is delivered and installed. All ongoing fees are billed and recognized as revenue on a monthly basis as service is provided.

Stock-Based Compensation

The Company records stock-based compensation in accordance with Financial Accounting Standards Board ("FASB") ASC Topic 718, *Compensation – Stock Compensation*. FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees. Nonemployee share-based payment equity awards are measured at the grant-date fair value of the equity instruments and recognized as an expense over the requisite service period.

F-23

**Vemanti Group, Inc. and Subsidiary**
**Notes to Unaudited Consolidated Financial Statements**
**March 31, 2021 and December 31, 2020**

Income Taxes

The Company accounts for income taxes in accordance with ASC Topic 740, *Income Taxes*. ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded.

Basic and Diluted Earnings (Loss) Per Share

Earnings per share is calculated in accordance with ASC Topic 260, *Earnings Per Share*. Basic earnings per share ("EPS") is based on the weighted average number of common shares outstanding. Diluted EPS is based on the assumption that all dilutive convertible shares and stock warrants were converted or exercised. Dilution is computed by applying the treasury stock method. Under this method, options and warrants are assumed to be exercised at the beginning of the period (or at the time of issuance, if later), and as if funds obtained thereby were used to purchase common stock at the average market price during the period. There are no potentially dilutive securities outstanding during any periods presented.

Fair Value Measurements

The Company applies the provisions of ASC 820-10, *"Fair Value Measurements and Disclosures."* ASC 820-10 defines fair value, and establishes a three-level valuation hierarchy for disclosures of fair value measurement that enhances disclosure requirements for fair value measures. The three levels of valuation hierarchy are defined as follows:

- Level 1 inputs to the valuation methodology are quoted prices for identical assets or liabilities in active markets.

- Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- Level 3 inputs to the valuation methodology are unobservable and significant to the fair value measurement.

For certain financial instruments, the carrying amounts reported in the balance sheets for cash investments, and current liabilities, each qualify as financial instruments and are a reasonable estimate of their fair values because of the short period of time between the origination of such instruments and their expected realization and their current market rate of interest.

At March 31, 2021 and December 31, 2020, the Company did not identify any assets or liabilities that are required to be presented on the balance sheet at fair value.

F-24

**Vemanti Group, Inc. and Subsidiary**
**Notes to Unaudited Consolidated Financial Statements**
**March 31, 2021 and December 31, 2020**

Recent Authoritative Guidance

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement* (Topic 820): *Disclosure Framework— Changes to the Disclosure Requirements for Fair Value Measurement*. The guidance is intended to improve the fair value measurement reporting of financial instruments including the effectiveness of the notes to financial statements by facilitating clearer communication, and it includes multiple new, eliminated and modified disclosure requirements. The guidance was effective for the Company as of January 1, 2020. The adoption of this guidance did not have a material impact on the Company's consolidated financial statements.

In December 2019, the FASB issued ASU No. 2019-12 *Income Taxes* (Topic 740)—*Simplifying the Accounting for Income Taxes*. The guidance removes certain exceptions to the general income tax accounting principles and clarifies and amends existing guidance to facilitate consistent application of the accounting principles. The new guidance is effective for the Company as of January 1, 2021. The adoption of the amendments in this update did not have a material impact on the Company consolidated financial position and results of operations.

Management does not believe any other recently issued but not yet effective accounting pronouncement, if adopted, would have a material impact effect on the Company's present or future financial statements.

**NOTE 3 – Digital Assets**

The following represents the change in digital assets:

| | March 31, 2021 | December 31, 2020 |
|---|---|---|
| | **Cryptocurrencies** | |
| Beginning balance | $        - | $        - |
| Purchase of cryptocurrencies | 10,000 | - |
| Gain or (Loss) | - | - |
| Ending balance | $   10,000 | $        - |

The Company does not record fair value gains (losses) associated with its digital assets.  Cryptocurrencies are classified as intangible assets, and the Company tests these assets for impairment on an annual basis.

**NOTE 4 – Equipment**

Equipment at March 31, 2021 and December 31, 2020 consisted of the following:

| | March 31, 2021 | December 31, 2020 |
|---|---|---|
| Software licenses | $   32,188 | $   32,188 |
| Computer equipment | 17,080 | 17,080 |
| | 49,268 | 49,268 |
| Less accumulated depreciation | (48,080) | (47,895) |
| Equipment, net | $   1,188 | $   1,373 |

Depreciation expense was $185 for both the three months ended March 31, 2021 and 2020.

F-25

**Vemanti Group, Inc. and Subsidiary**
**Notes to Unaudited Consolidated Financial Statements**
**March 31, 2021 and December 31, 2020**

**NOTE 5 – Stockholders' Equity**

Members' Interest

VoiceStep is governed by the terms and conditions of the Limited Liability Company Agreement (the Agreement) dated May 3, 2005, as amended on January 27, 2014. VoiceStep shall continue until terminated in accordance with the terms of the Agreement or as provided by law, including events of dissolution. VoiceStep shall be dissolved only upon any of the following events: (i) the vote of Member(s) holding a majority to the dissolution and winding up of VoiceStep, (ii) the entry of a decree of judicial dissolution of VoiceStep and (iii) at any time there are no Member(s), subject to remedy within 90 days of occurrence of termination event by the last remaining Member in writing.

VoiceStep originally consisted of two Members each owning 50% of VoiceStep. On January 27, 2014, one of the members was bought out with the remaining member owning 100% of the membership interest in VoiceStep. On April 3, 2014, the remaining member exchanged his 100% interest in VoiceStep for 40,000,000 shares of Vemanti common stock.

Preferred stock

The Company has authorized the issuance of 50,000,000 shares of preferred stock, $0.0001 par value. At both March 31, 2021 and December 31, 2020, the Company had 40,000,000 shares of preferred stock issued and outstanding. (See Note 1)

Common stock

The Company has authorized the issuance of 500,000,000 shares of common stock, $0.0001 par value. At March 31, 2021 and December 31, 2020, the Company had 69,364,086 shares and 68,984,086 shares of common stock issued and outstanding, respectively.

During the three months ended March 31, 2021, the Company, the Company issued 380,000 shares of its common stock for cash of $265,000.

**NOTE 6 – Investment in Fvndit, Inc., (formerly Directus Holdings, Inc.)**

On November 13, 2018, the Company purchased a 20% investment in Directus Holdings, Inc., which owns eLoan, JSC ("eLoan"), a fintech company based in Vietnam, for $300,000. Half of the investment was made through a cash payment of $150,000, and the remaining half of the investment was made through the issuance of 1,252,086 shares of Vemanti Group's common stock to the Founders of eLoan. On December 19, 2018, Directus Holdings, Inc. filed a Certificate of Amendment to Articles of Incorporation to the State of Nevada for its corporation name to be changed to Fvndit, Inc.

On October 5, 2020, Fvndit issued 500,000 shares of common stock to Tan Tran, CEO and majority shareholder of Vemanti. The issuance raised the total number of Fvndit outstanding shares to 40,500,000. Mr. Tran and Vemanti together owned 8,500,000 shares or 20.99% of total Fvndit outstanding shares at that time.

On March 16, 2021, Tan Tran resigned as an Officer and Director of Fvndit. On that same date, Fvndit issued 2,500,000 shares of common stock to Thomas Duc Tran, and appointed him as the Chairman, CEO, President, Secretary, and Treasurer of Fvndit. The issuance raised the total number of Fvndit outstanding shares to 43,000,000. As a result, Mr. Tran and Vemanti together own 19.77% of total Fvndit outstanding shares.

This investment is accounted for under the equity method of accounting. The equity method is applicable when a company has ownership in another company between 20% and 50% of the stock of the investee or if a company has significant influence over the other company. Under this accounting method, the investing company records the earning or loss of the investee for its proportional share of net income or loss. For 2020, Vemanti recorded $8,503 of unrealized loss on its investment in Fvndit. For the quarter ending March 31, 2021, Vemanti recorded $1,651 of unrealized loss on its investment in Fvndit.

**NOTE 7 – Loan to Fvndit, Inc. (formerly Directus Holdings, Inc.)**

On August 9, 2019, Vemanti entered into an agreement to lend $200,000 to Fvndit for the purpose of developing a peer-to-peer business lending platform operating in Vietnam.  The annual interest rate on the loan is 10.5% payable monthly to Vemanti. On August 12, 2019, Fvndit drew down the full $200,000. The entire loan was subsequently repaid in 2020.

F-26

**Vemanti Group, Inc. and Subsidiary**
**Notes to Unaudited Consolidated Financial Statements**
**March 31, 2021 and December 31, 2020**

**NOTE 8 – Related Party Transactions**

Since 2019, the Company has paid for some administrative expenses on behalf of Fvndit. The balance of those payments were $24,498 on December 31, 2020 and $25,142 on March 31, 2021 and are recorded as Due from Fvndit, Inc. on the accompanying consolidated balance sheet. From October 2018 through March 2021, Tan Tran served as an Officer and Director of Fvndit.

On October 5, 2020, Fvndit issued 500,000 shares of common stock to Tan Tran. The issuance raised the total number of Fvndit outstanding shares to 40,500,000.

The Company pays the CEO for professional services. The total of those payments were $40,000 in 2020, and no payment was made during the three months ended March 31, 2021.

VoiceStep pays a member of the CEO's family for technical services. The total of those payments were $40,000 in 2020, and $16,000 and $12,000 during the 3 months ended March 31, 2021 and March 31, 2020, respectively.

**NOTE 9 – Subsequent Events**

The Company has evaluated subsequent events through May 7, 2021, the date on which the accompanying consolidated financial statements were available to be issued, and concluded that, no material subsequent events have occurred since March 31, 2021 that require recognition or disclosure in the consolidated financial statements except as follows:

On April 1, 2021, the Company issued 50,000 shares of common stock at $1.00 per share for the total value of $50,000 in cash.

On April 28, 2021 the Company issued 150,000 shares of common stock to two consultants in exchange for professional services perform during the first quarter of 2021.  The stock price closed at $1.01 per share on that date. The total value of the issuance is $151,500.

F-27

**ITEM 14 CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

None

**ITEM 15. FINANCIAL STATEMENTS AND EXHIBITS.**

  *a)Financial Statements and Schedules*

The unaudited consolidated financial statements required to be field as part of this registration statement are included in Item 13 hereof.

  *b) Exhibits.*

The following exhibits are either filed as a part hereof or are incorporated by reference. Exhibit numbers correspond to the numbering system in Item 601 of Regulation S-K.

| Exhibit Number | Description of Document |
|---|---|
| **3.1*** | Articles of Incorporation of VoiceStep Telecom, LLC dated January 27, 2005. |
| **3.2*** | Articles of Incorporation of the Company dated April 3, 2014. |
| **3.3*** | Certificate of Amendment to the Articles of Incorporation of the Company dated May 1, 2014. |
| **3.4*** | Bylaws of the Company. |
| **10.1*** | Membership Interest Purchase Agreement between Mark Wehberg and Tan Tran dated January 22, 2014. |
| **10.2*** | Contribution Agreement between the Company and Tan Tran dated April 3, 2014. |
| **10.3*** | Note Agreement between the Company and Chopp, Inc. dated July 17, 2018. |
| **10.4*** | Note Cancellation Agreement between the Company and Chopp. Inc. dated June 27, 2019. |
| **10.5*** | Definitive Agreement between the Company, eLoan Joint Stock Company, eLoan Qualified Shareholders, eLoan Holdings Vietnam Joint Stock Company and Directus Holdings, Inc. dated July 10, 2018. |
| **10.6*** | Investment Agreement (short form) between the Company, eLoan Joint Stock Company and the eLoan Qualified Shareholders dated January 26, 2018. |
| **10.7*** | Loan Agreement between the Company and Fvndit, Inc. dated August 9, 2019. |
| **10.8*** | Form of VoiceStep Business Communications Service Agreement. |
| **21.1*** | List of subsidiaries of the Company |

* previously filed

*Table of Contents*

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

VEMANTI GROUP, INC.

Date: July 2, 2021

By: */s/ Tan Tran*
Name: Tan Tran
Title: President, Chief Executive Officer
and Chief Financial Officer
(Principal Executive Officer, Principal Financial
and Accounting Officer)

39

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

BARINDER SINGH "NABE" BAL,
Plaintiff,
v.
TAN TRAN, an individual; and VEMANTI GROUP, INC.,
a Nevada corporation,
Defendants.

Case No. _____

# EXHIBIT I

**WhatsApp Message Communications Between Plaintiff and Defendant Tan Tran**
**(with Related VMNT Investor-Group Messages)**

**June 7, 2020 – July 30, 2021**

**EXHIBIT I**

# EXHIBIT I — INDEX

The following sixty-five (65) screenshots are presented in two sections. Section A (authentication) precedes Section B (in-scope communications, in chronological order). Each screenshot bears its own date as displayed within the conversation.

## SECTION A — AUTHENTICATION & RELATIONSHIP FOUNDATION

| ID | Date | Description |
|---|---|---|
| A-1 | Pre-scope | Contact Information — WhatsApp Contact Info screen for Defendant Tan Tran, displaying name, photograph, and direct mobile number +1 (949) 378-4140 (Orange County, California). Offered for FRE 901 authentication of the identity of the sender of the messages reproduced below. |
| A-2 | June 7, 2020 | Relationship Foundation — First WhatsApp Message. Defendant Tan Tran transmits a 16-page confidential FVNDIT, Inc. corporate deck (March 2020): "Just some information for you about eLoan." Offered to establish the genesis date of the WhatsApp channel between the parties; not offered as a basis for liability. |

## SECTION B — IN-SCOPE COMMUNICATIONS (CHRONOLOGICAL)

| ID | Date | Description |
|---|---|---|
| B-1 | July 28, 2020 | Tan: "Crushing it…"; "Hit the Ask at the last minute….Lol." |
| B-2 | August 2, 2020 | Tan: "The founder, Loi Lu, and I are friends"; Kyber Network / KNC "ranked # 41 in the world." |
| B-3 | August 2, 2020 | Tan: Loi Lu "very very close to Vitalik Buterin… I have access [to] the best blockchain talents in the world. No joke"; "we're not just using buzzwords." |
| B-4 | August 4, 2020 | Tan: "Confidential. A big company just gave me a Letter of Intent. They want to buy eLoan!"; African gold call "tomorrow morning." |
| B-5 | August 6, 2020 | Tan forwards photos of gold bars stamped "MALI 500g FINE GOLD 999.9": "From my friend in Mali." |
| B-6 | August 13, 2020 | Tan: "the main docs all have been signed" for the eLoan deal; "I can show you the docs." |
| B-7 | August 13, 2020 | Tan: "Hang in there… we've got good stuff coming"; "Talking this Saturday morning to finalize the gold deal." |
| B-8 | August 15, 2020 | Tan: "Good call with our friend in Mali. They'll come back with a counter offer on Tuesday"; "I'll let you listen to the call. It was recorded." |
| B-9 | August 15, 2020 | Tan: LBMA certification "is huge… our 20% will be worth hundreds of millions"; "for your eyes only… Listen to it and delete it." |
| B-10 | August 15, 2020 | Tan: "Don't panic… it's coming. People will be sorry they got out too early"; "Sometimes the biggest deal is the one you least expect." |
| B-11 | August 15, 2020 | Tan: "when it's done… we'll be north of $1"; agrees a share-lockup "will be drawn up" (no dilution). |
| B-12 | August 20, 2020 | Tan: "it seems like every time I talk, the stock reacts… I need to make sure what I say is true"; "I have proof to back it up." |

| ID | Date | Description |
|---|---|---|
| B-13 | September 3, 2020 | Tan: "Each of these funds are over $500M… How many OTC companies got $30M by legit funds?" |
| B-14 | September 10, 2020 | Tan: "I know how it works now… Anticipation is better than the real news." |
| B-15 | September 10, 2020 | Tan: "in my tweet today I just said next week and not specific date." |
| B-16 | September 10, 2020 | Tan (re Siby / Mali government approval): "I'm playing the long game. Stay with me!" |
| B-17 | September 10, 2020 | Tan: "There will always be restrictions for private investors"; "Awesome!" (acknowledging the growing shareholder following). |
| B-18 | September 21, 2020 | Tan: "Working on closing the gold deal and busy with the deployment of the $30M of course." |
| B-19 | September 22, 2020 | Tan: "I'm in the middle of closing the gold deal and they're watching our stock. We need to keep it between 0.35-0.40 so we can keep them excited." |
| B-20 | October 2, 2020 | Forwarded messages between Tan and Ivan Hoo (Mali / Ismael Siby / ECOWAS sanctions); Tan: "FYI. Siby is in which is key." |
| B-21 | October 6, 2020 | Tan: "I just got off the phone with FINRA… They were asking about all the press releases and podcasts… We just need to be careful about what we put out"; "it needs to stay that way." |
| B-22 | October 6, 2020 | Tan (FINRA exchange, cont.): "it needs to stay that way… they're doing routing checks… routine… Just to keep us honest." |
| B-23 | October 8, 2020 | Tan transmits the Southridge Equity Purchase Agreement confidential term sheet (Vemanti Group; "$10 million"): "For your eyes only. Extremely confidential. Please don't share." |
| B-24 | October 9–10, 2020 | Tan: "stock did good today!" — arranging an in-person meeting (Newport Beach). |
| B-25 | October 10, 2020 | Tan arranges the in-person meeting: "Forget Javier's. Too crowded. Let me meet at Bluefin… 7952 Pacific Coast Hwy." |
| B-26 | October 10, 2020 | Tan, after the in-person meeting: "Thanks so much for coming down. I really enjoyed our brief time together… Sorry I had to leave to take care of the family." |
| B-27 | October 10, 2020 | Tan: "You're spending the night here, Nabe?… how about I come by at 9am for coffee? Give me your address and I'll pick you up." |
| B-28 | October 10, 2020 | Tan: "See you in the morning… get some rest." (in-person meeting; trust relationship). |
| B-29 | October 10–11, 2020 | Tan, checking in: "Home OK, Nabe? Just checking in on you." |
| B-30 | October 11, 2020 | Tan: "Glad to hear you're home safe and sound!" |
| B-31 | October 15, 2020 | Tan: "Had a chat with our African friend… official Board meeting next Wednesday. We will know Thursday." |
| B-32 | October 23, 2020 | Tan: "waiting on an email from Mali with feedback from the Board… No deal breakers"; "the key is to enjoy the ride whether it's high or low." |
| B-33 | October – November 5, 2020 | Tan: "talking to Roth… Maxim"; (Nov 5) "A bit of complication out of Mali… a Minister… One of the suggested solutions is to divest his shares." |

| ID | Date | Description |
|---|---|---|
| B-34 | November 20–23, 2020 | Tan's price projection: "OTCQB+Gold+Crypto+Defi+Fintech = $10 or more." |
| B-35 | December 3–9, 2020 / January 5, 2021 | Tan: "Gold deal in Australia is looking really good!"; "What's better than going from Pink to OTCQB?" |
| B-36 | February 9, 2021 | Tan: "The task at hand for us is to get on QB as soon as possible"; "We just need to hold her steady for the next 2-4 weeks." |
| B-37 | February 10, 2021 | Tan, on the pullback: "Yeah, it's expected since she's been gaining." |
| B-38 | February 10, 2021 | Plaintiff's contemporaneous trading income — brokerage screenshot showing a one-day realized gain of $138,098.30 (non-VMNT) — corroborating the active trading livelihood later impaired. |
| B-39 | February 10–11, 2021 | Tan: "That's more than most people make in a year! We need to open a trading division at Vemanti and have you run it… what do you think?" |
| B-40 | February 11, 2021 | Plaintiff's trading income — brokerage screenshot, realized gain $237,405.91 (non-VMNT); Tan: "Looks like people are getting impatient on VMNT." |
| B-41 | February 11, 2021 | Tan: "first thing first. QB and then we strategize and map things out." |
| B-42 | February 12, 2021 | Tan: "We need to keep her stable at $1.50 if possible… impacting deals we're working on"; "Every deal we're working on is looking at our stock." |
| B-43 | February 15–17, 2021 | Continued accumulation and a scheduled call; no substantive message from Defendant. |
| B-44 | February 24, 2021 | Tan: "Couldn't have done it without you!" — Plaintiff's reliance on the no-dilution representation (approximately $500,000 deployed). |
| B-45 | June 10, 2021 | Plaintiff's VMNT brokerage position: market value $1,573,675.00 less unrealized gain $1,059,247.34 = cost basis $514,427.66 — i.e., approximately $514,000 invested, corroborating the over $500,000 deployed. |
| B-46 | June 15, 2021 | Plaintiff's reliance and scope of harm — he brought his family and friends into VMNT in reliance on Defendant's no-dilution representation. |
| B-47 | June 15, 2021 | Tan: "it's all in the best interests of the company and the shareholders"; "how we do anything is how we do everything" (said while Defendant was selling). |
| B-48 | June 16, 2021 | Plaintiff's reliance — he continued to hold, believing Defendant had not sold any shares for the prior three quarters (the period in which Defendant was in fact selling). |
| B-49 | June 16, 2021 | Plaintiff's reliance (cont.) — he held and added to his position in reliance on Defendant's no-selling conduct, while Defendant was selling. |
| B-50 | July 12, 2021 | Fintel alert (embedded): "Insider Tan Tran reports selling 43,100 shares of $VMNT for a total cost of $49,710.00" — Plaintiff questions the reported selling. |
| B-51 | July 12, 2021 | Plaintiff confronts Defendant upon learning of the insider selling. |
| B-52 | July 12, 2021 | Plaintiff, in the investor group, initially rationalizes the reported selling as a likely promotion cost (~$50K) — reflecting the trust Defendant had cultivated and the delay in discovery. *[VMNT Investor Room group]* |
| B-53 | July 13, 2021 | Investor-group reactions (shared with Defendant) rationalizing the selling as funding company operations. |

| ID | Date | Description |
|---|---|---|
| B-54 | July 14–15, 2021 | Plaintiff continues to hold and engage after discovery; Defendant responds only with emojis. |
| B-55 | July 19, 2021 | VMNT price chart (shared by Plaintiff): one-year high of $2.74 and the subsequent collapse to ~$0.82 — documenting the decline. |
| B-56 | July 22, 2021 | Insider Forms alert (embedded): "$VMNT Insider Tran Tan has Sold 3,809 Shares… Total Cost: $3,074.56… Buy/Sell: Sell" (Director; 10% Owner; President, CEO, CFO). |
| B-57 | July 22, 2021 | Insider Forms / SEC record (embedded): Tran Tan sold 3,809 shares of VMNT on 2021-07-20 (1,309 + 2,500) for $3,074.56 — "Sell." |
| B-58 | July 22, 2021 | SEC Form 4 detail (embedded): Tran Tan sold 1,309 @ $0.84 and 2,500 @ $0.79 on 2021-07-20; ownership after 27,293,926 / 27,295,235 shares. |
| B-59 | July 22, 2021 | Plaintiff confronts Defendant over the insider selling after having brought others into the stock; urges public disclosure to shareholders. |
| B-60 | July 22, 2021 | (cont.) Plaintiff urges Defendant to disclose the selling to shareholders and to address them directly. |
| B-61 | July 26, 2021 | Tan, by private message to shareholder Javier (shared in the VMNT Investor Room): "Hi Javier. I'm looking for $1M. However, the $ from my shares should give us a bit of time to raise it with the banker. You think the group can gather $1M?" — soliciting additional retail capital while his own shares were being sold. |
| B-62 | July 26, 2021 | Tan's private message to shareholder Javier, shared in the VMNT Investor Room: "Hi Javier. I'm looking for $1M… the $ from my shares should give us a bit of time to raise it with the banker. You think the group can gather $1M?" *[VMNT Investor Room group]* |
| B-63 | July 26–30, 2021 | Plaintiff's July 30 message — Defendant continued selling shares late on news, the float increased by roughly 5 million shares, and Defendant declined to disclose publicly the reason for his selling. |

**EXHIBIT I — A-1 — Pre-scope**



*Contact Information — WhatsApp Contact Info screen for Defendant Tan Tran, displaying name, photograph, and direct mobile number +1 (949) 378-4140 (Orange County, California). Offered for FRE 901 authentication of the identity of the sender of the messages reproduced below.*

**EXHIBIT I  —  A-2  —  June 7, 2020**



*Relationship Foundation — First WhatsApp Message. Defendant Tan Tran transmits a 16-page confidential FVNDIT, Inc. corporate deck (March 2020): "Just some information for you about eLoan." Offered to establish the genesis date of the WhatsApp channel between the parties; not offered as a basis for liability.*

**EXHIBIT I — B-1 — July 28, 2020**



*Tan: "Crushing it…"; "Hit the Ask at the last minute….Lol."*

**EXHIBIT I — B-2 — August 2, 2020**



*Tan: "The founder, Loi Lu, and I are friends"; Kyber Network / KNC "ranked # 41 in the world."*

**EXHIBIT I — B-3 — August 2, 2020**



*Tan: Loi Lu "very very close to Vitalik Buterin… I have access [to] the best blockchain talents in the world. No joke"; "we're not just using buzzwords."*

**EXHIBIT I — B-4 — August 4, 2020**



*Tan: "Confidential. A big company just gave me a Letter of Intent. They want to buy eLoan!"; African gold call "tomorrow morning."*

**EXHIBIT I — B-5 — August 6, 2020**



*Tan forwards photos of gold bars stamped "MALI 500g FINE GOLD 999.9": "From my friend in Mali."*

**EXHIBIT I — B-6 — August 13, 2020**



*Tan: "the main docs all have been signed" for the eLoan deal; "I can show you the docs."*

**EXHIBIT I  —  B-7  —  August 13, 2020**



*Tan: "Hang in there... we've got good stuff coming"; "Talking this Saturday morning to finalize the gold deal."*

**EXHIBIT I — B-8 — August 15, 2020**



*Tan: "Good call with our friend in Mali. They'll come back with a counter offer on Tuesday"; "I'll let you listen to the call. It was recorded."*

**EXHIBIT I — B-9 — August 15, 2020**



*Tan: LBMA certification "is huge… our 20% will be worth hundreds of millions"; "for your eyes only… Listen to
it and delete it."*

**EXHIBIT I — B-10 — August 15, 2020**



*Tan: "Don't panic… it's coming. People will be sorry they got out too early"; "Sometimes the biggest deal is the one you least expect."*

**EXHIBIT I — B-11 — August 15, 2020**



*Tan: "when it's done… we'll be north of $1"; agrees a share-lockup "will be drawn up" (no dilution).*

**EXHIBIT I — B-12 — August 20, 2020**



*Tan: "it seems like every time I talk, the stock reacts… I need to make sure what I say is true"; "I have proof to back it up."*

**EXHIBIT I — B-13 — September 3, 2020**



*Tan: "Each of these funds are over $500M... How many OTC companies got $30M by legit funds?"*

**EXHIBIT I — B-14 — September 10, 2020**



*Tan: "I know how it works now… Anticipation is better than the real news."*

**EXHIBIT I — B-15 — September 10, 2020**



*Tan: "in my tweet today I just said next week and not specific date."*

**EXHIBIT I — B-16 — September 10, 2020**



*Tan (re Siby / Mali government approval): "I'm playing the long game. Stay with me!"*

**EXHIBIT I — B-17 — September 10, 2020**



*Tan: "There will always be restrictions for private investors"; "Awesome!" (acknowledging the growing shareholder following).*

**EXHIBIT I — B-18 — September 21, 2020**



*Tan: "Working on closing the gold deal and busy with the deployment of the $30M of course."*

**EXHIBIT I — B-19 — September 22, 2020**



*Tan: "I'm in the middle of closing the gold deal and they're watching our stock. We need to keep it between 0.35-0.40 so we can keep them excited."*

**EXHIBIT I — B-20 — October 2, 2020**



*Forwarded messages between Tan and Ivan Hoo (Mali / Ismael Siby / ECOWAS sanctions); Tan: "FYI. Siby is in
which is key."*

**EXHIBIT I — B-21 — October 6, 2020**



*Tan: "I just got off the phone with FINRA... They were asking about all the press releases and podcasts... We just need to be careful about what we put out"; "it needs to stay that way."*

**EXHIBIT I  —  B-22  —  October 6, 2020**



*Tan (FINRA exchange, cont.): "it needs to stay that way... they're doing routing checks... routine... Just to keep us honest."*

**EXHIBIT I — B-23 — October 8, 2020**



*Tan transmits the Southridge Equity Purchase Agreement confidential term sheet (Vemanti Group; "$10 million"): "For your eyes only. Extremely confidential. Please don't share."*

**EXHIBIT I  —  B-24  —  October 9–10, 2020**



*Tan: "stock did good today!" — arranging an in-person meeting (Newport Beach).*

**EXHIBIT I — B-25 — October 10, 2020**



*Tan arranges the in-person meeting: "Forget Javier's. Too crowded. Let me meet at Bluefin… 7952 Pacific Coast Hwy."*

**EXHIBIT I — B-26 — October 10, 2020**



*Tan, after the in-person meeting: "Thanks so much for coming down. I really enjoyed our brief time together...*
*Sorry I had to leave to take care of the family."*

**EXHIBIT I — B-27 — October 10, 2020**



*Tan: "You're spending the night here, Nabe?… how about I come by at 9am for coffee? Give me your address and I'll pick you up."*

**EXHIBIT I — B-28 — October 10, 2020**



*Tan: "See you in the morning... get some rest." (in-person meeting; trust relationship).*

**EXHIBIT I — B-29 — October 10–11, 2020**



*Tan, checking in: "Home OK, Nabe? Just checking in on you."*

**EXHIBIT I — B-30 — October 11, 2020**



*Tan: "Glad to hear you're home safe and sound!"*

**EXHIBIT I — B-31 — October 15, 2020**



*Tan: "Had a chat with our African friend... official Board meeting next Wednesday. We will know Thursday."*

**EXHIBIT I — B-32 — October 23, 2020**



*Tan: "waiting on an email from Mali with feedback from the Board… No deal breakers"; "the key is to enjoy the ride whether it's high or low."*

**EXHIBIT I — B-33 — October – November 5, 2020**



Tan: *"talking to Roth... Maxim"; (Nov 5) "A bit of complication out of Mali... a Minister... One of the suggested solutions is to divest his shares."*

**EXHIBIT I — B-34 — November 20–23, 2020**



*Tan's price projection: "OTCQB+Gold+Crypto+Defi+Fintech = $10 or more."*

**EXHIBIT I — B-35 — December 3–9, 2020 / January 5, 2021**



*Tan: "Gold deal in Australia is looking really good!"; "What's better than going from Pink to OTCQB?"*

**EXHIBIT I — B-36 — February 9, 2021**



*Tan: "The task at hand for us is to get on QB as soon as possible"; "We just need to hold her steady for the next 2-4 weeks."*

**EXHIBIT I — B-37 — February 10, 2021**



*Tan, on the pullback: "Yeah, it's expected since she's been gaining."*

**EXHIBIT I — B-38 — February 10, 2021**



*Plaintiff's contemporaneous trading income — brokerage screenshot showing a one-day realized gain of
$138,098.30 (non-VMNT) — corroborating the active trading livelihood later impaired.*

**EXHIBIT I — B-39 — February 10–11, 2021**



*Tan: "That's more than most people make in a year! We need to open a trading division at Vemanti and have you run it… what do you think?"*

**EXHIBIT I — B-40 — February 11, 2021**



*Plaintiff's trading income — brokerage screenshot, realized gain $237,405.91 (non-VMNT); Tan: "Looks like people are getting impatient on VMNT."*

**EXHIBIT I — B-41 — February 11, 2021**



*Tan: "first thing first. QB and then we strategize and map things out."*

**EXHIBIT I — B-42 — February 12, 2021**



*Tan: "We need to keep her stable at $1.50 if possible... impacting deals we're working on"; "Every deal we're working on is looking at our stock."*

**EXHIBIT I — B-43 — February 15–17, 2021**



*Continued accumulation and a scheduled call; no substantive message from Defendant.*

**EXHIBIT I — B-44 — February 24, 2021**



*Tan: "Couldn't have done it without you!" — Plaintiff's reliance on the no-dilution representation (approximately $500,000 deployed).*

**EXHIBIT I — B-45 — June 10, 2021**



*Plaintiff's VMNT brokerage position: market value $1,573,675.00 less unrealized gain $1,059,247.34 = cost basis $514,427.66 — i.e., approximately $514,000 invested, corroborating the over $500,000 deployed.*

**EXHIBIT I  —  B-46  —  June 15, 2021**



*Plaintiff's reliance and scope of harm — he brought his family and friends into VMNT in reliance on Defendant's
no-dilution representation.*

**EXHIBIT I — B-47 — June 15, 2021**



*Tan: "it's all in the best interests of the company and the shareholders"; "how we do anything is how we do everything" (said while Defendant was selling).*

**EXHIBIT I — B-48 — June 16, 2021**



*Plaintiff's reliance — he continued to hold, believing Defendant had not sold any shares for the prior three quarters (the period in which Defendant was in fact selling).*

**EXHIBIT I — B-49 — June 16, 2021**



*Plaintiff's reliance (cont.) — he held and added to his position in reliance on Defendant's no-selling conduct, while Defendant was selling.*

**EXHIBIT I  —  B-50  —  July 12, 2021**



*Fintel alert (embedded): "Insider Tan Tran reports selling 43,100 shares of $VMNT for a total cost of $49,710.00" — Plaintiff questions the reported selling.*

**EXHIBIT I  —  B-51  —  July 12, 2021**



*Plaintiff confronts Defendant upon learning of the insider selling.*

**EXHIBIT I — B-52 — July 12, 2021**



*Plaintiff, in the investor group, initially rationalizes the reported selling as a likely promotion cost (~$50K) —
reflecting the trust Defendant had cultivated and the delay in discovery.  [VMNT Investor Room group]*

**EXHIBIT I — B-53 — July 13, 2021**



*Investor-group reactions (shared with Defendant) rationalizing the selling as funding company operations.*

**EXHIBIT I — B-54 — July 14–15, 2021**



*Plaintiff continues to hold and engage after discovery; Defendant responds only with emojis.*

**EXHIBIT I — B-55 — July 19, 2021**



*VMNT price chart (shared by Plaintiff): one-year high of $2.74 and the subsequent collapse to ~$0.82 —*
*documenting the decline.*

**EXHIBIT I  —  B-56  —  July 22, 2021**



*Insider Forms alert (embedded): "$VMNT Insider Tran Tan has Sold 3,809 Shares… Total Cost: $3,074.56… Buy/Sell: Sell" (Director; 10% Owner; President, CEO, CFO).*

**EXHIBIT I  —  B-57  —  July 22, 2021**



*Insider Forms / SEC record (embedded): Tran Tan sold 3,809 shares of VMNT on 2021-07-20 (1,309 + 2,500) for $3,074.56 — "Sell."*

**EXHIBIT I — B-58 — July 22, 2021**



*SEC Form 4 detail (embedded): Tran Tan sold 1,309 @ $0.84 and 2,500 @ $0.79 on 2021-07-20; ownership after 27,293,926 / 27,295,235 shares.*

**EXHIBIT I — B-59 — July 22, 2021**



*Plaintiff confronts Defendant over the insider selling after having brought others into the stock; urges public disclosure to shareholders.*

**EXHIBIT I — B-60 — July 22, 2021**



*(cont.) Plaintiff urges Defendant to disclose the selling to shareholders and to address them directly.*

**EXHIBIT I  —  B-61  —  July 26, 2021**



*Tan, by private message to shareholder Javier (shared in the VMNT Investor Room): "Hi Javier. I'm looking for $1M. However, the $ from my shares should give us a bit of time to raise it with the banker. You think the group can gather $1M?" — soliciting additional retail capital while his own shares were being sold.*

**EXHIBIT I — B-62 — July 26, 2021**



*Tan's private message to shareholder Javier, shared in the VMNT Investor Room: "Hi Javier. I'm looking for $1M… the $ from my shares should give us a bit of time to raise it with the banker. You think the group can gather $1M?" [VMNT Investor Room group]*

**EXHIBIT I — B-63 — July 26–30, 2021**



*Plaintiff's July 30 message — Defendant continued selling shares late on news, the float increased by roughly 5 million shares, and Defendant declined to disclose publicly the reason for his selling.*

## EXHIBIT J — SUPPLEMENT A
### TAX YEAR 2023 — VMNT DISPOSITION AND
### IRS FORM 8949 / FORM 1099-B RECONCILIATION
*Bal v. Tran*

This Supplement documents the components of Plaintiff's tax year 2023 realized capital gain or loss and isolates the VMNT-specific portion. It extends the VMNT brokerage-trade record of Exhibit J beyond 2021 and authenticates the 2023 VMNT residual figure used in Section B of Exhibit K and pleaded in Paragraph 135 of the operative Complaint. The figures below are taken from Plaintiff's IRS-filed 2023 Form 1040, Schedule D, and Form 8949, and from the corresponding Forms 1099-B issued by E*TRADE Securities LLC / Morgan Stanley (which acquired E*TRADE in 2020), all reproduced in this Supplement.

On the face of the 2023 Schedule D, the net long-term capital gain is only $7,972, which masks the VMNT disposition. Form 8949, Part II shows that this $7,972 net is the sum of a long-term gain of $61,654 on the VMNT position (account ending 2233) and a long-term loss of ($53,682) on unrelated holdings (account ending 7205). The VMNT long-term gain of $61,654 is the 2023 VMNT residual; the remainder is non-VMNT.

| Component | Source | Amount |
|---|---|---|
| VMNT long-term gain (2020-era shares, long-term) | Acct …2233 — Form 8949 Pt II | +$61,654 |
| Other long-term loss (unrelated holdings) | Acct …7205 — Form 8949 Pt II | ($53,682) |
| **Net long-term capital gain** | **Schedule D, line 15** | **+$7,972** |
| Net short-term capital gain (all non-VMNT) | Form 8949 Pt I — Sch. D line 7 | +$2,717 |
| **IRS-filed total realized capital gain** | **Form 1040, line 7** | **+$10,689** |
| Less: VMNT residual | (VMNT long-term gain, above) | +$61,654 |
| **Non-VMNT realized P&L (as pleaded, Compl. ¶135)** | **= total − VMNT residual** | **($50,965)** |

Note: the four reproduced Forms 1099-B independently corroborate each component at the account level. These IRS-filed forms and broker statements identify the disposition by brokerage account; the per-security transaction detail (identifying the security as Vemanti Group, Inc. by name) is available and will be produced on request. Personally identifying information has been redacted under Fed. R. Civ. P. 5.2(a).

**2023 IRS Form 1040 — Line 7 (capital gain or loss) = $10,689.**

Form **1040** Department of the Treasury—Internal Revenue Service
**U.S. Individual Income Tax Return** **2023** OMB No. 1545-0074 IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2023, or other tax year beginning _____, 2023, ending _____, 20 ____ See separate instructions.

Your first name and middle initial: BARINDER SINGH  Last name: BAL  Your social security number: ████████

If joint return, spouse's first name and middle initial  Last name  Spouse's social security number

Home address (number and street). If you have a P.O. box, see instructions. ████████  Apt. no.

**Presidential Election Campaign** Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse

City, town, or post office. If you have a foreign address, also complete spaces below. ████  State: ███  ZIP code: ███

Foreign country name  Foreign province/state/county  Foreign postal code

**Filing Status**
Check only one box.
☒ Single
☐ Married filing jointly (even if only one had income)
☐ Married filing separately (MFS)
☐ Head of household (HOH)
☐ Qualifying surviving spouse (QSS)

If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QSS box, enter the child's name if the qualifying person is a child but not your dependent: _____

**Digital Assets**
At any time during 2023, did you: (a) receive (as a reward, award, or payment for property or services); or (b) sell, exchange, or otherwise dispose of a digital asset (or a financial interest in a digital asset)? (See instructions.) ☒ Yes ☐ No

**Standard Deduction**
Someone can claim: ☐ You as a dependent  ☐ Your spouse as a dependent
☐ Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness** You: ☐ Were born before January 2, 1959  ☐ Are blind  Spouse: ☐ Was born before January 2, 1959  ☐ Is blind

**Dependents** (see instructions):

| (1) First name   Last name | (2) Social security number | (3) Relationship to you | (4) Check the box if qualifies for (see instructions): Child tax credit | Credit for other dependents |
|---|---|---|---|---|
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |

If more than four dependents, see instructions and check here ☐

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.
If you did not get a Form W-2, see instructions.

| | | | |
|---|---|---|---|
| 1a | Total amount from Form(s) W-2, box 1 (see instructions) | 1a | |
| b | Household employee wages not reported on Form(s) W-2 | 1b | |
| c | Tip income not reported on line 1a (see instructions) | 1c | |
| d | Medicaid waiver payments not reported on Form(s) W-2 (see instructions) | 1d | |
| e | Taxable dependent care benefits from Form 2441, line 26 | 1e | |
| f | Employer-provided adoption benefits from Form 8839, line 29 | 1f | |
| g | Wages from Form 8919, line 6 | 1g | |
| h | Other earned income (see instructions) | 1h | |
| i | Nontaxable combat pay election (see instructions) 1i | | |
| z | Add lines 1a through 1h | 1z | |

Attach Sch. B if required.

| 2a | Tax-exempt interest | 2a | | b | Taxable interest | 2b | 1. |
| 3a | Qualified dividends | 3a | | b | Ordinary dividends | 3b | |
| 4a | IRA distributions | 4a | | b | Taxable amount | 4b | |
| 5a | Pensions and annuities | 5a | | b | Taxable amount | 5b | |
| 6a | Social security benefits | 6a | | b | Taxable amount | 6b | |

**Standard Deduction for—**
• Single or Married filing separately, $13,850
• Married filing jointly or Qualifying surviving spouse, $27,700
• Head of household, $20,800
• If you checked any box under Standard Deduction, see instructions.

| | | | |
|---|---|---|---|
| c | If you elect to use the lump-sum election method, check here (see instructions) ☐ | | |
| 7 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ☐ | 7 | 10,689. |
| 8 | Additional income from Schedule 1, line 10 | 8 | |
| 9 | Add lines 1z, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** | 9 | 10,690. |
| 10 | Adjustments to income from Schedule 1, line 26 | 10 | |
| 11 | Subtract line 10 from line 9. This is your **adjusted gross income** | 11 | 10,690. |
| 12 | **Standard deduction or itemized deductions** (from Schedule A) | 12 | 13,850. |
| 13 | Qualified business income deduction from Form 8995 or Form 8995-A | 13 | |
| 14 | Add lines 12 and 13 | 14 | 13,850. |
| 15 | Subtract line 14 from line 11. If zero or less, enter -0-. This is your **taxable income** | 15 | 0. |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.  Form **1040** (2023)

**2023 IRS Schedule D — Part I net short-term $2,717 (line 7); Part II net long-term $7,972 (line 15).**

**SCHEDULE D**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service

**Capital Gains and Losses**

Attach to Form 1040, 1040-SR, or 1040-NR.
Use Form 8949 to list your transactions for lines 1b, 2, 3, 8b, 9, and 10.
Go to *www.irs.gov/ScheduleD* for instructions and the latest information.

OMB No. 1545-0074

**2023**

Attachment
Sequence No. **12**

Name(s) shown on return
BARINDER SINGH BAL

Your social security number

Did you dispose of any investment(s) in a qualified opportunity fund during the tax year?   ☐ Yes   ☒ No
If "Yes," attach Form 8949 and see its instructions for additional requirements for reporting your gain or loss.

**Part I    Short-Term Capital Gains and Losses—Generally Assets Held One Year or Less** (see instructions)

| See instructions for how to figure the amounts to enter on the lines below. This form may be easier to complete if you round off cents to whole dollars. | (d) Proceeds (sales price) | (e) Cost (or other basis) | (g) Adjustments to gain or loss from Form(s) 8949, Part I, line 2, column (g) | (h) Gain or (loss) Subtract column (e) from column (d) and combine the result with column (g) |
|---|---|---|---|---|
| **1a** Totals for all short-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 1b . | | | | |
| **1b** Totals for all transactions reported on Form(s) 8949 with **Box A** checked . . . . . . . . . . . . . . | | | | |
| **2** Totals for all transactions reported on Form(s) 8949 with **Box B** checked . . . . . . . . . . . . . . | | | | |
| **3** Totals for all transactions reported on Form(s) 8949 with **Box C** checked . . . . . . . . . . . . . . | 141,255. | 141,935. | 3,397. | 2,717. |

| | | |
|---|---|---|
| **4** Short-term gain from Form 6252 and short-term gain or (loss) from Forms 4684, 6781, and 8824 . . | **4** | |
| **5** Net short-term gain or (loss) from partnerships, S corporations, estates, and trusts from Schedule(s) K-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5** | |
| **6** Short-term capital loss carryover. Enter the amount, if any, from line 8 of your **Capital Loss Carryover Worksheet** in the instructions . . . . . . . . . . . . . . . . . . . . . . . . . | **6** ( ) |
| **7** **Net short-term capital gain or (loss).** Combine lines 1a through 6 in column (h). If you have any long-term capital gains or losses, go to Part II below. Otherwise, go to Part III on the back . . . . . . | **7** | 2,717. |

**Part II    Long-Term Capital Gains and Losses—Generally Assets Held More Than One Year** (see instructions)

| See instructions for how to figure the amounts to enter on the lines below. This form may be easier to complete if you round off cents to whole dollars. | (d) Proceeds (sales price) | (e) Cost (or other basis) | (g) Adjustments to gain or loss from Form(s) 8949, Part II, line 2, column (g) | (h) Gain or (loss) Subtract column (e) from column (d) and combine the result with column (g) |
|---|---|---|---|---|
| **8a** Totals for all long-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 8b . | | | | |
| **8b** Totals for all transactions reported on Form(s) 8949 with **Box D** checked . . . . . . . . . . . . . . | | | | |
| **9** Totals for all transactions reported on Form(s) 8949 with **Box E** checked . . . . . . . . . . . . . . | | | | |
| **10** Totals for all transactions reported on Form(s) 8949 with **Box F** checked. . . . . . . . . . . . . . | 74,918. | 66,946. | | 7,972. |

| | | |
|---|---|---|
| **11** Gain from Form 4797, Part I; long-term gain from Forms 2439 and 6252; and long-term gain or (loss) from Forms 4684, 6781, and 8824 . . . . . . . . . . . . . . . . . . . . . . . . . . | **11** | |
| **12** Net long-term gain or (loss) from partnerships, S corporations, estates, and trusts from Schedule(s) K-1 | **12** | |
| **13** Capital gain distributions. See the instructions . . . . . . . . . . . . . . . . . . . . . | **13** | |
| **14** Long-term capital loss carryover. Enter the amount, if any, from line 13 of your **Capital Loss Carryover Worksheet** in the instructions . . . . . . . . . . . . . . . . . . . . . . | **14** ( ) |
| **15** **Net long-term capital gain or (loss).** Combine lines 8a through 14 in column (h). Then, go to Part III on the back . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **15** | 7,972. |

For Paperwork Reduction Act Notice, see your tax return instructions.

Schedule D (Form 1040) 2023

**2023 IRS Schedule D, Part III — Line 16 total = $10,689.**

Schedule D (Form 1040) 2023                                                                    Page **2**

| **Part III** | **Summary** |
| --- | --- |

**16** Combine lines 7 and 15 and enter the result . . . . . . . . . . . . . . . . . . . . . **16**    10,689.

- If line 16 is a **gain**, enter the amount from line 16 on Form 1040, 1040-SR, or 1040-NR, line 7. Then, go to line 17 below.
- If line 16 is a **loss**, skip lines 17 through 20 below. Then, go to line 21. Also be sure to complete line 22.
- If line 16 is **zero**, skip lines 17 through 21 below and enter -0- on Form 1040, 1040-SR, or 1040-NR, line 7. Then, go to line 22.

**17** Are lines 15 and 16 **both** gains?
☒ **Yes.** Go to line 18.
☐ **No.** Skip lines 18 through 21, and go to line 22.

**18** If you are required to complete the **28% Rate Gain Worksheet** (see instructions), enter the amount, if any, from line 7 of that worksheet . . . . . . . . . . . . . . . . . . . . **18**

**19** If you are required to complete the **Unrecaptured Section 1250 Gain Worksheet** (see instructions), enter the amount, if any, from line 18 of that worksheet . . . . . . . . . . . **19**

**20** Are lines 18 and 19 both zero or blank and you are not filing Form 4952?
☒ **Yes.** Complete the **Qualified Dividends and Capital Gain Tax Worksheet** in the instructions for Form 1040, line 16. **Don't** complete lines 21 and 22 below.

☐ **No.** Complete the **Schedule D Tax Worksheet** in the instructions. **Don't** complete lines 21 and 22 below.

**21** If line 16 is a loss, enter here and on Form 1040, 1040-SR, or 1040-NR, line 7, the **smaller** of:

- The loss on line 16; or
- ($3,000), or if married filing separately, ($1,500)  . . . . . . . . . . . . . . . . . . **21** (                    )

**Note:** When figuring which amount is smaller, treat both amounts as positive numbers.

**22** Do you have qualified dividends on Form 1040, 1040-SR, or 1040-NR, line 3a?

☐ **Yes.** Complete the **Qualified Dividends and Capital Gain Tax Worksheet** in the instructions for Form 1040, line 16.

☐ **No.** Complete the rest of Form 1040, 1040-SR, or 1040-NR.

BAA    REV 02/11/24 PRO                                          Schedule D (Form 1040) 2023

**2023 IRS Form 8949, Part I (Short-Term, Box C) — four lines totaling +$2,717. All non-VMNT.**

Form **8949**

Department of the Treasury
Internal Revenue Service

## Sales and Other Dispositions of Capital Assets

File with your Schedule D to list your transactions for lines 1b, 2, 3, 8b, 9, and 10 of Schedule D.
Go to www.irs.gov/Form8949 for instructions and the latest information.

OMB No. 1545-0074

**2023**

Attachment
Sequence No. **12A**

Name(s) shown on return
BARINDER SINGH BAL

Social security number or taxpayer identification number

Before you check Box A, B, or C below, see whether you received any Form(s) 1099-B or substitute statement(s) from your broker. A substitute statement will have the same information as Form 1099-B. Either will show whether your basis (usually your cost) was reported to the IRS by your broker and may even tell you which box to check.

**Part I** — **Short-Term.** Transactions involving capital assets you held 1 year or less are generally short-term (see instructions). For long-term transactions, see page 2.

**Note:** You may aggregate all short-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS and for which no adjustments or codes are required. Enter the totals directly on Schedule D, line 1a; you aren't required to report these transactions on Form 8949 (see instructions).

**You *must* check Box A, B, or C below. Check only one box.** If more than one box applies for your short-term transactions, complete a separate Form 8949, page 1, for each applicable box. If you have more short-term transactions than will fit on this page for one or more of the boxes, complete as many forms with the same box checked as you need.

☐ **(A)** Short-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS (see **Note** above)
☐ **(B)** Short-term transactions reported on Form(s) 1099-B showing basis **wasn't** reported to the IRS
☒ **(C)** Short-term transactions not reported to you on Form 1099-B

| 1 (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold or disposed of (Mo., day, yr.) | (d) Proceeds (sales price) (see instructions) | (e) Cost or other basis See the Note below and see Column (e) in the separate instructions. | (f) Code(s) from Instructions | (g) Amount of adjustment | (h) Gain or (loss) Subtract column (e) from column (d) and combine the result with column (g). |
|---|---|---|---|---|---|---|---|
| MORGAN STANLEY DOMESTIC HOLDINGS, INC | various | 12/31/23 | 108,423. | 100,070. | W | 171. | 8,524. |
| MORGAN STANLEY DOMESTIC HOLDINGS, INC | various | 12/31/23 | 25,516. | 35,064. | W | 3,226. | -6,322. |
| MORGAN STANLEY DOMESTIC HOLDINGS, INC | various | 12/31/23 | 3,809. | 4,997. | | | -1,188. |
| MORGAN STANLEY DOMESTIC HOLDINGS, INC | Various | 12/31/23 | 3,507. | 1,804. | | | 1,703. |
| **2 Totals.** Add the amounts in columns (d), (e), (g), and (h) (subtract negative amounts). Enter each total here and include on your Schedule D, **line 1b** (if Box A above is checked), **line 2** (if Box B above is checked), or **line 3** (if Box C above is checked) | | | 141,255. | 141,935. | | 3,397. | 2,717. |

**Note:** If you checked Box A above but the basis reported to the IRS was incorrect, enter in column (e) the basis as reported to the IRS, and enter an adjustment in column (g) to correct the basis. See *Column (g)* in the separate instructions for how to figure the amount of the adjustment.

For Paperwork Reduction Act Notice, see your tax return instructions. BAA          REV 02/11/24 PRO          Form **8949** (2023)

**2023 IRS Form 8949, Part II (Long-Term, Box F) — Morgan Stanley Domestic +$61,654 (acct ...2233, the VMNT) and E\*TRADE –$53,682 (acct ...7205); net +$7,972.**

Form 8949 (2023)      Attachment Sequence No. **12A**    Page **2**

| Name(s) shown on return. Name and SSN or taxpayer identification no. not required if shown on other side | Social security number or taxpayer identification number |
|---|---|
| BARINDER SINGH BAL | ▓▓▓▓▓▓ |

Before you check Box D, E, or F below, see whether you received any Form(s) 1099-B or substitute statement(s) from your broker. A substitute statement will have the same information as Form 1099-B. Either will show whether your basis (usually your cost) was reported to the IRS by your broker and may even tell you which box to check.

**Part II**    **Long-Term.** Transactions involving capital assets you held more than 1 year are generally long-term (see instructions). For short-term transactions, see page 1.

**Note:** You may aggregate all long-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS and for which no adjustments or codes are required. Enter the totals directly on Schedule D, line 8a; you aren't required to report these transactions on Form 8949 (see instructions).

**You _must_ check Box D, E, or F below. Check only one box.** If more than one box applies for your long-term transactions, complete a separate Form 8949, page 2, for each applicable box. If you have more long-term transactions than will fit on this page for one or more of the boxes, complete as many forms with the same box checked as you need.

☐ **(D)** Long-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS (see **Note** above)
☐ **(E)** Long-term transactions reported on Form(s) 1099-B showing basis **wasn't** reported to the IRS
☒ **(F)** Long-term transactions not reported to you on Form 1099-B

| 1 (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold or disposed of (Mo., day, yr.) | (d) Proceeds (sales price) (see instructions) | (e) Cost or other basis See the Note below and see Column (e) in the separate instructions. | (f) Code(s) from Instructions | (g) Amount of adjustment | (h) Gain or (loss) Subtract column (e) from column (d) and combine the result with column (g). |
|---|---|---|---|---|---|---|---|
| E*TRADE | Various | 12/31/23 | 6,311. | 59,993. | | | −53,682. |
| MORGAN STANLEY DOMESTIC HOLDINGS, INC | various | 12/31/23 | 68,607. | 6,953. | | | 61,654. |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| **2 Totals.** Add the amounts in columns (d), (e), (g), and (h) (subtract negative amounts). Enter each total here and include on your Schedule D, **line 8b** (if **Box D** above is checked), **line 9** (if **Box E** above is checked), or **line 10** (if **Box F** above is checked) . . | | | 74,918. | 66,946. | | | 7,972. |

**Note:** If you checked Box D above but the basis reported to the IRS was incorrect, enter in column (e) the basis as reported to the IRS, and enter an adjustment in column (g) to correct the basis. See _Column (g)_ in the separate instructions for how to figure the amount of the adjustment.

BAA      REV 02/11/24 PRO      Form **8949** (2023)

**2023 Form 1099-B (E\*TRADE / Morgan Stanley), acct ...2233 — long-term realized gain +$61,653.99 (the VMNT disposition); short-term –$9,547.58.**

| | |
|---|---|
| MORGAN STANLEY CAPITAL MANAGEMENT LLC<br>E\*TRADE SECURITIES LLC<br>PO BOX 484<br>JERSEY CITY, NJ 07303-0484 | Account No: ....2233<br>Account Name: BARINDER S BAL<br>Recipient's TIN: ▮▮▮<br><br>Account Executive No: ET1<br><br>ORIGINAL: 12/31/2023 |

### FORM 1099-B TOTALS SUMMARY

**REALIZED GAIN / LOSS SUMMARY**

Refer to Proceeds from Broker and Barter Exchange Transactions for detailed information regarding these summary values.  The amounts shown below are for informational purposes only.

| SHORT-TERM GAINS OR (LOSSES) – REPORT ON FORM 8949, PART I | PROCEEDS | COST BASIS | MARKET DISCOUNT | WASH SALE LOSS DISALLOWED | REALIZED GAIN OR (LOSS) |
|---|---|---|---|---|---|
| Box A (basis reported to IRS) | $25,516.33 | $35,063.91 | $0.00 | $3,225.82 | ($9,547.58) |
| Box A – Ordinary – (basis reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box B (basis not reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box B – Ordinary – (basis not reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total Short-Term** | **$25,516.33** | **$35,063.91** | **$0.00** | **$3,225.82** | **($9,547.58)** |
| **LONG-TERM GAINS OR (LOSSES) – REPORT ON FORM 8949, PART II** | | | | | |
| Box D (basis reported to IRS) | $68,607.36 | $6,953.37 | $0.00 | $0.00 | $61,653.99 |
| Box D – Ordinary – (basis reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box E (basis not reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box E – Ordinary – (basis not reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total Long-Term** | **$68,607.36** | **$6,953.37** | **$0.00** | **$0.00** | **$61,653.99** |
| **UNKNOWN TERM – CODE (X) REPORT ON FORM 8949 PART I OR PART II** | | | | | |
| Box B or Box E (basis not reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box B or Box E – Ordinary – (basis not reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total Unknown Term** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |

**2023 Form 1099-B (E*TRADE / Morgan Stanley), acct ...7205 — long-term realized loss ($53,682.24) on other holdings.**



| | 1099 Consolidated Tax Statement<br>Tax Year 2023    Copy B For Recipient | Morgan Stanley Capital Management, LLC<br>Morgan Stanley Smith Barney, LLC<br>1 New York Plaza<br>7th Floor<br>New York, NY 10004 | Page 5 of 8 |
|---|---|---|---|

Name Reported to the IRS:    BARINDER S BAL

Identification Number:          8445
Taxpayer ID Number:
Account Number:                  7 205

**Customer Service:  866-324-6088**

## FORM 1099-B TOTALS SUMMARY

### REALIZED GAIN/LOSS SUMMARY

Refer to Proceeds from Broker and Barter Exchange Transactions for detailed information regarding these summary values. The amounts shown below are for informational purposes only.

| SHORT -TERM GAIN OR (LOSSES) - REPORT ON FORM 8949, PART I | PROCEEDS | COST BASIS | MARKET DISCOUNT | WASH SALE LOSS DISALLOWED | REALIZED GAIN OR (LOSS) |
|---|---|---|---|---|---|
| Box A (basis reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box A - Ordinary - (basis reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box B (basis not reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box B - Ordinary - (basis not reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total Short - Term** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |
| **LONG -TERM GAIN OR (LOSSES) - REPORT ON FORM 8949, PART II** | | | | | |
| Box D (basis reported to the IRS) | $6,310.51 | $59,992.75 | $0.00 | $0.00 | ($53,682.24) |
| Box D - Ordinary - (basis reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box E (basis not reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box E - Ordinary - (basis not reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total Long - Term** | **$6,310.51** | **$59,992.75** | **$0.00** | **$0.00** | **($53,682.24)** |
| **UNKNOWN TERM - CODE (X) REPORT ON FORM 8949, PART I OR PART II** | | | | | |
| Box B or Box E (basis not reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box B  or Box E - Ordinary - (basis not reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total Unknown Term** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |

| REGULATED FUTURES CONTRACTS | AMOUNT |
|---|---|
| Profit or (loss) realized in 2023 - closed contracts | $0.00 |
| Unrealized Profit or (loss) on open contracts 12/31/2022 | $0.00 |
| Unrealized Profit or (loss) on open contracts 12/31/2023 | $0.00 |
| **Aggregate profit or (loss) on contracts** | **$0.00** |

**2023 Form 1099-B (Morgan Stanley / E\*TRADE), acct ...6167 — short-term realized gain +$8,352.63.**

| | | |
|---|---|---|
| MORGAN STANLEY CAPITAL MANAGEMENT LLC | Account No: | 6167 |
| | Account Name: | BARINDER S BAL |
| E\*TRADE SECURITIES LLC | Recipient's TIN: | |
| PO BOX 484 | | |
| JERSEY CITY, NJ 07303-0484 | Account Executive No: | ET1 |
| | ORIGINAL: | 12/31/2023 |

## FORM 1099-B TOTALS SUMMARY

### REALIZED GAIN / LOSS SUMMARY

Refer to Proceeds from Broker and Barter Exchange Transactions for detailed information regarding these summary values.  The amounts shown below are for informational purposes only.

| SHORT-TERM GAINS OR (LOSSES) – REPORT ON FORM 8949, PART I | PROCEEDS | COST BASIS | MARKET DISCOUNT | WASH SALE LOSS DISALLOWED | REALIZED GAIN OR (LOSS) |
|---|---|---|---|---|---|
| Box A (basis reported to IRS) | $108,422.74 | $100,070.11 | $0.00 | $171.45 | $8,352.63 |
| Box A – Ordinary – (basis reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box B (basis not reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box B – Ordinary – (basis not reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total Short-Term** | **$108,422.74** | **$100,070.11** | **$0.00** | **$171.45** | **$8,352.63** |
| LONG-TERM GAINS OR (LOSSES) – REPORT ON FORM 8949, PART II | | | | | |
| Box D (basis reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box D – Ordinary – (basis reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box E (basis not reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box E – Ordinary – (basis not reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total Long-Term** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |
| UNKNOWN TERM – CODE (X) REPORT ON FORM 8949 PART I OR PART II | | | | | |
| Box B or Box E (basis not reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box B or Box E – Ordinary – (basis not reported to IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total Unknown Term** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |

**2023 Form 1099-B (E\*TRADE / Morgan Stanley), acct ...2206 — short-term realized gain +$1,702.98.**



| | 1099 Consolidated Tax Statement | | Morgan Stanley Capital Management, LLC | Page 5 of 6 |
|---|---|---|---|---|
| | Tax Year 2023    Copy B For Recipient | | Morgan Stanley Smith Barney, LLC | |

Name Reported to the IRS:    BARINDER S BAL

Morgan Stanley Capital Management, LLC
Morgan Stanley Smith Barney, LLC
1 New York Plaza
7th Floor
New York, NY 10004
Identification Number:
Taxpayer ID Number:
Account Number:                    2 206

**Customer Service: 866-324-6088**

## FORM 1099-B TOTALS SUMMARY

### REALIZED GAIN/LOSS SUMMARY

Refer to Proceeds from Broker and Barter Exchange Transactions for detailed information regarding these summary values. The amounts shown below are for informational purposes only.

| SHORT -TERM GAIN OR (LOSSES) - REPORT ON FORM 8949, PART I | PROCEEDS | COST BASIS | MARKET DISCOUNT | WASH SALE LOSS DISALLOWED | REALIZED GAIN OR (LOSS) |
|---|---|---|---|---|---|
| Box A (basis reported to the IRS) | $3,506.97 | $1,803.99 | $0.00 | $0.00 | $1,702.98 |
| Box A - Ordinary - (basis reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box B (basis not reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box B - Ordinary - (basis not reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total Short - Term** | $3,506.97 | $1,803.99 | $0.00 | $0.00 | $1,702.98 |
| **LONG -TERM GAIN OR (LOSSES) - REPORT ON FORM 8949, PART II** | | | | | |
| Box D (basis reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box D - Ordinary - (basis reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box E (basis not reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box E - Ordinary - (basis not reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total Long - Term** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **UNKNOWN TERM - CODE (X) REPORT ON FORM 8949, PART I OR PART II** | | | | | |
| Box B or Box E (basis not reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Box B  or Box E - Ordinary - (basis not reported to the IRS) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total Unknown Term** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

**REGULATED FUTURES CONTRACTS**                    **AMOUNT**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

**BARINDER SINGH "NABE" BAL,**
    Plaintiff,

    v.

**TAN TRAN, an individual; and VEMANTI GROUP, INC.,**
**a Nevada corporation,**
    Defendants.

Case No. _____

# EXHIBIT K

Plaintiff's IRS-Filed Form 1040 / Schedule D Records, Tax Years 2017–2024
(Foundation for Opportunity-Cost Damages)

## DECLARATION OF BARINDER SINGH BAL
## IN SUPPORT OF EXHIBIT K
### PURSUANT TO 28 U.S.C. § 1746

I, BARINDER SINGH BAL, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my personal knowledge:

**1.** I am the Plaintiff in the above-captioned action and I appear pro se. I have personal knowledge of the facts stated in this Declaration and could competently testify to them if called upon to do so.

**2.** The records reproduced in Section A of this Exhibit K are true and correct copies of pages from my federal individual income tax returns (Form 1040 and its accompanying schedules and supporting forms) as filed with the Internal Revenue Service ("IRS") for tax years 2017 through 2024. I prepared, signed, and filed each of these returns under penalty of perjury pursuant to the requirements of the Internal Revenue Code, including 26 U.S.C. § 6065 (taxpayer-signed returns must contain a written declaration that they are made under the penalties of perjury). Each return reflects my realized capital gain or loss for the tax year in question as required to be reported under 26 U.S.C. §§ 1, 61, 1001, and 1211, and the regulations thereunder.

**3.** The IRS-filed total realized capital gain or loss for each tax year, as reflected on the source pages reproduced in Section A, is as follows:

| Tax Year | Form / Line | Realized Capital Gain or (Loss) |
|---|---|---:|
| 2017 | Form 1040, Line 13 | +$49,422 |
| 2018 | Schedule 1, Line 13 | +$105,934 |
| 2019 | Form 1040, Line 6 | +$73,993 |
| 2020 | Form 1040, Line 7 | +$389,148 |
| 2021 | Form 1040, Line 7 | +$755,556 |
| 2022 | Form 1040, Line 7 | +$71,991 |
| 2023 | Form 1040, Line 7 | +$10,689 |
| 2024 | Schedule D, Line 16 | ($198,109) |

**4.** For tax year 2024, the figure shown on Form 1040, Line 7 of (-$3,000) reflects the IRS-imposed annual limitation on the deduction of net capital losses against ordinary income under 26 U.S.C. § 1211(b), not the full amount of Plaintiff's realized capital loss for the year. The actual realized capital loss for tax year 2024, as reflected on Schedule D, Line 16, is $198,109. The excess of $195,109 constitutes Plaintiff's capital loss carryforward into subsequent tax years pursuant to 26 U.S.C. § 1212(b). This carryforward represents continuing post-fraud damages that will be

realized in tax years 2025 and beyond.

**5.** Section A reproduces the IRS-filed source pages for each tax year, in chronological order. For some years, Section A reproduces only Form 1040 (where Form 1040 contains the headline capital-gain figure directly). For tax years in which Form 1040 itself does not contain the detailed capital-gain breakdown (because of the IRS's 2018 form redesign and subsequent supporting-schedule conventions), Section A also reproduces the relevant supporting schedules and forms, including Schedule 1, Schedule D, Form 8949, and Form 6781, as applicable.

**6.** Section B presents the reconciliation table calculating Plaintiff's non-VMNT (alternative-position) realized capital P&L for each tax year. The methodology is straightforward: (i) for each tax year, Plaintiff takes the IRS-filed total realized capital gain or loss as the starting figure (the authoritative IRS-reported number from Section A); (ii) Plaintiff then subtracts Plaintiff's VMNT-specific realized capital gain documented in Exhibit J (for 2020 and 2021) or attributable VMNT-residual disposition (for 2022 and 2023, representing leftover 2020-era VMNT shares clearing their long-term holding period); (iii) the difference is Plaintiff's non-VMNT realized capital P&L for that year. For tax years 2017, 2018, and 2019, Plaintiff held no VMNT positions, and accordingly the IRS-filed total equals the non-VMNT figure directly. For tax year 2024, no significant VMNT activity remained (all VMNT positions having been cleared by the end of 2023), and accordingly the IRS-filed total again equals the non-VMNT figure.

**7.** Limitation on volume of reproduced records. The complete and unredacted source records underlying the realized capital gain figures shown in this Exhibit K — including each individual transaction reported on Form 1099-B issued by E*TRADE Securities LLC, Morgan Stanley Domestic Holdings, Inc., TD Ameritrade, and Charles Schwab & Co. (the brokers through which Plaintiff transacted during the years covered by this Exhibit), and the corresponding annual Investment Activity Reports — are voluminous and would, if reproduced in full, span many thousands of pages. Out of respect for the Court's time and to avoid imposing an unnecessary review burden at the pleading stage, Plaintiff reproduces in this Exhibit K only the IRS-filed Form 1040 capital-gain figure for each year, together with such supporting IRS-filed schedules as are necessary to authenticate that figure. Plaintiff has documented the VMNT-specific realized gain in detail in Exhibit J; the non-VMNT trading P&L referenced in the operative Complaint can be derived by subtracting the Exhibit J VMNT figures from the IRS-filed totals shown in this Exhibit K. Plaintiff hereby affirms that he is prepared and willing to produce the complete, unredacted source records — including every individual transaction record, broker statement, monthly statement, and supporting workpaper — to the Court, to opposing counsel, or to any other party upon proper request in discovery, subject to an appropriate protective order if requested. Not every trade is uploaded in this Exhibit; everything not uploaded will be made available upon request.

**8.** The non-VMNT realized capital figures stated in Section B are the figures pleaded in Paragraph 135 of the operative Complaint. For each tax year, that figure equals the IRS-filed total realized capital gain or loss shown in Section A, less the VMNT-specific realized gain documented in Exhibit J; the operative Complaint pleads those same IRS-derived figures.

**9.** Plaintiff's federal individual income tax return for tax year 2025 has not yet been filed at the time of this submission. The IRS deadline for individual returns for tax year 2025, as extended, is October 15, 2026. Upon filing, Plaintiff will supplement this Exhibit K with Plaintiff's 2025 Form 1040 and Schedule D. The 2017–2024 series reproduced herein is sufficient to establish the pre-fraud baseline (2017–2021) and the post-fraud damages trajectory (2022–2024) pleaded in the operative Complaint. Plaintiff's 2024 capital loss carryforward of $195,109 will deduct against 2025 capital gains (without limit) and against 2025 ordinary income (capped at $3,000), with any remainder rolling forward into subsequent tax years, continuing to evidence ongoing damages.

**10.** Personally identifying information has been redacted from the pages reproduced in this Exhibit in accordance with Federal Rule of Civil Procedure 5.2(a). Plaintiff's taxpayer identification number, home street address, financial account routing and account numbers (where applicable), and any other personal identifiers required to be redacted under FRCP 5.2(a) have been removed by the application of black-box overlays. Plaintiff's name remains visible to demonstrate that all pages reproduced in this Exhibit are Plaintiff's own returns.

**11.** I have not altered the substantive content of any record reproduced in this Exhibit. The IRS-filed figures appearing in this Exhibit are identical to those appearing on the returns as filed. The only modifications are the privacy redactions described in Paragraph 10.

**12.** I am prepared to produce the complete, unredacted source records to the Court, to opposing counsel, or to any party upon proper request in discovery, subject to an appropriate protective order if requested.


Executed this _____ day of _____, 2026, at Fresno, California.



_____

BARINDER SINGH BAL

Plaintiff, Pro Se

# EXHIBIT K — INDEX

The pages of this Exhibit are organized into two Sections. Section A reproduces the IRS-filed source pages for tax years 2017 through 2024, in chronological order. Section B reproduces the reconciliation table calculating Plaintiff's non-VMNT (alternative-position) realized capital P&L by year, the damages narrative derived therefrom, and supporting notes.

| Section | Contents | Source | Page Range |
|---|---|---|---|
| A | Tax Year 2017 — IRS-Filed Capital Gain/Loss | Form 1040 | Section A, p. 1 |
| A | Tax Year 2018 — IRS-Filed Capital Gain/Loss | Form 1040, pages 1 and 2; Schedule 1 (Additional Income and Adjustments) | Section A, pp. 2–3 |
| A | Tax Year 2019 — IRS-Filed Capital Gain/Loss | Form 1040 | Section A, p. 4 |
| A | Tax Year 2020 — IRS-Filed Capital Gain/Loss | Form 1040 (Client Copy) | Section A, p. 5 |
| A | Tax Year 2021 — IRS-Filed Capital Gain/Loss | Form 1040 (Client Copy) | Section A, p. 6 |
| A | Tax Year 2022 — IRS-Filed Capital Gain/Loss | Form 1040; Schedule D (Capital Gains and Losses); Form 8949, Part I — Short-Term; Form 8949, Part II — Long-Term; Form 6781 — Section 1256 Contracts | Section A, pp. 7–11 |
| A | Tax Year 2023 — IRS-Filed Capital Gain/Loss | Form 1040; Schedule D (Capital Gains and Losses) | Section A, pp. 12–13 |
| A | Tax Year 2024 — IRS-Filed Capital Gain/Loss | Form 1040; Schedule D (Capital Gains and Losses) | Section A, pp. 14–15 |
| B | Reconciliation Table — IRS Total to Non-VMNT | Calculated from Section A + Exhibit J | Section B, p. 1 |
| B | Damages Narrative — Trajectory by Period | Derived | Section B, p. 2 |

**Quick Reference — Authoritative IRS-Filed Totals and Non-VMNT Derivation:**

| Year | IRS Total Capital Gain/Loss | VMNT Residual (Exhibit J) | Non-VMNT (Calculated) |
|---|---|---|---|
| 2017 | +$49,422 | $0 | +$49,422 |
| 2018 | +$105,934 | $0 | +$105,934 |
| 2019 | +$73,993 | $0 | +$73,993 |
| 2020 | +$389,148 | +$180,212 | +$208,936 |
| 2021 | +$755,556 | +$439,583 | +$315,973 |
| 2022 | +$71,991 | +$80,710 | ($8,719) |
| 2023 | +$10,689 | +$61,654 | ($50,965) |
| 2024 | ($198,109) | $0 | ($198,109) |

*Pre-fraud baseline (2017–2019): avg +$76,450/yr. VMNT-era peak (2020–2021): avg +$262,455/yr. Post-fraud collapse (2022–2024): avg −$85,931/yr. Per-year damages swing from peak to collapse: −$348,386/yr.*

# SECTION A

# IRS-FILED FORM 1040 / SCHEDULE D RECORDS
# TAX YEARS 2017–2024

The pages in this Section reproduce Plaintiff's IRS-filed federal individual income tax returns (Form 1040 and accompanying schedules and supporting forms) for tax years 2017 through 2024. Each tax year's source pages are presented in chronological order. Each return reflects the realized capital gain or loss reported to the IRS for the tax year in question under penalty of perjury pursuant to 26 U.S.C. § 6065.

Personally identifying information (taxpayer identification number, home street address, and other identifiers protected under FRCP 5.2(a)) has been redacted by application of black-box overlays directly on the source pages. Plaintiff's name (BARINDER SINGH BAL) remains visible on each page to establish that all reproduced pages are Plaintiff's own returns.

**EXHIBIT K — Section A — Tax Year 2017 — Page 1 of 15**

IRS Form 1040 / Schedule D (Form 1040)

---

**Form 1040** Department of the Treasury—Internal Revenue Service (99)
**U.S. Individual Income Tax Return** **2017** OMB No. 1545-0074 IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2017, or other tax year beginning , 2017, ending , 20    See separate instructions.

| Your first name and initial | Last name | Your social security number |
|---|---|---|
| BARINDER | BAL | |
| If a joint return, spouse's first name and initial | Last name | Spouse's social security number |

Home address (number and street). If you have a P.O. box, see instructions.    Apt. no.

▲ Make sure the SSN(s) above and on line 6c are correct.

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse

| Foreign country name | Foreign province/state/county | Foreign postal code |
|---|---|---|

**Filing Status**
Check only one box.

1 ☒ Single
2 ☐ Married filing jointly (even if only one had income)
3 ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
4 ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 ☐ Qualifying widow(er) (see instructions)

**Exemptions**

6a ☒ Yourself. If someone can claim you as a dependent, **do not** check box 6a . . . . .
b ☐ Spouse . . . . . . . . . . . . . . . . . . . . . . . . . . .

c Dependents:

| (1) First name   Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if child under age 17 qualifying for child tax credit (see instructions) |
|---|---|---|---|
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |

If more than four dependents, see instructions and check here ▶ ☐

Boxes checked on 6a and 6b  **1**
No. of children on 6c who:
• lived with you
• did not live with you due to divorce or separation (see instructions)
Dependents on 6c not entered above
Add numbers on lines above ▶ **1**

d Total number of exemptions claimed . . . . . . . . . . . . . . . . .

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

| | | | |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . | 7 | 24,668. |
| 8a | Taxable interest. Attach Schedule B if required . . . . . . | 8a | |
| b | Tax-exempt interest. **Do not** include on line 8a . . . | 8b | |
| 9a | Ordinary dividends. Attach Schedule B if required . . . . | 9a | |
| b | Qualified dividends . . . . . . . | 9b | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes . . . . . | 10 | 703. |
| 11 | Alimony received . . . . . . . . . . . . . . | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ . . . . . . . . | 12 | −6,932. |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 | 49,422. |
| 14 | Other gains or (losses). Attach Form 4797 . . . . . . . . | 14 | |
| 15a | IRA distributions . 15a    b Taxable amount . . . | 15b | |
| 16a | Pensions and annuities 16a    b Taxable amount . . . | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | |
| 18 | Farm income or (loss). Attach Schedule F . . . . . . . . . | 18 | |
| 19 | Unemployment compensation . . . . . . . . . . . | 19 | 10,800. |
| 20a | Social security benefits 20a    b Taxable amount . . . | 20b | |
| 21 | Other income. List type and amount | 21 | |
| 22 | Combine the amounts in the far right column for lines 7 through 21. This is your **total income** ▶ | 22 | 78,661. |

**Adjusted Gross Income**

| | | | |
|---|---|---|---|
| 23 | Educator expenses . . . . . . . . . . | 23 | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 | |
| 25 | Health savings account deduction. Attach Form 8889 . | 25 | |
| 26 | Moving expenses. Attach Form 3903 . . . . . . | 26 | |
| 27 | Deductible part of self-employment tax. Attach Schedule SE . | 27 | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans . . | 28 | |
| 29 | Self-employed health insurance deduction . . . . | 29 | |
| 30 | Penalty on early withdrawal of savings . . . . . | 30 | |
| 31a | Alimony paid b Recipient's SSN ▶ | 31a | |
| 32 | IRA deduction . . . . . . . . . . . | 32 | |
| 33 | Student loan interest deduction . . . . . . | 33 | |
| 34 | Tuition and fees. Attach Form 8917 . . . . . | 34 | |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 | |
| 36 | Add lines 23 through 35 . . . . . . . . . . . . . . . . . . | 36 | |
| 37 | Subtract line 36 from line 22. This is your **adjusted gross income** . . . . . ▶ | 37 | 78,661. |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions. BAA    REV 02/22/18 PRO    Form **1040** (2017)

**EXHIBIT K — Section A — Tax Year 2018 — Page 2 of 15**

IRS Form 1040 / Schedule D (Form 1040, pages 1 and 2)

Form **1040** Department of the Treasury—Internal Revenue Service (99) **2018** U.S. Individual Income Tax Return  OMB No. 1545-0074  IRS Use Only—Do not write or staple in this space.

Filing status: ☒ Single  ☐ Married filing jointly  ☐ Married filing separately  ☐ Head of household  ☐ Qualifying widow(er)

| Your first name and initial | Last name | Your social security number |
|---|---|---|
| BARINDER | BAL | ▬▬▬ |

Your standard deduction: ☐ Someone can claim you as a dependent  ☐ You were born before January 2, 1954  ☐ You are blind

If joint return, spouse's first name and initial    Last name    Spouse's social security number

Spouse standard deduction: ☐ Someone can claim your spouse as a dependent  ☐ Spouse was born before January 2, 1954  ☐ Full-year health care coverage or exempt (see inst.)
☐ Spouse is blind  ☐ Spouse itemizes on a separate return or you were dual-status alien

Home address (number and street). If you have a P.O. box, see instructions.  Apt. no.  Presidential Election Campaign (see inst.) ☐ You ☐ Spouse

City, town or post office, state, and ZIP code. If you have a foreign address, attach Schedule 6.  If more than four dependents, see inst. and ✓ here ▶ ☐

**Dependents** (see instructions):

| (1) First name    Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see inst.): Child tax credit | Credit for other dependents |
|---|---|---|---|---|
|  |  |  | ☐ | ☐ |
|  |  |  | ☐ | ☐ |
|  |  |  | ☐ | ☐ |
|  |  |  | ☐ | ☐ |

**Sign Here**
Joint return?
See instructions.
Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date | Your occupation NURSING | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |
|---|---|---|---|
| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |

**Paid Preparer Use Only**

| Preparer's name | Preparer's signature | PTIN ▬▬ | Firm's EIN ▬▬ | Check if: ☐ 3rd Party Designee |
|---|---|---|---|---|
| Firm's name ▶ ▬▬ |  |  | ▬▬ | ☒ Self-employed |
| Firm's address ▶ ▬▬ |  |  |  |  |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.  Form **1040** (2018)

Form 1040 (2018)  Page **2**

Attach Form(s) W-2. Also attach Form(s) W-2G and 1099-R if tax was withheld.

| | | | |
|---|---|---|---|
| 1 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 1 | |
| 2a | Tax-exempt interest . . . 2a | b Taxable interest . . . 2b | |
| 3a | Qualified dividends . . . 3a | b Ordinary dividends . . 3b | |
| 4a | IRAs, pensions, and annuities . 4a | b Taxable amount . . . 4b | |
| 5a | Social security benefits . . 5a | b Taxable amount . . . 5b | |
| 6 | Total income. Add lines 1 through 5. Add any amount from Schedule 1, line 22  86,151. | 6 | 86,151. |
| 7 | Adjusted gross income. If you have no adjustments to income, enter the amount from line 6; otherwise, subtract Schedule 1, line 36, from line 6 | 7 | 86,151. |

**Standard Deduction for—**
- Single or married filing separately, $12,000
- Married filing jointly or Qualifying widow(er), $24,000
- Head of household, $18,000
- If you checked any box under Standard deduction, see instructions.

| | | | |
|---|---|---|---|
| 8 | Standard deduction or itemized deductions (from Schedule A) | 8 | 12,000. |
| 9 | Qualified business income deduction (see instructions) | 9 | 0. |
| 10 | Taxable income. Subtract lines 8 and 9 from line 7. If zero or less, enter -0- | 10 | 74,151. |
| 11 | a Tax (see inst.) 10,508. (check if any from: 1 ☐ Form(s) 8814  2 ☐ Form 4972  3 ☐ _____ ) b Add any amount from Schedule 2 and check here ▶ ☐ | 11 | 10,508. |
| 12 | a Child tax credit/credit for other dependents _____ b Add any amount from Schedule 3 and check here ▶ ☐ | 12 | |
| 13 | Subtract line 12 from line 11. If zero or less, enter -0- | 13 | 10,508. |
| 14 | Other taxes. Attach Schedule 4 | 14 | 1,854. |
| 15 | Total tax. Add lines 13 and 14 | 15 | 12,362. |
| 16 | Federal income tax withheld from Forms W-2 and 1099 | 16 | |
| 17 | Refundable credits: a EIC (see inst.) _____ b Sch. 8812 _____ c Form 8863 _____ | | |
| | Add any amount from Schedule 5 _____ | 17 | |
| 18 | Add lines 16 and 17. These are your total payments | 18 | |

**Refund**
Direct deposit? See instructions.

| | | | |
|---|---|---|---|
| 19 | If line 18 is more than line 15, subtract line 15 from line 18. This is the amount you **overpaid** | 19 | |
| 20a | Amount of line 19 you want **refunded to you**. If Form 8888 is attached, check here ▶ ☐ | 20a | |
| ▶b | Routing number X X X X X X X X X  ▶c Type: ☐ Checking ☐ Savings | | |
| ▶d | Account number X X X X X X X X X X X X X X X X X | | |
| 21 | Amount of line 19 you want applied to your 2019 estimated tax . ▶ 21 | | |

**Amount You Owe**

| | | | |
|---|---|---|---|
| 22 | Amount you owe. Subtract line 18 from line 15. For details on how to pay, see instructions ▶ | 22 | 12,362. |
| 23 | Estimated tax penalty (see instructions) . ▶ 23 | | |

Go to www.irs.gov/Form1040 for instructions and the latest information.  BAA  REV 07/19/20 PRO  Form **1040** (2018)

**EXHIBIT K — Section A — Tax Year 2018 — Page 3 of 15**

IRS Form 1040 / Schedule D (Schedule 1 (Additional Income and Adjustments))

| SCHEDULE 1 (Form 1040) (Rev. January 2020) Department of the Treasury Internal Revenue Service | Additional Income and Adjustments to Income ▶ Attach to Form 1040. ▶ Go to www.irs.gov/Form1040 for instructions and the latest information. | OMB No. 1545-0074 2018 Attachment Sequence No. 01 |
|---|---|---|

| Name(s) shown on Form 1040 | Your social security number |
|---|---|
| BARINDER BAL | ▆▆▆▆▆ |

| Additional Income | | | |
|---|---|---|---|
| | 1–9b | Reserved | **1–9b** ▆ |
| | 10 | Taxable refunds, credits, or offsets of state and local income taxes | **10** |
| | 11 | Alimony received | **11** |
| | 12 | Business income or (loss). Attach Schedule C or C-EZ | **12** −19,783. |
| | 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | **13** 105,934. |
| | 14 | Other gains or (losses). Attach Form 4797 | **14** |
| | 15a | Reserved | **15b** ▆ |
| | 16a | Reserved | **16b** ▆ |
| | 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | **17** |
| | 18 | Farm income or (loss). Attach Schedule F | **18** |
| | 19 | Unemployment compensation | **19** |
| | 20a | Reserved | **20b** ▆ |
| | 21 | Other income. List type and amount ▶ _____ | **21** |
| | 22 | Combine the amounts in the far right column. If you don't have any adjustments to income, enter here and include on Form 1040, line 6. Otherwise, go to line 23 | **22** 86,151. |

| Adjustments to Income | | | |
|---|---|---|---|
| | 23 | Educator expenses | **23** |
| | 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 | **24** |
| | 25 | Health savings account deduction. Attach Form 8889 | **25** |
| | 26 | Moving expenses for members of the Armed Forces. Attach Form 3903 | **26** |
| | 27 | Deductible part of self-employment tax. Attach Schedule SE | **27** |
| | 28 | Self-employed SEP, SIMPLE, and qualified plans | **28** |
| | 29 | Self-employed health insurance deduction | **29** |
| | 30 | Penalty on early withdrawal of savings | **30** |
| | 31a | Alimony paid    b Recipient's SSN ▶ _____ | **31a** |
| | 32 | IRA deduction | **32** |
| | 33 | Student loan interest deduction | **33** |
| | 34 | Tuition and fees. Attach Form 8917 | **34** |
| | 35 | Reserved | **35** ▆ |
| | 36 | Add lines 23 through 35 | **36** |

For Paperwork Reduction Act Notice, see your tax return instructions.                        Schedule 1 (Form 1040) 2018

REV 07/19/20 PRO

**EXHIBIT K — Section A — Tax Year 2019 — Page 4 of 15**

IRS Form 1040 / Schedule D (Form 1040)

Form **1040**

Department of the Treasury — Internal Revenue Service  (99)

**U.S. Individual Income Tax Return**

**2019**

OMB No. 1545-0074 | IRS Use Only — Do not write or staple in this space.

**Filing Status**

Check only one box.

[X] Single  [ ] Married filing jointly  [ ] Married filing separately (MFS)  [ ] Head of household (HOH)  [ ] Qualifying widow(er) (QW)

If you checked the MFS box, enter the name of spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent.  ►

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| BARINDER  BAL | | |

| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |
|---|---|---|
| | | |

Home address (number and street). If you have a P.O. box, see instructions. | Apt. no.

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.  [ ] You  [ ] Spouse

Foreign country name | Foreign province/state/county | Foreign postal code

If more than four dependents, see instructions and ✓ here  ►  [ ]

**Standard Deduction**

Someone can claim:  [ ] You as a dependent  [ ] Your spouse as a dependent

[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**  You:  [ ] Were born before January 2, 1955  [ ] Are blind  **Spouse:**  [ ] Was born before January 2, 1955  [ ] Is blind

**Dependents** (see instructions):

| (1) First name    Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions): | |
|---|---|---|---|---|
| | | | Child tax credit | Credit for other dependents |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | |
|---|---|---|---|
| 1 | Wages, salaries, tips, etc. Attach Form(s) W-2 ..................... | **1** | |
| 2a | Tax-exempt interest ............. **2a** | **b** Taxable int. Att. Sch. B if reqd ........ **2b** | 50. |
| 3a | Qualified dividends .............. **3a** | **b** Ordinary div. Att. Sch. B if reqd ...... **3b** | |
| 4a | IRA distributions ............... **4a** | **b** Taxable amount ............... **4b** | |
| c | Pensions and annuities ...... **4c** | **d** Taxable amount ............... **4d** | |
| 5a | Social security benefits ......... **5a** | **b** Taxable amount ............... **5b** | |
| **6** | Capital gain or (loss). Attach Schedule D if required. If not required, check here ........ ►  [ ] | **6** | 73,993. |
| **7a** | Other income from Schedule 1, line 9 ........................... | **7a** | −3,723. |
| **b** | Add lines 1, 2b, 3b, 4b, 4d, 5b, 6, and 7a. This is your **total income** .................... ► | **7b** | 70,320. |
| **8a** | Adjustments to income from Schedule 1, line 22 ................... | **8a** | |
| **b** | Subtract line 8a from line 7b. This is your **adjusted gross income** ..................... ► | **8b** | 70,320. |
| **9** | Standard deduction or itemized deductions (from Schedule A) ........... **9** | 12,200. | |
| **10** | Qualified business income deduction. Attach Form 8995 or Form 8995-A ....... **10** | | |
| **11a** | Add lines 9 and 10 .................................. | **11a** | 12,200. |
| **b** | **Taxable income.** Subtract line 11a from line 8b. If zero or less, enter -0- ................ | **11b** | 58,120. |

**Standard Deduction for —**
- Single or Married filing separately, $12,200
- Married filing jointly or Qualifying widow(er), $24,400
- Head of household, $18,350
- If you checked any box under *Standard Deduction,* see instructions.

**BAA  For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**

Form **1040** (2019)

**EXHIBIT K — Section A — Tax Year 2020 — Page 5 of 15**

IRS Form 1040 / Schedule D (Form 1040 (Client Copy))

Form **1040** — Department of the Treasury — Internal Revenue Service (99)
**U.S. Individual Income Tax Return** — **2020** — OMB No. 1545-0074 — IRS Use Only — Do not write or staple in this space.

**Filing Status** — Check only one box.
[X] Single  [ ] Married filing jointly  [ ] Married filing separately (MFS)  [ ] Head of household (HOH)  [ ] Qualifying widow(er) (QW)

If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent ►

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| BARINDER BAL | | |

| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |
|---|---|---|
| | | |

Home address (number and street). If you have a P.O. box, see instructions. — Apt. no.

City, town, or post office. If you have a foreign address, also complete spaces below. — State — ZIP code

Foreign country name — Foreign province/state/county — Foreign postal code

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.
[ ] You  [ ] Spouse

At any time during 2020, did you receive, sell, send, exchange, or otherwise acquire any financial interest in any virtual currency?  [ ] Yes  [X] No

**Standard Deduction**
Someone can claim:  [ ] You as a dependent   [ ] Your spouse as a dependent
[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**  You:  [ ] Were born before January 2, 1956  [ ] Are blind   Spouse:  [ ] Was born before January 2, 1956  [ ] Is blind

**Dependents** (see instructions):

| (1) First name   Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions): Child tax credit | Credit for other dependents |
|---|---|---|---|---|
| | | | | |

If more than four dependents, see instructions and check here ►

| | | | |
|---|---|---|---|
| | 1 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 1 | |
| Attach Sch. B if required. | 2a | Tax-exempt interest ... 2a | b Taxable interest ... 2b | |
| | 3a | Qualified dividends ... 3a | b Ordinary dividends ... 3b | |
| | 4a | IRA distributions ... 4a | b Taxable amount ... 4b | |
| | 5a | Pensions and annuities ... 5a | b Taxable amount ... 5b | |
| | 6a | Social security benefits ... 6a | b Taxable amount ... 6b | |
| | 7 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ► [ ] | 7 | 389,148. |
| | 8 | Other income from Schedule 1, line 9 | 8 | −7,140. |
| | 9 | Add lines 1, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** ► | 9 | 382,008. |

**Standard Deduction for —**
• Single or Married filing separately, $12,400
• Married filing jointly or Qualifying widow(er), $24,800
• Head of household, $18,650
• If you checked any box under *Standard Deduction*, see instructions.

| | | | |
|---|---|---|---|
| 10 | Adjustments to income: | | |
| a | From Schedule 1, line 22 ... 10a | | |
| b | Charitable contributions if you take the standard deduction. See instructions ... 10b | | |
| c | Add lines 10a and 10b. These are your **total adjustments to income** ► | 10c | |
| 11 | Subtract line 10c from line 9. This is your **adjusted gross income** ► | 11 | 382,008. |
| 12 | **Standard deduction or itemized deductions** (from Schedule A) | 12 | 12,400. |
| 13 | Qualified business income deduction. Attach Form 8995 or Form 8995-A | 13 | |
| 14 | Add lines 12 and 13 | 14 | 12,400. |
| 15 | **Taxable income.** Subtract line 14 from line 11. If zero or less, enter -0- | 15 | 369,608. |

BAA  For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.  Form **1040** (2020)

CLIENT COPY

**EXHIBIT K — Section A — Tax Year 2021 — Page 6 of 15**

IRS Form 1040 / Schedule D (Form 1040 (Client Copy))

Form **1040**
Department of the Treasury — Internal Revenue Service (99)
**U.S. Individual Income Tax Return** **2021**
OMB No. 1545-0074
IRS Use Only — Do not write or staple in this space.

**Filing Status**
Check only one box.
[X] Single [ ] Married filing jointly [ ] Married filing separately (MFS) [ ] Head of household (HOH) [ ] Qualifying widow(er) (QW)
If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent ▶

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| BARINDER BAL | | |

| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |
|---|---|---|
| | | |

Home address (number and street). If you have a P.O. box, see instructions. | Apt. no.

City, town, or post office. If you have a foreign address, also complete spaces below. | State | ZIP code

Foreign country name | Foreign province/state/county | Foreign postal code

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.
[ ] You [ ] Spouse

At any time during 2021, did you receive, sell, exchange, or otherwise dispose of any financial interest in any virtual currency? [ ] Yes [X] No

**Standard Deduction**
Someone can claim: [ ] You as a dependent [ ] Your spouse as a dependent
[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness** You: [ ] Were born before January 2, 1957 [ ] Are blind **Spouse:** [ ] Was born before January 2, 1957 [ ] Is blind

**Dependents** (see instructions):
If more than four dependents, see instructions and check here ▶

| (1) First name   Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions): Child tax credit | Credit for other dependents |
|---|---|---|---|---|
| | | | | |

| | | | | |
|---|---|---|---|---|
| Attach Sch. B if required. | 1 Wages, salaries, tips, etc. Attach Form(s) W-2 | | 1 | |
| | 2a Tax-exempt interest | 2a | **b** Taxable interest | 2b | 11. |
| | 3a Qualified dividends | 3a | **b** Ordinary dividends | 3b | |
| | 4a IRA distributions | 4a | **b** Taxable amount | 4b | |
| | 5a Pensions and annuities | 5a | **b** Taxable amount | 5b | |
| | 6a Social security benefits | 6a | **b** Taxable amount | 6b | |
| | 7 Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ [ ] | | 7 | 755,556. |
| | 8 Other income from Schedule 1, line 10 | | 8 | -4,340. |
| | 9 Add lines 1, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** ▶ | | 9 | 751,227. |
| | 10 Adjustments to income from Schedule 1, line 26 | | 10 | |
| | 11 Subtract line 10 from line 9. This is your **adjusted gross income** ▶ | | 11 | 751,227. |

**Standard Deduction for —**
• Single or Married filing separately, $12,550
• Married filing jointly or Qualifying widow(er), $25,100
• Head of household, $18,800
• If you checked any box under *Standard Deduction,* see instructions.

| 12 a Standard deduction or itemized deductions (from Schedule A) | 12a | 12,550. |
|---|---|---|
| **b** Charitable contributions if you take the standard deduction (see instructions) | 12b | |
| **c** Add lines 12a and 12b | 12c | 12,550. |
| 13 Qualified business income deduction from Form 8995 or Form 8995-A | 13 | |
| 14 Add lines 12c and 13 | 14 | 12,550. |
| 15 **Taxable income.** Subtract line 14 from line 11. If zero or less, enter -0- | 15 | 738,677. |

BAA **For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.** Form **1040** (2021)

CLIENT COPY

**EXHIBIT K — Section A — Tax Year 2022 — Page 7 of 15**

IRS Form 1040 / Schedule D (Form 1040)

Form **1040** — Department of the Treasury—Internal Revenue Service — **U.S. Individual Income Tax Return** — **2022** — OMB No. 1545-0074 — IRS Use Only—Do not write or staple in this space.

**Filing Status** — Check only one box. — ☒ Single ☐ Married filing jointly ☐ Married filing separately (MFS) ☐ Head of household (HOH) ☐ Qualifying surviving spouse (QSS)

If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QSS box, enter the child's name if the qualifying person is a child but not your dependent:

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| BARINDER SINGH | BAL | |

| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |
|---|---|---|
| | | |

Home address (number and street). If you have a P.O. box, see instructions. — Apt. no.

City, town, or post office. If you have a foreign address, also complete spaces below. — State — ZIP code

Foreign country name — Foreign province/state/county — Foreign postal code

**Presidential Election Campaign** Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse

**Digital Assets** At any time during 2022, did you: (a) receive (as a reward, award, or payment for property or services); or (b) sell, exchange, gift, or otherwise dispose of a digital asset (or a financial interest in a digital asset)? (See instructions.) ☒ Yes ☐ No

**Standard Deduction** Someone can claim: ☐ You as a dependent ☐ Your spouse as a dependent
☐ Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness** You: ☐ Were born before January 2, 1958 ☐ Are blind   Spouse: ☐ Was born before January 2, 1958 ☐ Is blind

**Dependents** (see instructions): — If more than four dependents, see instructions and check here ☐

| (1) First name   Last name | (2) Social security number | (3) Relationship to you | (4) Check the box if qualifies for (see instructions): | |
|---|---|---|---|---|
| | | | Child tax credit | Credit for other dependents |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld. If you did not get a Form W-2, see instructions.

| | | | |
|---|---|---|---|
| 1a | Total amount from Form(s) W-2, box 1 (see instructions) | 1a | |
| b | Household employee wages not reported on Form(s) W-2 | 1b | |
| c | Tip income not reported on line 1a (see instructions) | 1c | |
| d | Medicaid waiver payments not reported on Form(s) W-2 (see instructions) | 1d | |
| e | Taxable dependent care benefits from Form 2441, line 26 | 1e | |
| f | Employer-provided adoption benefits from Form 8839, line 29 | 1f | |
| g | Wages from Form 8919, line 6 | 1g | |
| h | Other earned income (see instructions) | 1h | |
| i | Nontaxable combat pay election (see instructions) [1i] | | |
| z | Add lines 1a through 1h | 1z | |

Attach Sch. B if required.

| | | | | | | |
|---|---|---|---|---|---|---|
| 2a | Tax-exempt interest | 2a | | b Taxable interest | 2b | 31. |
| 3a | Qualified dividends | 3a | | b Ordinary dividends | 3b | |
| 4a | IRA distributions | 4a | | b Taxable amount | 4b | |
| 5a | Pensions and annuities | 5a | | b Taxable amount | 5b | |
| 6a | Social security benefits | 6a | | b Taxable amount | 6b | |

**Standard Deduction for—**
- Single or Married filing separately, $12,950
- Married filing jointly or Qualifying surviving spouse, $25,900
- Head of household, $19,400
- If you checked any box under Standard Deduction, see instructions.

| | | | |
|---|---|---|---|
| c | If you elect to use the lump-sum election method, check here (see instructions) ☐ | | |
| 7 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ☐ | 7 | 71,991. |
| 8 | Other income from Schedule 1, line 10 | 8 | |
| 9 | Add lines 1z, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** | 9 | 72,022. |
| 10 | Adjustments to income from Schedule 1, line 26 | 10 | |
| 11 | Subtract line 10 from line 9. This is your **adjusted gross income** | 11 | 72,022. |
| 12 | **Standard deduction or itemized deductions** (from Schedule A) | 12 | 12,950. |
| 13 | Qualified business income deduction from Form 8995 or Form 8995-A | 13 | |
| 14 | Add lines 12 and 13 | 14 | 12,950. |
| 15 | Subtract line 14 from line 11. If zero or less, enter -0-. This is your **taxable income** | 15 | 59,072. |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.

Form **1040** (2022)

**EXHIBIT K — Section A — Tax Year 2022 — Page 8 of 15**

IRS Form 1040 / Schedule D (Schedule D (Capital Gains and Losses))

| SCHEDULE D (Form 1040) | Capital Gains and Losses | OMB No. 1545-0074 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | Attach to Form 1040, 1040-SR, or 1040-NR.<br>Go to *www.irs.gov/ScheduleD* for instructions and the latest information.<br>Use Form 8949 to list your transactions for lines 1b, 2, 3, 8b, 9, and 10. | **2022** Attachment Sequence No. **12** |

| Name(s) shown on return | Your social security number |
|---|---|
| BARINDER SINGH BAL | |

Did you dispose of any investment(s) in a qualified opportunity fund during the tax year?  ☐ Yes  ☒ No
If "Yes," attach Form 8949 and see its instructions for additional requirements for reporting your gain or loss.

### Part I — Short-Term Capital Gains and Losses—Generally Assets Held One Year or Less (see instructions)

| See instructions for how to figure the amounts to enter on the lines below.<br>This form may be easier to complete if you round off cents to whole dollars. | (d) Proceeds (sales price) | (e) Cost (or other basis) | (g) Adjustments to gain or loss from Form(s) 8949, Part I, line 2, column (g) | (h) Gain or (loss) Subtract column (e) from column (d) and combine the result with column (g) |
|---|---|---|---|---|
| **1a** Totals for all short-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 1b . | | | | |
| **1b** Totals for all transactions reported on Form(s) 8949 with **Box A** checked . . . . . . . . . . . . . . | 3,571,881. | 3,598,323. | 19,218. | −7,224. |
| **2** Totals for all transactions reported on Form(s) 8949 with **Box B** checked . . . . . . . . . . . . . . | | | | |
| **3** Totals for all transactions reported on Form(s) 8949 with **Box C** checked . . . . . . . . . . . . . . | | | | |

| | | |
|---|---|---|
| **4** Short-term gain from Form 6252 and short-term gain or (loss) from Forms 4684, 6781, and 8824 . . | **4** | −598. |
| **5** Net short-term gain or (loss) from partnerships, S corporations, estates, and trusts from Schedule(s) K-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5** | |
| **6** Short-term capital loss carryover. Enter the amount, if any, from line 8 of your **Capital Loss Carryover Worksheet** in the instructions . . . . . . . . . . . . . . . . . . | **6** | ( ) |
| **7** **Net short-term capital gain or (loss).** Combine lines 1a through 6 in column (h). If you have any long-term capital gains or losses, go to Part II below. Otherwise, go to Part III on the back . . . . . . | **7** | −7,822. |

### Part II — Long-Term Capital Gains and Losses—Generally Assets Held More Than One Year (see instructions)

| See instructions for how to figure the amounts to enter on the lines below.<br>This form may be easier to complete if you round off cents to whole dollars. | (d) Proceeds (sales price) | (e) Cost (or other basis) | (g) Adjustments to gain or loss from Form(s) 8949, Part II, line 2, column (g) | (h) Gain or (loss) Subtract column (e) from column (d) and combine the result with column (g) |
|---|---|---|---|---|
| **8a** Totals for all long-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 8b . | | | | |
| **8b** Totals for all transactions reported on Form(s) 8949 with **Box D** checked . . . . . . . . . . . . . . | 83,149. | 2,439. | | 80,710. |
| **9** Totals for all transactions reported on Form(s) 8949 with **Box E** checked . . . . . . . . . . . . . . | | | | |
| **10** Totals for all transactions reported on Form(s) 8949 with **Box F** checked. . . . . . . . . . . . . . | | | | |

| | | |
|---|---|---|
| **11** Gain from Form 4797, Part I; long-term gain from Forms 2439 and 6252; and long-term gain or (loss) from Forms 4684, 6781, and 8824 . . . . . . . . . . . . . . . . . . . | **11** | −897. |
| **12** Net long-term gain or (loss) from partnerships, S corporations, estates, and trusts from Schedule(s) K-1 | **12** | |
| **13** Capital gain distributions. See the instructions . . . . . . . . . . . . . . . . . . | **13** | |
| **14** Long-term capital loss carryover. Enter the amount, if any, from line 13 of your **Capital Loss Carryover Worksheet** in the instructions . . . . . . . . . . . . . . . . . . | **14** | ( ) |
| **15** **Net long-term capital gain or (loss).** Combine lines 8a through 14 in column (h). Then, go to Part III on the back . . . . . . . . . . . . . . . . . . . . . . . . . . . | **15** | 79,813. |

For Paperwork Reduction Act Notice, see your tax return instructions.    BAA    REV 07/23/23 PRO    Schedule D (Form 1040) 2022

**EXHIBIT K — Section A — Tax Year 2022 — Page 9 of 15**

IRS Form 1040 / Schedule D (Form 8949, Part I — Short-Term)

**Form 8949**

Department of the Treasury
Internal Revenue Service

**Sales and Other Dispositions of Capital Assets**

Go to *www.irs.gov/Form8949* for instructions and the latest information.
File with your Schedule D to list your transactions for lines 1b, 2, 3, 8b, 9, and 10 of Schedule D.

OMB No. 1545-0074

**2022**

Attachment
Sequence No. **12A**

Name(s) shown on return

BARINDER SINGH BAL

Social security number or taxpayer identification number

Before you check Box A, B, or C below, see whether you received any Form(s) 1099-B or substitute statement(s) from your broker. A substitute statement will have the same information as Form 1099-B. Either will show whether your basis (usually your cost) was reported to the IRS by your broker and may even tell you which box to check.

**Part I** **Short-Term.** Transactions involving capital assets you held 1 year or less are generally short-term (see instructions). For long-term transactions, see page 2.

**Note:** You may aggregate all short-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS and for which no adjustments or codes are required. Enter the totals directly on Schedule D, line 1a; you aren't required to report these transactions on Form 8949 (see instructions).

**You *must* check Box A, B, *or* C below. Check only one box.** If more than one box applies for your short-term transactions, complete a separate Form 8949, page 1, for each applicable box. If you have more short-term transactions than will fit on this page for one or more of the boxes, complete as many forms with the same box checked as you need.

- ☒ **(A)** Short-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS (see **Note** above)
- ☐ **(B)** Short-term transactions reported on Form(s) 1099-B showing basis **wasn't** reported to the IRS
- ☐ **(C)** Short-term transactions not reported to you on Form 1099-B

| **1** (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold or disposed of (Mo., day, yr.) | (d) Proceeds (sales price) (see instructions) | (e) Cost or other basis See the **Note** below and see *Column (e)* in the separate instructions. | (f) Code(s) from instructions | (g) Amount of adjustment | (h) Gain or (loss) Subtract column (e) from column (d) and combine the result with column (g). |
|---|---|---|---|---|---|---|---|
| AMERITRADE | Various | 12/31/22 | 1,079,323. | 1,141,012. | W | 19,218. | -42,471. |
| MORGAN STANLEY DOMESTIC | Various | 12/31/22 | 2,485,909. | 2,454,040. | | | 31,869. |
| MORGAN STANLEY DOMESTIC | Various | 12/31/22 | 6,649. | 3,271. | | | 3,378. |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| **2 Totals.** Add the amounts in columns (d), (e), (g), and (h) (subtract negative amounts). Enter each total here and include on your Schedule D, **line 1b** (if **Box A** above is checked), **line 2** (if **Box B** above is checked), or **line 3** (if **Box C** above is checked) . . | | | 3,571,881. | 3,598,323. | | 19,218. | -7,224. |

**Note:** If you checked Box A above but the basis reported to the IRS was incorrect, enter in column (e) the basis as reported to the IRS, and enter an adjustment in column (g) to correct the basis. See *Column (g)* in the separate instructions for how to figure the amount of the adjustment.

**For Paperwork Reduction Act Notice, see your tax return instructions.**    BAA    REV 07/23/23 PRO    Form **8949** (2022)

**EXHIBIT K — Section A — Tax Year 2022 — Page 10 of 15**

IRS Form 1040 / Schedule D (Form 8949, Part II — Long-Term)

Form 8949 (2022)                                                    Attachment Sequence No. **12A**    Page **2**

| Name(s) shown on return. Name and SSN or taxpayer identification no. not required if shown on other side | Social security number or taxpayer identification number |
|---|---|
| BARINDER SINGH BAL | ▃▃▃▃▃▃ |

*Before you check Box D, E, or F below, see whether you received any Form(s) 1099-B or substitute statement(s) from your broker. A substitute statement will have the same information as Form 1099-B. Either will show whether your basis (usually your cost) was reported to the IRS by your broker and may even tell you which box to check.*

**Part II**  **Long-Term.** Transactions involving capital assets you held more than 1 year are generally long-term (see instructions). For short-term transactions, see page 1.

**Note:** You may aggregate all long-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS and for which no adjustments or codes are required. Enter the totals directly on Schedule D, line 8a; you aren't required to report these transactions on Form 8949 (see instructions).

**You *must* check Box D, E, or F below. Check only one box.** If more than one box applies for your long-term transactions, complete a separate Form 8949, page 2, for each applicable box. If you have more long-term transactions than will fit on this page for one or more of the boxes, complete as many forms with the same box checked as you need.

☒ **(D)** Long-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS (see **Note** above)
☐ **(E)** Long-term transactions reported on Form(s) 1099-B showing basis **wasn't** reported to the IRS
☐ **(F)** Long-term transactions not reported to you on Form 1099-B

| 1 (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold or disposed of (Mo., day, yr.) | (d) Proceeds (sales price) (see instructions) | (e) Cost or other basis See the **Note** below and see *Column (e)* in the separate instructions. | (f) Code(s) from instructions | (g) Amount of adjustment | (h) Gain or (loss) Subtract column (e) from column (d) and combine the result with column (g). |
|---|---|---|---|---|---|---|---|
| MORGAN STANLEY DOMESTIC | various | 12/31/22 | 83,149. | 2,439. | | | 80,710. |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| **2 Totals.** Add the amounts in columns (d), (e), (g), and (h) (subtract negative amounts). Enter each total here and include on your Schedule D, **line 8b** (if **Box D** above is checked), **line 9** (if **Box E** above is checked), or **line 10** (if **Box F** above is checked) . . | | | 83,149. | 2,439. | | | 80,710. |

**Note:** If you checked Box D above but the basis reported to the IRS was incorrect, enter in column (e) the basis as reported to the IRS, and enter an adjustment in column (g) to correct the basis. See *Column (g)* in the separate instructions for how to figure the amount of the adjustment.

**BAA**          REV 07/23/23 PRO                    Form **8949** (2022)

**EXHIBIT K — Section A — Tax Year 2022 — Page 11 of 15**

IRS Form 1040 / Schedule D (Form 6781 — Section 1256 Contracts)

Form **6781**

Department of the Treasury
Internal Revenue Service

**Gains and Losses From Section 1256 Contracts and Straddles**

Go to *www.irs.gov/Form6781* for the latest information.

**Attach to your tax return.**

OMB No. 1545-0644

**2022**

Attachment
Sequence No. **82**

Name(s) shown on tax return

BARINDER SINGH BAL

Identifying number

Check all applicable boxes.
See instructions.

A ☐ Mixed straddle election
B ☐ Straddle-by-straddle identification election

C ☐ Mixed straddle account election
D ☒ Net section 1256 contracts loss election

## Part I  Section 1256 Contracts Marked to Market

| (a) Identification of account | (b) (Loss) | (c) Gain | |
|---|---|---|---|
| 1  Form 1099-B CHARLES SCHWAB | −1,495. | | |

| | | | |
|---|---|---|---|
| 2 | Add the amounts on line 1 in columns (b) and (c) . . . . . . | **2** ( 1,495. ) | |
| 3 | Net gain or (loss). Combine line 2, columns (b) and (c) . . . . . . . . . . . . . . . | **3** | −1,495. |
| 4 | Form 1099-B adjustments. See instructions and attach statement . . . . . . . . . . . | **4** | |
| 5 | Combine lines 3 and 4 . . . . . . . . . . . . . . . . . . . . . . . . . | **5** | −1,495. |
| | **Note:** If line 5 shows a net gain, skip line 6 and enter the gain on line 7. Partnerships and S corporations, see instructions. | | |
| 6 | If you have a net section 1256 contracts loss and checked box D above, enter the amount of loss to be carried back. Enter the loss as a positive number. If you didn't check box D, enter -0- . . . . | **6** | 0. |
| 7 | Combine lines 5 and 6 . . . . . . . . . . . . . . . . . . . . . . . . . | **7** | −1,495. |
| 8 | **Short-term capital gain or (loss).** Multiply line 7 by 40% (0.40). Enter here and include on line 4 of Schedule D or on Form 8949. See instructions . . . . . . . . . . . . . . . . . . . . | **8** | −598. |
| 9 | **Long-term capital gain or (loss).** Multiply line 7 by 60% (0.60). Enter here and include on line 11 of Schedule D or on Form 8949. See instructions . . . . . . . . . . . . . . . . . . . | **9** | −897. |

## Part II  Gains and Losses From Straddles. Attach a separate statement listing each straddle and its components.

### Section A—Losses From Straddles

| (a) Description of property | (b) Date entered into or acquired | (c) Date closed out or sold | (d) Gross sales price | (e) Cost or other basis plus expense of sale | (f) Loss. If column (e) is more than (d), enter difference. Otherwise, enter -0-. | (g) Unrecognized gain on offsetting positions | (h) Recognized loss. If column (f) is more than (g), enter difference. Otherwise, enter -0-. |
|---|---|---|---|---|---|---|---|
| 10 | | | | | | | |

| | | | |
|---|---|---|---|
| 11a | Enter the short-term portion of losses from line 10, column (h), here and include on line 4 of Schedule D or on Form 8949. See instructions . . . . . . . . . . . . . . . . . . . . . . . | **11a** ( ) |
| b | Enter the long-term portion of losses from line 10, column (h), here and include on line 11 of Schedule D or on Form 8949. See instructions . . . . . . . . . . . . . . . . . . . . . . . | **11b** ( ) |

### Section B—Gains From Straddles

| (a) Description of property | (b) Date entered into or acquired | (c) Date closed out or sold | (d) Gross sales price | (e) Cost or other basis plus expense of sale | (f) Gain. If column (d) is more than (e), enter difference. Otherwise, enter -0-. |
|---|---|---|---|---|---|
| 12 | | | | | |

| | | | |
|---|---|---|---|
| 13a | Enter the short-term portion of gains from line 12, column (f), here and include on line 4 of Schedule D or on Form 8949. See instructions . . . . . . . . . . . . . . . . . . . . . . . | **13a** |
| b | Enter the long-term portion of gains from line 12, column (f), here and include on line 11 of Schedule D or on Form 8949. See instructions . . . . . . . . . . . . . . . . . . . . . . . | **13b** |

## Part III  Unrecognized Gains From Positions Held on Last Day of Tax Year. Memo entry only (see instructions)

| (a) Description of property | (b) Date acquired | (c) Fair market value on last business day of tax year | (d) Cost or other basis as adjusted | (e) Unrecognized gain. If column (c) is more than (d), enter difference. Otherwise, enter -0-. |
|---|---|---|---|---|
| 14 | | | | |

**For Paperwork Reduction Act Notice, see instructions.**    BAA    REV 07/23/23 PRO    Form **6781** (2022)

**EXHIBIT K — Section A — Tax Year 2023 — Page 12 of 15**

IRS Form 1040 / Schedule D (Form 1040)

---

**Form 1040** — Department of the Treasury—Internal Revenue Service
**U.S. Individual Income Tax Return** — **2023** — OMB No. 1545-0074 — IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2023, or other tax year beginning _____, 2023, ending _____, 20 ___ — See separate instructions.

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| BARINDER SINGH | BAL | ▉▉▉▉▉ |

If joint return, spouse's first name and middle initial | Last name | Spouse's social security number

Home address (number and street). If you have a P.O. box, see instructions. ▉▉▉▉ | Apt. no.

**Presidential Election Campaign** — Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse

City, town, or post office. If you have a foreign address, also complete spaces below. ▉▉▉▉ | State ▉ | ZIP code ▉

Foreign country name | Foreign province/state/county | Foreign postal code

**Filing Status** — Check only one box.
☒ Single
☐ Married filing jointly (even if only one had income)
☐ Married filing separately (MFS)
☐ Head of household (HOH)
☐ Qualifying surviving spouse (QSS)

If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QSS box, enter the child's name if the qualifying person is a child but not your dependent: _____

**Digital Assets** — At any time during 2023, did you: (a) receive (as a reward, award, or payment for property or services); or (b) sell, exchange, or otherwise dispose of a digital asset (or a financial interest in a digital asset)? (See instructions.) ☒ Yes ☐ No

**Standard Deduction** — Someone can claim: ☐ You as a dependent ☐ Your spouse as a dependent
☐ Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness** You: ☐ Were born before January 2, 1959 ☐ Are blind Spouse: ☐ Was born before January 2, 1959 ☐ Is blind

**Dependents** (see instructions):

| (1) First name   Last name | (2) Social security number | (3) Relationship to you | (4) Child tax credit | Credit for other dependents |
|---|---|---|---|---|
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |

If more than four dependents, see instructions and check here ☐

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld. If you did not get a Form W-2, see instructions.

| | | Amount |
|---|---|---|
| 1a | Total amount from Form(s) W-2, box 1 (see instructions) | 1a |
| b | Household employee wages not reported on Form(s) W-2 | 1b |
| c | Tip income not reported on line 1a (see instructions) | 1c |
| d | Medicaid waiver payments not reported on Form(s) W-2 (see instructions) | 1d |
| e | Taxable dependent care benefits from Form 2441, line 26 | 1e |
| f | Employer-provided adoption benefits from Form 8839, line 29 | 1f |
| g | Wages from Form 8919, line 6 | 1g |
| h | Other earned income (see instructions) | 1h |
| i | Nontaxable combat pay election (see instructions) · 1i | |
| z | Add lines 1a through 1h | 1z |

Attach Sch. B if required.

| | | | | Amount |
|---|---|---|---|---|
| 2a | Tax-exempt interest · 2a | b | Taxable interest | 2b | 1. |
| 3a | Qualified dividends · 3a | b | Ordinary dividends | 3b | |
| 4a | IRA distributions · 4a | b | Taxable amount | 4b | |
| 5a | Pensions and annuities · 5a | b | Taxable amount | 5b | |
| 6a | Social security benefits · 6a | b | Taxable amount | 6b | |

**Standard Deduction for—**
- Single or Married filing separately, $13,850
- Married filing jointly or Qualifying surviving spouse, $27,700
- Head of household, $20,800
- If you checked any box under Standard Deduction, see instructions.

| | | Amount |
|---|---|---|
| c | If you elect to use the lump-sum election method, check here (see instructions) ☐ | |
| 7 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ☐ | 7 | 10,689. |
| 8 | Additional income from Schedule 1, line 10 | 8 | |
| 9 | Add lines 1z, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** | 9 | 10,690. |
| 10 | Adjustments to income from Schedule 1, line 26 | 10 | |
| 11 | Subtract line 10 from line 9. This is your **adjusted gross income** | 11 | 10,690. |
| 12 | **Standard deduction or itemized deductions** (from Schedule A) | 12 | 13,850. |
| 13 | Qualified business income deduction from Form 8995 or Form 8995-A | 13 | |
| 14 | Add lines 12 and 13 | 14 | 13,850. |
| 15 | Subtract line 14 from line 11. If zero or less, enter -0-. This is your **taxable income** | 15 | 0. |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.

Form **1040** (2023)

**EXHIBIT K — Section A — Tax Year 2023 — Page 13 of 15**

IRS Form 1040 / Schedule D (Schedule D (Capital Gains and Losses))

| SCHEDULE D (Form 1040)<br>Department of the Treasury<br>Internal Revenue Service | **Capital Gains and Losses**<br>Attach to Form 1040, 1040-SR, or 1040-NR.<br>Use Form 8949 to list your transactions for lines 1b, 2, 3, 8b, 9, and 10.<br>Go to *www.irs.gov/ScheduleD* for instructions and the latest information. | OMB No. 1545-0074<br>20**23**<br>Attachment Sequence No. **12** |
|---|---|---|

| Name(s) shown on return | Your social security number |
|---|---|
| BARINDER SINGH BAL | |

Did you dispose of any investment(s) in a qualified opportunity fund during the tax year?  ☐ Yes  ☒ No
If "Yes," attach Form 8949 and see its instructions for additional requirements for reporting your gain or loss.

**Part I  Short-Term Capital Gains and Losses—Generally Assets Held One Year or Less** (see instructions)

| See instructions for how to figure the amounts to enter on the lines below.<br>This form may be easier to complete if you round off cents to whole dollars. | **(d)** Proceeds (sales price) | **(e)** Cost (or other basis) | **(g)** Adjustments to gain or loss from Form(s) 8949, Part I, line 2, column (g) | **(h) Gain or (loss)** Subtract column (e) from column (d) and combine the result with column (g) |
|---|---|---|---|---|
| **1a** Totals for all short-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 1b . | | | | |
| **1b** Totals for all transactions reported on Form(s) 8949 with **Box A** checked . . . . . . . . . . . . . | | | | |
| **2** Totals for all transactions reported on Form(s) 8949 with **Box B** checked . . . . . . . . . . . . . | | | | |
| **3** Totals for all transactions reported on Form(s) 8949 with **Box C** checked . . . . . . . . . . . . . | 141,255. | 141,935. | 3,397. | 2,717. |
| **4** Short-term gain from Form 6252 and short-term gain or (loss) from Forms 4684, 6781, and 8824  . . | | | **4** | |
| **5** Net short-term gain or (loss) from partnerships, S corporations, estates, and trusts from Schedule(s) K-1 . . . . . . . . . . . . . . . . . . | | | **5** | |
| **6** Short-term capital loss carryover. Enter the amount, if any, from line 8 of your **Capital Loss Carryover Worksheet** in the instructions  . . . . . . . . . . . | | | **6** ( ) | |
| **7** **Net short-term capital gain or (loss).** Combine lines 1a through 6 in column (h). If you have any long-term capital gains or losses, go to Part II below. Otherwise, go to Part III on the back  . . . . . . | | | **7** | 2,717. |

**Part II  Long-Term Capital Gains and Losses—Generally Assets Held More Than One Year** (see instructions)

| See instructions for how to figure the amounts to enter on the lines below.<br>This form may be easier to complete if you round off cents to whole dollars. | **(d)** Proceeds (sales price) | **(e)** Cost (or other basis) | **(g)** Adjustments to gain or loss from Form(s) 8949, Part II, line 2, column (g) | **(h) Gain or (loss)** Subtract column (e) from column (d) and combine the result with column (g) |
|---|---|---|---|---|
| **8a** Totals for all long-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 8b . | | | | |
| **8b** Totals for all transactions reported on Form(s) 8949 with **Box D** checked  . . . . . . . . . . . | | | | |
| **9** Totals for all transactions reported on Form(s) 8949 with **Box E** checked  . . . . . . . . . . . | | | | |
| **10** Totals for all transactions reported on Form(s) 8949 with **Box F** checked.  . . . . . . . . . . . | 74,918. | 66,946. | | 7,972. |
| **11** Gain from Form 4797, Part I; long-term gain from Forms 2439 and 6252; and long-term gain or (loss) from Forms 4684, 6781, and 8824  . . . . . . . . . . . . . . . . . . | | | **11** | |
| **12** Net long-term gain or (loss) from partnerships, S corporations, estates, and trusts from Schedule(s) K-1 | | | **12** | |
| **13** Capital gain distributions. See the instructions  . . . . . . . . . . . . . . . . . . . . | | | **13** | |
| **14** Long-term capital loss carryover. Enter the amount, if any, from line 13 of your **Capital Loss Carryover Worksheet** in the instructions  . . . . . . . . . . . . . . . | | | **14** ( ) | |
| **15** **Net long-term capital gain or (loss).** Combine lines 8a through 14 in column (h). Then, go to Part III on the back .  . . . . . . . . . . . . . . . . . . . . . . . . | | | **15** | 7,972. |

For Paperwork Reduction Act Notice, see your tax return instructions.    Schedule D (Form 1040) 2023

**EXHIBIT K — Section A — Tax Year 2024 — Page 14 of 15**

IRS Form 1040 / Schedule D (Form 1040)

---

**Form 1040** — Department of the Treasury—Internal Revenue Service
**U.S. Individual Income Tax Return** — **2024** — OMB No. 1545-0074 — IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2024, or other tax year beginning _____, 2024, ending _____, 20 _____

See separate instructions.

Your first name and middle initial: BARINDER SINGH
Last name: BAL
Your social security number: [redacted]

If joint return, spouse's first name and middle initial:
Last name:
Spouse's social security number:

Home address (number and street). If you have a P.O. box, see instructions.: [redacted]
Apt. no.:

City, town, or post office. If you have a foreign address, also complete spaces below.: [redacted]
State: [redacted]
ZIP code: [redacted]

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse

Foreign country name:
Foreign province/state/county:
Foreign postal code:

**Filing Status**
Check only one box.
☒ Single
☐ Married filing jointly (even if only one had income)
☐ Married filing separately (MFS)
☐ Head of household (HOH)
☐ Qualifying surviving spouse (QSS)

If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QSS box, enter the child's name if the qualifying person is a child but not your dependent: _____

☐ If treating a nonresident alien or dual-status alien spouse as a U.S. resident for the entire tax year, check the box and enter their name (see instructions and attach statement if required): _____

**Digital Assets**
At any time during 2024, did you: (a) receive (as a reward, award, or payment for property or services); or (b) sell, exchange, or otherwise dispose of a digital asset (or a financial interest in a digital asset)? (See instructions.) ☒ Yes ☐ No

**Standard Deduction**
Someone can claim: ☐ You as a dependent ☐ Your spouse as a dependent
☐ Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness** You: ☐ Were born before January 2, 1960 ☐ Are blind   Spouse: ☐ Was born before January 2, 1960 ☐ Is blind

**Dependents** (see instructions):
If more than four dependents, see instructions and check here ☐

| (1) First name   Last name | (2) Social security number | (3) Relationship to you | (4) Check the box if qualifies for (see instructions): Child tax credit | Credit for other dependents |
|---|---|---|---|---|
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.
If you did not get a Form W-2, see instructions.

| | | Amount |
|---|---|---|
| 1a | Total amount from Form(s) W-2, box 1 (see instructions) | |
| b | Household employee wages not reported on Form(s) W-2 | |
| c | Tip income not reported on line 1a (see instructions) | |
| d | Medicaid waiver payments not reported on Form(s) W-2 (see instructions) | |
| e | Taxable dependent care benefits from Form 2441, line 26 | |
| f | Employer-provided adoption benefits from Form 8839, line 29 | |
| g | Wages from Form 8919, line 6 | |
| h | Other earned income (see instructions) | |
| i | Nontaxable combat pay election (see instructions) 1i | |
| z | Add lines 1a through 1h | |

Attach Sch. B if required.

| | | Amount |
|---|---|---|
| 2a | Tax-exempt interest . . . 2a | b Taxable interest . . . 2b 17. |
| 3a | Qualified dividends . . . 3a | b Ordinary dividends . . . 3b |
| 4a | IRA distributions . . . 4a | b Taxable amount . . . 4b |
| 5a | Pensions and annuities . . 5a | b Taxable amount . . . 5b |
| 6a | Social security benefits . . 6a | b Taxable amount . . . 6b |
| c | If you elect to use the lump-sum election method, check here (see instructions) ☐ | |

Standard Deduction for—
• Single or Married filing separately, $14,600
• Married filing jointly or Qualifying surviving spouse, $29,200
• Head of household, $21,900
• If you checked any box under Standard Deduction, see instructions.

| | | Amount |
|---|---|---|
| 7 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ☐ | 7  −3,000. |
| 8 | Additional income from Schedule 1, line 10 | 8 |
| 9 | Add lines 1z, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** | 9  −2,983. |
| 10 | Adjustments to income from Schedule 1, line 26 | 10 |
| 11 | Subtract line 10 from line 9. This is your **adjusted gross income** | 11  −2,983. |
| 12 | **Standard deduction or itemized deductions** (from Schedule A) | 12  14,600. |
| 13 | Qualified business income deduction from Form 8995 or Form 8995-A | 13 |
| 14 | Add lines 12 and 13 | 14  14,600. |
| 15 | Subtract line 14 from line 11. If zero or less, enter -0-. This is your **taxable income** | 15  0. |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.   Form **1040** (2024)

**EXHIBIT K — Section A — Tax Year 2024 — Page 15 of 15**

IRS Form 1040 / Schedule D (Schedule D (Capital Gains and Losses))

| SCHEDULE D (Form 1040) | Capital Gains and Losses | OMB No. 1545-0074 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | Attach to Form 1040, 1040-SR, or 1040-NR.<br>Use Form 8949 to list your transactions for lines 1b, 2, 3, 8b, 9, and 10.<br>Go to www.irs.gov/ScheduleD for instructions and the latest information. | 2024<br>Attachment Sequence No. 12 |

Name(s) shown on return: BARINDER SINGH BAL

Your social security number: ▮▮▮▮▮▮

Did you dispose of any investment(s) in a qualified opportunity fund during the tax year? ☐ Yes ☒ No
If "Yes," attach Form 8949 and see its instructions for additional requirements for reporting your gain or loss.

**Part I — Short-Term Capital Gains and Losses—Generally Assets Held One Year or Less** (see instructions)

See instructions for how to figure the amounts to enter on the lines below.

This form may be easier to complete if you round off cents to whole dollars.

| | (d) Proceeds (sales price) | (e) Cost (or other basis) | (g) Adjustments to gain or loss from Form(s) 8949, Part I, line 2, column (g) | (h) Gain or (loss) Subtract column (e) from column (d) and combine the result with column (g) |
|---|---|---|---|---|
| 1a Totals for all short-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 1b | 22,972. | | | -22,972. |
| 1b Totals for all transactions reported on Form(s) 8949 with Box A checked | 1,640,257. | 1,739,419. | 82,797. | -16,365. |
| 2 Totals for all transactions reported on Form(s) 8949 with Box B checked | | | | |
| 3 Totals for all transactions reported on Form(s) 8949 with Box C checked | | | | |

| 4 | Short-term gain from Form 6252 and short-term gain or (loss) from Forms 4684, 6781, and 8824 | 4 | |
| 5 | Net short-term gain or (loss) from partnerships, S corporations, estates, and trusts from Schedule(s) K-1 | 5 | |
| 6 | Short-term capital loss carryover. Enter the amount, if any, from line 8 of your **Capital Loss Carryover Worksheet** in the instructions | 6 | ( ) |
| 7 | **Net short-term capital gain or (loss).** Combine lines 1a through 6 in column (h). If you have any long-term capital gains or losses, go to Part II below. Otherwise, go to Part III on the back | 7 | -39,337. |

**Part II — Long-Term Capital Gains and Losses—Generally Assets Held More Than One Year** (see instructions)

See instructions for how to figure the amounts to enter on the lines below.

This form may be easier to complete if you round off cents to whole dollars.

| | (d) Proceeds (sales price) | (e) Cost (or other basis) | (g) Adjustments to gain or loss from Form(s) 8949, Part II, line 2, column (g) | (h) Gain or (loss) Subtract column (e) from column (d) and combine the result with column (g) |
|---|---|---|---|---|
| 8a Totals for all long-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 8b | | | | |
| 8b Totals for all transactions reported on Form(s) 8949 with Box D checked | 13,012. | 171,784. | | -158,772. |
| 9 Totals for all transactions reported on Form(s) 8949 with Box E checked | | | | |
| 10 Totals for all transactions reported on Form(s) 8949 with Box F checked. | | | | |

| 11 | Gain from Form 4797, Part I; long-term gain from Forms 2439 and 6252; and long-term gain or (loss) from Forms 4684, 6781, and 8824 | 11 | |
| 12 | Net long-term gain or (loss) from partnerships, S corporations, estates, and trusts from Schedule(s) K-1 | 12 | |
| 13 | Capital gain distributions. See the instructions | 13 | |
| 14 | Long-term capital loss carryover. Enter the amount, if any, from line 13 of your **Capital Loss Carryover Worksheet** in the instructions | 14 | ( ) |
| 15 | **Net long-term capital gain or (loss).** Combine lines 8a through 14 in column (h). Then, go to Part III on the back | 15 | -158,772. |

For Paperwork Reduction Act Notice, see your tax return instructions.

Schedule D (Form 1040) 2024

---

Schedule D (Form 1040) 2024 — Page **2**

**Part III — Summary**

| 16 | Combine lines 7 and 15 and enter the result | 16 | -198,109. |

- If line 16 is a **gain**, enter the amount from line 16 on Form 1040, 1040-SR, or 1040-NR, line 7.

# SECTION B

# RECONCILIATION OF IRS-FILED CAPITAL GAINS
# TO NON-VMNT REALIZED P&L
# (FOUNDATION FOR OPPORTUNITY-COST DAMAGES)

This Section presents the reconciliation table by which Plaintiff calculates non-VMNT (alternative-position) realized capital P&L for each tax year 2017 through 2024, derived from (i) the IRS-filed total realized capital gain or loss reproduced in Section A; minus (ii) the VMNT-specific realized capital gain documented in Exhibit J or the attributable VMNT-residual disposition; equals (iii) the non-VMNT realized capital P&L attributable to Plaintiff's alternative trading positions.

The non-VMNT realized capital P&L is the foundation for Plaintiff's opportunity-cost damages allegations: but for the time, capital, and attention diverted to Plaintiff's VMNT position (which Plaintiff was induced to acquire in Q1 2021 in reliance on Defendant Tan Tran's representations), Plaintiff would have continued his demonstrated alternative-position trading at a rate consistent with his pre-fraud baseline.

# MASTER RECONCILIATION TABLE

**For each tax year:** Non-VMNT realized P&L = (IRS-filed total capital gain or loss) - (VMNT residual).

| Year | IRS Total (Sec. A) | VMNT Residual (Exhibit J or LT clearing) | Non-VMNT (calculated) | As Pleaded (Compl. ¶135) | Notes |
|------|------|------|------|------|------|
| 2017 | +$49,422 | $0 | +$49,422 | +$49,422 | Pre-VMNT |
| 2018 | +$105,934 | $0 | +$105,934 | +$105,934 | Pre-VMNT |
| 2019 | +$73,993 | $0 | +$73,993 | +$73,993 | Pre-VMNT |
| 2020 | +$389,148 | +$180,212 | +$208,936 | +$208,936 | VMNT era |
| 2021 | +$755,556 | +$439,583 | +$315,973 | +$315,973 | Peak |
| 2022 | +$71,991 | +$80,710 | ($8,719) | ($8,719) | Inflection |
| 2023 | +$10,689 | +$61,654 | ($50,965) | ($50,965) | Collapse |
| 2024 | ($198,109) | $0 | ($198,109) | ($198,109) | Continued |

# CUMULATIVE SUMMARY

| Aggregate Across 8 Tax Years (2017–2024) | Amount |
|------|------|
| **Cumulative IRS-Filed Realized Capital Gain (Sum of Section A)** | **+$1,258,624** |
| **Cumulative VMNT Realized Gain (per Exhibit J, including LT residuals through 2023)** | **+$762,159** |
| **Cumulative Non-VMNT Realized P&L (alternative-position trading)** | **+$496,465** |
| 2024 Capital Loss Carryforward into 2025+ | ($195,109) |

# DAMAGES NARRATIVE — TRAJECTORY BY PERIOD

Plaintiff's non-VMNT realized capital P&L follows three distinct periods, corresponding to (i) the pre-VMNT baseline (2017–2019); (ii) the VMNT-era peak (2020–2021), during which Plaintiff's alternative-position trading continued to perform at strong levels notwithstanding the simultaneous active VMNT trading; and (iii) the post-fraud collapse (2022–2024), during which Plaintiff's alternative-position trading collapsed from peak performance to material losses.

| Period | Years | Annual Average Non-VMNT P&L | Aggregate Non-VMNT P&L |
|---|---|---|---|
| Pre-VMNT Baseline | 2017–2019 (3 years) | +$76,450/yr | +$229,349 |
| VMNT-Era Peak | 2020–2021 (2 years) | +$262,455/yr | +$524,909 |
| Post-Fraud Collapse | 2022–2024 (3 years) | ($85,931)/yr | ($257,793) |

# PER-YEAR DAMAGES SWING (Peak-to-Collapse)

**Annual swing from VMNT-era peak to post-fraud collapse:** +$262,455/yr (peak) − (−$85,931/yr) (collapse) = −**$348,386/yr**

**Three-year post-fraud cumulative damages swing** (vs. peak baseline): −$348,386/yr × 3 years = −**$1,045,158** in cumulative alternative-position trading P&L below the demonstrated peak.

**Three-year post-fraud cumulative damages swing** (vs. pre-VMNT baseline): (+$76,450/yr) − (−$85,931/yr) = $162,381/yr × 3 years = −**$487,143** in cumulative alternative-position trading P&L below the conservative pre-VMNT baseline.

**Continuing damages:** Plaintiff's 2024 capital loss carryforward of $195,109 will deduct against tax years 2025, 2026, and beyond until fully consumed, evidencing that the post-fraud trading collapse continues to accrue damages beyond the 2017–2024 series documented in this Exhibit.

**Methodology note:** This damages calculation does not assert that Plaintiff would have continued earning peak-period returns indefinitely; rather, it documents the realized economic deviation from Plaintiff's pre-fraud demonstrated trading capability. The peak-vs-collapse swing of −$348,386/yr represents an upper-bound estimate; the baseline-vs-collapse swing of −$162,381/yr represents a more conservative estimate using Plaintiff's pre-VMNT performance as the reference. Both estimates are conservative in that they assume no further trading capital deployment beyond what was actually used during 2017–2024 — they do not account for the opportunity cost of the ~$500,000 capital that was tied up in Plaintiff's Q1 2021 reliance purchase of VMNT shares (the damages anchor pleaded in the operative Complaint).

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

**BARINDER SINGH "NABE" BAL,**
                    Plaintiff,

        v.

**TAN TRAN, an individual; and VEMANTI GROUP, INC.,
a Nevada corporation,**
                    Defendants.

Case No. _____

# EXHIBIT L

Vemanti Group, Inc. GlobeNewswire Press Releases During the In-Scope
Period

---

EXHIBIT L

# AUTHENTICATION AND SOURCE DECLARATION

The thirteen (13) press releases compiled in this Exhibit L were issued via GlobeNewswire, a press release distribution service operated by Notified, Inc., and remain publicly accessible on GlobeNewswire's website (www.globenewswire.com) and through syndicated republication on news aggregators including Yahoo Finance, Nasdaq, Bloomberg, and Stock Titan, among others. All thirteen releases were issued under the GlobeNewswire organization profile of Vemanti Group, Inc. This Exhibit is limited to press releases issued by Vemanti Group, Inc. itself; press releases issued by counterparties or third parties concerning Vemanti are addressed in separate exhibits where applicable.

The text of each release reproduced in this Exhibit was extracted from the corresponding GlobeNewswire press release URL (provided in the metadata block at the head of each release) on or about June 2026. Formatting has been simplified for readability; the substantive content, dates, quotes, and statements attributed to Defendant Tan Tran and other parties have not been altered. Each release reproduced herein bears the original GlobeNewswire distribution timestamp, source attribution, and the original Legal Disclaimer / Safe Harbor statement issued by the issuing party. The original press releases remain available at the URLs identified for verification.

The in-scope period for this Exhibit is the third quarter of 2020 (commencing July 1, 2020) through March 24, 2022, inclusive. One additional release issued five (5) days outside this period (March 29, 2022 — Investment From Alpha Sigma Capital) is not included as it falls outside the in-scope period. Conduct after March 24, 2022 is reserved for a separate matter.

Exhibit L — Bal v. Tran — Page 2

# INDEX OF PRESS RELEASES (CHRONOLOGICAL)

The thirteen press releases below are arranged chronologically. Releases marked with a star (★) are flagged as Highlighted Releases in the Complaint and other exhibits. Where applicable, cross-reference notes immediately follow the index entry.

| # | Date | Title | Source |
|---|---|---|---|
| 1 | July 01, 2020 | Vemanti Group Announces Corporate Updates and Developments | Vemanti Group, Inc. |
| 2 | July 22, 2020 | ★ Vemanti Group's Portfolio Company Fvndit Has Disbursed Over $15 Million In Loans To SMEs | Vemanti Group, Inc. |
| 3 | September 08, 2020 | ★ Vemanti Group's Portfolio Company Fvndit Secures $30M In Financing | Vemanti Group, Inc. |
| 4 | October 13, 2020 | Vemanti Group Announces Quarterly Corporate Updates and Developments | Vemanti Group, Inc. |
| 5 | December 01, 2020 | ★ Vemanti Group Signs LOI With Marena Gold | Vemanti Group, Inc. |
| 6 | January 26, 2021 | Vemanti Group Announces Application To Uplist To OTCQB Venture Market | Vemanti Group, Inc. |
| 7 | March 09, 2021 | Vemanti Group Announces Uplisting To OTCQB Venture Market | Vemanti Group, Inc. |
| 8 | June 15, 2021 | Vemanti Group Announces Effectiveness of Form 10 Registration Statement | Vemanti Group, Inc. |
| 9 | June 23, 2021 | Vemanti Group Announces The Establishment of New Subsidiary For Its Planned Blockchain Business | Vemanti Group, Inc. |
| 10 | July 07, 2021 | ★ Vemanti Group's Wholly-Owned Subsidiary Announces Pilot Launch Of Its USD-Pegged Stablecoin | Vemanti Group, Inc. |
| 11 | August 11, 2021 | Vemanti Group Signs MOU with PVcomBank to Bring Banking Services to the Underserved | Vemanti Group, Inc. |
| 12 | January 18, 2022 | Vemanti Group Signs LOI with PVcomBank to Become First SME-Focused Neobank in Vietnam | Vemanti Group, Inc. |
| 13 | March 21, 2022 | Vemanti Group Closes Deal with PVcomBank to Launch First SME-Focused Digital Banking Platform in Vietnam | Vemanti Group, Inc. |

**Legend:** ★ = Highlighted Release (flagged in Complaint or other exhibits as materially related to fraud allegations).

## CROSS-REFERENCE NOTES

*Releases No. 2 (July 22, 2020 — Fvndit $15M Loan Disbursement) and No. 3 (September 8, 2020 — Fvndit Secures $30M In Financing): Both releases attribute material financial milestones to Vemanti's "portfolio company" Fvndit, Inc. and its wholly-owned Vietnam subsidiary eLoan, JSC. The $15M loan-disbursement activity is operating activity of eLoan, not Vemanti. The $30M financing is debt financing extended to Fvndit / eLoan by Accial Capital and Variant Investments, not equity investment in Vemanti. Vemanti held only a minority equity interest in Fvndit during the in-scope period. The headlines and framing of these releases are alleged to convey a materially misleading impression that Vemanti Group, Inc. shareholders share in these milestones. See Exhibit H (Form 10-12G/A and audited financials) for cross-reference to Vemanti's actual reported revenue, equity-method*

Exhibit L — Bal v. Tran — Page 3

*income, and Fvndit-related line items during FY 2020.*

Exhibit L — Bal v. Tran — Page 4

# SECTION A — PRESS RELEASES (CHRONOLOGICAL)

The press releases below appear in chronological order. Each is preceded by a header block identifying the release number, date, title, and source URL. Cross-reference notes, where present, appear immediately after the header and before the release text.

Exhibit L — Bal v. Tran — Page 5

# RELEASE NO. 1 — July 01, 2020

**Vemanti Group Announces Corporate Updates and Developments**

**Source:** Vemanti Group, Inc.
**URL:** https://www.globenewswire.com/news-release/2020/07/01/2056230/0/en/Vemanti-Group-Announces-Corporate-Updates-and-Developments.html

IRVINE, Calif., July 01, 2020 (GLOBE NEWSWIRE) -- Vemanti Group, Inc. (OTC PINK:VMNT) a multi-asset technology-driven company, today provided its corporate updates and developments. The Company's Q2 financial report will be issued in the near future.

"During this unprecedented time, protecting the health and well-being of our personnel is a top priority. In addition, we are focused on maintaining continuity of business activities while balancing potential impacts from the COVID-19 pandemic," said Mr. Tan Tran, CEO of Vemanti Group. "Our business fundamentals are intact, and we look forward to presenting additional updates. We remain steadfast in our commitment to advance our business objectives and shareholder value," he added.

Operational & Development Activities

• The Company's financials remain sound. It carries no debt or long-term liabilities. The Company continues to be active in high-growth emerging market opportunities and looks to drive growth through investment in early-stage companies, especially in the fintech sector, that have market viable products and are post-revenue. Strategically, it's focused on solving long-term problems using blockchain combined with other technologies, including machine learning/AI.

• The Company is currently deeply involved in the business management and development of its key portfolio company, Fvndit, Inc. ("Fvndit"), a California- and Vietnam-based fintech company, focused on solving the short-term working capital problem for SMEs. It's using technology to re-build core parts of the business funding infrastructure and make the underwriting and financing seamless for small businesses. Its wholly-owned subsidiary, eLoan, JSC ("eLoan"), is the market-leading online Peer-to-Peer (P2P) lending platform for SMEs in Vietnam. Its total revenues for FY2019 increased more than 300% compared to FY2018. Despite the uncertainties, Fvndit is still projected to exceed last year's performance.

• The Company believes that Vietnam is still forecasted to be the source of outsized returns based on many globally-driven positive factors. It is working with various capital partners to secure financing for Fvndit as it enters the next phase of growth. Tan Tran, CEO of Vemanti Group, who is also Fvndit's CEO, stated, "We're hugely optimistic about future prospects of Fvndit. As one of the few countries with COVID-19 under control and with its economy unexpectedly expands amid the virus outbreak, investors are eager to put capital to work as Vietnam opens for business again. We view our ownership in Fvndit a tremendous opportunity to establish foundation in one of the world's hottest economies. As the business model has already been proven, now is the time to take it to the next level."

About Vemanti Group, Inc.

Vemanti Group, Inc. (OTC PINK:VMNT) is a technology-driven multi-asset company that seeks to be active in high-growth and emerging markets. Our core strengths are in technology development and investment. We drive growth through acquisition and investment in disruptive and foundational technologies by targeting early-stage companies that have market viable products or by starting a new subsidiary of our own. Strategically, we focus mainly on fintech applications combined with other emerging technologies, including blockchain and machine learning/AI.

About Fvndit, Inc.

Fvndit, Inc. ("Fvndit"), pronounced like "Fund it", is a California- and Vietnam-based fintech company, focused on solving the working capital problem for SMEs using technology. The team is comprised of engineers,

Exhibit L — Bal v. Tran — Page 6

designers, data scientists, trade finance and banking veterans across 2 locations: Irvine, CA and HCMC, Vietnam.

About eLoan, JSC.

eLoan, JSC ("eLoan") is a peer-to-peer (P2P) lending marketplace that allows investors to lend money directly to small and medium-sized enterprises (SMEs) based in Ho Chi Minh City, Vietnam. eLoan is the first peer-to-peer lending company and one of the few fintech firms in Vietnam focusing purely on serving SME clients with short-term loans. Its platform is run on a proprietary AI-driven decision-making and credit-rating system.

Legal Disclaimer

This press release contains forward-looking statements within the meaning of Section 27a of the Securities Act of 1933, as amended and section 21e of the Securities and Exchange Act of 1934, as amended. Those statements include the intent, belief or current expectations of the company and its management team. Forward-looking statements are projections of events, revenues, income, future economics, research, development, reformulation, product performance or management's plans and objectives for future operations. Some or all of the events or results anticipated by these forward-looking statements may not occur. Prospective investors are cautioned that any such forward-looking statements are not guarantees of future performance and involve risks and uncertainties, and that actual results may differ materially from those projected in the forward-looking statements as a result of various factors.

Contact Information Vemanti Group, Inc. Investor Relations (800) 768-1288 ir@vemanti.com

Tags: VMNT, multi-asset technology, Mr. Tan Tran, Fvndit, eLoan, Corporate Updates, machine learning/AI, peer-to-peer (P2P)

Exhibit L — Bal v. Tran — Page 7

# RELEASE NO. 2 — ★ July 22, 2020

### Vemanti Group's Portfolio Company Fvndit Has Disbursed Over $15 Million In Loans To SMEs

**Source:** Vemanti Group, Inc.
**URL:** https://www.globenewswire.com/news-release/2020/07/22/2065786/0/en/Vemanti-Group-s-Portfolio-Company-Fvndit-Has-Disbursed-Over-15-Million-In-Loans-To-SMEs.html

> *CROSS-REFERENCE: This release attributes a $15M loan-disbursement milestone to Vemanti's "portfolio company" Fvndit, Inc., and Fvndit's wholly-owned subsidiary eLoan, JSC (a Vietnam JSC). The disbursements described are operating activity of eLoan, not of Vemanti Group, Inc. Vemanti's economic interest in Fvndit during the in-scope period was a minority equity stake; Fvndit's loan-portfolio activity does not, by itself, generate revenue, equity-method income, or distributions to Vemanti unless specifically reflected in Vemanti's audited financial statements. The framing of this release ("Vemanti Group's Portfolio Company... Has Disbursed Over $15 Million") is alleged to convey a materially misleading impression that Vemanti Group, Inc. shareholders benefit from or share in this disbursement activity. See Exhibit H (Form 10-12G/A and audited financials) for cross-reference to Vemanti's actual reported revenue, equity-method income, or fair-value gains attributable to Fvndit during FY 2020.*

IRVINE, Calif., July 22, 2020 (GLOBE NEWSWIRE) -- Vemanti Group, Inc. (OTC PINK:VMNT) a multi-asset technology-driven company, today announced that its portfolio company, Fvndit, Inc. ("Fvndit"), has disbursed a record of over $15M USD in loans to SMEs in Vietnam through its P2P lending marketplace, eLoan JSC ("eLoan").

eLoan's total revenues for FY2019 increased by 338% compared to FY2018. Despite the global uncertainties around COVID-19, it is still projected to exceed last year's performance. Most of the loans are short-term loans, averaging a two-month term. The average ticket size of the loans facilitated stands at $50,000 USD. Small to Medium-Size Enterprises (SMEs) play a major role in Vietnam's economy, accounting for 98% of all enterprises, more than 41% of GDP ($261.64 billion - nominal, 2019 est.), and over 50% of employment. Access to credit is the biggest challenge for these businesses. It is estimated that 70% of the SMEs in Vietnam don't have access to proper financing. Banks regard loans to SMEs as risky relative to high transaction costs and approval process could take 1-2 months. Most banks don't find enough value in underwriting loans for SMEs, often because their typical loan size is not very large, and banks cannot justify the money or the manpower they spend on underwriting smaller business loans. Banks providing commercial loans prefer to allocate their resources to larger firms rather than SMEs.

"We measure our success not just on numbers but also the impact we're creating. Helping SMEs grow is important for Vietnam's continued rise as a regional economic driver. Our retention rate is over 70%. There is a huge unmet credit demand that we want to fill. We're currently working on closing a sizable financing transaction with institutional investors to increase our loan portfolio and diversification of products to strengthen eLoan's position as the market-leading P2P SME financing platform in Vietnam. We're also confident in expanded future growth with strategic partnerships currently in the works as well as the ones we already have in place like Nam A Bank and Investree." stated Tan Tran, CEO of Vemanti Group, who is also Fvndit's CEO.

Fintech today is a much sought-after space in Vietnam's emerging economy and with a $23B-financing gap for SMEs in the country, a joint report released by the International Finance Corporation (IFC) and SME Finance Forum estimated. eLoan's P2P lending platform addresses the long-standing issue of lack of SME financing by using technology to streamline the loan underwriting procedures, making it relatively cost-effective and efficient with end to end processing completed in as little as 24 hours. With a population of close to 100M and a consistent growth in the annual gross domestic product (GDP), Vietnam has emerged as one of the next big lands of opportunity in Southeast Asia.

The current macro environment has brought economic challenges globally. However, it has also created a myriad of opportunities for P2P platforms like eLoan. P2P lending has started to come to fruition during the crisis, not just by surviving but by playing a role in the economic recovery. P2P has outpaced traditional bank

Exhibit L — Bal v. Tran — Page 8

savings, making alternative lending one of the more attractive products on the market for yield-seeking investors. As part of an effort to further enhance user experience, eLoan is looking to deploy a mobile app in the near future, available for both iOS and Android, to match their website capabilities in terms of account management for individual investors. With it, users will be able to set their own investment rules and have a customized portfolio by manually participating in individual loans or setting up an automated fixed-income strategy.

For more news and updates, current shareholders and prospective investors of VMNT can follow @Vemanti on Twitter (https://twitter.com/Vemanti).

About Vemanti Group, Inc.

Vemanti Group, Inc. (OTC PINK:VMNT) is a technology-driven multi-asset company that seeks to be active in high-growth and emerging markets.

About Fvndit, Inc.

Fvndit, Inc. ("Fvndit"), pronounced like "Fund it", is a California- and Vietnam-based fintech company, focused on solving the working capital problem for SMEs using technology.

About eLoan, JSC.

eLoan, JSC ("eLoan") (https://eloan.vn) is a peer-to-peer (P2P) lending marketplace that allows investors to lend money directly to small and medium-sized enterprises (SMEs) based in Ho Chi Minh City, Vietnam.

Legal Disclaimer

This press release contains forward-looking statements within the meaning of Section 27a of the Securities Act of 1933, as amended and section 21e of the Securities and Exchange Act of 1934, as amended.

Contact Information Vemanti Group, Inc. Investor Relations (800) 768-1288 ir@vemanti.com

Tags: Vemanti Group, Inc, VMNT, eLoan JSC, Fvndit's, Peer-to-Peer, emerging technologies

Exhibit L — Bal v. Tran — Page 9

# RELEASE NO. 3 — ★ September 08, 2020

### Vemanti Group's Portfolio Company Fvndit Secures $30M In Financing

**Source:** Vemanti Group, Inc.
**URL:** https://www.globenewswire.com/news-release/2020/09/08/2090231/0/en/Vemanti-Group-s-Portfolio-Company-Fvndit-Secures-30M-In-Financing.html

> *CROSS-REFERENCE: This release announces that Fvndit, Inc. "has secured $30M in non-dilutive financing from two US-based institutional capital partners" (identified elsewhere as Accial Capital and Variant Investments) for its Peer-to-Peer lending marketplace eLoan, JSC. The $30M is debt financing extended to Fvndit / eLoan, not equity investment in Vemanti Group, Inc. Vemanti Group, Inc. did not receive any portion of the $30M; the financing did not increase Vemanti's ownership stake in Fvndit; and the financing did not, on its face, give rise to any revenue, equity-method income, or distribution payable to Vemanti shareholders. The headline and framing of this release ("Vemanti Group's Portfolio Company Fvndit Secures $30M In Financing") is alleged to convey a materially misleading impression that Vemanti Group, Inc. shareholders benefit financially from this transaction. See Exhibit H (Form 10-12G/A and audited financials) for cross-reference to Vemanti's actual reported financial position and Fvndit-related line items during FY 2020.*

IRVINE, Calif., Sept. 08, 2020 (GLOBE NEWSWIRE) -- September 08, 2020 (GLOBE NEWSWIRE) - Vemanti Group, Inc. (OTC PINK:VMNT) a multi-asset technology-driven company, today announced that its portfolio company, Fvndit, Inc. ("Fvndit"), has secured $30M in non-dilutive financing from two US-based institutional capital partners for its Peer-to-Peer (P2P) lending marketplace eLoan JSC ("eLoan"). The committed investment will serve to further solidify and propel eLoan's business objectives as the market leading SME-focused funding platform in Vietnam.

Further details can be found at: http://www.globenewswire.com/news-release/2020/09/08/2090187/0/en/Fvndit-Closes-30M-In-Financing-For-eLoan-And-Seeks-To-Advance-Its-Market-Leading-Position-In-Vietnam.html

Fvndit, pronounced like "Fund it", is focused on solving the working capital problem for SMEs by using technology to make the underwriting process seamless for small businesses. Its wholly-owned subsidiary, eLoan, JSC ("eLoan"), operates an online Peer-to-Peer (P2P) funding and investing marketplace in Vietnam, its current local market. Today, SMEs account for more than 41% of Vietnam's GDP ($261.64 billion - nominal, 2019 est.), and 98% of all enterprises but still remain largely neglected by traditional banks with 70% of them do not have access or have difficulty in accessing credit. eLoan was launched in late 2017 with a clear mission - to make credit more simple and investing more rewarding. eLoan's total revenues for FY2019 increased by 338% compared to FY2018. Despite the global uncertainties around COVID-19, it is still projected to exceed last year's performance.

Tan Tran, CEO of Vemanti Group, who is also Fvndit's CEO, stated, "We're hugely excited about the new capital injection and very optimistic about future prospects of Fvndit and eLoan. We see a $100B market, and there is a huge unmet credit demand. Already a market-leader and one of the first movers, the additional capital will strengthen our position as the de facto SME financing platform in Vietnam and allow us to increase diversification of products. We're thrilled to be a part of a fast-growing company in one of the world's hottest economies."

For more news and updates, current shareholders and prospective investors of VMNT can follow @Vemanti on Twitter (https://twitter.com/Vemanti).

About Vemanti Group, Inc.

Vemanti Group, Inc. (OTC PINK:VMNT) is a technology-driven multi-asset company that seeks to be active in high-growth and emerging markets.

About Fvndit, Inc.

Exhibit L — Bal v. Tran — Page 10

Fvndit, Inc. ("Fvndit"), pronounced like "Fund it", is a California- and Vietnam-based fintech company, focused on solving the working capital problem for SMEs using technology.

About eLoan, JSC.

eLoan, JSC ("eLoan") (https://eloan.vn) is a peer-to-peer (P2P) lending marketplace that allows investors to lend money directly to small and medium-sized enterprises (SMEs) based in Ho Chi Minh City, Vietnam.

Legal Disclaimer

This press release contains forward-looking statements within the meaning of Section 27a of the Securities Act of 1933, as amended and section 21e of the Securities and Exchange Act of 1934, as amended.

Contact Information Vemanti Group, Inc. Investor Relations (800) 768-1288 ir@vemanti.com

Tags: VMNT, Fvndit Secures $30M, peer-to-peer (P2P), Vietnam's GDP, eLoan, small businesses, Tan Tran, CEO

Exhibit L — Bal v. Tran — Page 11

# RELEASE NO. 4 — October 13, 2020

**Vemanti Group Announces Quarterly Corporate Updates and Developments**

Source: Vemanti Group, Inc.
URL: https://www.globenewswire.com/news-release/2020/10/13/2107558/0/en/Vemanti-Group-Announces-Quarterly-Corporate-Updates-and-Developments.html

IRVINE, Calif., Oct. 13, 2020 (GLOBE NEWSWIRE) -- Vemanti Group, Inc. (OTC PINK:VMNT) a multi-asset technology-driven company, today provided its quarterly corporate updates and developments. The Company's Q3 financial report will be issued in the near future.

"Even in the midst of the lingering pandemic, we're pleased with where we are as an organization collectively," said Mr. Tan Tran, CEO of Vemanti Group. "We are seeing the success of our activities. As the trend towards full recovery slowly taking shape, we anticipate that our subsidiaries will continue to show financial gains. While we work our way to the next normal, we remain resolve and resilient with our business objectives. The strategic areas for us to focus on are growing our current assets, becoming a fully-reporting SEC issuer, and expanding our portfolio with alternative and digital assets," he added.

Recent Operational & Business Development Highlights

• The Company's financials remain free of debt and long-term liabilities. There have been no changes in its total number of issued and outstanding shares in all stock classes since the last quarter.

• The Company continues to be actively and deeply involved in the growth of its key portfolio company, Fvndit, Inc. ("Fvndit") and its wholly-owned subsidiary, eLoan, JSC ("eLoan"). The Company was instrumental in their recently announced funding from 2 US-based institutional partners. With the new financing facility in place, eLoan is well positioned to reach at least $50M USD in total loan disbursement by end of FY 2021. At the same time, the Company is exploring options to increase its stake in Fvndit and to expand to other markets such as Thailand and Malaysia.

• Since the beginning of FY 2020, the Company has been working on an equity exchange deal with an established West African gold refinery. Its target is to have at least 20% equity to start and with options for more. Talks are progressing around key terms and conditions and towards the signing of a Letter of Intent. The principals of the refinery are seeking regulatory pre-approval, and all indications have been positive. Barring any unforeseen circumstances, the Company is aiming to complete the equity exchange by end of the year.

• There have been also dialogues with the key principal of another entity based in Singapore that owns three gold-polymetallic deposits in Armenia which have a combined value of $360M according to a report done by CSA Global, an industry-leading and well-respected independent mining consulting company based in Australia. The basis of the discussions has been centered around the Company's gaining majority ownership of those deposits also via an equity exchange and with additional financing to kickstart mining operations on the biggest deposit. However, the recent situation between Armenia and Azerbaijan has prompted the Company to suspend talks until there's a peaceful resolution between the two countries.

• As part the Company's plans to become a fully-reporting SEC entity by Q1 2021, it has retained the services of RJI CPAs in Irvine, CA to perform financial audit for FY 2018-2020. Work for FY 2018-2019 is set to complete by end of the month which will allow the Company to start its Form S-1 filing with the SEC along with an application to move up to a higher tier with OTC Markets Group. This is fundamental to the Company's efforts to demonstrate heightened transparency to its investors and bring the Company greater visibility and credibility before a substantially larger group of investors.

• The Company is looking at adding digital assets to its portfolio. It continues to believe cryptocurrency is an instrument of economic empowerment and provides the underbanked and unbanked a way to participate in a global monetary system which aligns with its vision of democratizing financial services. Furthermore, the

Exhibit L — Bal v. Tran — Page 12

Company is forging partnership with a VND-backed stablecoin issuer to allow eLoan to pilot-launch a digital currency-based SME lending product for global retail investors who are interested participating in the economic growth of Vietnam.

• Security tokens have once again emerged to offer a compliant alternative of integrating the benefits of crypto-related technologies with mainstream finance world. The Company is in a joint-venture discussion with the capital management division of a prominent bank in Vietnam regarding a blockchain-based corporate stock and bond issuance platform for the SMEs, offering them an innovative and efficient capital raise method. The Company considers this a critical component of fintech.

• A NY-based investment banker has been retained to help the Company raise capital to execute its business objectives for the next 2 years. A preliminary term sheet of up to $10M in equity purchase of the Company's common stock has been presented and further negotiations are underway.

About Vemanti Group, Inc.

Vemanti Group, Inc. (OTC PINK:VMNT) is a technology-driven multi-asset company that seeks to be active in high-growth and emerging markets.

About Fvndit, Inc.

Fvndit, Inc. ("Fvndit"), pronounced like "Fund it", is a California- and Vietnam-based fintech company, focused on solving the working capital problem for SMEs using technology.

About eLoan, JSC

eLoan, JSC ("eLoan") is a peer-to-peer (P2P) lending marketplace that allows investors to lend money directly to small and medium-sized enterprises (SMEs) based in Ho Chi Minh City, Vietnam.

About RJI CPAs

RJI CPAs is a full-service accounting and consulting firm with corporate headquarters located in Irvine, California. They have been one of the top 25 CPA firms in Orange County, CA for the last 30 years as rated by the Orange County Business Journal and one of the largest consulting firms in Southern California. They are registered with the Public Company Accounting Oversight Board (PCAOB).

Legal Disclaimer

This press release contains forward-looking statements within the meaning of Section 27a of the Securities Act of 1933, as amended and section 21e of the Securities and Exchange Act of 1934, as amended.

Contact Information Vemanti Group, Inc. Investor Relations (800) 768-1288 ir@vemanti.com

Tags: VMNT, multi-asset technology-driven, Mr. Tan Tran, eLoan, JSC, Fvndit, Inc., PCAOB

Exhibit L — Bal v. Tran — Page 13

# RELEASE NO. 5 — ★ December 01, 2020

### Vemanti Group Signs LOI With Marena Gold

**Source:** Vemanti Group, Inc.
**URL:**
https://www.globenewswire.com/news-release/2020/12/01/2137491/0/en/Vemanti-Group-Signs-LOI-With-Marena-Gold.html

IRVINE, Calif., Dec. 01, 2020 (GLOBE NEWSWIRE) -- Vemanti Group, Inc. ("Vemanti" or the "Company") (OTC PINK:VMNT), a multi-asset technology-driven company, today announced that it has entered into a Letter of Intent ("LOI") with Marena Gold Refinery ("Marena Gold") pursuant to which the parties will complete an equity exchange transaction that will result in Marena Gold becoming a subsidiary of the Company.

Located in the capital city of Bamako, Marena Gold is the 2nd biggest precious metal refinery in the Republic of Mali, one of Africa's top 5 gold producing countries. The refinery is fully operational and covers all the phases necessary for the processing of raw gold with a maximum capacity of 90-kg-per-day at >99.9% purity. With modern machineries and well-trained personnel, it aims to contribute to the supply in the precious metals sector and to the improvement of the general welfare of the entire Western Africa Region, supporting the artisanal and small-scale mining. In addition, with mining concessions in the Kenieba Cercle region of Mali, Marena Gold intends to promote the highest global standards in product and service development, while simultaneously encouraging transparency to benefit market participants. It holds a mining permit over a gold-bearing area where miners are currently extracting gold. It is expected that Marena Gold's future infrastructure developments will strengthen its position as the leading regional producer for precious metals.

The final details of the transaction will be determined by the parties following due diligence of appropriate legal and financial corporate documents. This is an arm's length transaction, and the parties intend to sign a definitive share exchange agreement (the "Agreement") with an expected closing by the end of January 2021. Under the terms of the LOI, up to 20% of the issued and outstanding common stock of Marena Gold will be exchanged for common shares of the Company. The Company anticipates issuing a new class of stock to support the closing of the transaction. Post-closing, the Company will use its best efforts to arrange for additional working capital for the businesses and obligations of Marena Gold in the pursue of LBMA (London Bullion Metal Association) certification.

Effective on the closing of the transaction, an appointed member of the Company will join the Board of Directors of Marena Gold. Completion of the transaction is subject to a number of conditions, including but not limited to the following key conditions:

• execution of the Agreement;

• completion of mutually satisfactory due diligence; and receipt of all required regulatory, corporate and third-party approvals, including the approval of the stockholders of Marena Gold and the fulfillment of all applicable regulatory requirements and conditions necessary to complete the transaction.

For more news and updates, current shareholders and prospective investors of the Company can follow @Vemanti on Twitter (https://twitter.com/Vemanti).

About Vemanti Group, Inc.

Vemanti Group, Inc. (OTC PINK:VMNT) is a multi-asset technology-driven company that seeks to be active in high-growth and emerging markets. Our core strengths are in technology development and investment.

About Marena Gold Refinery

Marena Gold Refinery ("Marena Gold") is an established gold producer in the Republic of Mali with the sole purpose of collecting gold for artisan miners and processing it to >99.9% purity bars. Marena Gold aims to become the largest gold refiner in West Africa. Additionally, Marena Gold plans to introduce the trading of

Exhibit L — Bal v. Tran — Page 14

precious metals such as Gold and Silver, whilst fostering closer working ties with the Government & the local mining industry thereby, helping to facilitate the development and expansion of the regional precious metals market.

Legal Disclaimer

This press release contains forward-looking statements within the meaning of Section 27a of the Securities Act of 1933, as amended and section 21e of the Securities and Exchange Act of 1934, as amended.

Contact Information Vemanti Group, Inc. Investor Relations (800) 768-1288 ir@vemanti.com

Tags: Vemanti Group, Inc., VMNT, Signs LOI With Marena Gold, multi-asset technology, Marena Gold Refinery, gold producer, investment

Exhibit L — Bal v. Tran — Page 15

# RELEASE NO. 6 — January 26, 2021

**Vemanti Group Announces Application To Uplist To OTCQB Venture Market**

**Source:** Vemanti Group, Inc.
**URL:** https://www.globenewswire.com/news-release/2021/01/26/2164286/0/en/Vemanti-Group-Announces-Application-To-Uplist-To-OTCQB-Venture-Market.html

IRVINE, Calif., Jan. 26, 2021 (GLOBE NEWSWIRE) -- Vemanti Group, Inc. ("Vemanti" or the "Company") (OTC PINK:VMNT), a multi-asset technology-driven company, today announced that it has initiated a strategy to upgrade its position in the public markets and increase its visibility to a wider range of investors through the process of uplisting from the OTC Pink Open Market to the OTCQB Venture Market. The company has submitted OTCQB application materials to OTC Markets Group, operator of OTCMarkets.com.

The OTCQB Venture Market, operated by OTC Markets Group Inc., is designed for developing and entrepreneurial companies in the U.S. and abroad. Companies must be current in their financial reporting and undergo an annual verification and management certification process, including meeting a minimum bid price and other financial conditions. With more compliance and quality standards, the OTCQB provides investors improved visibility to enhance trading decisions. The OTCQB is recognized by the Securities and Exchange Commission as an established public market providing public information for analysis and value of securities.

With significant growth expected of the company's blockchain- and fintech-focused strategies and an expanded emphasis on transparency, management believes that the Company is in the ideal position to uplist to the OTCQB Venture Market and gain the increased visibility that the OTCQB provides.

Tan Tran, CEO of Vemanti Group, commented, "Uplisting to OTCQB is an important milestone in our plan to grow the company and upgrade its position in the public markets. We believe that trading on the OTCQB will increase visibility to the investment community, particularly to institutional investors, as we continue to solidify our position in the blockchain and fintech sectors."

The listing of the Company's common shares on the OTCQB remains subject to the approval of the OTCQB and the satisfaction of applicable listing requirements. The company already meets one of OTCQB Venture Market compliance requirements by having audited annual financials prepared in accordance with U.S. GAAP by a PCAOB auditor and maintains a Verified Company Profile at OTCMarkets.com.

As more information becomes available, the company will keep its shareholders up-to-date on the status of the application.

For more news and updates, shareholders and prospective investors are encouraged to follow @Vemanti on Twitter (https://twitter.com/Vemanti).

About Vemanti Group, Inc.

Vemanti Group, Inc. (OTC PINK:VMNT) is a multi-asset technology-driven company that seeks to be active in high-growth and emerging markets. Our core strengths are in technology development and investment. We drive growth through acquisition and investment in disruptive and foundational technologies by targeting early-stage companies that have market viable products or by starting a new subsidary of our own. Strategically, we focus mainly on fintech applications combined with other emerging technologies, including blockchain and machine learning/AI. To learn more about VMNT, visit www.vemanti.com.

About OTC Markets Group Inc.

OTC Markets Group Inc. (OTCQX: OTCM) operates the OTCQX Best Market, the OTCQB Venture Market and the Pink Open Market for 11,000 U.S. and global securities. Through OTC Link ATS and OTC Link ECN, OTC Market Group Inc. connects a diverse network of broker-dealers that provide liquidity and execution services.

Exhibit L — Bal v. Tran — Page 16

Legal Disclaimer

This press release contains forward-looking statements within the meaning of Section 27a of the Securities Act of 1933, as amended and section 21e of the Securities and Exchange Act of 1934, as amended.

Contact Information Vemanti Group, Inc. Investor Relations (800) 768-1288 ir@vemanti.com

Tags: VMNT, Uplist To OTCQB Venture, Tan Tran, entrepreneurial companies, multi-asset technology

Exhibit L — Bal v. Tran — Page 17

## RELEASE NO. 7 — March 09, 2021

**Vemanti Group Announces Uplisting To OTCQB Venture Market**

Source: Vemanti Group, Inc.
URL: https://www.globenewswire.com/news-release/2021/03/09/2189852/0/en/Vemanti-Group-Announces-Uplisting-To-OTCQB-Venture-Market.html

IRVINE, Calif., March 09, 2021 (GLOBE NEWSWIRE) -- Vemanti Group, Inc. ("Vemanti" or the "Company") (OTCQB:VMNT), a multi-asset technology-driven company, today announced that its stock was approved for quotation on the OTC Markets Group, Inc.'s OTCQB tier Venture Market (the "OTCQB") under the symbol "VMNT" effective as of the open of trading on March 09, 2021.

The OTCQB is a venture market operated by the OTC Markets Group, Inc. and is designed for early-stage and developing companies located both in the United States and abroad. To be eligible for quotation on the OTCQB, companies must be current in their reporting and undergo an annual verification and management certification process. Companies must also meet a minimum bid price test and cannot be in bankruptcy. The OTCQB is recognized by the Securities and Exchange Commission (the "SEC") as an established public market and provides current public information to investors that need to analyze, value, and trade securities.

Tan Tran, CEO of Vemanti Group, stated, "We believe that the acceptance to the OTCQB is just the latest step in the Company's growth and this status will assist us in continuing to grow our business and strengthen our strategic partnerships, as well as enhance our stockholder value. The broader exposure afforded by the OTCQB will increase our visibility within the investment community and assist in broadening our stockholder base. Thank you to all investors that share our company vision for long-term growth and innovation."

The Company's mission is to advance financial inclusion for the unbanked underbanked consumers and businesses of the world. It is focused on launching and growing innovative fintech products and services into mature and dominant brands in their respective markets.

For more news and updates, shareholders and prospective investors are encouraged to follow @Vemanti on Twitter (https://twitter.com/Vemanti).

About Vemanti Group, Inc.

Vemanti Group, Inc. (OTC PINK:VMNT) is a multi-asset technology-driven company that seeks to be active in high-growth and emerging markets. Our core strengths are in technology development and investment.

About OTC Markets Group Inc.

OTC Markets Group Inc. (OTCQX: OTCM) operates the OTCQX Best Market, the OTCQB Venture Market and the Pink Open Market for 11,000 U.S. and global securities.

Legal Disclaimer

This press release contains forward-looking statements within the meaning of Section 27a of the Securities Act of 1933, as amended and section 21e of the Securities and Exchange Act of 1934, as amended.

Contact Information Vemanti Group, Inc. Investor Relations (800) 768-1288 ir@vemanti.com

Tags: VMNT, Tan Tran, strategic partnerships, OTCQB, underbanked consumers, dominant brands

Exhibit L — Bal v. Tran — Page 18

# RELEASE NO. 8 — June 15, 2021

### Vemanti Group Announces Effectiveness of Form 10 Registration Statement

**Source:** Vemanti Group, Inc.
**URL:** https://www.globenewswire.com/news-release/2021/06/15/2247299/0/en/Vemanti-Group-Announces-Effectiveness-of-Form-10-Registration-Statement.html

IRVINE, Calif., June 15, 2021 (GLOBE NEWSWIRE) -- Vemanti Group, Inc. ("Vemanti" or the "Company") (OTCQB:VMNT), a multi-asset technology-driven company, today announced that its Form 10 Registration Statement initially filed with the U.S. Securities and Exchange Commission (the "SEC") on April 9, 2021, became effective on June 9, 2021. Moving forward, the Company will be subject to the reporting requirements subject to the periodic and current reporting requirements of Section 13 or 15(d) of the Exchange Act.

The Form 10 provides investors with detailed information about the Company's operations, including an overview of the business strategies, risk factors and financial statements. This additional information should allow for investors to make an educated investment decision regarding the Company. The Form 10 is available at www.sec.gov under the name of Vemanti Group, Inc.

Tan Tran, CEO of Vemanti, stated "The effectiveness of our Form 10 registration statement is a major milestone. Due to our unique business model and our future plans to engage in the fintech and blockchain sectors, we believe that being a fully reporting company will bring a greater level of comfort for our partners and investors. Additionally, being regulated and with clear transparency will help to differentiate us from other competitors in the blockchain space.

The Company's ultimate mission is to advance financial inclusion for the unbanked underbanked consumers and businesses of the world. It is focused on building a financial ecosystem based on innovative fintech and blockchain applications.

For more news and updates, shareholders and prospective investors are encouraged to follow @Vemanti on Twitter (https://twitter.com/Vemanti).

About Vemanti Group, Inc.

Vemanti Group, Inc. (OTCQB:VMNT) is a technology-driven company that seeks to become active in high-growth and emerging markets. Our core strength is in technology development. We intend to drive future growth through acquisitions and investment in disruptive and foundational technologies in early-stage companies that have market viable products. To learn more about VMNT, visit www.vemanti.com.

Legal Disclaimer

This press release may include, and oral statements made from time to time by representatives of the Company may include, "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Statements regarding possible business combinations and the financing thereof, and related matters, as well as all other statements other than statements of historical fact included in this press release are forward-looking statements.

Contact Information Vemanti Group, Inc. Investor Relations (800) 768-1288 ir@vemanti.com

Tags: Vemanti Group, Inc., VMNT, Form 10 Registration Statement, multi-asset technology-driven, emerging markets, Fintech, Blockchain

Exhibit L — Bal v. Tran — Page 19

## RELEASE NO. 9 — June 23, 2021

**Vemanti Group Announces The Establishment of New Subsidiary For Its Planned Blockchain Business**

**Source:** Vemanti Group, Inc.
**URL:** https://www.globenewswire.com/news-release/2021/06/23/2251799/0/en/Vemanti-Group-Announces-The-Establishment-of-New-Subsidiary-For-Its-Planned-Blockchain-Business.html

IRVINE, Calif., June 23, 2021 (GLOBE NEWSWIRE) -- Vemanti Group, Inc. ("Vemanti" "Vemanti Group" or the "Company") (OTCQB:VMNT), a multi-asset technology-driven company, today announced the establishment of a new wholly-owned subsidiary under the name of Vemanti Digital, Ltd. ("VDL"). VDL will be part of the Company's business plans and intends to act as a financial technology platform that empowers consumers and businesses to utilize the power of public blockchains for cross-border payments, commerce, and financial transactions, including but not limited to applications such as Decentralized Finance (DeFi) lending/borrowing, staking/swapping, asset tokenization, digital currency minting/mining, and Non-Fungible Tokens (NFTs).

Tan Tran, CEO of Vemanti Group, commented, "We recognize that blockchain and digital currency have the potential to enhance efficiency, lower costs, and foster broader financial inclusion. We are gradually implementing our strategy to get more entrenched in the monetization of blockchain applications and to bridge the gap between traditional and decentralized finance. With a focus of solving real-world problems for the underbanked of the world, we believe the establishment of a new subsidiary will serve as a strategic business unit on which we can expect tremendous future revenue growth. As an SEC reporting company, it also reflects our commitment to promote the benefits of innovation through transparency, trust, and regulatory compliance."

For more news and updates, shareholders and prospective investors are encouraged to follow @Vemanti on Twitter (https://twitter.com/Vemanti).

About Vemanti Group, Inc.

Vemanti Group, Inc. (OTCQB:VMNT) is a technology-driven company that seeks to become active in high-growth and emerging markets. The Company's mission is to advance financial inclusion for the unbanked underbanked consumers and businesses of the world. It is focused on building a financial ecosystem based on innovative fintech and blockchain applications. To learn more about VMNT, visit www.vemanti.com.

About Vemanti Digital, Ltd.

Vemanti Digital, Ltd. (VDL) is a wholly-owned subsidiary of Vemanti Group with a focus on blockchain-based products and decentralized financial services. VDL is based in Tortola, BVI.

Legal Disclaimer

This press release may include, and oral statements made from time to time by representatives of the Company may include, "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended.

Contact Information Vemanti Group, Inc. Investor Relations (800) 768-1288 ir@vemanti.com

Exhibit L — Bal v. Tran — Page 20

# RELEASE NO. 10 — ★ July 07, 2021

**Vemanti Group's Wholly-Owned Subsidiary Announces Pilot Launch Of Its USD-Pegged Stablecoin**

**Source:** Vemanti Group, Inc.
**URL:** https://www.globenewswire.com/news-release/2021/07/07/2258998/0/en/Vemanti-Group-s-Wholly-Owned-Subsidiary-Announces-Pilot-Launch-Of-Its-USD-Pegged-Stablecoin.html

IRVINE, Calif, July 07, 2021 (GLOBE NEWSWIRE) -- Vemanti Group, Inc.'s (OTCQB:VMNT) ("Vemanti") wholly-owned subsidiary, Vemanti Digital, Ltd. (collectively, the "Company"), announced today the launch of the Vemanti Dollar ("USDV"), an ERC-20 1:1 USD-pegged stablecoin, to registered early adopters. General roll-out plans are set to begin later this month in preparation for onboarding additional large-scale volume. USDV is one of the first stablecoins of its kind to be issued by an SEC reporting company.

USDV initially follows Ethereum ERC-20 standards with plans to rapidly expand into other blockchain networks. It holds a distinct advantage over all other tokens, such that it allows for blockchain ledger security without the price volatility of traditional cryptocurrencies, as well as operating with full regulatory compliance. USDV can be adopted easily by all commercial institutions that wish to process stablecoin as a form of payment within their own ecosystems.

Designed to be fast, low-cost, and borderless, the USDV stablecoin plans to provide the following use cases to individuals and businesses:

• Payments & Remittances

• Payroll

• Settlement

• Lending & Trading

• Decentralized Finance (DeFi) applications

• Escrow services

• Alternative banking services

Owners of USDV stablecoin can easily redeem it for USD or 150+ global currencies from anywhere in the world through SWIFT wires. Users of the USDV stablecoin can also access a multi-token wallet that allows for convenient management of USDV and other major digital assets, such as Bitcoin, Ethereum, USDC, USDT, and more. The wallet is equipped with multi-layer authentication security and technology, as well as the following planned features:

• Staking

• Credit lines

• Buying, selling, and trading various digital assets

• Crypto escrow

• E-voucher

Tan Tran, CEO of the Company, commented, "The launch of USDV will be a watershed moment for Vemanti as we look to aggressively gain footprint in the digital payments and money transfer markets. By addressing transparency and trust issues inherent in other stablecoins, we believe we are well positioned for rapid expansion and high-volume user adoption, which will create sustainable value for our shareholders."

Exhibit L — Bal v. Tran — Page 21

For more news and updates, shareholders and prospective investors are encouraged to follow @Vemanti on Twitter (https://twitter.com/Vemanti).

About Vemanti Group, Inc.

Vemanti Group, Inc. (OTCQB:VMNT) is a technology-driven company that seeks to become active in high-growth and emerging markets. The Company's mission is to advance financial inclusion for the unbanked, underbanked consumers and businesses of the world. It is focused on building a financial ecosystem based on innovative fintech and blockchain applications. To learn more about VMNT, visit www.vemanti.com.

About Vemanti Digital, Ltd.

Vemanti Digital, Ltd. (VDL) is a wholly-owned subsidiary of Vemanti Group with a focus on blockchain-based products and decentralized financial services. VDL is based in Tortola, BVI.

Legal Disclaimer

This press release may include, and oral statements made from time to time by representatives of the Company may include, "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended.

Contact Information Vemanti Group, Inc. Investor Relations (800) 768-1288 ir@vemanti.com

Tags: Vemanti Group, Inc., OTCQB:VMNT, Pilot Launch, USD-Pegged Stablecoin, wholly-owned subsidiary, USDV, Ethereum ERC-20, Blockchain, DeFi

Exhibit L — Bal v. Tran — Page 22

# RELEASE NO. 11 — August 11, 2021

**Vemanti Group Signs MOU with PVcomBank to Bring Banking Services to the Underserved**

Source: Vemanti Group, Inc.
URL: https://www.globenewswire.com/news-release/2021/08/11/2278804/0/en/Vemanti-Group-Signs-MOU-with-PVcomBank-to-Bring-Banking-Services-to-the-Underserved.html

IRVINE, Calif., Aug. 11, 2021 (GLOBE NEWSWIRE) -- Vemanti Group, Inc. (OTCQB:VMNT) ("Vemanti") announced today that it has signed a Fintech and Banking-as-a-Service ("BaaS") business cooperation Memorandum of Understanding ("MOU") with Vietnam Public Joint Stock Commercial Bank ("PVcomBank") to jointly develop financial products and banking solutions for the underserved consumers and small businesses in Vietnam.

PVcomBank is a fully licensed and regulated bank in Vietnam with comprehensive core banking products and services. It has a network of 109 transaction offices in major provinces and cities in Vietnam that provide a wide range of products services for its individual and corporate clients. In recent years, it has made significant progress in the digital banking segment, bringing superior financial products and services to customers while also enhancing their experience. PVcomBank has received numerous awards from prestigious international financial institutions, including "Most Innovative Digital Bank - Vietnam, 2020", "Best Bank for Customer Services in Vietnam for 2021".

According to the signed MOU outlining the partnership, Vemanti will gain access to the technical know-hows and banking expertise of PVcomBank via the latter's bank license, core banking services, and an existing technology platform purpose-built for API-based integration. The partnership's mission is to develop, demonstrate, and provide innovative, tech-driven, embedded financial and banking services to customers without requiring them to go into a physical branch to become registered bank customers. A market study to assess the business opportunity and commercial feasibility of the planned services will be jointly carried out by both parties. Once launched, the on-demand commercially-ready banking services from PVcomBank will be accessible via Application Programming Interfaces (APIs) and offered as Vemanti-branded products in its ecosystem. It is aimed to be a cost-effective and efficient approach to bring banking services to the underserved consumers and small businesses compared to traditional banking products that are either under-penetrated or under-marketed.

The MOU is only the beginning. Both parties plan on establishing deeper collaboration down the line to further tackle existing and incoming challenges by leveraging technology to increase efficiency, especially in cross-border transactions.

For more news and updates, shareholders and prospective investors are encouraged to follow @Vemanti on Twitter (https://twitter.com/Vemanti).

About Vemanti Group, Inc.

Vemanti Group, Inc. (OTCQB:VMNT) is a technology-driven company that seeks to become active in high-growth and emerging markets. The Company's mission is to advance financial inclusion for the unbanked, underbanked consumers and businesses of the world. It is focused on building a financial ecosystem based on innovative fintech and blockchain applications.

About PVcomBank

Vietnam Public Joint Stock Commercial Bank (PVcomBank) was founded on September 16, 2013 as a corporate amalgamation between PetroVietnam Finance Joint Stock Corporation (PVFC) and Western Joint Stock Commercial Bank (WesternBank). On October 1, 2013, PVcomBank officially operated with a charter capital of 9,000 billion VND and total assets of more than 100,000 billion VND. Up to now, PVcomBank has developed a strong network of 109 transaction points with more than 4,000 employees.

Exhibit L — Bal v. Tran — Page 23

Legal Disclaimer

This press release may include, and oral statements made from time to time by representatives of the Company may include, "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended.

Contact Information Vemanti Group, Inc. Investor Relations (800) 768-1288 ir@vemanti.com

Tags: Vemanti Group, Inc., OTCQB:VMNT, PVcomBank, Fintech, Banking-as-a-Service, banking products and services, PVFC, FAST500

Exhibit L — Bal v. Tran — Page 24

## RELEASE NO. 12 — January 18, 2022

**Vemanti Group Signs LOI with PVcomBank to Become First SME-Focused Neobank in Vietnam**

**Source:** Vemanti Group, Inc.
**URL:** https://www.globenewswire.com/news-release/2022/01/18/2368495/0/en/Vemanti-Group-Signs-LOI-with-PVcomBank-to-Become-First-SME-Focused-Neobank-in-Vietnam.html

IRVINE, Calif., Jan. 18, 2022 (GLOBE NEWSWIRE) -- Vemanti Group, Inc. ("Vemanti" "Vemanti Group" or the "Company") (OTCQB: VMNT) today announced that it has signed a non-binding Letter of Intent (the "LOI") with Vietnam Public Joint-stock Commercial Bank ("PVcomBank") to become one of the first Small-to-Medium Enterprise (SME) neobanking solutions in Vietnam. This signals a strategic move into the digital banking space for the Company, who will also look to continue its financial service expansion into additional countries in SE Asia in the near future.

The LOI is a major step forward on an integrated bilateral formal partnership for Vemanti Group and PVcomBank, which announced their first Memorandum of Understanding (MOU) to create joint financial projects in Q3 2021. PVcomBank is a fully licensed and regulated bank in Vietnam with comprehensive core banking products and services. Recently, the company has worked to advance its digital banking segment, offering new, easier to use banking features to its large customer base.

Pursuant to the terms of the LOI, it is the intention of the parties to sign a definitive agreement within 90 days of signing of the LOI and by March 31, 2022. Vemanti will utilize PVcomBank's industry-leading banking expertise to provide SMEs in Vietnam with an innovative digital-only financial solution via PVcomBank's existing core banking system. The Vemanti-branded digital bank platform will allow customers to be seamlessly onboarded online, eliminating the need to visit a physical branch, while giving them access to tailored banking services and financial products embedded to their business operations.

Neobanks, also known as digital or challenger banks, are a growing sector in the fintech space, representing a large portion of the investor funding over the last 24 months. According to a recent report from Grandview Research, the neobanking industry is expected to reach USD 722.60 billion by 2028. It is anticipated to register a CAGR of 47.7% from 2021 to 2028. The market growth is credited to better usability, lower interest rates than traditional predecessors, and superior technology. Both Vemanti and PVcomBank look forward to contributing to the global movement of digital transformation in banking.

"We're excited to partner with the Vemanti Group as we look toward the future of banking and work to promote the development of innovative products and services," stated Ha Viet Nguyen, Deputy CEO from PVcomBank. "By integrating our industry-leading technology with other forward-thinking organizations like Vemanti Group, we can improve financial accessibility and access with fewer roadblocks to entry than traditional banking providers."

PVcomBank has a network of 109 transaction offices in major provinces in Vietnam, and provides a wide range of products and services, fully meet the demands of personal and corporate customers. The company is focused on bringing the best financial services and products while continually increasing value for their shareholders. In 2021, PVcomBank was ranked "The Best Digital Bank in Vietnam" and also one of the "Top 100 Strongest Brands in Vietnam".

"The partnership with PVcomBank allows Vemanti Group to make major inroads into digital banking, providing underserved SMEs with more streamlined and efficient products compared to the traditional banking structure," said Tan Tran, CEO of Vemanti Group. "We're looking forward to collaborating with PVcomBank and working together to advance the future of banking in Vietnam and Southeast Asia."

For more news and updates, shareholders and prospective investors are encouraged to follow @Vemanti on Twitter (https://twitter.com/Vemanti).

Exhibit L — Bal v. Tran — Page 25

About Vemanti Group, Inc.

Vemanti Group, Inc. (OTCQB: VMNT) is a technology-driven company that seeks to become active in high-growth and emerging markets.

About PVcomBank

Vietnam Public Joint Stock Commercial Bank (PVcomBank) was founded on September 16, 2013, as a corporate amalgamation between PetroVietnam Finance Joint Stock Corporation (PVFC) and Western Joint Stock Commercial Bank (WesternBank). On October 1, 2013, PVcomBank officially operated with a charter capital of 9,000 billion VND and total assets of more than 100,000 billion VND, equivalent to 390M USD & 4.4B USD.

Legal Disclaimer

This press release may include, and oral statements made from time to time by representatives of the Company may include, "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended.

Contact Information Vemanti Group, Inc. Investor Relations (800) 768-1288 ir@vemanti.com

Tags: Vemanti Group, Inc, OTCQB: VMNT, PVcomBank, Neobank, SMEs, technology-driven, emerging markets, Tan Tran, Ha Viet Nguyen, FAST500

Exhibit L — Bal v. Tran — Page 26

## RELEASE NO. 13 — March 21, 2022

**Vemanti Group Closes Deal with PVcomBank to Launch First SME-Focused Digital Banking Platform in Vietnam**

**Source:** Vemanti Group, Inc.
**URL:** https://www.globenewswire.com/news-release/2022/03/21/2407069/0/en/Vemanti-Group-Closes-Deal-with-PVcomBank-to-Launch-First-SME-Focused-Digital-Banking-Platform-in-Vietnam.html

IRVINE, Calif., March 21, 2022 (GLOBE NEWSWIRE) -- Vemanti Group, Inc. ("Vemanti" "Vemanti Group" or the "Company") (OTCQB: VMNT) today announced it has entered into an official 10-year agreement with Vietnam Public Joint-stock Commercial Bank ("PVcomBank" or the "Bank") to launch one of the first Small-to-Medium Enterprise (SME) digital banking (aka neobanking) solutions in Vietnam. This agreement signals a major collaborative step forward for the two parties, which signed a Letter of Intent (LOI) earlier this year. Leveraging PVcomBank's dominant incumbent position, Vemanti plans to utilize cloud computing, API, automated KYC/AML, Artificial Intelligence, Machine Learning, and blockchain technologies to power its new digital-first platform.

PVcomBank, fully licensed and regulated by the State Bank of Vietnam, is a state-owned bank with comprehensive core banking products and services. The Bank is focused on spearheading digital banking services and will now jointly share this pursuit with Vemanti Group, which will help power a unique hybrid neobanking model. This unique omnichannel banking approach will allow customers to utilize a full range of digital services at their convenience powered by the Vemanti platform, while also having the ability to take advantage of PVcomBank's physical branch locations for in-person support if needed.

"We're excited to take this next step with Vemanti Group as we now look to actively build our joint platform and begin onboarding customers in the near future," stated Ha Viet Nguyen, Deputy CEO from PVcomBank. "Our physical banking presence in Vietnam combined with Vemanti's forward-thinking platform will give businesses a tech-forward, adaptable solution to their banking needs."

Vemanti will utilize PVcomBank's industry-leading banking expertise to provide SMEs in Vietnam with an innovative digital-only financial solution via PVcomBank's existing core banking system. As part of this new digital-first model, the Vemanti-branded banking platform will allow customers to sign up for accounts and get access to services entirely online, while still having the option of visiting a convenient branch location if needed. All customers will have access to tailored banking services and financial products able to be seamlessly integrated into their business operations.

"This agreement signals the next phase of growth for Vemanti Group," said Tan Tran, CEO of Vemanti Group. "Vietnam remains one of the fastest growing world economies with a well-educated workforce and mostly young population of nearly 100M people. Today, SMEs account for more than 41% of its GDP which is projected to trend around 310B USD in 2022 and 340B USD in 2023. By leveraging our core competencies in this space, we're able to create an entirely new banking experience for the underserved entrepreneurs and business owners. We believe our tech-driven but human-led formula is the right approach to accelerate digital transformation initiatives and to seamlessly drive customer engagement. We are looking forward to working with PVcomBank and combining our unique expertise to better address the banking needs of customers in Vietnam and beyond."

PVcomBank has a network of 108 transaction offices in major provinces in Vietnam, and provides a wide range of products and services, that fully meet the demands of personal and corporate customers. The company is focused on bringing the best financial services and products while continually increasing value for its shareholders. In 2021, PVcomBank was ranked "The Best Digital Bank in Vietnam" and also one of the "Top 100 Strongest Brands in Vietnam". Both Vemanti and PVcomBank look forward to contributing to the global movement of digital transformation in banking.

Exhibit L — Bal v. Tran — Page 27

For more news and updates, shareholders and prospective investors are encouraged to follow @Vemanti on Twitter (https://twitter.com/Vemanti).

About Vemanti Group, Inc.

Vemanti Group, Inc. (OTCQB: VMNT) is a technology-driven company that seeks to become active in high-growth and emerging markets.

About PVcomBank

Vietnam Public Joint Stock Commercial Bank (PVcomBank) was founded on September 16, 2013, as a corporate amalgamation between PetroVietnam Finance Joint Stock Corporation (PVFC) and Western Joint Stock Commercial Bank (WesternBank). On October 1, 2013, PVcomBank officially operated with a charter capital of 9,000 billion VND and total assets of more than 100,000 billion VND, equivalent to 390M USD & 4.4B USD.

Legal Disclaimer

This press release may include, and oral statements made from time to time by representatives of the Company may include, "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended.

Contact Information Vemanti Group, Inc. Investor Relations (800) 768-1288 ir@vemanti.com

Tags: Vemanti Group, Inc, (OTCQB: VMNT), SME-Focused Digital Banking, (SME), Letter of Intent, PVcomBank, Ha Viet Nguyen, Tan Tran, API, Vietnam

Exhibit L — Bal v. Tran — Page 28

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

**BARINDER SINGH "NABE" BAL,**
                    Plaintiff,

          v.

**TAN TRAN, an individual; and VEMANTI GROUP, INC.,**
**a Nevada corporation,**
                    Defendants.

                    Case No. _____

# EXHIBIT M

Equity Purchase Agreement (EPA) Confidential Term Sheet — Vemanti
Group, Inc. and Livingston Asset Management LLC

---

**EXHIBIT M**

# AUTHENTICATION AND SOURCE DECLARATION

This Exhibit M reproduces the three-page **Equity Purchase Agreement (EPA) Confidential Term Sheet** (the "Term Sheet") between Vemanti Group, Inc. and Livingston Asset Management LLC, bearing the letterhead of Southridge Capital, Ridgefield, Connecticut. The Term Sheet sets forth the principal terms of a proposed $10,000,000 equity purchase facility, a commitment fee in the form of a $75,000 promissory note, draw-down and pricing mechanics, and an exclusivity covenant restricting Vemanti from entering into parallel financing arrangements during the Term.

## Identification of the Document

| | |
|---|---|
| **Document Type:** | Confidential Term Sheet (non-binding) for an Equity Purchase Agreement ("EPA") |
| **Letterhead:** | Southridge Capital, Fund Management, Executive Pavilion, 90 Grove Street, Ridgefield, CT 06877; MAIN 203-431-8300; www.southridge.com |
| **Issuer:** | Vemanti Group, Inc., a Nevada corporation |
| **Purchaser:** | Livingston Asset Management LLC, a Florida limited liability company; Manager: Stephen Hicks |
| **Commitment Amount:** | Up to $10,000,000 of Vemanti Group, Inc. common stock |
| **Term:** | Two (2) years |
| **Securities:** | Registered common stock, to be registered on Form S-1 pursuant to the Securities Act of 1933 |
| **Commitment Fee:** | $75,000 promissory note (10%) maturing six (6) months from issuance |
| **Exclusivity:** | Vemanti to refrain from similar financing arrangements with third parties during the Term |
| **Governing Law:** | State of New York |
| **Page Count:** | Three (3) pages |
| **Signature Blocks:** | Vemanti Group, Inc., Chief Executive Officer (unexecuted); Livingston Asset Management LLC, Stephen Hicks, Manager (unexecuted) |

## Transmittal to Plaintiff

The Term Sheet reproduced in this Exhibit M was transmitted to Plaintiff Barinder Singh Bal by Defendant Tan Tran (then-Chief Executive Officer of Vemanti Group, Inc.) via the WhatsApp messaging platform on **October 8, 2020 at 1:26 PM**. The transmittal occurred via person-to-person message between Defendant's WhatsApp account and Plaintiff's WhatsApp account. Section A of this Exhibit reproduces the WhatsApp transmittal screenshot showing the date stamp, the file preview ("EPA_Term Sheet.pdf," 3 pages, 87 KB), the contemporaneous confidentiality framing, and the subsequent exchange between the parties.

Immediately following transmittal of the Term Sheet PDF at 1:26 PM, Defendant transmitted the following confidentiality framing:

> *"For your eyes only. Extremely confidential. Please don't share."*

Two minutes later, at 1:28 PM, Plaintiff acknowledged receipt and contemporaneously stated his understanding of the deal terms: "$10 million Dollars!!! You did it Tan!!!!" Defendant responded at 1:28 PM with "Still negotiating....always..." and "They like the deal." — affirmatively representing to Plaintiff that the counterparty (Livingston Asset Management LLC / Southridge Capital) was favorable to the proposed transaction. See Section A.

## Material Non-Public Status as of October 8, 2020

As of October 8, 2020, the contents of this Term Sheet were not publicly available. Vemanti Group, Inc. had made no public filing or press release disclosing the Term Sheet, the counterparties (Livingston Asset Management LLC, Southridge Capital), the Commitment Amount, the Commitment Fee, the Exclusivity covenant, or the draw-down pricing mechanics.

Five (5) days later, on October 13, 2020, Vemanti Group, Inc. issued a GlobeNewswire press release titled "Vemanti Group Announces Quarterly Corporate Updates and Developments" (see Exhibit L, Release No. 4), which made a single generic reference to "a preliminary term sheet of up to $10M in equity purchase of the Company's common stock" presented by "a NY-based investment banker" (Vemanti's characterization). The October 13, 2020 public release did not identify Livingston Asset Management LLC or Southridge Capital as the counterparties, did not disclose the Exclusivity covenant, did not disclose the Commitment Fee, and did not disclose the draw-down pricing mechanics or floor-price protection.

## Document Reproduction

Section A of this Exhibit reproduces the WhatsApp transmittal screenshot establishing the date, sender, and confidentiality framing of the transmittal. Section B reproduces the Term Sheet in its original form as received by Plaintiff (three screenshots, each labeled). Section C provides a clean text transcription of the Term Sheet text for searchability and citation. The text transcription is a faithful reproduction of the substantive content of the Term Sheet and is provided for the convenience of the reader; the original-form reproduction in Section B controls in the event of any discrepancy.

# SECTION A — WHATSAPP TRANSMITTAL EVIDENCE

The screenshot reproduced on the following page captures the WhatsApp conversation between Defendant Tan Tran (sender, identified by username "Tan Tran" and profile photo at the top of the conversation) and Plaintiff Barinder Singh Bal (conversation owner). The screenshot establishes the date, time, sender, file, and confidentiality framing of the Term Sheet transmittal and includes the contemporaneous exchange between the parties immediately following transmittal.

## Key Evidentiary Facts Established by the Screenshot

**(1) Date.** The conversation displays the date marker "Oct 8, 2020" (center-top of the conversation).

**(2) Sender.** The conversation header identifies the counterparty as "Tan Tran" with his profile photograph. Messages attributed to Defendant appear on the left side of the conversation (in dark grey); messages from Plaintiff appear on the right (in green).

**(3) Document Transmitted.** At 1:26 PM, Defendant transmitted a PDF attachment named **"EPA_Term Sheet.pdf"** (3 pages, 87 KB). The file preview thumbnail displayed in the conversation shows the Southridge letterhead and the document title "EQUITY PURCHASE AGREEMENT (EPA) CONFIDENTIAL TERM SHEET" with the field "Issuer: Vemanti Group, Inc. (the 'Company'), a Nevada corporation." This preview corresponds to Page 1 of the Term Sheet reproduced in Section B and transcribed in Section C.

**(4) Confidentiality Framing.** Immediately following transmittal of the PDF at 1:26 PM, Defendant transmitted: "**For your eyes only. Extremely confidential. Please don't share.**"

**(5) Plaintiff's Contemporaneous Acknowledgment.** At 1:28 PM, Plaintiff responded: "**$10 million Dollars!!! You did it Tan!!!!**" The reference to $10 million is consistent with, and corresponds to, the $10,000,000 Commitment Amount stated in the EPA Facility provision of the Term Sheet (see Section B, p. 1; Section C).

**(6) Defendant's Contemporaneous Representations.** At 1:28 PM, Defendant responded with two further messages: "**Still negotiating....always...**" and "**They like the deal.**" These statements confirm that, as of October 8, 2020, the proposed financing remained in active negotiation between Vemanti Group, Inc. and the counterparty identified in the Term Sheet (Livingston Asset Management LLC / Southridge Capital), and that Defendant affirmatively represented to Plaintiff that the counterparty was favorable to the proposed transaction.

## Transmittal Screenshot

*WhatsApp conversation between Defendant Tan Tran (sender) and Plaintiff Barinder Singh Bal (conversation owner), October 8, 2020, 1:26 PM (Term Sheet transmittal) through 1:28 PM (post-transmittal exchange).*



# SECTION B — ORIGINAL DOCUMENT (REPRODUCTION)

The three screenshots below reproduce the Equity Purchase Agreement Confidential Term Sheet ("EPA_Term Sheet.pdf") in the form received by Plaintiff via WhatsApp on October 8, 2020 at 1:26 PM. Each screenshot is reproduced full-page and labeled with its sequential identifier.

## Screenshot 1 of 3

*Term Sheet — Page 1 (Southridge letterhead; Issuer, Purchaser, EPA Facility, Securities, Term, Draw Down, Purchase Price mechanics)*

### Ill SOUTHRIDGE

**EQUITY PURCHASE AGREEMENT (EPA)**
**CONFIDENTIAL TERM SHEET**

**Issuer:** Vemanti Group, Inc. (the "Company"), a Nevada corporation.

**Purchaser:** Livingston Asset Management LLC, a Florida limited liability company (the "Purchaser").

**EPA Facility:** Commitment to purchase up to $10,000,000 of the Company's common stock (the "Commitment Amount").

**Securities:** Registered common stock issued in a private placement pursuant to the Securities Act of 1933, registered on Form S-1.

**Term:** Two years.

**Draw Down:** The Company may draw upon the Facility periodically during the Term (a "Draw Down") by the Company's delivery to the Purchaser of a written notice (a "Draw Down Notice") requiring the Purchaser to purchase a dollar amount in shares of common stock (a "Draw Down Amount"). In no event may the shares issuable pursuant to a Draw Down Notice, when aggregated with the shares then held by the Purchaser on the date of the Draw Down, exceed 9.99% of the Company's outstanding common stock.

**Purchase Price:** The purchase price per share of common stock purchased under the EPA Facility shall equal 90% of the lowest closing bid price during the Valuation Period (the "Purchase Price"). On the date that a Draw Down Notice is delivered to Purchaser, the Company shall deliver an estimated amount of shares to Purchaser's brokerage account equal to 125% of the Draw Down Amount indicated in the Notice divided by the closing bid price for the trading day immediately prior to the date of the Draw Down Notice ("Estimated Shares"). The Valuation Period shall begin the first trading day after the Estimated Shares have been delivered to Purchaser's brokerage account and have been cleared for trading. At the end of the Valuation Period, if the number of Estimated Shares delivered to Purchaser is greater than the shares issuable pursuant to the Draw Down,

**FUND MANAGEMENT**

Executive Pavilion I 90 Grove Street I Ridgefield CT 06877
MAIN  203 431 8300 FAX 203 431 8301                             www.southridge.com

---

then Purchaser shall return to Company the difference between the Estimated Shares and the actual number of shares issuable pursuant to the Draw Down. If the number of Estimated Shares is less the shares issuable under the Draw Down, then the Company shall issue additional shares to Purchaser equal to the difference.

**Purchase Price Protection:** The Company shall specify in each Draw Down Notice a minimum threshold market price under which no shares may be sold (the "Floor Price"). The Floor Price shall not be less than 80% of the average of the closing bid prices for the five (5) trading days ending immediately prior to delivery of the Draw Down Notice. In the event that during a Valuation

## Screenshot 2 of 3

*Term Sheet — Page 2 (Purchase Price continuation, Purchase Price Protection / Floor Price, Commitment Fee, Valuation Period, Closings, Covenants, No Shorting; start of Conditions)*

Purchaser is greater than the shares issuable pursuant to the Draw Down,

**FUND MANAGEMENT**

Executive Pavilion I 90 Grove Street I Ridgefield CT 06877
MAIN 203 431 8300 FAX 203 431 8301                                www.southridge.com

then Purchaser shall return to Company the difference between the Estimated Shares and the actual number of shares issuable pursuant to the Draw Down. If the number of Estimated Shares is less the shares issuable under the Draw Down, then the Company shall issue additional shares to Purchaser equal to the difference.

**Purchase Price Protection:** The Company shall specify in each Draw Down Notice a minimum threshold market price under which no shares may be sold (the "Floor Price"). The Floor Price shall not be less than 80% of the average of the closing bid prices for the five (5) trading days ending immediately prior to delivery of the Draw Down Notice. In the event that during a Valuation Period, the closing bid price on any Trading Day is below the Floor Price, the Purchaser shall be under no obligation to purchase and the Company under no obligation to sell 1/10th of the Draw Down Amount for each such Trading Day, and the Draw Down Amount shall be adjusted accordingly.

**Commitment Fee:** Upon the signing of the definitive legal documentation for this transaction, the Company shall issue a 10% promissory note in the principal amount of $75,000, maturing 6 months from the issuance date. The promissory note shall not have registration rights.

**Valuation Period:** Ten (10) trading days, commencing on the first trading day following delivery and clearing of the Estimated Shares delivered in connection with a Draw Down Notice.

**Closings:** A Closing shall occur upon the settlement of the trades of the Estimated Shares associated with a Draw Down.

**Covenants:** Subject to the terms contained herein, there shall be no minimum drawdowns, no cancellation penalties, no minimum volume restrictions and no blackout dates.

**No Shorting:** Neither Purchaser nor any affiliate of Purchaser acting on its behalf or pursuant to any understanding with it will execute any Short Sales during the period from the date hereof to the end of the Commitment Period. For the purposes hereof, and in accordance with Regulation SHO, the sale after delivery of a Draw Down Notice of such number of Estimated Shares reasonably expected to be purchased under a Draw Down shall not be deemed a Short Sale.

**Conditions:** The obligation of the Purchaser to purchase shares pursuant to the EPA Facility during the Term will be subject to the satisfaction or waiver on each Closing of the conditions contained in the definitive documentation with respect to the EPA Facility, to include the following:

**Effective Registration**: The registration statement shall remain effective at all times, not subject to any actual or threatened stop order or

## Screenshot 3 of 3

*Term Sheet — Page 3 (Conditions: Effective Registration, Absence of Material Adverse Change, Continued Listing, Exclusivity; Governing Law; signature blocks for Vemanti Group, Inc., CEO and Livingston Asset Management LLC, Stephen Hicks, Manager — both unexecuted)*

with a Draw Down Notice.

3 of 3

A Closing shall occur upon the settlement of the trades of the Estimated Shares associated with a Draw Down.

**Covenants:** Subject to the terms contained herein, there shall be no minimum drawdowns, no cancellation penalties, no minimum volume restrictions and no blackout dates.

**No Shorting:** Neither Purchaser nor any affiliate of Purchaser acting on its behalf or pursuant to any understanding with it will execute any Short Sales during the period from the date hereof to the end of the Commitment Period.  For the purposes hereof, and in accordance with Regulation SHO, the sale after delivery of a Draw Down Notice of such number of Estimated Shares reasonably expected to be purchased under a Draw Down shall not be deemed a Short Sale.

**Conditions:** The obligation of the Purchaser to purchase shares pursuant to the EPA Facility during the Term will be subject to the satisfaction or waiver on each Closing of the conditions contained in the definitive documentation with respect to the EPA Facility, to include the following:

**Effective Registration**: The registration statement shall remain effective at all times, not subject to any actual or threatened stop order or suspension at any time.

**Absence of Material Adverse Change:** No material adverse change shall have occurred prior to a Closing or during a Valuation Period.

**Continued Listing:** Continued listing of the Company's common stock on the Principal Exchange on which its common stock trades, including the shares to be issued herein.

**Exclusivity:** From the date definitive documentation is executed until the expiration of the Term, the Company will agree not to enter into a similar financing arrangement with any third-party.

**Governing Law:**     State of New York.

This term sheet reflects the present intentions of the parties as to the principal terms of the proposed transactions referenced herein and is subject to the execution of definitive documentation and review by legal counsel to the parties.

Vemanti Group, Inc.                              Livingston Asset Management LLC
Chief Executive Officer                          Stephen Hicks, Manager

By:_____    By: _____

Date:_____    Date:_____

# SECTION C — CLEAN TEXT TRANSCRIPTION

The following is a clean text transcription of the Term Sheet, provided for searchability and citation. Substantive content is faithful to the original; minor formatting adjustments have been made for readability. The original-form reproduction in Section B controls in the event of any discrepancy.

## SOUTHRIDGE

Fund Management

Executive Pavilion  |  90 Grove Street  |  Ridgefield CT 06877

MAIN 203 431 8300  |  FAX 203 431 8301  |  www.southridge.com

## EQUITY PURCHASE AGREEMENT (EPA)
## CONFIDENTIAL TERM SHEET

| | |
|---|---|
| **Issuer:** | Vemanti Group, Inc. (the "Company"), a Nevada corporation. |
| **Purchaser:** | Livingston Asset Management LLC, a Florida limited liability company (the "Purchaser"). |
| **EPA Facility:** | Commitment to purchase up to $10,000,000 of the Company's common stock (the "Commitment Amount"). |
| **Securities:** | Registered common stock issued in a private placement pursuant to the Securities Act of 1933, registered on Form S-1. |
| **Term:** | Two years. |
| **Draw Down:** | The Company may draw upon the Facility periodically during the Term (a "Draw Down") by the Company's delivery to the Purchaser of a written notice (a "Draw Down Notice") requiring the Purchaser to purchase a dollar amount in shares of common stock (a "Draw Down Amount"). In no event may the shares issuable pursuant to a Draw Down Notice, when aggregated with the shares then held by the Purchaser on the date of the Draw Down, exceed 9.99% of the Company's outstanding common stock. |

**Purchase Price:**     The purchase price per share of common stock purchased under the EPA Facility shall equal 90% of the lowest closing bid price during the Valuation Period (the "Purchase Price"). On the date that a Draw Down Notice is delivered to Purchaser, the Company shall deliver an estimated amount of shares to Purchaser's brokerage account equal to 125% of the Draw Down Amount indicated in the Notice divided by the closing bid price for the trading day immediately prior to the date of the Draw Down Notice ("Estimated Shares"). The Valuation Period shall begin the first trading day after the Estimated Shares have been delivered to Purchaser's brokerage account and have been cleared for trading. At the end of the Valuation Period, if the number of Estimated Shares delivered to Purchaser is greater than the shares issuable pursuant to the Draw Down, then Purchaser shall return to Company the difference between the Estimated Shares and the actual number of shares issuable pursuant to the Draw Down. If the number of Estimated Shares is less the shares issuable under the Draw Down, then the Company shall issue additional shares to Purchaser equal to the difference.

**Purchase            Price** The Company shall specify in each Draw Down Notice a minimum threshold market
**Protection:**        price under which no shares may be sold (the "Floor Price"). The Floor Price shall not be less than 80% of the average of the closing bid prices for the five (5) trading days ending immediately prior to delivery of the Draw Down Notice. In the event that during a Valuation Period, the closing bid price on any Trading Day is below the Floor Price, the Purchaser shall be under no obligation to purchase and the Company under no obligation to sell 1/10th of the Draw Down Amount for each such Trading Day, and the Draw Down Amount shall be adjusted accordingly.

**Commitment Fee:**    Upon the signing of the definitive legal documentation for this transaction, the Company shall issue a 10% promissory note in the principal amount of $75,000, maturing 6 months from the issuance date. The promissory note shall not have registration rights.

**Valuation Period:**  Ten (10) trading days, commencing on the first trading day following delivery and clearing of the Estimated Shares delivered in connection with a Draw Down Notice.

**Closings:**          A Closing shall occur upon the settlement of the trades of the Estimated Shares associated with a Draw Down.

**Covenants:**         Subject to the terms contained herein, there shall be no minimum drawdowns, no cancellation penalties, no minimum volume restrictions and no blackout dates.

**No Shorting:**       Neither Purchaser nor any affiliate of Purchaser acting on its behalf or pursuant to any understanding with it will execute any Short Sales during the period from the date hereof to the end of the Commitment Period. For the purposes hereof, and in accordance with Regulation SHO, the sale after delivery of a Draw Down Notice of such number of Estimated Shares reasonably expected to be purchased under a Draw Down shall not be deemed a Short Sale.

**Conditions:**        The obligation of the Purchaser to purchase shares pursuant to the EPA Facility during the Term will be subject to the satisfaction or waiver on each Closing of the conditions contained in the definitive documentation with respect to the EPA Facility, to include the following:

**Effective Registration:**     The registration statement shall remain effective at all times, not subject to any actual or threatened stop order or suspension at any time.

| | |
|---|---|
| **Absence of Material Adverse Change:** | No material adverse change shall have occurred prior to a Closing or during a Valuation Period. |
| **Continued Listing:** | Continued listing of the Company's common stock on the Principal Exchange on which its common stock trades, including the shares to be issued herein. |
| **Exclusivity:** | From the date definitive documentation is executed until the expiration of the Term, the Company will agree not to enter into a similar financing arrangement with any third-party. |
| **Governing Law:** | State of New York. |

This term sheet reflects the present intentions of the parties as to the principal terms of the proposed transactions referenced herein and is subject to the execution of definitive documentation and review by legal counsel to the parties.


**Vemanti Group, Inc.**
Chief Executive Officer

**Livingston Asset Management LLC**
Stephen Hicks, Manager

By: _____

By: _____

Date: _____

Date: _____


*Note: Both signature blocks in the Term Sheet as transmitted to Plaintiff on October 8, 2020 were unexecuted.*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

**BARINDER SINGH "NABE" BAL,**

        Plaintiff,

    v.

**TAN TRAN, an individual; and VEMANTI GROUP, INC.,**
**a Nevada corporation,**

        Defendants.

Case No. _____

# EXHIBIT N

Schedule 13D/A Filed October 24, 2023

# AUTHENTICATION AND SOURCE DECLARATION

This Exhibit N reproduces the Schedule 13D/A (Amendment No. 1) filed by Defendant Tan Tran with the U.S. Securities and Exchange Commission on October 24, 2023, with respect to his beneficial ownership of common stock and preferred stock of Vemanti Group, Inc. The filing is a public document on the SEC's EDGAR system, accessible at the URL identified below. This Exhibit is offered for the limited purpose of corroborating the in-scope-period claim that Defendant disposed of common stock in amounts exceeding the Section 13(d) amendment threshold without timely filing the required amendments.

## Filing Identification

| | |
|---|---|
| **Form Type:** | Schedule 13D/A (Amendment No. 1 to Schedule 13D) |
| **Filer / Reporting Person:** | Tan Tran (individual; Defendant herein) |
| **Issuer:** | Vemanti Group, Inc., a Nevada corporation (OTCQB: VMNT) (Defendant herein) |
| **CUSIP Number:** | 92259A102 |
| **Date of Event Triggering Filing:** | September 20, 2023 |
| **Date Filed and Signed:** | October 24, 2023 |
| **Counsel of Record on Filing:** | Mark Crone, Esq., The Crone Law Group, P.C., 420 Lexington Avenue, Suite 2446, New York, NY 10170 |
| **SEC EDGAR Accession No.:** | 0001477932-23-007819 |
| **Issuer CIK:** | 0001605057 |
| **Source URL:** | https://www.sec.gov/Archives/edgar/data/0001605057/000147793223007819/vemanti_sc13da.htm |

# COMMON STOCK DISPOSITION ANALYSIS

The Schedule 13D/A reproduced in Section A of this Exhibit is the first amendment to a Schedule 13D originally filed by Defendant Tan Tran with the SEC on July 7, 2021 (SEC EDGAR Accession No. 0001477932-21-004431). Comparison of the common stock holdings disclosed across these two filings — the only two Schedule 13D filings made by Mr. Tran with respect to Vemanti Group, Inc. during the period July 7, 2021 through October 24, 2023 — establishes the following facts.

## A. Common Stock Holdings as Disclosed in the Two Filings

| | Original Schedule 13D (July 7, 2021) | Amendment No. 1 (October 24, 2023) |
|---|---|---|
| **Common Stock Directly Owned by Mr. Tran** | **27,350,000** shares | **20,155,000** shares |
| **Common Stock Held by Family Members** | Not reported in original filing | **6,500,000** shares (3,250,000 wife Phoebe Tran + 3,250,000 son Jacob Tran) |
| **Aggregate Common Stock Beneficial Ownership** | 27,350,000 shares | **26,655,000** shares (per Item 5) |
| **Issuer Common Stock Outstanding** | 69,564,086 (as of July 7, 2021) | 70,524,209 (as of October 13, 2023) |
| **Percent of Class (Common Stock)** | ~39.32% | ~37.89% (per Item 5) |

*Note: The cover-page footnote to Amendment No. 1 states that the aggregate common stock component is 26,665,000 shares; the corresponding figure in Item 5 of the same filing is 26,655,000 shares. The 10-share discrepancy appears in the original filing as filed. The Item 5 figure (26,655,000) is used herein for the comparative analysis because Item 5 is the narrative disclosure of beneficial ownership.*

## B. Net Change in Mr. Tran's Direct Common Stock Holdings

Between the original Schedule 13D filed July 7, 2021 and Amendment No. 1 filed October 24, 2023, Mr. Tran's directly-held common stock position decreased from **27,350,000 shares** to **20,155,000 shares** — a reduction of **7,195,000 shares** of common stock.

Even crediting the maximum possible explanation of family transfers (i.e., assuming the full 6,500,000 shares now held by Mrs. Phoebe Tran and Mr. Jacob Tran originated from transfers by Mr. Tran), a residual reduction of **695,000 shares** remains. The family transfers themselves, regardless of timing, are dispositions for purposes of Section 13(d) of the Securities Exchange Act and Rule 13d-2.

Expressed as a percentage of the Issuer's common stock outstanding as of October 13, 2023 (70,524,209 shares), Mr. Tran's 7,195,000-share reduction in direct ownership represents **approximately 10.2% of the class**.

## C. Section 13(d) Amendment Threshold

Under Section 13(d) of the Securities Exchange Act of 1934 and Rule 13d-2(a) promulgated thereunder, a beneficial owner of more than 5% of a class of equity securities registered under Section 12 is required to **promptly** amend their Schedule 13D upon the occurrence of any "material change" in the facts disclosed, including any acquisition or disposition of **1% or more** of the class of securities to which the filing relates.

The 1% threshold applied to the Issuer's common stock as of October 13, 2023 (70,524,209 shares outstanding) is **approximately 705,242 shares**. The total movement in Mr. Tran's directly-held common stock between the two filings (7,195,000 shares) exceeds this 1% threshold by an order of magnitude.

Notwithstanding the magnitude of this change, the public record reflects only **one Schedule 13D amendment** filed by Mr. Tran with respect to Vemanti Group, Inc. in the period between July 7, 2021 and October 24, 2023 — the present Amendment No. 1, filed on October 24, 2023.

## D. Cross-Reference to Operative Complaint

The Operative Complaint identifies two unreported Section 16(a) selling windows during the in-scope period (Q3 2020 through March 24, 2022), reconstructing dispositions of **505,685 shares** (Window 1: 7,850 shares; Window 2: 497,835 shares) that should have been disclosed via Form 4 filings during that window. The present Amendment No. 1, filed October 24, 2023, corroborates a broader pattern of unreported common stock dispositions by reflecting an end-state common stock position that is materially lower than the position disclosed in the original July 7, 2021 Schedule 13D, with no intervening amendments.

Mr. Tran's ownership of 40,000,000 shares of Series A preferred stock disclosed in Amendment No. 1 is noted in this Exhibit only for completeness of the filing reproduction. Because the Series A preferred stock has not been converted or sold by Mr. Tran as of the date of the filing, the Series A preferred holdings are not the basis on which this Exhibit is offered. The basis is the common stock disposition pattern.

## E. Evidentiary Use Limitation

This Exhibit N is offered solely as evidentiary corroboration of facts concerning Defendant Tan Tran's common stock dispositions in the Issuer, which dispositions should have been disclosed in Defendant's Section 13(d) and Section 16(a) filings during the in-scope period (Q3 2020 through March 24, 2022) but were not so disclosed. Inclusion of this Exhibit does not constitute or imply a claim regarding any conduct occurring on or after the filing date (October 24, 2023), which conduct is reserved for separate proceedings.

# SECTION A — SCHEDULE 13D/A AS FILED

The pages that follow reproduce the Schedule 13D/A (Amendment No. 1) filed by Tan Tran with the SEC on October 24, 2023, rendered from the SEC EDGAR HTML at the Source URL identified in the Authentication section above. The substantive content (text, tables, signature) is a faithful reproduction of the SEC EDGAR filing; minor visual styling has been preserved. The original filing remains the controlling source document.

## Page 1 of 3

*Filing cover page — Issuer (Vemanti Group, Inc.), CUSIP (92259A102), counsel of record (Mark Crone, Esq., The Crone Law Group, P.C.), and Date of Event triggering filing (September 20, 2023).*

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**SCHEDULE 13D/A**
Under the Securities Exchange Act of 1934
**(Amendment No. 1)**

| |
|---|
| **VEMANTI GROUP, INC.** |
| *(Name of Issuer)* |

Common Stock, $0.0001 par value per share
*(Title of Class of Securities)*

**92259A102**
*(CUSIP Number)*

Mark Crone, Esq.
The Crone Law Group, P.C.
420 Lexington Avenue
Suite 2446
New York, New York 10170
Telephone: (646) 861-7891
*(Name, Address and Telephone Number of Person*
*Authorized to Receive Notices and Communications)*

**September 20, 2023**
*(Date of Event which Requires Filing of this Statement)*

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box. ☐

**Note:** Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See §240.13d-7 for other parties to whom copies are to be sent.

*\* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.*

*The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).*

## Page 2 of 3

*Reporting Person table — rows 1 through 14, including beneficial ownership computation (Sole Voting Power 420,155,000 / Shared Voting Power 6,500,000 / Sole Dispositive Power 60,155,000 / Shared Dispositive Power 6,500,000 / Aggregate 66,655,000 / Percent of Class 60.31%) and footnotes.*

| | | |
|---|---|---|
| **1.** | Names of Reporting Persons. **Tan Tran** | |
| **2.** | Check the Appropriate Box if a Member of a Group (a) ☐   (b) ☐ | |
| **3.** | SEC Use Only | |
| **4.** | Source of Funds (see instructions) **OO** | |
| **5.** | Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e) ☐ | |
| **6.** | Citizenship or Place of Organization **United States** | |
| Number of Shares Beneficially Owned by Each Reporting Person With: | **7.** | Sole Voting Power **420,155,000**[1] |
| | **8.** | Shared Voting Power **6,500,000** |
| | **9.** | Sole Dispositive Power **60,155,000**[1] |
| | **10.** | Shared Dispositive Power **6,500,000** |
| **11.** | Aggregate Amount Beneficially Owned by Each Reporting Person **66,655,000** | |
| **12.** | Check if the Aggregate Amount in Row (11) Excludes Certain Shares  ☐ | |
| **13.** | Percent of Class Represented by Amount in Row (11) **60.31%** | |
| **14.** | Type of Reporting Person (see instructions) **IN** | |

[1] Includes 26,665,000 shares of the Issuer's common stock, par value $0.0001 per share, and 40,000,000 shares of the Issuer's Series A preferred stock, par value $0.0001 per share. The Shares of Series A preferred stock are convertible into shares of common stock and vote with the common stock on the basis of each share of common stock being entitled to one vote and each share of Series A preferred stock being entitled to 10 votes.

Percentage calculated based on 70,524,209 shares of common stock, par value $0.0001 per share, outstanding as of October 13, 2023, plus 40,000,000 shares of common stock underlying the Series A preferred stock on an as-converted basis held by the Reporting Person.

2

## Page 3 of 3

*Item 5 (Interest in Securities of the Issuer) and signature block. Item 5 discloses aggregate common stock of 26,655,000 shares, comprising 20,155,000 shares directly owned by Mr. Tran, 3,250,000 by his wife Phoebe Tran, and 3,250,000 by his son Jacob Tran. Signed October 24, 2023 by /s/ Tan Tran.*

**ITEM 5. INTEREST IN SECURITIES OF THE ISSUER**

Item 5 of Schedule 13D is hereby amended and restated as follows:

The information set forth on the cover page of Amendment No. 1 is hereby incorporated by reference into this Item 5.

As of the date of this Schedule 13D/A, Mr. Tran beneficially owns an aggregate of 26,655,000 shares of the Issuer's common stock, issued and outstanding. 20,155,000 shares of common stock are directly owned by Mr. Tran, 3,250,000 shares are directly owned by his wife, Phoebe Tran and 3,250,000 are directly owned by his son, Jacob Tran. Collectively, Mr. Tran beneficially holds approximately 37.89% of the Issuer's common stock.

Mr. Tran also holds 40,000,000 shares of Series A preferred stock, which constitute 100% of the Issuer's preferred stock issued and outstanding as of the date of this report. The Series A preferred stock is convertible into shares of common stock and each share of Series A preferred stock is entitled to 10 votes.

Collectively, Mr. Tran holds 426,665,000 or 60.31% of the votes reported herein and is deemed to control and/or have shared disposition rights and voting rights over such votes.

There have been no other transactions in the shares of common stock of the Issuer effected by Mr. Tran during the past 60 days.

Not applicable.

**SIGNATURE**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

**Date: October 24, 2023**               **By:**         **/s/ Tan Tran**

                                                    Tan Tran

3

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

**BARINDER SINGH "NABE" BAL,**
        Plaintiff,

    v.

**TAN TRAN, an individual; and VEMANTI GROUP, INC.,**
**a Nevada corporation,**
        Defendants.

Case No. _____

# EXHIBIT O

Excerpt — Vemanti Group, Inc. Annual Report for Fiscal Year Ended
December 31, 2015 (Note 1, Organization)

---

# AUTHENTICATION AND SOURCE DECLARATION

This Exhibit O reproduces seven pages of Vemanti Group, Inc.'s Annual Report for the fiscal year ended December 31, 2015 (the signed version, filed on or about February 11, 2016). The report was filed by Vemanti Group, Inc. with the OTC Markets disclosure system pursuant to Rule 15c2-11(a) under the Securities Exchange Act of 1934 and the OTC Markets Group's Pink Basic Disclosure Guidelines. The report's Issuer Certification (Item 10) is signed by Defendant Tan Tran as CEO/President and by Kate Mai as Secretary/Treasurer, dated **February 8, 2016**.

## Note on Filing History

Vemanti Group, Inc. submitted an earlier version of its Annual Report for the fiscal year ended December 31, 2015 dated February 9, 2016. That earlier version's cover page contained a typed signature reference ("By: /s/ Mr. Tan Tran") but did not include the executed Issuer Certification signature page. The version reproduced in this Exhibit O is the operative **signed** version, which includes the executed Issuer Certification (Item 10) bearing the signatures of Tan Tran and Kate Mai. Both versions cover the same fiscal period and disclose materially the same financial and corporate information; this Exhibit relies on the signed version as the operative document.

## Document Identification

| | |
|---|---|
| **Document Type:** | OTC Markets Group Annual Report (Pink Basic Disclosure) |
| **Issuer:** | Vemanti Group, Inc., a Nevada corporation |
| **Trading Symbol:** | VMNT |
| **CUSIP Number:** | 92259A 102 |
| **Period Covered:** | Fiscal Year Ended December 31, 2015 |
| **Certification Date:** | February 8, 2016 (signed) |
| **Filing Date:** | On or about February 11, 2016 |
| **Certified / Signed By:** | Tan Tran, CEO / President; and Kate Mai, Secretary / Treasurer |
| **Report Length:** | 18 pages total |
| **Pages Reproduced Herein:** | Pages 1, 2, 8, 12, 16, 17, and 18 |
| **Filing Compliance Basis:** | Rule 15c2-11(a) under the Securities Exchange Act of 1934 |
| **Disclosure Framework:** | OTC Markets Group Pink Basic Disclosure Guidelines (v1.1 April 25, 2013) |

## Issuer Certification Reproduced from the Report

Item 10 of the report (Issuer Certification, reproduced on Pages 17–18 herein) contains the following certification by Defendant Tan Tran:

> *"I, Tan Tran, certify that: 1. I have reviewed this Annual Statement of the Vemanti Group, Inc.; 2. Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made… not misleading…; 3. Based on my knowledge, the financial statements… fairly present in all material respects the financial condition, results of operations and cash flows of the issuer…"*

The certification signature block (Page 18) reads: **02/08/2016 [Date]; /s/ TAN TRAN CEO/PRESIDENT; /s/ KATE MAI Secretary/Treasurer.**

# MATERIAL FACTS ESTABLISHED BY THIS REPORT

The signed Annual Report reproduced in Section A of this Exhibit establishes the following facts regarding the corporate history, capital structure, and controlling-shareholder position of Vemanti Group, Inc.:

## A. Incorporation and the VoiceStep Founding Transaction

Note 1 to the Consolidated Financial Statements (Organization and Line of Business, reproduced on Page 8) states that Vemanti Group, Inc. was incorporated on **April 3, 2014** under the laws of the State of Nevada, and that VoiceStep Telecom, LLC, a California limited liability company, was formed on January 27, 2005 and originally founded in 2002. Note 1 further states:

> *"On April 3, 2014, the sole member of VoiceStep exchanged 100% of his membership interest in VoiceStep for 40,000,000 shares of Vemanti's common stock and 40,000,000 shares of Vemanti's preferred stock."*

## B. The Two-Member Origin of VoiceStep and the Buyout

Note 6 to the Consolidated Financial Statements (Members' Interest / Stockholders' Equity, reproduced on Page 12) discloses the membership history of VoiceStep Telecom, LLC:

> *"VoiceStep originally consisted of two Members each owning 50% of VoiceStep. On January 27, 2014, one of the members was bought out with the remaining member owning 100% of the membership interest in VoiceStep. On April 3, 2014, the remaining member exchanged his 100% interest in VoiceStep for 40,000,000 shares of Vemanti common stock. VoiceStep made distributions to its members totaling $314,079 during the years ended December 31, 2014."*

Accordingly: (i) VoiceStep began with two equal 50/50 members; (ii) on January 27, 2014, one member was bought out, leaving a single remaining member owning 100%; and (iii) on April 3, 2014, that sole remaining member exchanged his 100% VoiceStep interest for Vemanti stock in the founding-issuance transaction. The sole remaining member who received the founding-issuance shares is Tan Tran, as corroborated by his 95.3% beneficial ownership of Vemanti common stock disclosed elsewhere in the same report (Section 8(C), discussed below).

*Note on internal cross-reference: Note 1 describes the April 3, 2014 exchange as being for "40,000,000 shares of Vemanti's common stock and 40,000,000 shares of Vemanti's preferred stock," whereas Note 6 describes the same exchange as being for "40,000,000 shares of Vemanti common stock." Both descriptions appear in the report as filed and are reproduced faithfully herein. The precise allocation of common versus preferred consideration in the founding exchange is a matter for discovery; in either reading, 40,000,000 shares of Vemanti preferred stock were issued and outstanding as of December 31, 2014, as separately confirmed by Note 6 (discussed in Part C below).*

## C. Preferred Stock Issued and Outstanding Since December 31, 2014

Note 6 to the Consolidated Financial Statements (Members' Interest / Stockholders' Equity, reproduced on Page 12) contains the following disclosure regarding preferred stock:

> *"Preferred stock — The Company has authorized the issuance of 50,000,000 shares of preferred stock, $0.0001 par value. At June 30, 2015 and December 31, 2014, the Company had 40,000,000 and 40,000,000, respectively, shares of preferred stock issued and outstanding. (See Note 1)"*

This disclosure establishes that **40,000,000 shares of Vemanti preferred stock were issued and outstanding as of December 31, 2014, and remained outstanding as of June 30, 2015.** The preferred stock class therefore existed and was outstanding more than five years before the start of the in-scope period of this action (Q3 2020) and more than six years before Defendant Tan Tran's initial Schedule 13D filing (July 7, 2021), which reported only common stock and disclosed no preferred holdings (see Exhibit N).

The Schedule 13D/A filed by Tan Tran on October 24, 2023 (reproduced in Exhibit N) discloses that Tan Tran beneficially owns 40,000,000 shares of Series A preferred stock constituting 100% of the Issuer's preferred stock, each share carrying 10 votes. The number of preferred shares disclosed in that 2023 filing (40,000,000) is identical to the number of preferred shares this 2015 Annual Report states were issued and outstanding as of December 31, 2014 (40,000,000). The correspondence in share count, coupled with the Note 1 statement that the founding-issuance exchange included Vemanti preferred stock, supports the inference that the 40,000,000 preferred shares disclosed in the 2023 Schedule 13D/A are the same 40,000,000 preferred shares that existed at the Issuer's founding stage and were never disclosed in Tan Tran's Section 13(d) filings during the in-scope period.

## D. Common Stock Capitalization

Note 6 further discloses that the Company had authorized 500,000,000 shares of common stock, $0.0001 par value, of which **41,970,000 shares were issued and outstanding** at both December 31, 2015 and December 31, 2014. The common stock issuances disclosed in Note 6 are: (i) 40,000,000 shares in connection with the VoiceStep membership-interest exchange described in Note 1; (ii) 1,000,000 shares for cash proceeds of $100; (iii) 600,000 shares for services rendered valued at $60; and (iv) 370,000 shares for cash proceeds of $37,000. These figures are consistent with Section 3 (Security Information, reproduced on Page 2), which states total common shares outstanding of 41,970,000 as of February 5, 2016.

## E. Tan Tran's Beneficial Ownership of Common Stock

Section 8(C) of the report (Beneficial Shareholders, reproduced on Page 17) discloses:

> *"Beneficial Shareholders. Provide a list of the name, address and shareholdings or the percentage of shares: **Tan Tran, 51 Acorn Glen, Irvine, CA 92620 — 95.3%.**"*

Applying the stated 95.3% beneficial ownership percentage to the total common shares outstanding:

| | |
|---|---|
| Total Common Shares Outstanding: | **41,970,000** |
| Tan Tran's Beneficial Ownership Percentage: | **95.3%** |
| Implied Common Shares Beneficially Owned by Tan Tran: | 41,970,000 × 0.953 = **39,997,410** shares |
| Rounded: | **Approximately 40,000,000 common shares** |

The implied figure of approximately 40,000,000 common shares corresponds precisely to the 40,000,000 founding-issuance common shares that Note 1 and Note 6 disclose were issued to the sole remaining

VoiceStep member in the April 3, 2014 exchange. This establishes that, as of the report date, Tan Tran's common stock holdings consisted substantially of the original founding-issuance shares, and that Tan Tran was the sole remaining VoiceStep member who received those shares.

## F. Officers and Directors

Section 8(A) of the report (Names of Officers, Directors, and Control Persons, reproduced on Page 16) lists:

| Tan Tran | Chairman of Board, CEO |
|----------|------------------------|
| Kate Mai | Treasurer & Secretary |

The same two individuals who are listed as the Issuer's only officers and directors (Tan Tran and Kate Mai) are the two individuals who signed the Issuer Certification on Page 18. Section 8(B) (Legal/Disciplinary History) reports "None" for all four enumerated categories.

# CROSS-REFERENCE TO OTHER EXHIBITS AND CASE FACTS

The facts established by this Exhibit O bear on, and corroborate, evidentiary points advanced in connection with other Exhibits and counts in the Operative Complaint as follows:

## 1. Preferred Stock Existed Throughout the In-Scope Period (Exhibit N)

This Exhibit establishes that 40,000,000 shares of Vemanti preferred stock were issued and outstanding as of December 31, 2014 (Note 6). The Schedule 13D originally filed by Tan Tran on July 7, 2021 (reproduced in Exhibit N) reported only common stock and disclosed no preferred holdings. The Schedule 13D/A filed by Tan Tran on October 24, 2023 (reproduced in Exhibit N) disclosed for the first time that Tan Tran beneficially owned 40,000,000 shares of Series A preferred stock — the identical share count to the preferred stock this 2015 Annual Report states was outstanding as of December 31, 2014. Because the preferred class existed at least since December 31, 2014, it existed throughout the entire in-scope period (Q3 2020 through March 24, 2022) and at the time of Tan Tran's initial Section 13(d) filing. This corroborates the allegation that Tan Tran's Section 13(d) disclosures during the in-scope period were materially deficient for omitting his super-voting preferred holdings.

## 2. CUSIP Continuity (Exhibit N)

The CUSIP Number for Vemanti common stock disclosed in this 2015 Annual Report is **92259A 102**, the same CUSIP (92259A102) appearing on both Schedule 13D filings reproduced in Exhibit N. This establishes that the securities referenced across these documents are the same class of the same issuer.

## 3. Founding Common Stock Baseline and Subsequent Dispositions (Exhibit N)

This Exhibit establishes that, at the founding stage (and as of February 5, 2016), Tan Tran beneficially owned approximately 40,000,000 shares of Vemanti common stock — substantially all of the founding-issuance shares. By his initial Schedule 13D filed July 7, 2021 (Exhibit N), Tan Tran reported direct ownership of **27,350,000** common shares, and by his Schedule 13D/A filed October 24, 2023 (Exhibit N), he reported direct ownership of **20,155,000** common shares. The progressive reduction in Tan Tran's common stock position — from approximately 40,000,000 shares (2016) to 27,350,000 shares (2021) to 20,155,000 shares (2023) — corroborates the allegation that Tan Tran disposed of common stock over time, including dispositions during the in-scope period that should have been reported through timely Section 13(d) amendments and Section 16(a) filings but were not.

## 4. Founding-Stage Control Concentration

Tan Tran's 95.3% beneficial ownership of Vemanti common stock at the founding stage, together with his ownership of 100% of the 40,000,000 outstanding preferred shares, establishes that Tan Tran held overwhelming voting and economic control of Vemanti Group, Inc. from inception. This corroborates the allegations that Tan Tran exercised effective control over Vemanti's public disclosures, corporate actions, and trading-related communications during the in-scope period.

## Evidentiary Use Limitation

This Exhibit O is offered solely as evidentiary corroboration of corporate-history, capital-structure, and founding-issuance facts. The 2015 fiscal year is outside the in-scope period of this action (Q3 2020 through March 24, 2022). Inclusion of this Exhibit does not constitute or imply any claim for relief based on conduct occurring during the 2015 fiscal year or in connection with the founding-issuance transaction itself.

# SECTION A — REPORT PAGES (REPRODUCTION)

The seven pages that follow reproduce Pages 1, 2, 8, 12, 16, 17, and 18 of the 18-page signed Annual Report of Vemanti Group, Inc. for the fiscal year ended December 31, 2015. Any highlighting or annotation visible on the reproduced pages was applied by Plaintiff for emphasis of material facts and was not present on the original report as filed with the OTC Markets disclosure system.

## Page 1 of 18

*Cover page — OTC Markets Group Annual Report, Vemanti Group, Inc., fiscal year ended December 31, 2015. Rule 15c2-11(a) compliance language; company headquarters at 7545 Irvine Center Drive, Suite 200, Irvine, CA 92618; Sections 1 (Name of issuer) and 2 (Principal executive offices). IR contact: Richard Oravec.*



YEAR ENDED DECEMBER 31, 2015

OTC MARKETS GROUP
Vemanti Group, Inc. (A Nevada Company)
ANNUAL REPORT
As of December 31, 2015

All information in this Information and Disclosure Statement has been compiled to fulfill the disclosure requirements of rule 15c2-11 (a) promulgated under the Securities and Exchange Act of 1934, as amended. The enumerated captions contained herein correspond to the sequential format set forth in the rule.

No Dealer, salesmen or any other person has been authorized to give any information, or to make any representations, not contained herein in connection with the issuer. Such information or representations, if made, must not be relied upon as having been authorized by the issuer, and:

Delivery of this information file does not any time imply that the information contained herein is correct as of any time subsequent to the date first written above.
The undersigned hereby certifies that the information herein is true and correct to the best of their knowledge and belief.

Date: February 9, 2016
Vemanti Group, Inc.

By: /s/ Mr. Tan Tran

Name: Tan Tran
Position: CEO / President
Phone: 949-559-7200 x6168
E-mail: tan.tran@vemanti.com
Web-Page: www.vemanti.com

### OTC Pink Basic Disclosure Guidelines

**1)      Name of the issuer and its predecessors (if any)**

The Exact name of the Issuer is Vemanti Group Inc.

**2)      Address of the issuer's principal executive offices**

Company Headquarters
7545 Irvine Center Drive, Suite 200
Irvine, CA 92618
949-559-7200 x6168
tan.tran@vemanti.com
www.vemanti.com

IR Contact
Richard Oravec
277 West 11th Street, Suite 2F
NY, NY. 10014

1

## Page 2 of 18

*Section 3 (Security Information) — Trading Symbol VMNT; class of securities outstanding: Common Class A Shares;
CUSIP 92259A 102; Par/Stated Value $0.001; Total shares authorized 500,000,000; Total shares outstanding 41,970,000
(both as of February 5, 2016); **Additional class of securities: Not Applicable**. Transfer Agent: Globex Stock Transfer Inc.
Beginning of Section 4 (Issuance History), Securities Act Rule 504 / Form D.*

(949) 559-7200 Ext. 6170
richard.oravec@vemanti.com
www.vemanti.com

**3)     Security Information**

Trading Symbol: VMNT
Exact title and class of securities outstanding: Common Class A Shares
CUSIP: 92259A 102
Par or Stated Value: .001
Total shares authorized: 500,000,000           as of: February 5, 2016
Total shares outstanding: 41,970,000           as of: February 5, 2016

Additional class of securities: Not Applicable

Transfer Agent
Globex Stock Transfer Inc.
780 Deltona Blvd, Suite 202
Deltona, FL. 32725
386-206-1133

The transfer agent is registered under the Exchange Act.

List any restrictions on the transfer of security:

None

Describe any trading suspension orders issued by the SEC in the past 12 months.

None

List any stock split, stock dividend, recapitalization, merger, acquisition, spin-off, or reorganization either
currently anticipated or that occurred within the past 12 months:

None

**4)     Issuance History**

List below any events, in chronological order, that resulted in changes in total shares outstanding by the
issuer in the past two fiscal years and any interim period.  The list shall include all offerings of equity
securities, including debt convertible into equity securities, whether private or public, and all shares or any
other securities or options to acquire such securities issued for services, describing (1) the securities, (2)
the persons or entities to whom such securities were issued and (3) the services provided by such
persons or entities.  The list shall indicate:

    A.   The nature of each offering (e.g., Securities Act Rule 504, intrastate, etc.);

Securities Act Rule 504

    B.   Any jurisdictions where the offering was registered or qualified;

Federally through Form D

2

## Page 8 of 18

*Note 1 (Organization and Line of Business) — States Vemanti Group, Inc. was incorporated April 3, 2014 in Nevada; VoiceStep Telecom, LLC formed January 27, 2005, originally founded 2002; and that on April 3, 2014, the sole member of VoiceStep exchanged 100% of his membership interest for **40,000,000 shares of Vemanti common stock and 40,000,000 shares of Vemanti preferred stock**. Note 2 (Summary of Significant Accounting Policies) begins.*

Organization and Line of Business

Vemanti Group, Inc., ("Vemanti") was incorporated on April 3, 2014 under the laws of the state of Nevada. VoiceStep Telecom, LLC, a California limited liability company, was formed on January 27, 2005 and originally founded in 2002 ("VoiceStep"). On April 3, 2014, the sole member of VoiceStep exchanged 100% of his membership interest in VoiceStep for 40,000,000 shares of Vemanti's common stock and 40,000,000 shares of Vemanti's preferred stock. Vemanti and its wholly-owned subsidiary, VoiceStep are hereafter referred to as the "Company."

The Company provides a one-stop resource for network communication needs. The Company's network offers availability, coverage and flexibility, and enables the following technology solutions: unified communications, data center services, content delivery, voice over IP (VoIP) and cloud computing.

Basis of Presentation

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiary, VoiceStep. Prior to April 3, 2014 the financial statement only include the accounts of VoiceStep. The accompanying financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America. All significant intercompany transactions and balances have been eliminated.

**Note 2 – Summary of Significant Accounting Policies**

Accounting Method

The Company's financial statements are prepared using the accrual method of accounting. The Company has elected a fiscal year ending on December 31.

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates made by management include, among others, revenue recognition. Actual results could differ from those estimates. It is possible that accounting estimates and assumptions may be material to the Company due to the levels of subjectivity and judgment involved.

Cash and Cash Equivalents

Cash and cash equivalents include cash on hand and cash in time deposits, certificates of deposit and all highly liquid debt instruments with original maturities of three months or less. As of December 31, 2015 and 2014, the Company had no cash equivalents.

Accounts Receivable

The Company regularly reviews collectability and establishes an allowance for doubtful accounts as necessary using the allowance method. The receivables are not collateralized.

The Company estimates the ability to collect receivables by performing ongoing credit evaluations of its customers' financial condition. Estimates are based on assumptions and other considerations, including payment history, credit ratings, customer financial performance, industry financial performance and aging analysis. The Company reviews its accounts receivable by aging category and to identify customers with known disputes or collection issues. In determining the allowance, the Company makes judgments about the creditworthiness of a majority of its customers based on ongoing credit evaluations. The Company also considers its historical level of credit losses and current

## Page 12 of 18

*Note 6 (Members' Interest / Stockholders' Equity) — Discloses VoiceStep originally had two 50/50 members; one bought out January 27, 2014; remaining member exchanged 100% interest April 3, 2014 for 40,000,000 Vemanti common shares; VoiceStep distributions of $314,079 in 2014.* **Preferred stock: 50,000,000 authorized; 40,000,000 issued and outstanding at both June 30, 2015 and December 31, 2014.** *Common stock: 500,000,000 authorized; 41,970,000 issued and outstanding.*

| | | |
|---|---|---|
| 2016 | $ | 45,159 |
| 2017 | | 47,558 |
| 2018 | | 50,711 |
| 2019 | | 4,374 |
| | $ | 147,802 |

**Note 6 – Members' Interest/Stockholders' Equity**

<u>Members' Interest</u>

VoiceStep is governed by the terms and conditions of the Limited Liability Company Agreement (the Agreement) dated May 3, 2005, as amended on January 27, 2014. VoiceStep shall continue until terminated in accordance with the terms of the Agreement or as provided by law, including events of dissolution. VoiceStep shall be dissolved only upon any of the following events: (i) the vote of Member(s) holding a majority to the dissolution and winding up of VoiceStep, (ii) the entry of a decree of judicial dissolution of VoiceStep and (iii) at any time there are no Member(s), subject to remedy within 90 days of occurrence of termination event by the last remaining Member in writing.

VoiceStep originally consisted of two Members each owning 50% of VoiceStep. On January 27, 2014, one of the members was bought out with the remaining member owning 100% of the membership interest in VoiceStep. On April 3, 2014, the remaining member exchanged his 100% interest in VoiceStep for 40,000,000 shares of Vemanti common stock.

VoiceStep made distributions to its members totaling $314,079 during the years ended December 31, 2014.

<u>Preferred stock</u>

The Company has authorized the issuance of 50,000,000 shares of preferred stock, $0.0001 par value. At June 30, 2015 and December 31, 2014, the Company had 40,000,000 and 40,000,000, respectively, shares of preferred stock issued and outstanding. (See Note 1)

<u>Common stock</u>

The Company has authorized the issuance of 500,000,000 shares of common stock, $0.0001 par value. At December 31, 2015 and 2014, the Company had 41,970,000 and 41,970,000, respectively, shares of common stock issued and outstanding.

During the year ended December 31, 2014, the Company issued the following shares of common stock:

- 40,000,000 shares in connection with the exchange for 100% of the membership interest in VoiceStep described in Note 1;

- 1,000,000 shares for cash proceeds of $100;

- 600,000 shares for services rendered valued at $60; and

- 370,000 shares for cash proceeds of $37,000.

On March 25, 2015, the Company granted 500,000 shares of restricted stock under the Vemanti Group, Inc. 2015 Stock Incentive Plan to a consultant. The shares vest on March 25, 2016 and will be issued to the consultant on that date as long as the consultant still has a relationship with the Company. The value of the restricted stock awards was $50,000 and is based on the fair value of the Company's common stock on the grant date. This amount is being

**Page 16 of 18**

*Section 8 (Officers, Directors, and Control Persons) — Sub-paragraph (A) lists **Tan Tran (Chairman of Board, CEO)** and **Kate Mai (Treasurer & Secretary)**. Sub-paragraph (B) (Legal/Disciplinary History) reports "None" for the enumerated categories. Also notes virtual-office setup (Regus, Irvine CA) and data centers in Tustin and Los Angeles, CA.*

If the issuer leases any assets, properties or facilities, clearly describe them as above and the terms of their leases.

We currently operate under a virtual-office setup with Regus in Irvine, CA. Our official mailing address with Regus is at 7545 Irvine Center Dr., Ste. 200, Irvine, CA 92618, USA. All employees are working remotely in a virtual network environment. Our operational equipment is located at 2 data centers: Tustin, CA and Los Angeles, CA.

8)    **Officers, Directors, and Control Persons**

The goal of this section is to provide an investor with a clear understanding of the identity of all the persons or entities that are involved in managing, controlling or advising the operations, business development and disclosure of the issuer, as well as the identity of any significant shareholders.

A.    <u>Names of Officers, Directors, and Control Persons</u>.  In responding to this item, please provide the names of each of the issuer's executive officers, directors, general partners and control persons (control persons are beneficial owners of more than five percent (5%) of any class of the issuer's equity securities), as of the date of this information statement.

| Tan Tran | Chairman of Board, CEO |
|----------|------------------------|
| Kate Mai | Treasurer & Secretary |

B.    <u>Legal/Disciplinary History</u>. Please identify whether any of the foregoing persons have, in the last five years, been the subject of:

1.    A conviction in a criminal proceeding or named as a defendant in a pending criminal proceeding (excluding traffic violations and other minor offenses);

<u>None</u>

2.    The entry of an order, judgment, or decree, not subsequently reversed, suspended or vacated, by a court of competent jurisdiction that permanently or temporarily enjoined, barred, suspended or otherwise limited such person's involvement in any type of business, securities, commodities, or banking activities;

<u>None</u>

3.    A finding or judgment by a court of competent jurisdiction (in a civil action), the Securities and Exchange Commission, the Commodity Futures Trading Commission, or a state securities regulator of a violation of federal or state securities or commodities law, which finding or judgment has not been reversed, suspended, or vacated; or

<u>None</u>

## Page 17 of 18

*Section 8(C) (Beneficial Shareholders) discloses: **"Tan Tran, 51 Acorn Glen, Irvine, CA 92620 — 95.3%."** Section 9 (Third Party Providers): legal counsel Michael T. Williams (Williams Law Firm, Tampa FL); accountant Kevin Pickard (Pickard & Company CPAs, Valencia CA). Section 10 (Issuer Certification) begins: "I, Tan Tran, certify that: 1. I have reviewed this Annual Statement of the Vemanti Group, Inc...."*

4. The entry of an order by a self-regulatory organization that permanently or temporarily barred suspended or otherwise limited such person's involvement in any type of business or securities activities.

> None

C. <u>Beneficial Shareholders</u>. Provide a list of the name, address and shareholdings or the percentage of shares

Tan Tran, 51 Acorn Glen, Irvine, CA 92620        95.3%

**9)    Third Party Providers**

Please provide the name, address, telephone number, and email address of each of the following outside providers that advise your company on matters relating to operations, business development and disclosure:

Legal Counsel
Name: Michael T. Williams
Firm: Williams Law Firm
Address 1: 8503 W. Gardner CT
Address 2: Tampa, FL 33611
Phone: 813-835-4044
Email: Michael@gopublicdirect.com

Accountant or Auditor
Name: Kevin Pickard
Firm: Pickard & Company CPAs
Address 1: 25350 Magic Mountain Parkway, Suite 300
Address 2: Valencia, CA 91355
Phone: 661-294-8300
Email: kevin@pickardcpa.com

Investor Relations: Not Applicable

**10)    Issuer Certification**

The issuer shall include certifications by the chief executive officer and chief financial officer of the issuer (or any other persons with different titles, but having the same responsibilities).

The certifications shall follow the format below:

I, Tan Tran, certify that:

1. I have reviewed this Annual Statement of the Vemanti Group, Inc.

2. Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and

**Page 18 of 18**

*Issuer Certification (Item 10) continued and signature block. Certification paragraph 3 (fair-presentation of financial statements), followed by: **02/08/2016 [Date]; /s/ TAN TRAN CEO/PRESIDENT; /s/ KATE MAI Secretary/Treasurer.** This is the executed signature page absent from the earlier February 9, 2016 version.*

3. Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this disclosure statement.

02/08/2016 [Date]

/s/ TAN TRAN CEO/PRESIDENT

/s/ KATE MAI Secretary/Treasurer
_(Digital Signatures should appear as "/s/ [OFFICER NAME]")

OTC Markets Group Inc.
OTC Pink Basic Disclosure Guidelines (v1.1 April 25, 2013)                    Page 18 of 18

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

**BARINDER SINGH "NABE" BAL,**
      Plaintiff,

    v.

**TAN TRAN, an individual; and VEMANTI GROUP, INC.,**
**a Nevada corporation,**
      Defendants.

Case No. _____

# EXHIBIT P

California Articles of Organization — VoiceStep Telecom, LLC (Filed January 27, 2005)

# AUTHENTICATION AND SOURCE DECLARATION

This Exhibit P reproduces the California Limited Liability Company Articles of Organization (Form LLC-1) for VoiceStep Telecom, LLC, filed with and stamped "FILED" by the California Secretary of State (Kevin Shelley) on **January 27, 2005**, bearing Secretary of State File No. **200503110236**. The document is a public record of the California Secretary of State.

## Document Identification

| | |
|---|---|
| **Document Type:** | Limited Liability Company Articles of Organization (California Form LLC-1, Rev. 12/2004) |
| **Entity Name:** | VoiceStep Telecom, LLC |
| **Filing Office:** | California Secretary of State (Kevin Shelley) |
| **File Number:** | 200503110236 |
| **Date Filed:** | January 27, 2005 |
| **Purpose:** | Any lawful act or activity under the Beverly-Killea Limited Liability Company Act |
| **Initial Agent for Service of Process:** | Tan Tran |
| **Agent Address:** | 21 Arizona, Irvine, California 92606 |
| **Management Structure:** | Member-managed ("ALL LIMITED LIABILITY COMPANY MEMBER(S)" box checked) |
| **Organizer (Execution):** | Rendi Eichner, dated January 26, 2005 |
| **Filing Service / Return To:** | Rendi Eichner, LegalZoom.com, Inc., 7083 Hollywood Blvd, Suite 180, Los Angeles, CA 90028 |

## Scope of What This Document Establishes

The Articles of Organization establish: (i) the legal formation of VoiceStep Telecom, LLC as a California limited liability company on January 27, 2005; (ii) that the entity was member-managed; and (iii) that Tan Tran was designated as the entity's Initial Agent for Service of Process at 21 Arizona, Irvine, California 92606.

The Articles of Organization were executed by an organizer, Rendi Eichner, through the filing service LegalZoom.com, Inc. As is standard for California Form LLC-1, the Articles do not enumerate the members or their respective ownership interests. The identity and ownership interests of VoiceStep's members are separately established by other evidence in this action, including the Note 6 disclosures in Vemanti Group, Inc.'s Annual Report for the fiscal year ended December 31, 2015 (Exhibit O), which discloses that VoiceStep originally consisted of two members each owning 50%, one of whom was bought out on January 27, 2014, leaving the remaining member owning 100%.

# MATERIAL FACTS ESTABLISHED BY THIS DOCUMENT

## A. Legal Formation of VoiceStep Telecom, LLC

The Articles of Organization were stamped "FILED" by the California Secretary of State on January 27, 2005, establishing the legal formation of VoiceStep Telecom, LLC as a California limited liability company as of that date, under File No. 200503110236. Item 2 states the entity's purpose as "to engage in any lawful act or activity for which a limited liability company may be organized under the Beverly-Killea Limited Liability Company Act."

## B. Tan Tran as Initial Agent for Service of Process

Item 3 of the Articles names **Tan Tran** as the Initial Agent for Service of Process for VoiceStep Telecom, LLC. Item 4 states the agent's California address as:

> **21 Arizona, Irvine, California 92606**

The designation of Tan Tran as the Initial Agent for Service of Process establishes Tan Tran's connection to VoiceStep Telecom, LLC from the entity's inception in January 2005. This is consistent with, and corroborates, the corporate-history narrative in Exhibit O, which establishes that VoiceStep ultimately became the wholly-owned operating subsidiary of Vemanti Group, Inc. following the April 3, 2014 founding-issuance exchange.

## C. Member-Managed Structure

Item 5 of the Articles indicates, by the checked box, that the limited liability company "will be managed by: ALL LIMITED LIABILITY COMPANY MEMBER(S)." VoiceStep Telecom, LLC was therefore organized as a member-managed limited liability company, in which management authority is vested in the members rather than in designated managers.

## D. Execution by Organizer

Item 7 (Execution) reflects that the Articles were executed by an organizer, **Rendi Eichner**, who signed and declared "I am the person who executed this instrument, which execution is my act and deed," dated January 26, 2005. Item 8 (Return To) identifies the filing service as LegalZoom.com, Inc., 7083 Hollywood Blvd, Suite 180, Los Angeles, CA 90028. The use of an organizer and a commercial filing service to execute and file Articles of Organization is a routine and lawful method of forming a California limited liability company; the organizer need not be a member of the resulting entity.

# CROSS-REFERENCE TO OTHER EXHIBITS AND CASE FACTS

The facts established by this Exhibit P bear on, and corroborate, evidentiary points advanced in connection with other Exhibits and counts in the Operative Complaint as follows:

## 1. Corroboration of VoiceStep Formation Date (Exhibit O)

Note 1 to Vemanti Group, Inc.'s Annual Report for the fiscal year ended December 31, 2015 (Exhibit O) states that "VoiceStep Telecom, LLC, a California limited liability company, was formed on January 27, 2005." The filing date stamped on these Articles of Organization — **January 27, 2005** — matches the formation date disclosed in Exhibit O exactly, corroborating the accuracy of the corporate-history disclosures in the 2015 Annual Report.

## 2. Tan Tran's Connection to VoiceStep from Inception (Exhibit O)

This Exhibit establishes that Tan Tran was the Initial Agent for Service of Process for VoiceStep Telecom, LLC at the entity's formation in 2005. Exhibit O establishes that VoiceStep ultimately became the wholly-owned subsidiary of Vemanti Group, Inc. through the April 3, 2014 founding-issuance exchange, in which the sole remaining VoiceStep member exchanged 100% of his membership interest for Vemanti stock. Read together, these Exhibits trace Tan Tran's continuous involvement with VoiceStep from its 2005 formation through its 2014 absorption into Vemanti Group, Inc.

## 3. Agent Address Note

The agent address stated in these 2005 Articles (21 Arizona, Irvine, California 92606) differs from the address associated with Tan Tran in the 2015 Annual Report (51 Acorn Glen, Irvine, California 92620; see Exhibit O, Section 8(C)). The difference is consistent with the approximately eleven-year interval between the two documents and is noted here for completeness and accuracy.

## Evidentiary Use Limitation

This Exhibit P is offered solely as evidentiary corroboration of corporate-formation facts concerning VoiceStep Telecom, LLC and Tan Tran's designated agent role at its inception. The 2005 formation of VoiceStep is outside the in-scope period of this action (Q3 2020 through March 24, 2022). Inclusion of this Exhibit does not constitute or imply any claim for relief based on conduct occurring in connection with the 2005 formation of VoiceStep Telecom, LLC.

## SECTION A — ARTICLES OF ORGANIZATION (REPRODUCTION)

The page that follows reproduces the California Limited Liability Company Articles of Organization (Form LLC-1) for VoiceStep Telecom, LLC, as filed with and stamped "FILED" by the California Secretary of State on January 27, 2005 under File No. 200503110236.

## Articles of Organization — VoiceStep Telecom, LLC

*California Secretary of State Form LLC-1, File No. 200503110236, filed January 27, 2005. Item 1 (Name): VoiceStep Telecom, LLC. Item 3 (Initial Agent for Service of Process): Tan Tran. Item 4 (Agent Address): 21 Arizona, Irvine, CA 92606. Item 5 (Management): All LLC Member(s). Item 7 (Execution): Rendi Eichner, organizer, dated January 26, 2005. Item 8 (Return To): LegalZoom.com, Inc., Los Angeles, CA.*

---

**State of California**
**Kevin Shelley**
**Secretary of State**

**LIMITED LIABILITY COMPANY**
**ARTICLES OF ORGANIZATION**

A $70.00 filing fee must accompany this form.

**IMPORTANT – Read instructions before completing this form.**

File # **200503110236**

**FILED**
In the office of the Secretary of State
of the State of California

JAN 2 7 2005

KEVIN SHELLEY, SECRETARY OF STATE

This Space For Filing Use Only

**ENTITY NAME** (End the name with the words "Limited Liability Company," "Ltd. Liability Co.," or the abbreviations "LLC" or "L.L.C.")

1. NAME OF LIMITED LIABILITY COMPANY

VoiceStep Telecom, LLC

**PURPOSE** (The following statement is required by statute and may not be altered.)

2. THE PURPOSE OF THE LIMITED LIABILITY COMPANY IS TO ENGAGE IN ANY LAWFUL ACT OR ACTIVITY FOR WHICH A LIMITED LIABILITY COMPANY MAY BE ORGANIZED UNDER THE BEVERLY-KILLEA LIMITED LIABILITY COMPANY ACT.

**INITIAL AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and both Items 3 and 4 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 3 must be completed (leave Item 4 blank).

3. NAME OF INITIAL AGENT FOR SERVICE OF PROCESS

Tan Tran

4. IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA    CITY    STATE    ZIP CODE

21 Arizona                    Irvine        CA      92606

**MANAGEMENT** (Check only one)

5. THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY:

☐ ONE MANAGER

☐ MORE THAN ONE MANAGER

☑ ALL LIMITED LIABILITY COMPANY MEMBER(S)

**ADDITIONAL INFORMATION**

6. ADDITIONAL INFORMATION SET FORTH ON THE ATTACHED PAGES, IF ANY, IS INCORPORATED HEREIN BY THIS REFERENCE AND MADE A PART OF THIS CERTIFICATE.

**EXECUTION**

7. I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

SIGNATURE OF ORGANIZER

01.26.05
DATE

Rendi Eichner
TYPE OR PRINT NAME OF ORGANIZER

**RETURN TO** (Enter the name and the address of the person or firm to whom a copy of the filed document should be returned.)

8. NAME        Rendi Eichner

FIRM        LegalZoom.com, Inc.

ADDRESS    7083 Hollywood Blvd, suite 180

CITY/STATE/ZIP   Los Angeles, CA 90028

LLC-1 (REV 12/2004)                    APPROVED BY SECRETARY OF STATE

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

**BARINDER SINGH "NABE" BAL,**

          Plaintiff,

   v.

**TAN TRAN, an individual; and VEMANTI GROUP, INC.,**
**a Nevada corporation,**

          Defendants.

Case No. _____

# EXHIBIT Q

Excerpts — Vemanti Group, Inc. OTC Annual Report for Fiscal Year 2015
(Sections 3, 4, and 8C)

# AUTHENTICATION AND SOURCE DECLARATION

This Exhibit Q reproduces three focused excerpts from Vemanti Group, Inc.'s Annual Report for the fiscal year ended December 31, 2015 (the signed version, filed on or about February 11, 2016 with the OTC Markets disclosure system). The full report and its certification are separately reproduced and authenticated in Exhibit O. This Exhibit Q is offered for the focused purpose of establishing Tan Tran's 95.3% beneficial ownership of Vemanti common stock as of the report date and tying that ownership percentage arithmetically to the 40,000,000 founding-exchange shares.

## Excerpts Reproduced Herein

**Excerpt (i):**     Section 3 (Security Information), Page 2 — total common shares outstanding 41,970,000 as of February 5, 2016

**Excerpt (ii):**    Section 4 (Issuance History), Pages 2–3 — the 40,000,000-share founding exchange for 100% of the VoiceStep Telecom, LLC membership interest

**Excerpt (iii):**   Section 8 (Officers, Directors, and Control Persons) and Section 8(C) (Beneficial Shareholders), Pages 16–17 — Tan Tran, 51 Acorn Glen, Irvine, CA 92620, 95.3%

## Source Document

**Document:** OTC Markets Group Annual Report (Pink Basic Disclosure), Vemanti Group, Inc., fiscal year ended December 31, 2015.
**Trading Symbol:** VMNT   **CUSIP:** 92259A 102
**Certification:** Signed by Tan Tran (CEO/President) and Kate Mai (Secretary/Treasurer), dated February 8, 2016 (see Exhibit O, Page 18).
**Filing Compliance Basis:** Rule 15c2-11(a) under the Securities Exchange Act of 1934.

# BENEFICIAL OWNERSHIP BREAKDOWN

The three excerpts reproduced in Section A establish the following facts, which together demonstrate — by arithmetic confirmation in both directions — that Tan Tran's reported 95.3% beneficial ownership corresponds to approximately 40,000,000 common shares, matching the 40,000,000 founding-exchange shares he received for his VoiceStep membership interest.

## A. The Three Reported Figures

| Figure | Value | Source |
|---|---|---|
| Total common shares outstanding | 41,970,000 | Section 3 (Security Information), as of Feb. 5, 2016 |
| Founding-exchange shares issued for VoiceStep | 40,000,000 | Section 4(E) (Issuance History) |
| Tan Tran beneficial ownership percentage | 95.3% | Section 8(C) (Beneficial Shareholders) |

## B. Forward Calculation (Percentage → Shares)

Applying the reported 95.3% beneficial ownership percentage to the total common shares outstanding yields the number of shares beneficially owned by Tan Tran:

$$41{,}970{,}000 \times 0.953 = 39{,}997{,}410 \text{ shares} \approx 40{,}000{,}000 \text{ shares}$$

The product, 39,997,410 shares, rounds to approximately 40,000,000 shares — matching the 40,000,000 founding-exchange shares to within 2,590 shares (a variance of approximately 0.006% of shares outstanding).

## C. Reverse Calculation (Shares → Percentage)

The arithmetic also confirms in the reverse direction. Expressing the 40,000,000 founding-exchange shares as a percentage of the 41,970,000 total common shares outstanding yields:

$$40{,}000{,}000 \div 41{,}970{,}000 = 0.95306\ldots = 95.31\% \approx 95.3\%$$

The 40,000,000 founding-exchange shares, taken as a percentage of total shares outstanding, independently reproduce the **95.3%** beneficial ownership figure reported in Section 8(C). This two-way arithmetic correspondence establishes that Tan Tran's reported beneficial ownership is substantially composed of, and traceable to, the 40,000,000 shares he received in the VoiceStep Telecom, LLC founding exchange.

## D. Reconciliation of the Remaining Shares

The 41,970,000 total common shares outstanding are fully accounted for by the issuances itemized in Section 4 of the report:

| Issuance | Shares | Consideration |
|---|---|---|
| VoiceStep founding exchange (to Tan Tran) | 40,000,000 | 100% of VoiceStep membership interest |
| Cash issuance | 1,000,000 | $100 cash |
| Services issuance | 600,000 | Services rendered valued at $60 |

| Cash issuance | 370,000 | $37,000 cash |
|---|---|---|
| **Total Outstanding** | **41,970,000** | |

Of the 41,970,000 total shares, the 40,000,000 founding-exchange shares represent 95.31%, and the remaining 1,970,000 shares (issued for cash and services, and registered under Securities Act Rule 504) represent 4.69%. The 1,970,000 non-founding shares correspond exactly to the "number of shares offered" and "number of shares sold" figures stated in Section 4(C) and 4(D) of the report, and to the 1,970,000 shares for which a Rule 144 opinion was issued (Section 4(F)). Tan Tran's reported 95.3% beneficial ownership is therefore consistent with his holding substantially all of the 40,000,000 founding-exchange shares and little or none of the 1,970,000 Rule 504 shares.

# CROSS-REFERENCE TO OTHER EXHIBITS

**1. Founding Exchange (Exhibits O and P).** The 40,000,000 founding-exchange shares are disclosed in Note 1 and Note 6 of the same Annual Report (reproduced in Exhibit O), which state that on April 3, 2014 the sole remaining member of VoiceStep Telecom, LLC exchanged 100% of his membership interest for Vemanti stock. VoiceStep's formation and Tan Tran's designation as its agent for service of process are established by its California Articles of Organization (Exhibit P).

**2. Subsequent Common Stock Dispositions (Exhibit N).** This Exhibit establishes that, as of the founding stage (February 5, 2016), Tan Tran beneficially owned approximately 40,000,000 common shares. By his initial Schedule 13D filed July 7, 2021 (Exhibit N), Tan Tran reported direct ownership of 27,350,000 common shares, and by his Schedule 13D/A filed October 24, 2023 (Exhibit N), 20,155,000 common shares. The progressive reduction in his common stock position over time corroborates the allegation that Tan Tran disposed of common stock, including dispositions during the in-scope period that should have been reported through timely Section 13(d) amendments and Section 16(a) filings but were not.

**3. Control Concentration.** Tan Tran's 95.3% beneficial ownership of common stock at the founding stage corroborates the allegation that Tan Tran held and exercised effective control over Vemanti Group, Inc. and its public disclosures during the in-scope period (Q3 2020 through March 24, 2022).

## Evidentiary Use Limitation

This Exhibit Q is offered solely as evidentiary corroboration of capital-structure and beneficial-ownership facts. The 2015 fiscal year is outside the in-scope period of this action. Inclusion of this Exhibit does not constitute or imply any claim for relief based on conduct occurring during the 2015 fiscal year or in connection with the founding-issuance transaction itself.

# SECTION A — REPORT EXCERPTS (REPRODUCTION)

The pages that follow reproduce the three excerpts described in the Authentication section. Any highlighting or annotation visible on the reproduced pages was applied by Plaintiff for emphasis and was not present on the original report as filed.

## Excerpt (i) — Section 3 (Security Information), Page 2

*Discloses Trading Symbol VMNT; class of securities outstanding: Common Class A Shares; CUSIP 92259A 102; Par/Stated Value $0.001; Total shares authorized 500,000,000; **Total shares outstanding 41,970,000** (both as of February 5, 2016); Additional class of securities: Not Applicable. Transfer Agent: Globex Stock Transfer Inc. Beginning of Section 4 (Issuance History).*

(949) 559-7200 Ext. 6170
richard.oravec@vemanti.com
www.vemanti.com

**3)     Security Information**

Trading Symbol: VMNT
Exact title and class of securities outstanding: Common Class A Shares
CUSIP: 92259A 102
Par or Stated Value: .001
Total shares authorized: 500,000,000          as of: February 5, 2016
Total shares outstanding: 41,970,000          as of: February 5, 2016

Additional class of securities: Not Applicable

Transfer Agent
Globex Stock Transfer Inc.
780 Deltona Blvd, Suite 202
Deltona, FL. 32725
386-206-1133

The transfer agent is registered under the Exchange Act.

List any restrictions on the transfer of security:

None

Describe any trading suspension orders issued by the SEC in the past 12 months.

None

List any stock split, stock dividend, recapitalization, merger, acquisition, spin-off, or reorganization either currently anticipated or that occurred within the past 12 months:

None

**4)     Issuance History**

List below any events, in chronological order, that resulted in changes in total shares outstanding by the issuer in the past two fiscal years and any interim period.  The list shall include all offerings of equity securities, including debt convertible into equity securities, whether private or public, and all shares or any other securities or options to acquire such securities issued for services, describing (1) the securities, (2) the persons or entities to whom such securities were issued and (3) the services provided by such persons or entities.  The list shall indicate:

    A.  The nature of each offering (e.g., Securities Act Rule 504, intrastate, etc.);

Securities Act Rule 504

    B.  Any jurisdictions where the offering was registered or qualified;

Federally through Form D

2

## Excerpt (ii) — Section 4 (Issuance History), Pages 2–3

*Itemizes the issuance history. Section 4(C)/(D): 1,970,000 shares offered and sold. Section 4(E): **40,000,000 shares in connection with the exchange for 100% of the membership interest in VoiceStep Telecom, LLC**; plus 1,000,000 shares for $100 cash; 600,000 shares for services valued at $60; and 370,000 shares for $37,000 cash. Section 4(F): Rule 144 opinion issued for 1,970,000 shares.*

**4)    Issuance History**

List below any events, in chronological order, that resulted in changes in total shares outstanding by the issuer in the past two fiscal years and any interim period.  The list shall include all offerings of equity securities, including debt convertible into equity securities, whether private or public, and all shares or any other securities or options to acquire such securities issued for services, describing (1) the securities, (2) the persons or entities to whom such securities were issued and (3) the services provided by such persons or entities.  The list shall indicate:

A.  The nature of each offering (e.g., Securities Act Rule 504, intrastate, etc.);

Securities Act Rule 504

B.  Any jurisdictions where the offering was registered or qualified;

Federally through Form D

2

C.  The number of shares offered;

1,970,000

D.  The number of shares sold;

1,970,000

E.  The price at which the shares were offered, and the amount actually paid to the issuer;

- 40,000,000 shares in connection with the exchange for 100% of the membership interest in VoiceStep Telecom, LLC.

- 1,000,000 shares for cash proceeds of $100;

- 600,000 shares for services rendered valued at $60; and

- 370,000 shares for cash proceeds of $37,000.

F.  The trading status of the shares; and

A 144 opinion was issued for the trading of 1,970,000 shares

G.  Whether the certificates or other documents that evidence the shares contain a legend (1) stating that the shares have not been registered under the Securities Act and (2) setting forth or referring to the restrictions on transferability and sale of the shares under the Securities Act.

All Shares were issued with restrictive legend and are subject to resale under 144 Rules.

**5)    Financial Statements**

**Vemanti Group, Inc. and Subsidiary**
**Consolidated Financial Statements**
**For The Years Ended December 31, 2015 and 2014**

## Excerpt (iii) — Section 8 and Section 8(C), Pages 16–17

*Section 8(A) lists Tan Tran (Chairman of Board, CEO) and Kate Mai (Treasurer & Secretary). Section 8(B) (Legal/Disciplinary History) reports "None" for all enumerated categories. Section 8(C) (Beneficial Shareholders) discloses: Tan Tran, 51 Acorn Glen, Irvine, CA 92620 — 95.3%.*

**8)    Officers, Directors, and Control Persons**

The goal of this section is to provide an investor with a clear understanding of the identity of all the persons or entities that are involved in managing, controlling or advising the operations, business development and disclosure of the issuer, as well as the identity of any significant shareholders.

A.    Names of Officers, Directors, and Control Persons. In responding to this item, please provide the names of each of the issuer's executive officers, directors, general partners and control persons (control persons are beneficial owners of more than five percent (5%) of any class of the issuer's equity securities), as of the date of this information statement.

| Tan Tran | Chairman of Board, CEO |
|---|---|
| Kate Mai | Treasurer & Secretary |

B.    Legal/Disciplinary History. Please identify whether any of the foregoing persons have, in the last five years, been the subject of:

1.    A conviction in a criminal proceeding or named as a defendant in a pending criminal proceeding (excluding traffic violations and other minor offenses);

None

2.    The entry of an order, judgment, or decree, not subsequently reversed, suspended or vacated, by a court of competent jurisdiction that permanently or temporarily enjoined, barred, suspended or otherwise limited such person's involvement in any type of business, securities, commodities, or banking activities;

None

3.    A finding or judgment by a court of competent jurisdiction (in a civil action), the Securities and Exchange Commission, the Commodity Futures Trading Commission, or a state securities regulator of a violation of federal or state securities or commodities law, which finding or judgment has not been reversed, suspended, or vacated; or

None

OTC Markets Group Inc.
OTC Pink Basic Disclosure Guidelines (v1.1 April 25, 2013)                    Page 16 of 18

4.    The entry of an order by a self-regulatory organization that permanently or temporarily barred suspended or otherwise limited such person's involvement in any type of business or securities activities.

None

C.    Beneficial Shareholders. Provide a list of the name, address and shareholdings or the percentage of shares

Tan Tran, 51 Acorn Glen, Irvine, CA 92620        95.3%

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

BARINDER SINGH "NABE" BAL,
                Plaintiff,

    v.

TAN TRAN, an individual; and VEMANTI GROUP, INC.,
a Nevada corporation,
                Defendants.

Case No. _____

# EXHIBIT R

Consolidated Excerpts — Vemanti Group, Inc. OTC Markets Quarterly
Disclosures and Annual Report, 2016–2017 Pre-In-Scope Period

---

**EXHIBIT R**

# EXHIBIT R — INDEX OF EXCERPTS

*The following six (6) OTC Markets disclosure filings of Vemanti Group, Inc. (symbol VMNT) are reproduced in relevant part. For each filing the excerpt set comprises the face/certification page and the Securities Information, Issuance History, and Officers/Directors/Control Persons (including Beneficial Shareholders) sections.*

**R-1.**    Vemanti Group, Inc. — Quarterly Report
Period ended March 31, 2016; filed June 1, 2016.
*Excerpts: face page; §3 Securities Information; §4 Issuance History; §8 / 8C Beneficial Shareholders.*

**R-2.**    Vemanti Group, Inc. — Quarterly Report
Period ended June 30, 2016; filed August 17, 2016.
*Excerpts: face page; §3 Securities Information; §4 Issuance History; §8 / 8C Beneficial Shareholders.*

**R-3.**    Vemanti Group, Inc. — Quarterly Report
Period ended September 30, 2016; filed October 31, 2016.
*Excerpts: face page; §3 Securities Information; §4 Issuance History; §8 / 8C Beneficial Shareholders.*

**R-4.**    Vemanti Group, Inc. — Annual Report
Period ended December 31, 2016; filed February 8, 2017.
*Excerpts: face page; §3 Securities Information; §4 Issuance History; §8 / 8C Beneficial Shareholders.*

**R-5.**    Vemanti Group, Inc. — Quarterly Report
Period ended March 31, 2017; filed June 1, 2017.
*Excerpts: face page; §3 Securities Information; §4 Issuance History; §8 / 8C Beneficial Shareholders.*

**R-6.**    Vemanti Group, Inc. — Quarterly Report
Period ended June 30, 2017; filed August 1, 2017.
*Excerpts: face page; §3 Securities Information; §4 Issuance History; §8 / 8C Beneficial Shareholders.*

# EXHIBIT R-1

---

**Vemanti Group, Inc.**

Quarterly Report — Period Ended March 31, 2016

*Filed June 1, 2016 (OTC Markets)*

*Reproduced in relevant part: face/certification page; Securities Information (§3); Issuance History (§4); Officers, Directors, and Control Persons, including Beneficial Shareholders (§8 / 8C).*

QUARTER ENDED MARCH 31, 2016

OTC MARKETS GROUP
Vemanti Group, Inc. (A Nevada Company)
QUARTERLY REPORT
As of March 31, 2016

All information in this Information and Disclosure Statement has been compiled to fulfill the disclosure requirements of rule 15c2-11 (a) promulgated under the Securities and Exchange Act of 1934, as amended. The enumerated captions contained herein correspond to the sequential format set forth in the rule.

No Dealer, salesmen or any other person has been authorized to give any information, or to make any representations, not contained herein in connection with the issuer. Such information or representations, if made, must not be relied upon as having been authorized by the issuer, and:

Delivery of this information file does not any time imply that the information contained herein is correct as of any time subsequent to the date first written above.
The undersigned hereby certifies that the information herein is true and correct to the best of their knowledge and belief.

Date: June 1, 2016
Vemanti Group, Inc.

By: /s/ Mr. Tan Tran

Name: Tan Tran
Position: CEO / President
Phone: 949-559-7200 x6168
E-mail: tan.tran@vemanti.com
Web-Page: www.vemanti.com

**OTC Pink Basic Disclosure Guidelines**

**1)      Name of the issuer and its predecessors (if any)**

The Exact name of the Issuer is Vemanti Group Inc.

**2)      Address of the issuer's principal executive offices**

Company Headquarters
5000 Birch Street
West Tower – 3rd Floor
Newport Beach, CA 92660
949-559-7200 x6168
tan.tran@vemanti.com
www.vemanti.com

IR Contact
Richard Oravec
277 West 11th Street, Suite 2F

1

Vemanti Group, Inc. — Quarterly Report, period ended March 31, 2016 (filed June 1, 2016)  —  Face / Certification Page
**EXHIBIT R-1.1**

NY, NY. 10014
(949) 559-7200 Ext. 6170
richard.oravec@vemanti.com
www.vemanti.com

3)      **Security Information**

Trading Symbol: VMNT
Exact title and class of securities outstanding: Common Class A Shares
CUSIP: 92259A 102
Par or Stated Value: .0001
Total shares authorized: 500,000,000          as of: March 31, 2016
Total shares outstanding: 42,470,000          as of: March 31, 2016

Additional class of securities: Not Applicable

Transfer Agent
Globex Stock Transfer Inc.
780 Deltona Blvd, Suite 202
Deltona, FL. 32725
386-206-1133

The transfer agent is registered under the Exchange Act.

List any restrictions on the transfer of security:

None

Describe any trading suspension orders issued by the SEC in the past 12 months.

None

List any stock split, stock dividend, recapitalization, merger, acquisition, spin-off, or reorganization either currently anticipated or that occurred within the past 12 months:

None

4)      **Issuance History**

List below any events, in chronological order, that resulted in changes in total shares outstanding by the issuer in the past two fiscal years and any interim period.  The list shall include all offerings of equity securities, including debt convertible into equity securities, whether private or public, and all shares or any other securities or options to acquire such securities issued for services, describing (1) the securities, (2) the persons or entities to whom such securities were issued and (3) the services provided by such persons or entities.  The list shall indicate:

   A.  The nature of each offering (e.g., Securities Act Rule 504, intrastate, etc.);

Securities Act Rule 504

   B.  Any jurisdictions where the offering was registered or qualified;

Federally through Form D

2

**4)    Issuance History**

List below any events, in chronological order, that resulted in changes in total shares outstanding by the issuer in the past two fiscal years and any interim period.  The list shall include all offerings of equity securities, including debt convertible into equity securities, whether private or public, and all shares or any other securities or options to acquire such securities issued for services, describing (1) the securities, (2) the persons or entities to whom such securities were issued and (3) the services provided by such persons or entities.  The list shall indicate:

A.   The nature of each offering (e.g., Securities Act Rule 504, intrastate, etc.);

Securities Act Rule 504

B.   Any jurisdictions where the offering was registered or qualified;

Federally through Form D

2

C.   The number of shares offered;

2,470,000

D.   The number of shares sold;

2,470,000

E.   The price at which the shares were offered, and the amount actually paid to the issuer;

- 40,000,000 shares in connection with the exchange for 100% of the membership interest in VoiceStep Telecom, LLC.

- 1,000,000 shares for cash proceeds of $100;

- 600,000 shares for services rendered valued at $60;

- 370,000 shares for cash proceeds of $37,000; and

- 500,000 shares for services rendered valued at $50,000.

F.   The trading status of the shares; and

A 144 opinion was issued for the trading of 2,470,000 shares

G.   Whether the certificates or other documents that evidence the shares contain a legend (1) stating that the shares have not been registered under the Securities Act and (2) setting forth or referring to the restrictions on transferability and sale of the shares under the Securities Act.

All Shares were issued with restrictive legend and are subject to resale under 144 Rules.

Vemanti Group, Inc. — Quarterly Report, period ended March 31, 2016 (filed June 1, 2016)  —  Section 4 — Issuance History

**EXHIBIT R-1.3**

**8)**    **Officers, Directors, and Control Persons**

The goal of this section is to provide an investor with a clear understanding of the identity of all the persons or entities that are involved in managing, controlling or advising the operations, business development and disclosure of the issuer, as well as the identity of any significant shareholders.

A.    Names of Officers, Directors, and Control Persons.  In responding to this item, please provide the names of each of the issuer's executive officers, directors, general partners and control persons (control persons are beneficial owners of more than five percent (5%) of any class of the issuer's equity securities), as of the date of this information statement.

| Tan Tran | Chairman of Board, CEO |
|---|---|
| Lucille Kowalski | Treasurer & Secretary |

B.    Legal/Disciplinary History. Please identify whether any of the foregoing persons have, in the last five years, been the subject of:

16

**Vemanti Group, Inc. and Subsidiary**
**Notes to Consolidated Financial Statements**
**For the Three Months Ended March 31, 2016 and 2015**

1.  A conviction in a criminal proceeding or named as a defendant in a pending criminal proceeding (excluding traffic violations and other minor offenses);

None

2.  The entry of an order, judgment, or decree, not subsequently reversed, suspended or vacated, by a court of competent jurisdiction that permanently or temporarily enjoined, barred, suspended or otherwise limited such person's involvement in any type of business, securities, commodities, or banking activities;

None

3.  A finding or judgment by a court of competent jurisdiction (in a civil action), the Securities and Exchange Commission, the Commodity Futures Trading Commission, or a state securities regulator of a violation of federal or state securities or commodities law, which finding or judgment has not been reversed, suspended, or vacated; or

None

4.  The entry of an order by a self-regulatory organization that permanently or temporarily barred suspended or otherwise limited such person's involvement in any type of business or securities activities.

None

C.    Beneficial Shareholders. Provide a list of the name, address and shareholdings or the percentage of shares

Tan Tran, 51 Acorn Glen, Irvine, CA 92620        95.3%

Quarterly Report, period ended March 31, 2016 (filed June 1, 2016) — Section 8 — Officers, Directors, and Control Persons (incl. 8C, Beneficial Shareholders)

**EXHIBIT R-1.4**

# EXHIBIT R-2

---

**Vemanti Group, Inc.**

Quarterly Report — Period Ended June 30, 2016

*Filed August 17, 2016 (OTC Markets)*

*Reproduced in relevant part: face/certification page; Securities Information (§3); Issuance History (§4); Officers, Directors, and Control Persons, including Beneficial Shareholders (§8 / 8C).*

QUARTER ENDED JUNE 30, 2016

OTC MARKETS GROUP

Vemanti Group, Inc. (A Nevada Company)

QUARTERLY REPORT
As of June 30, 2016

All information in this Information and Disclosure Statement has been compiled to fulfill the disclosure requirements of rule 15c2-11 (a) promulgated under the Securities and Exchange Act of 1934, as amended. The enumerated captions contained herein correspond to the sequential format set forth in the rule.

No Dealer, salesmen or any other person has been authorized to give any information, or to make any representations, not contained herein in connection with the issuer. Such information or representations, if made, must not be relied upon as having been authorized by the issuer, and:

Delivery of this information file does not any time imply that the information contained herein is correct as of any time subsequent to the date first written above.
The undersigned hereby certifies that the information herein is true and correct to the best of their knowledge and belief.

Date: August 17, 2016

Vemanti Group, Inc.

By: /s/ Mr. Tan Tran

Name: Tan Tran
Position: CEO / President
Phone: 949-559-7200 x6168
E-mail: tan.tran@vemanti.com
Website: www.vemanti.com

**OTC Pink Basic Disclosure Guidelines**

**1)      Name of the issuer and its predecessors (if any)**

The Exact name of the Issuer is Vemanti Group Inc.

**2)      Address of the issuer's principal executive offices**

Company Headquarters
5000 Birch Street
West Tower – 3rd Floor
Newport Beach, CA 92660
949-559-7200 x6168
tan.tran@vemanti.com
www.vemanti.com

**IR Contact**

1

Richard Oravec
277 West 11th Street, Suite 2F
NY, NY. 10014
(949) 559-7200 Ext. 6170
richard.oravec@vemanti.com
www.vemanti.com

## 3)    Security Information

Trading Symbol: VMNT
Exact title and class of securities outstanding: Common Class A Shares
CUSIP: 92259A 102
Par or Stated Value: .0001

| | | |
|---|---|---|
| Total shares authorized: | 500,000,000 | as of: June 30, 2016 |
| Total shares outstanding: 44,470,000 | | as of: June 30, 2016 |

Additional class of securities: Not Applicable

Transfer Agent
Globex Stock Transfer Inc.
780 Deltona Blvd, Suite 202
Deltona, FL. 32725
386-206-1133

The transfer agent is registered under the Exchange Act.

List any restrictions on the transfer of security:

None

Describe any trading suspension orders issued by the SEC in the past 12 months.

None

List any stock split, stock dividend, recapitalization, merger, acquisition, spin-off, or reorganization either currently anticipated or that occurred within the past 12 months:

None

## 4)    Issuance History

List below any events, in chronological order, that resulted in changes in total shares outstanding by the issuer in the past two fiscal years and any interim period. The list shall include all offerings of equity securities, including debt convertible into equity securities, whether private or public, and all shares or any other securities or options to acquire such securities issued for services, describing (1) the securities, (2) the persons or entities to whom such securities were issued and (3) the services provided by such persons or entities. The list shall indicate:

   A.  The nature of each offering (e.g., Securities Act Rule 504, intrastate, etc.);

   Securities Act Rule 504

   B.  Any jurisdictions where the offering was registered or qualified;

2

Vemanti Group, Inc. — Quarterly Report, period ended June 30, 2016 (filed August 17, 2016)  —  Section 3 — Securities Information

**EXHIBIT R-2.2**

4)      **Issuance History**

List below any events, in chronological order, that resulted in changes in total shares outstanding by the issuer in the past two fiscal years and any interim period. The list shall include all offerings of equity securities, including debt convertible into equity securities, whether private or public, and all shares or any other securities or options to acquire such securities issued for services, describing (1) the securities, (2) the persons or entities to whom such securities were issued and (3) the services provided by such persons or entities. The list shall indicate:

A.  The nature of each offering (e.g., Securities Act Rule 504, intrastate, etc.);

Securities Act Rule 504

B.  Any jurisdictions where the offering was registered or qualified;

2

Federally through Form D

C.  The number of shares offered;

4,470,000

D.  The number of shares sold;

4,470,000

E.  The price at which the shares were offered, and the amount actually paid to the issuer;

- 40,000,000 shares in connection with the exchange for 100% of the membership interest in VoiceStep Telecom, LLC.

- 1,000,000 shares for cash proceeds of $100;

- 600,000 shares for services rendered valued at $60;

- 370,000 shares for cash proceeds of $37,000; and

- 500,000 shares for services rendered valued at $50,000.

- 2,000,000 shares for debt conversion valued at $2,000.

F.  The trading status of the shares; and

A 144 opinion was issued for the trading of 4,470,000 shares

G.  Whether the certificates or other documents that evidence the shares contain a legend (1) stating that the shares have not been registered under the Securities Act and (2) setting forth or referring to the restrictions on transferability and sale of the shares under the Securities Act.

All Shares were issued with restrictive legend and are subject to resale under 144 Rules.

Vemanti Group, Inc. — Quarterly Report, period ended June 30, 2016 (filed August 17, 2016)  —  Section 4 — Issuance History

**EXHIBIT R-2.3**

8)      **Officers, Directors, and Control Persons**

The goal of this section is to provide an investor with a clear understanding of the identity of all the persons or entities that are involved in managing, controlling or advising the operations, business development and disclosure of the issuer, as well as the identity of any significant shareholders.

A.      Names of Officers, Directors, and Control Persons. In responding to this item, please provide the names of each of the issuer's executive officers, directors, general partners and control persons (control persons are beneficial owners of more than five percent (5%) of any class of the issuer's equity securities), as of the date of this information statement.

17

**Vemanti Group, Inc. and Subsidiary**
**Notes to Consolidated Financial Statements**
**June 30, 2016**
**(Unaudited)**

| | |
|---|---|
| **Tan Tran** | **Chairman of Board, CEO** |
| **Fred Thiel** | **Director** |
| **Rachel Boulds** | **CFO** |
| **Lucille Kowalski** | **Secretary & Treasurer** |

B.      Legal/Disciplinary History. Please identify whether any of the foregoing persons have, in the last five years, been the subject of:

1.   A conviction in a criminal proceeding or named as a defendant in a pending criminal proceeding (excluding traffic violations and other minor offenses);

None

2.   The entry of an order, judgment, or decree, not subsequently reversed, suspended or vacated, by a court of competent jurisdiction that permanently or temporarily enjoined, barred, suspended or otherwise limited such person's involvement in any type of business, securities, commodities, or banking activities;

None

3.   A finding or judgment by a court of competent jurisdiction (in a civil action), the Securities and Exchange Commission, the Commodity Futures Trading Commission, or a state securities regulator of a violation of federal or state securities or commodities law, which finding or judgment has not been reversed, suspended, or vacated; or

None

4.   The entry of an order by a self-regulatory organization that permanently or temporarily barred suspended or otherwise limited such person's involvement in any type of business or securities activities.

None

C.      Beneficial Shareholders. Provide a list of the name, address and shareholdings or the percentage of shares

Tan Tran, 51 Acorn Glen, Irvine, CA 92620 68.9%

Quarterly Report, period ended June 30, 2016 (filed August 17, 2016) — Section 8 — Officers, Directors, and Control Persons (incl. 8C, Beneficial Shareholders)

**EXHIBIT R-2.4**

# EXHIBIT R-3

---

**Vemanti Group, Inc.**

Quarterly Report — Period Ended September 30, 2016

*Filed October 31, 2016 (OTC Markets)*

*Reproduced in relevant part: face/certification page; Securities Information (§3); Issuance History (§4);*
*Officers, Directors, and Control Persons, including Beneficial Shareholders (§8 / 8C).*



# VEMANTI GROUP, INC.

## QUARTERLY REPORT

September 30, 2016

1

Vemanti Group, Inc. — Quarterly Report, period ended September 30, 2016 (filed October 31, 2016)  —  Face / Certification Page

**EXHIBIT R-3.1**

1)      **NAME OF THE ISSUER AND ITS PREDECESSORS**

Exact name of the Issuer is Vemanti Group Inc. The Company was incorporated in the State of Nevada on April 3, 2014.

2)      **ADDRESS OF THE ISSUER'S PRINCIPAL EXECUTIVE OFFICES**

5000 Birch Street
West Tower – 3rd Floor
Newport Beach, CA 92660

Email: info@vemanti.com
Website: www.vemanti.com

3)      **SECURITIES INFORMATION**

| | |
|---|---|
| Trading Symbol: | VMNT |
| CUSIP: | 92259A 102 |
| Par or Stated Value: | $0.0001 |

**PREFERRED STOCK**

| | | |
|---|---|---|
| Shares Authorized: | 50,000,000 | Preferred Class A |
| Shares Outstanding: | 40,000,000 | As of September 30, 2016 |

**COMMON STOCK**

| | | |
|---|---|---|
| Shares Authorized: | 500,000,000 | |
| Shares Outstanding: | 45,020,000 | As of September 30, 2016 |
| Non-Restricted: | 4,710,000 | As of September 30, 2016 |
| Shareholder of Record: | 49 | |

**Transfer Agent**
Globex Transfer, LLC.
780 Deltona Blvd, Suite 202
Deltona, FL. 32725
386-206-1133

The transfer agent is registered under the Exchange Act.

There are no restrictions on the transfer of securities.

There are no trading suspension orders issued by the SEC in the past 12 months.

3

4)      **ISSUANCE HISTORY**

- On April 3, 2014 40,000,000 Common and Preferred shares were issued in connection with the exchange for 100% of the membership interest in VoiceStep Telecom, LLC.

- On April 19, 2014 1,000,000 Common shares were issued for cash proceeds of $100;

- On August 31, 2014 1,000,000 Common shares were offered through 506(b) Form D and 370,000 Common shares were sold and issued for cash proceeds of $37,000;

- On December 09, 2015 600,000 Common shares were issued for services rendered valued at $60;

- On May 20, 2015 500,000 Common shares were issued for services rendered valued at $50,000;

- On June 24, 2016 2,000,000 Common shares were issued for debt conversion valued at $2,000;

- On July 25, 2016 500,000 Common shares were issued for services rendered valued at $65,000;

- On August 26, 2016 50,000 Common shares were issued for acquisition rendered valued at $10,000.

5)      **FINANCIAL STATEMENTS**

The financial statements are incorporated herein of this quarterly report.

4

Vemanti Group, Inc. — Quarterly Report, period ended September 30, 2016 (filed October 31, 2016)  —  Section 4 — Issuance History

**EXHIBIT R-3.3**

Our current core products are:

- Business-class VOIP cloud phone system (a/k/a "Hosted PBX") and
- Carrier-class domestic/international origination and termination.
- Essential business communications tools and applications such as fax, SMS (texting), call conferencing, and call center.

We operate in a variety of industries including advertising, consulting, finance, healthcare, legal, real estate, retail, and technology industries through its direct sales representatives and resellers. All are on a monthly recurring service plan.

7)  **ISSUER'S FACILITIES**

We currently operate under a virtual-office setup with Regus in Irvine, CA and Newport Beach, CA. Our official mailing address with Regus is at 5000 Birch Street, West Tower – 3rd Floor, Newport Beach, CA 92660, USA. The Company does not own or have any mortgages on this or any other facilities. All employees are working remotely in a virtual network environment.

8)  **OFFICERS, DIRECTORS, AND CONTROL PERSONS**

A. Names of Officers, Directors, and Control Persons.

Listed below are the Company's Officers and Directors as of September 30, 2016.

| Name | Tittle |
| --- | --- |
| Tan Tran | Chairman of Board, CEO |
| Fred Thiel | Director |
| Rachel Boulds | CFO |
| Lucille Kowalski | Secretary & Treasurer |

B. Legal/Disciplinary History.

There is no current or pending legal/disciplinary action against the Company or any of its Officers/Directors as of September 30, 2016.

C. Beneficial Shareholders.

| Name | Shares | Percentage | Stock | Address |
| --- | --- | --- | --- | --- |
| Tan Tran | 31,000,000 | 68.93% | Common | 51 Acorn Glen, Irvine, CA 92620 |
| Tan Tran | 40,000,000 | 80.00% | Preferred | 51 Acorn Glen, Irvine, CA 92620 |

15

Quarterly Report, period ended September 30, 2016 (filed October 31, 2016) — Section 8 — Officers, Directors, and Control Persons (incl. 8C, Beneficial Shareholders)

**EXHIBIT R-3.4**

# EXHIBIT R-4

---

**Vemanti Group, Inc.**

Annual Report — Period Ended December 31, 2016

*Filed February 8, 2017 (OTC Markets)*

*Reproduced in relevant part: face/certification page; Securities Information (§3); Issuance History (§4); Officers, Directors, and Control Persons, including Beneficial Shareholders (§8 / 8C).*



# VEMANTI GROUP, INC.

## ANNUAL REPORT

December 31, 2016

Vemanti Group, Inc. — Annual Report, period ended December 31, 2016 (filed February 8, 2017)  —  Face / Certification Page

**EXHIBIT R-4.1**

1)    NAME OF THE ISSUER AND ITS PREDECESSORS

Exact name of the Issuer is Vemanti Group Inc. The Company was incorporated in the State of Nevada on April 3, 2014.

2)    ADDRESS OF THE ISSUER'S PRINCIPAL EXECUTIVE OFFICES

5000 Birch Street
West Tower – 3rd Floor
Newport Beach, CA 92660

Email: info@vemanti.com
Website: www.vemanti.com

3)    SECURITIES INFORMATION

Trading Symbol:        VMNT
CUSIP:                 92259A 102
Par or Stated Value:   $0.0001

PREFERRED STOCK

Shares Authorized:     50,000,000      Preferred Class A
Shares Outstanding:    40,000,000      As of December 31, 2016

COMMON STOCK

Shares Authorized:     500,000,000
Shares Outstanding:    45,270,000      As of December 31, 2016
Non-Restricted:        5,030,000       As of December 31, 2016
Shareholder of Record: 53

**Transfer Agent**
Globex Transfer, LLC.
780 Deltona Blvd, Suite 202
Deltona, FL. 32725
386-206-1133

The transfer agent is registered under the Exchange Act.

There are no restrictions on the transfer of securities.

There are no trading suspension orders issued by the SEC in the past 12 months.

3

Vemanti Group, Inc. — Annual Report, period ended December 31, 2016 (filed February 8, 2017)  —  Section 3 — Securities Information

**EXHIBIT R-4.2**

4)    ISSUANCE HISTORY

- On April 3, 2014 40,000,000 Common and Preferred shares were issued in connection with the exchange for 100% of the membership interest in VoiceStep Telecom, LLC.

- On April 19, 2014, 1,000,000 Common shares were issued for cash proceeds of $100;

- On August 31, 2014, 1,000,000 Common shares were offered through 506(b) Form D and 370,000 Common shares were sold and issued for cash proceeds of $37,000;

- On December 09, 2016, 600,000 Common shares were issued for services rendered valued at $60;

- On March 25, 2016, 500,000 Common shares were issued for services rendered valued at $50,000;

- On June 24, 2016 2,000,000 Common shares were issued for debt conversion valued at $2,000;

- On July 26, 2016, 500,000 Common shares were issued for services rendered valued at $65,000;

- On August 26, 2016, 50,000 Common shares were issued for acquisition rendered valued at $10,000.

- On November 30, 2016, 250,000 Common shares were issued for services rendered valued at $25,000;

5)    FINANCIAL STATEMENTS

The financial statements are incorporated herein of this quarterly report.

4

Vemanti Group, Inc. — Annual Report, period ended December 31, 2016 (filed February 8, 2017)  —  Section 4 — Issuance History

**EXHIBIT R-4.3**

8)    OFFICERS, DIRECTORS, AND CONTROL PERSONS

A. Names of Officers, Directors, and Control Persons.

Listed below are the Company's Officers and Directors as of December 31, 2016.

| Name | Tittle |
|------|--------|
| Tan Tran | Chairman of Board, CEO |
| Fred Thiel | Director |
| Rachel Boulds | CFO |
| Lucille Kowalski | Secretary & Treasurer |

16

B. Legal/Disciplinary History.

There is no current or pending legal/disciplinary action against the Company or any of its
Officers/Directors as of December 31, 2016.

C. Beneficial Shareholders.

| Name | Shares | Percentage | Stock | Address |
|------|--------|-----------|-------|---------|
| Tan Tran | 27,600,000 | 60.96% | Common | 51 Acorn Glen, Irvine, CA 92620 |
| Tan Tran | 40,000,000 | 80.00% | Preferred | 51 Acorn Glen, Irvine, CA 92620 |

# EXHIBIT R-5

---

**Vemanti Group, Inc.**

Quarterly Report — Period Ended March 31, 2017

*Filed June 1, 2017 (OTC Markets)*

*Reproduced in relevant part: face/certification page; Securities Information (§3); Issuance History (§4); Officers, Directors, and Control Persons, including Beneficial Shareholders (§8 / 8C).*



# VEMANTI GROUP, INC.

## QUARTERLY REPORT

March 31, 2017

1

Vemanti Group, Inc. — Quarterly Report, period ended March 31, 2017 (filed June 1, 2017)  —  Face / Certification Page

**EXHIBIT R-5.1**

1)     NAME OF THE ISSUER AND ITS PREDECESSORS

Exact name of the Issuer is Vemanti Group Inc. The Company was incorporated in the State of Nevada on April 3, 2014.

2)     ADDRESS OF THE ISSUER'S PRINCIPAL EXECUTIVE OFFICES

5000 Birch Street
West Tower – 3rd Floor
Newport Beach, CA 92660

Email: info@vemanti.com
Website: www.vemanti.com

3)     SECURITIES INFORMATION

| | |
|---|---|
| Trading Symbol: | VMNT |
| CUSIP: | 92259A 102 |
| Par or Stated Value: | $0.0001 |

**PREFERRED STOCK**

| | | |
|---|---|---|
| Shares Authorized: | 50,000,000 | Preferred Class A |
| Shares Outstanding: | 40,000,000 | As of March 31, 2017 |

**COMMON STOCK**

| | | |
|---|---|---|
| Shares Authorized: | 500,000,000 | |
| Shares Outstanding: | 45,370,000 | As of March 31, 2017 |
| Non-Restricted: | 5,030,000 | As of March 31, 2017 |
| Shareholder of Record: | 348 | |

**Transfer Agent**
Globex Transfer, LLC.
780 Deltona Blvd, Suite 202
Deltona, FL. 32725
386-206-1133

The transfer agent is registered under the Exchange Act.

There are no restrictions on the transfer of securities.

There are no trading suspension orders issued by the SEC in the past 12 months.

3

Vemanti Group, Inc. — Quarterly Report, period ended March 31, 2017 (filed June 1, 2017)  —  Section 3 — Securities Information
**EXHIBIT R-5.2**

4)    ISSUANCE HISTORY

- On April 3, 2014 40,000,000 Common and Preferred shares were issued in connection with the exchange for 100% of the membership interest in VoiceStep Telecom, LLC.

- On April 19, 2014, 1,000,000 Common shares were issued for cash proceeds of $100;

- On August 31, 2014, 1,000,000 Common shares were offered through 506(b) Form D and 370,000 Common shares were sold and issued for cash proceeds of $37,000;

- On December 09, 2015, 600,000 Common shares were issued for services rendered valued at $60;

- On March 25, 2016, 500,000 Common shares were issued for services rendered valued at $50,000;

- On June 24, 2016 2,000,000 Common shares were issued for debt conversion valued at $2,000;

- On July 26, 2016, 500,000 Common shares were issued for services rendered valued at $65,000;

- On August 26, 2016, 50,000 Common shares were issued for acquisition rendered valued at $10,000;

- On November 30, 2016, 250,000 Common shares were issued for services rendered valued at $25,000;

- On February 06, 2017, 100,000 Common shares were issued for services rendered valued at $24,000;

5)    FINANCIAL STATEMENTS

The financial statements are incorporated herein of this quarterly report.

4

8)     OFFICERS, DIRECTORS, AND CONTROL PERSONS

A. Names of Officers, Directors, and Control Persons.

Listed below are the Company's Officers and Directors as of March 31, 2017.

| Name | Tittle |
|---|---|
| Tan Tran | Chairman of Board, CEO |
| Fred Thiel | Director |
| Rachel Boulds | CFO |
| Lucille Kowalski | Secretary & Treasurer |

B. Legal/Disciplinary History.

There is no current or pending legal/disciplinary action against the Company or any of its Officers/Directors as of March 31, 2017.

C. Beneficial Shareholders.

| Name | Shares | Percentage | Stock | Address |
|---|---|---|---|---|
| Tan Tran | 25,100,000 | 55.32% | Common | 51 Acorn Glen, Irvine, CA 92620 |
| Tan Tran | 40,000,000 | 80.00% | Preferred | 51 Acorn Glen, Irvine, CA 92620 |

9)     THIRD PARTY PROVIDERS

Legal Counsel
Name: Michael T. Williams
Firm: Williams Law Firm
Address 1: 8503 W. Gardner Ct.
Address 2: Tampa, FL 33611

16

Quarterly Report, period ended March 31, 2017 (filed June 1, 2017) — Section 8 — Officers, Directors, and Control Persons (incl. 8C, Beneficial Shareholders)

**EXHIBIT R-5.4**

# EXHIBIT R-6

---

**Vemanti Group, Inc.**

Quarterly Report — Period Ended June 30, 2017

*Filed August 1, 2017 (OTC Markets)*

*Reproduced in relevant part: face/certification page; Securities Information (§3); Issuance History (§4); Officers, Directors, and Control Persons, including Beneficial Shareholders (§8 / 8C).*



# VEMANTI GROUP, INC.

## QUARTERLY REPORT

June 30, 2017

1

1)  NAME OF THE ISSUER AND ITS PREDECESSORS

Exact name of the Issuer is Vemanti Group Inc. The Company was incorporated in the State of Nevada on April 3, 2014.

2)  ADDRESS OF THE ISSUER'S PRINCIPAL EXECUTIVE OFFICES

5000 Birch Street
West Tower – 3rd Floor
Newport Beach, CA 92660

Email: info@vemanti.com
Website: www.vemanti.com

3)  SECURITIES INFORMATION

Trading Symbol:        VMNT
CUSIP:                 92259A 102
Par or Stated Value:   $0.0001

PREFERRED STOCK

| | | |
|---|---|---|
| Shares Authorized: | 50,000,000 | Preferred Class A |
| Shares Outstanding: | 40,000,000 | As of June 30, 2017 |

COMMON STOCK

| | | |
|---|---|---|
| Shares Authorized: | 500,000,000 | |
| Shares Outstanding: | 45,370,000 | As of June 30, 2017 |
| Non-Restricted: | 5,480,000 | As of June 30, 2017 |
| Shareholder of Record: | 348 | |

**Transfer Agent**
Globex Transfer, LLC.
780 Deltona Blvd, Suite 202
Deltona, FL. 32725
386-206-1133

The transfer agent is registered under the Exchange Act.

There are no restrictions on the transfer of securities.

There are no trading suspension orders issued by the SEC in the past 12 months.

3

Vemanti Group, Inc. — Quarterly Report, period ended June 30, 2017 (filed August 1, 2017) — Section 3 — Securities Information
**EXHIBIT R-6.2**

4)      ISSUANCE HISTORY

- On April 3, 2014 40,000,000 Common and Preferred shares were issued in connection with the exchange for 100% of the membership interest in VoiceStep Telecom, LLC.

- On April 19, 2014, 1,000,000 Common shares were issued for cash proceeds of $100;

- On August 31, 2014, 1,000,000 Common shares were offered through 506(b) Form D and 370,000 Common shares were sold and issued for cash proceeds of $37,000;

- On December 09, 2015, 600,000 Common shares were issued for services rendered valued at $60;

- On March 25, 2016, 500,000 Common shares were issued for services rendered valued at $50,000;

- On June 24, 2016 2,000,000 Common shares were issued for debt conversion valued at $2,000;

- On July 26, 2016, 500,000 Common shares were issued for services rendered valued at $65,000;

- On August 26, 2016, 50,000 Common shares were issued for acquisition rendered valued at $10,000;

- On November 30, 2016, 250,000 Common shares were issued for services rendered valued at $25,000;

- On February 06, 2017, 100,000 Common shares were issued for services rendered valued at $24,000;

5)      FINANCIAL STATEMENTS

The financial statements are incorporated herein of this quarterly report.

4

Vemanti Group, Inc. — Quarterly Report, period ended June 30, 2017 (filed August 1, 2017)  —  Section 4 — Issuance History

**EXHIBIT R-6.3**

8)   OFFICERS, DIRECTORS, AND CONTROL PERSONS

A. Names of Officers, Directors, and Control Persons.

Listed below are the Company's Officers and Directors as of June 30, 2017.

| Name | Tittle |
|------|--------|
| Tan Tran | Chairman of Board, CEO |
| Fred Thiel | Director |
| Rachel Boulds | CFO |
| Phoebe Pham | Secretary & Treasurer |

B. Legal/Disciplinary History.

There is no current or pending legal/disciplinary action against the Company or any of its Officers/Directors as of June 30, 2017.

C. Beneficial Shareholders.

| Name | Shares | Percentage | Stock | Address |
|------|--------|------------|-------|---------|
| Tan Tran | 28,650,000 | 63.15% | Common | 51 Acorn Glen, Irvine, CA 92620 |
| Tan Tran | 40,000,000 | 80.00% | Preferred | 51 Acorn Glen, Irvine, CA 92620 |

9)   THIRD PARTY PROVIDERS

Legal Counsel
Name: Matt McMurdo, Esq.
Firm: McMurdo Law Group, LLC
Address 1: 1185 Avenue of the Americas, 3rd Floor
Address 2: New York, NY 10036

16

Quarterly Report, period ended June 30, 2017 (filed August 1, 2017) — Section 8 — Officers, Directors, and Control Persons (incl. 8C, Beneficial Shareholders)

**EXHIBIT R-6.4**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

**BARINDER SINGH "NABE" BAL,**
                    Plaintiff,

        v.

**TAN TRAN, an individual; and VEMANTI GROUP, INC.,**
**a Nevada corporation,**
                    Defendants.

Case No. _____

# EXHIBIT S

Vemanti Group, Inc. Q2 2020 OTC Markets Quarterly Disclosure (Period
Ending June 30, 2020)

**EXHIBIT S**

## Facts Surfaced for the Court

**(Citations are to the source document's internal page numbers, "Page X of 19.")**

1. **Capital structure as of June 30, 2020 (source p. 2).** Total common shares outstanding: 65,784,086. Public float: 8,420,000 shares. Shareholders of record: 88. Preferred shares outstanding: 40,000,000 (of 50,000,000 authorized).

2. **Tan Tran's beneficial ownership as of June 30, 2020 (source p. 16).** 28,650,000 common shares (45.81% of the common class) *and* 40,000,000 preferred shares (80.00% of the preferred class). The preferred holding disclosed here is the same 40,000,000-share preferred position; cross-reference Exhibits N and O on the Schedule 13D disclosure theory.

3. **Issuance history, 12/31/2017 opening balance through 6/30/2020 ending balance (source pp. 3–4).** Itemizes every change to outstanding shares over the period, including the October 29, 2018 equity-exchange issuances of 626,043 common shares each to Thomas Duc Tran and to Trung Viet Vo, and the April 1, 2019 consultant issuance of 3,250,000 common shares to Chenyuan Anthony Chen. Opening balance: 57,482,000 common / 40,000,000 preferred. Ending balance: 65,784,086 common / 40,000,000 preferred.

4. **Tan Tran's personal certification (source p. 19).** As both Principal Executive Officer and Principal Financial Officer, Tan Tran personally certified that the disclosure contained no untrue statement of material fact and omitted no material fact, establishing his knowledge of and responsibility for the share-structure and ownership figures stated in this filing.

## Note on the source document

The filing is reproduced exactly as published and contains certain minor internal inconsistencies of the issuer's own making — e.g., weighted-average shares stated as 65,748,086 on source p. 7 against 65,784,086 shares outstanding elsewhere, and a $2 difference between the balance sheet (source p. 6) and the statement of stockholders' equity (source p. 9). These have not been altered or corrected.



**Vemanti Group, Inc.**

A Nevada Corporation

7545 Irvine Center Dr., Ste. 200, Irvine, CA 92618

_____

1.949.559.7200

https://vemanti.com

info@vemanti.com

SIC: 3576

**<u>Quarterly</u> Report**

**For the Period Ending:** <u>06/30/2020</u>

(The "Reporting Period")

As of <u>06/30/2020</u>, the number of shares outstanding of our Common Stock was: <u>65,784,086</u>

As of <u>12/31/2019</u>, the number of shares outstanding of our Common Stock was: <u>65,784,086</u>

Indicate by check mark whether the company is a shell company (as defined in Rule 405 of the Securities Act of 1933 and Rule 12b-2 of the Exchange Act of 1934):

Yes: ☐    No: ☒ (Double-click and select "Default Value" to check)

Indicate by check mark whether the company's shell status has changed since the previous reporting period:

Yes: ☐    No: ☒

Indicate by check mark whether a Change in Control[1] of the company has occurred over this reporting period:

Yes: ☐    No: ☒

**1)      Name of the issuer and its predecessors (if any)**

In answering this item, please also provide any names used by predecessor entities and the dates of the name changes.

None

Date and state (or jurisdiction) of incorporation (also describe any changes to incorporation since inception, if applicable) Please also include the issuer's current standing in its state of incorporation (e.g. active, default, inactive):

04/03/2014 - State of Nevada - ACTIVE

Has the issuer or any of its predecessors ever been in bankruptcy, receivership, or any similar proceeding in the past five years?

Yes: ☐         No: ☒

**2)      Security Information**

| | |
|---|---|
| Trading symbol: | VMNT |
| Exact title and class of securities outstanding: | Common |
| CUSIP: | 92259A 102 |
| Par or stated value: | $0.0001 |

| | | |
|---|---|---|
| Total shares authorized: | 500,000,000 | as of date: 06/30/2020 |
| Total shares outstanding: | 65,784,086 | as of date: 06/30/2020 |
| Number of shares in the Public Float: | 8,420,000 | as of date: 06/30/2020 |
| Total number of shareholders of record: | 88 | as of date: 06/30/2020 |

*Additional class of securities (if any):*

| | | |
|---|---|---|
| Trading symbol: | VMNT | |
| Exact title and class of securities outstanding: | Preferred | |
| CUSIP: | 92259A 102 | |
| Par or stated value: | $0.0001 | |
| Total shares authorized: | 50,000,000 | as of date: 06/30/2020 |
| Total shares outstanding: | 40,000,000 | as of date: 06/30/2020 |

Transfer Agent

| | |
|---|---|
| Name: | V Stock Transfer, LLC |
| Phone: | 212.828.8436 |
| Email: | info@vstocktransfer.com |

Is the Transfer Agent registered under the Exchange Act?  Yes: ☒        No: ☐

Describe any trading suspension orders issued by the SEC concerning the issuer or its predecessors: None

List any stock split, stock dividend, recapitalization, merger, acquisition, spin-off, or reorganization either currently anticipated or that occurred within the past 12 months: None

**3)       Issuance History**

## A. Changes to the Number of Outstanding Shares

Check this box to indicate there were no changes to the number of outstanding shares within the past two completed fiscal years and any subsequent periods: ☐

| Number of Shares outstanding as of 12/31/2017 | Opening Balance: Common: 57,482,000 Preferred: 40,000,000 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | *Right-click the rows below and select "Insert" to add rows as needed. | | | | | | | |
| Date of Transaction | Transaction type (e.g. new issuance, cancellation, shares returned to treasury) | Number of Shares Issued (or cancelled) | Class of Securities | Value of shares issued ($/per share) at Issuance | Were the shares issued at a discount to market price at the time of issuance? (Yes/No) | Individual/ Entity Shares were issued to (entities must have individual with voting / investment control disclosed). | Reason for share issuance (e.g. for cash or debt conversion) OR Nature of Services Provided (if applicable) | Restricted or Unrestricted as of this filing? | Exemption or Registration Type? |
| 01/23/2018 | New Issuance | 100,000 | Common | $0.10 | Yes | Edwin Stuckmeyer | For Cash | Restricted | Rule 144 |
| 01/25/2018 | New Issuance | 150,000 | Common | $0.10 | Yes | YC Enterprises, Inc. | For Cash | Restricted | Rule 144 |
| 01/25/2018 | New Issuance | 100,000 | Common | $0.10 | Yes | Melvin B. Long | For Cash | Restricted | Rule 144 |
| 01/25/2018 | New Issuance | 100,000 | Common | $0.10 | Yes | Sarah J. Poulsen | For Cash | Restricted | Rule 144 |
| 01/25/2018 | New Issuance | 100,000 | Common | $0.10 | Yes | David C. Steere | For Cash | Restricted | Rule 144 |
| 01/26/2018 | New Issuance | 100,000 | Common | $0.10 | Yes | Fred Downs | For Cash | Restricted | Rule 144 |
| 01/30/2018 | New Issuance | 100,000 | Common | $0.10 | Yes | Hilgrove H. Gordon | For Cash | Restricted | Rule 144 |
| 01/30/2018 | New Issuance | 150,000 | Common | $0.10 | Yes | Louis F. Bunker Jr. | For Cash | Restricted | Rule 144 |
| 02/13/2018 | New Issuance | 250,000 | Common | $0.10 | Yes | Arthur V. Rocco | For Cash | Restricted | Rule 144 |
| 02/16/2018 | New Issuance | 300,000 | Common | $0.10 | Yes | Greg Dixon | For Cash | Restricted | Rule 144 |
| 02/22/2018 | New Issuance | 150,000 | Common | $0.10 | Yes | Hilgrove H. Gordon | For Cash | Restricted | Rule 144 |
| 03/02/2018 | New Issuance | 100,000 | Common | $0.10 | Yes | Ben Herman | For Cash | Restricted | Rule 144 |
| 03/02/2018 | New Issuance | 100,000 | Common | $0.10 | Yes | YC Enterprises, Inc. | For Cash | Restricted | Rule 144 |

| Date | Type | Shares | Class | Price | Affiliate | Holder | Consideration | Status | Exemption |
|------|------|--------|-------|-------|-----------|--------|---------------|--------|-----------|
| 03/09/2018 | New Issuance | 500,000 | Common | $0.10 | Yes | JR Properties | For Cash | Restricted | Rule 144 |
| 03/14/2018 | New Issuance | 100,000 | Common | $0.10 | Yes | Jerry Maier | For Cash | Restricted | Rule 144 |
| 03/14/2018 | New Issuance | 300,000 | Common | $0.10 | Yes | Laurence E. Butts | For Cash | Restricted | Rule 144 |
| 06/18/2018 | New Issuance | 100,000 | Common | $0.10 | Yes | Bambi Oedekoven | For Cash | Restricted | Rule 144 |
| 06/19/2018 | New Issuance | 100,000 | Common | $0.10 | Yes | Eugene A. Peterson | For Cash | Restricted | Rule 144 |
| 07/16/2018 | New Issuance | 150,000 | Common | $0.10 | Yes | Eric Long | For Cash | Restricted | Rule 144 |
| 08/02/2018 | New Issuance | 100,000 | Common | $0.10 | Yes | Louis F. Bunker Jr. | For Cash | Restricted | Rule 144 |
| 08/06/2018 | New Issuance | 100,000 | Common | $0.10 | Yes | John R. Loftin Karen R. Loftin | For Cash | Restricted | Rule 144 |
| 10/02/2018 | New Issuance | 100,000 | Common | $0.10 | Yes | Johnny R. Woodruff | For Cash | Restricted | Rule 144 |
| 10/02/2018 | New Issuance | 50,000 | Common | $0.10 | Yes | John R. Loftin Karen R. Loftin | For Cash | Restricted | Rule 144 |
| 10/29/2018 | New Issuance | 626,043 | Common | $0.1198 | Yes | Trung Viet Vo | Equity Exchange | Restricted | Rule 144 |
| 10/29/2018 | New Issuance | 626,043 | Common | $0.1198 | Yes | Thomas Duc Tran | Equity Exchange | Restricted | Rule 144 |
| 11/02/2018 | New Issuance | 100,000 | Common | $0.10 | Yes | Sintich, LLC | For Cash | Restricted | Rule 144 |
| 03/29/2019 | New Issuance | 300,000 | Common | $0.20 | No | Dennis Gumm | Consultant | Restricted | Rule 144 |
| 04/01/2019 | New Issuance | 3,250,000 | Common | $0.035 | No | Chenyuan Anthony Chen | Consultant | Restricted | Rule 144 |
| Shares Outstanding on 06/30/2020: | Ending Balance: Common: 65,784,086 Preferred: 40,000,000 | | | | | | | | |

**B.  Debt Securities, Including Promissory and Convertible Notes**

Use the chart and additional space below to list and describe all outstanding promissory notes, convertible notes, convertible debentures, or any other debt instruments that may be converted into a class of the issuer's equity securities.

Check this box if there are no outstanding promissory, convertible notes or debt arrangements: ☒

| Date of Note Issuance | Outstanding Balance ($) | Principal Amount at Issuance ($) | Interest Accrued ($) | Maturity Date | Conversion Terms (e.g. pricing mechanism for determining conversion of instrument to shares) | Name of Noteholder (entities must have individual with voting / investment control disclosed). | Reason for Issuance (e.g. Loan, Services, etc.) |
|---|---|---|---|---|---|---|---|
| ___ | ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ | ___ |

Use the space below to provide any additional details, including footnotes to the table above:

None

**4)      Financial Statements**

A.  The following financial statements were prepared in accordance with:

☒ U.S. GAAP
☐ IFRS

B.  The financial statements for this reporting period were prepared by (name of individual):

Name:                          **Catherine Doll (The Gilson Group)**
Title:                          **Certified Public Accountant**
Relationship to Issuer:         **Third-Party Service Provider**

C.  Balance Sheet

**Vemanti Group, Inc. and Subsidiary**
**Consolidated Balance Sheets**
**(Unaudited)**

|  | | June 30, 2020 | | December 31, 2019 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current Assets: | | | | |
| Cash | $ | 185,802 | $ | 118,802 |
| Accounts receivable | | 4,277 | | 17,716 |
| Other assets | | 20,134 | | 17,109 |
| Total Current Assets | | 210,213 | | 153,267 |
| | | | | |
| Equipment, net | | 1,744 | | 2,114 |
| Investment in Fvndit, Inc. | | 300,000 | | 300,000 |
| Loan to Fvndit, Inc. | | 100,000 | | 200,000 |
| TOTAL ASSETS | $ | 611,957 | $ | 655,741 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| | | | | |
| Current Liabilities: | | | | |
| Accounts payable | $ | 4,087 | $ | 914 |
| Accrued expenses | | 1,238 | | 2,074 |
| Payable to credit card companies | | 283 | | - |
| Total current liabilities | | 5,608 | | 2,988 |
| TOTAL LIABILITIES | | 5,608 | | 2,988 |
| | | | | |
| STOCKHOLDERS' EQUITY: | | | | |
| Preferred stock, $0.0001 par value, 50,000,000 shares authorized; 40,000,000 shares issued and outstanding | | 4,000 | | 4,000 |
| Common stock, $0.0001 par value, 500,000,000 shares authorized; 65,784,086 shares issued and outstanding as of June 30, 2020 and December 31, 2019, respectively | | 6,578 | | 6,578 |
| Additional paid-in capital | | 2,297,754 | | 2,297,754 |
| Accumulated deficit | | (1,701,983) | | (1,655,579) |
| Total stockholders' equity | | 606,349 | | 652,753 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ | 611,957 | $ | 655,741 |

*The accompanying notes are an integral part of these unaudited consolidated financial statements.*

D.  Statement of Income

<div align="center">

**Vemanti Group, Inc. and Subsidiary**

**Consolidated Statements of Operations**

**(Unaudited)**

</div>

| | | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- | --- |
| | | **2020** | **2019** | **2020** | **2019** |
| Sales | $ | 40,197 | $ 85,405 | $ 87,309 | $ 185,507 |
| Cost of sales | | 10,761 | 12,140 | 21,384 | 36,688 |
| Gross margin | | 29,436 | 73,265 | 67,581 | 148,819 |
| | | | | | |
| Operating expenses: | | | | | |
| General & administrative expenses | | 46,648 | 292,741 | 129,492 | 447,373 |
| Total operating expenses | | 46,648 | 292,741 | 129,492 | 447,373 |
| Loss from operations | | (17,212) | (219,476) | (61,911) | (298,554) |
| | | | | | |
| Other income (expense): | | | | | |
| Interest income (expense) | | 5,246 | - | 10,496 | - |
| Other income (expense) | | 2 | 2,302 | 3 | 2,604 |
| Unrealized loss | | - | - | - | - |
| Total other income (expense) | | 5,248 | 2,302 | 10,499 | 2,604 |
| | | | | | |
| Loss before provision for income taxes | | (11,963) | (217,174) | (51,412) | (295,950) |
| | | | | | |
| Provision (credit) for income taxes | | (4,955) | - | (5,006) | - |
| | | | | | |
| Net loss | $ | (7,008) | $ (217,174) | $ (46,406) | $ (295,950) |
| | | | | | |
| Loss per share: | | | | | |
| Basic | $ | (0.00) | $ (0.00) | $ (0.00) | $ (0.00) |
| Diluted | $ | (0.00) | $ (0.00) | $ (0.00) | $ (0.00) |
| | | | | | |
| Weighted average shares outstanding: | | | | | |
| Basic | | 65,748,086 | 65,748,086 | 65,748,086 | 64,004,252 |
| Diluted | | 65,748,086 | 65,748,086 | 65,748,086 | 64,004,252 |

<div align="center">

*The accompanying notes are an integral part of these unaudited consolidated financial statements.*

</div>

E.  Statement of Cash Flows

**Vemanti Group, Inc. and Subsidiary**
**Consolidated Statements of Cash Flows**
**(Unaudited)**

| | For the Six Months Ended June 30, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Cash flows from operating activities: | | |
| Net loss | $ (46,406) | $ (295,950) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 370 | 370 |
| (Gain)/loss on digital assets | | (5,087) |
| Stock-based compensation | | 173,750 |
| Changes in assets and liabilities: | | |
| Accounts receivable | 13,439 | 7,219 |
| Other current assets | (3,025) | (13,345) |
| Accounts payable | 3,173 | (1,379) |
| Accrued expenses | (553) | 38,895 |
| Net cash used in operating activities | (33,002) | (95,527) |
| | | |
| Cash flows from investing activities: | | |
| Proceeds from collecting of note receivable | 100,000 | |
| Proceeds from transfer of digital assets | - | 9,342 |
| Proceeds from cancellation of investment in Chopp, Inc. | - | 25,000 |
| Net cash provided by investing activities | 100,000 | 34,342 |
| | | |
| Cash flows from financing activities: | | |
| Issuance of common stock | - | - |
| Net cash provided by financing activities | - | - |
| | | |
| Net (decrease) increase in cash | 66,998 | (61,185) |
| | | |
| Cash, beginning of the period | 118,802 | 403,192 |
| | | |
| Cash, end of the period | $ 185,802 | $ 342,007 |
| | | |
| Cash paid for: | | |
| Interest | $ - | $ - |
| Income taxes | $ - | $ - |

*The accompanying notes are an integral part of these unaudited consolidated financial statements.*

F.   Statement of Stockholders' Equity

**Vemanti Group, Inc. and Subsidiary**
**Consolidated Statement of Stockholders' Equity**

**(unaudited)**

| | Preferred Stock | | | Common Stock | | | Additional Paid-in | | Accumulated | | Total Stockholders' |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | | Amount | Shares | | Amount | | Capital | | Deficit | Equity |
| Balance, December 31, 2018 | 40,000,000 | $ | 4,000 | $ 62,234,086 | $ | 6,223 | $ | 2,042,112 | $ | (1,343,864) | $ 708,471 |
| Stock issued for cash | - | | - | - | | - | | - | | - | - |
| Stock issued for professional services | - | | - | 3,550,000 | | 355 | | 255,642 | | - | 255,997 |
| Net loss | - | | - | - | | - | | - | | (311,715) | (311,715) |
| Balance, December 31, 2019 | 40,000,000 | | 4,000 | 65,784,086 | | 6,578 | | 2,297,754 | | (1,655,579) | 652,753 |
| Stock issued for cash | - | | - | - | | - | | - | | - | - |
| Stock issued for professional services | - | | - | - | | - | | - | | - | - |
| Net loss | - | | - | - | | - | | - | | (46,406) | (46,406) |
| Balance, June 30, 2020 | 40,000,000 | $ | 4,000 | 65,784,086 | $ | 6,578 | $ | 2,297,754 | $ | (1,701,985) | $ 606,347 |

*The accompanying notes are an integral part of these unaudited consolidated financial statements.*

G.  Financial Notes

**NOTE 1 - Organization and Basis of Presentation**

Organization and Line of Business

Vemanti Group, Inc., ("Vemanti") was incorporated on April 3, 2014 under the laws of the state of Nevada. VoiceStep Telecom, LLC, a California limited liability company, was formed on January 27, 2005 and originally founded in 2002 ("VoiceStep"). On April 3, 2014, the sole member of VoiceStep exchanged 100% of his membership interest in VoiceStep for 40,000,000 shares of Vemanti's common stock and 40,000,000 shares of Vemanti's preferred stock. Vemanti and its wholly-owned subsidiaries, VoiceStep and MedicatedOne, are hereafter referred to as the "Company." The Company closed MedicatedOne during the second quarter of 2017. On July 10, 2018, the Company entered into an investment agreement with Fvndit, Inc. ("Fvndit") to initially take 20% ownership in the latter with warrants for more.

The Company is a technology-driven holding company that seeks to be active in high-growth and emerging markets. Its core strengths are in technology development and investment. It drives growth through acquisition and investment in disruptive and foundational technologies by targeting early-stage companies that have market viable products or by starting a new subsidiary of its own. Strategically, it focuses mainly on blockchain projects and applications combined with other emerging technologies, including machine learning/AI, security and internet of things (IoT).

Going forward, the Company plans to expand its strategy by identifying and adding innovative fintech businesses at good value to its portfolio as well as slowly establishing holdings in commodities such as previous metals and cryptocurrencies that can serve as a source of long-term returns and a diversifier to mitigate losses in times of market stress. Ultimately, its goal is to be a multi-asset holding and investment company focused on the emerging markets of Vietnam and other ASEAN countries where the economic force is projected to be a strong driver of global growth for the next 50 years.

**NOTE 2 – Summary of Significant Accounting Policies**

Basis of Presentation

The consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

Principles of Consolidation

The accompanying unaudited consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries, VoiceStep and MedicatedOne. All significant intercompany transactions and balances have been eliminated.

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates made by management include, among others, revenue recognition. Actual results could differ from those estimates. It is possible that accounting estimates and assumptions may be material to the Company due to the levels of subjectivity and judgment involved.

Cash and Cash Equivalents

Cash and cash equivalents include cash on hand and cash in time deposits, certificates of deposit, and all highly liquid debt instruments with original maturities of three months or less. As of June 30, 2020 and December 31, 2019, the Company had no cash equivalents.

Accounts Receivable

The Company regularly reviews collectability and establishes an allowance for doubtful accounts as necessary using the allowance method. The receivables are not collateralized.

The Company estimates the ability to collect receivables by performing ongoing credit evaluations of its customers' financial condition. Estimates are based on assumptions and other considerations, including payment history, credit ratings, customer financial performance, industry financial performance and aging analysis. The Company reviews its accounts receivable by aging category and to identify customers with known disputes or collection issues. In determining the allowance, the Company makes judgments about the creditworthiness of a majority of its customers based on ongoing credit evaluations. The Company also considers its historical level of credit losses and current economic trends that might impact the level of future credit losses. Accounts receivable are written-off when they are deemed uncollectible.

Equipment

Equipment is stated at cost. Expenditures for maintenance and repairs are charged to earnings as incurred; additions, renewals and betterments are capitalized. When equipment is retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts, and any gain or loss is included in operations. Depreciation of equipment is provided using the straight-line method for substantially all assets with estimated lives as follows:

| | |
|---|---|
| Software licenses | 5 years |
| Computer equipment | 5 years |

Long-Lived Assets

The Company applies the provisions of ASC Topic 360, *Property, Plant, and Equipment*, which addresses financial accounting and reporting for the impairment or disposal of long-lived assets. ASC 360 requires impairment losses to be recorded on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. In that event, a loss is recognized based on the amount by which the carrying amount exceeds the fair value of the long-lived assets. Loss on long-lived assets to be disposed of is determined in a similar manner, except that fair values are reduced for the cost of disposal. Based on its review at June 30, 2020 and December 31, 2019, the Company believes there was no impairment of its long-lived assets.

Revenue Recognition

The Company recognizes revenues derived from sub-leasing telecommunications infrastructure and the provision of telecommunications and colocation services when the service has been provided and when there is persuasive evidence of an arrangement, the fee is fixed or determinable, and collection of the receivable is reasonably assured. Taxes collected from customers and remitted to a governmental authority are reported on a net basis and are excluded from revenue. Most revenue is billed in advance on a fixed-rate basis. The remainder of revenue is billed in arrears on a transactional basis determined by customer usage.

The Company often bills customers for upfront charges. These charges relate to down payments or prepayments for future services or equipment and are influenced by various business factors including how the Company and customer agree to structure the payment terms. These payments are recognized as deferred revenue until the service is provided or equipment is delivered and installed. All ongoing fees are billed and recognized as revenue on a monthly basis as service is provided.

Stock-Based Compensation

The Company records stock-based compensation in accordance with FASB ASC Topic 718, *Compensation – Stock Compensation*. FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at FV at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date FV of stock options and other equity-based compensation issued to employees and non-employees.

Income Taxes

The Company accounts for income taxes in accordance with ASC Topic 740, *Income Taxes*. ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. The adoption had no effect on the Company's consolidated financial statements.

Basic and Diluted Earnings Per Share

Earnings per share is calculated in accordance with ASC Topic 260, *Earnings Per Share*. Basic earnings per share ("EPS") is based on the weighted average number of common shares outstanding. Diluted EPS is based on the assumption that all dilutive convertible shares and stock warrants were converted or exercised. Dilution is computed by applying the treasury stock method. Under this method, options and warrants are assumed to be exercised at the beginning of the period (or at the time of issuance, if later), and as if funds obtained thereby were used to purchase common stock at the average market price during the period. There are no potentially dilutive securities outstanding during any periods presented.

Fair Value Measurements

The Company applies the provisions of ASC 820-10, *"Fair Value Measurements and Disclosures."* ASC 820-10 defines fair value, and establishes a three-level valuation hierarchy for disclosures of fair value measurement that enhances disclosure requirements for fair value measures. The three levels of valuation hierarchy are defined as follows:

- Level 1 inputs to the valuation methodology are quoted prices for identical assets or liabilities in active markets.

- Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- Level 3 inputs to the valuation methodology are unobservable and significant to the fair value measurement.

For certain financial instruments, the carrying amounts reported in the balance sheets for cash and current liabilities, including convertible notes payable, each qualify as financial instruments and are a reasonable estimate of their fair values because of the short period of time between the origination of such instruments and their expected realization and their current market rate of interest.

At June 30, 2020 and December 31, 2019, the Company did not identify any assets or liabilities that are required to be presented on the balance sheet at fair value.

Recently Adopted Accounting Standards

In May 2014, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) No. 2014-09, *Revenue from Contracts with Customer*s (Topic 606). ASU 2014-09 clarifies the principles for recognizing revenue

and develops a common revenue standard for U.S. GAAP and International Financial Reporting Standards that removes inconsistencies and weaknesses in revenue requirements, provides a more robust framework for addressing revenue issues, improves comparability of revenue recognition practices across entities, industries, jurisdiction, and capital markets, provides more useful information to users of financial statements through improved disclosure requirements and simplifies the preparation of financial statements by reducing the number of requirements to which an entity must refer. The guidance is effective for annual reporting periods beginning after December 15, 2018. The Company adopted this guidance at the beginning of 2019 using the modified retrospective method. The Company determined there was no impact on its consolidated financial statements and disclosures.

Recent Authoritative Guidance

In February 2017, the FASB issued ASU No. 2017-02, *Leases* (Topic 842). Under the new guidance, lessees will be required to recognize the following for all leases (with the exception of short-term leases) at the commencement date:

- A lease liability, which is the lessee's obligation to make lease payments arising from a lease, measured on a discounted basis; and
- A right-of-use asset, which is an asset that represents the lessee's right to use, or control the use of, a specified asset for the lease term.

Under the new guidance, lessor accounting is largely unchanged.  Certain targeted improvements were made to align, where necessary, the lessor's accounting with the lessee's accounting model and Topic 606, *Revenue from Contracts with Customers.*

The new lease guidance simplified the accounting for sale and leaseback transactions primarily because lessees must recognize lease assets and lease liabilities.  Lessees will no longer be provided with a source of off-balance sheet financing.

Nonpublic business entities should apply the amendments for fiscal years beginning after December 15, 2019 (i.e., January 1, 2020, for a calendar year entity), and interim periods within fiscal years beginning after December 15, 2020. Early application is permitted for all public business entities and all nonpublic business entities upon issuance.

Lessees (for capital and operating leases) and lessors (for sales-type, direct financing, and operating leases) must apply a modified retrospective transition approach for leases existing at, or entered into after, the beginning of the earliest comparative period presented in the consolidated financial statements. The modified retrospective approach would not require any transition accounting for leases that expired before the earliest comparative period presented. Lessees and lessors may not apply a full retrospective transition approach.  The Company intends to adopt this guidance at the beginning of is fiscal year 2020 and is currently evaluating the impact on its consolidated financial statements and disclosures.

Management does not believe any other recently issued but not yet effective accounting pronouncement, if adopted, would have a material impact effect on the Company's present or future financial statements.

**NOTE 3 – Digital Assets**

The following represents the change in digital assets:

|  | Six Months Ended June 30, 2019 Cryptocurrencies |
| --- | --- |
| Beginning balance | $ 4,255 |
| Realized gain | 5,087 |
| Transfer of cryptocurrencies | (9,342) |
| Ending balance | $ - |

In May 2019, the Company's entire digital assets balance was used to pay a contractor for services rendered.

**NOTE 4 – Equipment**

Equipment at June 30, 2019 and December 31, 2018 consisted of the following:

|  | | June 30, 2020 | | December 31, 2019 |
|---|---|---:|---|---:|
| Software licenses | $ | 32,188 | $ | 32,188 |
| Computer equipment | | 17,080 | | 17,080 |
| | | 49,268 | | 49,268 |
| Less accumulated depreciation | | (47,524) | | (47,153) |
| Equipment, net | $ | 1,744 | $ | 2,114 |

Depreciation expense was $370 for both the six months ended June 30, 2020 and 2019.

**NOTE 5 – Stockholders' Equity**

Members' Interest

VoiceStep is governed by the terms and conditions of the Limited Liability Company Agreement (the Agreement) dated May 3, 2005, as amended on January 27, 2014. VoiceStep shall continue until terminated in accordance with the terms of the Agreement or as provided by law, including events of dissolution. VoiceStep shall be dissolved only upon any of the following events: (i) the vote of Member(s) holding a majority to the dissolution and winding up of VoiceStep, (ii) the entry of a decree of judicial dissolution of VoiceStep and (iii) at any time there are no Member(s), subject to remedy within 90 days of occurrence of termination event by the last remaining Member in writing.

VoiceStep originally consisted of two Members each owning 50% of VoiceStep. On January 27, 2014, one of the members was bought out with the remaining member owning 100% of the membership interest in VoiceStep. On April 3, 2014, the remaining member exchanged his 100% interest in VoiceStep for 40,000,000 shares of Vemanti common stock.

Preferred stock

The Company has authorized the issuance of 50,000,000 shares of preferred stock, $0.0001 par value. At both June 30, 2020 and December 31, 2019, the Company had 40,000,000 shares of preferred stock issued and outstanding. (See Note 1)

Common stock

The Company has authorized the issuance of 500,000,000 shares of common stock, $0.0001 par value. At June 30, 2020 and December 31, 20119, the Company had 65,784,086 and 65,784,086 shares of common stock issued and outstanding, respectively.

During the year ended December, 2019, the Company issued 3,550,000 shares of its common stock with a fair value of $255,997 to consultants for services rendered.

During the tsix months ended June 30, 2020, the Company did not issue any common stock.

**NOTE 6 – Investment in Chopp, Inc.**

On July 17, 2018, the Company made a $25,000 Keep It Simple Security ("KISS") investment in Chopp, Inc. ("Chopp"), a Delaware-registered online logistics company that currently operates as a same-day e-grocery delivery service.

In June 2019, the Company cancelled its investment in Chopp, Inc. and received repayment of its $25,000 investment.

**NOTE 7 – Investment in Fvndit, Inc. (formerly Directus Holdings, Inc.)**

On November 13, 2018, the Company purchased a 20% investment in Directus Holdings, Inc., which owns eLoan, JSC ("eLoan"), a fintech company based in Vietnam, for $300,000. Half of the investment was made through a cash payment of $150,000, and the remaining half of the investment was made through the issuance of 1,252,086 shares of Vemanti Group's common stock to the Founders of eLoan. On December 19, 2018, Directus Holdings, Inc. filed a Certificate of Amendment to Articles of Incorporation to the State of Nevada for its corporation name to be changed to Fvndit, Inc.

**NOTE 8 – Loan to Fvndit, Inc.**

On August 9, 2019, the Company entered into an agreement to lend $200,000 to Fvndit, Inc. ("Fvndit") for the purpose of developing a peer-to-peer business lending platform operating in Vietnam catering to the Small and Mid-size Enterprises (SMEs).  The annual interest rate on the loan is 10.5% payable monthly to the Company. On August 12, 2019, Fvndit drawn down the full $200,000.00.  On May 28, 2020 Fvndit repaid $100,000 to the Company.  The outstanding balance of the loan became $100,000 after that date.

**5)      Issuer's Business, Products and Services**

The purpose of this section is to provide a clear description of the issuer's current operations.  In answering this item, please include the following:

A.   Summarize the issuer's business operations (If the issuer does not have current operations, state "no operations")

The Company is a technology-driven holding company that seeks to be active in high-growth and emerging markets. Its core strengths are in technology development and investment. It drives growth through acquisition and investment in disruptive and foundational technologies by targeting early-stage companies that have market viable products or by starting a new subsidiary of its own. Strategically, it focuses mainly on Financial Technology (fintech) platforms combined with other emerging technologies, including blockchain and machine learning/AI (artificial intelligence).

B.   Describe any subsidiaries, parents, or affiliated companies, if applicable, and a description of their business contact information for the business, officers, directors, managers or control persons. Subsidiary information may be included by reference

Vemanti Group, Inc., ("Vemanti") was incorporated on April 3, 2014 under the laws of the state of Nevada. VoiceStep Telecom, LLC, a California limited liability company, was formed on January 27, 2005 and originally founded in 2002 ("VoiceStep"). On April 3, 2014, the sole member of VoiceStep exchanged 100% of his membership interest in VoiceStep for 40,000,000 shares of Vemanti's common stock and 40,000,000 shares of Vemanti's preferred stock. Vemanti and its wholly-owned subsidiaries, VoiceStep, are hereafter referred to as the "Company."

Contact Information:        Vemanti Group, Inc.
                            7545 Irvine Center Dr., Ste. 200
                            Irvine, CA 92618
                            Tel: 1.949.559.7200
                            Fax: 1.949.559.7201
                            Email: info@vemanti.com
                            Website: https://vemanti.com

C.   Describe the issuers' principal products or services, and their markets

Currently, the Company conducts these products and services through its subsidiaries:

   1)  VoiceStep Telecom, LLC ("VoiceStep") is a one-stop resource for IP-based business communication services
       to small-to-medium (SMB) business customers based in the US.

VoiceStep's current core products are:

• Business-class VOIP cloud phone system (a/k/a "Hosted PBX") and
• Carrier-class domestic/international origination and termination.
• Essential business communications tools and applications such as fax, SMS (texting), call conferencing, and call center.

VoiceStep operates in a variety of industries including advertising, consulting, finance, healthcare, legal, real estate, retail, and technology industries through its direct sales representatives and resellers. All are on a monthly recurring service plan.

2) Fvndit, Inc. ("Fvndit") is a USA- and Vietnam-based fintech company, focused on solving the working capital problem for SMEs. Fvndit was founded in 2018 and is fully operational. The team comprises of software engineers, UX/UI designers, data analytics experts, trade finance analysts, and banking veterans across 2 locations: Irvine, CA and HCMC, Vietnam. Trade finance is an age-old industry dominated by banks that focus on large, established corporate customers. Fvndit is using technology to re-build core parts of the business funding infrastructure and make the underwriting and financing seamless for small businesses. Its main product is short-term business financing based on accounts receivable and inventory. Its wholly-owned subsidiary eLoan (https://eloan.vn) operates an online Peer-to-Peer (P2P) funding and investing marketplace in Vietnam. eLoan was launched in late 2017 and has facilitated over $15M USD in loan disbursements. Fvndit's mission is to make credit more simple for entrepreneurs and investing more rewarding for investors. Looking ahead, the Company is aiming to offer additional SME-focused financial products and services in Vietnam as well as in other countries in SE Asia where economic growth is expected to remain strong for decades to come. Its goal is to level the playing field for small businesses located in emerging markets and to provide them with simplified financial services at the click of a button.

## 6) Issuer's Facilities

The Company operates under a shared-workspace environment with Regus in Irvine, CA and Newport Beach, CA. Its official mailing address is 7545 Irvine Center Dr., Ste. 200, Irvine, CA 92618, USA. The Company does not own or have any mortgages on this or any other facilities. All employees, including the officers and directors, are working remotely in a distributed workforce setup via the use of virtual office technologies.

## 7) Officers, Directors, and Control Persons

| Name of Officer/Director and Control Person | Affiliation with Company (e.g. Officer/Director/Owner of more than 5%) | Residential Address (City / State Only) | Number of shares owned | Share type/class | Ownership Percentage of Class Outstanding | Note |
|---|---|---|---|---|---|---|
| Tan Tran | CEO | Irvine, CA | 28,650,000 | Common | 45.81% | _____ |
| Tan Tran | CEO | Irvine, CA | 40,000,000 | Preferred | 80.00% | _____ |
| Rachel Boulds | CFO | Murray, UT | 0 | 0 | 0 | _____ |
| Phoebe Pham | Secretary & Treasurer | Irvine, CA | 0 | 0 | 0 | _____ |
| Richard Oravec | Director | New York, NY | 0 | 0 | 0 | _____ |
| Fred Thiel | Director | Dana Point, CA | 0 | 0 | 0 | _____ |

| | | | | | | |
|---|---|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ | _____ | _____ |

As of June 30, 2020, there are no other control persons of more than five percent of any class of the Company's securities.

## 8)    Legal/Disciplinary History

A.  Please identify whether any of the persons listed above have, in the past 10 years, been the subject of:

1.  A conviction in a criminal proceeding or named as a defendant in a pending criminal proceeding (excluding traffic violations and other minor offenses);

    None

2.  The entry of an order, judgment, or decree, not subsequently reversed, suspended or vacated, by a court of competent jurisdiction that permanently or temporarily enjoined, barred, suspended or otherwise limited such person's involvement in any type of business, securities, commodities, or banking activities;

    None

3.  A finding or judgment by a court of competent jurisdiction (in a civil action), the Securities and Exchange Commission, the Commodity Futures Trading Commission, or a state securities regulator of a violation of federal or state securities or commodities law, which finding or judgment has not been reversed, suspended, or vacated; or

    None

4.  The entry of an order by a self-regulatory organization that permanently or temporarily barred, suspended, or otherwise limited such person's involvement in any type of business or securities activities.

    None

B.  Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the issuer or any of its subsidiaries is a party or of which any of their property is the subject. Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought. Include similar information as to any such proceedings known to be contemplated by governmental authorities.

    None

## 9)    Third Party Providers

Please provide the name, address, telephone number and email address of each of the following outside providers:

Securities Counsel

| | |
|---|---|
| Name: | Matt McMurdo, Esq. |
| Firm: | McMurdo Law Group, LLC |
| Address 1: | 1185 Avenue of the Americas, 3rd Floor |
| Address 2: | New York, NY 10036 |
| Phone: | 917-318-2865 |
| Email: | matt@nannaronelaw.com |

Accountant or Auditor

| | |
|---|---|
| Name: | Catherine Doll |

| | |
|---|---|
| Firm: | The Gilson Group, LLC |
| Address 1: | 31878 Del Obispo St. Suite 118-615 |
| Address 2: | San Juan Capistrano, CA 92675 |
| Phone: | 949-464-4550 |
| Email: | catherine@thegilsongroup.com |

Investor Relations Consultant

| | |
|---|---|
| Name: | Richard Oravec |
| Firm: | PIVO Associates |
| Address 1: | 277 West 11th Street, Suite 2F |
| Address 2: | New York, NY 10014 |
| Phone: | 212-924-3548 |
| Email: | roravec@mac.com |

Other Service Providers

Provide the name of any other service provider(s), including, counsel, advisor(s) or consultant(s) **that assisted, advised, prepared or provided information with respect to this disclosure statement**, or provided assistance or services to the issuer during the reporting period.

| | |
|---|---|
| Name: | _____ |
| Firm: | _____ |
| Nature of Services: | _____ |
| Address 1: | _____ |
| Address 2: | _____ |
| Phone: | _____ |
| Email: | _____ |

| | |
|---|---|
| Name: | _____ |
| Firm: | _____ |
| Nature of Services: | _____ |
| Address 1: | _____ |
| Address 2: | _____ |
| Phone: | _____ |
| Email: | _____ |

## 10)    Issuer Certification

*Principal Executive Officer:*

The issuer shall include certifications by the chief executive officer and chief financial officer of the issuer (or any other persons with different titles but having the same responsibilities).

The certifications shall follow the format below:

I, Tan Tran certify that:

1. I have reviewed this Quarterly Report of Vemanti Group, Inc.;

2. Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and

3. Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this disclosure statement.

08/05/2020 [Date]

/s/ Tan Tran [CEO's Signature]

(Digital Signatures should appear as "/s/ [OFFICER NAME]")


*Principal Financial Officer:*

I, **Tan Tran** certify that:

1. I have reviewed this Quarterly Report of Vemanti Group, Inc.;

2. Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and

3. Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this disclosure statement.

08/05/2020 [Date]

**/s/ Tan Tran** [CEO's Signature]

(Digital Signatures should appear as "/s/ [OFFICER NAME]")

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

BARINDER SINGH "NABE" BAL,

Plaintiff,

v.

TAN TRAN, an individual; and VEMANTI GROUP, INC.,
a Nevada corporation,

Defendants.

Case No. _____

# EXHIBIT T

Summary (Fed. R. Evid. 1006) of Reported Beneficial Ownership and Share
Structure — Vemanti Group, Inc., 2016–2017 Pre-In-Scope Period

**Summary of Reported Beneficial Ownership and Share Structure**

*Vemanti Group, Inc. (OTC: VMNT) — 2016–2017 Pre-In-Scope Period*

Offered under Federal Rule of Evidence 1006 as a summary of the OTC Markets disclosure filings reproduced in relevant part at Exhibit R, which remain available for examination. Every figure below is drawn from those filings at the page cited in the Source column (R-n.2 = Securities Information, Section 3; R-n.3 = Issuance History, Section 4; R-n.4 = Beneficial Shareholders, Section 8/8C). Figures marked with an asterisk (*) are addressed in the note immediately following the table.

| Filing (period end / filed) | Common Outstanding | Non-Restricted | Tan Tran Common | Tan Tran Preferred | Holders of Record | Source (Exh. R) |
|---|---|---|---|---|---|---|
| Q1 2016 3/31/16 · 6/1/16 | 42,470,000 | — | 40,000,000 (95.3%)* | Not disclosed | — | R-1.2 / .4 |
| Q2 2016 6/30/16 · 8/17/16 | 44,470,000 | — | 30,639,830* (68.9%) | Not disclosed | — | R-2.2 / .4 |
| Q3 2016 9/30/16 · 10/31/16 | 45,020,000 | 4,710,000 | 31,000,000 (68.93%) | 40,000,000 (80.00%) | 49 | R-3.2 / .4 |
| Annual 2016 12/31/16 · 2/8/17 | 45,270,000 | 5,030,000 | 27,600,000 (60.96%) | 40,000,000 (80.00%) | 53 | R-4.2 / .4 |
| Q1 2017 3/31/17 · 6/1/17 | 45,370,000 | 5,030,000 | 25,100,000 (55.32%) | 40,000,000 (80.00%) | 348 | R-5.2 / .4 |
| Q2 2017 6/30/17 · 8/1/17 | 45,370,000 | 5,480,000 | 28,650,000 (63.15%) | 40,000,000 (80.00%) | 348 | R-6.2 / .4 |

* R-1 (Q1 2016) and R-2 (Q2 2016) report only a percentage of Tan Tran's common ownership, not an absolute share count. For Q1 2016, the figure shown is Tan Tran's founding common block of 40,000,000 shares — issued in the April 3, 2014 VoiceStep Telecom exchange itemized in Section 4 of the filings — which the issuer reported at 95.3% as of March 31, 2016 (R-1.4). For Q2 2016, the 30,639,830 figure is the issuer's reported 68.9% (R-2.4) applied to the 44,470,000 common shares then outstanding. The "80.00%" preferred figure is computed by the issuer against the 50,000,000 preferred shares authorized; against the 40,000,000 preferred shares outstanding, Tan Tran holds 100% of the outstanding preferred class.

## Facts shown by the filings (each verifiable at the cited page)

1. Reported common beneficial ownership of Tan Tran moved from 95.3% (R-1.4) to a low of 55.32% (R-5.4) and then back up to 63.15% (R-6.4). In share terms, Tan Tran's position moved from his 40,000,000-share founding common block (the April 3, 2014 VoiceStep Telecom exchange, Section 4) — which the issuer still reported at 95.3% as of March 31, 2016 (R-1.4) — down to a stated 25,100,000 shares as of March 31, 2017 (R-5.4), a decline of 14,900,000 shares measured to that trough, and then back up by 3,550,000 shares to 28,650,000 shares as of June 30, 2017 (R-6.4). The 14,900,000-share figure measures the founding-to-March-2017 trough; following the Q2 2017 rebound, Tan Tran's net pre-in-scope reduction was approximately 11,350,000 shares by June 30, 2020 and approximately 13,345,000 shares by March 24, 2022, as pleaded in the Complaint.

2. The Issuance History (Section 4) in every filing discloses no sale, transfer, disposition, buyback, cancellation, or reverse split of shares by or affecting Tan Tran. Common shares outstanding increased only through the issuances listed (for example, 2,000,000 shares for debt conversion, together with shares issued for services and one acquisition), reconciling on the face of Section 4 to 45,370,000 shares outstanding (R-6.3).

3. The non-restricted (free-trading) common stayed between 4,710,000 and 5,480,000 across every filing that reports it (R-3.2 through R-6.2), while reported holders of record rose from 49 (R-3.2) to 348 (R-5.2). During the same interval the largest single change in any holder's position was the 2,500,000-share decline in Tan Tran's

holdings between R-4.4 and R-5.4, while only 100,000 new common shares were issued (R-5.3, Section 4).

4. Between R-5 (period ended March 31, 2017) and R-6 (period ended June 30, 2017), Tan Tran's reported common position increased by 3,550,000 shares (R-5.4 to R-6.4) even though Section 4 discloses no shares issued after February 6, 2017 (R-6.3) and holders of record remained 348 (R-5.2, R-6.2).

5. A class of 40,000,000 Preferred (Class A) shares is reported outstanding, all held by Tan Tran, beginning with the filing for the period ended September 30, 2016 (R-3.2, R-3.4) and unchanged through June 30, 2017 (R-6.4). The two earlier filings state "Additional class of securities: Not Applicable" (R-1.2, R-2.2). The Section 4 issuance history describes the April 3, 2014 VoiceStep Telecom exchange as issuing "Common and Preferred" shares (R-3.3), placing the existence of the preferred class within the periods covered by R-1 and R-2.

*This summary organizes figures stated in the underlying filings; it draws no legal conclusion. The filings themselves appear in relevant part at Exhibit R.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

**BARINDER SINGH "NABE" BAL,**
        Plaintiff,

        v.

**TAN TRAN, an individual; and VEMANTI GROUP, INC.,**
**a Nevada corporation,**
        Defendants.

Case No. _____

# EXHIBIT U

**Summary (Fed. R. Evid. 1006) of Reported and Unreported Changes in the Beneficial Ownership of Tan Tran and the Status of His Section 13(d) and Section 16(a) Reporting — Vemanti Group, Inc., June 9, 2021 – October 24, 2023**

# EXHIBIT U

**Summary of Reported and Unreported Changes in Beneficial Ownership and Reporting Status**

**Tan Tran — Vemanti Group, Inc. (OTC: VMNT) — June 9, 2021 through October 24, 2023**

Offered under Federal Rule of Evidence 1006 as a summary of the U.S. Securities and Exchange Commission filings reproduced in relevant part at Exhibit E (Schedule 13D, filed July 7, 2021), Exhibit F (the five Form 4 filings of July 2021), Exhibit G (the FY2021 Form 10-K, filed March 24, 2022), and Exhibit N (Schedule 13D/A, Amendment No. 1, filed October 24, 2023), each of which remains available for examination. Every share figure below is either stated in those filings at the source cited or arithmetically derived from balances stated in them, as indicated. Figures marked with an asterisk (*) or double asterisk (**) are addressed in the notes immediately following the table.

| Date | Event | Tan Tran common (% of class) | Change (shares) | Reporting status | Source |
|---|---|---|---|---|---|
| June 9, 2021 (event date); filed July 7, 2021 | Original Schedule 13D — reporting baseline | 27,350,000 (39.3% of 69,564,086) | — | Schedule 13D filed | Ex. E |
| June 9 – July 5, 2021 | Window 1 — undisclosed dispositions | 27,342,150* | −7,850* | No Form 4 filed | Ex. F * |
| July 6 – 29, 2021 | 74 sale transactions reported across five Form 4s (filed July 12, 20, 22, 23, and 29, 2021) | 27,152,835 | −189,315 | Reported on Form 4 | Ex. F |
| After July 29, 2021 | Tan Tran ceases all Form 4 filing for the remainder of the in-scope period | — | — | No further Form 4 filed | Ex. F |
| July 30, 2021 – Mar. 24, 2022 | Window 2 — undisclosed dispositions | 26,655,000* | −497,835* | No Form 4 filed; no Schedule 13D/A filed | Ex. G * |
| March 24, 2022 | FY2021 Form 10-K beneficial-ownership table, Item 12 | 26,655,000 (37.3% of 71,519,830) | — | Disclosed only in 10-K table | Ex. G (Item 12, p. 48) |
| Sept. 20, 2023 (triggering event); filed Oct. 24, 2023 | Schedule 13D/A (Amendment No. 1) — first amendment, filed approximately 27 months after the original Schedule 13D | 26,655,000** (37.89%) | — | First and only Schedule 13D amendment | Ex. N |

* Window 1 and Window 2 are not separately itemized on any Form 4 or other filing; the share counts are derived from the reported balances on either side. Per Exhibit F, Tan Tran's reported common holding was 27,342,150 shares immediately before the first reported sale on July 6, 2021, and 27,152,835 shares immediately after the last reported sale on July 29, 2021. Thus 27,350,000 (Ex. E) − 27,342,150 (Ex. F) = 7,850 shares (Window 1), and 27,152,835 (Ex. F) − 26,655,000 (Ex. G) = 497,835 shares (Window 2). Total undisclosed dispositions = 505,685 shares.

** The Schedule 13D/A cover page states 26,665,000 shares while Item 5 of the same filing states 26,655,000 shares; the ten-share discrepancy appears in the filing as filed and is addressed at Exhibit N. The Item 5 figure (26,655,000) is used here, consistent with the FY2021 Form 10-K (Ex. G). Item 5 of the Schedule 13D/A reports this position as held 20,155,000 shares directly by Tan Tran, 3,250,000 shares by his wife, Phoebe Tran, and 3,250,000 shares by his son, Jacob Tran.

**Facts shown by the filings (each verifiable at the cited source)**

1. Net reduction. Tan Tran's reported common beneficial ownership fell by 695,000 shares — from 27,350,000 shares as of June 9, 2021 (Ex. E) to 26,655,000 shares as of March 24, 2022 (Ex. G) — a decline of approximately 1.0% of the common stock then outstanding, and a decline from 39.3% to 37.3% of the class.

2. Reported versus unreported. Of that 695,000-share reduction, only 189,315 shares — the 74 transactions executed July 6 through July 29, 2021 — were reported on any Form 4 (Ex. F). The remaining 505,685 shares were disposed of without any Form 4: 7,850 shares before the first reported transaction (June 9 – July 5, 2021) and 497,835 shares after the last reported transaction (July 30, 2021 – March 24, 2022).

3. Cessation of Form 4 filing. Tan Tran filed no Form 4 of any kind after July 29, 2021 (Ex. F) for the remainder of the in-scope period.

4. Absence of any Schedule 13D amendment for approximately twenty-seven (27) months. Between the original Schedule 13D filed July 7, 2021 (Ex. E) and Amendment No. 1 filed October 24, 2023 (Ex. N), Tan Tran filed no amendment to his Schedule 13D, notwithstanding the 695,000-share reduction summarized above.

5. Content of the eventual amendment. The Schedule 13D/A filed October 24, 2023 reported Tan Tran's common position as divided among Tan Tran (20,155,000 shares), his wife, Phoebe Tran (3,250,000 shares), and his son, Jacob Tran (3,250,000 shares) (Ex. N).

This summary organizes figures stated in, or arithmetically derived from, the underlying filings; it draws no legal conclusion. The filings themselves appear at Exhibits E, F, G, and N.